JOSEPH HARRINGTON
Acting United States Attorney
Eastern District of Washington
Stephanie Van Marter
Caitlin Baunsgard
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

APR 2 5 2017

SEAN F. McAVOY, CLERK
_____ DEPUTY
RICHLAND, WASHINGTON

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FRANCISCO DUARTE FIGUEROA,

Defendant.

)
)
)
)
)
)
)
)
)
)
)

4:15-CR-6049-EFS-6

Plea Agreement

Plaintiff, United States of America, by and through Joseph Harrington, Acting United States Attorney for the Eastern District of Washington, and Stephanie Van Marter, Assistant United States Attorney for the Eastern District of Washington, and Defendant FRANCISCO DUARTE FIGUEROA, and the Defendant's counsel, Rick L. Hoffman, agree to the following Plea Agreement:

1.    Guilty Plea and Maximum Statutory Penalties:

The Defendant, FRANCISCO DUARTE FIGUEROA, agrees to enter a plea of guilty to Count 15 of the Second Superseding Indictment filed on December 6, 2016, charging the Defendant with Possession with the Intent to Distribute 1 Kilogram or More of a Mixture or Substance Containing Heroin and

Plea Agreement - 1
Plea 2.docx

400 grams or More of a Mixture or Substance Containing N-phenyl-N Propanamide, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(i), (vi).

The Defendant, FRANCISCO DUARTE FIGUEROA, understands that the charge contained in the Superseding Indictment is a Class A felony charge. The Defendant, FRANCISCO DUARTE FIGUEROA, also understands that the maximum statutory penalty for Possession with the Intent to Distribute 1 Kilogram or More of a Mixture or Substance Containing Heroin and 400 grams or More of a Mixture or Substance Containing N-phenyl-N Propanamide, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(i), (vi), is not less than 10 years imprisonment, which is non-suspendable and non-parolable, and a maximum possible penalty of life imprisonment; a fine not to exceed $10,000,000; a term of supervised release of not less than 5 years up to a life term; denial of certain federal benefits; *Deportation,* and a $100 special penalty assessment.

The Defendant, FRANCISCO DUARTE FIGUEROA, understands that a violation of a condition of supervised release carries an additional penalty of re-imprisonment for all or part of the term of supervised release without credit for time previously served on post-release supervision.

2.    Denial of Federal Benefits:

The Defendant understands that by entering this plea of guilty the Defendant is no longer eligible for assistance under any state program funded under part A of title IV of the Social Security Act (concerning Temporary Assistance for Needy Families) or benefits under the food stamp program or any state program carried out under the Food Stamp Act. 21 U.S.C. § 862a. Further, the Court may deny the Defendant's eligibility to any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States.  21 U.S.C. § 862.

Plea Agreement - 2
Plea 2.docx

3.    The Court is Not a Party to the Agreement:

The Court is not a party to this Plea Agreement and may accept or reject this Plea Agreement. Sentencing is a matter that is solely within the discretion of the Court. The Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by the Defendant; that the Court will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in this Plea Agreement.

The Defendant acknowledges that no promises of any type have been made to the Defendant with respect to the sentence the Court will impose in this matter. The Defendant understands that the Court is required to consider the applicable sentencing guideline range, but may depart upward or downward under the appropriate circumstances.

The Defendant also understands that should the sentencing judge decide not to accept any of the parties' recommendations, that decision is not a basis for withdrawing from this Plea Agreement or a basis for withdrawing his plea of guilty.

4.    Effect on Immigration Status:

The Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the Defendant is pleading guilty.  Indeed, because the Defendant is pleading guilty to Possession with the Intent to Distribute 1 Kilogram or More of a Mixture or Substance Containing Heroin and 400 grams or More of a Mixture or Substance Containing N-phenyl-N Propanamide, in violation of 21

Plea Agreement - 3
Plea 2.docx

U.S.C. § 841(a)(1), (b)(1)(A)(i), (vi), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that while deportation and/or removal appears to be a virtual certainty, no one, including his attorney or the district court, can predict with absolute certainty the effect of his conviction on his immigration status. The Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if automatic removal from the United States is a virtual certainty.

5. <u>Waiver of Constitutional Rights:</u>

The Defendant, FRANCISCO DUARTE FIGUEROA, understands that by entering this plea of guilty the Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

(a). The right to a jury trial;

(b). The right to see, hear and question the witnesses;

(c). The right to remain silent at trial;

(d). The right to testify at trial; and

(e). The right to compel witnesses to testify.

While the Defendant is waiving certain constitutional rights, the Defendant understands the Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if the Defendant cannot afford to hire an attorney. The Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

6. <u>Elements of the Offense:</u>

The United States and the Defendant agree that in order to convict the Defendant of Possession with the Intent to Distribute 1 Kilogram or More of a

Plea Agreement - 4
Plea 2.docx

Mixture or Substance Containing Heroin and 400 grams or More of a Mixture or Substance Containing N-phenyl-N Propanamide, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), (vi), the United States would have to prove beyond a reasonable doubt the following elements:

> *First*, on or about August 15, 2016, in the Eastern District of Washington, the Defendant, FRANCISCO DUARTE FIGUEROA, knowingly possessed a mixture or substance containing a detectable amount of heroin and fentanyl (N-phenyl-N Propanamide);

> *Second*, the defendant possessed it with the intent to deliver it to another person; and

> *Third*, the Defendant possessed 1 kilograms or more of a mixture or substance containing a detectable amount of heroin~~heorin~~ and 400 grams or More of a Mixture or Substance Containing N-phenyl-N Propanamide.

7.    <u>Factual Basis and Statement of Facts</u>:

The United States and the Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis FRANCISCO DUARTE FIGUEROA's guilty plea. This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

Members of the FBI Eastern Washington Safe Streets Violent Gang Task Force- Tri-Cities (EWVGSSTF) have been investigating a transnational drug trafficking organization operating herein the Eastern District of Washington and elsewhere since at least 2011.  During that investigation, Jese David Carillo Casillas (hereafter Jese/Casillas) was identified as a high-ranking member of this

Plea Agreement - 5
Plea 2.docx

organization, first identified in the spring of 2015. In addition to Casillas, the Defendant was identified during the course of this investigation as a member of this DTO working directly with Casillas in the Tri-Cities area. EWVGSSTF has also been utilizing a Confidential Human Source (hereinafter CHS), to investigate this transnational drug trafficking organization as this CHS has been in direct communication with several of its members to include Casillas.

By way of background, on approximately April 15th 2015, the CHS spoke with TFO Whitby and advised an individual named "Jese" contacted the CHS and told the CHS that Jese needed the title for a previously identified load vehicle. The CHS reported that "Jese" had in the past worked for the then identified leader/organizer of this organization, Ivan Calvillo (hereafter Ivan) who fled to Mexico from the EDWA in 2011.

Since that time through physical and electronic surveillance, members of the EWVGSSTF identified Casillas' residence as 8 N Palouse St, Kennewick WA. Other occupants of the house were unknown at that time. During this same time period (Spring 2015) the CHS, under the surveillance of members of the EWVGSSTF, met with Casillas' relative to the above described load vehicle. During that meet, the CHS advised that Casillas told the CHS he was selling methamphetamine again and had a half pound for sale. Casillas confirmed he was still working for Ivan's organization and was also looking for guns to take to Mexico for the organization.

On May 13th 2015, the CHS was again contacted by Casillas concerning a second load vehicle that was used by Ivan in the past. Casillas told the CHS he now owned that second load vehicle and needed to know where the "Clavo" (hidden compartment) was located inside the vehicle. On May 23rd 2015, Casillas spoke with the CHS telling the CHS that Casillas was in contact with

Plea Agreement - 6
Plea 2.docx

Ivan who wanted Casillas to travel to California to assist in transporting 7 kilos of cocaine from California to Washington. Casillas and the CHS discussed the previously aforementioned load vehicle and that the load vehicle would not be used to make the trip because the rear door to the vehicle needed be fixed.

A companion investigation in to this same DTO began in early 2014, when Ivan made contact with a DEA undercover who was allegedly operating an international investment company that was looking to make extra cash laundering money for this drug trafficking organization. Although the undercover agent was physically located in Boston, his make believe company was centered out of the Seattle, WA area primarily because Ivan and his operation was in the EDWA. All the communications between the Boston Under Cover (hereinafter BUC) and Ivan were over "What's App" and have been recorded and provided to us in discovery. As time went on, the BUC and Ivan began to have very detailed communications as to the laundering relationship. The basic need the BUC filled for the organization was his ability to accept Canadian cash, deposit it and wash it electronically through his business and then wire US currency out in smaller deposits in Mexico and the United States. The BUC would then charge a commission or percentage for the washed cash, keep that percentage and report back to Ivan and later Casillas as to the remaining amount available for wire transfer. This relationship ultimately cultivated into Ivan and the organization seeking the BUC's assistance in developing a new drug distribution group in Vancouver BC. As a result, their conversations were all centered around drug shipments and money laundering, some of which is in coded language, however after time progressed the code was sporadic. Thus, the entire premise of their business relationship was based upon the BUC's ability to launder drug money and not for any other purpose.

Plea Agreement - 7
Plea 2.docx

Between April 2014 and December 2015, Ivan was in direct communication with the BUC via recorded What's App messenger and arranged for over 13 cash money drops to be laundered by the BUC.  The amount laundered during these money drops totaled over 1.6 million in cash.  During these cash money drops, the organization would utilize a specific code system to ensure the correct people were meeting at the direction of Ivan, then Casillas and the BUC's associates.  The way the code worked was that Ivan provided the BUC a serial number of a piece of currency. The BUC would communicate that serial number so that when the two associates would meet, they would compare serial numbers.  Once that was confirmed, the money was handed off.

In approximately August 2015, Casillas was introduced to the BUC as a partner of Ivan's.  Several face-to-face meetings as well as What's App communications began to occur between the BUC and Casillas.

Ivan was murdered in Mexico on December 13, 2015.  The United States would present evidence that after Ivan was murdered, Casillas stepped in and took over all operations here in the EDWA.  Casillas also took over all communications with the BUC on the money laundering aspect as well as additional drug transaction negotiations.  During the conversations over "What's App" and their in person meets, Casillas and the undercover also discussed prices for future transactions involving narcotics. A meet was ultimately set up for Casillas to provide a "sample" to the BUC of methamphetamine for these future drug transactions.  The meet was set for May 17, 2016 in Seattle, WA.

Prior to that meet and related to this investigation, members of the EWVGSSTF identified a distributor working with Casillas in tricities, Hurtado Garcia.  In March 2016, Hurtado Garcia was arrested for his involvement in the distribution of Methamphetamine. *See*, 4:16-CR-6020-EFS. Hurtado Garcia was

Plea Agreement - 8
Plea 2.docx

to make a two-pound methamphetamine delivery to a CHS and on the day of his arrest and was driving a Jeep, which belonged to Defendant Jese Casillas[1].  As noted above, during that time, the United States had a pole camera up on Defendant Casillas' house and observed Hurtado Garcia at Casillas' house on numerous occasions to include the day of the two-pound deal.  The pole camera captured Hurtado Garcia meet with the Defendant at Jese's just prior to the two-pound delivery.  The two-pound delivery did not ultimately occur.  However, Hurtado Garcia's phone was seized and searched pursuant to search warrant.  Among the text messages recovered were messages between the Defendant and Jese Casillas, clearly establishing that Casillas was his source of supply[2].

On May 17, 2016 a meeting between Casillas and an undercover officer was set at a predetermined location near Seattle, WA for a buy of 1 kilogram of methamphetamine. During the meeting, a red 2002 Honda Accord bearing AZ plate BRJ1086, was used during the narcotics transaction. The 1 kilogram of methamphetamine was taken from the trunk of the red Honda Accord.  The driver of the red Honda Accord was not identified at the time. It was discussed that there would be future narcotics transactions between the undercover officer and Casillas. Due to the involvement of the red Honda Accord a tracker warrant, (4:16-mj-07123), was applied for and obtained on July 22, 2016.

---

1 This same vehicle was stopped just one-month prior with Defendant Juvenal Landa (4:15-6049-EFS-14) where two pounds of methamphetamine was seized from inside the vehicle.  The car was returned to Jese Casillas' wife who then returned it to Jese Casillas and ultimately it was provided to Hurtado Garcia by Casillas and the Defendant.

2 Jese is noted as "JC" in the text messages utilizing 13233266149. This number was confirmed to be utilized by Jese during this undercover investigation as the UC was in direct contact with Jese utilizing this same number.

Plea Agreement - 9
Plea 2.docx

During the months of July and August 2016, through electronic and physical surveillance, the Defendant was seen leaving and arriving at 8 N. Palouse St Kennewick, WA on an almost daily basis while driving the above referenced red 2002 Honda Accord bearing AZ plate BRJ1086.

During the end of July 2016, the DEA undercover officer advised he had several conversations with Casillas about the delivery of 10 kilograms of heroin. They discussed that the heroin would first be brought into Los Angeles CA and then transported to Washington. The DEA undercover officer advised on August 11, 2016 that there would now be 12 kilos of heroin being delivered. The DEA undercover officer later confirmed the transaction was to take place on August 15th, 2016 near Seattle WA.

During the morning of August 15, 2016 members of the EWVGSSTF were surveilling 8 N. Palouse St Kennewick, WA due to the information that the sale of the 12 kilograms of heroin would happen later that day.  At approximately 12:21 a.m., a vehicle entered the parking area behind 8 N. Palouse St, Kennewick, WA and parked in an obstructed view of the electronic surveillance. At approximately 12:55 a.m. a vehicle parked directly behind 8 N. Palouse St, Kennewick WA. Through electronic monitoring the vehicle, later identified as a silver 2014 Nissan Altima, bearing WA plate AXM8029, was still seen in the same spot later that morning.

Electronic monitoring reviewed on August 15, 2016 and physical surveillance confirmed that at approximately 7:08 a.m., a male wearing a red t-shirt, later positively identified as the Defendant, and a male wearing a white hat and gray and white striped shirt, later positively identified as Casillas, exited the rear of 8 N Palouse St Kennewick WA. The Defendant was carrying a large black duffle style bag. The Defendant and Casillas walked behind a van and Casillas

Plea Agreement - 10
Plea 2.docx

grabbed a red towel from a vehicle in the parking lot and took it to where the Defendant was last seen behind the van. At approximately 7:14 a.m. Casillas pulled the silver Nissan Altima, bearing WA plate AXM8029, behind the white van where the Defendant was last seen. Physical surveillance determined that the Defendant and Casillas were standing behind the silver Nissan Altima. The trunk was seen open through video surveillance. At approximately 7:22 a.m., the Defendant left the area in the silver Nissan Altima.

Members of the EWVGSSTF conducted physical surveillance and followed the silver Nissan Altima west onto Interstate 82 towards Seattle, WA. The physical surveillance was terminated near Benton City, WA on Interstate 82. Approximately 20-30 minutes later. The BUC contacted SA Leahy that Casillas had contacted the BUC advising that he was on his way to deliver the narcotics and requested directions on how to contact the individual taking delivery in Seattle, WA.

EWVGSSTF was working with DEA Seattle and turned over surveillance to them when once the Defendant and Casillas were believed to be on their way to Seattle.  On August 15, 2016 at approximately 1:00 pm, the silver Nissan Altima bearing WA plate AXM8029 arrived at the meet location near Seattle in tandem with a red Nissan Altima bearing WA plate AAR8958, registered to Guillermo Casillas, 1724 Nixon St Pasco, WA.  Prior to the delivery, the UC passed onto Casillas the serial number of a $1dollar bill that the parties who met were supposed to recite to one another as a code to ensure the safe delivery of the 12 kilograms to the right parties.  This same code had been utilized in the cash money drops as directed by Ivan and later Casillas.  As a result, the Defendant pulled up next to the UC vehicle and requested the dollar bill.  The UC provided the dollar bill to the Defendant, who looked at the bill, promptly tore it up and

Plea Agreement - 11
Plea 2.docx

told the UC it was in the trunk.  The UC and the Defendant went to the trunk area where the Defendant retrieved the black Adidas athletic bag and gave it to the DEA undercover[3]. Casillas was observed by surveillance a watching from a distance in the Red Nissan Altima. DEA Seattle advised that Casillas was acting as counter surveillance for the narcotics exchange. After the exchange occurred, the Defendant and Casillas were followed to a Fred Meyer at 1st Ave South and 145th St. Surveillance continued until 128th St and 1st Ave where surveillance was terminated.

The black Adidas bag contained 12 blocks that weighed approximately 1 kilogram apiece. One of the blocks was opened and field tested presumptive positive for heroin.

Based upon the above-described delivery, a search warrant was applied for and obtained for Casillas and the Defendant's residence located at 8 N. Palouse St Kennewick, WA.  See, 4:16-mj-07125.  At approximately 7:00am on August 17, 2016, the search warrant was executed at the residence.  Agents located both Casillas and the Defendant inside the residence, each occupying their own bedroom.  The Defendant was placed into custody and advised of his Miranda Rights both orally and in writing in English.  The Defendant confirmed he spoke English and understood his rights.  He agreed to waive them and be interviewed by the agents on scene.  The Defendant admitted that he had left the residence with Casillas on Monday (August 15, 2016) and that he was driving a silver vehicle.  He further acknowledged that he was given a bag to carry with him and that he delivered that bag to an individual they met in Seattle WA at the direction of Casillas. The Defendant claimed that he did not know what was inside the bag.

---

3 No money was exchanged at that time as the BUC was arranging with Casillas to wire the payments to accounts at the direction of Casillas.

Plea Agreement - 12
Plea 2.docx

He further stated that Casillas followed him over to Seattle in a separate red vehicle and that they returned to their residence that day.

During the execution of the search warrant, agents located inside Casillas' identified bedroom cellular telephones and a computer. The search of the bedroom where the Defendant was located produced a Taurus 9mm handgun, a phone, 2 laptops, specific clothing worn on the day of the narcotics transaction in Seattle, WA, documents and a white powder substance that tested presumptive positive for cocaine. The handgun was located under the mattress where the Defendant was found lying down. The search of the kitchen and living room produced two phones, approximately $2000 in US currency[4] an unknown amount of Canadian currency, and a shirt that Casillas was wearing during the narcotics transaction in Seattle, WA.

A search warrant was obtained for each electronic device seized. The search of these phones revealed a number of pertinent text messages, saved images and other confirmed connectivity between the Defendant, Casillas and several co-defendants. In addition to an analysis of the physical phones seized, an FBI analyst has conducted phone analysis regularly. The analysis shows that historically, Calvillo and Casillas have used multiple cellular phones, frequently dropping phones to prevent detection by law enforcement. However, based upon the CHS, the DEA undercover officer and other investigative efforts, law enforcement has been able to identify or has been provided most of the cellular phones utilized by Casillas. During an analysis of his phones, law enforcement has been able to identify thousands of contacts between the Defendant's

---

4 Prior to the execution of the search warrant, the BUC had wired some of the payment to Casillas for the agreed heroin delivery. The $2000 seized inside the residence was believed to be some of the money from that payment.

Plea Agreement - 13
Plea 2.docx

identified phones and several co-defendants/distributors to include Juvenal Landa and Jose Adrian Mendoza.

An urgent lab request was sent to DEA based upon the appearance of the heroin seized as it had a coloring unknown to law enforcement.  The DEA lab confirmed that two of the kilograms contained bunk, or the waste from the manufacture of heroin and Fentanyal.  However, the remaining 10 kilograms contained over 650 grams of the substance Fentanyl.  Heroin was also present in small quantities.

8.    The United States Agrees:

(a).    Dismissals:

At the time of sentencing, the United States agrees to move to dismiss Count 1 of the Indictment, charging the Defendant with Conspiracy to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine, 5 Kilograms or More of Cocaine, 1 Kilogram or More of Heroin and 400 grams or More of N-phenyl-N Propanamide, in violation of 21 U.S.C. §841 (a)(1), (b)(1)(A)(i), (ii)(I), (vi), and (viii); all in violation of 21 U.S.C. § 846

(b).    Not to File Additional Charges:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against the Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in this Indictment, unless the Defendant breaches this Plea Agreement any time before or after sentencing.

//
//
//

Plea Agreement - 14
Plea 2.docx

(c).    Not to File a Penalty Enhancement:

In consideration for the Defendant's timely acceptance of responsibility, the United States agrees not to file an enhanced penalty information to establish his prior drug conviction(s) pursuant to 21 U.S.C. § 851.

9.    United States Sentencing Guideline Calculations:

The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "U.S.S.G.") are applicable to this case and that the Court will determine the Defendant's applicable sentencing guideline range at the time of sentencing.

(a).    Base Offense Level and Application of U.S.S.G. §1B1.3:

The Government and Defendant agree and stipulate that more than 400 grams but less than 1.2 kilograms of Fentanyl was possessed with the intent to distribute. Thus, the Government and Defendant agree that the base offense level for Count 15, is 30. *See* U.S.S.G. §2D1.1(c)(1) and Commentary 8(b).

Based upon application of U.S.S.G. §1B1.3, the Relevant Conduct provision, the United States will argue that the Defendant's offense level should be increased an additional four levels based upon the Defendant's role in this offense and his jointly undertaken criminal activity pursuant to U.S.S.G. 1B1.3(a)(1)(B)(i)(ii) and (iii). The United States will therefore argue the Defendant's offense level should be a 34. The Defendant is free to argue against the increase in offense level.

(b).    Specific Offense Characteristics- Dangerous Weapon:

The United States will argue that during the course of this offense, the Defendant possessed a firearm, specifically a Taurus 9mm handgun. The Defendant, however, reserves the right to argue that it is "clearly improbable that [any of] the weapon[s] [were] connected to the offense," see U.S.S.G. §2D1.1,

Plea Agreement - 15
Plea 2.docx

cmt., n.3, and thus reserves the right to contest the ultimate issue of whether the two (2)-level upward adjustment in the base offense level, pursuant to U.S.S.G. §2D1.1(b)(1), applies.

(c).    Acceptance of Responsibility:

If the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; accepts this Plea Agreement; and enters a plea of guilty no later than the next Pre-Trial Conference, the United States will move for a three (3) level downward adjustment in the offense level for the Defendant's timely acceptance of responsibility, pursuant to U.S.S.G. §3E1.1(a) and (b).

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, not recommend a three (3) level downward reduction for acceptance of responsibility if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

Furthermore, the Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment, as a condition to this recommendation by the United States.

(d).    Criminal History:

The United States and the Defendant understand that the Defendant's criminal history computation is tentative and that ultimately the Defendant's criminal history category will be determined by the Court after review of the

Plea Agreement - 16
Plea 2.docx

Presentence Investigative Report.  The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined after the Presentence Investigative Report is completed.

10.    <u>Safety Valve</u>:

The United States and the Defendant agree that he is not eligible for the safety valve provisions of 18 U.S.C. § 3553(f) and U.S.S.G. §5C1.2.

11.    <u>Departures</u>:

The Defendant intends to request downward departures and variances from the sentencing guidelines. The United States reserves its right to oppose any downward departure.

12.    <u>Length of Incarceration</u>:

The United States will recommend that the Court impose a sentence at the low end of the applicable advisory sentencing guideline range.   The Defendant understands that he cannot argue for a sentence less than the mandatory minimum of ten years.

13.    <u>Criminal Fine</u>:

The United States and the Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

14.    <u>Supervised Release</u>:

Should the Defendant be allowed to remain in the United States or lawfully return, the parties agree to recommend that the Court impose a 5-year term of supervised release, to include the following special conditions, in addition to the standard conditions of supervised release:

(1)     that the Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Office; and

(2)     that the Defendant have no contact with any witnesses or Co-defendants in this cause number.

15.     Mandatory Special Penalty Assessment:

The Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

16.     Payments While Incarcerated:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, the Defendant agrees to earn the money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

17.     Additional Violations of Law Can Void Plea Agreement:

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

18.     Appeal Rights:

In return for the concessions that the United States has made in this Plea Agreement, the Defendant agrees to waive his right to appeal the conviction and sentence if the Court imposes a prison term no higher than the applicable guideline range and imposes no more than 5 years supervised release.  Defendant

Plea Agreement - 18
Plea 2.docx

further expressly waives his right to file any post-conviction motion attacking his conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence.  Should the Defendant successfully move to withdraw from this Plea Agreement or should the Defendant's conviction on Count 15 of the Indictment be dismissed, set aside, vacated, or reversed, the Plea Agreement shall become null and void; the United States may move to reinstate all counts of Indictment No. 4:15-CR-6049-EFS-6; and the United States may prosecute the Defendant on all available charges involving or arising out of Indictment No. 4:15-CR-6049-EFS-6.  Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack of the conviction or sentence, including, but not limited to, proceedings pursuant to 28 U.S.C. § 2255 (writ of habeas corpus).

19.   Integration Clause:

The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case.  This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities.  The United States and the Defendant agree that this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

Plea Agreement - 19
Plea 2.docx

## Approvals and Signature

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

JOSEPH H. HARRINGTON
Acting United States Attorney

_____                    _4/25/17_
Stephanie Van Marter                          Date
Assistant U.S. Attorney

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. My attorney has advised me that by pleading guilty to the charge relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____                    _4/12/17_
FRANCISCO DUARTE FIGUEROA                     Date
Defendant

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. I have further advised

Plea Agreement - 20
Plea 2.docx

my client by pleading guilty to the charge relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. There is no legal reason why the Court should not accept the Defendant's plea of guilty.

_____     4/12/17
Rick L. Hoffman                                Date
Attorney for the Defendant


    I hereby certify that I have read and translated the entire foregoing document to the Defendant in a language with which he is conversant. If questions have arisen, I have notified the Defendant's counsel of the questions and have not offered nor given legal advice nor personal opinions.

_____     4/12/17
Interpreter                                        Date


Plea Agreement - 21
Plea 2.docx