# EXHIBIT B

AO 106 (04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the Eastern District of Washington

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Residence located at

████████████████████

████████), Benton City, WA

)
)
)
)
)
)
)
)

Case No. 4:16-mj-07192-JTR

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property *(identify the person or describe property to be searched and give its location)*: a residence located at ████████████ (PR NW), Benton City, WA, further described in Attachment A, attached hereto and incorporated herein by this reference,

located in the EASTERN District of WASHINGTON, there is now concealed *(identify the person or describe property to be seized)* See Attachment B, attached hereto and incorporated herein by this reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

21 U.S.C. §§ 841(a)(1), 846          Conspiracy/Possession/Distribution of Controlled Substance(s)

The application is based on these facts:
- ☒ Continued on attached sheet.
- ☐ Delayed notice of days (give exact ending date if more than 30 days:) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Doug Stanley, FBI-EWVGSSTF
*Applicant's printed name and title*

☐ Sworn to before me and signed in my presence.
☒ Sworn to telephonically and signed electronically

Date: **12-15-16**

City and state: <u>Spokane, Washington</u>

_____
*Judge's signature*

John T. Rodgers, United States Magistrate Judge
*Printed name and title*

Empire.Application.docx

*AUSA: SAV*

*County of Investigation:  Benton*

*Re:  Search Warrant Affidavit of Task Force Officer Douglas Stanley in Support of*

*a search warrant at* ███████████████████████████ *Benton City,*

*Washington*

I, Douglas L. Stanley, a Task Force Officer with the Federal Bureau of

Investigation, being duly sworn, deposes and states:

## INTRODUCTION

1.      I currently am a full time Sheriff's Detective for the Benton County

Sheriff's Office, and have been so employed since December of 1998.

2.      In June of 2009, I was selected as a Task Force Officer with the

Federal Bureau of Investigation's Violent Gangs Task Force.  Since June of 2009, I

have participated in the investigations of several criminal enterprises involved in

drug trafficking, money launders and firearm violations at the State and Federal

level.

3.      From May of 2004 until March of 2008, I have been assigned to the

Benton County Sheriff's Office Detectives Division. During this time, I

investigated felony property crimes and crimes against person including rape,

robbery, burglary and homicide.

4.      In August of 2003, I attended the Clandestine Laboratory

Investigators Conference in Calgary, Alberta, Canada.  During the conference, I

received 40 hours of Advanced Clandestine Laboratory Investigation Training.

Affidavit of FBI TFO Douglas L. Stanley - 1
Empire.Affidavit.docx

00000997

5.      In February of 2002, I completed 40 hours of Basic Clandestine Laboratory Safety Instruction, including eight hours of Methamphetamine Laboratory Manufacturing Methods and Sampling Instruction from a certified Washington State Patrol Crime Laboratory Chemist.

6.      I was a Deputy for the Whitman County Sheriff's Office for two years. I am also a graduate of the Washington State Criminal Justice Training Commission's 440 hour Police Academy in Spokane, Washington.

7.      I have completed Patrol Narcotics Detection and training through the Drug Enforcement Administration.

8.      In 1997, I was assigned to the Quad Cities Drug Task Force. During this time, I became familiar with Evidence Law, Seizure Law, Probable Cause, Drug Investigation and Identification from a patrol and Narcotics Investigator stand-point.

9.      In my experience as a law enforcement officer, I have participated in numerous investigations, which have resulted in the issuance and executions of search warrants resulting in the seizure of drugs and other property, and the arrest and convictions of individuals. My duties as a TFO for the FBI include the investigation of all violations of Federal law and related criminal activities, including, but not limited to, drug offenses as contained within Title 21 of United States Code.

10.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

Affidavit of FBI TFO Douglas L. Stanley - 2
Empire.Affidavit.docx

11.    Additionally, I have participated in hundreds of criminal investigations involving drug trafficking. This participation includes acting as the case agent and assisting other law enforcement officers. Through this participation, I have gained an understanding of the manner in which controlled substances are manufactured, and/or distributed, and the various roles members of such organizations serve in furtherance of the organization's drug trafficking and money laundering activities.

12.    Based on my training and experience, and participation in this investigation, as well as numerous other investigations involving the illegal trafficking of controlled substances, I know:

(a)    That drug traffickers and associates who work with them maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business, or as drug proceeds;

(b).    That drug traffickers and those who assist them maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code. That drug traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients, and that records are maintained by such dealers and those who assist them so they can account for their drugs and the monies owed for these illegal drugs; that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where drug traffickers and those who assist them have ready access to them, i.e., homes, offices, automobiles and storage places;

Affidavit of FBI TFO Douglas L. Stanley - 3
Empire.Affidavit.docx

(c).    That it is common for drug traffickers and those who assist them to conceal or secure drugs and other contraband, proceeds of drug sales and/or records of drug transactions, drug sources, and drug customers in secure locations within residences, businesses, offices, safe houses. garages, storage buildings, safes, vaults, safe deposit boxes, vehicles and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities;

(d).    That persons involved in drug trafficking and those who assist them conceal caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities in their residences, other safe houses, businesses, offices, garages, storage buildings, safes, vaults, safety deposit boxes and/or automobiles;

(e).    That drug traffickers and those who assist them commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devises;

(f).    That drug traffickers and those who assist them often keep paraphernalia for packaging, cutting, weighing, manufacturing and distributing controlled substances, and that such paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, and aromatic substances

such as soap, dryer sheets, wood shavings, heat sealers and plastic wrapping, which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs and law enforcement;

(g).    That it is common for drug traffickers and those who assist them to deal/possess stolen weapons or goods and exchange drugs for such weapons or goods, and these weapons are commonly used by drug dealers as an item of investment and for protection from robberies by other drug dealers, and often are altered to fire fully automatic;

(h).    That when drug traffickers and those who assist them collect proceeds from the sale of illegal drugs, they often attempt to legitimize these profits; that to accomplish this goal, drug traffickers use sources, including but not limited to, foreign and domestic banks and their attendant services, cashier's checks, money orders, wire transfers, and bank drafts;

(i).    That persons involved in the distribution/sale, manufacture or smuggling/transportation of narcotics (i.e. drug trafficking) and persons who assist them often communicate with each other to further their drug trafficking activities;

(j).    That drug trafficking, although illegal, operates under many of the same principals/premises as a legitimate/legal business, one of those principals/premises being communication. I know that drug trafficking, just like a legitimate/legal business, also operates under the principal/premise of supply and demand, and that to respond to the requirements of supply and demand, drug traffickers and persons who assist them must communicate with drug sources of supply, drug stash houses, drug transporters/smugglers, drug associates, drug customers, etc. to further their drug trafficking activities;

Affidavit of FBI TFO Douglas L. Stanley - 5
Empire.Affidavit.docx

(k).    That drug traffickers and persons who assist them use various methods/means to communicate with each other, to include the use of telephones and in particular cellular telephones.  I know that drug traffickers and persons who assist them utilize telephones and cellular telephones as a means of directing and facilitating their drug trafficking activities.  I know that drug traffickers and persons who assist them not only use cellular devices to conduct audio communications but that they also use those same cellular devices to conduct written (i.e. such as text messaging) and data communications as well;

(l).    That it is not uncommon for drug traffickers and those who assist them to initiate such communication services under the name of an associate, nominee or fictitious person for the purpose of concealing their drug trafficking activities and to insulate themselves from detection by law enforcement;

(m).    That it is not uncommon for drug traffickers and those who assist them to utilize more than one cellular telephone to conduct their drug trafficking activities;

(n).    That drug traffickers and persons who assist them maintain contact telephone numbers, as well as other information such as names, nicknames, addresses, email addresses, photographs, video recordings, text messages and such, pertaining to their drug trafficking associates and coconspirators within the memory of their cellular telephone(s), either intentionally in electronic phone books, contact lists and media files or incidentally in incoming call logs, outgoing call logs, missed call logs, sent messages, received messages, draft messages, voice mail messages, etc., or

incidentally in the content of stored wire and/or electronic communications maintained by their cellular service/communications service provider. I know that this information may or may not be labeled, marked or otherwise be identified as belonging to their actual users;

(o).    That drug traffickers and those who assist them frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos in their residences, offices, cellular telephones, computers, other electronic data storage means and other places or devices under their control. Additionally, that this stored data can provide evidence of criminal activities as it is not an uncommon practice for persons engaged in drug trafficking to photograph and/or record themselves and other coconspirators engaging in activities that further their drug trafficking;

(p).    That drug traffickers and those who assist them may possess a cellular telephone(s) that provides them with the ability to access the Internet and in turn Internet web sites/web applications/web pages, etc. That these Internet web sites/web applications/web pages, etc. in turn provided them with the ability to access personal account information, such as banking services, email services, online bill pay services, Internet download services, map/GPS services, search engines, peer to peer messaging, etc. That these types of cellular telephones have the ability to record and maintain a "history" of recently accessed Internet websites/web applications/web pages, etc. That this "history" can provide evidence of criminal activities which help further their drug trafficking activities;

Affidavit of FBI TFO Douglas L. Stanley - 7
Empire.Affidavit.docx

(q).   That drug traffickers and those who assist them frequently employ the use of coded language and avoid explicit references to narcotics, locations, names, amounts, times and dates.   Narcotics traffickers conduct most of their narcotics transactions in cash in order to avoid a paper trail of their narcotics transactions and proceeds. Narcotics traffickers go to extreme measures to avoid law enforcement surveillance and investigations, such as the development of aliases, use of false social security numbers, the use of varying pagers and cellular telephones, the use of pre-paid calling cards, the use of other individuals' names and addresses (either true or fabricated) to subscribe to telephones, pagers and utilities and to acquire assets.   That drug traffickers and those who assist them commonly maintain addresses or telephone numbers in books, papers, cellular telephones, computers and other electronic data storage means.   That these books, papers, cellular telephones, computers and other electronic data storage means can reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if said items may be in listed in code.   That drug traffickers and those who assist them maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts, cellular telephone text messaging and data communications, as well as other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code.

(r).   That there are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous when considered alone (i.e. financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and

photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and page bills, keys to safe deposit boxes, computer hardware and software, text messages, voicemail messages, etc.) but has significant relevance when considered in light of other evidence. The evidence may be highly valuable to the offender and at the same time be of usefulness for evidentiary purposes, such as valuable investments (i.e. art, jewelry, precious metals and stones, real estate, securities), large sums of currency, narcotics or money laundering ledgers, safes, customers lists, receipts or listed locations of storage facilities and/or safe houses, firearms, communications equipment (to include cellular telephones), vehicles, airplanes, vessels, computers;

(s).    That drug traffickers and those who assist them often purchase expensive vehicles, businesses, and residences with the proceeds from their drug transactions, and that they often keep these items registered in the names of other trusted individuals and often store them with the trusted individuals in order to avoid discovery by law enforcement;

(t).    That the courts have recognized that unexplained wealth in combination with other factors is probative evidence of crime motivated by greed, in particular, trafficking in controlled substances;

(u).    That illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers will repeatedly obtain or manufacture and then distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale and similarly such drug traffickers will have an "inventory" which will fluctuate in size depending upon the demand for the product. Certain types of

Affidavit of FBI TFO Douglas L. Stanley - 9
Empire.Affidavit.docx

drug paraphernalia, such as scales for use in weighing amounts of controlled drugs at the time of purchase, plastic wrap and plastic bags for packaging drugs for distribution and/or transportation, precursor chemicals, glassware, and other items utilized in the manufacture of methamphetamine are often kept by a trafficker on an essentially continuous basis for use whenever needed. Further, that traffickers keep records of their illegal activities for a period of time extending beyond the time during which they actually possess illegal controlled substances, in order to maintain contact with their criminal associates for future drug transactions, and so that they can have records of prior transactions for which, for example, they might still be owed money, or might owe someone else money;

(v).    That drug traffickers and those who assist them often use/consume the drugs that they traffic and manufacture and/or use/consume other controlled substances, and it is not unusual to find personal use quantities of drugs and paraphernalia consistent with the use of these substances on their persons and on their property;

(w).    That drug traffickers and those who assist them often use vehicles to conduct narcotics transactions, to store drugs, and to transport drugs from locations inside and outside the United States. Records regarding the ownership, purchase, registration, and maintenance of such vehicles are often maintained at the traffickers' residences, businesses, and in their vehicles and often times at locations controlled by those people who assist them;

(x).    That drug traffickers and those who assist them often keep vehicles that they utilized to facilitate their drug trafficking activities registered in the names of other trusted individuals (other than themselves) in

Affidavit of FBI TFO Douglas L. Stanley - 10
Empire.Affidavit.docx

order to avoid discovery by law enforcement and that those vehicles are often times parked/kept at various locations in order to avoid discovery by law enforcement; and

(y).    Individuals involved in the distribution of controlled substances tend to maintain certain items pertaining to their drug trafficking and manufacturing activities at their homes or in their vehicles.  Courts have recognized that evidence of drug trafficking, is likely to be found where the drug dealers reside, and a search warrant may be properly issued for a suspected drug dealer's residence (or temporary residence) despite the lack of direct evidence of criminal activity at the residence;

13.    The statements contained in this Affidavit in Support of Application are based in part on my training, experience, participation in and knowledge of this investigation, and as well as knowledge I learned from various other federal, state and local law enforcement agencies, special agents, task force officers, state and local law enforcement officers.  Since this Affidavit is being submitted solely for the purpose of establishing probable cause to obtain a search warrant(s), your affiant has not included each and every fact known to me concerning this investigation.  Rather, your affiant has only set forth facts necessary to support the authorization of the requested search warrants.

## **BACKGROUND**

14.    Members of EWVGSSTF have been investigating a transnational drug trafficking organization operating herein the Eastern District of Washington and elsewhere since at least 2011, previously identified as the Ivan Calvillo Drug Trafficking Organization (DTO).  The Ivan Calvillo DTO has been operating in multiple jurisdictions to include the Eastern District of Washington, Western

Affidavit of FBI TFO Douglas L. Stanley - 11
Empire.Affidavit.docx

District of Washington, North Dakota, Illinois, Minnesota and internationally, Vancouver BC, Sinaloa Mexico and Australia. During the course of the investigation, your affiant through the interview of multiple cooperating Defendants and drug seizures, learned the DTO was utilizing backpackers to physically carry quantities of cocaine from the EDWA thorough a trail system into Canada for distribution. Your affiant is also aware the typical amount of cocaine loaded into a backpack was 20 to 40 kilograms of cocaine.

15.    Juan Zambrano and his brother, Marciel Zambrano were identified by two cooperating defendants[1] who testified before the grand jury as members of this DTO who were initially identified as backpackers. Juan Zambrano, Marciel Zambrano, Miguel Reyes Garcia and Javier Camilo Gomez Calvillo were deported due to an enforcement action in Canada that will be more fully discussed below. Moreover, an anonymous citizen witness has been in contact with the task force on multiple occasions to report the Zambrano's involvement in this organization. This anonymous citizen witness further confirmed they were originally utilized as backpackers.

16.    In approximately the spring of 2014, a companion investigation was initiated by a DEA undercover task force relative to the money laundering activities of this DTO. Beginning in early 2014, Ivan Calvillo was in contact with

---

[1] Both of the cooperating defendants were charged with federal drug trafficking offenses. They each pled guilty and agreed to cooperate in hopes for consideration of a reduced sentence. One of the cooperating Defendant has been sentence and did in fact receive a reduced sentence based upon their cooperation. The other is still pending sentencing.

Affidavit of FBI TFO Douglas L. Stanley - 12
Empire.Affidavit.docx

a DEA undercover who was feigning to operate an international business that was looking to make extra cash laundering money for the DTO. All the communications between the DEA Under Cover (hereinafter BUC) and Ivan Calvillo were over "What's App"[2] and have been recorded and preserved. Once the relationship was established between the BUC and the DTO, they began to have very detailed communications as to the business relationship. The basic need the BUC filled for the organization was his ability to accept Canadian cash, deposit it and wash it electronically through his business and then wire US currency out in smaller deposits in Mexico and the United States. The BUC would then charge a commission or percentage for the washed cash, keep that percentage and report back to the DTO as to the remaining amount available for wire transfer. This relationship ultimately cultivated into DTO seeking the BUC's assistance in developing a new drug distribution group in Vancouver BC with ties to China. Thus, the entire premise of their business relationship was based upon the BUC's ability to launder drug money and not for any other purpose.[3] There were a

[2] "Whats App" messenger is a cross platform mobile messaging app which allows individuals to exchange messages without having to pay for SMS. It is also a messaging service that law enforcement is not able to intercept and therefore has become a popular means of communication for those engaged in illegal activities.

[3] Ivan Calvillo was in direct communication with an undercover task force officer with DEA up until December 2015 when he was murdered in Mexico. After Calvillo's death, a person identified as Jese David Carillo Casillas began communicating directly with the undercover task force officer taking over some of those same money laundering activities for the drug trafficking organization. Casillas was identified as a high ranking member of this organization in the spring of 2015. Casillas is a codefendant on the same indictment as Juan and Marciel

Affidavit of FBI TFO Douglas L. Stanley - 13
Empire.Affidavit.docx

number of money laundering transactions that occurred during the investigation where the DTO would arrange for a co-conspirator to meet with a subject pretending to work for the money launderer (who in fact was another undercover agent) and hand deliver large quantities of cash drug proceeds in Canadian currency to be washed by the launderer.

17.    On August 23, 2015, one of those Canadian cash money drops occurred. On this date, Ivan Calvillo was again in direct communication with the BUC via recorded What's App messenger. The purpose of the contact was to arrange another money laundering transaction though the BUC cover business. Ivan arranged for a money drop to occur in Vancouver BC Canada with Canadian money. The conversation surrounding this money drop was clear that it was all cash drug proceeds from the sale of controlled substances originating from Mexico, passing through this district for its transportation into the Vancouver Canada area. With the assistance of RCMP, a person identified as Javier Camilo Gomez Calvillo, a.k.a. Angel was sent to make the money drop. The meet was audio/video recorded by the RCMP. Angel was driving a blue Mercedes registered to a residence associated with Sobieda Reynosa (previously identified by the RCMP as a girlfriend/associate of Jorge Esau De Vicente Luque, another indicted co-defendant). Angel delivered $74,029 in Canadian currency to a Canadian Undercover Agent. After the BUC withdrew the percentage charged for laundering the money, Ivan Calvillo directed the BUC to wire the remaining funds in US currency to various accounts in Mexico.

---

Zambrano. See, 4:15-CR-6049-EFS. These communications lead to additional conversations relative to Casillas supplying the undercover officer with large quantities of narcotics.

Affidavit of FBI TFO Douglas L. Stanley - 14
Empire.Affidavit.docx

18.    On August 25, 2015, the RCMP stopped the same Blue Mercedes just north of the border directly next to one of the identified trails utilized by this organization to back pack controlled substances. The driver was identified as Sobieda Reynosa and the passengers were identified as Juan Bravo Zambrano, Marciel Zambrano and Javier Camilo Gomez Calvillo, a.k.a. Angel. A search warrant was obtained and executed on the vehicle. Inside a secret compartment in the vehicle, RCMP located 18 kilograms of methamphetamine, 4 kilograms of cocaine, 171 grams of heroin, $50,000 in US currency and two loaded firearms. Based upon that seizure further reinvestigation led the RCMP to a hotel nearby where one of the rooms was registered in their names. A search warrant was obtained for the hotel room. Located inside the room was Miguel Reyes Garcia.

19.    Subsequent testing of the packages of controlled substances revealed a number of fingerprints to include several belonging to Miguel Reyes Garcia. Each of the Defendants was deported as a result of the arrest. Juan Zambrano is a legal permanent resident of the United States and was therefore, deported back to the United States shortly after his arrest in Canada. Your affiant does not know when exactly Juan Zambrano returned to the EDWA.

20.    On December 6, 2016, in the Eastern District of Washington the Grand Jury indicted Juan Zambrano Bravo (4:15-CR-6049-EFS) for Title 21 USC 846 -- Conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, 5 kilograms or more of cocaine, 1 kilogram or more of heroin and 400 grams or more of N-Phenyl-N Popanamide. An arrest warrant was issued for Zambrano on 12/7/2016 (4:15-CR-6049-EFS-19).

21.    On December 15, 2016 members of the FBI Eastern Washington Tri-City Violent Gangs Safe Streets Task Force (EWTCVGSSTF) made contact at ██████████████ Benton City, Washington a last known address for Juan Zambrano. Members of the Task Force were at the residence in an effort to arrest Zambrano Bravo. Your affiant made contact with a Hispanic male who only identified himself as Reyes. Although I identified myself as a Detective with Benton County, I utilized a ruse and indicated we had seized mail that had been stolen in the name of Juan Bravo Zambrano that needed to be returned.  According to Reyes, Zambrano and his family had moved to a neighboring residence. Reyes pointed out the location and I identified it as ██████████████ *Benton City, Washington*.

22.    Members of EWTCVGST attempted contact at ██████████████ ███. Prior to making contact, your affiant observed silver Chrysler 300 parked in the driveway.  Your affiant was familiar with this vehicle based upon information developed during this investigation and knew that to be a vehicle utilized by Juan Zambrano.[4]  Upon approach to the residence, your affiant made contact with a Hispanic female at the back door of ██████████████. This residence is described as a double wide trailer.  The Hispanic female was later identified as Socorro Sanchez, Juan Zambrano's girlfriend. Upon her opening the door, your affiant immediately smelled a strong odor of marijuana coming from inside the residence.  Utilizing the same ruse, Socorro Sanchez advised that Zambrano was in the residence and pointed down the hallway to a bedroom.  Sanchez kept the door open when she motioned inside.  Your affiant did not breach the doorway until

---

[4] Your affiant had previously applied for and obtained a tracker warrant for this vehicle. See, 4:16-mj-07029-MKD.

Affidavit of FBI TFO Douglas L. Stanley - 16
Empire.Affidavit.docx

after she confirmed he was in fact inside the residence. Your affiant stepped into the residence and positively identified Zambrano exiting a bedroom. The hallway where Zambrano was identified is a small and confined space. It was unknown at that time if there were any other people inside this residence. Given the information developed in this investigation to include the prior seizure of firearms, officer safety was of concern. Once I had visual confirmation of Zambrano, I approached him to make the arrest. While I was placing Zambrano under arrest, two other agents and two deputies checked only the immediate area of the arrest for officer safety.

23.     During that cursory sweep for officer safety, your affiant observed in in plain view packaged green leafy substance believed to marijuana. Based upon your affiants training and experience the amount of packaged marijuana was approximately one pound. Your affiant also observed approximately ten growing marijuana plants. These plants were planted in various different pots. The room had additional grow lights in and around the marijuana plants that your affiant knows is consistent with a marijuana grow operation. Multiple firearms were also observed. Your affiant been involved in numerous marijuana investigations including indoor and outdoor marijuana grow operations. Your affiant has received numerous hours of marijuana grow investigation training as well as Clandestine Laboratory investigations related to marijuana grow operations. In anticipation of obtaining a search warrant, the residence was secured and the other occupants of the residence were removed. As a result, your affiant nor other officers manipulated or removed any items.

24.     Based upon the facts and on my training and experience, I believe there is probable cause to conclude that Juan Zambrano Bravo is involved in drug trafficking, in violation of 21 U.S.C. §§ 841 and 846. Your affiant knows this DTO

traffics in multiple controlled substances and frequently possessed and or uses firearms in association with their drug trafficking activities  Your affiant further believes that the residence of ███████████ Benton City, Washington is being used by the organization to facilitate the ongoing distribution of controlled substances therefore it is more than likely that evidence as to the ongoing drug trafficking activities of this organization will be located inside.

## CONCLUSION

Based on your affiant's training and experience, as well as participation in this investigation, your affiant believes there is probable cause for the issuance of a search warrant for the residence listed above (further described in the respective Attachment A) for the items described in the respective Attachment B.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Douglas L. Stanley, Task Force Officer
Federal Bureau of Investigation-EWGSSTF

Sworn to telephonically and signed electronically this ██████ day of December 15, 2016.

Honorable John T. Rodgers
United States Magistrate Judge

Affidavit of FBI TFO Douglas L. Stanley - 18
Empire.Affidavit.docx

30

00001014

## Attachment A

██████████████████████████████████ Benton City, Washington is a white in color with blue trim, double wide manufacture home. The residence is located on the north east corner of ██████████████████ and ██████████████████ in Benton County, Washington. The residence is located on the east side of ████████ ████████ and faces west towards the road. The residence has a chain-link fence around the front yard. The address marker is located at the entrance of driveway and is clearly posted with the numbers ████████.

 

31

ATTACHMENT "B"

Your affiant requests authorization to seize the following as types of evidence that would prove violations of 21 U.S.C. § § 841(a)(1), 846.

(a) any and all controlled substances, including Oxycodone, PCP, MDMA, cocaine, heroin, methamphetamine, marijuana, and paraphernalia for packaging, cutting, weighing, manufacturing, and distributing drugs. Such paraphernalia includes scales, plastic bags, heat sealers, Tupperware containers, and cutting agents used to adulterate the purity of controlled substances;

(b) firearms, firearms purchase and ammunition receipts, holsters, ammunition and ammunition boxes, firearm ownership documents, gun boxes, firearms cleaning kits;

(c) records relating to the purchase, importation, transportation, sale, distribution and possession of controlled substances, including but not limited to, customer lists, ledgers, log books, documents, receipts, financial statements, telephone notes, telephone answering machine tape recordings of messages from co-conspirators and other communication records, personal telephone and address books, credit records, diaries, airline tickets, passports, and money orders. The aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug traffickers have ready access to them, e.g, homes, offices and automobiles;

(d) Photographs, including still photos, negatives, slides videotapes, films, undeveloped film, memory cards, and the contents therein, in particular photographs of co-conspirators, subjects posing with illegal firearms in their possession, of assets and/or controlled substances;

(e) United States and foreign currency, financial instruments, income tax returns, safe deposit box keys and records, precious metals, jewelry, and other items of value which are the proceeds of drug transactions and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities in secure locations within their residences, offices, automobiles, garages, and storage buildings, books, records, invoices, receipts, records of real estate

transactions, bank statements and related records, gift cards, pre-paid visa cards, American Express Bluebird cards, money drafts, money orders, bank drafts, and cashier's checks, bank checks, safe deposit box keys, and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money. Any and all records pertaining to the rental of self-storage locker units, post office boxes, U-Haul type trailers or trucks, rental properties, and other residences or locations where controlled substances or assets subject to forfeiture could be located;

(f)     records relating to the attempt by drug traffickers to legitimize profits from the sale of drugs relating to, for example, foreign banks and domestic banks, and their attendant services, cashier's checks, money drafts, real estate, and businesses real and fictitious;

(g)     records relating to vehicles which are used, or are intended to be used, to transport, convey, or facilitate the sale, distribution, transportation, importation and possession of controlled substances, and control of the locations and vehicles searched, including but not limited to, deeds, escrow documents, real estate records, leases, rental records, utility bill, telephone bills, personal telephone directories, photographs, keys, and documents reflecting ownership of automobiles, "pink slips", insurance records, repair bills, and service records. Indicia of occupancy, residency, rental and/or ownership of the premise described herein, including, but not limited to utility and telephone bills, concealed envelopes, rental, purchase or lease agreements and keys;

(h)     any account holder information and access logs for storage units, and any payment of unit information;

(i)     Any PDAs, smartphones, tablets, cellular phones, and other electronic and storage media and storage devices. A subsequent search warrant shall be requested to search the contents of any PDAs, smartphones, cellular phones, and other electronic and storage media and storage devices.