1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
2

3    UNITED STATES OF AMERICA,      ) Case No.
                                    ) 4:15-CR-6049-EFS-2, 10, 11,
                 Plaintiff,         ) 16, 18, 19, 21, 23
4                                   )
     v.                             ) March 6, 2018
5                                   )
     JESE DAVID CARILLO             ) Richland, Washington
6    CASILLAS (2), BRITTNEY         )
     LEE ZARAGOZA (10), SALVADOR    ) Excerpt of Pretrial
7    GUDINO CHAVEZ (11), EDGAR OMAR ) Conference/Motion Hearing
     HERRERA FARIAS (16), ALFREDO   )
8    MAGANA GARIBAY (18), JUAN BRAVO) Testimony of William Leahy
     ZAMBRANO (19), MIGUEL REYES    ) Pages 1 to 37
9    GARCIA (21), JOSE ADRIAN       )
     MENDOZA (23),                  )
10                                  )
     _____Defendants.____)
11

12                 BEFORE THE HONORABLE EDWARD F. SHEA
13             SENIOR UNITED STATES DISTRICT COURT JUDGE

14                            APPEARANCES:
15
     For the Plaintiff:            Stephanie A. Van Marter
16                                 Stephanie.Van Marter@usdoj.gov
                                   Caitlin Baunsgard
17                                 US Attorney's Office-SPO
                                   920 W Riverside, Suite 300
18                                 P.O. Box 1494
                                   Spokane, WA 99210
19                                 509-353-2767

20   For the Defendant Carillo     Nicolas V. Vieth
     Casillas (2):                 Nick@viethlaw.com
21                                 Vieth Law Offices
                                   505 West Riverside
22                                 Suite 200
                                   Spokane, WA 99201
23                                 208-664-9448

24

25

```
 1    For the Defendant Zaragoza      Victor H. Lara
      (10):                           Vh_lara@hotmail.com
 2                                    Hurley Lara & Hehir
                                      411 North Second Street
 3                                    Yakima, WA  98901
                                      509-248-4282
 4

 5    For the Defendant Gudino        Gregory Lee Scott
      Chavez (11):                    Gregory@scottlaw.net
 6                                    Gregory Scott Law Office
                                      6 South Second Street
 7                                    Suite 208
                                      Yakima, WA  98907
 8                                    509-574-0991

 9

10    For the Defendant Herrera       Peter Steven Schweda
      Farias (16) and Magana          Pschweda@wsmattorneys.com
11    Garibay (18):                   Waldo & Schweda, PS
                                      2206 N Pines Road
12                                    Spokane, WA  99206
                                      509-924-3686
13

14    For the Defendant Bravo         Richard A. Smith
      Zambrano (19):                  Rasmith@house314.com
15                                    Smith Law Firm
                                      314 North Second Street
16                                    Yakima, WA 98901
                                      509-457-5108
17

18    For the Defendant Reyes         Kenneth D. Therrien
      Garcia (21):                    Kentherrien@msn.com
19                                    Kenneth Therrien Law Office
                                      413 North Second Street
20                                    Yakima, WA  98901
                                      509-457-5991
21

22    For the Defendant Adrian        Scott W. Johnson
      Mendoza (23):                   Scott@johnsonorr.com
23                                    Johnson & Orr PS
                                      1038 Jadwin Avenue
24                                    Richland, WA  99352
                                      509-579-0080
25
```

3

1    Official Court Reporter:        Kimberly J. Allen, CCR #2758
2                                    United States District Courthouse
                                     P.O. Box 685
3                                    Richland, Washington 99352
                                     (509) 943-8175

4    Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

4

1    (Additional proceedings were reported but not requested to be

2    transcribed.)

3         MS. VAN MARTER:  The United States would call retired

4    Special Agent William Leahy.

11:21:52   5         THE COURT:  If you'll come forward, please, and be

6    sworn.

7       (Witness approached.)

8

9                      WILLIAM LEAHY,

11:21:56   10    called as a witness on behalf of the Plaintiff, having first

11       sworn or affirmed, testified under oath as follows:

12         THE WITNESS:  I do.

13         THE COURT:  Please be seated.

14         Tell us your first and last name; spell them both for

11:22:16   15    the record.  Thank you.

16         THE WITNESS:  William Leahy, L-E-A-H-Y.

17         THE COURT:  And what is it your current status?

18         THE WITNESS:  Retired.

19         THE COURT:  Retired from what?

11:22:30   20         THE WITNESS:  Special agent with the FBI.

21         THE COURT:  Thank you.

22         You may proceed.

23

24

25

DIRECT EXAMINATION

BY MS. VAN MARTER:

Q    And how long were you with the FBI prior to retirement?

A    From 1992 to 2017.

Q    And were you assigned to, and at some point in charge of, a task force located here in the Tri-Cities?

A    Yes, I was.

Q    And what was the focus or task or mission of that particular task force?

A    Uh, investigating criminal enterprises in the Eastern District of Washington that were dealing in drug trafficking.

Q    And have you previously testified before this specific Court and Your Honor regarding your prior qualifications, training, and experience?

A    Yes.

Q    And, specifically, were you a case agent involved in the investigation of a drug trafficking organization called the Ivan Calvillo Organization?

A    Yes, I was.

Q    And did he also have a nickname?

A    Uh, 500.

Q    And when did that investigation initiate, at least as far as your involvement and knowledge?

A    I would say back as far as -- as possibly 2012.

Q    And prior to 2012 did you engage in an investigation that

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*                              6
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

1    involved a Title III that occurred, at least the cases brought

2    before this Court?

3    A    Yes.

4    Q    And was that in 2010 and 2011?

11:23:52  5    A    Yes.

6    Q    And was Ivan Calvillo ultimately tied to and identified

7    during the course of that investigation?

8    A    Yes, he was.

9    Q    Okay.  Were you assigned then as the case agent as that

11:24:03 10    investigation continued into 2014, '15, '16, '17 and up until

11    your retirement?

12    A    At some point I was the supervisor of the office here so I

13    was not -- no longer the case agent, but I stayed involved in

14    the case.

11:24:19 15    Q    And did you also stay directly involved when the

16    investigation required the coordination and/or assistance of

17    other federal law enforcement agencies?

18    A    Yes.

19    Q    And how many other federal law enforcement agencies

11:24:32 20    specifically to the Ivan Calvillo investigation?

21    A    Probably every agency out there.

22    Q    And did you specifically begin to work with Drug

23    Enforcement Administration with respect to the investigation of

24    the Calvillo drug trafficking organization?

11:24:48 25    A    Yes.

1  Q    And do you recall approximately when that was?

2  A    Uh, again, since 2012 I think we were bouncing -- I

3  don't -- for better -- for lack of a better term, bouncing

4  against them with investigations that they were conducting.

11:25:08  5  Q    And at some point did you end up working with individuals

6  out of the Boston DEA field office?

7  A    Yes.

8  Q    And specifically that particular part of the investigation,

9  did that have to do with money laundering?

11:25:19  10  A    Yes, it did.

11  Q    And did there come a time where there was an undercover

12  money laundering investigation that ended up being tied to your

13  investigation here in the Eastern District of Washington?

14  A    Yes.  Um, Boston was kept separate from what we were trying

11:25:37  15  to do.  There's no question that they were in charge of their

16  investigation; we were in charge of our investigation.

17  Q    But were you sharing information?

18  A    We were sharing information, and we were trying to help

19  each other.  These investigations are complex, and, uh, it's

11:25:55  20  very difficult to keep the momentum moving without, uh,

21  jeopardizing the investigation, so there was a lot of

22  cooperation.

23  Q    And what role did that DEA Boston, for lack of a better way

24  to identify them, what role did they play with respect to the

11:26:13  25  money laundering aspect of the investigation?

1   A    They were in charge of it.

2   Q    Did you have any enforcement or control over the decisions

3  as to the money laundering aspect of it?

4   A    We could, uh, indicate our opinion.  Uh, that's pretty much

11:26:29  5  it.

6   Q    But still attempting to work together and share

7  information, is that --

8   A    Definitely.  There was a good relationship, uh, that we

9  built between Boston and ourselves.  There was a trust, um, that

11:26:41  10  sometimes isn't there.  But we built a trust, and -- and we

11  trusted each other.

12   Q    And so as far as that particular part of the investigation,

13  did you understand that they had an undercover officer who was

14  directly communicating with Ivan Calvillo?

11:26:57  15   A    Yes.

16   Q    And during the course of that part of the investigation,

17  did you have any control, then, over those communications or how

18  they were to happen or when they were to happen?

19   A    No.  Um, he would try to notify us, but, uh, he was out of

11:27:14  20  country a lot.  Um, it was difficult to, uh, maintain contact at

21  times with him, um, but -- but both sides tried their best.

22   Q    And would they, at least the undercover, provide

23  information to you when there had been communications that were

24  significant to the investigation?

11:27:34  25   A    Yes, they would try to provide it as quickly as possible.

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*                    9
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

1    Q     And if anytime during those communications there was

2    information pertaining to individuals in the Eastern District of

3    Washington, would they share that with you?

4    A     Yes, they would.

11:27:46   5    Q     At some point in time did you understand that they sought

6    for or asked for the assistance of the RCMP?

7    A     Yes.

8    Q     And what was your understanding with regard to the RCMP's

9    involvement?

11:27:58   10   A     There were several meetings --

11             MR. SMITH:  Your Honor, I'm going to object to what his

12   understanding was unless he can provide some foundation for that

13   understanding.

14             THE COURT:  Go ahead.  Lay the foundation.

11:28:11   15   BY MS. VAN MARTER:   (Continuing)

16   Q     Again, when did you -- in terms of the communication or

17   involvement of the RCMP, do you recall when or how you first

18   learned of that?

19   A     I believe that DEA had already had contact with RCMP, um,

11:28:29   20   when we began to be involved with DEA.  Shortly thereafter,

21   there was a meeting in Mexico City with the Mexican authorities,

22   RCMP, and ourselves and DEA, um, and then during that meeting we

23   discussed, uh, how we were going to move forward on this

24   investigation.

11:28:51   25   Q     So were you present during that coordination meeting in

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Mexico City?

2    A    Yes, I was.

3    Q    And was I also present?

4    A    Yes.

11:28:56  5    Q    And what was the point of this coordination meeting in

6    Mexico City?

7    A    It was essentially how to move forward on this organization

8    and to try to prosecute the organization, where best to do that,

9    how best to do that, um --

11:29:16  10    Q    And were Mexican authorities also engaged in their own

11    investigation?

12    A    Yes.

13    Q    And were they present to provide information as to their

14    investigation?

11:29:23  15    A    Yes, they were.

16    Q    And you indicated the RCMP was present; is that correct?

17    A    Yes.

18    Q    And did they provide information as to their investigation?

19    A    Yes.

11:29:31  20    Q    And were you asked to provide information about your

21    investigation here in the Eastern District of Washington?

22    A    Yes.

23    Q    So it was your understanding at that time that each entity

24    had their own ongoing investigations.

11:29:43  25    A    Yes.

1   Q    After that coordination meeting, then, in Mexico City, what

2   did you understand the role of the RCMP to be?

3   A    RCM essentially was there to assist, um, DEA's

4   investigation of the money laundering.  Um, they had indicated

11:30:05   5   that they would try to help us with our issues in our district

6   and the backpacking of money and -- and narcotics across the

7   border, um, but they really had nobody in the area to -- to work

8   that with us, and we never really got that help from them.  And

9   they admitted up front that they probably weren't going to be

11:30:32   10   able to help us with that.

11   Q    Okay.  I'm going to ask you a couple questions about that.

12        During the course of your investigation into this

13   organization, did you come to identify the use of backpackers

14   from the United States into Canada?

11:30:44   15   A    Yes.

16   Q    And did you come to identify specific areas that the

17   organization would utilize?

18   A    Yes.

19   Q    Did you share that information with the RCMP?

11:30:52   20   A    Yes.

21   Q    What kind of terrain or what kind of area are we talking

22   about in terms of where they were crossing into Canada?

23   A    Well, during the winter months there obviously would be

24   snow, um, on -- and in the summer months, they were orchards.

11:31:08   25   Um, so remote areas, uh, not -- not a lot of road access.

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*                    12
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

1    Q    Was it difficult for law enforcement to surveil that area?

2    A    Yes, it was.  At that time it was.  Since then, uh, I

3    believe that ICE has put up a lot of cameras in the area and

4    has -- has a lot better surveillance in those areas.

11:31:34    5    Q    And at that time you indicated you asked for more

6    assistance from the RCMP with respect to foot traffic or

7    crossings into Canada; is that correct?

8    A    Yes.

9    Q    And were they able to provide you specific joint effort?

11:31:48    10    A    No, they weren't.

11    Q    And why not?

12    A    They didn't have the manpower.  They were, um -- the way

13    they prioritize their cases, it just wasn't a priority.

14    Q    And did you have any ability to request for them to do

11:32:06    15    specific things for you whenever you wanted in the

16    investigation?

17    A    We had a contact with the RCMP that we could contact, um,

18    but he was not in the area where we needed help.

19    Q    And where was that contact located?

11:32:20    20    A    I -- I believe he was in Vancouver, but I could be wrong on

21    that.

22    Q    And the physical area that you were referencing with

23    respect to the cross-border traffic, where generally was that?

24    A    It essentially, um -- it would be a remote area right on

11:32:43    25    the border.

1    Q     On this side, in the Eastern District of Washington?

2    A     Well, on both sides essentially.

3          THE COURT:  When you say "remote area," do you mean east

4    of Vancouver?

11:32:56   5          THE WITNESS:  Yes.

6          THE COURT:  In the Okanogan or that --

7          THE WITNESS:  Yes.  Yes, in the Okanogan area.

8          THE COURT:  Thank you.

9          THE WITNESS:  Yeah.  Sorry.

11:33:05  10   BY MS. VAN MARTER:  (Continuing)

11   Q     And you indicated that the RCMP agreed to assist DEA in the

12   money laundering aspect.

13          Do you know in what regard?

14   A     Again, the details of it we weren't involved in because it

11:33:18  15   wasn't part of our investigation, um, that we were specifically

16   looking into.  Um, what I know is that --

17          MR. SMITH:  Again, Your Honor, I'm going to object to

18   what he knows after he's --

19          THE COURT:  How can you object to personal knowledge of

11:33:35  20   the witness, Mr. Smith?

21          MR. SMITH:  Well, because he says he wasn't involved in

22   the details, so it sounds to me it's not personal knowledge.

23   But --

24          THE COURT:  Okay.  If that's your objection, that's your

11:33:44  25   objection.

1          So go ahead.

2          MS. VAN MARTER:  Can I --

3          THE COURT:  Is it personal knowledge or not?

4     BY MS. VAN MARTER:  (Continuing)

11:33:48  5     Q    Is this based upon --

6          THE COURT:  Or is it, in fact, information that he

7     considered in order to pursue other avenues, something of that

8     nature?  In other words, was it working information that he

9     needed to make decisions about what he was going to do?

11:34:02  10         MS. VAN MARTER:  Would you like me to ask him --

11         THE COURT:  Go ahead.

12         MS. VAN MARTER:  Or do you want him to answer your

13    question, Your Honor?  Either way.

14         THE COURT:  No.  You just do it any way you want.

11:34:11  15    BY MS. VAN MARTER:  (Continuing)

16    Q    Your understanding with respect to the role of the RCMP,

17    was that in part based upon your presence at certain

18    coordination meetings?

19    A    Yes.

11:34:18  20    Q    Was it also in part based upon your conversations with the

21    RCMP?

22    A    Yes, and DEA.

23    Q    And what was your understanding in terms of RCMP's

24    involvement or assistance with DEA?

11:34:26  25    A    They were basically requested by DEA to do the money drops.

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*                    15
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

1  Q    And did you have any knowledge or understanding as to

2  whether the RCMP was continuing to conduct their own

3  investigations?

4        THE COURT:  About what?

11:34:44  5  A    They -- they were --

6        THE COURT:  Excuse me.  About what?

7  BY MS. VAN MARTER:  (Continuing)

8  Q    About their role in this particular, this whole

9  organization, based on the coordination meeting in Mexico City.

11:34:54  10        THE COURT:  No, no, no.  So you're talking about coming

11  out of the meeting in Mexico City, what was his understanding of

12  what RCMP was doing?

13        MS. VAN MARTER:  I believe we already asked -- covered

14  the foundation question, that each entity had their own ongoing

11:35:08  15  investigations.

16        THE COURT:  Sure.

17        MS. VAN MARTER:  And so now I covered the question that

18  the RCMP was assisting the DEA with the money laundering part --

19        THE COURT:  Right.

11:35:14  20        MS. VAN MARTER:  -- and I'm doing a follow-up question

21  as to whether he understood at that time if they were continuing

22  their individual investigation as referenced --

23        THE COURT:  Okay.  Individual investigations.  Thank

24  you.

11:35:24  25  A    So through DEA, the money drops, they had identified a

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    launderer up in Canada and were trying to do an investigation

2    into his organization.

3    BY MS. VAN MARTER:   (Continuing)

4    Q    And based upon your knowledge of the investigation and your

11:35:37  5    involvement with the RCMP, do you know if they, for instance,

6    would conduct search warrants during the course of this

7    investigation in Canada?

8    A    They were doing surveillance and search warrants, yes.

9    Q    Okay.  And before we get into the subject of this

11:35:50  10   particular motion, a seizure that occurred in Grand Forks, do

11   you know that there were other search warrant and surveillance

12   actions outside of what occurred in Grand Forks, BC?

13   A    Yes.

14   Q    And did you have any involvement in any of those

11:36:02  15   enforcement operations in Canada?

16   A    No.  We were notified after the fact.

17   Q    I'm going to ask you specifically about the particular

18   events that occurred up in Grand Forks, BC.

19        Are you aware of those events and the seizure that

11:36:17  20   occurred?

21   A    Yes.

22   Q    And how did you become aware of it?

23   A    My best recollection is that, uh, the morning after the

24   warrants were executed, um, I believe we were notified by DEA.

11:36:33  25   Q    That something happened.

1    A    That's my best recollection.

2    Q    Did you receive any phone calls or contacts during the time

3    the warrants were being served or sought?

4    A    I don't recall that.  Um, I'm sure that there was probably

11:36:51   5    a phone call to us saying that these drops were going to happen.

6    Um, that way we would be able to, uh, monitor the people that we

7    felt were tied to this in our area.

8    Q    And when you say "drops," are you referring to what kind of

9    a drop?

11:37:11   10    A    Money drop.

11    Q    And so were you aware that there was a money drop close in

12    time to the Grand Forks seizure?

13         MR. SMITH:  Objection, Your Honor; asked and answered.

14    He said that he wasn't specifically aware, but he may have been.

11:37:24   15         THE COURT:  Overruled.

16         Go ahead.

17    BY MS. VAN MARTER:   (Continuing)

18    Q    You can answer the question.

19    A    I'm sorry.  Can you repeat the question?

11:37:28   20    Q    So do you recall that there was a money drop around the

21    same time as the enforcement actions in Grand Forks, BC?

22    A    Now or then?

23    Q    Then.

24    A    Again, I would think that --

11:37:45   25         MR. SMITH:  Your Honor, this is speculation.  Object

1   based on speculation.

2          THE COURT:  I think he's trying to recapture his memory.

3          Go ahead.

4   A    At the time, um -- again, I would say I would assume that

11:38:03   5   we would have had a phone call notifying us of the drop.

6          MR. SMITH:  Same objection.

7   BY MS. VAN MARTER:  (Continuing)

8   Q    Let me ask some follow-up questions.

9          At this point in time had there been multiple cash money

11:38:15   10   drops that you were aware of?

11   A    Yes.

12   Q    And was there a typical process that was followed when a

13   cash money drop was going to happen, with respect to your

14   involvement?

11:38:25   15   A    Yeah, typically we would be notified that a -- that a drop

16   was going to happen, um, to ensure that it was not going to

17   jeopardize our part of the investigation.

18          Can I specifically remember on this occasion whether we got

19   that call?  I can't.

11:38:41   20   Q    And why would they want to inform you that there was a

21   money drop about to occur?

22   A    Just as I said, they didn't want to jeopardize our

23   investigation.  Plus, if individuals were involved from our

24   area, there may be movement from those individuals that we would

11:38:57   25   be interested in.

1    Q    And, for instance, at some point in time did you have a

2    pole camera up or pole cameras up --

3    A    We had --

4    Q    -- during the investigation?

11:39:06   5    A    We had multiple pole cameras up.  We had trackers up.  Lots

6    of things going on.

7    Q    So it would give you an opportunity, then, to maybe review

8    those resources you were utilizing in the investigation?

9    A    Yes.

11:39:17  10    Q    And so your memory today is, although you can't

11    specifically recall in this instance, that was the general

12    practice, that they would at least notify you it was going to

13    happen?

14    A    Yes.  They would attempt to, yes.

11:39:27  15    Q    And when those things would happen, did you have any direct

16    role in the actual money drop or the decisions relative to how

17    the money drop would happen?

18    A    No.  Our role was to monitor our territory.

19    Q    So in this particular instance with respect to the money

11:39:43  20    drop that occurred prior to the Grand Forks seizure, whether you

21    got a specific call or not, you may have been generally aware.

22         Is that a fair way to say?

23    A    Yes.

24    Q    Did you have any direct involvement in that money drop?

11:39:57  25    A    No.

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*                    20
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

1    Q    Were any of your agents or the agents from this district

2    present for surveillance?

3    A    No.

4    Q    Who did the surveillance, if you are aware?

11:40:07  5    A    Based upon a report that I read this morning, uh, RCMP did.

6    Q    And from the events that occurred after the fact of the

7    money drop, did you have any control in what was going to happen

8    by the RCMP after that?

9    A    No.  We definitely made contact with them to find out what

11:40:29  10   they -- what their plans were and if we could assist in any way

11   or if there was evidence that was obtained by them that could

12   have helped us in our investigation.

13   Q    And did you provide any direct assistance specifically with

14   the surveillance in Grand Forks?

11:40:44  15   A    No.

16   Q    Did you -- were you present for surveillance?

17   A    No.

18   Q    In Grand Forks, BC.  Excuse me.

19   A    No.

11:40:50  20   Q    And were you present or did you provide information

21   directly to anybody who provided a document to their court

22   system with respect to the Grand Forks investigation?

23   A    No.

24   Q    And up until the time of the response of this motion, had

11:41:05  25   you even seen the information in support of -- or their version

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*                    21
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/D/Van Marter*

1    of an affidavit in support of their actions in Canada?

2    A    No.  I had seen -- I believe I had seen reports by the

3    undercovers, um, in preparing for discovery, but, no.

4    Q    Not the information in support or their affidavit itself?

11:41:30  5    A    No.

6    Q    And speaking of that, once -- well, let me ask -- I'll go

7    back to that in a minute.  I don't want to get too much out of

8    order.

9         So at some point in time you recall receiving information

11:41:42  10   from Canada as to the search warrants that were executed up in

11   Grand Forks; is that correct?

12   A    Yes.

13   Q    And do you remember who contacted you about that?

14   A    I'm not sure if it was DEA or if it would have been RCMP.

11:42:02  15   And at that time I believe I was the supervisor here, um, so the

16   contact, uh -- at that point I would have, once I knew of this

17   information, I would have put the task force officer that, uh, I

18   had placed in charge of this in contact with the appropriate

19   individuals, which would be the RCMP and DEA.  Um, so he

11:42:23  20   probably would have gotten that contact, not -- not myself

21   directly.

22   Q    Okay.  And did you have any conversations or provide any

23   direction to the RCMP as to what to do with the individuals that

24   had been arrested in Canada?

11:42:36  25   A    No.

1    Q    Did you have any say in what was going to happen?

2    A    No.  There's -- they're a different country.

3    Q    So I just also want to -- after --

4         THE COURT:  Counsel, I've got to take up a matter, so I

11:42:54  5  think probably, as I'm trying to organize our day, which will be

6    lengthy, I want to take up this matter now, outside the presence

7    of the rest of the crowd.  So what I'm going to do is have you

8    folks come back, and I've got some matters this afternoon, but

9    they'll have to trail this.  So let's come back at 1:30 and

11:43:13  10  we'll start.  I've got pleas or other things to do at 1:30.

11         How is your schedule?

12         THE WITNESS:  I need to be at a funeral at 3:30.

13         THE COURT:  Okay.  Well, then I guess to adjust to that,

14   given the cross-examination that's likely, we'll just -- we'll

11:43:31  15  have to do what we can.

16         I'm going to do the Mendoza *ex parte* at 1:15.  So we'll

17   do the Mendoza *ex parte* at 1:15, and then we'll come back at

18   1:30 -- or make it quarter of 2:00, because everybody has things

19   to do.

11:43:51  20         So we'll just keep going, but we'll see how it goes.

21         So finish up.

22         MS. VAN MARTER:  Yeah, and I only have two more

23   questions, and then I'm done with this witness.

24         THE COURT:  Okay.

25

1    BY MS. VAN MARTER:   (Continuing)

2    Q    After the investigation concluded here in the Eastern

3    District of Washington, did your relationship with the RCMP and

4    DEA continue for purposes of assistance in discovery?

11:44:10  5    A    Yes.

6    Q    And did they agree then to provide you information as to

7    their enforcement actions that occurred in their various

8    jurisdictions?

9    A    Yeah.  And, actually, I think the communication, uh, got

11:44:20  10   even better after -- at that time.

11   Q    And did the RCMP themselves agree to provide a complete

12   hard drive of all of their reports that they could provide?

13   A    They did.

14   Q    And did you understand they had some things that were under

11:44:33  15   seal?

16   A    I did not.

17   Q    Until the response to this motion; is that correct?

18   A    Until I was notified yesterday by you.

19        MS. VAN MARTER:  I don't have any other questions, Your

11:44:42  20   Honor.

21        THE COURT:  What is your travel time to your destination

22   at 3:30?

23        THE WITNESS:  Just two blocks over.

24        THE COURT:  Over at Christ the King?

11:44:51  25        THE WITNESS:  Yeah.

1    THE COURT:  Okay.  Thank you.

2    Mr. Smith, you can begin.

3

4                        CROSS-EXAMINATION

11:44:55    5    BY MR. SMITH:

6    Q    I'm going to try not to just repeat anything that Ms. Van

7    Marter has gone over, but the way I understand it, there was --

8    the initial meeting was in Mexico City.

9         And that was when, please?

11:45:17    10    A    When was it?

11    Q    Yes.

12    A    I can't recall at this time.  I believe it was in 2014,

13    but ...

14    Q    Do you -- and at that meeting, of course, it was -- as you

11:45:28    15    indicated, it was the RCMP and it was the DEA and the Mexican

16    authorities?

17    A    And the FBI and the U.S. Attorney's Office --

18    Q    And the FBI.  All right.

19    A    -- and prosecutors from all those districts.

11:45:38    20    Q    All right.  And the point of that was to come together and

21    make some decisions regarding this investigation, correct?

22    A    That was correct.

23    Q    Now, the -- you were here in court when I referenced this

24    information to obtain, which is the application for the search

11:45:56    25    warrant?

1   A    This morning?

2   Q    Yes.

3   A    Yes.

4   Q    And you said that you had reviewed that prior to coming to

11:46:01   5   court?

6   A    Yes.

7   Q    And so you're aware that in it it references a letter of

8   August 18th, 2014, from the resident agent in charge of the

9   United States DEA requesting the RCMP assistance, correct?

11:46:16   10   A    I saw that, yes.

11   Q    Did you see the letter?

12   A    I -- I haven't seen the letter.

13   Q    The -- were you aware that there was a letter that was

14   written from Resident Agent in Charge Lenartowicz to the RCMP

11:46:33   15   requesting their assistance?

16   A    No.

17   Q    And isn't it true -- I mean, what you're -- what you've

18   testified to today is with regard to the FBI, that agency's

19   involvement in this -- in this investigation, correct?

11:46:50   20   A    I was -- I was the person in charge of this investigation

21   for the FBI.

22   Q    That -- I'm sorry.  It was my -- it was -- my question

23   wasn't as clear as you make it.  That's correct.

24        So -- and in that regard, you were -- you were in

11:47:09   25   communication with the DEA, correct?

1    A    Yes.

2    Q    You knew that they were part of this investigation,

3    correct?

4    A    Yes.

11:47:15   5    Q    But you didn't know everything, all the contact that they

6    had with the RCMP.  That just wasn't part of your job.

7    A    Correct.

8    Q    And -- and you agree that of course with regard to this

9    investigation -- or can we call it cooperation between these

11:47:33   10   entities, RCMP, Boston DEA, the DEA here, the FBI, and the RCMP,

11   can we call that cooperation?

12   A    That's probably a good term to use.

13   Q    Okay.  With regard to the cooperation between all those

14   entities, you're saying that they were cooperating, one, to

11:47:58   15   investigate a money laundering operation, correct?

16   A    Yes.

17   Q    And you agree with me that -- that the money laundering

18   necessarily involves the -- investigating a source of money,

19   correct?

11:48:15   20   A    Yes.

21   Q    And -- well, it's not money laundering unless there's --

22   it's money from a specified or unspecified criminal activity,

23   correct?

24   A    Correct.

11:48:25   25   Q    And so if there was investigation with regard to the drug

1    trafficking portion of that money laundering organization, then

2    that would be primarily the responsibility of the DEA, correct?

3    A     In -- in this instance, no, it was not.

4    Q     Thanks.

5          The -- so was it the -- was it the role of the FBI, then,

6    to investigate the drug trafficking portion of this?

7    A     Yes.

8    Q     And did you enlist the cooperation of the DEA in doing that

9    or were they just, they were cut out of it?

10   A     They didn't have the sources to conduct that part of the

11   investigation.  We did.

12   Q     Well, why would it be, then, that they were having

13   independent communication with RCMP requesting their assistance

14   with this investigation?

15   A     They had a separate investigation from what we were

16   investigating.  We found out at some time that this -- the

17   subject, Ivan Calvillo, they were talking to him, and we had

18   been investigating him and --

19         THE COURT:  Mr. Smith, my understanding from what's

20   happened is that the DEA had an ongoing investigation about

21   money laundering and Calvillo before contact by Eastern District

22   FBI.  That's my current understanding.  So there was already a

23   money laundering investigation going on between Boston DEA and

24   RCMP.

25         Now, if I'm wrong on that, then straighten me out.

1    BY MR. SMITH:   (Continuing)

2    Q    The -- you said that in conjunction with the RCMP, your --

3    your role was to monitor their territory, the territory of the

4    drug traffickers?

11:50:22  5    A    What was decided -- well, what had been occurring is we

6    were monitoring a group that was, what we believed, they were

7    moving narcotics and possibly cash between the borders.

8    Q    All right.  And that was part of your money laundering

9    investigation?

11:50:45  10   A    At the time we started this investigation, there was --

11   there was no money laundering investigation by the FBI.

12   Q    It developed into a -- the investigation that we're talking

13   about, it developed into a cooperation in an investigation with

14   the RCMP; isn't that true?

11:51:10  15   A    You're asking different questions here.

16   Q    Well, let me see --

17   A    The money laundering investigation by the FBI was a

18   historical investigation that occurred after the fact.

19   Q    All right.

11:51:26  20   A    Because you're chasing paper.

21   Q    All right.

22   A    So you can do that historically.

23   Q    At some point in time your investigation developed into

24   identifying crossing routes into -- from United States into

11:51:49  25   Canada, correct?

1   A    We were attempting to, yes.

2   Q    And you believed that there was money and drugs that were

3   being crossed from the United States into Canada, correct?

4   A    Yes.

11:52:01   5   Q    And that that investigation actually was -- was cooperative

6   or partly in cooperation with the RCMP, correct?

7   A    It really wasn't.

8   Q    Did it become a cooperation -- cooperation between you and

9   the RCMP when Mr. Juan Bravo Zambrano was arrested in Canada?

11:52:37   10   A    When he was arrested in Canada, we worked with the RCMP to

11   obtain -- we knew who Mr. Zambrano was, so we worked with RCMP

12   to obtain evidence that they had to see if we could further our

13   investigation.

14        Does that answer your question?

11:53:02   15   Q    I think so.

16   A    Okay.

17   Q    You said that -- that you were notified by the RCMP the

18   morning after those arrests occurred.

19   A    I believe so.  That's -- that's my recollection, because --

11:53:37   20   my recollection is we did not know Mr. Zambrano was involved,

21   um, and at some point we were notified of that.  I believe it

22   was that morning, but I -- I'm not 100-percent sure on the exact

23   timing of that.

24   Q    And -- and when you were notified, you're saying you were

11:54:00   25   notified by the RCMP?

1   A    That is my recollection.  Um, it could have been DEA, but I

2   doubt it.  I think at that point DEA realized that, um -- and it

3   may have been DEA saying these are the people that were

4   arrested, and then once they notified us of those individuals,

11:54:21   5   then we contacted RCMP directly.

6        And, in fact, that -- that is my recollection, actually,

7   now that I think about it, is that DEA did contact us with the

8   names, and then once we got the names, then we contacted RCMP.

9            MR. SMITH:  I have no other questions, Your Honor.

11:54:39   10            THE COURT:  I'm sorry.  Say that again.

11            MR. SMITH:  I don't have any more questions for this

12   witness.

13            THE COURT:  Hang on a second.

14            No, stay at the podium, please.

11:54:52   15            Do you have ECF 674?

16            MR. SMITH:  674 ECF?

17            THE COURT:  Yeah.  Attached to your reply, which is 673.

18            MR. SMITH:  Yes.

19            THE COURT:  Okay.  Do you see 674?

11:55:11   20            MR. SMITH:  No.

21            THE COURT:  Report of Investigation, U.S. Department of

22   Justice, Drug Enforcement Administration.

23            MR. SMITH:  Say it again, Your Honor.

24            THE COURT:  If you look at your own reply, it's attached

11:55:26   25   to it.

1     Do you have your reply?

2          MR. SMITH:  I do.

3        (Counsel conferring.)

4          MR. SMITH:  Yes, Your Honor.  I have it.

11:55:43  5     THE COURT:  Do you have 674?

6          MR. SMITH:  That's the Exhibit A with regard to the --

7          THE COURT:  It is, yeah.

8          MR. SMITH:  -- the report of investigation?

9          THE COURT:  Um-hmm.

11:55:53  10    MR. SMITH:  Yes.

11         THE COURT:  Do you have any questions for this witness

12   about that?

13         MR. SMITH:  Well, based upon Your Honor's comments, I

14   think I probably should.

11:56:07  15    THE COURT:  Well, I'm never going to ask anybody to do

16   something I want them to do.  I can do that myself.  The

17   question is whether you want to ask any questions about

18   Exhibit A --

19         MR. SMITH:  Thank you, Your Honor.

11:56:17  20    THE COURT:  -- that you attached to your reply, given

21   your theory.

22   BY MR. SMITH:  (Continuing)

23   Q    The -- now, are --

24         MR. SMITH:  Your Honor, may I approach?

11:56:32  25    THE COURT:  We have Elmo.  You seem to have a large

1  volume of material.

2       Is it something you can easily show him?  And that's

3  fine if you want to just walk it over, that's fine, but you can

4  do an Elmo.

11:56:44  5       MR. SMITH:  Elmo would be better.

6       THE COURT:  That's actually not within your job

7  description, but thank you for that, Ms. Van Marter.  Appreciate

8  that.

9       THE COURTROOM DEPUTY:  Are your monitors on now?

11:57:03  10      THE COURT:  Everybody have a screen up?  Okay.  Thank

11  you.

12      Let's go.

13  BY MR. SMITH:   (Continuing)

14  Q    Mr. Leahy, I'm showing you what's -- I'm simply going to

11:57:12  15  identify it as Report of Investigation.  It's attachment

16  Exhibit A to 6 -- ECF 674.

17      And can you see that on the monitor?

18  A    Yes.

19  Q    All right.  Now, are you familiar with either Special Agent

11:57:37  20  Jason J. Marconi or Kenneth A. McLeod?

21  A    Yes.

22  Q    And how are you familiar with each of those individuals?

23  A    Uh, Jason was a contact that we had for DEA Seattle, um, on

24  this investigation towards the end.  And I -- I thought I knew

11:58:07  25  McLeod, but it says he's the GS, so I don't know him.

1    Q    Okay.  And you recognize these documents, correct, as a DEA

2    Form 6?

3         MS. VAN MARTER:  Just to be clear for the record, are

4    you talking about one page and one document or are you talking

11:58:21   5    about documents?

6         MR. SMITH:  I'm talking about one page, Bates number --

7    actually, let's just make it Bates No. 10000104.

8    A    I am familiar with the DEA Form 6, yes.

9    BY MR. SMITH:  (Continuing)

11:58:32   10   Q    And, I mean, it's a formal form that is used by the DEA to

11   prepare their reports of their investigation, correct?

12   A    That's my understanding, yes.

13   Q    All right.  Well, you've seen these.  You've seen thousands

14   of them, I'm sure.

11:58:47   15   A    They're a report -- they are reports of what they do, like

16   our 302s.

17   Q    And -- and in this document it indicates that the basis of

18   the investigation is that (reading):  Agents from the Boston

19   field division, the Drug Enforcement Administration, and the

11:59:10   20   Vancouver Royal Canadian Mounted Police have been negotiating

21   for the delivery of a large shipment of heroin to the Seattle

22   area.

23        Do you agree with that?

24   A    Yes.

11:59:23   25   Q    And it also indicates that this is a joint operation with

1    the Federal Bureau of Investigation Tri-Cities.

2         That would be you, correct?

3    A    Yes.

4    Q    All right.  The -- and the joint -- the joint investigation

11:59:39  5    with the FBI is the drug trafficking investigation performed by

6    the DEA, the RCMP, and the Boston field division?

7    A    In this instance, yes.

8    Q    Are you saying that this now is separated out somehow?

9    A    This is a specific instance.

12:00:02  10        THE COURT:  What's the date of that document?

11        THE WITNESS:  August 16th, 2016.

12        THE COURT:  Okay.  And what's the date of the -- doesn't

13   it reference August 15th, 2016, as well, in Targets 1 and 2?

14        THE WITNESS:  Yes.

12:00:21  15        THE COURT:  Okay.  Why don't you explain this to us.

16        THE WITNESS:  So, again, I'm retired, so I don't have

17   documents in front of me and the timeline is -- is not really

18   right on at this point, but I believe this set up the actual

19   takedown of this whole case, and this was a coordinated effort

12:00:45  20   by everybody to take this down at this time.

21        THE COURT:  Okay.

22        THE WITNESS:  And it resulted in the indictment of all

23   these individuals.

24        THE COURT:  Thank you.

12:00:54  25        All right.  Counsel, I just wanted to get that -- I

1  wanted to get something so I can hear it.  So you can ask such

2  questions as you wish.

3  　　　　MR. SMITH:  Thank you, Your Honor.

4  BY MR. SMITH:  (Continuing)

12:01:04  5  Q    The primary -- it indicates that the primary target of the

6  investigation or of the operation was Jese David Casillas

7  Carillo, correct?

8  A    Correct.

9  Q    And he'd been the primary target since, what, 2015?

12:01:18  10  A    Um, no.  He -- well, I -- again, dates I'm not -- I'm not

11  good on at this point in time.  But Mr. Calvillo was killed at

12  some point.  After he was killed, it took us several months

13  to -- I want to say almost six months to a year to -- to

14  identify who had taken over their organization.

12:01:43  15  Q    And were you able to identify who had taken over the

16  organization by virtue of the cooperation between the DEA, the

17  FBI, and the RCMP?

18  A    The DEA and the FBI in this instance, yes.

19  　　　　MR. SMITH:  No further questions, Your Honor.

12:02:01  20  　　　　THE COURT:  Okay.  Thank you.

21  　　　　Anything else for -- no?  You're good?

22  　　　　MS. VAN MARTER:  No, Your Honor.  No other questions.

23  　　　　THE COURT:  Okay.  Thank you, Mr. Leahy.

24  　　　　THE WITNESS:  Thank you.

12:02:10  25  　　　　THE COURT:  You may step down.

*USA v. Carillo Casillas, et al./4:15-CR-6049-EFS*
*Excerpt of Pretrial Conference/Motion Hearing/March 6, 2018*
*Leahy/X/Smith*

36

1          Excuse me.  I'm assuming nobody else has questions for

2     Mr. Leahy, since this is Mr. Smith's motion.

3          Hearing nothing, you're excused.  Thank you.

4          (End of excerpt of proceedings.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

1                        C E R T I F I C A T E

2

3      I, KIMBERLY J. ALLEN, do hereby certify:

4           That I am an Official Court Reporter for the United

5  States District Court for the Eastern District of Washington in

6  Richland, Washington;

7           That the foregoing proceedings were taken on the date

8  and at the time and place as shown on the first page hereto; and

9           That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12           I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15           DATED this 19th day of March, 2018.

16

17

18

19  _____

20  Kimberly J. Allen, CRR, RMR, RPR, CCR
   Washington CCR No. 2758
21  Official Court Reporter
   Richland, Washington
22

23

24

25