UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:15-CR-6049-EFS-2, 10, 11, 16, 18, 19, 21, 23 |
| Plaintiff, | ) | |
| v. | ) | March 6, 2018 |
| JESE DAVID CARILLO CASILLAS (2), BRITTNEY LEE ZARAGOZA (10), SALVADOR GUDINO CHAVEZ (11), EDGAR OMAR HERRERA FARIAS (16), ALFREDO MAGANA GARIBAY (18), JUAN BRAVO ZAMBRANO (19), MIGUEL REYES GARCIA (21), JOSE ADRIAN MENDOZA (23), | ) | Richland, Washington |
| | ) | Excerpt of Pretrial Conference/Motion Hearing (excluding William Leahy testimony, filed previously) |
| | ) | Pages 1 to 176 |
| Defendants. | ) | |

BEFORE THE HONORABLE EDWARD F. SHEA
SENIOR UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:

Stephanie A. Van Marter
Stephanie.Van Marter@usdoj.gov
Caitlin Baunsgard
US Attorney's Office-SPO
920 W Riverside, Suite 300
P.O. Box 1494
Spokane, WA 99210
509-353-2767

For the Defendant Carillo Casillas (2):

Nicolas V. Vieth
Nick@viethlaw.com
Vieth Law Offices
505 West Riverside
Suite 200
Spokane, WA 99201
208-664-9448

For the Defendant Zaragoza (10): Victor H. Lara
Vh_lara@hotmail.com
Hurley Lara & Hehir
411 North Second Street
Yakima, WA 98901
509-248-4282

For the Defendant Gudino Chavez (11): Gregory Lee Scott
Gregory@scottlaw.net
Gregory Scott Law Office
6 South Second Street
Suite 208
Yakima, WA 98907
509-574-0991

For the Defendant Herrera Farias (16) and Magana Garibay (18): Peter Steven Schweda
Pschweda@wsmattorneys.com
Waldo & Schweda, PS
2206 N Pines Road
Spokane, WA 99206
509-924-3686

For the Defendant Bravo Zambrano (19): Richard A. Smith
Rasmith@house314.com
Smith Law Firm
314 North Second Street
Yakima, WA 98901
509-457-5108

For the Defendant Reyes Garcia (21): Kenneth D. Therrien
Kentherrien@msn.com
Kenneth Therrien Law Office
413 North Second Street
Yakima, WA 98901
509-457-5991

For the Defendant Adrian Mendoza (23): Scott W. Johnson
Scott@johnsonorr.com
Johnson & Orr PS
1038 Jadwin Avenue
Richland, WA 99352
509-579-0080

Official Court Reporter: Kimberly J. Allen, CCR #2758
United States District Courthouse
P.O. Box 685
Richland, Washington 99352
(509) 943-8175

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

**INDEX**

| **Proceedings:** | **Page** |
|---|---|
| Colloquy Re: Motion to Continue, ECF No. 684 | 10 |
| Colloquy Re: Motion to Continue Motion to Suppress, ECF 688 | 12 |
| Motion to Suppress, ECF 614 | 21 |
| Argument Mr. Schweda | 75 |
| Argument Ms. Baunsgard | 76 |
| Rebuttal Argument Mr. Schweda | 80 |
| Ruling By the Court | 80 |
| Motion to Suppress, ECF 621 | 81 |
| Argument Mr. Smith | 92 |
| Argument Ms. Van Marter | 101 |
| Rebuttal Argument Mr. Smith | 105 |
| Ruling By the Court | 110 |
| Motion to Suppress, ECF 622 | 110 |
| Argument Mr. Smith | 139 |
| Argument Ms. Van Marter | 140 |
| Rebuttal Argument Mr. Smith | 141 |
| Ruling By the Court | 142 |
| Motion to Suppress, ECF 624 | 142 |
| Argument Mr. Smith | 142 |
| Argument Ms. Van Marter | 143 |
| Rebuttal Argument Mr. Smith | 145 |
| Ruling By the Court | 146 |
| Colloquy Re: ECF 620 | 147 |

**WITNESS INDEX**

| **Plaintiff Witness:** | **Page** |
|---|---|
| **DOUG STANLEY** | |
| Direct Examination By Ms. Van Marter | 118 |
| Cross-Examination By Mr. Smith | 123 |
| Redirect Examination By Ms. Van Marter | 135 |
| **ROBERT TUCKER** | |
| Direct Examination By Ms. Baunsgard | 22 |
| Cross-Examination By Mr. Schweda | 59 |
| Redirect Examination By Ms. Baunsgard | 72 |

*****

| **Defense Witnesses:** | **Page** |
|---|---|
| None | |

## EXHIBITS ADMITTED

| Plaintiff Number | Description | Page |
|---|---|---|
| 1 | 35 photographs taken by Sergeant Tucker during execution of March 17, 2012 search warrant | 32 |
| 2 | LEAD Task Force list of items seized during execution of search warrant | 55 |
| 3 | March 17, 2012 search warrant | 59 |
| 4 | Affidavit in Support of March 17, 2012 Search Warrant | 58 |

| Defense Number | Description | Page |
|---|---|---|
| 5 | Three additional search warrants | 66 |

## GENERAL INDEX

Page

Reporter's Certificate.............................176

(March 6, 2018; 9:38 a.m.)

THE COURTROOM DEPUTY: Please rise.

(Call to Order of the Court.)

THE COURT: Good morning to you all. Please be seated.

09:38:30 THE COURTROOM DEPUTY: Matter before the Court is *United States of America v. Carillo Casillas*, et al. Cause No. 15-CR-6049-EFS, Defendant Nos. 2, 10, 11, 16, 18, 19, 21, and 23. Time set for a pretrial conference and motion hearing.

Counsel, please state your presence for the record.

09:38:52 We'll go with the Government first, and then we'll move to the top row in the box --

THE COURT: Excuse me. Excuse me. Has everybody checked in with you already?

THE COURTROOM DEPUTY: Yes.

09:39:02 THE COURT: Okay. Well, everybody has checked in, and so of record, each attorney, except for Mr. Felice from Spokane, who is absent -- and is Mr. Schweda standing in for him? Is that correct?

MR. SCHWEDA: Yes, Your Honor.

09:39:18 THE COURT: So all other counsel for all other defendants who have not plead guilty are present in court with each of their clients.

And, Mr. Vieth, thank you for being here. I appreciate it.

09:39:31 MR. VIETH: Yes, Your Honor.

THE COURT: Okay. That said, we're ready to go.

Ms. Van Marter?

MS. VAN MARTER: Yes, Your Honor.

Stephanie Van Marter on behalf of the United States. At counsel table is Caitlin Baunsgard; our case agent, Joe Brazeau; and we also have an intern from our office, Matthew Lieberwitz (ph).

THE COURT: All right. Thank you.

Let's get started. Why don't you bring me up to date as to where we are. And, from my perspective, we're ready to go ahead with all motions today.

MS. VAN MARTER: Thank you, Your Honor.

Your Honor, we -- there are a number of motions that have been filed before the Court. The United States does have witnesses prepared, if needed. There are several of the responses to which the United States, specifically some of the Zambrano motions, that the United States does not believe that defense has met burden to even proceed to testimony or hearing. So I'm not sure which one the Court would like me --

THE COURT: Whatever has been an ECF -- the ECF numbers rule, so whatever is the oldest ECF number of motions pending, that's where we begin.

MS. VAN MARTER: Well, most of them are filed the same day, pursuant to the Court's motions deadline.

THE COURT: That would be the deadline for the motions.

MS. VAN MARTER: Yes, Your Honor.

THE COURT: Okay.

MS. VAN MARTER: We have one, ECF 614, which is the earliest in time, that is a motion to suppress that was filed by Mr. Schweda on behalf of his client, Mr. Farias.

09:40:51

THE COURT: Okay.

MS. VAN MARTER: That one we do have a witness prepared, and we do have exhibits prepared.

THE COURT: Great.

09:41:01

MS. VAN MARTER: We also have several motions in limine and a bill of particulars that the United States responded to in a consolidated response, and that is ECF 617.

THE COURT: I've read that. I've read them all.

MS. VAN MARTER: Okay. And then, Your Honor, the other

09:41:16

contested motions that we have, we have several motions to suppress filed by Mr. Smith on behalf of Mr. Zambrano; specifically ECF 621, 622, and 624. The 621 pertains to the enforcement actions in Canada. 622 and 624 are motions which pertain to the search of Mr. Zambrano's residence.

09:41:44

THE COURT: Okay. All right. We're ready to proceed, but for the purposes of the record, the Court makes this order: There's a compelling governmental interest in ensuring the safety of all individuals in the courtroom, including the defendants, counsel, and courthouse staff. With five in-custody

09:42:03

defendants present at hearing, along with three out-of-custody

defendants, with family members and a great number of people in the courtroom, given the mandatory minimum sentences of ten years that many are facing because of the conspiracy count, the security risks are such under those circumstances where the Court finds that the use of leg shackles is the least restrictive means possible for maintaining security and order in the courtroom and accomplishing the Court's compelling interest in ensuring the safety of everyone in the courtroom. And I've signed the order to that effect as of this time.

09:42:21

Okay. A couple of things.

09:42:37

Mr. Vieth, you have just recently been appointed and you want a continuance.

Is that correct?

MR. VIETH: It is, Judge.

THE COURT: Okay. And I've read your materials, and I'm familiar with them, so from my perspective, at least as to your client, there will be a continuance. I don't know that there's necessarily a need for continuing the case otherwise, but it may be that we'll just split out your client from everybody else, and we'll go to trial on March 26th as scheduled. And I'm prepared to go forward with that, absent some reason why I shouldn't. So ...

09:42:47

09:43:02

MR. VIETH: Thank you, Judge.

MS. VAN MARTER: Your Honor, I just want to note for the record, the United States is prepared to go to trial on

09:43:16

March 26th. I would just note the difficulty in separating. We have witnesses coming from Canada, from the East Coast of the United States; from all over --

THE COURT: And they're scheduled to be here.

09:43:30 MS. VAN MARTER: They are scheduled to be here. But to try this case multiple times would require us to bring them all back on multiple occasions, as some of them apply to the testimony --

THE COURT: I understand that multiple includes two, but 09:43:42 I'm thinking two. So, from my perspective, it would be on two occasions, one now and one in October. And the reason I say October is that I've looked carefully at the preparation of this case by all CJA counsel, and I've looked at the date of appointment, and I've looked at the date of first motion and the 09:44:03 date of trial, and it's clear to me that Mr. Vieth is going to need every bit of that period of time, especially given the status of his client in this case, to prepare his case. So as a matter of due process for his client, he needs all that time, and he's going to get it.

09:44:22 And I do that based on what I've seen of the performance of counsel in this case so far. The case has been pending, motions aren't filed until the last minute, and the least amount of time would be seven months. So I think it's only fair to him and his client that he have an October setting, and so he will 09:44:43 be set for trial in October.

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Colloquy Re: Motion to Continue Motion to Suppress, ECF 688
12

So I need to hear -- from your perspective, I expected you'd tell me exactly what you told me: I don't want to try this case twice. Well, then the answer is you've got a lot of other people that want to go to trial. I mean, they want their day in court, and they're not willing to wait another seven months; and, frankly, they don't have to.

09:44:57

So, from my perspective, are there any other motions to continue, that I need to continue trial? Because I don't remember any.

09:45:09

No. So there aren't any other motions to continue trial except Mr. Vieth.

So let's get started with the motions to suppress, and we'll start with Mr. Schweda's motion to suppress.

But, Mr. Schweda, do I understand that you filed some sort of motion to continue that hearing?

09:45:21

MR. SCHWEDA: Yes, Your Honor. Do you want me to go to the podium?

THE COURT: No, I can hear you.

MR. SCHWEDA: On March 1st, the Government sent out Discovery Disclosure No. 22. It comprises of 956 pages that have to deal with the search that's in question here. The way this -- I filed a motion based upon an independent investigation -- what happened was we had received a proposed plea agreement from the Government which listed a search warrant that was executed on March 22 of 2012 at the home of my client.

09:45:32

09:46:05

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 13
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: Motion to Continue Motion to Suppress, ECF 688*

There was no discovery that we had that was provided for by the Government.

THE COURT: What is your client charged with?

MR. SCHWEDA: Pardon?

09:46:21 THE COURT: What is your client charged with?

MR. SCHWEDA: In that case he was charged with possession of methamphetamine --

THE COURT: Are you talking about the state case?

MR. SCHWEDA: Yes.

09:46:28 THE COURT: Back in 2012?

MR. SCHWEDA: Correct.

THE COURT: What about it?

MR. SCHWEDA: The Government had indicated in the factual recitation of a proposed plea agreement that that incident was an act in furtherance of this charged conspiracy.

09:46:39

THE COURT: You already knew about the March 2012 case.

MR. SCHWEDA: I knew about it, but I didn't know until then that the Government was going to use that as an act in furtherance of this conspiracy.

09:47:00 THE COURT: Well, yes, but you raised the issue of the conflict of interest with Mr. Vieth's client, correct?

MR. SCHWEDA: Correct.

THE COURT: Yeah, and you did that because you'd done work that established that -- in fact, the basis for Ms. Emmans withdrawing because she had been involved in the representation

09:47:19

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: Motion to Continue Motion to Suppress, ECF 688*
14

at that time.

MR. SCHWEDA: Correct.

THE COURT: So you knew that there was a 2012 case. You knew that it was related to this.

09:47:28 MR. SCHWEDA: At that point in time. I didn't know it -- I didn't know it until the plea agreement was saying that that was going to be used as an act in furtherance of the -- of this conspiracy that's charged in this case. And so it isn't something that was -- isn't something that --

09:47:47 THE COURT: Well, the plea agreement, as you know -- and I don't mean to interrupt you, but the plea agreement is none of my business.

MR. SCHWEDA: Pardon?

THE COURT: The plea agreement is none of my business.

09:47:54 MR. SCHWEDA: I understand, but I'm only bringing it up because that's the first time that I was alerted that that incident was going to be used as evidence against my client, to attempt to prove that he's a member of this conspiracy.

THE COURT: Okay.

09:48:12 MR. SCHWEDA: Well, we did -- we obtained, independently of the Government, the search warrants, the affidavit --

THE COURT: I assumed you would, but that's just because I knew you would. I knew you'd do your due diligence and look at that and ask yourself whether there was anything in that case you needed to worry about and what avenues of attack or strategy

09:48:30

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: Motion to Continue Motion to Suppress, ECF 688*
15

you could employ. I mean, I expected that. So -- I mean, I expected you'd do that.

MR. SCHWEDA: Certainly. And -- and in response, the Government provided numerous pages of discovery. I haven't had a chance to look at all that discovery. The -- I was in trial last Friday, so I wasn't available. I started looking at it on Sunday. I didn't have much time to look at it yesterday. Some of it may not pertain to this search, but I can tell you that by looking at it, a great -- it appears that a great majority of this discovery that was provided pertains to this search.

THE COURT: What search?

MR. SCHWEDA: The search that's the subject of this motion to suppress in ECF No. 614.

THE COURT: Ms. Van Marter, what is your position on this?

MS. VAN MARTER: Your Honor, actually, Ms. Baunsgard stepped in to assist, so she is going to be handling this particular response, but I will tell the Court that prior to presenting a factual summary to the defendant, the references to the search warrant from 2012 were in several of the summary affidavits in the preindictment pleadings that were disclosed in September and October of 2016. The defendant is correct, we did not have all of the reports, and gathered them based upon his motion to suppress and the allegations that were made in the motion to suppress so that we could respond. We had provided to

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Colloquy Re: Motion to Continue Motion to Suppress, ECF 688
16

counsel an understanding of the amount of drugs seized. We've provided the DEA lab -- excuse me, the WSP lab materials from the testing of the controlled substances from the search of the defendant's residence, prior to him filing the motions to suppress.

09:50:10 So although Mr. Schweda was newer to the case, this information is not new. It had been in the discovery previously, and more detailed so in response to his motion to suppress.

09:50:20 THE COURT: Well, you said you supplied them in September of 2017?

MS. VAN MARTER: '16 was the first time we provided information in preindictment pleadings regarding reference to the warrant.

09:50:31 THE COURT: That would be of record then.

MS. VAN MARTER: It would be in our discovery, yes. And I was just looking in our discovery binders. We made some -- when we did affidavits in summary of the investigation, a reference to that search warrant that occurred in 2012, that was 09:50:44 the first time it was referenced in discovery. We then provided lab reports and information from the search warrant, as well as Rule 16 materials, in anticipation of notice of expert testimony regarding the drugs that were seized from the defendant's residence prior --

09:51:01 THE COURT: So counsel had those for how long?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 17
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: Motion to Continue Motion to Suppress, ECF 688*

MS. VAN MARTER: On the notice of expert materials, I'd have to look to see, but I believe for several months prior to Mr. Schweda's appointment.

THE COURT: Okay.

09:51:12 MR. SCHWEDA: Well, Your Honor, the expert materials as far as the substances that are involved in this search were just received just recently. I -- I didn't have it before that.

And as far as --

THE COURT: I'm sorry. You didn't have what before 09:51:30 that, Counsel?

MR. SCHWEDA: Any of the lab results or anything about the substances. They weren't in discovery. And they weren't in the -- they weren't --

THE COURT: Excuse me. Excuse me. Are you telling me 09:51:41 that you only recently got the expert --

MR. SCHWEDA: Yes.

THE COURT: -- lab analysis?

MR. SCHWEDA: Yes. And, in fact, if you --

THE COURT: So that counsel -- so your view would be 09:51:49 that I should bar those at trial because she failed to disclose those as a matter of discovery?

MR. SCHWEDA: I'm not asking for that at this point in time, Your Honor. I'm just wanting the Court to understand, if you look at the Government's disclosures on the drug -- or the 09:52:06 controlled substance evidence that it will present, the

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS 18
Pretrial Conference and Motion Hearing/March 6, 2018
Colloquy Re: Motion to Continue Motion to Suppress, ECF 688

controlled -- the alleged controlled substances that deal with this search are not disclosed by the Government in that. And I would submit that I have not received -- I did not receive that until recently.

09:52:23 As far as the disclosure of this search being in 2012, I -- I looked for that as soon as I found out that they were going to use this or thought that this was an act in furtherance of the conspiracy, and I couldn't find any -- any reference to it --

09:52:40 THE COURT: You filed a motion to suppress, didn't you?

MR. SCHWEDA: Pardon?

THE COURT: You filed a motion to suppress?

MR. SCHWEDA: Correct.

THE COURT: Okay. And they filed a response. And so 09:52:48 we're here to deal with the motion to suppress.

MR. SCHWEDA: And they presented evidence to me --

THE COURT: They didn't have to tell you what -- now, Mr. Schweda, once you file a motion to suppress, you accept the fact that they're going to respond or agree or acquiesce, and 09:53:05 they didn't acquiesce. So at some point they say, no, here is why the response -- here's what our response is.

What was your reply to their response? Did you file a reply to their --

MR. SCHWEDA: I filed a response, but at that point in 09:53:22 time, I had not received this additional discovery. The

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: Motion to Continue Motion to Suppress, ECF 688*
19

discovery is after I filed the reply to my motion.

THE COURT: You keep saying discovery.

Is this something that you identified as discovery, or is this material that was -- you were going to present at time of motion to suppress?

09:53:36

MS. VAN MARTER: Your Honor, it's going to be exhibits in response to the motion to suppress filed by the defendants. So we gathered the materials in response to his motion.

THE COURT: Okay.

09:53:49

MS. VAN MARTER: We also provided it in discovery, so we would have a Bates number.

THE COURT: So why can't I have the hearing today?

MR. SCHWEDA: Your Honor, I think that Ms. Van Marter just alerted the Court that their -- what they presented to me on the 1st, that I didn't get a chance to look at until Sunday,

09:54:04

and have only had a cursory opportunity to review, are exhibits that they're going to be using today during the hearing. And I think that that's unfair, and I'd ask for additional time to prepare to respond to the motion.

09:54:22

THE COURT: No, I want to hear the motion today. If you need to have a continuance in some fashion or another to supplement or to call additional witnesses, I'll be happy to give you that opportunity. But I want to take what I can get today, and then, if necessary, and you make a record that's persuasive to me that you need more time, then we'll simply

09:54:37

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Colloquy Re: Motion to Continue Motion to Suppress, ECF 688
20

continue the hearing, and you'll be back within a few days, and you'll have your chance to put on your situation. But I've got a trial starting March 26th. So, you know, we need to get this done for the benefit of you and your client, as well as everybody else who is associated with -- who may have some interest in the outcome of that, and the only way to get that done is to, in fact, say we'll take what we have today, and then you can -- because all of the witnesses to be called are all local, aren't they, Ms. Van Marter? The witnesses on this suppression hearing are all local?

MS. VAN MARTER: Yes, Your Honor.

THE COURT: Yeah, so we don't have -- it's not an international problem; we're not going to have to bring folks back from a long distance. And if you really think you need another hearing, then you can tell me you need another hearing, and I'll be happy to conduct a continuation of this hearing. But I think we're ready to go.

So there are other motions as well as the motion to continue -- I'm sorry, this motion to suppress, and -- you have some, Mr. Smith has some, Mr. Therrien has some, but those are the only motions I'm aware of.

Does anybody else have motions that I've overlooked, other than Mr. Smith, Mr. Therrien, and Mr. Schweda?

I'm sorry. The headset for Mr. Casillas is not working? Your client, Mr. Vieth?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

MR. VIETH: That's correct, Judge. It's not working.

THE COURTROOM DEPUTY: Are the other headsets? Are the others working?

MR. SCOTT: No, this is not working.

09:56:15 (Discussion held off the record.)

MR. THERRIEN: My client says --

THE COURT: I'm sorry, Mr. Therrien, you need to speak up.

MR. THERRIEN: My client says his headset is giving him

09:56:25 problems.

MR. VIETH: We're better now, Judge. Thank you.

THE COURTROOM DEPUTY: So, Mike, it sounds like it's the one that she has right there.

(The Court and courtroom deputy conferring.)

09:57:07 THE COURT: Yeah, I've observed, and everybody has nodded their heads, indicating that they have a functioning headset, so I'm ready to go.

All right. So those are the only motions that I know of, and there are no other attorneys who have any other motions.

09:57:23 I've taken care of Mr. Vieth's motion, and now the question is, what's next. And let's get started with the motion to suppress.

THE COURTROOM DEPUTY: Are you at the point that we can display the monitor?

MS. BAUNSGARD: Not yet. I just wanted to be ready

09:58:15 when ... it's up, yeah.

THE COURT: Okay. Got a first witness?

MS. BAUNSGARD: Good morning, Your Honor.

THE COURT: Good morning.

09:58:28 MS. BAUNSGARD: I do. The United States would call Sergeant Robert Tucker.

THE COURT: If you'll come forward, please.

ROBERT TUCKER,

called as a witness on behalf of the Plaintiff, having first

09:58:50 sworn or affirmed, testified under oath as follows:

THE WITNESS: Yes, sir.

THE COURT: Please be seated.

THE COURTROOM DEPUTY: Is the green light on on the microphone?

09:58:58 THE WITNESS: Yes, ma'am.

DIRECT EXAMINATION

BY MS. BAUNSGARD:

Q Good morning.

09:59:10 A Good morning.

Q When you're comfortable, could you introduce yourself to the judge and the courtroom, please.

A Yes. I am Sergeant Robert Tucker. The spelling of my last is T-U-C-K-E-R.

09:59:19 Q And how are you employed?

A I am employed by the Yakima County Sheriff's Office since 2003.
Q What rank do you currently hold?
A Sergeant.
09:59:27 Q And prior to being a sergeant, what rank did you hold?
A Uh, I was a patrol deputy and a detective.
Q And how long have you been with the sheriff's office?
A Since 2003, so roughly -- however many years that is now.
Q All right. And did you have any prior law enforcement
09:59:40 experience?
A I did. Prior to that, in 1999, I was employed by the City of Toppenish as a police officer.
Q And so from Toppenish, then, you went to the Yakima County Sheriff's Office?
09:59:51 A Correct, in I believe it was July of 2003.
Q And prior to working for the City of Toppenish, did you have any other law enforcement experience?
A I was in the United States Air Force, and I was a police officer there.
10:00:01 Q And how long did you do that?
A Since, uh, '93 to '97.
Q And in your employment with the Yakima County Sheriff's Office, were you specially detailed at any point to a drug task force?
10:00:15 A Yes. From 2009 to 2015 I was assigned to the Law

Enforcement Against Drugs Task Force.
Q Is that known as LEAD?
A Yes.
Q And what role did you undertake at the LEAD Task Force?
10:00:29 A At the LEAD Task Force, I was assigned as a, what we refer to as a case agent, so I was in charge of running investigations.
Q And as a case agent, you were involved in day-to-day investigations of drug-trafficking crimes, it sounds like.
10:00:41 A Yes.
Q And as part of your employment as a law enforcement officer, I assume you've received a vast number of trainings in law enforcement techniques, probable cause; things of that nature.
10:00:51 A Correct.
Q And as part of your employment with the LEAD -- or assignment, I should say, to the LEAD Task Force, were you involved in an investigation into an Esteban Hernandez?
A Yes.
10:01:06 Q And prior to the hearing today, did you happen to review search warrants and your affidavit in support of search warrants for three residences associated with Mr. Hernandez's case?
A Yes, I reviewed them this morning.
Q And was one of the residences that you searched located at
10:01:29 4873 East Edison Road in Sunnyside?

A Yes.

Q And is that in Yakima County?

A It is.

Q And is that the Eastern District of Washington?

10:01:38 A Yes.

Q And for purposes of the record, I would note the ones that you reviewed.

Do you believe what is Defense Exhibit 1, which is the search warrant for 4873 East Edison Road, does that appear to be

10:01:57 a true and accurate copy of that search warrant that you obtained?

A What am I looking at? I'm sorry.

Q Your search warrant?

THE COURT: You said defense -- did you say defense

10:02:09 exhibit?

MS. BAUNSGARD: Correct. Defense had marked it as Exhibit 1 in their response.

BY MS. BAUNSGARD: (Continuing)

Q Is that a true and correct copy of what you --

10:02:15 A Yes. Of my actual search warrant, yes.

Q Correct. Yes.

And that was a search warrant signed by a Yakima County district court judge on March 17th, 2012?

A That sounds correct.

10:02:32 Q And did you also have the opportunity to review the

affidavit you submitted in support of the search warrant for that residence, prior to your testimony today?

A Yes.

MS. BAUNSGARD: And I would note, for purposes of the record, that's marked as Defense Exhibit 2 in their filing.

10:02:43

BY MS. BAUNSGARD: (Continuing)

Q And based on your review of your affidavit, do you believe that's a true and correct affidavit or your true and correct copy of the affidavit you submitted in support of that search warrant?

10:02:58

A Yes.

Q So based on your investigation into Esteban Hernandez, what did you believe was the significance of the 4873 East Edison Road address in Sunnyside?

10:03:27

A Uh, based off the intelligence we gathered during the investigation, we believed that was the actual source of the methamphetamine that we were purchasing.

Q And so you were utilizing a confidential informant to purchase methamphetamine from Mr. Hernandez?

10:03:39

A Yes, along with -- we also used an undercover agent during one of the purchases from Mr. Hernandez, too.

Q And based on your investigation, you believed the methamphetamine that Mr. Hernandez was selling was coming out of that residence on East Edison Road, correct?

10:03:54

A That's correct.

MR. SCHWEDA: Objection, Your Honor. That asks for a conclusion only. It's not based on any facts.

THE COURT: Rephrase the question.

BY MS. BAUNSGARD: (Continuing)

10:04:03 Q Based on your investigation, you indicated that you believed that 4873 East Edison Road was the source-of-supply's house?

A Correct.

Q And what did you base that on?

10:04:18 A Uh, based off the fact that when we would request an order, uh, with the confidential informant through Mr. Hernandez and he said he didn't have any, based off a GPS tracker that we had on the vehicle, we could watch him leave his workplace, go directly to that location; he would then call our informant and advise 10:04:37 that he now had the drugs and we could meet.

Q And is that all outlined in your affidavit in support of search warrant?

A Yes.

Q So did you conduct any due diligence on that 4873 East 10:04:51 Edison Road address to determine who might be residing there?

A Yes.

Q Could you describe what you did.

A Uh, we were able to identify the majority of the cars located at that address. We were able to identify, I believe, 10:05:01 five or six of them. Um, then we ran those through our

Department of Licensing. None of them were actually registered to that location. Two of them, I believe, were actually registered off of the west side, where they had been sold and never transferred. Um, I mean, I tried to find every aspect that I could without disclosing our investigation to anyone, and we were never able to come up with who was actually living in that residence.

10:05:15

Q And is that something of interest or significant to you as a drug investigator, that these vehicles were sold but never re-registered?

10:05:31

A Yes.

Q And why is that?

A Uh, because that's a way of hiding their identities as to who is actually inside those, uh, residences conducting illegal activities. It allows them to basically work undetected.

10:05:40

Q And so based on the totality of your investigation, which you've outlined in your affidavit, you applied for and received a search warrant?

A Correct.

10:05:53

Q And how did you -- or could you describe the residence as it appears from the outside. Is it --

A So the residence is set up on the south side of East Edison. Um, the driveway is to the west, and you have to come in a -- basically kind of like a long, sweeping driveway to the back of the residence, which is where the main door was. Um,

10:06:11

there was a small carport structure, and then there was a small shop off to the south. The actual, uh, entrance to the door was on the east side, southeast side of the residence. That was the only point of entry that we used or even located that went in.

10:06:30 On entering, there's like a small, I call it like an entryway area. The door opened out, which was odd, because most residential construction, um, is all inward-opening doors. Um, once you entered in, you were into the kitchen/dining area. Then it went to a living room, two bedrooms, and a bathroom.

10:06:52 Q And I believe you said that there was one driveway to the residence?

A Only one.

Q And were there -- was there any indication from the exterior of the residence that there might be multiple, like

10:07:03 separate living units, like separate apartments there?

A No.

Q Was there any, like, addresses that said like "half" or "A" or --

A No.

10:07:10 Q No?

A No. There was nothing to indicate there was other than just a single family dwelling.

Q So you executed that search warrant you obtained on March 22nd, 2012?

10:07:21 A Correct.

Q At the 4873 East Edison Road address.
A That's correct.
Q And so upon entry into the residence -- you've articulated the outlay -- did you encounter any residents of that building?
10:07:37 A We encountered two males and one female.
Q And did they give any articulation of who they were or their relationship to the premises?
A Yes.
Q And what was that?
10:07:47 A The, uh -- there was a couple, a male and a female, that lived in the northwest bedroom, and then the suspect, uh, the main suspect lived in the southwest bedroom.
Q And did you subsequently identify the individual who lived in the southwest bedroom?
10:08:06 A It was, uh, Edgar Farias, I believe.
Q And did you or a member of your team take photographs of the execution of the search warrant?
A Yes.
Q And prior to your testimony today, did you review the photographs of the search warrant?
10:08:22
A Yes.
Q Is that the photographs, all the photographs taken of the residence during that search?
A Yes.
10:08:31 Q And do those appear to you to be true and accurate

depictions of how the residence appeared to you when you executed the search warrant?

A Yes.

MS. BAUNSGARD: I have marked them on a disc Government Exhibit 1, and I would move for their admission.

THE COURT: Did you review them on the disc? You understand that these photos are on the disc?

THE WITNESS: I believe those are the same ones that -- they were provided by the LEAD Task Force, and I actually took those photographs at the scene.

THE COURT: Okay. Any objections?

MR. SCHWEDA: Well, Your Honor, I'd ask that he go through -- through them.

THE COURT: Well, he's going to.

MR. SCHWEDA: Okay.

THE COURT: She's just moving to admit them, and then he's going to go through them.

MR. SCHWEDA: Yeah, I'd ask that it be subject to his going through them.

THE COURT: Certainly. Subject to that, you can review them. Usual foundations of photographs.

Go ahead.

MS. BAUNSGARD: Certainly. I would have a copy for the Court as well.

THE COURT: You are going to cue it up on the machine,

aren't you?

MS. BAUNSGARD: I do, but just for the Court's --

THE COURT: Are you using your laptop?

MS. BAUNSGARD: I am, yes.

10:09:23 THE COURT: Okay. And it's connected to our system?

MS. BAUNSGARD: It is, and it's ready to publish, with the Court's blessing.

THE COURT: Well, you can lay a foundation by showing the witness the photographs to make sure that what you're

10:09:32 telling him is on the disc is what he reviewed and that there's a proper foundation, and I think that's the point of Mr. Schweda's statement.

So go ahead.

(Government Exhibit No. 1 admitted into evidence subject to

10:09:40 foundation being laid.)

MS. BAUNSGARD: Certainly.

And is the photo displayed on your screen?

THE WITNESS: Yes.

THE COURT: Okay. There is -- hang on a second.

10:09:56 Thank you. I just had to adjust my computer. Go ahead.

BY MS. BAUNSGARD: (Continuing)

Q All right. And, sir, do you recognize the image that's up on the screen right there?

A Yes.

10:10:06 Q What is that a photograph of?

A That would be the main entry into the residence at the southeast side of the house.

THE COURT: Does this have an individual number or is this just your exhibit X, whatever your number is?

10:10:19 MS. BAUNSGARD: This is Government's Exhibit No. 1. It's labeled as Image 70 on the disc.

THE COURT: It's a series of how many?

MS. BAUNSGARD: It's a series of 35 photographs taken during the execution of the search warrant.

10:10:33 THE COURT: Okay. Have you reviewed each and every one of these photographs on this disc?

THE WITNESS: Yes.

THE COURT: You have.

Okay. Go ahead.

10:10:39 BY MS. BAUNSGARD: (Continuing)

Q So Image No. 70, that is the entryway to that home; is that correct?

A Correct.

Q And was it very early in the morning when you took these pictures?

10:10:48

A Yes. And I believe I was having issues with the flash.

Q The flash on your camera?

A Correct.

Q And the second photograph is labeled Image No. 71.

10:11:02 Do you recognize that photograph?

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 614/Tucker/D/Baunsgard*
34

A Correct.

Q And what is that a photograph of?

A Again, it's of the entryway.

Q And what's on the disc labeled Image No. 72? Do you recognize that photograph?

A I do.

Q And what do you recognize it as?

A That is me stepping into -- in between the entryway and into the kitchen/dinette area.

10:11:15 / 10:11:26 / 10:11:38 / 10:11:48 / 10:11:52

THE COURT: Okay. So do you want to use the usual standard foundation that he took them, that these are an accurate representation of what they purport to show at the time that he took them?

MS. BAUNSGARD: I apologize. I thought I did.

THE COURT: Did you? Maybe you did, and maybe I just didn't hear it.

Are these, in fact, accurate photos that you took?

THE WITNESS: Yes, sir.

THE COURT: And do they reasonably represent the scene as it was at that time?

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you.

Go ahead.

BY MS. BAUNSGARD: (Continuing)

Q So you said you're looking into the living, kind of common

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

area?

A Yeah, it would be the common kitchen/dinette area.

Q And during your execution of the search warrant, did you -- was there more than one kitchen there?

10:12:05 A No. Just the one kitchen.

Q Was there more than one, like, living room there?

A No.

Q Looking at Image 73, was that a photograph you took during the execution of the search warrant?

10:12:19 A That's correct.

Q And is that one of the occupants?

A Yes.

Q Image No. 74, is that also a photograph you took during the execution of the search warrant?

10:12:26 A That would be the female inside the residence.

Q And Image No. 75, is that a photo you took during the execution of the search warrant?

A Yes.

Q And what does that depict?

10:12:36 A Of a black spot. I believe it was meant to be something else, but the flash didn't go off. But it's the wall inside the residence.

Q And Image No. 76, did you take that photograph?

A Yes.

10:12:50 Q Is that one of the occupants of the residence?

A Yes.

Q Image No. 77?

THE COURT: You keep saying "one of the occupants." Do you want to identify these people, or can you?

10:13:00 MS. BAUNSGARD: I don't know.

BY MS. BAUNSGARD: (Continuing)

Q Do you know the identity of the --

A I believe that is -- that is the boyfriend to the female that was located in there, and I do not recall his name.

10:13:13 THE COURT: All right. Thank you.

BY MS. BAUNSGARD: (Continuing)

Q And going back to Image No. 73 on your screen, do you know the identity of that individual?

A That was Mr. Farias.

10:13:29 Q Going ahead to Image No. 77, is that a photograph that you took?

A Yes.

Q And what is that a photograph of?

A Of a bedroom; looking into the bedroom.

10:13:38 Q And during the execution of the search warrant, did you note if the bedroom doors had any further, like, delineation of like "A" or "B" or "half" or anything to indicate it was a separate unit?

A They did not.

10:13:51 Q Did they have any padlocks on the door that would prevent

entry?

A Based off my recollection, they all just had standard interior doorknobs that you'd find in any other residence.

Q Anything that you can recollect about the doors to these individual bedrooms which would prevent normal or routine access to them?

A No.

Q And based on your recollection, on Image No. 77, do you recall whose bedroom that was?

A I believe that was Mr. Farias' bedroom.

Q And Image No. 78, what is that an image of?

A It would be the closet in Mr. Farias' bedroom, I believe.

THE COURT: Counsel, in fairness to the defendant, these images are so dark that it's impossible for me to tell what I'm looking at. Other than him telling me what it is, I can't determine what that is. All I see is some red and some browns and -- unless my screen is unusually dusty.

MS. BAUNSGARD: That's why I provided the Court with the documents. I -- the photographs taken were extremely dark, so that's why I provided the images to Court and defense counsel on the CD, because if you look at them in their native formats, so not through -- like through the technology, they're brighter on the screen, and that's what I did with Detective Tucker before his testimony; we went through them on their native file.

I have no way to brighten the image or make them

brighter, which is why I would like Detective Tucker to articulate what each of the photographs are of.

THE COURT: Have you seen these in their native format?

MR. SCHWEDA: I've only seen copies, Your Honor. And they're all -- they're not very good -- I haven't been able to tell what they are either. That's why --

THE COURT: Well, are they better than this?

MR. SCHWEDA: No.

THE COURT: He says they're not, so I have issues, and the issue is whether or not that's a better quality than you're showing me on my monitor, because I can't tell what this is. So if -- don't we have a delivery system ourselves that can play the disc?

THE COURTROOM DEPUTY: I don't believe we do anymore. I can ask Mr. Edwards.

THE COURT: Sure. Ask Mr. Edwards, because I thought we could just cue in the disc and you could cue it up, and we'd be ready to go. But I'm concerned about -- I can't tell what I'm seeing.

So, that said, you're going to have to show me some pictures that are critical to your case that are -- that give me -- that have greater visibility than this.

MS. BAUNSGARD: There are pictures better coming up when we get to the --

THE COURT: Okay. So why don't you decide, from your

perspective strategically, what is in your best interest to show, and make sure that I can see them so that we can proceed from there.

Okay?

10:16:43 Now, I can see that. That's much improved.

So what number is that?

MS. BAUNSGARD: This is Image No. 80.

THE COURT: 80. Thank you. Okay. Go ahead.

BY MS. BAUNSGARD: (Continuing)

10:16:52 Q And, sir, what is -- did you take this photograph?

A I did.

Q And what is this a photograph of?

A It's again a picture inside Mr. Farias' bedroom, showing a bed and a nightstand with helmets on it.

10:17:05 THE COURT: And for your purposes -- I don't want to prolong this -- he's already laid the foundation that each of these reasonably accurately portray the condition as it existed at the time and that he took them, so you can simplify ask, "What is this of?" because he's already laid the foundation for

10:17:17 each one.

Okay?

MS. BAUNSGARD: Certainly.

THE COURT: I apologize for intruding, but I thought that would be helpful. Go ahead.

BY MS. BAUNSGARD: (Continuing)

Q Looking at Image No. 81, what is this a photograph of?

A This is the closet shelving system in Mr. Farias' bedroom.

Q And what is this a photograph of, looking at Image No. 82?

10:17:34 A This is more of the closet, showing the relationship of his bed to the closet, slash, shelving system.

Q And in the upper shelf in this closet, is there anything of significance?

A Phones.

10:17:46 Q Phones?

A His phones.

Q Multiple cell phones?

A Multiple cell phones.

Q And looking at Image No. 83, what are we looking at here?

10:17:57 A Just an overall view of the contents of the shelving system, away from the bed.

Q And so is that moving the camera slightly to the right from that first picture we looked at with the cell phones?

A Correct.

10:18:12 Q And Photograph No. 84?

A Again showing more of the contents of the actual shelving system.

Q So is that tilting the camera more down?

A Correct.

10:18:22 Q And on the left-hand side of that photograph, can you see

one of those cell phones that we first saw in the first picture of the closet?

MR. VIETH: Your Honor, the headphones are no longer working.

10:18:40 THE COURTROOM DEPUTY: Is that for all of the defendants that are using them?

MR. SCOTT: Yes. It's buzzing.

THE COURTROOM DEPUTY: It's in and out?

MR. SCOTT: It's buzzing. Every time she speaks, it's just a buzz.

10:18:52

THE COURT: For the record, the interpreter had a headphone, too, didn't she?

Did you have a headphone?

THE INTERPRETER: Yes, there is a -- I have a sound-up headphone. But the noise comes from when we switch from one interpreter to another, so there's a moment of static to do that. The equipment is working properly. It's just --

10:19:09

THE COURT: Well, then let's keep going. Make the assurance -- ask them if they can hear you, please.

10:19:28 Mr. Edwards, we need some help. Talk with Ms. Vargas.

Now, if there's a question about this, we'll just have the clerk put the headsets on and determine whether they're working.

So are they working?

10:19:45 Okay. Good to go. Everybody assures me they're good to

go.

Mr. Edwards, do we have equipment that can play a CD in this system?

MR. EDWARDS: Not directly, but I can set one up.

10:20:02 THE COURT: That can play the CD?

MR. EDWARDS: Correct.

THE COURT: Okay. We'll -- you mean right now?

MR. EDWARDS: It would take me about five minutes, Judge, to set it up, but, yeah.

10:20:12 THE COURT: Is it independent of this, something you need to do on the podium?

MR. EDWARDS: It would be a laptop.

THE COURT: She has a laptop. We're playing it in a laptop. So I guess that's it. Appreciate it. Not going to be

10:20:25 any improvement, so ready to go.

BY MS. BAUNSGARD: (Continuing)

Q Looking at Image 88 --

THE COURT: I apologize.

Mr. Edwards, stick around. If you have some thoughts on

10:20:36 what would improve it, then let us know, so you need to be able to look and see what's going on.

MS. EDWARDS: Sure.

THE COURT: Go ahead.

BY MS. BAUNSGARD: (Continuing)

10:20:41 Q Image No. 88, what is that a photograph of?

A That's a bag with a parcel with some powdery substance in it and a digital scale and some other contents.

Q And what did you believe the powdery substance to be?

A At that time I thought it might have been methamphetamine or a cutting agent.

THE COURT: What exhibit is this?

MS. BAUNSGARD: Government's Exhibit No. 1, Image 88.

THE COURT: Photo 88 from Exhibit 1.

MS. BAUNSGARD: Yes.

THE COURT: Thank you.

BY MS. BAUNSGARD: (Continuing)

Q And where was that located?

A Mr. Farias' bedroom.

Q And Image No. 89, what is that an image of?

A That is going to be of the closet again, and it's going to be of two firearms that were located in the bottom section of the -- the shelving, slash, closet system.

Q And is that Mr. Farias' bedroom?

A Yes.

Q Image No. 90?

A That is going to be looking up from the two rifles, and that is going to be of a pistol, some ammo, and a magazine for a firearm, along with some dominion, also in his bedroom.

Q And when you say "some dominion," what do you mean by that?

A Uh, I believe there was -- a ticket that was issued by the

Washington State Patrol was located in there, to Mr. Farias, or some sort of a court document like that.

THE COURT: Are these dominion documents?

MS. BAUNSGARD: Yes.

10:22:03 THE COURT: And they were in Mr. Farias' name?

THE WITNESS: Yes.

MR. SCHWEDA: Your Honor, I'm going to ask that -- he is just speculating as to what it is. He doesn't even know --

THE COURT: You can do that on cross, if you'd like.

10:22:14 MR. SCHWEDA: Pardon?

THE COURT: You can do that on cross.

MR. SCHWEDA: Okay.

BY MS. BAUNSGARD: (Continuing)

Q Image No. 91?

10:22:21 A That is the court document in question. And I do apologize; it was a -- it wasn't a ticket. It was an -- issued by a court, though. I knew it was something from a court. That's what it was.

THE COURT: And it was in Mr. Farias' -- he was identified on the document?

10:22:38

THE WITNESS: Yes.

THE COURT: The addressee, or something of that nature?

THE WITNESS: Uh, the name.

THE COURT: The name was on the document. Okay. Thank you.

10:22:45

MS. BAUNSGARD: I hear some loud like staticky noise coming from that.

MR. THERRIEN: My client says --

THE COURT: I'm sorry?

10:22:56 MR. THERRIEN: My client says -- it's working now. I heard some static, what she heard.

THE COURT: Okay. Give me a second, please.

(The Court and courtroom deputy conferring.)

THE COURT: Okay. Are we good to go with the headsets?

10:23:28 Tell me what the problem is so I understand it, if any.

THE INTERPRETER: The problem seems to be that there is static when we switch from one microphone to another, so there's a moment of static when we take turns. The rest of the time --

THE COURT: Okay. Did you explain for those whom you're

10:23:46 interpreting that that will occur, and that doesn't mean their headsets are nonfunctioning?

(Interpreter conferring with defendants.)

THE COURT: Thank you.

Thanks, Mr. Edwards.

10:24:03 Go ahead, Ms. Baunsgard.

BY MS. BAUNSGARD: (Continuing)

Q And looking at Image 92, what are we looking at there?

A Uh, again another shelf in the closet in Mr. Farias' bedroom. It's a gun case, a magazine, and then a notebook.

10:24:19 Q And do you recall what was in the notebook?

A Notes.

Q And Image No. 93?

A It's a digital scale and a Tupperware dish in his bedroom in the closet.

10:24:30 THE COURT: Excuse me. Your screen enables you to point to the documents, I think.

Doesn't it? Can he do this on laptop? Will this --

THE COURTROOM DEPUTY: Yes, he can do it on his screen there.

10:24:42 THE COURT: Sure. You can still point to the screen and make a note, if you wish.

THE WITNESS: Do I need to make a note?

THE COURT: Using your finger, you should be able to draw a line or an arrow or something of that nature.

10:24:55 (Courtroom deputy and counsel conferring.)

BY MS. BAUNSGARD: (Continuing)

Q And could you delineate on the picture, when you're talking about a scale, where that is located?

A I hope I'm doing it right. (Indicating.)

10:25:12 Q And that is the yellow circle?

A Yes.

THE COURT: And this is 92?

MS. BAUNSGARD: Image 93.

THE COURT: Image 93. Okay. Thank you.

BY MS. BAUNSGARD: (Continuing)

Q And you also indicated there was a Tupperware container with residue on it?

A Yes.

10:25:25 Q And where is that located?

A (Indicating.)

Q And that's the second yellow circle you've drawn on Image 93?

A I'll put a "2" by it.

10:25:36 Q Okay.

THE COURT: And there was some residue in that?

THE WITNESS: Yes.

THE COURT: Thank you.

BY MS. BAUNSGARD: (Continuing)

10:25:44 Q And Image No. 94?

A It's going to be the bottom, and there was some more powdery substance down below.

Q And could you indicate in the photograph where that powdery substance was?

10:25:54 A (Indicating.)

THE COURT: And this was in -- where was this located?

THE WITNESS: In Mr. Farias' bedroom, in the closet, in the shelving system.

THE COURT: Okay.

BY MS. BAUNSGARD: (Continuing)

Q And just above that yellow circle that you've drawn, is that the scale and the cup with residue that --

A From the prior picture, correct.

10:26:11 Q From the prior picture.

And turning to Image No. 95, what is that an image of?

A That is going to be of the northwest bedroom, so that would be the couple that lived in there, the male and female.

Q And in this photograph, is this of an interior door?

10:26:34 A Yes.

Q And if you look at the locking mechanism on that door, is that similar to the locking mechanism that was on Mr. Farias' door --

A Yes.

10:26:44 Q -- bedroom door?

A Yes.

Q And if you could circle that on the photograph, the locking mechanism we're talking about.

THE COURT: You keep saying "locking mechanism." It 10:26:53 looks like a knob to me, like a doorknob.

MS. BAUNSGARD: Yes, that's what I was looking for, and the only thing that came to my brain was "locking mechanism."

THE COURT: Well, they have distinctly different meanings --

10:27:02 MS. BAUNSGARD: They do.

THE COURT: -- so which do you intend?

MS. BAUNSGARD: Door -- doorknob.

THE WITNESS: That's how I would refer to it as, a doorknob.

BY MS. BAUNSGARD: (Continuing)

10:27:07

Q An interior doorknob?

A Interior doorknob.

Q Can you recall, was it keyed or not?

A I do not recall.

10:27:12

Q So there was nothing particularly noteworthy about the lock, in your recollection?

A No.

THE COURT: You keep saying "lock."

MS. BAUNSGARD: Doorknob. Knob.

10:27:19

THE COURT: It's your question. You know, whatever you want, you tell me what it is, and I'll listen.

BY MS. BAUNSGARD: (Continuing)

Q There was nothing particularly special about this doorknob, in your recollection?

10:27:29

A No.

Q Image No. 96.

A That's just me stepping into the doorway of the couple's bedroom, so you can see their bed and their closet system.

Q Image 97?

10:27:51

A Is a blurry picture of their nightstand dresser in their

bedroom.

Q Image No. 98?

A Would be a picture of their bed and some personal belongings inside that room.

10:28:06 Q And Image No. 99?

A Would be a -- that was located along the north -- the north wall in their bedroom next to their closet, and it was like a computer screen and more paperwork and personal items.

Q And, to your recollection, were there any items of narcotics or paraphernalia or anything coming out of that room?

10:28:24

A To my recollection, the only thing I remember recovering out of there might have been keys to one of the vehicles that was parked out back. Might have been a Dodge truck.

Q Were there multiple vehicles parked out back of the residence?

10:28:42

A I think there was a total of five vehicles when we did the search warrant.

THE COURT: Excuse me. Did you ask him whether there was any illegal substances found in this room?

10:28:52 MS. BAUNSGARD: Yes.

THE COURT: Okay. What was your answer?

THE WITNESS: No. No illegal substance.

THE COURT: Thank you.

THE WITNESS: Sorry, sir.

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 614/Tucker/D/Baunsgard
51

BY MS. BAUNSGARD: (Continuing)

Q And Image 100?

A That would be of their closet.

Q And Image 101?

A More items inside their bedroom.

THE COURT: This is 101 -- 100, 101?

MS. BAUNSGARD: Correct.

THE COURT: Okay.

BY MS. BAUNSGARD: (Continuing)

Q And then Image No. 103?

A That would be items back in Mr. Farias' bedroom.

THE COURT: Did I miss 102?

MS. BAUNSGARD: No. 102 was basically a duplicate of --

THE COURT: Of the bottles and the bananas?

MS. BAUNSGARD: Yes.

THE COURT: Thank you.

That's in the couple's bedroom, correct?

THE WITNESS: Yes.

THE COURT: Okay. Then we're going back to 103.

Are we back in Mr. Farias' bedroom?

MS. BAUNSGARD: Yes.

THE WITNESS: Correct.

THE COURT: Thank you.

Go ahead.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

BY MS. BAUNSGARD: (Continuing)

Q And what did you locate in this -- or what is significant in this picture?

A What is significant in this picture is the Macy's bag, and inside the Macy's bag we located ammunition.

10:29:53

THE COURT: Is this 104?

MS. BAUNSGARD: And then we've just moved to 104.

THE COURT: So 104 is the interior of the Macy's bag?

MS. BAUNSGARD: Correct.

10:30:05

THE COURT: And what is that?

THE WITNESS: Ammunition.

BY MS. BAUNSGARD: (Continuing)

Q Now we're back to the beginning.

So during -- and I'm done with the monitor.

10:30:21

And after you -- or during, I should say, the execution of the search warrant, did you prepare a warrant return or a list of items that was seized from the residence?

A Yes.

Q All right.

10:30:35

MS. BAUNSGARD: And if I may approach the witness, Your Honor, to provide --

THE COURT: You may.

A Thank you.

BY MS. BAUNSGARD: (Continuing)

10:30:47

Q And, sir, do you recognize what I've just handed to you?

A I do.
Q And what do you recognize it as?
A This is the -- the LEAD Task Force's -- at this time, this is the form we used to document all the evidence prior to, or as we're placing it into our secure facility.
Q And does it appear to you to be a six-page document?
A Yes.
Q And do you recognize it to be a true and accurate copy of the document you prepared after you executed the search warrant?
A Yes.
Q And on Page 1 of the document, what does that outline?
A Page 1 will document the location that items were located at, times, and then it will start listing out the items that we actually took and their locations.

THE COURT: This is exhibit number?

MS. BAUNSGARD: 2.

THE COURT: Thank you.

BY MS. BAUNSGARD: (Continuing)
Q And as far -- on this document, what pages delineate the items seized from the Edison Road address?
A Uh, Page 1, starting with Exhibit 8, it's actually listed, uh -- right above it, it says, "Location: 4873 East Edison Road, Sunnyside," and a bunch of little stars.
Q And is that in the middle of the page under bolded word "Description"?

A Yes.

Q And then what is further delineated on that page?

A Also Items Exhibit 8, N2 -- and "N" delineates a nondrug item -- N3, N4, Exhibit 9, Exhibit 10, N5 -- I'm sorry, we're on Page 2, sir. So on Page 2 is Exhibit 10, N5, Exhibit 11, Exhibit 12, N6, Exhibit 13, N7, N8, N9, N10, N11. On Page 3 it is N12, N13, N14 --

THE COURT: Excuse me. Counsel, this speaks for itself. This is admitted, correct?

MS. BAUNSGARD: I have not moved for its admission. I was trying to just lay the foundation that this is what came as a result of the search warrant.

THE COURT: Okay. I apologize. Go right ahead.

A N15, Exhibit 14, N16, N17, N18, N19, Exhibit 15, N20, and then on Page 4 we have N21, N22, N23, N24, N25, N26, N27, N28, N29, N30, N31, N32, N33, N34, N35, and N36. On Page 5 we have N37 and N38.

BY MS. BAUNSGARD: (Continuing)

Q And does that represent all the items seized as a result of the search warrant on the East Edison Road address?

A That is correct.

Q And then the pages -- the continuation of Page 5 and Page 6, generally speaking, what does that delineate or discuss?

A The two other locations that were -- search warrants were executed -- executed on.

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 614/Tucker/D/Baunsgard
55

Q And that's the Sunnyside Mabton Highway and the Forsell Road addresses?

A That's correct.

MS. BAUNSGARD: I would move to admit Government's Exhibit No. 2.

10:34:28 MR. SCHWEDA: Your Honor, this is the first opportunity I've had to review this exhibit, so I'm objecting because I'm not ready to --

THE COURT: Admitted.

10:34:40 Go ahead.

(Government Exhibit No. 2 admitted into evidence.)

BY MS. BAUNSGARD: (Continuing)

Q While you were there executing the search warrant, did you see any backpacks that drew your attention?

10:34:48 A I did.

Q And could you describe those backpacks.

A They were dark in color, and they were located at the point of entry, right at the door. There was -- I would -- I would only be guessing at the number, so I don't want to speculate, but there was -- there was multiple backpacks there.

10:35:02

Q And why was that of significance to you?

A Because of -- outdoor marijuana grows at the time were a big thing in Eastern Washington, and during the many, many, many marijuana grows that I investigated, we always encountered backpacks with equipment inside of them.

10:35:18

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

Q So you felt, based on your training and experience, that those were significant indicators of drug trafficking?
A Of potential drug trafficking, correct.
Q Did you seize those backpacks as a result of the search warrant?
A I only documented the fact that I observed them, because there was no evidentiary value to them to -- there was no marijuana grow. I wasn't investigating that, so ...
Q So you did not seize the backpacks?
A I did not.
Q And defense has raised issue with the -- also raised issue with the seizure of a -- of the cell phones from that residence.
Did you believe you had authority to seize and search those cell phones?
A I did.
Q And what was your authority?
A Uh, the search warrant that I obtained through Yakima County District Court.
Q And that included your ability to seize and search cell phones?
A Correct.
Q What about firearms? Defense has raised the issue that firearms were not included in the search warrant.
A They were actually clearly written in to the items to be searched for.

Q And seized?
A And seized.
Q So your authority was under that warrant as well?
A That is correct.
10:36:43 Q Other than the front door, which you indicated you had to breach, did you have to breach any of the interior doors?
A No, we did not.
Q And in Mr. -- either in Mr. Farias' room or the other couple's room, was there any indication of separate living, like separate kitchens, bathrooms?
10:37:00
A It was all common area.
Q So is it more akin, in your opinion, to a single family home --
A Yes.
10:37:10 Q -- versus like multiple apartments?
A Correct.
Q And so in -- based on what you saw during the execution of the search warrant, each bedroom was not a self-contained unit, so to speak?
10:37:20 A No. There was a common bathroom, there was a common kitchen; all their personal possessions, aside from the bedrooms, were all commingled together.
Q And there were no separate entrances to the bedrooms from the exterior of the building?
10:37:34 A No.

Q And was there any indication, during your execution of the search warrant, that the defendant would not have control over the entirety of the residence?

A No.

10:37:51 MS. BAUNSGARD: If I may have just one moment, Your Honor?

THE COURT: Yes.

(Counsel conferring.)

THE COURTROOM DEPUTY: Do you need to use the Elmo?

10:38:52 MS. BAUNSGARD: I was just going to hand them to him. It's a multipage document.

If I may approach?

THE COURT: You may.

BY MS. BAUNSGARD: (Continuing)

10:39:09 Q Do you recognize what I've handed you?

A Exhibit 1 is the actual search warrant to be executed on -- that we executed on March 22nd, and then Exhibit 2 is the actual affidavit for that search warrant.

MS. BAUNSGARD: And, for the record, what I have handed 10:39:38 the witness is Defense Exhibit 1, attached to their motion; and Defense Exhibit 2, which was attached to their motion.

THE COURT: Okay.

MS. BAUNSGARD: If the -- if the Court would prefer, I could delineate it with Government exhibit numbers to make that 10:39:53 clearer.

THE COURT: Sure. Let's do that.

MS. BAUNSGARD: Okay. I would move for their admission as Government's Exhibit 3 as the search warrant and 4 as the affidavit.

10:40:02 THE COURT: Okay. I assume you have no objections?

MR. SCHWEDA: Correct.

(Government Exhibit Nos. 3, 4 admitted into evidence.)

BY MS. BAUNSGARD: (Continuing)

Q And I believe we covered this at the beginning of your testimony, but are those true and accurate copies of the search warrant and the affidavit -- or the search warrant you received and the affidavit you prepared in association with the search warrant for this residence?

A That's correct.

10:40:31 MS. BAUNSGARD: I don't have any further questions. I'll put those stickers on.

THE COURT: Okay. Mr. Schweda.

CROSS-EXAMINATION

10:41:08 BY MR. SCHWEDA:

Q Good morning, Officer Tucker.

A Good morning, sir.

Q Can you identify Mr. Farias today?

A I -- I couldn't. It's --

10:41:22 Q Okay.

A It's from 2012, so ...

Q Pardon?

A It's from 2012. I -- I could not.

Q Now, in Exhibit No. 3, the warrant for the Edison address -- and I'm just going to, instead of using the numbers 4873 East Edison Road in Sunnyside, I'm just going to refer to it as the Edison address, if that's okay with you.

A That's fine with me.

Q That -- the warrant is a Jane -- or a John/Jane Doe warrant, correct?

A That is correct.

Q And why didn't you identify a specific person in that?

A Because all of my attempts to identify a person that actually resided at that residence were unsuccessful.

Q And all of the other warrants that are included in Exhibit -- Government's Exhibit No. 3 -- and there are three others, correct?

A In the Exhibit 3? I only have the one warrant here, sir.

MR. SCHWEDA: Didn't you --

MS. BAUNSGARD: Because you're not challenging other warrants.

MR. SCHWEDA: Okay.

THE COURT: There's -- excuse me. There's one warrant, but there's a return of evidence on three addresses.

Is that your point?

MR. SCHWEDA: Well, and there was actually four search warrants, and I wanted to --

THE COURT: The only ones admitted right now are the ones so far that we have, so ...

10:42:42 MR. SCHWEDA: Well, in the effort --

MS. BAUNSGARD: Do you want the other ones?

MR. SCHWEDA: For completeness, Your Honor, I'd ask that --

THE COURT: I don't know why it would be complete. 10:42:51 We're dealing with 4873 Edison, and that's where Mr. Farias was found, and that's what you're trying to suppress.

So where are we going?

MR. SCHWEDA: Well, all of these warrants were issued at the same time, based upon the same affidavit of probable cause, 10:43:04 and they were all executed either simultaneously or contemporaneous with each other, and they all deal with the same nucleus of facts, and I wanted to ask him some questions about it.

THE COURT: Okay.

10:43:23 MR. SCHWEDA: May I approach the witness?

THE COURT: You may.

BY MR. SCHWEDA: (Continuing)

Q So, Officer, there -- you obtained four search warrants, correct?

10:43:40 A That's correct, sir.

Q And were they all for residences?

A No.

Q How many were for residences?

A Three for residences; one for a vehicle.

10:43:48 Q And in all the other search warrants you identified people; is that correct?

A I identified one person.

Q And who was that?

A The Esteban Hernandez.

10:43:59 Q And that's the person you were obtaining the drugs from, your agent and your cooperators or informants, correct?

A That's correct, sir.

Q The -- now, other than the informant going over to the Edison -- or, excuse me, Mr. Hernandez going over to the Edison 10:44:25 address and first saying he didn't have drugs and then afterwards saying he had drugs, do you have any evidence, other evidence that he obtained drugs at the Edison address?

A I wasn't in there with him when he got them, so, no.

Q Okay. The -- so it would be possible that Mr. Hernandez 10:44:46 had drugs all -- all along, correct?

A Based off the investigation that whenever we asked if he had any methamphetamine to sell, every other time he was immediately able to provide it. On the instance where he wasn't, he would always go to that address and pick them up.

10:45:02 Q All right. So my question was: Other than Mr. Hernandez

saying that, that he was out and that he had some and going to the address, you don't have any evidence that Mr. Hernandez obtained drugs or controlled substances at the Edison address, do you?

10:45:21 A Other than our request, no, sir.

Q Just answer the question, if you would.

A No, sir.

Q Okay. You know what countersurveillance is?

A Yes, I'm very familiar with it.

10:45:36 Q And what is it?

A It's where the, I'll refer to them as the bad guys, try and do surveillance on us doing surveillance on them.

Q Trying to throw the police or the law enforcement off the track of what they're doing, correct?

10:45:47 A That's correct.

Q And so this might have been Mr. Hernandez performing some countersurveillance technique, correct? Is it possible?

A Anything is possible, sir.

(Audible sound in the courtroom.)

10:46:08 MR. SCHWEDA: I don't know what that was, Your Honor. It's not anything I have --

THE COURT: I don't know either. I heard it earlier.

MR. SCHWEDA: Okay.

THE COURTROOM DEPUTY: It's the laptop.

10:46:18 MR. SCHWEDA: And, Your Honor, I need to -- if it would

be Exhibit No. 5, Defendants' Exhibit No. 5, I'd like to approach the witness with an exhibit.

THE COURT: You may.

THE WITNESS: Your Honor, what would you like me to do with these? These have not been marked. I don't want to get them confused.

10:46:32

MR. SCHWEDA: I'm sorry?

THE COURT: What was your concern?

THE WITNESS: I don't want to get -- these were not marked. I don't want to get them confused --

10:46:44

MR. SCHWEDA: They're going to be part of Exhibit 3 at this point, correct, for completeness?

THE COURT: No, I think they're your exhibits, and if you want to put them in, that's up to you.

MR. SCHWEDA: Okay. Then I'll ask that that be marked as Defendant's -- those three search warrants be marked as Exhibit 5, I guess.

10:46:54

Is that right?

THE COURT: I don't know. How many exhibits do you have?

10:47:07

MR. SCHWEDA: I'm going to have two. Those and a picture.

THE COURT: You can retrieve them if you'd like.

MR. SCHWEDA: Pardon?

THE COURT: You can retrieve them if you want.

10:47:16

THE COURTROOM DEPUTY: Ms. Baunsgard, have you already numbered your exhibits? I don't want to have two --

MS. BAUNSGARD: I did. I numbered 1, 2, and 3.

THE WITNESS: Up here I have 3 and 4 with me.

10:47:28 MS. BAUNSGARD: And 4.

THE WITNESS: And 2.

THE COURTROOM DEPUTY: You don't have other exhibits that you are going to admit that are the same numbers as --

MS. BAUNSGARD: No. I have concluded my exhibits for

10:47:37 this motion.

THE COURTROOM DEPUTY: Okay.

MR. SCHWEDA: So do you want me to mark these now or can I do it later?

THE COURT: I think you need to mark them as you wish.

10:47:48 But how do you want to identify them?

MR. SCHWEDA: Well, I'll mark them and have them identified that way, Your Honor.

THE COURT: And they'll be your Exhibits 1 for this hearing?

10:47:59 MR. SCHWEDA: If that's how you want me to number them, yes, Your Honor.

THE COURTROOM DEPUTY: I think it would be better if they started off where the Government ended, so he was indicating No. 5.

10:48:10 THE COURT: Sure. We'll start this as 5. That's a good

suggestion.

MR. SCHWEDA: And I do have a bench copy of Defendant's Exhibit 6.

THE COURT: You can put it on the Elmo if you want.

10:49:10 MR. SCHWEDA: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MR. SCHWEDA: (Continuing)

Q So just for identification purposes, Exhibit 5 is the other three search warrants that you've identified this morning that

10:49:27 were issued?

A Yes, sir. So it would be the search warrant for the 1280 Forsell Road, the search warrant for 2100 Sunnyside Mabton Highway, and the search warrant for Washington license 290 zebra, Victor, zebra.

10:49:48 MR. SCHWEDA: We'd move for admission of Exhibit 5.

MS. BAUNSGARD: No objection.

THE COURT: Admitted.

(Defense Exhibit No. 5 admitted into evidence.)

BY MR. SCHWEDA: (Continuing)

10:49:54 Q And then you have in front of you Exhibit No. 6?

A Okay.

Q Does that look like that doorknob for the southwest bedroom at the Edison address?

A It could be. It looks like a doorknob.

10:50:13 Q Do you remember the doorknob on the southwest bedroom,

whether it had a locking mechanism?
A I do not recall, sir.
Q So it very well could have?
A It could have. I don't -- I don't recall the specifics of the doorknob.
10:50:25
Q When you entered the Edison address, what was the first thing you did?
A When we entered?
Q Yes.
10:50:33
A We cleared the residence.
Q And what do you mean by "clear the residence"?
A Uh, we enter the residence, and we take control of it; we detain the people inside so there's no threats to us.
Q And at what point did you identify the occupants?
10:50:46
A Once we got them into the kitchen, they were identified and read the search warrant.
Q And had you conducted a search at that point?
A No. I read the search warrant first, sir.
Q And did you read it in English or Spanish?
10:51:01
A I only read English, sir.
Q And was the search warrant read in Spanish at all?
A To my knowledge, no.
Q The -- and at that point, after you read the warrant, what did you do next?
10:51:13
A Uh, then we assigned people to search specific rooms and

started taking photographs.

Q Okay. Did you identify the occupants of the house?

A Yes.

Q And did you determine that they were occupants of the house?

10:51:25

A Based off their own admissions, correct.

Q And was that before or after you started the search?

A It would have been before so we could determine whose room was whose room.

10:51:35

Q So you determined -- you understood that Mr. Farias had the southwest bedroom and that the other two occupants had the northwest bedroom?

A Yes.

Q And you knew that right at the very beginning?

10:51:46

A After we served the search warrant, got their information, determine where they lived, yes.

Q And your warrant was for John/Jane Doe, correct?

A That's correct.

Q Did you -- did you consider at all the fact that, now that

10:51:59

you had identified the occupants, that perhaps you should get another warrant that would identify these people?

A Absolutely not.

Q The -- you did not know who lived at the Edison address, correct?

10:52:23

A I made every effort to try and figure out who it was and

never could.

Q What was every effort?

A By running every vehicle that we located there. I also did DOL checks. Nothing came up. Other than knocking on their door, there's nothing else I could have done.

Q Did you conduct any surveillance?

A Continuously.

Q How much surveillance was made of the Edison address, on what dates and how long?

A Of what dates?

Q On what dates and how long did you surveil the residence?

A I couldn't give you specific dates and --

Q Pardon?

A From the time we identified that as the potential source house, I'd say that, because I become very dedicated to my investigations, I'd go by there at least twice a day to try and identify anything and everything. Only once during the surveillance missions did I observe one Hispanic male in his 20s with a -- I believe it was a weed blower -- or a leaf blower out in the yard. But other than going up in my undercover vehicle and asking for his identification, which I had no legal authority to do, I couldn't have identified him.

Q Did you check to see who subscribed to any of the utilities that were provided?

A I did not.

Q Did you check to see who the owner of the property was?

A I did.

Q And who was the owner?

A Without looking at notes, I wouldn't know, sir.

10:53:41 Q Do you have your notes with you?

A I have my report here, but I don't believe it's actually in my report from the actual search warrant.

Would you like -- actually, I take that back, sir. If I could look at the Exhibit 3? Can I look at Exhibit 3?

10:54:02 THE COURT: Sure you can. Go ahead.

MR. SCHWEDA: Well, Your Honor, that's his report. It's not Exhibit 3. So I don't want to --

THE WITNESS: No, no. Exhibit 3 would be the search warrant, sir.

10:54:11 BY MR. SCHWEDA: (Continuing)

Q Oh, okay. I'm sorry. Okay. I stand corrected.

A The listed owner for that address is -- and I'm going to pronounce this 100 percent wrong -- Schil Schillymax, LLC, which was a corporation, or I'm assuming -- at this location out where 10:54:33 we're at is an actual farm, so it would have been someone who potentially worked at a farm or had access to the housing from the farm.

Q Did you obtain an additional search warrant for doing any forensic analysis of the cell phones?

10:54:55 A I did not.

Q How many cell phones did you seize at this residence?

A I couldn't give you a specific number, sir.

Q Pardon?

A I couldn't give you the specific number without looking at the notes.

Q Well, go ahead.

A Okay.

(Reviewing document.)

If I counted correctly, I believe there was 11.

Q Okay. And were -- was there forensic analysis done on any of these cell phones?

A Yes.

Q How many?

A I don't have that report to be able to verify that, so I don't know.

Q But in order to do the forensic analysis of the phones, there was no additional search warrant issued, correct?

A I did not get an additional search warrant.

Q Okay.

MR. SCHWEDA: I have no further questions.

THE COURT: Okay. Thank you.

MR. SCHWEDA: Oh, if I didn't move for admission of Exhibit 5, I do at this point.

THE COURTROOM DEPUTY: You did for 5 but not for 6.

MR. SCHWEDA: Yeah, that's fine. He couldn't identify

it.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. BAUNSGARD:

10:57:12

Q Defense asked you if you got a supplemental search warrant once you entered the residence and saw there were multiple occupants, and you said no.

A That's correct.

10:57:23

Q And why didn't you get a supplemental warrant?

A Because there was no need.

Q Why was there no need?

A Because we already had a search warrant for the residence, and that's what we were searching for -- or searching. I'm sorry.

10:57:38

Q And defense asked you why you didn't get -- or asked you if you got a supplemental search warrant for cell phones, and you said no, correct?

A That's correct.

10:57:44

Q And why did you not get a supplemental search warrant for the cell phones?

A At that time, the way that -- my understanding of the law, and the way that the prosecutor's office also interpreted it, was --

10:57:54

MR. SCHWEDA: I'm going to object, Your Honor, as

explaining what the law is.

THE COURT: He's explaining what he thought and why he didn't do something, so he may be wrong on that issue, but that's what his mind-set was.

10:58:04 Go ahead.

BY MS. BAUNSGARD: (Continuing)

Q So why didn't you get a supplemental warrant?

A Uh, my interpretation at the time and the guidance from our prosecutor's office, we didn't need a secondary warrant, um, and 10:58:13 that the original warrant would cover it.

Later in my career at the task force, we did change that process to include a secondary warrant. I think that was like about a year and a half later we started doing secondary warrants to actually open up the phones and get data.

10:58:26 Q So, in your opinion, based upon your review of the search warrant authorized by the judge, you were allowed to seize and search cell phones recovered from the residence?

A That is correct.

Q And that's delineated on the warrant itself?

10:58:40 A Yes.

Q And could you describe what exhibit that is and what page number that is, sir?

A Uh, the actual warrant itself was Exhibit 1, Government 3, and that actually included the part, um -- it says: Now, 10:58:59 therefore, you are hereby commanded, and it has the -- do you

want me to read the actual wording?

Q Sure.

A (Reading): Search of the above-described premises, any associated outbuildings, personal property --

10:59:16 THE INTERPRETER: Repeat --

THE COURT: A little bit slower.

THE WITNESS: Slow down?

BY MS. BAUNSGARD: (Continuing)

Q We have interpreters.

10:59:18 A I'm sorry. I apologize.

-- personal property situated in said described residence and all rooms, closets there within connected; all computer hardware, software, including storage devices, and media to include instruction manuals, computer peripherals which are

10:59:37 capable of being used to store --

THE COURT: Slow down.

A -- or archive any records, documentations, invoices, and correspondence; computer passwords or security devices designed to restrict access to any of the above-mentioned items; cellular

10:59:55 phones and related equipment; digital cameras and related devices.

Do you want me to keep reading?

BY MS. BAUNSGARD: (Continuing)

Q I think that's sufficient.

11:00:04 A Okay.

*USA v. Casillas, et al./4:15-CR-6049-EFS* 75
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 614/Argument by Mr. Schweda*

Q Thank you.

MS. BAUNSGARD: I don't have any further questions. Thank you.

THE COURT: Any recross, Mr. Schweda?

11:00:11 MR. SCHWEDA: No, no further questions, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

THE COURT: You may call your next witness.

MS. BAUNSGARD: Your Honor, this is the only witness we have for this motion.

11:00:21

THE COURT: Okay. Thank you.

Okay. Mr. Schweda, your motion, so ...

MS. BAUNSGARD: If I may approach to collect the exhibits?

11:00:29 THE COURT: Sure. Go ahead.

Your motion, Mr. Schweda.

MR. SCHWEDA: I was just waiting for her to retrieve the exhibits.

THE COURT: Sure. Thanks.

11:00:39

ARGUMENT

MR. SCHWEDA: Your Honor, the -- we would submit that the work of identifying the occupants of the Edison address was minimal, at best; that it was a John Doe warrant, and under those circumstances, once they identified that there were

11:01:05

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 76
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 614/Argument by Ms. Baunsgard*

multiple people in the home, that they -- the officers should have obtained a more specific warrant to search the belongings of the occupants; that this is not something that would lend itself to a good-faith analysis.

11:01:29 And if the Court does not grant the motion to suppress, we would ask that the Court suppress any cellular analysis of the cell phones that were seized.

THE COURT: Is it your understanding that there's going to be evidence regarding the cellular analysis? Because that's not mine.

11:01:48

MR. SCHWEDA: Your Honor, I guess the Government, in its submittal, has indicated it's not going to, and that renders the issue moot. If that's true, then there wouldn't be any need for the Court to rule on the motion.

11:02:02 THE COURT: What is the Government's position on cell phone analysis?

MS. BAUNSGARD: We are not seeking to introduce any of the forensic analysis from the cell phones seized in the residence.

11:02:12 THE COURT: So that is your answer.

MR. SCHWEDA: All right. Thank you.

THE COURT: Thank you.

ARGUMENT

11:02:22 MS. BAUNSGARD: Your Honor, we are opposing the motion

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 614/Argument by Ms. Baunsgard*
77

to suppress. I think the testimony of Detective Tucker established that this was a single family unit residence occupied by multiple residents, and that is a key distinguishing factor in the case law that we've outlined in our briefing, and I know Your Honor has reviewed that in detail.

11:02:44

The defendant hasn't come out and said there's no probable cause associated with the warrant. Kind of alluded to it in his motion and then his oral remarks just now. I would submit the document speaks for itself, and certainly the Court can adjudge whether or not there is probable cause on that warrant. And even if there's not, there's been no indication or record of a lack of good faith on the part of the LEAD Task Force in executing that warrant.

11:03:01

The defense raises the issue of the backpacks. Detective Tucker has articulated that backpacks were not seized, and we also have no photographs of them to admit in court.

11:03:15

THE COURT: So there will be no backpack photographs or evidence as such.

MS. BAUNSGARD: I -- my understanding is that there will be oral testimony, just like Detective Tucker had today, about the fact that they found backpacks, they were large in nature, and there were multiple of them, and that's to make the connection between some other evidence in the overall conspiracy case, which involves backpacking from the United States controlled substances into --

11:03:31

11:03:49

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 78
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 614/Argument by Ms. Baunsgard*

THE COURT: All right. I've connected the dots. Okay. Thank you.

MS. BAUNSGARD: As I've indicated, we are not going to seek to introduce the forensic examination of the cell phones seized; however, I would intend to introduce a photograph of that closet where you can see the three cell phones with the articulation of the importance of multiple cell phones in the drug trafficking --

THE COURT: Is that again part of your overall scheme, backpacks, cell phones?

MS. BAUNSGARD: Yes. Yes. So I think -- I know Your Honor is familiar with the case law. I would just note --

THE COURT: Well, you know, judges believe they're familiar with the case law, but that doesn't mean you shouldn't educate me.

So go ahead.

MS. BAUNSGARD: Well, outside of your review of my pleadings, Your Honor, I would have nothing else to offer you, other than I just wanted to comment on a couple of the cases the defense cited in their reply.

THE COURT: Go ahead.

MS. BAUNSGARD: In the *Cannon* case, the defense cites that to support the proposition that searching a guest room in a single family home requires a warrant. And if you actually review the facts of the *Cannon* case, that had to deal with a

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 614/Argument by Ms. Baunsgard
79

single family residence that had a separate rental unit, separate and attached behind the residence.

The Ninth Circuit was very careful to point out this was akin to two houses and two apartments because both the main living structure that they had the search warrant for had a stove, a refrigerator, a bathroom, a bedroom, and a kitchen, as well as the rental unit in the back of the property also had a separate living structure, so a wood-burning stove, a refrigerator, a separate bathroom. So it was akin to two separate units, kind of like in the *Maryland v. Garrison* case, which talked about two separate apartments, and so they continued the delineation between a single family residence, with multiple people living in it, and that is okay to proceed under one search warrant, versus two separate and distinct living structures, which would require separate search warrants, under the Ninth Circuit and Supreme Court case law.

So I think based on Detective Tucker's recitation of what he observed in the residence, to include the fact there was one common kitchen, one common living room, a shared bathroom, this fact is in line with the cases the United States has cited in its resistance of the defendant's motion to suppress.

THE COURT: Thank you.

Mr. Schweda.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

REBUTTAL ARGUMENT

MR. SCHWEDA: The distinction here, Your Honor, is that this was a John Doe warrant. The -- as the *Katz* case holds, the Fourth Amendment protects people, not places, and that's the defect in this case.

RULING BY THE COURT

THE COURT: Thank you.

The Court denies the motion. There was adequate basis in the affidavit itself; it was full and sufficient. The warrant itself was specific, and carried out pursuant to its terms. There was probable cause under the totality of the circumstances, and the issuing judge got it right.

The residence itself was a single residence with common areas and separate bedrooms. This was not two residences, and therefore another -- the John Doe warrant was adequate for its purposes. And even if I disagreed, the *Leon* good-faith exception applies.

Anything else?

MS. BAUNSGARD: No. Thank you.

THE COURT: Okay. I just want to make sure that when we talk about the backpacks and the cell phones, that at trial when these items are introduced, that -- I'm uncertain what will happen if the defense talks about the fact that there was -- that they have not introduced the forensic analysis of the cell

phones, and if the defense raises that topic, whether something -- whether some door is opened and the forensic analysis comes in, I don't know, and if the argument is going to be made you didn't hear anything about the forensic analysis in the phones. I just wanted to cue that up for trial so that we're all ready to go on that issue, if that happens. I'm not sure what the trial will show, but it may be that it will be appropriate. It may be that it will open the door. It may be that you folks have thought about it and know exactly how you're going to handle that.

11:08:05

11:08:25

But I anticipate that there will be evidence in the photographs and whatnot of the cell phones and the backpacks, or at least oral testimony about it, to lay the foundation for the Government's theory of the case that this implicates the specific defendant with participation in the conspiracy, given all the other evidence about backpacks and cell phone usage.

11:08:41

Okay. What's next? Mr. Smith's or Mr. Therrien's?

MS. VAN MARTER: Your Honor, I believe the next would be the motion to suppress -- there's two separate motions to suppress filed on behalf of Mr. Zambrano. The first is a motion to suppress the residence itself, and there are a couple of theories presented by the defendant there; and then there's also a motion to suppress the seizure up in Canada.

11:09:00

And so I don't know which one -- I think --

THE COURT: Let's start with Canada.

11:09:16

MS. VAN MARTER: And, Your Honor, the United States attached to its response -- was able to actually obtain -- as the Court is aware, the warrants were sought for and obtained in Canada. They were under seal in Canada. They were able to provide that particular, it's called an information to obtain rather than an affidavit, in Canada, in support of the search warrant. That has been attached as Government's Exhibit A. We'd ask that to be included within the record for the Court's consideration.

11:09:38

11:09:56

We've raised a couple different arguments to the Court. And the first, we do have a witness prepared to testify, and that first has to do with standing for the defendant to be able to challenge the warrants that were executed in Canada. And part of the dispute in that regard has to do with the involvement or level of involvement of the United States agents during the course of this particular enforcement action. And it's United States' position from its Attachment A, which was the information in support of affidavit, as well as Attachment B --

11:10:13

THE COURT: That's the Canadian affidavit.

11:10:27

MS. VAN MARTER: That is correct, Your Honor.

-- as well as Attachment B, which are surveillance reports from the RCMP Canadian authorities, that support the United States' argument that although there was an overall joint investigation in the money laundering aspect, specifically, the

11:10:41

RCMP had agreed to provide undercover agents to be present for several cash money drops that were orchestrated by leaders of the organization through an undercover officer with the DEA task force in Boston, they did agree to be a part of that joint investigation.

11:11:02

However, the secondary investigations that occurred after those money drops were exclusively in the responsibility of that particular sovereignty.

THE COURT: I understood that that was the position you were taking.

11:11:14

MS. VAN MARTER: And we do have a witness to further explore that, if the Court wants us to present that testimony now.

THE COURT: Yeah. Give us a moment.

11:11:23

Mr. Smith.

MR. SMITH: Thank you.

Your Honor, with regard to that, in our response, we had -- I guess part of the problem is that we never have the kind of information or maybe the depth of information that the -- that the Government has with this type of an issue as to whether or not this was a joint venture and what the specific participation was.

11:11:57

However, we -- we had attached to our motion the -- the information that we did have, and that started out with, one, just a report of one of the agents that was involved in the --

11:12:16

11:12:34
11:12:53
11:13:08
11:13:31
11:13:45

in the investigation --

THE COURT: Well, Counsel, my point here is that you've got a witness -- there's a witness ready to go, and so -- you're not conceding that, based on the materials, that this was an independent effort by the RMCP, or if that's how you say it?

MR. SMITH: No, not at all. In fact, I don't see -- I mean, what they want to do is they want to separate out the money laundering from the drug trafficking that -- that results in the money that they have to launder or that was the subject of the money laundering charges.

We're charged in the conspiracy with Mr. Casillas, and they're saying, well, our investigation was of the money laundering of Mr. Casillas, but we didn't have -- we didn't have anything to do with the -- with the drug trafficking that resulted in that money laundering.

However, our -- our attachment to, I guess it's Exhibit A to our motion, ECF No. 673, the first part of the basis of the investigation says that this is --

THE COURT: This is ECF 673?

MR. SMITH: Yes, ECF 673.

THE COURT: Yeah. Okay. What about it?

MR. SMITH: It says -- it starts off, "The basis of the investigation"; it's like a summary. It says that the Boston Field Division, the Drug Enforcement Administration, and the Vancouver RCMP, Royal Canadian Mounted Police, have been

negotiating for the delivery of a large shipment of heroin to the Seattle area, and this is as of August 16th of 2016. Just an indication of the joint nature of the investigation that goes directly to the drug trafficking.

11:14:03 And then this was provided, and it's an exhibit, I don't know whether it's Exhibit A or Exhibit B to the Government's response to our --

THE COURT: Well, which is it?

MR. SMITH: Well, I don't know because it was -- it was 11:14:18 filed separately by the Government. But I can tell you what it is. It's the information to obtain that the Government has -- has referenced. And in that --

THE COURT: Are you talking about the application?

MR. SMITH: Well, it's called an information to -- 11:14:37 there's two -- there's two separate documents --

THE COURT: I'm looking at Exhibit B to your response.

MR. SMITH: That's an application. That -- that was the statement by Jennifer Maclean [sic], and she indicates that there is a cooperative action, and what she identifies for the 11:14:55 Court was -- the reason why we included it was because two days earlier there was a money drop, and then as part of that money drop or part of the surveillance of the money drop, the surveillance continued of this Mercedes and Mr. Calvillo and Ms. Reynosa.

11:15:16 And what they did is they drove back to Grand Forks, and

they set up at the Ramada Inn there, and then later on the -- the Mercedes is seen leaving the Ramada Inn in the early morning hours, I think it was of the 26th, and then later on it's observed that there's five occupants instead of two, and approximately 12 hours later, at 11:00 p.m. that night, they pull it over, they just simply stop it, based upon -- well, that's the issue: Based upon what?

But -- and so -- and so the Government says, well, that part of the investigation, the continuing investigation of the individual that did the money drop and where they got the money, meaning the drug trafficking part of it, shouldn't be -- we don't have standing because, well, the joint investigation ended, apparently, right when the cash drop was made to the agent that was being used jointly, I think, between the United States and Canada at Vancouver, BC on the 25th.

But I want to -- I want to point out this, Your Honor, before we get going here, and this is the -- the Government, in its response -- it referenced some sealed exhibits, but I think, then, there was additional exhibits that were filed later, and that's why I don't have a good grasp on the exact identification. But I can identify it -- mark it and identify it. And it's part of the Government's identification, the information to obtain.

MS. VAN MARTER: Our Exhibit A.

MR. SMITH: To ECF?

MS. VAN MARTER: ECF 648, Exhibit A.

MR. SMITH: And then -- so Exhibit A to the Government's 648, we received -- we've never seen this document prior to the time that it was filed as part of the Government's response.

11:17:22 And the importance of it, it was after the -- it was filed after the motions. But the importance of it was that on Page 6 of that exhibit -- does Your Honor, have it?

THE COURT: Are you referring to the Government's filing in -- as to your motion?

11:17:46 MR. SMITH: Exhibit A to ECF 648.

THE COURT: Sure.

MR. SMITH: Your Honor, I have a copy if the Court --

THE COURT: No, I have it, but it's actually ECF 649.

MR. SMITH: To theirs?

11:18:05 THE COURT: Well, the confusion is that the response itself is styled ECF 648. The attachment, according to my copy, is 649.

MR. SMITH: Okay.

THE COURT: So I'm looking at Attachment A to 648, but

11:18:20 that's 649. And if you're referring to A -- is that what you're referring to?

MR. SMITH: I am, Your Honor. Well, I believe I am. I have the same problem that the Court is experiencing that when we got it in, it was just a little bit confusing as far as the

11:18:33 numbering of what it was.

THE COURT: This is in matter of an application for a search warrant.

MR. SMITH: Yes.

THE COURT: Is that the document that you want me to look at?

11:18:39

MR. SMITH: Page 6.

THE COURT: All right. Let me get there.

MR. SMITH: And at the -- this is the summary, Paragraph 14.

11:18:49

THE COURT: Sure.

MR. SMITH: What this part says is enlightening because it says on August 18th of 2014, that the individual making the application (reading): I read a letter from Resident Agent in Charge David Lenartowicz, of the United States DEA, requesting

11:19:08

RCMP assistance with an investigation related to money laundering, and the letter included the following information. And then it goes on. They were -- the DEA in Boston were investigating the Columbian-based money laundering organization. Through their investigation, the DEA received a request to

11:19:28

transport $200,000, and the unknown Columbia launderers provided a local BC telephone number.

And then Paragraph 15 (reading): This letter from the DEA initiated an RCMP FSOC investigation into -- this is the individual for which Calvillo -- Casillas and Calvillo --

11:19:54

THE COURT: I can read it, Counsel. I've read what it

says.

So tell me what the efficacy is from your viewpoint, will you?

MR. SMITH: Well, the letter, in Paragraph 15 it says that the letter from the DEA initiated that joint investigation into Hernandez's drug trafficking --

THE COURT: Well, now, Mr. Smith, Mr. Smith, why don't you just read it. Because you're using some terms of art that just don't appear in that paragraph.

MR. SMITH: Okay. This letter -- I'm going to read Paragraph 15, Your Honor.

THE COURT: That would be a good thing for you to do, Mr. Smith.

MR. SMITH: (Reading): This letter from DEA initiated an RCMP FSOC investigation "E-NASCENT" into Hernandez's drug-trafficking organization which has been ongoing since August 2014.

THE COURT: Yeah. Do you see the word "joint" in there that you used?

MR. SMITH: No. No.

THE COURT: So when you were quoting it, you didn't say it correctly, did you?

MR. SMITH: I included a word -- I included my interpretation of what that says when it says "initiated an RCMP FSOC investigation."

THE COURT: Okay. Then I apologize. I thought you were actually trying to tell me that the word "joint" was in that paragraph because you were reading it, and the word "joint" doesn't appear in that. So I must have misunderstood you. Okay.

11:21:12

MR. SMITH: It's my -- it's my error, Your Honor. I do think that it's -- that this references -- or what it says is, is that -- how can it be anything but joint if --

THE COURT: Well, that's an argument, Counsel, and so why don't we save that for after the witness when you get to argue your motion? So let's have the witness come.

11:21:29

Okay?

MR. SMITH: Thank you, Your Honor.

THE COURT: Thank you.

MS. VAN MARTER: The United States would call Retired Special Agent William Leahy.

11:21:47

(Additional proceedings were reported and previously filed under ECF No. 718.)

11:21:50

THE COURT: We'll take our luncheon recess. We'll do your hearing at 1:15, Mr. Johnson.

And you folks, I think, need to come back about quarter of 2:00 to make sure that we've got everything ready for you.

So, marshals, people back in the courtroom, 1:15 for

12:02:33

Mr. Johnson's client, and then everybody else at quarter of 2:00.

Okay. All right.

MR. SCHWEDA: Your Honor, Mr. Garibay wants to have an *ex parte* communication with the Court as well.

12:02:45

THE COURT: That's -- I have no time right now. I'll do what I can.

MR. SCHWEDA: Okay.

THE COURTROOM DEPUTY: All rise. Court is in recess.

01:47:26

(Recess taken 12:02 p.m. to 1:47 p.m.)

THE COURTROOM DEPUTY: Court is reconvened in the matter of *United States of America v. Carillo Casillas, et al.*, for a pretrial conference and motion hearing, counsel having previously stated their presence for the record and all counsel and defendants are present.

01:47:38

THE COURT: Ready to proceed? Let's resume.

We have a witness on the stand?

MS. VAN MARTER: I believe we finished with the witness, Your Honor.

01:47:50

THE COURT: Have we finished, Mr. Smith?

MR. SMITH: Yes, Your Honor.

THE COURT: Oh, we have. Then we need argument?

MR. SMITH: Yes.

THE COURT: It's your motion.

01:47:56

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Mr. Smith*
92

ARGUMENT

MR. SMITH: All right. Your Honor, something that I didn't know prior to the time that we took testimony today was that there was a meeting that involved all the agencies that we argue are a part of this joint venture in the investigation of the drug trafficking and money laundering organization that is under indictment here. One thing that I understand is that there was a meeting at some point in time of all these agencies, in 2014.

One thing that we know, pursuant to the letter that's referenced in the information to obtain, is that the DEA initiated an RCMP FSOC investigation. And even though Agent Leahy says that he was part of the FBI's part of that investigation, he says he never saw the letter, he never read the letter that -- that requested RCMP assistance with the investigation.

THE COURT: Which investigation are you referring to?

MR. SMITH: Pardon me?

THE COURT: Which investigation are you --

MR. SMITH: It says that it's a money laundering investigation. We know that. They say that.

But the DE -- but -- and here's what we -- the evidence seems to show, is that there was a letter requesting assistance; all the agencies got together in Mexico City; they began the investigation; they did the investigation. They were

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS 93
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 621/Argument by Mr. Smith

01:50:08 investigating an event that occurred on August 25th of 2015, but the -- the basis for the money laundering, where those illegal proceeds came -- apparently, they separated it right at that point this time. Then that wasn't part of the money laundering investigation.

01:50:26 I think that that is inaccurate. It was the same people that were -- that were doing the money drop that surveilled Calvillo and Reynosa on August 25th of 2015, that made the surveillance, that followed them to the hotel, that saw the car leave the hotel, and ultimately stopped the car that Mr. Zambrano Bravo was -- was a passenger in.

01:50:52 But from what we -- and I guess we know that there was a time when the FBI was investigating the territory that they were -- I think in his words, the FBI's role was to monitor their territory, which was the -- these supposed backpacking routes and the routes that people were bringing money and drugs into -- into Canada. But yet where it stops, according to the Government, is at this precise time when they were arrested.

01:51:12 But it begins again immediately after that because a phone call was received either by the FBI or by the DEA to let them know that they had made these arrests and what they had found, and then ultimately we know that all of the fruits of that investigation were provided to the United States.

Thank you.

01:51:28 THE COURT: Give me a sense of what, in your cited

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Mr. Smith*
94

01:51:47
01:52:28
01:52:47
01:53:04
01:53:19

cases, supports you. You've cited some cases in support. So ...

MR. SMITH: Actually, I was -- I was surprised that the -- let me just find my brief, Your Honor, and I'll cite the actual.

The one case -- excuse me. Just give me one moment.

*United States of America v. Emery*.

THE COURT: I'm sorry, United States versus?

MR. SMITH: Emery, E-M-E-R-Y.

THE COURT: Sure.

MR. SMITH: 591 F.2d 1266. And a joint venture was found because the DEA tipped the Mexican authorities to a possible smuggling transaction to take place in Mexico, and they had planted -- the DEA had planted an undercover operative with the suspected drug trafficker.

Isn't that -- I mean, if it was simply a tip to a possible smuggling transaction to take place in the other country, here they did plant an undercover --

THE COURT: Excuse me, Counsel. You're glossing over *Emery* a little bit. So let's go back to *Emery*.

It's your case, and you think it's important, so what are the facts of *Emery* that the Court there found was joint venture?

MR. SMITH: That the DEA tipped the Mexican authorities to a possible smuggling transaction to take place in Mexico.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Mr. Smith*
95

And because of that, they planted an undercover operative with --

THE COURT: Who is "they"?

MR. SMITH: The DEA planted an undercover operative with the suspected narcotic trafficker.

01:53:33

In this case what we have is not --

THE COURT: Let's go over it. It says (reading): The DEA, acting on a call from the Reno office, alerted the Mexican police that a drug transaction was possible in the Guaymas area. Agent Ramirez coordinated surveillance of the Guaymas, Mexico Airport with Mexican police.

01:53:53

So DEA agents at the airport in Mexico coordinating the surveillance. They were present when the DEA agent -- undercover, Agent Johns, piloting -- and this was a DEA undercover agent -- piloted a rented airplane that came to the airport to pick up the dope. That's a paraphrase.

01:54:13

Johns was hired by one of the co-conspirators to fly the airplane to the Guaymas. It was met by one of the co-conspirators. He left and returned with Emery. He carried suitcases containing marijuana. Agent Johns then gave a signal at the airport, a prearranged signal, and the agents and Mexican police arrested everybody.

01:54:33

So how -- give me a sense of how those facts compare to these facts.

MR. SMITH: Well, the DEA initiated an investigation

01:54:52

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Mr. Smith*
96

01:55:19

with the RCMP. The RCMP with the DEA planted, essentially, or used an undercover agent to obtain the money drop, to do the money drop. Once the same agents that did the money drop or that surveilled the money drop and arranged for that money drop followed the -- basically just followed the money back to the Ramada Inn.

01:55:41

Now, the fact that the -- that the DEA didn't engage in the ongoing surveillance of the -- of the vehicle as it travels back to the -- to the Ramada Inn, and then does -- makes a pickup there, or allegedly makes a pickup, I don't think that's such a great distinction, because -- because the money laundering naturally has to include illegal activity, so your investigation into money laundering has to identify that they were proceeds of criminal activity.

01:56:01

I'm charged in a conspiracy of -- to possess with intent to distribute drugs, and it's -- the main -- the main defendant in it, the primary defendant is identified by the Government as a money launderer. Or I'm not saying that. I don't know if he did anything wrong.

01:56:20

But that's -- that's the way I see this portion of it. It's like we just want to kind of separate out this part, but you don't get money laundering unless you have drug trafficking.

THE COURT: Okay. How about the other cases?

MR. SMITH: I think I cited *Peterson*.

01:56:39

THE COURT: I think you did.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 97
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Mr. Smith*

MR. SMITH: And *Peterson* is probably a little bit harder to rectify on the facts. I think there was more involvement than in the *Emery* case. I think that's probably our best case.

THE COURT: I'm sorry? Do you think the facts of *Peterson* support you in this case, or is it a matter of citing the principle?

MR. SMITH: Just a second, Your Honor. I don't have -- unfortunately, I don't have my --

THE COURT: It says in part (reading): If, however, the United States agents' participation in the investigation is so substantial that the action is a joint venture between the United States and foreign officials, the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable. Here -- and *Peterson* says the district court concluded no joint venture existed between the United States and Philippines. And the Court then said: United States agents, however, turned their actions into a joint investigation in their own testimony. The DEA was involved in daily translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance. The DEA treated the affair as one in which the marijuana was destined from the United States and so assumed a substantial role in the case. And there the Court held the district court erred in saying it was not a joint venture.

So ...

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Mr. Smith*
98

01:58:42 01:59:02 01:59:21 01:59:38 02:00:00

MR. SMITH: We had -- or I had cited the *Peterson* case primarily for the point that the benefits of the evidence from the investigation and drug evidence were all delivered to the United States from the RCMP, as partner in the investigation. And I think that that was similar to what happened in the *United States v. Peterson*.

What the Court just iterated as far as the facts, it's just kind of the reverse in this case, that -- that even though maybe the DEA wasn't taking the leadership role in -- in the investigation, but they were partners in the investigation. And let's say, okay, so they -- they weren't monitoring telephone conversations with regard to drug transactions. They were monitoring telephone conversations and recording telephone conversations, as far as I know, in the money laundering, which was part and parcel of the -- of the drug trafficking.

THE COURT: You attach the affidavit in application, or the Government did, for the warrant in British Columbia.

Is that right?

MR. SMITH: I think we both did, and then we had the other information to obtain.

THE COURT: Okay. So Attachment A, this was 667, and that's the information to obtain; is that correct?

MR. SMITH: Well, that's the one that I think you had 649, because it was -- I think that's the information to obtain. And then Attachment A --

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 621/Argument by Mr. Smith
99

THE COURT: That's Attachment A.

Attachment B on 649 is some police reports from British Columbia.

MR. SMITH: Yes.

02:00:14 THE COURT: So Attachment A is the British Columbia reports.

Can you point me to something in either Attachment A or Attachment B which you think supports your position?

MR. SMITH: Well, I think I have identified in what 02:00:32 we're saying is Attachment A now, which is the information to obtain, with regard to the letter and the letter identifying DEA initiating the investigation in 2014.

And then in the affidavit, this is the affidavit that we referred to as Attachment B in our 673, and I think it's the 02:00:59 same -- the Government attaches it also, the affidavit of Jessica Maclean.

THE COURT: Yeah, I'm trying to stick with 649 A and B, and that's Constable Mark Levesque.

What about that particular document, 667, supports your 02:01:22 position in this matter?

MR. SMITH: Well, the --

THE COURT: Just point me to a page and a paragraph that I can say, okay, I understand your position.

MR. SMITH: Well, I don't think that there is a specific 02:01:34 page or paragraph. This is simply a surveillance operation that

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 621/Argument by Mr. Smith
100

begins with the surveillance of Calvillo and Sobieda Reynosa that goes from August 25th, where they do the cash drop, and then the surveillance just continues into the next day where they -- where they follow them back to -- to the Ramada Inn. And so it's just a continuation of the investigation that the Government wants to separate.

02:02:02

THE COURT: So is the short answer that there's nothing actually explicit in A that speaks to that and supports your --

MR. SMITH: No. Exactly. I mean, I think that's part of the problem that we have, is that there's -- we don't have a specific document. We don't have the letter from the DEA. We -- we don't have a specific document where the DEA says or the RCMP says, "We're working together in a joint venture on this," no.

02:02:19

THE COURT: Okay. And how about Attachment B?

02:02:33

MR. SMITH: The same. It's more -- it's -- I think Attachment B is -- to their document is simply the police reports regarding that same event or series of events beginning on August 25th and going to August 26th. I don't think it's the --

02:02:53

MS. VAN MARTER: August 23rd?

MR. SMITH: 23rd. August 23rd to August 26, Your Honor, and the arrest of Juan Zambrano.

THE COURT: Thank you.

MR. SMITH: Thank you.

02:03:05

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 101
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Ms. Van Marter*

ARGUMENT

MS. VAN MARTER: Your Honor, there's a large distinction and difference between joint investigation, joint venture, cooperative investigation, and a joint venture. In the case law, as the Court highlighted, especially those cited by defense counsel, you can have collaborative efforts, you can have ongoing joint investigations.

However, the assessment of this Court in this circumstance is whether the joint venture or the venture that occurred on the enforcement action on August 25th and 26th had substantial involvement from United States authorities. And the answer is the United States authorities had no involvement in that aspect of the investigation.

There was -- and I want to make sure the record is clear. Referring specifically to Attachment A, which is ECF No. 649, beginning -- there's some historic information on Pages 6 to 7 that summarizes the Canadian RCMP investigation as entitled and highlighted by defense counsel as E-NASCENT. As the Court pointed out, E-NASCENT was the RCMP's aspect of the investigation.

Defense counsel noted repeatedly the letter referred to on Paragraph -- Page 6, Paragraph 15.

THE COURT: Are you talking about 649?

MS. VAN MARTER: Yes, Your Honor, 649.

THE COURT: What page?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 621/Argument by Ms. Van Marter
102

MS. VAN MARTER: Page 6.

THE COURT: Page 6. Thank you.

MS. VAN MARTER: As this Court pointed out, in that Paragraph 15, RCMP initiated their own investigation and called it E-NASCENT -- E-NASCENT. Pages 6 and 7 summarize that RCMP -- parts of that RCMP investigation.

The money pickup referred to specifically by counsel actually occurred on August 23rd. The money pickup itself was coordinated with DEA, as DEA was the one communicating. And that is part of the collaborative investigation. But that money pickup ends that same day.

The RCMP, on their own, as is reflective in all the surveillance reports in Attachment B of this same document, did their own surveillance. And contrary to counsel's arguments, they actually followed the Mercedes from the pickup back to a residence and did several days of surveillance on the vehicle on their own. As indicative in Attachment B, there is no interference, involvement, direction whatsoever from --

THE COURT: Are you talking -- so when you start talking A and B, it's helpful if you'd recite the ECF because the record will be clearer then.

MS. VAN MARTER: ECF No. 649 and 649-1 that was attached as Exhibits A and B to Government's response --

THE COURT: 667.

MS. VAN MARTER: -- 667.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Argument by Ms. Van Marter*
103

THE COURT: Okay. Fine.

MS. VAN MARTER: And referring to that timeline of events, all of the things that occurred after the money drop were exclusively controlled by the RCMP to further their aspects of the investigation. It was just unfortunate luck for Defendant Zambrano and Miguel Reyes Garcia that that surveillance led them several days later to the Grand Forks area, an area that we knew, in our investigation, was utilized by the organization, the trail system, for trafficking narcotics from United States to Canada.

THE COURT: Okay. So what do you make of Mr. Smith's argument that he wants to suppress all of this? So what should we do about all of that?

MS. VAN MARTER: Well, Your Honor, I think the first -- there's many responses. The first response is he doesn't have standing because it's our position that in this particular case there was not a joint venture, there was not substantial involvement on the followthrough of the investigation. And simply because there's an overall collaborative investigation does not mean on this instance, for this enforcement action, that there was substantial government -- United States Government involvement. In fact, there was none. That was all exclusively controlled by the RCMP. So the defendant does not have standing, then, to challenge.

If the Court, in argument sake, does not agree with

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS 104
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 621/Argument by Ms. Van Marter

United States, then the Court is directed to apply its own Fourth Amendment principles. Here, there are a number of bases which would further lead the Court to deny the defendant's motion to suppress.

02:07:25 First, the defendant has no standing to challenge the search of the vehicle or the search of the hotel room, and we noted that in our brief.

The other basis is that there was more than sufficient probable cause, as noted in Government's ECF 649, which is the 02:07:39 information in support of the warrants. Not only does it contain, in its four corners, sufficient probable cause for this Court to support the issuance of the search warrant as done in Canada, but there is also an independent K-9 sniff, which, under United States law, is PC all day long for the search of that 02:07:58 vehicle and the subsequent investigation into the apartment.

So I think the Court would be well within its grounds to rule in the alternative. Not only has the defendant failed to establish that there was substantial United States Government involvement in the enforcement actions as to this part of it, 02:08:15 but even if the Court believed there was, there's more than sufficient probable cause to authorize the search warrant not only of the vehicle but also of the apartment -- or, I'm sorry, of the hotel room, and the defendant has not been able to present standing to challenge otherwise.

02:08:30 THE COURT: Thank you.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Rebuttal Argument by Mr. Smith*
105

Mr. Smith.

REBUTTAL ARGUMENT

MR. SMITH: Your Honor, the -- our challenge on the Fourth Amendment grounds is whether or not the stop was supported by probable cause. There's a -- I mean, and that's -- that's factually driven as far as what -- what information law enforcement had at the time that they stopped. You may not have an opportunity to -- or he may not have standing to challenge the search of the vehicle, but he has challenge -- he has standing to challenge the stop of the vehicle, the identification, and the taking of his identification and information and information that -- the property they found within the vehicle that now the Government wants to ascribe to him.

Even if the Government were correct, and they had probable cause to stop the vehicle because of the identification of Calvillo and Reynosa, they had no idea of Juan Zambrano Bravo or whether he was engaged in any type of illegal activity. And, consequently, their stop and their detention of him is illegal based on -- on the reasonable --

THE COURT: Where was he?

MR. SMITH: Where was it?

THE COURT: Where was he?

MR. SMITH: He was a passenger in the vehicle. They

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Rebuttal Argument by Mr. Smith*
106

were -- what happened was --

THE COURT: Are you contesting whether -- are you saying that he has standing to contest the stop?

MR. SMITH: Yes.

02:10:03 THE COURT: Okay.

MR. SMITH: His detention --

THE COURT: If the Fourth Amendment applies, he has standing to contest the stop.

MR. SMITH: Yes.

02:10:10 THE COURT: Okay. And you're saying there was no basis for the stop.

MR. SMITH: Correct.

THE COURT: And you've read the reports, A and B --

MR. SMITH: I have.

02:10:16 THE COURT: -- the application for it, et cetera.

MR. SMITH: I have. And I -- we received -- we received the information to obtain, which is essentially the affidavit for the search warrant, prior to the time -- in fact, I included it in our brief. I haven't had an opportunity to analyze that under Fourth Amendment standards, but I'm thinking that simply because he doesn't have -- he wasn't the driver of the vehicle, that he wouldn't have standing. I agree with that.

But the fact is, is that once --

THE COURT: He wouldn't have standing to do what?

02:10:44 MR. SMITH: Wouldn't have standing to challenge the

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 621/Rebuttal Argument by Mr. Smith
107

search of, say, the motel room.

THE COURT: Right.

MR. SMITH: Or -- and the vehicle itself is a different -- is a different issue because --

02:10:55 THE COURT: Well, then why don't you concentrate on that.

MR. SMITH: The -- here's -- the information that they had at the time was --

THE COURT: Why did they stop the vehicle?

02:11:04 MR. SMITH: I -- they -- they said it was because there were -- well, they didn't say.

THE COURT: Actually, they did, didn't they?

MR. SMITH: Well, I don't think so.

THE COURT: Actually, I think they did. They issued a citation.

02:11:17

MR. SMITH: For being illegally in the country.

THE COURT: No. They issued a citation for the car itself, didn't they?

MR. SMITH: I don't recall that, Your Honor. The basis -- the basis that they stopped the vehicle was because there was three other occupants, and they said they had stopped it because --

02:11:28

THE COURT: Well, that was certainly why they brought it to their attention, and the question was why did they stop them. And they, in fact, had said they issued a citation for

02:11:41

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 108
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Rebuttal Argument by Mr. Smith*

correction. That's what they said.

Now, whether that's accurate or not, that's a whole other story. But my recollection is, when I read this just now, when I was whipping through it, there was a notation by the reporting authority that they had issued an actual citation.

02:12:00

MR. SMITH: Well, I think we put in our brief that we didn't know -- there wasn't an indication of a violation, of a traffic violation. And that if -- so I -- Your Honor, if we received information on that, I did not -- I didn't see it. They said the reason why they stopped it was because of the immigration law violation.

02:12:24

THE COURT: Well, that may be, but they may have bootstrapped it with a traffic violation, and then issued a citation for it, for corrective action. I didn't pull that out of my head. I pulled it out of a report which I'm trying to locate now, but I saw it in the material and believe it was there.

02:12:44

MS. VAN MARTER: Your Honor, there was actually a couple different times that they stopped the vehicle. The first time they stopped the vehicle was right after the money drop, in order to identify the driver as Calvillo, and that's listed on Page 9.

02:12:56

THE COURT: Of what? Of Exhibit A?

MS. VAN MARTER: ECF 649.

THE COURT: 649?

02:13:10

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 109
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 621/Rebuttal Argument by Mr. Smith*

MS. VAN MARTER: Correct.

THE COURT: Okay. So?

MS. VAN MARTER: And so there was a citation at that time issued. At the time they identified him, there was a violation, a traffic violation noted then.

THE COURT: Okay.

MS. VAN MARTER: Then there was the second stop that occurred up in --

THE COURT: After seeing him in an area where two people, now five people, et cetera. Okay. Thank you.

MS. VAN MARTER: Sure.

MR. SMITH: So by the time that they stopped the vehicle they were interested in -- and here's the thing, Your Honor: We don't -- we don't know -- there isn't anything that indicates they're -- like in this general area they lost -- they lost surveillance of the -- of the vehicle for, one report I think says 15 to 20 minutes, another report says half an hour. And they didn't stop it at that time or anywhere near that time. They went back, they surveilled it for an entire day, and they saw nothing that was suspicious at all, from what I can tell. And then at 11 o'clock at night when that vehicle was headed someplace in Canada, that's when they stopped the vehicle and said that it was for immigration violation. And they couldn't have known that because they didn't know who was the -- the passengers in the vehicle, or that's why they said they stopped

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

Juan Bravo Zambrano, in any event.

RULING BY THE COURT

THE COURT: Thank you.

02:14:29 The Court denies the motion. There was no joint venture. There was no substantial involvement of the American authorities in the Canadian -- in this particular aspect of the Canadian venture. All of the decisions made were coordinated to stop and to seize by the Canadian authorities based on, and the 02:14:51 warrant itself and the application for it demonstrate that as well.

Even if the -- there was a joint venture, the authorities had probable cause to stop this vehicle and to -- and then they -- both the application for and the warrant 02:15:13 themselves, even if, it met Fourth Amendment standards because they were explicit and gave adequate basis for any independent magistrate to issue an authorization to search as was done here. So the motion is denied.

Now, there is another aspect of this, isn't there? 02:15:34 Another motion that you have with regard to something else?

MR. SMITH: I do, Your Honor.

THE COURT: Go ahead. Let's go.

MR. SMITH: Well, I think it's, the Government will -- well, all right.

02:15:45 THE COURT: Do you have another motion?

MR. SMITH: I do.

THE COURT: Remind me, would you? Because there are a lot of motions pending. So you know what you've got going so, tell me, what else is it?

02:15:54 MR. SMITH: Your Honor, we have a motion to suppress based upon the entry into the residence. We have a motion to suppress based upon the search warrant itself that was obtained after the entry into the residence --

THE COURT: Well, let's start with the first one, shall 02:16:12 we?

MR. SMITH: All right.

THE COURT: So what about that? What do you say happened?

MR. SMITH: Well --

02:16:18 THE COURT: Just tell me what your position is.

MR. SMITH: Our position -- our position is this, is that the agents, when they -- when they came to the residence, they didn't know whether or not Mr. Zambrano lived there or not. They didn't know -- actually, they didn't know the person who 02:16:35 had told them that they could find him there, they didn't identify that person. They knocked on the door, and they used a ruse. And they contacted Socorro Sanchez, and when they contacted her, she says that they asked her if he lived there, and she told them that he did. They asked her if he was there 02:16:57 at the time, and she said that she would check, and she shut the

door. That at that time --

THE COURT: Who said that?

MR. SMITH: His -- Socorro Sanchez, and she was a resident of the residence.

02:17:08 THE COURT: I apologize, Mr. Smith. There's a lot of paperwork. So did I miss her declaration?

MR. SMITH: No. No, I included it in the statement of facts.

THE COURT: Is her declaration on record?

02:17:21 MR. SMITH: She -- it's not a declaration. My statement in the statement of facts, Your Honor.

THE COURT: Well, that's not a declaration. So you're not a witness.

So did the woman who was at the dwelling, did she give

02:17:32 you a declaration in support of your position?

MR. SMITH: I didn't ask her for one, Your Honor.

THE COURT: Okay. So there is no such declaration, right?

MR. SMITH: I'll put her on the stand.

02:17:42 THE COURT: Well, that's up to you.

MR. SMITH: Okay. Well, but I thought you wanted to know the outlines of the motion.

THE COURT: I do.

MR. SMITH: Okay.

02:17:51 THE COURT: But you kept saying, as if it was a fact

that I should already know, that she was going to say A, B, and C, and I didn't know that because it wasn't clear to me that there was anything in the record for us to examine, and if I had overlooked something, I wanted to read it.

02:18:08 MR. SMITH: Okay. I put it -- I put those -- the statements from my conversation with her in my memorandum, and I did not -- I did not have her do a statement of fact declaration under oath for the purposes of the memorandum.

THE COURT: Okay. Is she represented by counsel?

02:18:28 MR. SMITH: She's not.

THE COURT: Okay. I'm ready. Let's go. We have a hearing.

Do you have a witness?

MS. VAN MARTER: Your Honor, we do have a witness. I

02:18:46 did -- and I know the Court wants to get moving, but I do want to seek a bit of clarification.

The United States' position is that, as well, the defendant hasn't even presented evidence in support of their claim. I understand he's bifurcated this to two issues: One

02:18:59 being the lawful presence of law enforcement inside the residence; and, two, he's raised a *Franks* motion against the affiant.

It is our position that he's not raised sufficient proof and/or met burden to obtain the *Franks* aspect of the hearing.

02:19:14 THE COURT: Yeah, I want to deal with the -- but there's

nothing about -- *Franks* doesn't implicate the entry.

MS. VAN MARTER: No, Your Honor.

THE COURT: Okay. And so we're dealing with entry.

MS. VAN MARTER: Yes.

02:19:22 THE COURT: And the question is what's the evidence. He says, without any sworn testimony, that there was a breach, and I saw nothing to indicate that.

MS. VAN MARTER: No. In fact, Your Honor, the affidavit that's attached by defense counsel, and we both agreed prior to 02:19:39 the Court taking this matter on the record that it would be marked as Defense Exhibit No. 7 -- is that correct?

MR. SMITH: The report?

MS. VAN MARTER: No, the affidavit.

MR. SMITH: Oh, yeah.

02:19:49 MS. VAN MARTER: -- and that I could reference that affidavit as well.

THE COURT: What affidavit is this?

MS. VAN MARTER: It was attached as ECF 624-2. And he --

02:20:00 THE COURT: I'm sorry. Say that again, please.

MS. VAN MARTER: Yes, Your Honor. 624-2.

THE COURT: 624?

MS. VAN MARTER: It was attached as Defendant's Exhibit B.

02:20:13 THE COURT: To what ECF?

MS. VAN MARTER: ECF 624.

THE COURT: 624. Okay. Thank you. I wasn't hearing the "6".

MS. VAN MARTER: I'm sorry. Yes. Dash 2.

02:20:27 THE COURT: Fair enough. Okay.

Okay. Now I'm at 624.

What page am I looking at?

MS. VAN MARTER: Defense counsel has handwritten page numbers on the left bottom. It would be the left bottom 28, or 02:21:35 if the Court wanted to go to the discovery Bates number on the right, 00001012.

THE COURT: Sure. I'm there.

MS. VAN MARTER: Paragraphs 21 and 22 discuss the aspect to which the Court is inquiring now. The parties agreed that 02:21:51 this would be an exhibit for the Court's consideration as to this motion. And specifically in that paragraph, as sworn to by the affiant for purposes of obtaining the search warrant, specifically in Paragraph 22 it was clear -- actually, there is a couple of material facts --

02:22:07 THE COURT: I've read all of this, and that's why I'm not understanding what the problem is.

MS. VAN MARTER: We don't believe there is one. The door did not get closed. The door remained open. There was confirmation by law enforcement that the person with a federal 02:22:19 arrest warrant was inside.

A couple other material facts counsel didn't highlight that support the conclusion of law enforcement and their ability, therefore, to lawfully enter into the residence --

THE COURT: I think it's a question -- as I understand his point, it's not whether they had an arrest warrant. It's whether or not they breached the door or entered somehow.

MS. VAN MARTER: He certainly gives a -- there was an argument on knock-and-announce law, which isn't applicable. Here we have an arrest warrant. It's whether they had cause to believe the person was inside. They did clearly.

THE COURT: Right. But I think counsel is making much of the fact that he believes that they breached the door in a physical fashion that was closed, and therefore they were not really -- that they violated some aspect of Washington law. So ...

MS. VAN MARTER: Well, Your Honor, I don't believe there's any evidence that the door was actually pushed open, breached opened in that way, and under the law it doesn't really matter.

THE COURT: They show no declaration, but I think Mr. Smith is calling a witness, isn't he?

MR. SMITH: I will.

THE COURT: See, he thinks he's going to call this woman who was in the house, and she's going to testify. I guess that's his story.

MS. VAN MARTER: I don't believe she is here. I think there's a concern -- if he wants to call the witness, I think the Court already addressed the concern; she was co-located in a house with illegal items.

02:23:33 THE COURT: I don't know what he's going to do, but he says he wants to put on evidence and hasn't filed a declaration. I mean, I won't say it's surprising, but it may be strategic on his part. So let's see what happens.

So you've got a witness? Let's start with yours.

02:23:46 MS. VAN MARTER: We do, Your Honor. Task Force Officer Doug Stanley.

THE COURT: Okay. Good.

(Witness approached.)

02:23:56 DOUG STANLEY,

called as a witness on behalf of the Plaintiff, having first sworn or affirmed, testified under oath as follows:

THE WITNESS: Yes, sir.

THE COURT: Please be seated.

02:24:14 Okay. Tell us your name and your occupation.

THE WITNESS: My name is Doug Stanley. I'm a detective with the Benton County Sheriff's Office, and have been assigned to the FBI's Violent Crimes Task Force for approximately eight and a half years.

02:24:28 THE COURT: Thank you.

You may proceed.

MS. VAN MARTER: Thank you.

DIRECT EXAMINATION

BY MS. VAN MARTER:

Q Task Force Officer Stanley, did you participate in looking for an individual by the name of Juan Zambrano for purposes of effectuating a federal arrest warrant?

A I did.

Q And do you recall the facts and circumstances of that day?

A Uh, December 15th, 2016. The first location that I went to was a residence known to belong to family in Benton City on 464 Private Road Northwest.

Q When you say "a residence known to belong to family," had you previously identified that residence?

A Yes.

Q And known to belong to whose family?

A Juan Zambrano Bravo.

Q And so why did you go to that residence?

A Uh, to locate Zambrano and to effectuate the arrest.

Q And did you utilize a ruse during that point in time in making contact with Mr. Zambrano's family?

A I did.

Q And what was that?

A That I was a detective with the Benton County Sheriff's

Office, and that stolen mail had been recovered in his name, and I needed to return it to him personally.

Q And why did you use a ruse?

A The ruse is a technique to avoid alerting a potential arrestee to the fact that they're going to be arrested. It's an officer safety tactic. It's obviously more conducive to finding them if we come up with a ruse.

Q A lot easier than telling them that you're looking for them to arrest them?

A Yes.

Q So when you made contact with the first residents, what occurred?

A A younger gentleman, identified his first name, I believe, as Reyes, told me that Juan Zambrano Bravo was not at that location. I followed through with some questioning as to where I could locate him so I could return his mail, and Reyes points to a neighboring house and says that he lives there now.

Q And could you see that neighboring house?

A Yes.

Q So is it located on the same general property?

A Uh, it's actually a different, uh, street altogether. It's Empire Private Road; 200 yards across an open pasture, and it was in the winter with no foliage on the trees so it was clearly visible.

Q And were you familiar with that second residence?

A Uh, no.

Q Had you ever encountered that residence before?

A No.

Q So what did you do?

02:26:50 A I went over to the Empire Private Road address. Um, I -- upon pulling into the driveway, I observed that there was a Chrysler 300 with a license plate matching a silver Chrysler 300 I'd previously identified as a vehicle being used by Juan Zambrano Bravo.

02:27:09 Q And, in fact, had you previously applied for a court order relative to that exact same vehicle?

A Yes.

Q What type of court order?

A A GPS tracking order.

02:27:18 Q And so you had in the present -- excuse me -- in the process of obtaining that GPS tracking order, had you previously identified Mr. Zambrano driving that vehicle?

A Yes, we had.

Q And once you approached and observed that the vehicle was there, what did you think?

02:27:31

A We went to the back door because, on appearance, it looked like the one that got used for primary entry. Knocked on the door. Knocked several times until the door opened, and the female, later identified as a Ms. Sanchez -- I'm afraid I'll mispronounce her first name -- was contacted by me.

02:27:52

Q And was anybody with you at that time?

A Uh, there were two uniformed officers from the Benton County Sheriff's Office and Task Force Officer Jason Gilbert was with me.

02:28:04 Q And what happened when you made contact at this door?

A I utilized the same ruse as before. I asked if he was home. I was told that he was home. I asked if we could speak to him, and she had kind of pointed down the hallway, and at the same time we were hearing someone exiting a door, what it 02:28:26 sounded to me like exiting a door. Um, and I stepped into the residence, looked down the hallway, confirmed it was him, met him in the hallway in front of the bedroom door, and arrested him.

Q Okay. I'm going to just stop you for a few questions 02:28:42 there.

You indicated that when she opened the door and you inquired as to whether he was at home, she gestured.

Is that correct?

A Yes.

02:28:50 Q Did the door remain open?

A Yes.

Q At any point in time did she shut the door?

A No.

Q Did she have any -- appear to have any difficult -- 02:28:58 difficulty in understanding your question as to whether he was

home?

A No.

Q And when she gestured, how did she gesture?

A Down the hallway, where we were hearing the noise.

02:29:07 Q And at that point in time you indicated that you stepped inside the doorway; is that correct?

A It is approximately 5 or 6 feet to where I could see down the hallway, and clearly observed Zambrano Bravo, who had exited a master bedroom on the north end of the house.

02:29:22 Q And do you recognize him by sight?

A Changed a little bit, yes, but he's in the jury box.

Q And when you entered into the house, upon confirmation from her that he was there, did you recognize him by sight?

A Yes.

02:29:34 Q And you, at that point in time, had a federal arrest warrant in your possession?

A Yes.

Q And so at the time that she gestured down the hallway, why did you walk into the doorway then?

02:29:47 A Hearing the -- her gesturing, her saying he was there, the neighbor, the whole totality of it gave me more than reasonable expectation he was there, and then her confirmation pointing down the hallway, the federal arrest warrant in my pocket.

MS. VAN MARTER: Thank you. I have no other questions,

02:30:08 Your Honor.

THE COURT: Cross?

CROSS-EXAMINATION

BY MR. SMITH:

02:30:25 Q Agent Stanley, as you indicated, you had -- you had an arrest warrant for Juan Zambrano, correct?

A That is correct.

Q And tell me, when had you obtained that arrest warrant?

A The exact date I do not know, but it was days before.

02:30:39 Q Not months?

A No, I don't believe so. No.

Q It was -- and would you -- would you agree with me that the -- that the arrest warrant was based upon the incident that occurred -- was based primarily on the incident that occurred in

02:30:58 Canada on --

MS. VAN MARTER: Your Honor, I'm going to object to this line of questioning. The scope of these questions is the entrance to the home based upon --

THE COURT: We're here at the home, aren't we?

02:31:06 MR. SMITH: We are. My -- my -- the purpose for the question, Your Honor, is that the length of the time in the investigation; I don't think they had identified Mr. Zambrano prior to the arrest in Canada.

THE COURT: What difference does it make? He had an

02:31:23 arrest warrant for Zambrano, and the question is whether the

entry and the execution of the warrant were constitutional. So ...

BY MR. SMITH: (Continuing)

Q You didn't know where Mr. Zambrano lived.

A At that time I did not know he was living on Empire Private Road.

Q Well, did -- you -- at one point in time you had indicated that you didn't even believe he was in the country.

MS. VAN MARTER: Objection, Your Honor. Again, the scope of questioning is to the entrance of the home.

THE COURT: Sustained.

BY MR. SMITH: (Continuing)

Q The -- when you contacted a person at the first residence, that person, you identified him only as Reyes, correct?

A That's correct.

Q And you didn't -- you didn't question him further as to how he knew or why he knew or why he believed that Mr. Zambrano lived at the residence that he pointed to?

A No, I did not.

Q And what you saw was you saw the Chrysler 300 in the yard or the parking lot, and you knew that at some point in time you -- what, a year earlier or something you put a tracker on that?

A Again, I don't know the exact date of the tracker.

Q Well, it was prior to August 25th of 2016, correct?

A August --

Q Excuse me.

A I do not. No, I don't know August 25th.

Q Well, let me put it to you this way: It was prior to the time that Mr. Zambrano was arrested in Canada.

A Yes, the tracking warrants were prior to his arrest in Canada.

Q The -- when you -- when you came to the door, you knocked on the door. You didn't identify yourself. You didn't say, when you knocked on the door, "Police. Open the door."

THE COURT: Counsel, you're going to have to ask him one question, and then -- you can ask him another, but ...

MR. SMITH: I'll try to do that, Your Honor.

THE COURT: Why don't you reframe that question.

BY MR. SMITH: (Continuing)

Q When you -- prior to the time that you knocked on the door, you didn't identify yourself as a police officer.

A I'm not sure I know how to answer the question. Prior to talking to someone did I -- did I announce my --

Q I'll say it.

Prior to the time, meaning before you knocked on the door, did you announce yourself as a police officer?

A No, I did not.

Q And when you knocked on the door, at the time that you knocked on the door, did you announce yourself as a police

officer?

A No, I did not.

Q When you knocked on the door, did you -- you didn't announce yourself as a police officer.

02:33:58 Did you say that you had an arrest warrant for Juan Zambrano?

A No, I did not.

Q You knocked on the door, and then you waited for someone to respond.

02:34:09 Am I right?

A That's correct.

Q And when a woman responded to the door, she opened the door, correct?

A Yes.

02:34:17 Q And you -- at that time you didn't identify the woman.

A Um, I didn't ask her for photo identification. I knew who she was.

Q So you knew that she was Socorro Sanchez?

A Yes.

02:34:33 Q And did you know whether or not she had any relationship to Juan Zambrano?

A Uh, it was my understanding from previous investigation that they were a paramour; they were living together.

Q The -- when you say that at the time that she approached

02:34:53 the door -- was it at that time that you told her that you were

a police officer?

THE COURT: You need to rephrase that question, Counsel. He would not be able to see her approaching the door.

BY MR. SMITH: (Continuing)

02:35:04 Q At the time that she answered the door, did you tell her that you were a police officer?

A Yes. The door opened, I introduced myself, presented a badge, and had two uniformed police officers in my presence.

Q And at that time you told her that you had some stolen mail that you wanted to deliver to Juan Zambrano, correct?

02:35:19

A That is correct.

Q When -- did you -- is it your testimony that you asked her if she -- if Juan Zambrano lived there?

A I told her the circumstances of the ruse -- I had mail for him -- and asked if he was available. I asked if he was present. The exact wording of my question I don't remember --

02:35:42

Q Okay.

A -- but the gist was: Is Juan home?

Q Is it possible, sir, that you asked her if he lived there?

02:35:58 A It's very much possible.

Q Is it also possible that after you asked her if he lived there, that you asked her if he was there at the time?

A I know I asked, "Is he here?"

Q All right. And isn't it true that when you asked her if he was there, she said she would find out?

02:36:14

A No.

Q The -- is it your testimony that when you asked her if he was present, that at that point in time she pointed down the hall?

02:36:36 A Could you please ask the question again.

Q Sure.

Is it your testimony that when you asked her if he was present, that she pointed down the hall?

A Yes.

02:36:51 Q And you say that when she pointed down the hall, that's when you went in the door, correct?

A That plus hearing movement in the hallway she was pointing to.

Q All right.

02:37:07 A Yes, that's correct.

Q Give me one moment, Detective.

(Counsel conferring.)

THE COURT: Are you referring to Paragraphs 21 and 22 of the 642 -- 624?

02:37:55 MR. SMITH: Yes, Your Honor.

THE COURT: Good. Let's do it.

BY MR. SMITH: (Continuing)

Q Do you have a copy of your search warrant and affidavit in support of the search warrant, sir?

02:38:08 A Yes, I believe I have it with me.

Q All right. Well, let me -- let me do it this way then. Let me just direct your attention to Bates-numbered Page 1 -- it's 00001012.

A That means nothing to me.

02:38:23 Q Okay. How about Page 16 of your affidavit?

A Okay. I'm there.

Q And on Paragraph 22 at the -- you indicate that you did not breach the doorway until after she confirmed that he was, in fact, inside the residence, correct?

02:38:48 A Yeah, that confirmation came from the question and her pointing down the hallway that he was home.

Q You say that you stepped into the residence and positively identified him exiting a bedroom.

THE COURT: Counsel, are you referring him to the document?

02:39:01

MR. SMITH: I am.

THE COURT: Okay. So he's asking you only questions about the document language.

Okay?

02:39:07 THE WITNESS: Yes, sir.

THE COURT: So focus on the document.

Ask your question.

BY MR. SMITH: (Continuing)

Q Let me -- let me point -- direct your attention to -- this is on Page 17, the first sentence on the first paragraph. You

02:39:16

state that you stepped into the residence and positively identified Zambrano exiting a bedroom, correct?

A That's what it says, yes.

Q In fact, when you stepped into the residence, you couldn't see anybody.

02:39:35

A No, that's not true.

Q There's an L shape to the hallway that you step into, correct?

A Five to 6 feet inside the residence you could see down the length of the hallway.

02:39:46

Q So you had to -- you had to go 5 to 6 feet in, and then you could turn to your right or your left, and that's where you saw him?

A That's correct. Yes.

02:39:55

Q All right. And you indicated that it was a confined space?

A The hallway where we were effecting the arrest was a confined area.

Q And let me ask you this: With regard to your contact with Mr. Zambrano, you say you saw him exit the -- exit a bedroom, correct?

02:40:13

A Yes.

Q And -- and did you -- at the time that you saw him, after you'd come in and looked around the corner, did you tell him to go to the ground or did you give him some command?

02:40:23

A I announced my presence, told him I had a warrant for his

arrest, and to show his hands.

Q All right. And then did you take him into custody at that time?

A Yes.

02:40:33 Q He was compliant?

A Yes.

Q And when -- when you took him into custody, there were -- you didn't have any information that there was anybody else in the house, correct?

02:40:44 A No, we did not.

Q You hadn't -- you hadn't seen or heard anybody else in the residence, correct?

A Um, I believe we heard what sounded like some children in one of the rooms.

02:41:00 Q All right. And did you question Ms. Sanchez as to whether there was anybody else in the house?

A No, I did not, not at that time.

Q Once you had -- once you had placed him in handcuffs, there was -- was there -- other than the bedroom door, was there any

02:41:18 other door that was open --

A No.

Q -- at the time?

A Not open.

Q And you arrested him how far from the bedroom itself?

02:41:30 A Back of the hall -- so within 2 feet, 3 feet of a couple of

different doors.

Q With regard to your investigation of Juan Zambrano, other than the information that was given to you by the RCMP from Canada, you never -- you never, in your entire investigation, was there some indication that Mr. Zambrano --

02:41:54

MS. VAN MARTER: We need an objection, Your Honor. We're in the limited scope of entry of the residence. We're getting back into other stuff.

THE COURT: That's where we are, Counsel.

02:42:06

MR. SMITH: Well, it goes into, Your Honor, whether or not the protective sweep was appropriate or necessary. I mean, that's part of it, essentially. The motion to suppress was this, one: Was the breach proper; two --

THE COURT: What breach are you talking about? You keep saying there was a breach. It's in the air.

02:42:20

What do you mean by breach?

MR. SMITH: Well, I'm sorry, the entry into the house, whether the entry into the house was proper.

THE COURT: He used "breach" in his affidavit. So I'm uncertain what you all mean by that, and rather than speculate about what that means, I think you need to draw that out.

02:42:32

So ...

BY MR. SMITH: (Continuing)

Q When you -- you've been -- you're a task force officer, correct?

02:43:01

A Yes, sir.

Q And what that means is that you're kind of on loan, if I can use that term, you're on loan from a specific entity to the task force.

02:43:12 A That's fair.

Q And your actual employer is the City of Kennewick?

A Benton County Sheriff's Office.

Q Benton County Sheriff's Office. All right.

In -- in your capacity as a Benton County Sheriff's officer, deputy, you have served numerous arrest warrants.

02:43:31

A Yes.

Q You know that terms in serving warrants, in entering houses, that there's certain terms that have specific meaning in your work, correct?

02:43:52 A Yes.

Q Let's use the word "breach," as in this case. All right? It's -- you know that the term "breach" generally means that there was some force put to the door to enter the residence.

Am I correct?

02:44:12 A No. I -- specifically the word "breach" can have many scopes. In my mind, the word "breach" is cross a threshold, is breach a window, is breach a door.

Q So in this case --

A In a tactical dynamic, the word "breach" would be force, in my mind.

02:44:30

Q Okay. So you agree with me that the tactical dynamic of the word "breach" means force?

A What I mean by "tactical" would apply to a specialized unit of tactic; SWAT teams.

02:44:44 Q So in this case you just used the term "breach" loosely to mean that you crossed the threshold? Is that what you're saying?

A I breached the threshold of the door, yes. I walked into the house.

02:45:02 Q During your entire investigation, did you receive any information from any source that Mr. Zambrano was in possession of a firearm?

A Yes.

Q And was that from the Canadian investigation?

02:45:21 A It was from the Canadian, yes.

Q All right. The -- other than the information that you received from the Canadian investigation and arrest, there was never any other source that identified Mr. Zambrano as having a firearm.

02:45:38 Isn't that true?

A Not that I recall, no.

MR. SMITH: I have no other questions, Your Honor.

THE COURT: Do you have any questions, Ms. Van Marter?

REDIRECT EXAMINATION

BY MS. VAN MARTER:

Q Task Force Officer Stanley, you indicated on direct examination and cross-examination that you stepped into the residence approximately how deep?

A Five to 6 feet.

Q And you observed what again, once you stepped inside 5 to 6 feet?

A Simply turning my head, looking down the hallway, I observed the defendant, uh, coming out of a bedroom. He was actually out of the bedroom but was pulling that door closed.

Q And at that point in time you identified yourself; is that correct?

A Yes.

Q And you effectuated the arrest of Mr. Zambrano?

A Yes.

Q And who was with you at that time?

A Task Force Officer Jason Gilbert and two deputies from the Benton County Sheriff's Office.

Q And once you effectuated the arrest of Mr. Zambrano, what happened?

A Um, I told the other agents, the two -- the two deputies to do a very limited, cursory officer safety sweep on the area around the arrest.

Q And why did you do that?

A Uh, for our safety.

Q And is that specific to prior information about the defendant's possession of firearms?

A Um, that; and as a general course of business, when there's four, grown men arresting someone in a small hallway, to be -- make sure that we are safe from closed doors and what is behind them.

Q And referring specifically to ECF 624-2, your affidavit that you have in front of you, Page 17, if you could look at the top of that page and to Paragraph No. 23 and those paragraphs -- and carried over from Paragraph 22 on Page 16.

In that area are you indicating in your affidavit the information that you have testified to here today regarding the identification of Mr. Zambrano and the basis for the cursory search?

A Yes.

Q And approximately -- when you said that there were doors that were closed, is that of an additional concern for you?

A Yes.

Q Why?

A We don't know what's behind them.

Q And when you encountered the defendant, you indicated that he was actually closing the door --

A Yes.

Q -- is that correct?

A That's how I knew which room he had come out of.

Q And did you -- did you or the deputies with you or Task Force Officer Gilbert do a full search at that time?

A No.

02:48:30

Q And when you say "cursory," what does that term mean to you?

A I had those, uh, doors that were within an arm's reach or so, uh, doors opened, looked inside of, and made sure there wasn't any more people that were there to cause us any harm or cause us problems.

02:48:45

Q And during that cursory sweep, then, did you then see or encounter the items as you described in Paragraph 23 of ECF 624, identified as Defendants' Exhibit No. 7 on Page 17?

A I did.

02:49:01

MS. VAN MARTER: I don't have any other questions, Your Honor.

THE COURT: Anything else, Mr. Smith?

MR. SMITH: No, Your Honor.

THE COURT: Okay. What's next?

02:49:11

MR. SMITH: Next is the motion to suppress based upon the failure to include the information regarding a medical marijuana grow.

But, Your Honor, I need to check, because my witness -- maybe the Government knew before I did, but my witness is not present in the courtroom, and I want to check outside to see if

02:49:31

she's there.

THE COURT: Go ahead.

(Pause in proceedings.)

MR. SMITH: She's not. And I -- although I think that her testimony is perhaps more pointed in this --

THE COURT: I apologize. Did you say she's not here?

MR. SMITH: She's not here.

THE COURT: Okay. So we're ready for a ruling on that motion?

MR. SMITH: Pardon me?

THE COURT: Are you ready to have a motion ruled on, that motion?

MR. SMITH: Well, I want to argue it.

THE COURT: Go ahead.

MR. SMITH: The -- here's what -- here's what I think, based upon the testimony. And we made this argument, and the Government discounts it. And the fact is, is that there's a --

THE COURT: I apologize. I apologize, Counsel, for interrupting you; I really do.

Do we need this witness on the stand for the next motion?

MR. SMITH: Well, he's -- yes.

THE COURT: All right then.

MR. SMITH: Well -- the Government may have a different view of that, but ...

*USA v. Casillas, et al./4:15-CR-6049-EFS* 139
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 622/Argument by Mr. Smith*

THE COURT: Is he going to be called for the next motion as well, which is the *Franks* hearing?

MS. VAN MARTER: If -- yes, he is the affiant, so he is the relevant witness, if the Court proceeds to hearing on that port of the motion.

02:51:16 THE COURT: Well, it's the best seat in the house, so you can just stay where you are and see what happens.

THE WITNESS: Thank you, sir.

THE COURT: All right. Go ahead. Make your argument, and then we'll take up the next motions, if I decide a *Franks* hearing is necessary, about which I have some reservations.

02:51:26 So go ahead.

ARGUMENT

02:51:33 MR. SMITH: Okay. Well, right now I'm going to argue that the ruse entry to the residence, I'll call it the Zambrano residence on Empire Road, but that that avoids the requirement of a knock and announce and -- which has specific reasons for being in place. And so here's what -- here's what the rule says: That you, if you're serving an arrest warrant, that the officers or the agents that are serving the arrest warrant must knock and announce their presence in order to give the individual who's wanted an opportunity to respond to the knock and the announce.

02:51:55

02:52:15 And what Detective Stanley says here is that the

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS 140
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 622/Argument by Ms. Van Marter

specific purpose that they used the ruse was so that they would not alert the individual to the fact that there was an arrest warrant.

02:52:34 Now, he says, well, we don't want to alert them to it because we have other concerns. But what the courts have said is that here's what the concerns that the knock-and-announce rule is meant to address, and that is that an individual has the time to respond, because there's -- it isn't a search warrant. It gives them -- it puts them on notice that the individual who 02:52:55 is sought is the subject of an arrest warrant and gives them to -- time to surrender themselves peacefully and not have agents enter their house. And the procedure that this -- that these officers used under these circumstances circumvents that.

Thank you.

02:53:16 THE COURT: Thank you.

Okay. Who is arguing? Ms. Van Marter, do you have some argument?

You can share the podium, so ...

02:53:25 ARGUMENT

MS. VAN MARTER: Your Honor, with respect to counsel, there is not one line of authority that actually supports the defendant's extension of knock and announce to this circumstance. And, in fact, the case law cited by the United 02:53:39 States gives explicit authority for law enforcement, once they

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 141
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 622/Rebuttal Argument by Mr. Smith*

have reasonable cause to believe the individual with which they have a valid arrest warrant, once they've identified that individual, they have the ability to -- in fact, implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe that the suspect is within.

02:53:55

Here there is more than sufficient record before the Court to justify Task Force Officer Stanley's belief, including the defendant's girlfriend's confirmation of his presence, and then the visual confirmation that he was there, to enter into the residence to effectuate the arrest, and then thereby participate in the very cursory search of the immediate area for purposes of officer safety. And that is a Supreme Court case, *Maryland vs. Buie*, and those circumstances were followed appropriately here.

02:54:09

02:54:30

THE COURT: Thank you.

Mr. Smith.

REBUTTAL ARGUMENT

02:54:35

MR. SMITH: The point that I -- that I disagree most strongly with is that to comply with the knock-and-announce statute, they have to knock and announce their presence, and there's -- there is, of course, federal law that supports that, supports the knock and announce; and that, prior to a nonconsensual entry, they must announce their identity, demand

02:54:59

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 624/Argument by Mr. Smith*
142

admittance, and announce the purpose of their demand to be explicitly or implicitly denied admittance.

02:55:12 Here what they do, they say, well, we have this -- you know, they make the ruse. The Court knows what the facts and circumstances are. What I'm saying is that because it's -- it is in force to allow the person sought to appear voluntarily, protects the privacy interests of an individual from a search pursuant to only an arrest warrant. This procedure circumvents it, did circumvent it in this -- in this instance and allowed the search.

02:55:35

RULING BY THE COURT

THE COURT: Thank you.

The motion is overruled. The search was constitutional.

02:55:42 And what's next?

ARGUMENT

MR. SMITH: Your Honor, the next argument is, is that law enforcement at the time -- well, what happened was that, 02:55:55 pursuant to the search, pursuant to the arrest warrant, they identified the odor of marijuana, and then identified a small marijuana grow. They said that there was ten plants there and what appeared to be about a pound of packaged marijuana. That this, in fact, was a -- was a medical marijuana authorized grow.

02:56:23 And it's our position that Agent Stanley either knew or

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS* 143
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 624/Argument by Ms. Van Marter*

should have known that -- that it was, and he did not advise the magistrate of that fact when he sought a warrant that resulted in the location and seizure of, well, I guess the plants -- I don't think that the Government is intending on introducing those, but the grow, a small amount of methamphetamine, and a firearm.

02:56:46

THE COURT: A small amount of what?

MR. SMITH: Methamphetamine.

THE COURT: Okay. Ms. Van Marter?

02:56:54

ARGUMENT

MS. VAN MARTER: Your Honor, the defendant's basis for the motion is simply the failure to include a statement that this was somehow a lawful medical marijuana grow. And it's the United States' position that the defendant has not even met his required burden of making a substantial preliminary showing that both the state of mind and the materiality elements are met by, first, the affiant intentionally or recklessly omitted information from the affidavit; and, second, the omitted information was material to a finding of probable cause.

02:57:12

02:57:30

Here, as indicated, the task force officer was effectuating a federal arrest warrant, lawfully entered into the residence to effectuate the arrest warrant, and upon cursory sweep, observed an active marijuana grow. Also, as noted in the affidavit, which is Defense Exhibit No. 7, returning back to --

02:57:50

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Casillas, et al./4:15-CR-6049-EFS 144
Pretrial Conference and Motion Hearing/March 6, 2018
Motion to Suppress, ECF 624/Argument by Ms. Van Marter

I forgot the ECF number already. Hold on -- ECF 624-2, specifically Paragraph 23 on Page 17 of that, during that cursory sweep for officer safety, your affiant observed in plain view packaged, green, leafy substance believed to be marijuana; prior to that in the affidavit, on the page prior, indicated the strong odor of marijuana upon the opening of the door at the time they made contact; observed approximately ten growing marijuana plants planted in various and different pots; grow lights in and around the marijuana plants, consistent with a marijuana grow operation; observed multiple firearms during that cursory search, and approximately a processed pound of -- I think it said indicating approximately a pound of marijuana. Excuse me.

The defense accusations that there was somehow an intentional piece of information that this affiant should somehow have speculated at that point in time that this was some kind of lawful marijuana grow, the defendant has not met -- has not presented any evidence sufficient to attack the credibility of this affiant by suggesting that he somehow intentionally omitted information.

And on top of that, even if this information were included within the affidavit, there would still be probable cause, and the opportunity for this affiant, especially executing a federal arrest warrant, to investigate the circumstances of what were literally in his face at the time he

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Motion to Suppress, ECF 624/Rebuttal Argument by Mr. Smith*
145

arrested the defendant for a serious federal drug trafficking warrant.

THE COURT: Thank you.

Mr. Smith.

REBUTTAL ARGUMENT

MR. SMITH: Your Honor, we -- we believe that the evidence or the testimony would show, were we allowed to question Mr. -- or Deputy Stanley, that he -- he is well versed -- in fact, he says so in his affidavit, that he's investigated -- he's very experienced and knowledgeable in investigating marijuana grows, and that he would know simply by the size of this grow, ten plants and a pound of packaged marijuana, that he would be put on notice that this would -- this was a medical marijuana grow, as it complied with or was under the limits established by the Washington state statute.

And I -- according to him, at least according to the Government's response, at the time they didn't -- we actually didn't know what his conversation was or investigation was to determine whether it was a medical marijuana grow. Apparently he was on leave at the time when the Government's memorandum was filed. And the other agent said he just didn't recall having a conversation with Ms. Sanchez telling him that it was -- that they had a medical marijuana authorization.

THE COURT: I beg your pardon? The last part.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

MR. SMITH: The last part was that Agent Gilbert -- in the -- in the Government's memorandum addressing this issue, I believe that they say in a footnote that the two agents that were involved, the one agent, I think it's Agent Gilbert, said that he couldn't recall whether or not he had a conversation with Ms. Sanchez saying that this was a medical -- they had a medical marijuana authorization.

And at the time that the Government submitted its memorandum, they indicated that Mr. -- that Deputy Stanley was on leave, and so they hadn't had the opportunity to determine from him whether or not he had questioned anybody or had a conversation with anybody regarding whether or not it was a legal marijuana grow, although I think that the Government, the way that it was analyzing it, was that Agent Gilbert spoke Spanish, and so any information would have been translated to -- to Deputy Stanley.

RULING BY THE COURT

THE COURT: Yeah, the motion is denied. There's no reason for a *Franks* hearing here on the facts that are before the Court.

Anything else from you?

MR. SMITH: Motion in limine.

THE COURT: Not yet. Okay.

MR. SMITH: Thank you, Your Honor.

03:02:24
03:02:44
03:03:06
03:03:32
03:03:54

THE COURT: Thank you.

Mr. Therrien.

MR. THERRIEN: Yes, Your Honor.

THE COURT: Do you have motions?

MR. THERRIEN: I do. I have a motion in limine.

THE COURT: I'm sorry. You can step down.

THE WITNESS: Thank you, Your Honor.

MR. THERRIEN: Judge, I had --

THE COURT: Do you want to start with the motion for a bill of particulars.

MR. THERRIEN: Yes, Your Honor.

I filed that motion on -- well, let me go -- the Government's response to my motion for a bill of particulars was basically that I was trying to discover the identity of controlled informants or the identity of the cooperating defendants prior to the time -- to their dated disclosure of February 23rd.

I filed that motion on February 16th, pursuant to the Court's prior scheduling order. And it was on February 23rd or February 22nd when the Government filed its motion to delay the disclosure of the controlled informants and the grand jury transcripts because the Court -- the Government anticipated that the case might be continued beyond March 26th.

THE COURT: Well, that's still a possibility, but --

MR. THERRIEN: Well, it's not, from my understanding

from your comments this morning, Judge, because you indicated that we were going to trial on March 26th.

THE COURT: Yeah, that's what I indicated this morning, but since then there's been at least one hearing *ex parte* about issues with regard to attorney-client conflict.

03:04:08

MR. THERRIEN: Okay. Well --

THE COURT: So let's get back to why when you were retained -- or, excuse me, when you were appointed in January of -- 2016?

03:04:24

MR. THERRIEN: '17.

THE COURT: -- '17, okay, now, some 14 months later, you file a motion for a bill of particulars, telling me that the indictment doesn't give you enough information to adequately represent your client.

03:04:47

MR. THERRIEN: Well, I didn't -- what I pointed out in my response is the rule required me -- I could file a motion for a bill of particulars at any time, with the permission of the Court.

THE COURT: Why do you file a motion for a bill of particulars?

03:05:05

MR. THERRIEN: Other than what I stated for in my --

THE COURT: Just tell me: Why do you file one?

MR. THERRIEN: Why do I file one?

THE COURT: Why do lawyers file a motion for a bill of particulars?

03:05:16

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: ECF 620*
149

MR. THERRIEN: Right. Because my client can't tell from the indictment what he's being charged with and how he is going to defend himself.

THE COURT: When was the second superseding indictment filed?

MR. THERRIEN: When was the second superseding indictment filed?

THE COURT: Yeah.

MR. THERRIEN: Let me check. I don't know if I have that in my brief.

THE COURT: You don't. You say Count 1 of the superseding indictment, and that's on Page 2 of your --

MR. THERRIEN: Right.

THE COURT: It says it was commenced -- you just refer to it. You don't refer to a date when it was there. And my question is, I think, pointed: What is it that's recently transpired that makes you aware that the indictment, the second superseding indictment has somehow deprived you of the opportunity to prepare your case? Because I think that's what you're really telling me, isn't it?

MR. THERRIEN: Right. Well, my review -- my review of the discovery and -- is as I stated in my -- in my motion for a bill of particulars. There's testimony regarding -- or there's alleged -- going to be alleged testimony regarding Mr. Garcia Reyes -- Reyes Garcia, that he somehow was a part of the

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

Calvillo drug trafficking organization or was participating in the conspiracy.

Much of the statements that I've reviewed from controlled sources and cooperating defendants sort of gives some historical information regarding Mr. Garcia's activities, but they don't -- other than saying that -- alleging that Mr. Garcia -- Reyes Garcia owed Mr. Calvillo $70,000, or both him and his brother owed Mr. Calvillo $70,000 -- you know, they say he likes to -- he likes to fight roosters, he likes -- he likes -- he has a ranch in Benton County, he has -- he's paid -- allegedly paid one of the cooperating defendants or controlled informants, gave them 20 pounds of meth to pay back Mr. Calvillo for a debt that was owed, he packed the -- he backpacked drugs up through Washington to Canada.

However, that doesn't make Mr. Reyes Garcia part of the Calvillo drug trafficking organization or necessarily part of the conspiracy. We just heard this morning from Agent Leahy that these investigations, the one with the DEA out of Boston, the RCMP, the one with the FBI, were separate -- separate investigations. And, in fact, the agency that's prosecuting him now in Eastern District of Washington wasn't part of the stop of the motor vehicle, the Mercedes Benz where the packages were found in the hidden compartments and, allegedly, my client's fingerprints are on, nor does it indicate, nor is there -- nor does it seem that that seizure of those drugs were part of the

drug -- I mean, the money laundering investigation of -- between Calvillo and the RCMP and the DEA.

So what we've asked -- it says, well, if Mr. -- Mr. Reyes Garcia is part of your drug trafficking organization, then what part is he? Is he a -- is he just a backpacker who transports drugs through the Oregon -- through Washington up into Canada, through those trails? Or is he a source of supply for you, for the Calvillo drug trafficking organization? Is he a distributor?

03:09:20

Because what I have is those allegations, but the connection on the seizure and his arrest in Canada was a separate incident. And I think that's -- even the Government agrees with that, from the investigation that was going on between the DEA and the RCMP of the money laundering aspect of this. Certainly not part of the money laundering aspect of this, because he's not charged in any of the money laundering counts.

03:09:42

03:10:14

So from his standpoint and from -- as his counsel's standpoint, all right, if what happened in Canada is all you have, then there's no connection that, in fact, that was done to benefit the Calvillo drug trafficking organization.

03:10:33

How do we know that -- that those drugs weren't somebody else's other than Mr. Calvillo's that were in that Mercedes Benz?

So, really, that's what the question is. If he's part

03:11:02

of this organization, then what part is he? Some other people's parts are more defined clearly. But his is -- a lot of it is historical. Him and his brother allegedly dealt drugs out of California or up through Mexico. They had their own contacts. They had a falling out. You know, that's the kind of information that we have.

We do have some people who say that, yeah, he gave me 20 -- 20 pounds of meth to pay off Ivan Calvillo for the amounts that was owed him, but that was in August of 2015, and in December of 2015, Ivan Calvillo was murdered.

So, you know, the -- the conspiracy takes us up through that period of time to December 6th of 2016, and I think we have -- we'd like to know that, with the Court's permission.

THE COURT: Like to know what? What would you like to know?

MR. THERRIEN: Just what I said: What's his position in the drug trafficking organization of the Calvillo? Is he -- is he a debtor, trying to pay back a debt? Is he -- does he run distribution or transportation?

THE COURT: I think I catch your point.

MR. THERRIEN: All right.

THE COURT: Thank you.

You can share the podium. I don't need you to be coming back and forth.

MR. THERRIEN: Okay.

THE COURT: Okay. Go ahead.

MS. VAN MARTER: Your Honor, in the context of the application of a bill of particulars, by the defendant's arguments, it sure sounds he can articulate what the facts are. It also sounds like he can articulate what his defense is, which is going to be that somehow his client was part of a different conspiracy or some other intimation of facts.

The United States, in its response, had identified a number of discovery page numbers that references exactly the witness' proposed testimony as to what the defendant's role was, both historical as well as current. And as the Court knows, under conspiracy law, individuals can join into an active and ongoing conspiracy; they can -- unless there's affirmative evidence of withdrawal, they are then part of that ongoing conspiracy. And under conspiracy law, the slight connection in all of the case law the United States cited to, including the jury instructions as to what conspiracy actually means, here, with the United States and their own discovery coordinator, they've received detailed information as to what's been provided. And it sounds like the defense attorney has been able to articulate in summary what we believe his role to be: Distributor, transporter of this particular organization.

THE COURT: Thank you.

Mr. Therrien.

MR. THERRIEN: So that's -- they've just answered my

bill of particulars as to what his role in the Calvillo drug trafficking organization conspiracy is? Is that -- is there anything else that --

THE COURT: I don't think at this point they need to give you anything else.

MR. THERRIEN: Well, I'd just ask to identify those individuals that were -- who would be able -- to identify those individuals who could --

THE COURT: Well, as you know, that is going to come. So that's not a bill of particulars.

MR. THERRIEN: Okay. Well, yeah. I was hoping to have that information before we argued this so I could --

THE COURT: Well, Counsel, why do you think I postponed it until today?

MR. THERRIEN: I understand, Judge. I just -- the reason -- I drafted my bill of particulars with the understanding that on February 23rd I'd have some of that information so I wouldn't maybe be making the same argument that I was here today.

THE COURT: Yeah, that's fine. Okay, Counsel, not a problem. I deny your motion for a bill of particulars. So, thank you.

MR. THERRIEN: Okay. I just had a -- I just had a -- I had the same motion in limine that Mr. Smith has, we both have, regarding a conspiracy.

THE COURT: We'll take those up at some point.

MR. THERRIEN: Okay.

THE COURT: Maybe not today.

MR. THERRIEN: All right.

03:15:05 THE COURT: We all may have to come back.

MR. THERRIEN: And I had the other one, too, objecting to the extension of the disclosure of the controlled informants and grand jury transcripts.

THE COURT: Well, that depends when trial is going to 03:15:18 take place, and that is in some considerable jeopardy at this point. So let's talk about that.

Ms. Van Marter, your position is that you want to try this whole case at the same time.

MS. VAN MARTER: Yes, Your Honor. In addition to the 03:15:32 reasons I cited to before regarding the number of witnesses that we have out of the area, we also have substantial concerns with respect to early identification of confidential informants and cooperating defendants. If there were multiple trials, those individuals would not only have to testify multiple times, their 03:15:48 identities would be known for a longer and extended period of time.

There's a number of governmental resources involved in this case because, as the Court is aware, we have money laundering aspects to it, as well as drug trafficking and 03:16:01 historic; we have a multitude of seizures involved that date

back to prior to 2012. The extent of the conspiracy is 2010 until 2017. Several of those seizures not only occurred internationally but also all over the United States, and even from the money wire transactions as well as the money drops, there's Kansas City, New York, Los Angeles.

03:16:24

THE COURT: Okay. Thank you.

So I've continued Mr. Vieth's client's case until October. At this point we're looking at October -- you might want to check your calendars, all of you, now. I'm looking at the Wednesday after Columbus Day, which is October 10th.

03:16:45

MS. VAN MARTER: I'm sorry, Your Honor. I have an issue with one of my children. I apologize. I was just --

THE COURT: No. Life comes first, so ...

MS. VAN MARTER: Did the Court -- right when you were talking, I was receiving an update.

03:17:03

THE COURT: Ms. Van Marter, that's just how life intrudes on our respective roles.

MS. VAN MARTER: Yes.

THE COURT: So what is it that you need to know? It's October 10th.

03:17:14

MS. VAN MARTER: We're moving the whole trial to October 10th?

THE COURT: All you need to do is tell me whether that's available to you. And everybody else needs to tell me that, too.

03:17:21

MS. VAN MARTER: Seems like a simple question.

THE COURT: Okay.

MS. VAN MARTER: We will make it available, Your Honor.

THE COURT: Well, I've heard -- that's a little too quick. I want you to really just think about this, because I don't want to be back here having you tell me, oh, gosh, I overlooked something.

MS. VAN MARTER: The difficulty I have, Your Honor, is I don't have communication with all of the witnesses who are out of town to ensure their availability. Given the trial will likely be multiple weeks, usually it works out --

THE COURT: Well, I'm starting you on a Wednesday after Columbus Day, which is federal holiday, and it seems to me that gives us approximately two and a half weeks, and we can -- we can vary that. But, you know, this courtroom is full of very busy litigators, so I want to make sure that nobody is going to tell me that they already have a case -- a murder case pending someplace that will trump this.

MS. VAN MARTER: I currently do not, nor does my co-counsel, Ms. Baunsgard, have a trial confliction with that date.

THE COURT: All right.

Mr. Vieth?

MR. VIETH: No, Your Honor. That is good for us. Thank you, Judge.

THE COURT: Mr. Schweda?

MR. SCHWEDA: That would work, yes.

THE COURT: Mr. Smith?

MR. SMITH: I don't have any conflict, Your Honor, but one of the things that I think happened in this case is that as we've gotten close to trial, and whether or not these informants have been disclosed, somehow some of their identities have become known or -- I guess because --

THE COURT: I don't know.

MR. SMITH: Well, it turns out --

THE COURT: I can tell you I don't know them, so --

MR. SMITH: I don't know.

THE COURT: -- if you know them, then you -- you know, I suppose you could share them with those people like Mr. Therrien who are worried about what their identities are, and you'll be that further along, Mr. Therrien.

MR. SMITH: All I'm concerned about is if we get right up again and there's a conflict, you know, as there was in this case -- wasn't that the issue? That there was a conflict that was identified just in the last month or so that resulted in --

THE COURT: Well, there was a conflict identified, but it wasn't a confidential informant.

MR. SMITH: I just -- I don't know how we avoid that when the informants --

THE COURT: I think it's a fair question, Mr. Smith, and

there's tension between safety concerns of the Government and conflicts in kicking the trial date yet again, and I agree with you, so I'll listen to more about that.

Mr. Therrien, any conflicts?

03:19:42 MR. THERRIEN: No.

THE COURT: Okay. Mr. Johnson?

MR. JOHNSON: No, Your Honor.

THE COURT: Okay. Mr. Lara?

MR. LARA: My calendar is clear, Your Honor.

03:19:49 THE COURT: I'm sorry?

MR. LARA: My calendar is clear.

THE COURT: Clear.

MR. SCOTT: Your Honor, you are at the very top of the list for October 10th. This case takes precedent over

03:19:59 everything.

THE COURT: Okay. Happy to hear that, Mr. Scott. You're always welcome here, Mr. Scott, as you know, so ...

MR. SCOTT: Thank you.

THE COURT: And if you have any motions pending --

03:20:09 MR. SCOTT: No, Your Honor.

THE COURT: All right. So we're ready to -- we're going to do that, but I do think that counsel -- Mr. Smith makes a good point.

So how do you want to handle that? Because there is

03:20:23 going to be disclosure of those CIs. So what do you want to do?

MS. VAN MARTER: Could I have a moment, Your Honor?

THE COURT: Sure. And I can assure you that that doesn't mean anytime soon, but sometime well before the trial so that we don't have a conflict issue that suddenly arises. There's just too many lawyers with too many busy schedules.

(Counsel conferring.)

MS. VAN MARTER: Your Honor, I appreciate the Court's position. I would tell the Court and counsel, we do have several of those witnesses who are in some form of custody, so we are working to figure out how to address any conflicts that may create, as well as other judicial schedules.

THE COURT: Well, okay. Let me just say this: One thing that popped up on our screen was the concern that arose out of Mr. Vieth's client.

Remind me of your client's name. There's just too many.

MR. VIETH: Mr. Jese Casillas.

THE COURT: So what came up as a fix to our CMO was that I'm going to ask the magistrates to require defense counsel, upon appointment, to run a conflict screen right then and there, or at least within a day or two, to make sure we don't have a conflict. And so this has heightened my awareness that you'd have this issue come up. And in a complex case like this, it may be a greater potential for it, so many people involved and so many CIs and that sort of thing.

So it's -- I do intend to take this up with the

magistrates and require the CJAs at the time of appointment to -- and the FDO to run a conflict check based on what they need to know. And, frankly -- and I defer to you all, because you're more familiar with the workup and the preparation, but it seems to me that once you get a 302 and you're talking to your client, the dates and times and places should signify pretty clearly whether there's a problem, from your client's perspective, about that the probability is that the person who I sold the drugs to, or alleged to have sold the drugs to, is probably so and so or such and such. In a -- you know, in a large transaction that's maybe hard to identify because there's just too many transactions.

But I'm trying to think of a way to make sure we don't have this issue again, and so I'm certainly going to put -- in a multi-defendant case, every CJA is going to be required to run a conflict check on the various co-defendants right at the outset, by magistrate rule, or at least in my CMO.

And then it seems to me that if there's going to be a complex case that favors early identification by the Government doing its own research as to potential conflicts without disclosure, so if you know that the particular CI has cases that -- prior convictions, then I think it's incumbent upon the USAO, as a matter of efficiency, to run a conflict check in the federal, at least the federal system, and just find out whether you've got co-counsel -- counsel assigned to some co-defendant

that's previously represented the CI. And that's a simple thing you can do without disclosure, but it avoids the very problem Mr. Smith may -- I think mitigates the problem Mr. Smith raises.

MS. VAN MARTER: Your Honor, we -- just for the record, 03:24:28 we did provide a conflict list at the onset of this case for any attorneys who had previously represented what will be a witness.

THE COURT: Oh, really?

MS. VAN MARTER: We did. Circumstances -- if defense counsel has state representation of other defendants, that's a 03:24:44 more difficult thing for us.

THE COURT: That's what happened in this case, so, yeah. And I agree.

MS. VAN MARTER: We wouldn't have any -- but we do attempt and venture to identify any prior representation of a 03:24:55 potential witness, and we do provide a list to the magistrate prior to arraignment --

THE COURT: Okay. Great. I didn't know that. Thank you.

MS. VAN MARTER: -- of those potential conflicts. So 03:25:05 not always perfect, but we do try and do that.

So in this particular case, Your Honor, I was indicating that some of those cooperating defendants are currently in custody, some pending sentencing, some not, some serving sentences. So one of the prejudices to the Government is now 03:25:22 having to rearrange with those entities, Bureau of Prisons and

other benches, other courts, on scheduling to postpone any of their releases or the conclusion of their cases to correlate with this.

03:25:39 And having that in mind, I think that it would be fair for the United States to disclose materials in September, early September. That would be a greater amount of time than previously ordered by the Court. That would be six weeks prior to.

03:25:52 THE COURT: Yeah, I think that's -- yeah, I think that's, unless somebody can persuade me otherwise, that sounds like a reasonable approach.

03:26:05 MS. VAN MARTER: And I would invite counsel, as we have before, if they would like to sit down and talk to us about what we believe that summary of information specific to potential witnesses, without necessarily identifying their name or location, we would be happy to do that as well. And I would certainly invite counsel, if they have discovery-related questions from that, we'd be happy to address those matters so that there can be a meaningful conversation that they have with 03:26:23 their clients regarding what the potential information may be. We've extended that invitation to counsel in the past.

03:26:43 THE COURT: I'm going to -- to the best of my knowledge, the only thing we have left is the motions in limine, and we can set another date in a couple of months to deal with those. And I see no reason why they shouldn't be dealt with early on, so

everybody can relax during the summer, and then get busy in September and late August, and we're ready for trial in October.

We'll give you a trial date, which I think currently is, as I said, the 10th of October, and we'll set up a couple of PTCs, one in early September, and I think we need to do that -- you need to disclose, it seems to me, in early September, maybe September 1st, in order that we can take up the issues, any issues related to those disclosures at a pretrial conference that's appropriate. So I'm going to say that currently it's going to be September 1st, if that's a business day.

MS. VAN MARTER: I believe that's a Saturday, so the 31st?

THE COURT: Okay. Then August 31st. August 31st is the CI disclosure, and we'll set a pretrial conference sometime in mid-September.

What would you suggest, Ms. Vargas?

THE COURTROOM DEPUTY: September 18th.

THE COURT: September 18th for PTC, 9 o'clock. Okay.

Anybody have any vacations at this time they know of September 18th?

September 18th, 9 o'clock. Okay. That's then the PTC. The motions in limine, I think we should get those handled at some point, and I think before summer really launches, so let's look for a time in May to deal with those.

And so why don't you all confer, and also with

Ms. Vargas, your respective trial schedules.

Ms. Vargas, what do you have for a potential May date for these folks tentatively?

THE COURTROOM DEPUTY: May 29th? It's the Tuesday after Memorial Day.

THE COURT: Anybody going away Memorial Day week on vacation?

MR. VIETH: I am, Judge. I'm going to be in Indianapolis for the Indy 500, actually.

THE COURT: Okay. Well, it won't be -- that won't do then. So ...

THE COURTROOM DEPUTY: May 8th at 1:30?

MS. VAN MARTER: Your Honor, I will be teaching at a conference outside of state --

THE COURT: Okay.

MS. VAN MARTER: -- that whole week, actually.

THE COURTROOM DEPUTY: How about May 22nd at 1:30?

THE COURT: May 22nd?

THE COURTROOM DEPUTY: About how long of a hearing are you wanting to set?

THE COURT: Set it at 9:00.

THE COURTROOM DEPUTY: Well, we have another matter set in the morning that day. That's why I was saying 1:30, but if you think it needs to be entire day ...

THE COURT: Well, Mr. Vieth is on his feet again.

Some other racetrack?

MR. VIETH: Judge, I apologize. I actually fly back on Monday, so Tuesday will work. I will be here on Tuesday. That will be May 29th, so that I -- that would actually be better. A little jet lag, but I'll do it.

THE COURT: Which day are you referring to?

MR. VIETH: It will be Tuesday after Memorial Day, so it would be -- May 29th will work out fine.

THE COURTROOM DEPUTY: Okay. Otherwise, we could do Wednesday, May 23nd, at 9 o'clock.

THE COURT: Okay. We will shoot you an ECF, and we'll set it for one of those two days, and if somebody has an objection, you can get in touch with Ms. Vargas, or just notify us that there's a conflict.

So put those dates in ECF.

We'll send you the two dates. It's going to be one or the other at 9 o'clock, or whatever time Ms. Vargas says.

All right. So what else do we need to do at this point? We will issue another case management order, but all motions have already been filed. The only other motions to occur would be taking the motions in limine, and then I'll give you your witness lists and your exhibit dates and your JERS dates as well.

MS. VAN MARTER: Your Honor, I would just, out of fairness to counsel, we did file a notice of summary exhibits

recently, I think in the last week, with respect to GPS tracking information and telephone information, and that's all been a part of discovery, but the actual summary exhibit has now been provided. So I don't know if the -- if -- that would be a new topic, I would think, that maybe not has been addressed previously in the motions in limine, at least in terms of our notice of using the summary exhibit.

THE COURT: Mr. Vieth is up first.

Mr. Vieth, you get a full CMO.

MR. VIETH: Thank you, Judge.

THE COURT: Yeah.

MR. SCHWEDA: Your Honor, I'd ask the Court to set another pretrial motion deadline. I'm not -- we're not going to be repeating any motions, and -- for example, I received this last week a disclosure from the Government that they intend to use my client's prior conviction, and I want to make a motion to preclude that before trial, and so I'd ask the Court to --

THE COURT: Are you talking about 609, 404?

MR. SCHWEDA: Yes. This -- my motion to suppress led to a state conviction. The Government has given notice that they intend to use that conviction to impeach my client if he takes the witness stand in this case, and I want to make a motion to preclude them from doing that.

And I think that also that, in fairness to Mr. Vieth or any of the other defendants, that they be given the opportunity

to file any additional pretrial motions that they decide they need to before trial.

THE COURT: You know, Mr. Schweda you're just simply saying it's going to be a rolling motions practice, and my answer is no. You get a time within which you analyze your case and you prepare it, and then you file your motions, and we deal with it, and then you're ready for trial. And so I'm not going to have six more months of counsel filing motions.

03:32:34

So I'm happy to entertain some 404 or 609 issues, if they come up, but, you know, if there's something that you think needs to be done, you can ask me for permission to file those motions, and I'll deal with it.

03:32:54

MR. SCHWEDA: Well, discovery is rolling, Your Honor. We received a thousand pages last week. We just received a bunch of more documents yesterday.

03:33:09

THE COURT: What do you mean more documents yesterday?

MR. SCHWEDA: Well, there's probably, it looks like -- I have them here with me. I haven't had a chance to look at them.

THE COURT: What's going on, Ms. Van Marter? Mr. Schweda is complaining that there's rolling discovery.

03:33:22

MS. VAN MARTER: Mr. Schweda received the information previously referenced from the LEAD Task Force investigation in response to the motion to suppress. That was the pictures and things the Court reviewed today. Mr. --

03:33:37

THE COURT: So are they useful for trial, or are these

just for the motion to suppress?

MS. VAN MARTER: That was the motion to suppress response. We have also compiled, for purposes of preparation of trial that was supposed to be in a couple of weeks, documents that have already been provided to them in discovery, for instance, vehicle registrations or telephone toll records, and we've compiled them for the purpose of our summary.

03:33:50

So we -- so in raw discovery already provided to counsel and in all of the affidavits, we've indicated when we received a GPS tracking warrant for a vehicle, for instance.

03:34:09

THE COURT: So are you giving them more?

MS. VAN MARTER: We're giving it in summary fashion so they know exactly which pages --

THE COURT: Summary fashion. But that's something they've already fully examined --

03:34:17

MS. VAN MARTER: Yes.

THE COURT: -- of course because they would be ready for trial on March 26th, right?

MS. VAN MARTER: Yes.

03:34:23

MR. SCHWEDA: I beg your pardon, Your Honor, but these are summary exhibits of documents we haven't received, so we -- this is not -- it's -- my understanding is they -- these documents are so voluminous that they're not providing them to us in discovery but just providing summaries.

03:34:46

MS. VAN MARTER: No. The actual -- the foundation we

have to lay is to first indicate they're voluminous. We've provided the raw data, the voluminous raw data on the hard drives and to their discovery coordinator.

03:35:03 THE COURT: Well, it should be evident for anybody that's reviewed the raw data, and God knows everybody in this courtroom has had months and months and months to review the raw data, so the summaries should be very helpful to those folks who have done the complete review in preparation for the trial which is only a couple weeks away.

03:35:16 So I don't see the problem with that, Mr. Schweda. I mean, my gosh, they have given you a summary they don't have to give you. They don't have to give you a summary. They can just say, "Here's the raw data." So the fact they've given you summaries doesn't mean that suddenly we now have a discovery problem. 03:35:31 If you don't want the summaries, then you can just throw them back, I suppose, and then we don't have this issue.

Do you want the summaries?

MR. SCHWEDA: Certainly, Your Honor, but --

THE COURT: Well, if you want the summaries, Mr. Schweda, 03:35:45 then you're going to have to take a look at them. And it's uphill with you to persuade me that there is some reason that we should be doing more motions practice. You've had seven or eight months, Mr. Schweda. You need to tell me why you need more motions time.

03:36:00 MR. SCHWEDA: Because I don't know what the future is

going to --

THE COURT: I don't know either. So you're going to have to -- you can make a motion to file a motion. I'll listen to you. That's all. But there's going to have to be good cause for it, Mr. Schweda, because you've already had adequate time.

MR. LARA: Your Honor, I just want to provide some information.

THE COURT: Sure.

MR. LARA: I don't know whether it makes any difference to the arguments of counsel.

Mr. Schweda indicates that there's been new discovery coming in, and just on March 1st we received a new disclosure, No. 22, which I haven't reviewed yet, but it relates to Bates Pages 0001-00960. That's something new that just came in a few days ago. And I don't know what it is, but I thought the Court ought to know there is information out there that has not been previously provided.

THE COURT: Well, what document was that?

MS. VAN MARTER: What counsel was just referring to was the whole LEAD case file that we produced in response to defense counsel's motion to suppress the evidence from the search warrant. Much of that are the photographs. So when they asked and raised the issue, we grabbed the whole case file from LEAD so that they had it in response to the motion to suppress.

THE COURT: Okay.

MR. SCHWEDA: Mr. Garibay is asking for more time because he doesn't feel that there's proper representation or proper preparation of his case. But I do want to indicate to the Court that --

03:37:43 THE COURT: Certainly you just heard me say that the case is going out to October, didn't you?

MR. SCHWEDA: Yes.

DEFENDANT GARIBAY: I mean, for the motions, isn't there like a certain deadline that you had set?

03:37:56 THE COURT: Oh, really? Well, your counsel has had many, many months to file motions and hasn't filed one.

DEFENDANT GARIBAY: My attorney hasn't given me --

THE COURT: Well, that's something that we'll take up *ex parte*.

03:38:06 MR. THERRIEN: Judge, I just have something really quick. It has nothing to do with discovery issues.

THE COURT: Well, we're going to hang on to discovery.

He's fine.

THE COURTROOM DEPUTY: Okay. The interpreter has a hard

03:38:14 time hearing.

THE COURT: If the interpreter needs it, go ahead.

MR. THERRIEN: Oh. I'm sorry. I'm not talking -- Judge, I know the Court read an order this morning requiring our clients to be shackled.

03:38:32 Is that just going to -- is that going to apply at trial

as well?

THE COURT: Depends on the circumstances at the time.

MR. THERRIEN: Okay.

THE COURT: I make the ruling every motion, at every hearing.

03:38:45

MR. THERRIEN: Right. And it just occurred to me, I don't think it's an issue for us if it's at the pretrial conference, but it would be --

THE COURT: That depends, Counsel, on how many defendants remain in the case at the time and the circumstances that are brought to my attention. I have no clue what they may be. But under Ninth Circuit law, I'm required to make that assessment at the time of the hearing.

03:38:55

MR. THERRIEN: Right. Well, I -- just speaking on behalf of my client, I think he would object to being shackled at the time of trial.

03:39:06

THE COURT: And you have every right at some point to file a motion to that effect.

MR. THERRIEN: Okay.

THE COURT: Anything else?

03:39:16

Okay. So just be sure, there is no more discovery coming on the case itself.

MS. VAN MARTER: The only -- as we indicated previously, we are in preparation with respect to the cooperating defendants and informants. That has not yet been disclosed yet, all of

03:39:35

their *Jencks* materials. That will be provided on August 31st.

THE COURT: Okay.

MS. VAN MARTER: We anticipate additional interviews and we have produced reports from additional interviews as information has come up.

03:39:50

THE COURT: Yeah, here's the problem: I'm empathetic with defense counsel's need to prepare finally, and so the Government simply doesn't get to have forever to prepare its case and then tell the defendants, oh, by the way, we just -- we're going to be putting this in as well.

03:40:08

In order to have due process, a continuance at this point is not going to be sufficient. And so it's not going to be enough for you to tell me, "We've just got another 3,000 pages, and all we need is another six months, and that will cure the problem."

03:40:24

Believe me, I'm going to be really very firm in that regard, and so if it's not exculpatory, and you're not starting to roll with discovery, the Court may be inclined to allow motions to bar that documentation going into evidence.

03:40:45

So I just want to be clear that I'm not going to allow rolling discovery that prevents due process for the defendants and the inability to prepare their case, given the extent of time that you've had to both investigate it, bring it, and now prepare it.

03:41:05

Okay?

*USA v. Casillas, et al./4:15-CR-6049-EFS*
*Pretrial Conference and Motion Hearing/March 6, 2018*
*Colloquy Re: Trial Date*
175

MS. VAN MARTER: Understood.

THE COURT: Thanks.

Thanks, folks. That's all for today. We'll take a 15-minute recess.

03:41:20 THE COURTROOM DEPUTY: All rise.

THE COURT: You may go about your business.

(Hearing concluded at 3:41 p.m..)

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

C E R T I F I C A T E

I, KIMBERLY J. ALLEN, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Richland, Washington;

That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

DATED this 18th day of September, 2018.

Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
Washington CCR No. 2758
Official Court Reporter
Richland, Washington