# EXHIBIT 2

# Defendant's Proposed Redaction

18

Q:  SO, I'M BILL, WITH THE FBI. THIS IS MIKE. HE'S WITH THE FBI. DO YOU HAVE A CLUE OF WHY YOU'VE BEEN ASKED—OF WHAT THIS IS ABOUT?

A:  NO.

Q:  NO. OKAY. SO, BEFORE WE DO ANYTHING, I HAVE TO ADVISE YOU OF YOUR RIGHTS.

A:  OKAY.

Q:  OKAY. AND THEN WE'LL GO THROUGH ALL THIS AND KIND OF TRY TO EXPLAIN TO YOU WHAT'S GOING ON.

A:  OKAY.

Q:  (INAUDIBLE) I DON'T KNOW—

WHAT TIME IS IT?

7:36.

SO, BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS. YOU HAVE THE RIGHT TO REMAIN SILENT, ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT. YOU HAVE THE RIGHT TO TALK TO A LAWYER (INAUDIBLE—BACKGROUND NOISE) WE ASK YOU ANY QUESTIONS. YOU HAVE THE RIGHT TO HAVE A LAWYER WITH YOU DURING QUESTIONING. IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU BEFORE ANY QUESTIONS, IF YOU WISH. YOU CAN DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT. YOU HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME. I HAVE READ THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE. AT THIS TIME, I AM WILLING TO ANSWER QUESTIONS WITHOUT A LAWYER PRESENT. IF YOU AGREE WITH THAT, YOU CAN JUST SIGN RIGHT THERE.

WANT ME TO TURN THAT FAN OFF?

IS IT BLOWING RIGHT IN YOUR FACE?

UH, IT'S JUST KIND OF LOUD, YOU KNOW?

THERE YOU GO.

(PAUSE)

ALRIGHT. SO BRITTNEY, HAVE YOU EVER BEEN ARRESTED BEFORE?

A:  NO.

Q:  SO THIS IS BRAND NEW TO YOU.

A:  UH HUH.

Q:  OKAY. SO, UM, I'M JUST GOING TO BE STRAIGHT WITH YOU, OKAY? I'VE BEEN DOING THIS FOR A LONG TIME, AND UH, YOU GOT A FEDERAL WARRANT WHICH IS A LOT DIFFERENT THAN A STATE WARRANT. IT'S SERIOUS.

19

A:      HM.

Q:      UM, YOU'RE LOOKING AT SOME, SOME SERIOUS ISSUES HERE. OKAY? UM, DO YOU KNOW JESE CASILLAS?

A:      YES.

Q:      ~~OKAY. THAT'S WHAT THIS IS ALL ABOUT.~~

A:      OKAY.

Q:      OKAY? THE BEST THING YOU CAN DO AT THIS POINT IS TO COOPERATE WITH US.

A:      HM.

Q:      TELL US EVERYTHING YOU KNOW, ~~UM, AND THEN WE WILL TELL THE ASSISTANT UNITED STATES ATTORNEY THAT YOU'VE COOPERATED, AND SHE WILL MORE THAN LIKELY GO LIGHT ON YOU AT THIS POINT. UM, WE WILL RECOMMEND TO HER IF YOU COOPERATE, YOU KNOW, THAT YOU'RE FULLY COOPERATIVE, AND UH, AND SHE WILL TRY TO WORK WITH YOU ON THIS. UM, BUT, AT THIS POINT, UM, YOU'VE BEEN WRAPPED UP WITH A BUNCH OF OTHER PEOPLE, INCLUDING HIM, ON A CASE THAT WE'VE BEEN WORKING (INAUDIBLE—BACKGROUND NOISE).~~

A:      WAIT A MINUTE—HOW COME (INAUDIBLE)

Q:      BECAUSE OF YOUR RELATIONSHIP WITH, WITH JESE. OR JESSE OR HOWEVER, WHATEVER YOU WANT TO CALL HIM. DO YOU HAVE (INAUDIBLE—NOISE) MONEY FOR HIM? IN BANK ACCOUNTS? ~~WE HAVE PHONE MESSAGES, WE HAVE ALL OF HIS PHONES, SO WE'VE SEEN ALL THE COMMUNICATIONS YOU'VE HAD WITH HIM.~~

A:      UH HUH.

Q:      SO, WE KNOW PRETTY MUCH EVERYTHING THAT YOU'VE DONE. AND—

A:      WELL, I HAVEN'T—THE ONLY THING THAT I'VE DONE IS GOTTEN MONEY FOR HIM, LIKE TWICE, OUT OF AN ACCOUNT AND LIKE HE SAID, IT WAS, HE SAID THAT HIS AUNT WAS SENDING HIM MONEY FROM CALIFORNIA. IT WAS LIKE THREE THOUSAND DOLLARS.

Q:      OKAY.

A:      I MEAN, I WAS DATING HIM. HE HAS GIVEN ME MONEY. BUT…

Q:      SO, YOU'RE DATING HIM? DID YOU KNOW WHAT HE DID?

A:      NO. I MEAN, I HAD AN IDEA, BECAUSE HE WAS GIVING ME MONEY. HE WAS GIVING ME QUITE A BIT OF MONEY.

Q:      ~~OKAY. SO WE HAVE INFORMATION THAT YOU WERE SELLING DRUGS TOO.~~

A:      ~~I WASN'T SELLING ANY DRUGS.~~

Q:      ~~OKAY. THAT'S NOT WHAT—THERE'S BEEN A LOT OF PEOPLE ARRESTED IN THIS CASE.~~

A:      ~~WELL, WHY—~~

20

Q: ~~WE'VE ARRESTED CLOSE TO A HUNDRED PEOPLE, ACCORDING TO THE ASSISTANT UNITED STATES ATTORNEY ON THIS CASE.~~

A: ~~BUT I WASN'T (INAUDIBLE). I REALLY WASN'T SELLING ANY DRUGS.~~

Q: ~~OKAY. NEVER TRANSPORTING DRUGS?~~

A: ~~NO.~~

Q: NEVER TRANSPORTING MONEY?

A: NO. WELL, JUST THAT THREE THOUSAND AND THEN THERE WAS ANOTHER ONE FOR LIKE A THOUSAND.

Q: SO YOU DID A THREE THOUSAND DOLLAR—

A: AND A THOUSAND.

Q: AND A THOUSAND.

A: HE JUST ASKED IF I COULD—IF HE COULD USE MY BANK ACCOUNT, SO, IF HE COULD SEND MONEY THERE. (INAUDIBLE) WORK, AND THAT HE NEEDED IT.

Q: (INAUDIBLE)

 THE MONEY WAS DEPOSITED IN YOUR ACCOUNT?

A: YES.

Q: AND THEN, UH, AND THEN YOU WITHDREW IT AND GAVE HIM THE MONEY?

A: YES.

Q: OKAY.

A: IT WAS LIKE, I THINK FOUR HUNDRED OUT OF THAT HE HAD GIVEN ME, AND I HAD GIVEN TO MY MOM FOR MY SISTER'S BIRTHDAY. BECAUSE SHE WAS (INAUDIBLE).

Q: SO, ON ONE OF THEM YOU KEPT FOUR HUNDRED AND GAVE TO YOUR MOM?

A: YEAH, FOR MY SISTER'S (INAUDIBLE) WELL (INAUDIBLE)

Q: THE OTHER ONE, DID YOU KEEP ANY?

A: NO.

Q: AND YOU DATED HIM, BUT YOU DIDN'T KNOW WHAT HE DID?

A: NO. I MEAN, I WOULDN'T REALLY SEE HIM OFTEN. HE WAS HARDLY EVEN AROUND. I DID SEE HIM LIKE MAYBE FOUR OR FIVE TIMES A MONTH. AND I LIVED IN SEATTLE MOST OF THE TIME WITH MY SISTER.

Q: YOUR SISTER EVER DO ANYTHING FOR HIM?

A: NO. HUH UH.

Q: YOU SURE ABOUT THAT?

A: I'M SURE.

Q: OKAY. BECAUSE I HAVE PHOTOS OF HER.

A: OF FELICIA?

Q: YEAH.

A: OH NO, SHE'S NEVER DID ANYTHING.

Q: I HAVE PHOTOS OF HER AT A DRUG TRANSACTION.

A: I DON'T THINK SO. MY SISTER HAS NEVER DID ANYTHING.

Q: I HAVE PHOTOS OF HER.

A: WHERE WAS THAT AT?

Q: SEATTLE.

A: MY SISTER NEVER DID ANYTHING.

Q: NOTHING AT ALL?

A: NOTHING. MY SISTER'S NEVER EVER BEEN INVOLVED IN THAT STUFF.

Q: DID HE PAY HER TO DO SOMETHING?

A: NO. HE'S GIVEN HER WEED. IT, IT WASN'T EVEN, IT'S LIKE LEGAL. HE'S NEVER—SHE'S NEVER BEEN INVOLVED IN THAT.

Q: DID HE KNOW HER WELL ENOUGH TO TALK TO HER DIRECTLY, THAT YOU WOULDN'T HAVE KNOWN?

A: I MEAN, JUST FOR A MINUTE, HE'D COME TO THE HOUSE, LIKE (INAUDIBLE), BUT SHE WASN'T IN—SHE WAS LIVING WITH ME FOR LIKE SIX MONTHS, BUT HE NEVER SAW HER LIKE THAT. THEY'D SAY HI AND STUFF, BUT MY SISTER WOULDN'T HAVE DONE THAT. MY SISTER WOULDN'T HAVE DONE THAT.

Q: OKAY. ALRIGHT, SO THE ONLY THING THAT YOU HAVE IS THE TWO CON—THE TWO DEPOSITS. UM, DID YOU EVER SEE, SEE HIM WITH DOPE AT ALL?

A: NO. HE'S NEVER BRINGING THAT IN FRONT OF ME. HE'D ALWAYS ASK IF WE WERE USING IT, BUT NEVER TO USE THAT, LIKE, HE WOULD NEVER BRING THAT AROUND ME.

Q: OKAY. SO YOU DON'T USE?

A: NO.

Q: NO COCAINE, NO METH?

A: NO.

22

Q: I TAKE IT WEED THOUGH?

A: YEAH.

Q: OKAY. YOU SAYS HE SAID "NEVER USE THE STUFF." WHAT STUFF WAS HE IMPLYING? WHAT WAS HE, UH, TALKING ABOUT?

A: ~~DRUGS, JUST IN COMMON.~~

Q: BUT NOT A SPECIFIC KIND?

A: NO.

Q: NOT HEROIN? NOT COKE? NOT METH?

A: NO.

Q: OKAY. ALRIGHT. DO YOU HAVE ANYTHING FURTHER TO ADD?

A: NO, JUST THAT TWO MONEY THINGS, BUT I'VE NEVER BEEN INVOLVED IN ANY—I DON'T—

Q: ~~OKAY, I CAN TELL YOU THAT'S NOT WHAT WE'RE BEING TOLD BY PEOPLE THAT HAVE BEEN ARRESTED THAT HAVE COOPERATED.~~ AND I CAN YOU TELL YOU THAT I'M NOT LYING TO YOU WHEN I HAVE PICTURES OF YOUR SISTER AT AN UNDERCOVER DEAL WITH A D.E.A. AGENT PRESENT. ON VIDEO. WITH JESE.

A: I CANNOT IMAGINE HER DOING THAT. SHE DIDN'T EVEN KNOW HIM WELL ENOUGH TO DO THAT. AND SHE WOULD'VE TOLD—I WOULD'VE KNOWN IF SHE WOULD'VE LEFT, ESPECIALLY IF IT'S IN SEATTLE. I CAN'T... I DON'T THINK THAT IT WAS MY SISTER. OR CAN I—DO YOU GUYS HAVE IT? OR PICTURES OF HER?

Q: I DON'T HAVE IT WITH ME RIGHT NOW, BUT, YEAH. I MEAN, I'VE GOT NO REASON TO LIE TO YOU.

A: WELL, I KNOW. I JUST CAN'T SEE MY SISTER DOING THAT. ESPECIALLY LEAVING WITH HIM.

Q: YEP, SHE SHOWED UP THERE AND...

A: AND IT WAS IN SEATTLE SEATTLE?

Q: NO, IT WAS IN, UH, GOD I CAN'T REMEMBER THE... IT WAS AT A RESTAURANT, OUTSIDE OF A RESTAURANT. I CAN'T REMEMBER THE UH, WHERE EXACTLY IT WAS OVER THERE.

A: I CANNOT PICTURE HER DOING THAT. AT ALL. OR LEAVING, ESPECIALLY—

Q: WHERE'S FELICIA NOW?

A: SHE'S IN SEATTLE.

Q: OKAY. SO SHE'S LIVING OVER THERE NOW?

A: YEAH.

Q: AND YOU'RE LIVING HERE?

23

A: YEAH.

Q: WHO ARE YOU LIVING WITH?

A: WITH HECTOR.

Q: HECTOR... CHAVEZ?

A: UH HUH.

Q: WHERE ARE YOU LIVING?

A: AT 200802 AND IT'S GAME FARM ROAD. AND THEN THEY ARE MOBILE HOMES, 173. AND THEN ITS' IN KENNEWICK. 99337.

Q: OKAY. AND YOU GOT IN AN ACCIDENT YESTERDAY?

A: YES.

Q: OKAY. UM, WHO WAS WITH YOU AT THE TIME OF THE ACCIDENT?

A: HECTOR.

Q: HECTOR?

A: YES.

Q: AND YOUR KIDS ARE WHERE?

A: WITH THEIR DAD.

Q: YOU HAVE THREE, RIGHT?

A: FOUR.

Q: FOUR? DOES HE HAVE CUSTODY?

A: WELL YEAH, WE BOTH DO.

Q: JOINT CUSTODY?

A: YEAH.

Q: WHERE DO THEY STAY MOST OF THE TIME?

A: WITH ME, AND HE HAS THEM ON THE WEEKENDS. HE HAS THEM FRIDAY, SATURDAY AND SUNDAY, AND ME, MONDAY THROUGH THURSDAY.

Q: WHAT'S HECTOR DO?

A: UM, HE WORKS AT, UM, LIKE 45 MINUTES FROM HOME. I DON'T WHAT COMPANY IT IS, BUT THEY'RE LIKE BIG PACKAGES THAT THEY STAND UP ON WOODEN CRATES. I DON'T KNOW THEY'RE CALLED. I DON'T KNOW IF IT'S JUST SEEDS.

Q: SO IT'S A FARM THING?

24

| | |
|---|---|
| A: | YEAH. IT'S A FARM THING. |
| Q: | WHEREABOUTS, DO YOU KNOW? |
| A: | I THINK IT'S IN CON—CONNELL. |
| Q: | CONNELL? |
| A: | YEAH. IT'S IN THAT DIRECTION. |
| Q: | DO YOU KNOW ANY OTHER, OTHER PEOPLE THAT JESE WAS ASSOCIATING WITH, THAT WERE INVOLVED IN THIS? |
| A: | NO. I MEAN, THE ONLY THAT I EVER DID WAS THAT MONEY THING FOR HIM. THAT WAS THE MOST AMOUNT OF MONEY, IT'S NOT THAT IT WAS A LOT, BUT THEY WERE SENDING HIM. BUT HE NEVER, I HAVE NEVER REALLY SAID ANYTHING ABOUT IT. I JUST TOLD HIM YEAH. |
| Q: | WHO WAS "THEY"? |
| A: | HE SAID HIS AUNT, THAT HIS AUNT WAS SENDING HIM MONEY. |
| Q: | DID HE SAY WHY? |
| A: | A RESTAURANT IN… IN, IT WAS IN OREGON. I THINK HERMIS—HERMISTON? |
| Q: | OKAY. A RESTAURANT IN OREGON. |
| A: | UH HUH. |
| Q: | AND THE MONEY WAS FOR HIS AUNT? |
| A: | NO, IT WAS FOR HIS WIFE--HIS WIFE'S MOM. THEY WERE MAKING A RESTAURANT. THEY WERE GETTING MONEY FOR THE RESTAURANT. |
| Q: | SO HIS AUNT WAS SENDING MONEY TO— |
| A: | TO PUT TOWARDS THE RESTAURANT. |
| Q: | --TO PUT TOWARDS A RESTAURANT FOR HIS WIFE'S MOM. |
| A: | YEAH. |
| Q: | OKAY. WHY DIDN'T HE JUST HAVE HIS WIFE DO THAT? |
| A: | UM, I DON'T KNOW. PROBABLY BECAUSE… OR HOW COME THE AUNT DIDN'T SEND MONEY TO THE— |
| Q: | THE WIFE? YEAH. |
| A: | --TO THE WIFE? I DON'T KNOW. |
| Q: | OKAY. UM, DID HE SAY ANYTHING ABOUT THE RESTAURANT? WAS HE… WAS HE INVOLVED IN THE RESTAURANT, OR WAS IT JUST HIS— |

25

A: WELL, HE HAD PUT... HE TOLD ME THAT HE HAD PUT QUITE A BIT OF MONEY INTO THE RESTAURANT.

Q: HE DIDN'T SAY HOW MUCH THOUGH?

A: NO.

Q: ~~DID YOU KNOW WHAT HE DID FOR A LIVING AT ALL? BESIDES—~~

A: LANDSCAPING.

Q: HE DID LANDSCAPING? BUT YOU KNEW HE WAS SELLING DRUGS, TOO?

A: NO, I DIDN'T KNOW ABOUT THAT. I JUST KNEW THAT HE HAD—

Q: YOU DIDN'T KNOW ANYTHING ABOUT SELLING DRUGS?

A: NO. UH YEAH, I HAD AN IDEA. BUT I NEVER ASKED HIM IF HE DID. I WOULDN'T SEE HIM THAT MUCH. AND HE WAS HELPING ME, BECAUSE I NEEDED MONEY. HE'D GIVEN ME FOUR HUNDRED.

Q: HOW MUCH MONEY DO YOU THINK HE GAVE YOU?

A: UM... LIKE TWO THOUSAND, FIVE HUNDRED.

Q: OVER HOW LONG?

A: LIKE FOUR MONTHS. FOUR OR FIVE MONTHS.

Q: AND YOU GUYS DATED FOR FOUR OR FIVE MONTHS?

A: LIKE SIX.

Q: IS THAT WHEN HE MOVED OUT OF HIS, UH, FROM LIVING WITH HIS WIFE?

A: I DON'T KNOW ABOUT THAT.

Q: DID HE MOVE IN WITH YOU AT ALL, OR?

A: NO.

Q: NO? ALRIGHT. AND DID YOU MEET ANY OF HIS FRIENDS AT ALL?

A: UM, WELL I KNEW BEFORE THAT—I DIDN'T KNOW THAT HE HAD KNOWN THEM—GINA AND HUGO?

Q: HUGO?

A: HUGO HERNANDEZ AND GINA HERNANDEZ. I'VE KNOWN THEM FOR LIKE FIVE YEARS. I DIDN'T EVEN KNOW THAT THEY KNEW EACH OTHER.

Q: ANYBODY ELSE?

A: UM...

26

Q:   HOW DID YOU MEET HIM?

A:   AT GINA'S BIRTHDAY PARTY. HE WAS INVITED.

Q:   OKAY. ANY OTHER PEOPLE THAT HE KNEW?

A:   UM...

Q:   DID YOU EVER MEET HIS BROTHER—

A:   ONLY THE UNCLE, HIS UNCLE.

Q:   HIS UNCLE?

A:   YEAH.

Q:   WHO IS THAT?

A:   FRANCIS—FRANCISCO?

Q:   FIGUEROA?

A:   UH YEAH, I HAVE HIM ON FACEBOOK.

Q:   WHO WAS HE? JUST AN UNCLE?

A:   YEAH. UMM. THAT'S PRETTY MUCH THE ONLY ONE THAT HE'D BRING AROUND ME. AND THEN GINA AND HUGO.

Q:   OKAY. HOW DO YOU SPELL HUGO?

A:   H-U-G-O.

Q:   OH, HUGO. AND HOW DO YOU KNOW GINA AND HUGO?

A:   THROUGH MY EX-HUSBAND. WELL, I'M STILL LEGALLY MARRIED, BUT WE SEPARATED. THEY GREW UP TOGETHER. HE DIDN'T KNOW HUGO, HE JUST KNEW GINA. HER NAME'S GEORGINA (INAUDIBLE).

Q:   OKAY. MIKE, YOU GOT ANYTHING ELSE?

NO.

ALRIGHT, SO WHAT I'M GOING TO DO, IS I'LL MAKE A PHONE CALL TO THE U.S. MARSHALS AND FIND OUT, BECAUSE OF ALL THE WEATHER—

A:   OKAY.

Q:   --IF THERE'S GOING TO BE COURT TODAY. UM—

A:   WOULD IT BE HERE, OR?

Q:   IT'D BE IN YAKIMA.

A:   YAKIMA? OKAY.

27

Q: AND IF THERE'S COURT, WE WILL TRANSPORT YOU TO YAKIMA TO THE MARSHALS. UM, YOU'LL HAVE AN INITIAL APPEARANCE, UM, WHERE YOU'LL BE APPOINTED AN ATTORNEY, AND UH, AND THEN MAYBE A DETENTION HEARING, UM, WHERE THEY'LL DECIDE WHETHER UM TO DETAIN YOU OR TO RELEASE YOU. AND THEN, UH, AT A LATER DATE, UH, YOU'LL START YOUR COURT PROCESS.

A: ~~OKAY.~~

Q: SO LET ME CALL AND FIND OUT.

IF YOU WANT TO BE RIGHT HERE, I'LL DO THE D.N.A. AND STUFF—

YEAH, THAT'LL BE GREAT.

OKAY.

A: DO YOU KNOW IF THEY'RE GOING TO SHOW US (INAUDIBLE)

Q: UM,

A: BECAUSE I'M NOT TOO SURE (INAUDIBLE)

Q: UM, THEY PROBABLY WON'T UNTIL TRIAL, OR UNTIL YOU PLEAD OR, UM... THERE'LL BE DISCOVERY AT SOME POINT AND YOUR ATTORNEY WILL BE GIVEN ALL THE INFORMATION.

A: OKAY.

Q: UM, IF SHE HAS NOT BEEN CHARGED, SHE WILL NOT BE CHARGED.

A: OKAY.

Q: SO, UM, AT THIS POINT, YOU'RE THE ONLY ONE CHARGED. UM... YOU KNOW, BASICALLY, IN YOUR FAMILY AND THE TIES THAT YOU HAD TO, TO HIM, BUT SHE'S NOT GOING TO BE CHARGED.

A: DO YOU KNOW HOW, HOW MANY PEOPLE ARE (INAUDIBLE) I DON'T EVEN KNOW ANYBODY FROM HIM.

Q: UM, THERE WERE—

A: JUST LIKE HIS UNCLE AND HIM. AND I DON'T SEE WHY HE'D EVEN BRING ME INTO THIS.

Q: UM...

A: I'VE ONLY PICKED UP MONEY FOR HIS WIFE. AND HE TOLD ME IT WAS FROM HIS AUNT.

~~Q: UM, I CAN'T REMEMBER EXACTLY HOW MANY PEOPLE SAID THAT. UM, THAT YOU WERE INVOLVED.~~

~~A: I DON'T EVEN KNOW—~~

~~Q: PROBABLY AT LEAST THREE. IS WHAT MY, MY THINKING WOULD GO, BUT, LIKE I SAID, I'M NOT SURE.~~

28

A:  OKAY.

Q:  LET ME FIND OUT WHAT WE'VE GOT.

HE'S GOING TO TAKE—

[RECORDING ENDS]

29