1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No. 4:15-CR-6049-EFS-2
3                                )
                     Plaintiff,  ) December 11, 2018
4                                ) Richland, Washington
v.                               ) Sentencing Hearing/
5                                ) EXCERPT FROM DAY 1 -
JESE DAVID CARILLO CASILLAS,     ) Testimony of S. Barlow and
6                                ) W. Leahy only
                     Defendant.  ) Pages 1 to 58
7    _____

8
                  BEFORE THE HONORABLE EDWARD F. SHEA
9             SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                            APPEARANCES:
11
     For the Plaintiff:          Stephanie A. Van Marter
12                               Stephanie.Van Marter@usdoj.gov
                                 Caitlin Baunsgard
13                               US Attorney's Office-SPO
                                 920 W Riverside, Suite 300
14                               P.O. Box 1494
                                 Spokane, WA 99210
15                               509-353-2767

16   For the Defendant Carillo   Nicolas V. Vieth
     Casillas:                   Nick@viethlaw.com
17                               Vieth Law Offices
                                 505 West Riverside
18                               Suite 200
                                 Spokane, WA 99201
19                               208-664-9448

20   Official Court Interpreters: Carolina Hickey, Jessica McBride

21   Official Court Reporter:    Kimberly J. Allen, CCR #2758
                                 United States District Courthouse
22                               P.O. Box 685
                                 Richland, Washington 99352
23                               (509) 943-8175

24   Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
25

2

1                          <u>**INDEX**</u>

2

3                      <u>**WITNESS INDEX**</u>

4  <u>**Plaintiff Witness:**</u>                          <u>**Page**</u>

5

6     **SCOTT BARLOW**
          Direct Examination By Ms. Van Marter      5
7         Cross-Examination By Mr. Vieth            16
          Redirect Examination By Ms. Van Marter    17
8     **WILLIAM LEAHY**
9         Direct Examination By Ms. Van Marter      18
          Cross-Examination By Mr. Vieth            44
10
                            *****
11
   <u>**Defense Witnesses:**</u>                          <u>**Page**</u>
12

13
      None
14

15

16                    <u>**EXHIBITS ADMITTED**</u>

17 **Plaintiff**
      <u>**Number**</u>        <u>**Description**</u>              <u>**Page**</u>
18
       12          Image from fentanyl seizure        56
19     13          Image from fentanyl seizure        56

20
   **Defense**
21    <u>**Number**</u>        <u>**Description**</u>              <u>**Page**</u>

22                 None

23

24

25

1

## **GENERAL INDEX**

2

**Page**

3

Reporter's Certificate.............................58

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Carillo Casillas/4:15-CR-6049-EFS-2                    4
Excerpt of Sentencing Hearing/December 11, 2018
Barlow/D/Van Marter

1    (Additional proceedings were reported but not requested to be

2    transcribed.)

3             THE COURT:  Call your witness.

4             MS. VAN MARTER:  Thank you, Your Honor.  The United

03:17:05    5    States calls Scott Barlow.

6             THE COURT:  Cora, let Judge Rodgers' people know we'll

7    do it at 3:30-ish.

8             Come forward, please, to your right and to my left.

9        (Witness approached.)

03:17:25   10             THE COURT:  Good afternoon.

11

12                      SCOTT BARLOW,

13     called as a witness on behalf of the Plaintiff, having first

14        sworn or affirmed, testified under oath as follows:

03:17:27   15             THE WITNESS:  I do.

16             THE COURT:  Please be seated.

17             When you're comfortable, tell us your first and your

18    last name, and then spell both of them for the record.

19             THE WITNESS:  First name is Scott, last name is Barlow;

03:17:41   20    S-C-O-T-T, B-A-R-L-O-W.

21             THE COURT:  Thank you.  Good afternoon.

22             You may proceed.

23             MS. VAN MARTER:  Thank you.

24

25

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1                          DIRECT EXAMINATION

2    BY MS. VAN MARTER:

3    Q     Good afternoon.

4          How are you employed?

03:17:50  5    A     I'm employed by the RCMP, Royal Canadian Mounted Police.

6    Q     And how long have you been with the RCMP?

7    A     I've been a member of the RCMP since 2000; approximately 18

8    years.

9    Q     And just for the record, do we -- you have permission to

03:18:04  10   sit during the testimony.

11              THE WITNESS:  Thank you very much, Your Honor.

12   BY MS. VAN MARTER:   (Continuing)

13   Q     Do you usually stand during testimony?

14   A     Yes.  In Canada, we normally stand during testimony.

03:18:11  15   Q     All right.  What is your current assignment?

16   A     I'm currently assigned as a sergeant team leader to the

17   Federal Serious and Organized Crime section.

18   Q     Is that referred to as FSOC?

19   A     Yes.

03:18:21  20   Q     And what are your duties and responsibilities with FSOC?

21   A     Our mandate is to investigate transnational organized crime

22   with respect to drug smuggling and money laundering.

23   Q     And did you become involved in an investigation that

24   related to a DEA Boston case?

03:18:37  25   A     Yes.

1   Q    And do you recall when you became involved?

2   A    I became involved in roughly September of 2014, Your Honor.

3   Q    And what -- what was your role in that investigation?

4   A    I was assigned as the primary investigator, which would

03:18:50   5   control the speed, flow, and direction of the file occurring in

6   Canada.

7   Q    And was there a particular target that was identified in

8   the Vancouver area that you were in charge of following up

9   investigation?

03:19:00   10   A    Yes.  The target was, Jorge Esau De Vicente Luque.

11   Q    And is that an individual who has been indicted in this

12   particular case?

13   A    Yes.

14   Q    Yet remains a fugitive?

03:19:12   15   A    Yes.

16   Q    And during your initial assignment, then, did you follow up

17   in regard to surveillance and other investigative techniques

18   with regard to Jorge Luque?

19   A    Yes.  We conducted surveillance on him; we placed trackers

03:19:24   20   on his vehicles; we did telephone dial-recorders, which would

21   monitor all of his telephone calls in and out.

22   Q    And during the course of the investigation, were you aware

23   if he personally participated in aspects of the investigation to

24   include money drops?

03:19:36   25   A    Yes.

1    THE COURT:  Sorry.  Hold on.

2    MR. VIETH:  Mr. Barlow, could you speak up a little bit?

3  The interpreter is having a little bit of difficulty.

4    THE WITNESS:  Yes, I will, sir.

03:19:45   5    THE COURT:  Pull that microphone a little closer.

6  BY MS. VAN MARTER:   (Continuing)

7  Q    I'm sorry.  I'll repeat the question.

8    Did you identify Mr. Jorge Luque as being involved in the

9  investigation, specifically also involved in money drops?

03:19:55   10  A    Yes, he showed up on several occasions to deliver money to

11  our undercover operators.

12  Q    And what was RCMP's role in the investigation with DEA in

13  Boston, predominately?

14  A    Our role?

03:20:06   15  Q    Yes.

16  A    Our role was to support their investigation, but also to

17  look at opportunities in Canada to have disruption and

18  enforcement with respect to seizing drugs or money or cash.

19  Q    And that also included providing undercover operatives who

03:20:20   20  played the role of the Canadian bosses?

21  A    Yes, we inserted several undercover operators to support

22  DEA's operation.

23  Q    And back to Mr. Jorge Luque, you had indicated he

24  participated in several cash money drops; is that correct?

03:20:33   25  A    Yes, that is correct, ma'am.

8

1    Q    And did he participate early on in the investigation and

2    then --

3             THE COURT:  Counsel, can you just go a little bit

4    slower?

03:20:38    5             MS. VAN MARTER:  Yes, Your Honor.  Sorry, Your Honor.

6             THE COURT:  Thank you.

7    BY MS. VAN MARTER:  (Continuing)

8    Q    During the early part of the investigation, was he

9    identified, then, as participating in those cash money drops?

03:20:46    10   A    Yes.  He showed up at the first part of the cash money

11   drops, and then there was a little bit of a lull in his

12   appearance, and then he showed up towards the end of the

13   investigation, which I believe is --

14            THE COURT:  Who are we speaking of here?

03:20:57    15   BY MS. VAN MARTER:  (Continuing)

16   Q    Jorge Luque?  Is that correct?

17   A    Jorge Luque, yes.

18            THE COURT:  Thank you.

19   BY MS. VAN MARTER:  (Continuing)

03:21:00    20   Q    And during the initial part, that was when Mr. Ivan

21   Calvillo was involved; is that correct?

22   A    Yes, that is correct.

23            THE COURT:  How do we know that?  How do I know that?

24   How does he know that?

25

1    BY MS. VAN MARTER:   (Continuing)

2    Q     You first became involved in the fall of 2014; is that

3    correct?

4    A     Yes.

03:21:13   5    Q     And when you first became involved, did you have

6    conversations and debriefings with DEA Boston?

7    A     Yes.  We entered into a joint investigation with the Drug

8    Enforcement Agency to support the money pickups occurring in

9    Vancouver and to investigate the criminal organization in

03:21:28   10   Canada.

11   Q     And based upon that involvement, did you become familiar,

12   then, with who the Undercover Operative Jaime Cepero was in

13   communication with?

14   A     Yes.  We had routine communications with Mr. Cepero's team

03:21:41   15   and updates on the file as it progressed in the United States

16   and in Mexico.

17   Q     And so in that early part of your involvement in the fall

18   of 2014, who did you understand Undercover Cepero was in

19   communication with?

03:21:52   20   A     We were advised that he was communicating with

21   Mr. Calvillo, Ivan Calvillo.

22   Q     And it was that time that you first identified Mr. Luque

23   participating in the money drops?

24   A     Yes.

03:22:02   25   Q     And you indicated that there was a lull in time where you

1  didn't see him.

2  A    Yes, there was a lull in time where there were several

3  money pickups where Luque was not the person delivering the cash

4  at hand.

03:22:13  5  Q    And can you recall some of the people that delivered on

6  his -- during -- excuse me, some other individuals who

7  provided -- who participated in the cash money drops?

8  A    Yes, we had several.  We had an Armando Betancort, we had

9  had a Rolando Guajardo (phonetic spelling), we had an Oscar

03:22:28  10  Mendoza, we had a Anna Rogalski, and I believe --

11  Q    A Benjamin Goldring?

12  A    And, sorry, and a Benjamin Goldring.

13  Q    So there are other individuals that were involved in these

14  cash money drops in addition to those that were presented in

03:22:43  15  indictment here in the United States?

16  A    Yes.

17  Q    You had mentioned an Anna Rogalski; is that correct?

18  A    Yes.  Anna Rogalski was identified as she delivered, uh, I

19  believe, approximately $100,000 on April 15th, 2015.

03:23:00  20  Q    And did she also then --

21       THE COURT:  In Vancouver British, Columbia?

22       THE WITNESS:  In Surrey, British Columbia, a small

23  suburb of Vancouver, yes.

24  BY MS. VAN MARTER:   (Continuing)

03:23:11  25  Q    And did she also deliver within a week after that, on

1    April 22nd?

2    A    Yes, approximately seven days later I believe she delivered

3    163,000.

4    Q    And was this the time period that Ivan was in communication

03:23:24  5    with the undercover?

6    A    Yes, I believe so.

7    Q    And based upon those cash deliveries, did you do follow-up

8    investigation regarding Ms. Rogalski?

9    A    Yes.  So we conducted surveillance on Anna Rogalski, just

03:23:36 10    to find out who her associates were, who she was working for,

11    because we believed she was just a runner, delivering the cash.

12    And during surveillance, we found that she met up with an

13    individual called Oscar Mendoza, which we had previous history

14    of.  He's actually -- he was currently under indictment at the

03:23:50 15    time that we found him and located him on surveillance.  He has

16    since been indicted to the United States for drug trafficking

17    offenses and drug smuggling offenses.

18         And during that time on surveillance, she met with him on

19    several occasions, and they went to various places together and

03:24:05 20    purchased a vacuum sealer and a money counter.

21    Q    And where was Mr. Mendoza brought to the United States to

22    face his charges?

23    A    I believe in the Western District of Washington;

24    Bellingham, I believe, was the DEA office.

03:24:19 25         THE COURT:  So is he under indictment in the Western

1    District?

2            THE WITNESS:  Yes, and he has since been extradited to

3    the United States, Your Honor.

4            THE COURT:  Okay.  Thank you.

5    BY MS. VAN MARTER:  (Continuing)

6    Q    And did you also understand or come to learn that

7    Mr. Mendoza had ties to this side of Washington state as well?

8    A    Yes.

9    Q    After you observed Ms. Rogalski purchase the money counter

10   and such, did you participate in or obtain a search warrant for

11   her residence in Canada?

12   A    Yes.  There was another pending money contract that

13   Mr. Cepero had received, and we believed it was from the same

14   organization.  Roughly, they were organizing $300,000 that

15   needed to be repatriated back to other parts of the United

16   States and Mexico.

17           So at that point in time we made an investigative decision

18   to execute a search warrant on her residence, and during the

19   search warrant we located the vacuum sealer, the money counter,

20   and $300,000 in Canadian currency vacuum-sealed and ready for

21   delivery.

22           THE COURT:  How do you spell her last name?

23           THE WITNESS:  Rogalski?  It's R-O-G-A-L-S-K-I.

24           THE COURT:  Thank you.

25

1    BY MS. VAN MARTER:   (Continuing)

2    Q    And is that also an individual who has been presented in

3    indictment in this jurisdiction --

4    A    Yes.

03:25:27  5    Q    -- based upon her role?

6    A    Yes, she has.

7    Q    And did you have an opportunity to speak to her during the

8    execution of that search warrant?

9    A    Yes.  Following the execution of the search warrant, I

03:25:37  10   personally did a warrant statement of her at the scene.

11   Q    And did she provide you any information as to how she got

12   involved?

13   A    Limited information; just the fact that she was recruited,

14   Your Honor, basically at a salsa dance club by an individual by

03:25:54  15   the name of Hugo.

16   Q    And was she supposed to receive any payment for her

17   participation?

18   A    Yeah, she received, um, a minimal -- a few thousand

19   dollars, I believe, I recall.

03:26:06  20        THE COURT:  Did you say she's under indictment in this

21   district?

22        MS. VAN MARTER:  Yes, Your Honor.

23        THE COURT:  In front of me?

24        MS. VAN MARTER:  Yes.  She's not appeared before you

03:26:14  25   yet.

1  BY MS. VAN MARTER:   (Continuing)

2  Q    Does she remain a fugitive?

3  A    She remains a fugitive in Canada.

4  Q    And, let's see, did Mr. Luque reappear during the course of

03:26:34  5  the investigation himself?

6  A    Yes.  Towards the end, I believe the summer of 2016, maybe

7  June and July, he showed up and delivered, I believe, on three

8  separate occasions bulk cash for transferring to the United

9  States.

03:26:48  10  Q    And based upon your involvement in the investigation at

11  that time, did you know who the undercover was in communication

12  with at that time?

13  A    Who, sorry, Mr. Cepero was in communication with?

14  Q    Yes.

03:27:00  15  A    Yes.

16  Q    And who was that?

17  A    And we knew it was Jese Casillas.

18  Q    Aside from the $300,000 seizure, did your unit also

19  participate in or were a part of a seizure that occurred in

03:27:25  20  August up in Grand Forks?

21  A    Yes, we were.

22  Q    And that -- was that a part of your independent

23  investigation or follow up?

24  A    Yes.  As a result of the money contract received by

03:27:34  25  Mr. Cepero during our undercover operation, the undercover

1    operator observed a hidden compartment in the vehicle that

2    arrived to deliver the cash.  As a result, we conducted

3    surveillance, and within a few days that vehicle drove to a

4    remote area on the border of Washington state and Canada, which

03:27:49  5    is approximately about five or six hours away from Vancouver,

6    and in the middle of the evening, several occupants crossed the

7    border illegally and entered into that vehicle.  And an arrest

8    was made and several items, I believe 17 kilos of

9    methamphetamine, 4 kilos of cocaine, just under a kilogram of

03:28:07 10    heroin, and two stolen handguns, were located.

11    Q    Other than the search warrant, then, at Ms. Rogalski's and

12    the seizure at Grand Forks, BC, did you have any other large

13    cash seizures or bulk drug seizures related to this

14    investigation?

03:28:22 15    A    Not during that time we didn't.

16    Q    So earlier when Officer Cepero was testifying regarding a

17    $300,000 loss or seizure that occurred in Canada, what did you

18    understand that to be a reference to?

19    A    We believe it was the money that we seized during the

03:28:40 20    search warrant from Anna Rogalski.

21          MS. VAN MARTER:  Your Honor, if I could have a moment?

22          THE COURT:  Yes.

23       (Counsel conferring.)

24          MS. VAN MARTER:  That was a long way to come, but thank

03:29:05 25    you very much.  I have no other questions of this witness.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1      THE COURT:  Mr. Vieth?

2

3                          CROSS-EXAMINATION

4    BY MR. VIETH:

03:29:11  5    Q    Good afternoon, sir.

6    A    Good afternoon.

7         THE COURTROOM DEPUTY:  Judge, it's 3:30.  Did you want

8    to break now or --

9         MR. VIETH:  I'll be brief, Judge.  I've only got two

03:29:21  10   questions.

11        THE COURT:  Go ahead.

12   BY MR. VIETH:  (Continuing)

13   Q    Who is Luque?

14   A    Jorge Esau De Vicente Luque was identified as the person

03:29:29  15   who Mr. Cepero was originally in contact with who was

16   negotiating the money contracts in Canada.

17   Q    Is he best described as the leader/organizer, I guess, in

18   Canada, the leader of the group up there?

19   A    Yes.

03:29:44  20   Q    Do you know if there are any telephone records, any other

21   documentation, text messages, e-mails, anything that links my

22   client to Luque?

23   A    Not that I know of.

24        MR. VIETH:  That's all we have, Judge.

03:30:05  25        MS. VAN MARTER:  Just one clarifying question?

1              REDIRECT EXAMINATION

2    BY MS. VAN MARTER:

3    Q    So Luque was utilized for cash money drops at the direction

4    of Ivan; is that correct?

03:30:14  5    A    Yes.

6    Q    And also at the direction of Jese Casillas?

7    A    Yes, I believe so.

8    Q    And do you know if you have all of the phone numbers and

9    BBM PINs and WhatsApp communications or contacts for Luque?

03:30:27  10   A    No, we don't have all the communications for Luque.

11   Q    And do you know if you have any or all of the

12   communications for Mr. Casillas?

13   A    No, we don't.

14        MS. VAN MARTER:  No other questions, Your Honor.

03:30:37  15        MR. VIETH:  Nothing further.  Thank you, Judge.

16        THE COURT:  Well, thank you for being here.

17        THE WITNESS:  Thank you very much, Your Honor.

18        THE COURT:  Okay, folks, 15 minutes.  See you in 15.

19        THE COURTROOM DEPUTY:  Please rise.

03:30:54  20     (Recess taken: 3:30 p.m. to 3:58 p.m.)

21        THE COURTROOM DEPUTY:  Please rise.

22     (Call to Order of the Court.)

23        THE COURT:  Good afternoon.  Let's resume.

24        You folks ready over there?

03:58:15  25        All right.  Mr. Leahy.

1    (Witness approached.)

2        THE COURT:  Welcome back.

3

4                        WILLIAM LEAHY,

03:58:23  5   called as a witness on behalf of the Plaintiff, having first

6            sworn or affirmed, testified under oath as follows:

7        THE WITNESS:  I do.

8        THE COURT:  Please be seated.

9        When you're ready, tell us your first and last name, and

03:58:34  10  spell them both for the record.  Thank you.

11       THE WITNESS:  William Leahy, W-I-L-L-I-A-M, Leahy,

12  L-E-A-H-Y.

13       THE COURT:  Good afternoon.

14       You may proceed.

03:58:41  15

16                     DIRECT EXAMINATION

17  BY MS. VAN MARTER:

18  Q    Good afternoon.

19       Have you previously testified before this Court in this

03:58:48  20  case regarding your role in the investigation?

21  A    Yes.

22  Q    And were you formerly employed by the FBI?

23  A    Yes.

24  Q    Are you now retired?

03:58:55  25  A    Yes.

1    Q    And how long were you with the FBI?

2    A    Uh, 26 years.

3    Q    And were you assigned specifically to a task force?

4    A    Uh, yes.

03:59:04   5    Q    And how long did you work with the task force while with

6    the FBI?

7    A    Um, approximately ten years off and on because I was a

8    supervisor for some of that time.

9    Q    And you previously testified as to your training and

03:59:17  10    experience in the investigation of large-scale drug trafficking

11    organizations here in this district?

12    A    Yes.

13    Q    Did you become involved in an investigation regarding Ivan

14    Calvillo?

03:59:27  15    A    Yes.

16    Q    And when did you first become involved in that

17    investigation?

18    A    You could probably say back as far as 2010.

19    Q    And are you familiar, then, with how that investigation has

03:59:42  20    continued on up until the present day, specifically to include

21    Mr. Jese Casillas?

22    A    Yes.

23    Q    And have you been a party to that investigation during that

24    entirety up until the time of your retirement --

03:59:53  25    A    Yes.

1    Q    -- and after?

2    A    Yes.

3    Q    I'm going to ask you just a couple of questions.

4         Were you familiar with the arrest and seizure involving

04:00:01    5    Ivan Calvillo down in California during the course of the

6    investigation?

7    A    Yes.

8    Q    And could you just briefly tell the Court what occurred.

9    A    Um, my recollection is that, uh, he was arrested down there

04:00:14    10    with a couple of other individuals by Pomona, I think it was

11    city police department, if I recall correctly.  Um, and it was a

12    reverse where they, uh, obtained approximately $400,000 cash

13    from Calvillo.  Essentially task forces down in California take

14    the money.

04:00:35    15         We got wind of it, um, and Ms. Van Marter and Darren Pitt

16    with HSI began to draft an affidavit for his arrest, uh, up here

17    in the Eastern District of Washington.  We were told by HSI down

18    there that they would hold him until that was done.

19         Somehow administratively HSI let him go before the

04:01:04    20    paperwork could be, uh, put on him, essentially.

21    Q    And was that based upon the ongoing investigation into Ivan

22    Calvillo out of this district at that time?

23    A    Yes, it was.

24    Q    And --

04:01:15    25         THE COURT:  This was the Pomona Police Department?

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                    21
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/D/Van Marter*

1       THE WITNESS:  Yes.

2   BY MS. VAN MARTER:   (Continuing)

3   Q    Was that associated with a task force as well down in that

4   area of California?

04:01:22  5   A    It was a task force, and I can't recall if it was the

6   Pomona PD task force, if it was -- it was either a county or a

7   local task force, and that's why I'm not sure if it -- if it was

8   Pomona city or county.

9   Q    And at that time were -- was the FBI in the process of

04:01:40  10  trying to go up on a Title III on Ivan Calvillo's phone?

11  A    We were.

12  Q    So once we received word in this district, was there then

13  efforts to get Mr. Calvillo into custody?

14  A    Yes.

04:01:53  15  Q    And then he was deported instead?

16  A    Correct.

17  Q    And based upon your communications, then, with some of

18  those task forces down there, is deconfliction difficult in

19  terms of their state-level investigations comparative to what is

04:02:09  20  going on in a federal investigation?

21  A    At times, yes.

22  Q    And based on your understanding, did they not have access

23  to or properly deconflict their target at that time?

24      THE COURT:  A what?

04:02:21  25      MS. VAN MARTER:  Deconfliction.

1    BY MS. VAN MARTER:   (Continuing)

2    Q     What is deconfliction?

3    A     So deconfliction is knowing that, for example, that we are

4    working Mr. Calvillo as a target here in the Eastern District of

04:02:31  5    Washington.  And there was not a deconfliction done.

6            THE COURT:  So this is an effort to cooperate so you

7    deconflict?

8            THE WITNESS:  It's an effort to cooperate so that we all

9    work together.

04:02:45  10            THE COURT:  Okay.  Thank you.

11    BY MS. VAN MARTER:   (Continuing)

12    Q     And after that point in time, then, did we lose the ability

13    to obtain a Title III on Mr. Calvillo?

14    A     Yes.  He was deported to Mexico and -- and at that point

04:02:57  15    knew we were investigating him and chose not to come back to the

16    United States.

17    Q     And after that did he remain, then, in Mexico until the

18    time of his death, as best we can tell?

19    A     As best as we know.

04:03:08  20    Q     And did the investigation, however, continue into his --

21    other individuals that may have been operating on behalf of the

22    organization here in the district?

23    A     Yeah.  Essentially what our focus was is once -- once he

24    was deported, we were trying to ascertain who took -- was going

04:03:24  25    to take over for him here in this area.

1  Q    And based on your training and experience and knowledge of

2  this investigation as it operates here in this district with

3  this organization, typically what is put in place in terms of

4  who is in charge and what they're in charge of?

04:03:41  5  A    There's typically one person put in charge of the

6  organization here, um, in -- in the Eastern District of

7  Washington and, uh, into other states and obviously up into

8  Canada.  Um, that person would be in charge of the distribution,

9  um, obtaining the drugs from Mexico, and also the money part of

04:04:03  10  the transactions.

11  Q    And are there other people who play roles in the

12  organization, for instance, in the California area?

13  A    Yeah.  Um, for example, I think that Mr. Cepero testified

14  that money was wired to California.  Um, obviously the -- the

04:04:21  15  narcotics has to come from Mexico into the United States and

16  this --

17       MR. VIETH:  Your Honor, I'm going to object on

18  speculation.  I think he can testify to what he knows, but what,

19  you know, the witness has already testified to, I already heard

04:04:34  20  that part.

21       THE COURT:  No, I'm going to permit this.

22       I had -- I want to make a record that we've had a

23  hearing qualifying him as an expert in this case.  It's of

24  record.  So there was a challenge to his expertise.  I had a

04:04:46  25  hearing.  He testified.  Defense counsel were there.  And so, of

1  record, I found that he was qualified to give opinions about

2  DTOs and money laundering.  And I believe that, Mr. Vieth,

3  you'll find that as an order in the file to that effect.

4      MR. VIETH:  I believe I was present, Judge, so I will

04:05:06  5  retract my objection.

6      THE COURT:  I'm glad that you remember you were present.

7  Thank you.  And I accept your withdrawal.

8      Okay, Mr. Leahy.

9  A    So, for example, uh, drugs would come across from Mexico

04:05:17  10  into California with this organization, and then from California

11  be shipped up here.  And we know that from people that we have

12  arrested, cooperators, um, et cetera.

13  BY MS. VAN MARTER:  (Continuing)

14  Q    And even during the course of the early part of this

04:05:31  15  investigation, was there a defendant arrested out of the

16  California area by the name of Rulas Hernandez?

17  A    Yes.

18  Q    And was that a second part of this investigation that also

19  involved an Alberto Hernandez?

04:05:43  20  A    Yes, it was -- yes.

21  Q    And --

22      THE COURT:  Just for the record, you're offering his

23  testimony as an expert as well as his percipient witness

24  testimony to the extent that -- you need to clarify when it's

04:05:55  25  percipient and when it's expert.  Okay?

1          MS. VAN MARTER:  Yes, Your Honor.

2          THE COURT:  So far I understand it's DTO expertise.

3          MS. VAN MARTER:  I am asking specifically about this

4    investigation now, about this drug trafficking organization and

5    his knowledge.

6          THE COURT:  That's percipient.

7          MS. VAN MARTER:  Yes.

8    BY MS. VAN MARTER:  (Continuing)

9    Q     So in that particular investigation, did you also identify

10   a woman by the name of Rosa?

11   A     Yes.

12   Q     And who was Rosa?

13   A     She was the wife of the individual that you just mentioned.

14   Q     Rulas Hernandez?

15   A     Yes.

16   Q     And what was Rulas Hernandez's role in the organization at

17   that time?

18   A     Well, um, it's debatable, but our understanding is that he

19   was in charge of, uh, bringing narcotics from Mexico up to

20   California.  And then his brother was put in charge up here in

21   Tri-Cities, and, uh, he was, uh, the -- the drugs would be sent

22   from Rulas up here to Beto.

23   Q     And would then Beto be in charge of disbursing them --

24   A     Yes.

25   Q     -- into Canada and elsewhere?

1    A    Yes.  And Ivan Calvillo at the time was in charge of the

2    two -- two brothers.

3    Q    And when this was happening, that was when Ivan was in

4    Mexico.

04:07:05   5        Is that correct?

6    A    Yes.  That's true.

7    Q    So when you were -- previously testified that somebody is

8    usually put in charge in this district, was that Rulas Hernandez

9    in California and Beto Hernandez here in the Eastern District of

04:07:17  10   Washington?

11   A    That's correct.

12       THE COURT:  So it's Ruelas, R-U-E-L-A-S, [sic]

13   Hernandez?

14       MS. VAN MARTER:  Yes.

04:07:24  15   BY MS. VAN MARTER:  (Continuing)

16   Q    And did Rosa come up again during the course of this

17   investigation when the money laundering part of it started

18   through Officer Cepero?

19   A    She did.

04:07:34  20   Q    How so?

21   A    She was sent by Mr. Calvillo to Australia to coordinate,

22   um, the distribution of narcotics in Australia.

23       THE COURT:  And what is her actual name?  You say

24   "Rosa," and I wanted to make sure I knew --

04:07:51  25       MS. VAN MARTER:  Rosa Hernandez, Rulas Hernandez's wife.

1          THE COURT:  Okay.

2          THE WITNESS:  Yeah.  I'm not sure if it's Hernandez.

3    I -- I've been retired for a year.  Sorry, Judge.

4    BY MS. VAN MARTER:  (Continuing)

04:08:01   5    Q    And eventually were Beto and Rulas also arrested?

6    A    Yes.

7    Q    And in your --

8          THE COURT:  And Beto is who?

9          MS. HOLLAND:  Beto Hernandez Ramirez.

04:08:13   10         THE COURT:  Okay.  Thank you.

11   BY MS. VAN MARTER:  (Continuing)

12   Q    After their arrest, were there other individuals, then, put

13   into charge up here in the Eastern District of Washington

14   regarding operations?

04:08:22   15   A    Yes.

16   Q    And did you know one of those to be somebody referred to as

17   AR-15?

18   A    Yes.

19   Q    And that's Juan Pablo Gonzalez Mendoza?

04:08:31   20   A    Yes.

21   Q    And after -- and was he ultimately arrested?

22   A    Yes, he was.

23   Q    And at some point in time did you come to understand if

24   Mr. Casillas played a role with respect to this district?

04:08:43   25   A    Yes.

1    Q    And what role was that?

2    A    Our understanding was, is that he took over for this -- for

3    this organization, um, this territory.

4    Q    And when taking over for this territory, you had mentioned

04:08:56    5    transportation also up into Canada.  I believe you previously

6    testified about a trail system.

7         Are you familiar with that?

8    A    Yes.

9    Q    And was there a trail system specifically utilized by this

04:09:06    10    organization that originated out of this district?

11    A    Yes.

12    Q    And what was that?

13    A    Um, there was basically a trail system where, uh, they

14    would drive up to Oroville, and then at nighttime cross over the

04:09:19    15    border into Canada with backpacks, um, typically containing

16    narcotics to take up to Canada.  And sometimes they would bring

17    back cash into the United States.

18    Q    And based upon this investigation, did you understand those

19    that were in charge in this district would also be responsible

04:09:38    20    for the movement of those narcotics into Canada and cash drug

21    proceeds back down?

22    A    Yes.

23    Q    I'm going to direct your attention to Government's Exhibit

24    No. 1; specifically, the April of 2015 time period.

04:09:59    25         Were you still a part of this investigation at that time?

1   A    Yes, I was.

2   Q    And did you have a confidential human source that had been

3   tied into this organization for a number of years?

4   A    Yes.

04:10:09   5   Q    And did that confidential human source first come to you

6   and identify Mr. Casillas?

7   A    Yes, he did.

8   Q    And how so?

9   A    Uh, he indicated that, um, he had been requested to, uh,

04:10:24   10   give a load car by Mr. Calvillo to Mr. Casillas.

11   Q    And was that the Mini Cooper?

12   A    Yes.

13   Q    Was there a second load car that Mr. Casillas also

14   requested?

04:10:37   15   A    Yes.  It was a Sebring, and I can't recall which -- there

16   were two Sebrings, so I'm not going to remember which one.

17   Q    Did this organization utilize multiple load vehicles?

18   A    Yes.

19   Q    And what was the purpose of Mr. Casillas wanting access to

04:10:52   20   these two load vehicles?

21   A    Uh, to transport narcotics.

22   Q    And this is separate and apart from what you later learned

23   to be his involvement with the money laundering aspect of this

24   investigation and Officer Cepero?

04:11:08   25        Well, let me rephrase the question.

1    These are additional activities from the money laundering

2    part of the investigation with Officer Cepero?

3    A    They're different than the wire transfer part of the

4    investigation because there was money, um, being physically

04:11:25  5    distributed using vehicles, et cetera.

6    Q    And I just scrolled up.  There's a box there that

7    references surveillance of the Mini Cooper.

8         Did your task force surveil and confirm the defendant, as

9    well as his wife, in possession of the Mini Cooper, the load

04:11:43  10   vehicle?

11   A    Yes.

12   Q    And who is Daisy Camacho?

13   A    The defendant's significant other.

14   Q    And did he also have other significant others identified

04:11:54  15   during the course of the investigation?

16   A    There was a girlfriend; Brittany Zaragoza, I believe.

17   Q    And during this time period, was there identification of

18   potential drivers for Mr. Casillas?

19   A    Yes.

04:12:15  20   Q    And who was the potential driver that was identified?

21   A    Um, there were multiple drivers.  Um, one was Juan -- Jose

22   Adrian Mendoza.  Um, he was surveillanced [sic] going up to --

23   to the Canadian border, I think, multiple times by us.

24   Q    And, again, is this consistent with the previous area that

04:12:41  25   had been identified as the trail system utilized by the

1    organization?

2    A     Yes, it was.

3         THE COURT:  Who is his wife or significant other, the

4    defendant's?

04:12:50  5    BY MS. VAN MARTER:  (Continuing)

6    Q     Who is Mr. Casillas's wife or --

7    A     Daisy.

8         THE COURT:  Daisy what?

9         THE WITNESS:  Uh, Camacho, I believe.

04:12:58  10        THE COURT:  Camacho?

11    BY MS. VAN MARTER:  (Continuing)

12    Q     Camacho?

13    A     I believe so.

14        THE COURT:  Okay.  Thank you.

04:13:02  15    BY MS. VAN MARTER:  (Continuing)

16    Q     And I think if we look right here, she's identified

17    (indicating).

18        Is that --

19    A     Yeah, it's Daisy Biviano Camacho Duarte.

04:13:11  20        THE COURT:  There you go.  Thank you.  Camacho Duarte.

21    Thank you.

22    BY MS. VAN MARTER:  (Continuing)

23    Q     And so while the money laundering aspect of the

24    investigation was ongoing, you were also tracking and

04:13:25  25    surveilling load vehicles and identification of Jose Adrian

1    Mendoza; is that correct?

2    A    Yes.

3    Q    Did there come a time during this investigation that you

4    identified a residence associated with Mr. Casillas?

04:13:40  5    A    Yes.

6    Q    And do you recall what residence that was?

7    A    It was in Kennewick, I believe, right off of Kennewick

8    Avenue by the golf course there.  I can't remember -- I can't

9    recall the address at this time.

04:13:52  10    Q    Does 8 North Palouse sound about right?

11    A    That's it.

12    Q    And based upon the investigation, did you ultimately put up

13    a pole camera outside that residence?

14    A    Yes, we did.

04:14:02  15    Q    And do you recall approximately when that pole camera was

16    placed?

17    A    I believe it was very close to -- well, no.  It would have

18    been in the spring after the death of Calvillo, so it would have

19    been in the spring of 2016.

04:14:19  20    Q    Mr. Calvillo was killed in December 2015?

21    A    Yes.

22    Q    Okay.  And you began the pole camera outside the residence,

23    and what was the purpose of that?

24    A    Uh, surveillance to figure out who was coming and going

04:14:33  25    from the residence, uh, to determine, uh, load cars, uh, load

1   drivers; uh, those types of things.

2   Q    Were you also able to ever identify any distributors?

3   A    Uh, yes.

4   Q    And were you able to identify load cars coming to the

04:14:49  5   residence?

6   A    Yes.

7   Q    And some of these distributors, were you able to effectuate

8   traffic stops and seize quantities of narcotics?

9   A    Yes.

04:14:57  10   Q    And what type of narcotic?

11   A    Um, my recollection, it was meth -- all methamphetamine.

12   Q    And in this particular organization, did they typically

13   transport certain narcotics up into Canada and leave certain

14   narcotics here in the United States?

04:15:13  15   A    Yes.

16   Q    And what was that and why?

17   A    Uh, methamphetamine was, uh, the, uh -- what do I want to

18   say?  The -- there was a need for it in, uh, in the Dakotas, so

19   that's why most of the methamphetamine, they could get a better

04:15:34  20   price for it there.  The cocaine, the best price they could get

21   for it was in Canada, so the cocaine would go to Canada.  And

22   the meth would go out towards, uh, South Dakota, North Dakota,

23   and Minneapolis, Chicago.

24   Q    And was there also a time that heroin came into the picture

04:15:50  25   during the course of the investigation?

1    A    Uh, yes.

2    Q    And was -- was heroin more expensive up in Canada than here

3    in the United States?

4    A    Yes.

04:16:00    5    Q    I'm going to ask you, at some point in time you became

6    aware of the money laundering investigation as well as the RCMP

7    involvement; is that correct?

8    A    Yes.

9    Q    And were you receiving information then from Officer Cepero

04:16:14    10    regarding money wire transfers that may have been occurring in

11    this district?

12    A    Yes.  We were trying to coordinate those to see whether the

13    wire transfers coordinated with movement of load vehicles.

14    Q    And during the course of that part of the investigation,

04:16:29    15    did you identify if Mr. Casillas received money wire transfers?

16    A    Yes.

17    Q    Did you also identify if any of his family members received

18    money wire transfers?

19    A    Yes, they did.

04:16:50    20         THE COURT:  When you say "wire transfers," are you

21    talking about the drug trafficking organization's money

22    laundering?

23         THE WITNESS:  No.  So Mr. Cepero would get directions

24    from Casillas after doing a money exchange, and then he would be

04:17:08    25    asked to wire --

1    THE COURT:  Right.

2    THE WITNESS:  -- funds, and those funds would go to

3 people that he may not have known who they were but we did.

4    THE COURT:  But these were proceeds from drug

04:17:20    5 transactions.

6    THE WITNESS:  Yes.

7    THE COURT:  Okay.

8 BY MS. VAN MARTER:  (Continuing)

9 Q    I have now showed you Government's Exhibit No. 1.  I've

04:17:27   10 scrolled to the December 2015 time frame, December all the way,

11 actually, through March.

12    So we see here some more representation of cash money wire

13 transfers; is that correct?

14 A    Yes.

04:17:45   15 Q    And, again, these are from the cash drops that occurred at

16 the direction of Mr. Calvillo, Ivan, and then Mr. Casillas

17 during the course of the investigation; is that correct?

18 A    Yes.

19 Q    There's one here (indicating).  And who is that?

04:18:02   20 A    That is, uh, Mr. Casillas' significant other.

21 Q    And did you determine where she was living during the

22 course of the investigation?

23 A    Uh, she was living with -- with him for -- for most of the

24 investigation.  I think he -- he actually moved out for a very

04:18:18   25 short time.

1   Q    Okay.  Then again -- and what was the amount of this

2   February 26th, 2016, cash wire transfer?

3   A    $5,000.

4   Q    Oh, I'm sorry.  This one first (indicating).

04:18:32  5   A    $2,411.

6   Q    And then there was another one referenced over here

7   (indicating), and how much was that?

8   A    $5,000 on, it looks like, November -- I can't see it.  The

9   blue line is through it.  March of 2016.

04:18:47  10   Q    And then another one here (indicating).

11   A    Again, March of 2016, $5,000.

12   Q    And did you also know Julio Cesar Rosales?

13   A    Yes.

14   Q    And who did you understand Mr. Rosales to be?

04:19:02  15   A    I believe he was a cousin who lived down in Los Angeles.

16   Q    And did you know who a Cindy Alvarado was?

17   A    Uh, a girlfriend of Rosales', I believe.  That's a stretch

18   for my memory.

19   Q    As well as Mr. Gudino Chavez and Claudio Franco.  Were

04:19:25  20   those also associates down in Los Angeles area?

21   A    They were associates, yes.

22        THE COURT:  Associates of whom?

23        THE WITNESS:  Of Julio Cesar Rosales and, I believe, of

24   Mr. Casillas.

25

1  BY MS. VAN MARTER:  (Continuing)

2  Q    Okay.  I'm going to take you over here to -- here we are

3  again, the individuals (indicating).

4      And Brittany Zaragoza, who did you understand Ms. Zaragoza

5  to be?

6  A    Girlfriend of Mr. Casillas.

7  Q    And, again, the same individuals you previously testified,

8  additional cash money wire transfers to Julio Cesar Rosales and

9  Salvador Gudino Chavez?

10  A    Yeah.

11  Q    And did you become familiar with who a Luis DeDios Valdez

12  or a Rosa Duarte DeDios were?

13  A    Yes.

14  Q    And who were they?

15  A    The father and mother of Daisy Camacho.

16  Q    And did you also become familiar with La Hacienda Mexican

17  restaurant?

18  A    Yes.

19  Q    And what was that?

20  A    It was a restaurant, I believe, in Hermiston that the

21  DeDioses were running with, um, another person.  I can't

22  remember the name, but it may be this Martha Echeverria, but I

23  can't recall.

24  Q    And after Mr. Casillas' arrest, did individuals with your

25  task force go and interview Ms. Camacho's parents regarding some

1    of these cash wire transfers?

2    A    Yes.

3    Q    And what was the purpose of that interview?

4    A    Uh, to find out what they were for and, uh, basically -- my

04:21:16    5    recollection, again, a little fuzzy, but is that they admitted

6    to receiving the funds, but felt that the funds were from his

7    employment, Mr. --

8    Q    And what employment did they think he had?

9    A    He was employed, um, with a lawn service company, I

04:21:38    10    believe, in the Tri-Cities.

11    Q    So they believed that the total of $18,000 in this May,

12    June time period came from Mr. Casillas' landscaping business?

13    A    I think it was 15,000.  I think there was one transaction

14    that didn't go through, if I remember correctly.  But, yes, to

04:22:05    15    answer your question.

16    Q    Okay.  And I've scrolled over on Government's Exhibit No. 1

17    to this area here (indicating).

18         There are a number of additional cash wire transfers

19    represented there; is that correct?

04:22:21    20    A    Yes.

21    Q    And you were previously here for the testimony regarding

22    additional cash money drops that were occurring during this time

23    period at the direction of Mr. Casillas?

24    A    Yes.

04:22:30    25    Q    And, again, there are some cash wire transfers to the

1    restaurant and the parents of Daisy Camacho?

2    A    Yes.

3    Q    Based on your training and experience -- and this is

4    generalized testimony -- in investigating drug trafficking

04:22:47   5    organizations, is it common for individuals involved to try and

6    disburse their funds through legal methodologies or legal

7    businesses?

8    A    Yes.

9    Q    And why is that?

04:22:56   10   A    It's a way to, uh, cover up the money, to launder the

11   money, essentially.

12   Q    And is it also your training and experience that

13   individuals who may receive some of these deposits may not

14   understand necessarily the exact origin of the funds?

04:23:10   15   A    Yes.

16   Q    So would a restaurant pose an ability to hide funds --

17   A    Yes.

18   Q    -- drug proceeds, I should say?

19   A    Yes, especially if it's a cash business.

04:23:23   20   Q    And, for the record, these deposits are June 3rd to

21   Brittany Zaragoza, $3,000; July 1st, 2016, in the amount of

22   $4,162 to the restaurant; July 5th, 2016, in the amount of $3500

23   to Rosa DeDios; July 1st, 2016, in the amount of $3500 to Luis

24   DeDios; and, again, $4700 on July 20th to Rosa DeDios; and

04:23:52   25   another, looks like, $265 to the restaurant on July 5th, and

1    another 3,000 on August 15th, 2016.

2          Is that correct?

3    A    Yes.

4    Q    And back to this specific organization, based on your

04:24:08    5    experience in investigating this organization, are individuals

6    who are part of it always paid in cash?

7    A     No.  Um, cash is very troublesome.  Um, as Mr. Cepero, I

8    believe, explained earlier today, uh, it's very difficult to,

9    uh, launder the cash, and it costs money to do that.  So a lot

04:24:31   10    of times, um, the individuals in Mexico will -- they like to pay

11    in -- in product instead of cash.

12    Q    And why is that?

13    A    Just like I said, it's difficult to launder the money, and

14    it's a lot easier to pay in product.

04:24:48   15    Q    And when you say "pay in product," what do you mean?

16    A    Uh, in narcotics.

17    Q    And so typically how would that work?

18    A    So if -- if -- for example, if -- if somebody is receiving

19    10 kilos here in the Tri-Cities, they would receive 12 instead,

04:25:09   20    and the two extra kilos would be theirs to sell for their own

21    profit.

22    Q    In this particular case, were you present during kind of

23    the last operation involving Mr. Casillas, specifically the

24    12-kilo transaction of what ended up being fentanyl?

04:25:25   25    A    Yes.

1    Q    And did you have individuals in place surveying his

2    residence prior to the transaction?

3    A    We had a surveillance camera, and I had somebody monitoring

4    the camera that morning.

04:25:35    5    Q    And did you see what you believed to be the product arrive

6    to Mr. Casillas' residence?

7    A    Yes.

8    Q    And do you know if Mr. Casillas was able to take a

9    percentage of or any product from that delivery?

04:25:49    10    A    I do not, no.

11    Q    And then that delivery was ultimately followed to the

12    Seattle area; is that correct?

13    A    Yes.

14    Q    I wanted to show you just a couple -- there's previously

04:26:08    15    been testimony that that product ended up being fentanyl.

16         Are you aware of that?

17    A    Yes.

18    Q    And at the time did law enforcement know that that was

19    going to be fentanyl?

04:26:16    20    A    No.

21    Q    Was -- were you familiar with fentanyl at that time?

22    A    I was familiar with it, but, uh, not like I am now.

23         THE COURT:  Is this where people think they're buying

24    heroin but it's fentanyl or a mixture of fentanyl and heroin?

04:26:49    25         THE WITNESS:  Yes.  So a lot of times it will be a

1   mixture.  Sometimes it will be straight fentanyl.  And

2   that's where --

3           THE COURT:  That's much more powerful.

4           THE WITNESS:  Yeah.  And that's where you saw a lot of

04:26:58  5   the overdoses.  A lot of that was going on, I want to say,

6   approximately two years ago now.  There was -- it became a major

7   problem.

8   BY MS. VAN MARTER:   (Continuing)

9   Q    I am showing you what I would like to mark as Government's

04:27:11 10   Exhibit Nos. 12 and 13; specifically, images from that seizure

11   of the fentanyl.

12          At the -- first, do you recognize this first photo?

13   A    Yes, I do, but I can't recall if it's because I actually

14   saw it or because it was sent to me via photo through e-mail,

04:27:32 15   and I think it was through e-mail.

16   Q    And this was -- was this from Seattle DEA when they seized

17   the product?

18   A    Yeah.

19   Q    And is this a capture of what the outside packaging looked

04:27:42 20   like --

21   A    Yes.

22   Q    -- on the fentanyl?

23          And is it common for individuals or for drug trafficking

24   organizations such as this to mark their product?

04:27:50 25   A    Lots of times the laboratories will mark their product.

1    Q    So there's a marking on the outside.

2         And did you receive contact from the Seattle agents when

3    they opened the product and realized that this was not heroin?

4    A    Yes.

04:28:06  5    Q    And how did they describe that?

6    A    Uh, they -- they thought that it possibly was fentanyl, um,

7    and they sent it to the lab to be tested.

8    Q    Immediately closed it up and sent it off?

9    A    That's correct.

04:28:19 10    Q    And Government's Exhibit No. 13, there's some stamping on

11   the inside of the product?

12   A    Yes.

13   Q    And do you recall if that was a devil-type stamping?

14   A    I don't recall.

04:28:31 15    Q    And, again, marking of the particular product from the

16   organization?

17   A    Yes.

18        MS. VAN MARTER:  If I could have a moment, Your Honor.

19        (Counsel conferring.)

04:28:46 20        MS. VAN MARTER:  I don't have any other questions, Your

21   Honor.

22        THE COURT:  Mr. Vieth?

23        Thank you.

24

25

1                          CROSS-EXAMINATION

2    BY MR. VIETH:

3    Q    As an expert in drug trafficking organizations, would you

4    agree that there is a hierarchy within the organization?

04:29:11    5    A    Yes.

6    Q    That there's bosses and leaders, there's managers, and then

7    ultimately you've got, you know, I guess the street folks that

8    are selling whatever it is that they're distributing?

9    A    I wouldn't say it's that clear-cut.

04:29:29    10    Q    How would you describe it, then, for the drug trafficking

11    organization that we're dealing with?

12    A    I think that what you have is you have bosses in areas that

13    are working for the organization.  That's how I would describe

14    it.  And then from there you have people that are carrying out

04:29:52    15    functions for those bosses.

16    Q    Were you here when Agent Cepero was testifying?

17    A    Yes.

18    Q    Were you here when Agent Cepero described my client as a

19    middleman?

04:30:08    20    A    Yes.

21    Q    And that the bosses were in Mexico?

22    A    Yes.

23    Q    Would you agree with the agent?

24    A    I would say that -- that the most powerful people would be

04:30:20    25    in Mexico, yes.

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                                    45
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/X/Vieth*

1    Q    And it's my understanding that you had a supervisory role

2    in this investigation.

3         Is that correct?

4    A    No, I was a supervisor of the office in Richland.

04:30:30    5    Q    Okay.  What was your involvement in this particular case?

6    A    Uh, at times I was the agent that was in charge of the

7    investigation.  Um, at other times I was the task force

8    coordinator.  Um, at -- at other times, uh, other investigators

9    had parts of the investigation.

04:30:54    10    Q    Was Agent Cepero the lead investigator on it?

11    A    He -- he was the lead investigator on the financial side of

12    it from -- from Boston.

13    Q    And so, again, I guess when he testified that my client was

14    a middleman and he took orders from the bosses, is -- is that

04:31:19    15    accurate?

16    A    He -- he took orders from people in Mexico, no doubt about

17    it.  But was he the boss here for a while?  In my opinion as an

18    expert, yes, he was.

19    Q    And when he was having to check in with his bosses about

04:31:39    20    price --

21    A    Um-hmm.

22    Q    -- it's in your opinion that he's still a boss, even though

23    he can't make that decision without another boss telling him yes

24    or no?

04:31:52    25    A    Yes.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Q    Can you explain that?

2    A    So he's in charge of this territory.

3    Q    But he can't make a decision as to price.

4    A    No, because he's new.  He's got to prove himself.

04:32:09  5    Q    So wouldn't that lessen his role to a middleman?

6    A    He's -- he's -- he's still got the same role.  He just

7    doesn't have the power because he hasn't -- he's not Ivan

8    Calvillo.  He has not built up his stature here.

9    Q    So he --

04:32:25  10   A    And -- and you have to realize that there were several

11   people that had been put into this position that had been

12   arrested rather quickly.

13   Q    As middlemen --

14   A    No, as bosses.

04:32:37  15   Q    -- or the bosses?

16   A    As bosses.

17   Q    So it's my understanding that the bosses are in Mexico.

18   It's my understanding that the drugs are coming up from Mexico.

19   And then it's my understanding that the money is owned by those

04:32:50  20   bosses in Mexico.

21        Is that accurate?

22   A    The money is -- yeah, you could --

23   Q    I'm using the agent's words.

24   A    Whether you want to say it's owned by the cartel, who in

04:33:03  25   the cartel, what -- what you want to call them, does the cartel

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    own the dope at the end of the day, does the cartel own the

2    money at the end of the day?  Yes, they do.

3    Q    And that's exactly what the agent testified to.  And I'm

4    asking you, as an expert, was he accurate in saying that, that

04:33:18    5    it's not owned by my client, it's owned by the bosses?

6    A    It's owned by the cartel.

7    Q    He described -- he said "bosses."

8    A    I will say "cartel."

9    Q    Okay.  When -- it's my understanding that surveillance on

04:33:39    10    my client's residence was extensive.

11         Is that accurate?

12    A    Yeah.

13    Q    And there was a pole camera up.

14    A    Yes, there was.

04:33:49    15    Q    And that camera shot constant video of my client's

16    residence.

17    A    Yes.

18    Q    Was there ever a hiccup in there?  Was there ever a cutoff?

19    Do you know?

04:34:00    20    A    I would have to talk to the agent that was actually the one

21    monitoring it to -- I -- I -- with technology, I would say yes.

22    Q    And so from the spring of 2015 to August of '16, is it your

23    understanding that there was constant surveillance, including a

24    pole camera, on my client's residence?

04:34:22    25    A    I can't be certain of the dates at this point, um, but

1    if -- if that's what documents say, then I would say yes.

2    Q    A little over a year.  Can we agree there?

3    A    I think that's approximately correct.

4    Q    And how many times, in your recollection, were there any

5    reported instances of drug activity at my client's house?

6    A    There was a lot of suspicious activity --

7    Q    I'm not talking about suspicion.  I'm talking about

8    knowing, confirming that there was either drugs in the house or

9    that there was money associated with drug --

10   A    So I -- I believe there were four stops done, based upon

11   what you're asking.

12   Q    So four times -- am I accurate:  Four times over the

13   year-plus that there was constant surveillance is when you can

14   pinpoint that there was either drugs or drug money in my

15   client's house?

16   A    Yes, because we actually -- we -- we did warrants and got

17   drugs --

18   Q    Okay.

19   A    -- on four occasions.

20   Q    Four times over a year.

21   A    Approximately, based on my recollection at this time.

22   Q    And did you -- is it your training and experience that when

23   those video cameras are up, that those are thoroughly reviewed

24   by FBI agents or DEA agents to make sure that if there's any

25   suspicion or anything else, that they can confirm the accuracy

1    of what they're suspicious of?

2    A    So it -- it depends.  If -- if we are coordinating with

3    somebody like Mr. Cepero and we know some things are happening,

4    the guys are going to monitor the cameras more closely.

04:36:26    5        But to say that I have somebody monitoring those cameras

6    24/7, no, that does not happen.  Um, there are weeks where we

7    get busy on other -- other investigations.

8        Do the guys try to go back and review them?  Yes.  But if

9    we go back and review them, at that point it's -- it's outdated,

04:36:46    10    and there's nothing we can do with that information because the

11    load is already gone or the activity has already happened.

12    Q    Well, I think we can all agree that, you know, nobody is

13    perfect, and some things are missed.  But for the most part, you

14    do your best and you try to catch every possible hint of

04:37:02    15    evidence that may end up supporting a search warrant or whatever

16    it is that you want to accomplish; is that right?

17    A    We try, with the limited resources we have, which means

18    that, you know, there are days where -- lots of days where it's

19    not reviewed until a week or two later.

04:37:20    20    Q    In regard to the money that was taken or being wired to my

21    client, to his friends and family, and to his wife, my total is

22    approximately $20,000 to my client.

23        Is that --

24    A    Based on your figures, I can't dispute it.

04:37:44    25    Q    Okay.  It's a little under that.  It's 19,000 and change,

1    but ...

2        And then I have approximately 35,000 additional going to

3    friends and family.

4        Does that sound --

04:37:57  5  A    I -- based on your calculations.

6    Q    Okay.  And then another 10,000 to his wife?  I think you

7    testified to two $5,000 transactions?

8    A    I believe that's --

9    Q    Or was it 15?  Fifteen.  Sorry.

04:38:09 10  A    Okay.

11   Q    So I have approximately $70,000 coming to my client, my

12   client's friends, his wife.

13   A    (Nodded.)

14   Q    Would you agree with me that that is actually less than

04:38:31 15  what the DEA was able to take from their 6 percent percentage?

16   A    I believe, based on your earlier calculations that I heard

17   in this courtroom, that is less.

18   Q    So that would have -- it's less than 6 percent from the 1.6

19   that was totaled.

04:38:59 20  A    That's correct, based on your calculations.

21   Q    And in your training and experience, when divvying up the

22   proceeds from the sale of narcotics, do bosses usually take the

23   majority of the proceeds?

24   A    Yes.

04:39:22 25       MR. VIETH:  No more questions.  Thank you.

1          THE COURT:  Any cross --

2          MS. VAN MARTER:  No, Your Honor.

3          THE COURT:  -- or redirect?

4          MR. VIETH:  No, Judge.  Thank you.

04:39:38   5          THE COURT:  Thank you.

6          Tell me, do you have any -- remind me, is this the

7    witness that was going to demonstrate or testify to the amount

8    of drugs transported from this district into Canada, 20 to

9    40 kilos?  Or has that already been done by the first witness or

04:39:50  10    second -- first witness?

11          MS. VAN MARTER:  Your Honor, I believe that that was

12    already a part of the record over time from previous testimony

13    of this witness and other witnesses, so I didn't -- I wasn't --

14          THE COURT:  When you say "other witnesses," you mean

04:40:05  15    when?

16          MR. VIETH:  During the suppression hearing process and

17    some of the documents that were admitted as exhibits during that

18    time period.

19          THE COURT:  Okay.  And the seizure that occurred in

04:40:19  20    British Columbia that was talked about, I'm trying to recall how

21    much -- I probably have his testimony here.

22          MS. VAN MARTER:  Your Honor, I believe it's in --

23          THE COURT:  They seized -- they searched the car, and

24    they found quite a bit in the car, backpacks, et cetera.

04:40:36  25          THE WITNESS:  I believe it's one kilo of heroin, ten of

1    coke.

2            MS. VAN MARTER:  Your Honor, I'll pull it up on

3    Government's Exhibit No. 1.  There's actually a number of

4    seizures that are noted on Government's Exhibit No. 1.

04:40:49   5            THE COURT:  That's in the timeline?

6            MS. VAN MARTER:  Yes, Your Honor.

7            THE COURT:  Okay.  So that would demonstrate the facts

8    supporting your position that this was the amount of drugs?

9            MS. VAN MARTER:  Yes, Your Honor.  In fact, there is --

04:40:59  10    so that -- showing right now, August 27th, 18 kilos of meth,

11    4 kilos of cocaine, and a smaller amount of heroin, handguns,

12    and cash.

13            THE COURT:  Where is that, please?

14            MS. VAN MARTER:  (Indicating.)

04:41:15  15            THE COURT:  Okay.  Thank you.

16            MS. VAN MARTER:  But that also is a matter of record in

17    the suppression hearing and all of the documents that were

18    provided during the Mr. Zambrano --

19            THE COURT:  Okay.  Thank you.

04:41:23  20            MS. VAN MARTER:  And Mr. -- or, I'm sorry, and RCMP

21    Barlow also testified to the quantity.  And then there's some

22    previous references to seizures, Your Honor, from backpackers in

23    the timeline.

24            THE COURT:  Okay.  Thank you.

04:41:47  25            MS. VAN MARTER:  Yes, Your Honor.

1    THE COURT:  I have no other questions.  Thank you.

2    You may step down.

3    MS. VAN MARTER:  I do not have any other witnesses, Your

4    Honor.

04:42:09  5    THE COURT:  Do you have witnesses?

6    MR. VIETH:  No, Your Honor.  My client does wish to make

7    a statement, though.

8    THE COURT:  Well, I'm sure he does, but we have a lot of

9    talk about.  We've got objections, discussions about your

04:42:19 10    objections to the PSIR.

11    And how would you like to proceed?  Because we're not

12    going to have enough time to get all of this done.  And I say

13    that -- I mean, I'm happy to spend a half an hour, but that's --

14    that's all I'm going to spend.

04:42:33 15    So the question is how do you want to handle this?

16    You've got people from Spokane and Idaho; you do, Mr. Vieth, you

17    and your colleagues.

18    So how do you want to handle this?

19    MR. VIETH:  Judge, I think we're going to have to

04:42:46 20    continue it, unfortunately.  And --

21    THE COURT:  Well, when would you like to conclude?

22    MR. VIETH:  I think we conclude now, and then we save

23    our argument for what was contained in the PSR for that time.  I

24    don't think we can get all that in in --

04:43:02 25    THE COURT:  I don't think we can either.  I think it's

1   going to take us an hour minimally.

2          MR. VIETH:  At least.

3          THE COURT:  So how do you want to handle this?  I think

4   we continue it, but the question is to when.

04:43:13  5          MS. VAN MARTER:  Your Honor, I am here tomorrow.

6          MR. VIETH:  I can be, Judge.

7          THE COURT:  I think what I'm doing is trying to organize

8   my day so that I have -- are you here on my afternoon docket?

9          MS. VAN MARTER:  And I'm also here in the morning, Your

04:43:29  10  Honor.

11         THE COURT:  Okay.  Well, I think I have an afternoon

12  docket, and the problem is that I have colleagues in Yakima who

13  have matters in the morning, and our interpreter is scheduled to

14  be there for them, and I haven't checked with them to see if

04:43:45  15  they can move their hearings an hour or two to get ours in first

16  so that our out-of-town people can get home.  And I'll make an

17  inquiry, but -- I know Judge Bastian has a docket tomorrow, and

18  so my interpreter, the court interpreter is scheduled to be

19  there, and I don't know what -- about our second interpreter

04:44:09  20  either, whether she's available tomorrow.

21         MR. VIETH:  And, Judge, I do have a meeting at the U.S.

22  Attorney's Office in the District of Idaho at 8:30 in the

23  morning.  I anticipate that taking an hour, so I can be here at

24  12:30 or 1:00 tomorrow.

04:44:23  25         THE COURT:  That's good with me.

1          Ms. Vargas?

2          THE COURTROOM DEPUTY:  We could do 12:45 -- I'm sorry,

3     2:45.

4          THE COURT:  2:45?

04:44:36  5          THE COURTROOM DEPUTY:  Yes.

6          THE COURT:  Well, then my Yakima colleagues, their

7     docket should be completed by then, right?

8          THE COURTROOM DEPUTY:  Yes, and Ms. Hickey can be here

9     in the afternoon at that time.

04:44:45 10          THE COURT:  Okay.  Well, then I think we'll do it at

11    2:45.

12          MS. VAN MARTER:  That's fine for the United States, Your

13    Honor.

14          THE COURT:  Is that okay?

04:44:51 15          MS. VAN MARTER:  Yes, Your Honor.

16          THE COURT:  So you can have a good night tomorrow and

17    then enjoy the ride back tomorrow.

18          MR. VIETH:  And my wife is on call, Judge.  It's

19    awesome.

04:44:59 20          THE COURT:  Okay.  Well, always a pleasure to meet with

21    you folks, and we'll have that pleasure again tomorrow afternoon

22    at 2:45.

23          Can you be here as well?

24          THE INTERPRETER:  I cannot, Your Honor.  I am scheduled

04:45:10 25    in Portland.

1     THE COURT:  Okay.  Well, I don't know how we want to

2   handle that, but we'll do the best we can.  We may have to go

3   with one interpreter for that hour or hour and a half.  So ...

4     THE COURTROOM DEPUTY:  I already cleared that with

04:45:24   5   Ms. Hickey.  She just will need a break.

6     THE COURT:  Sure.  We'll take a break.

7     Anything else that we need to do for the good of the

8   order before we take a recess?

9     MS. VAN MARTER:  No, Your Honor.  I just want to -- I

04:45:38  10   think, for the record, all of the Government's exhibits have

11   been admitted.  If not, we would so move to admit any ones for

12   the record that were not.

13     THE COURT:  They would be what numbers, what?  One

14   through ...

04:45:49  15     MS. VAN MARTER:  1, 2, and 3 -- there was no

16   Exhibit 4 -- 5 through 13.

17     THE COURT:  Mr. Vieth?

18     MR. VIETH:  No objection to those, Judge.

19     THE COURT:  Admitted.

04:45:56  20   (Government Exhibit No. 12 admitted into evidence.)

21   (Government Exhibit No. 13 admitted into evidence.)

22     THE COURT:  No more testimony, so we'll hear from you,

23   then we'll hear from -- Ms. Coronado, are you on this file.

24     THE PROBATION OFFICER:  I am, Your Honor.

04:46:03  25     THE COURT:  We'll hear from her as well.  I believe that

1    completes matters for today.  I appreciate all of your

2    cooperation.  Thank you for being here, and we'll resume

3    tomorrow at 2:45.

4           All right, folks, have a good night.

04:46:17  5           THE COURTROOM DEPUTY:  Please rise.

6           THE COURT:  You may go about your business.

7        (Hearing adjourned at 4:46 p.m.)

8    (End of excerpt; additional proceedings were reported the

9    following day, but not requested to be transcribed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1               C E R T I F I C A T E

2

3       I, KIMBERLY J. ALLEN, do hereby certify:

4           That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7           That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9           That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12          I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15          DATED this 14th day of January, 2019.

16

17

18

19  _____

20  Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
    Washington CCR No. 2758
21  Official Court Reporter
    Richland, Washington
22

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER