1

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No. 4:15-CR-6049-EFS-2
3                                )
                    Plaintiff,   ) December 11, 2018
4                                )
v.                               ) Richland, Washington
5                                ) Sentencing Hearing
JESE DAVID CARILLO CASILLAS,     ) Day 1
6                                )
                    Defendant.   ) Pages 1 to 164
7    _____

8
            BEFORE THE HONORABLE EDWARD F. SHEA
9       SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                    APPEARANCES:
11

For the Plaintiff:          Stephanie A. Van Marter
12                          Stephanie.Van Marter@usdoj.gov
                            Caitlin Baunsgard
13                          US Attorney's Office-SPO
                            920 W Riverside, Suite 300
14                          P.O. Box 1494
                            Spokane, WA 99210
15                          509-353-2767

16   For the Defendant Carillo   Nicolas V. Vieth
     Casillas:                   Nick@viethlaw.com
17                               Vieth Law Offices
                                 505 West Riverside
18                               Suite 200
                                 Spokane, WA 99201
19                               208-664-9448

20

21   Official Court Reporter:    Kimberly J. Allen, CCR #2758
                                 United States District Courthouse
22                               P.O. Box 685
                                 Richland, Washington 99352
23                               (509) 943-8175

24   Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
25

2

1                            **INDEX**

2

3                         **WITNESS INDEX**

4
**Plaintiff Witness:**                                    **Page**

5

6

7   **SCOTT BARLOW**
        Direct Examination By Ms. Van Marter      111
        Cross-Examination By Mr. Vieth            122
8       Redirect Examination By Ms. Van Marter    123

9   **JAIME CEPERO, JR.,**
        Direct Examination By Ms. Van Marter      9
10      Continued Direct Examination of Jaime     31
        Cepero By Ms. Van Marter
11      Cross-Examination By Mr. Vieth            83
        Redirect Examination By Ms. Van Marter    94
12      Recross-Examination By Mr. Vieth          103

13  **WILLIAM LEAHY**
        Direct Examination By Ms. Van Marter      125
14      Cross-Examination By Mr. Vieth            150

15                          *****

16  **Defense Witnesses:**                                **Page**

17

18      None

19

20

21

22

23

24

25

1

## EXHIBITS ADMITTED

2

3

| Plaintiff Number | Description | Page |
|---|---|---|
| 1 (also referred to as Attachment A) | Summary Timeline of events relating to investigation | 23 |
| 2 (also referred to as Attachment D) | E-mail from Defendant to Jaime Cepero dated 26th | 40 |
| 5 (also referred to as Attachment E) | Video clip of meeting at coffee shop areas of Westin hotel in Seattle on November 7, 2015 | 46 |
| 6 | Transcript of November 7, 2015 meeting referenced in Exhibit 5 | 48 |
| 7 | Screen-shot from inside of hotel room on November 7, 2015 | 51 |
| 8 | Screen-shot from inside hotel room on November 7, 2015 | 51 |
| 9 | Screenshot from surveillance of meeting with Ivan's ex-wife and child on January 29, 2016 | 61 |
| 10 | Transcript from January 29, 2016 meeting | 62 |
| 11 | Incident Report and receipt of cash re: Seizure | 72 |
| 1-3, 5-11 | Offered and admitted formally | 83 |
| 12 | Image from fentanyl seizure | 163 |
| 13 | Image from fentanyl seizure | 163 |

| Defense Number | Description | Page |
|---|---|---|

23

24

25

4

**<u>GENERAL INDEX</u>**

**<u>Page</u>**

Reporter's Certificate.............................164

1    (December 11, 2018; 11:31 a.m.)

2         THE COURTROOM DEPUTY:  Please rise.

3         (Call to Order of the Court.)

4         THE COURT:  Good morning to you all.

11:31:17  5         Please be seated.

6         THE COURTROOM DEPUTY:  Matter before the Court is United

7    States of America v. Jese David Carillo Casillas, Cause

8    No. 4:15-CR-6049-EFS, Defendant No. 2.  Time set for sentencing.

9         Counsel, please state your presence for the record.

11:31:33 10         MR. VIETH:  Stephanie Van Marter, Caitlin Baunsgard, and

11   also our case agent, Joe Brazeau, are at counsel table.  Good

12   morning.

13         THE COURT:  Good morning.

14         MR. VIETH:  Good morning, Your Honor.  Nick Vieth for

11:31:45 15   Mr. Jese Casillas.  Also with me is Mr. Al Barrett.

16         THE COURT:  Okay.  Thank you.

17         Mr. Casillas Carillo; welcome to you all.  And,

18   Mr. Barrett, good to see you again.

19         MR. BARRETT:  Thank you.

11:31:57 20         THE COURT:  You may start.

21         MS. VAN MARTER:  Your Honor --

22         THE COURT:  Just outline your day for me, will you?

23         MS. VAN MARTER:  I was just going to say, some

24   housekeeping matters.  The United States has provided to the

11:32:04 25   Court a number of exhibits.  It is not our intention to play

1   every one and go through every one in detail.  It is our

2   intention to present a few witnesses, to go over parts of some

3   of those transcripts and recordings for the Court, so that we

4   can try and get through this as efficiently as possible.

11:32:21   5        Right now we would like to call Jaime Cepero, as well as

6   Scott Barlow with RCMP; and if there's any remaining issues,

7   then we would call Bill Leahy.

8        THE COURT:  Okay.  Well, it's 12:32 [sic] at this time.

9        Can you lower the volume, Ms. Vargas, in some fashion?

11:32:38  10   Thanks.

11        We may get it so low that we can't hear each other, but

12   at least we're trying so -- that seems a little bit better for

13   me.

14        MS. VAN MARTER:  Is it a little bit -- not quite so

11:32:48  15   loud?

16        THE COURT:  Yeah.

17        Okay.  Well, I need to know, Mr. Vieth, what is your

18   sense of the day?

19        MR. VIETH:  It's largely in the hands of the Government,

11:32:55  20   Your Honor.  I think, after speaking with the Government,

21   hopefully we can keep this pretty consolidated.  That was my

22   early request, because I know the Court already has all of these

23   exhibits.

24        THE COURT:  Well, now, having the exhibits is one thing.

11:33:08  25   Making findings of fact that support certain rulings is another.

1   And so I'm not using exhibits to fill in what you don't do,

2   unless you tell me that.  So if it's in evidence as an exhibit,

3   and there are only portions you want me to consider in order to

4   establish findings of facts and conclusions of law, then you

11:33:30   5   need to tell me what those are.  I'm not making the assumption,

6   just for all of our benefit, that I'm going through each of the

7   CDs and culling those for evidence to support your respective

8   positions.

9        MR. VIETH:  And that's my understanding, after speaking

11:33:46   10   with the Government, what they are going to be doing.

11        THE COURT:  Is identifying those things that you think

12   are supportive?

13        MS. VAN MARTER:  Yes, Your Honor.

14        THE COURT:  And you can contest those as you wish or

11:33:55   15   agree to them as you wish.

16        MR. VIETH:  Yes.

17        THE COURT:  So what kind of time are you looking at?

18   Because it's 12:35.  We'll take a break at noon.  Tell me what

19   you're thinking of.

11:34:06   20        MS. VAN MARTER:  Your Honor, I was -- I know the Court

21   had previously provided approximately two and a half hours for

22   the purpose of sentencing.  It's my intention to keep it as

23   close to that as possible.

24        THE COURT:  Okay.

11:34:15   25        MS. VAN MARTER:  It's likely going to go over by about

1    30 minutes or so.  But that's the intention.

2         THE COURT:  So, Mr. Vieth, is that what you understand

3    the schedule to be?

4         MR. VIETH:  It is now, Your Honor.  The only thing that

11:34:27  5    I have, Judge, is that my client did submit a -- it's about a

6    five- or six-page letter, and I just would request that the

7    Court can review that in chambers at its leisure, if it

8    hasn't -- if you haven't already done so.

9         THE COURT:  Well, I think he sent it to me, didn't he?

11:34:48 10        MR. VIETH:  He did, yes.

11        THE COURT:  And then I thought I sent it to you.

12        MR. VIETH:  You did, Judge.

13        THE COURT:  Okay.  Well, then I've already reviewed it.

14        MR. VIETH:  Exactly, Judge.  And I just wanted to make

11:34:56 15    that clear for my client, because he was very concerned, and

16    make sure that you did have an opportunity --

17        THE COURT:  No, I read it twice.

18        MR. VIETH:  Thank you, Judge.

19        THE COURT:  Thank you.

11:35:02 20        Okay.  Let's get started then, if you're ready.  Okay?

21    Let's get started.  First witness?

22        MS. VAN MARTER:  The United States would call Jaime

23    Cepero, please.

24        THE COURT:  Okay.

11:35:12 25        (Witness approached.)

1        THE COURT:  If you'll come forward, please, to your

2    right and to my left.

3        THE WITNESS:  Good morning, Your Honor.

4

11:35:25  5                    JAIME CEPERO, JR.,

6     called as a witness on behalf of the Plaintiff, having first

7        sworn or affirmed, testified under oath as follows:

8        THE WITNESS:  I do.

9        THE COURT:  Good morning.

11:35:33  10        Please be seated.  Make sure the green light is on on

11   your microphone, and speaking directly into the microphone, tell

12   us your first and last name, please, and then spell them both

13   for the record.

14        THE WITNESS:  Yes.  My name is Jaime Cepero, and that's

11:35:45  15   J-A-I-M-E, C-E-P-E-R-O.  I'm a junior, and I'm a trooper with

16   the Massachusetts State Police.

17        THE COURT:  Well, welcome.  Go ahead.

18

19                    DIRECT EXAMINATION

11:35:55  20   BY MS. VAN MARTER:

21   Q    Good morning.

22        How long have you been with the Massachusetts State Police?

23   A    Thirty-five years, ma'am.

24   Q    And what is your current assignment?

11:36:03  25   A    I'm currently assigned to the DEA Financial Investigations

1    Team in Boston as a task force officer.

2    Q    And how long have you been with the Financial

3    Investigations Team?

4    A    I've been a task force officer since, uh, 2000 -- since

11:36:18    5    2000, so about 18 years.

6    Q    And what are your primary duties and responsibilities on

7    the task force?

8    A    It's the investigation of money laundering organizations,

9    both domestic and international, but my primary duties are

11:36:31    10    undercover activities.

11    Q    And when you say "undercover activities," what do you mean?

12    A    I portray myself as either a money launderer or a drug

13    trafficker, and I engage actual money launderers or drug

14    traffickers in the act of money laundering and/or negotiating

11:36:46    15    for trafficking deals.

16    Q    And, just briefly, what type of training have you received

17    specific to undercover operations?

18    A    I received training from the Massachusetts State Police

19    upon induction as a trooper with regards to basic narcotics

11:36:59    20    investigations and narcotics identification.  Throughout my

21    career, I've attended numerous other training sessions, both

22    provided by the Massachusetts State Police, the Drug Enforcement

23    Administration, the Customs and Border Protection organization,

24    and other organizations dedicated to narcotics enforcement.

11:37:18    25    Q    And do your duties also take you overseas?

1    A    Yes, they do, ma'am.

2    Q    And are you fluent in any languages?

3    A    Yes, in Spanish.  That's my native tongue.

4    Q    And is that the primary language that you utilize while

11:37:31   5    undercover?

6    A    Yes.

7    Q    I'm going to ask you some specific questions about a

8    particular organization that you participated in the

9    investigation, and we refer to it here in this district as the

11:37:42   10   Ivan Calvillo drug trafficking organization.

11        Are you familiar with that individual?

12   A    I have become familiar with him, yes.

13        THE COURT:  Before going any further, just for counsel,

14   all findings of facts in this case are by a preponderance of the

11:37:53   15   evidence, correct?

16        MS. VAN MARTER:  Correct, Your Honor.

17        THE COURT:  Mr. Vieth?

18        MR. VIETH:  Yes, Judge.

19        THE COURT:  Okay.  Go ahead.

11:38:00   20   BY MS. VAN MARTER:  (Continuing)

21   Q    And how did you know or what name did you know Ivan

22   Calvillo by?

23   A    I know him as Cholo, *compadre*, and also as Ivan.

24   Q    And how did you come to be in contact with Ivan?

11:38:13   25   A    It began through a money laundering operation we were doing

1    in Toronto, Canada, in which, after the money was -- was moved

2    in an undercover capacity, I was contacted by members of his

3    organization and, ultimately, him personally.

4    Q    So when you refer to that Toronto movement of money, was

11:38:33  5    there a particular issue with that that brought you into contact

6    with Ivan?

7    A    Um, after I had received the disbursement request, uh,

8    all -- all the disbursements were made, and I was contacted by

9    one of his, uh, workers out of Vancouver telling me that, uh,

11:38:53  10    the money had not been paid to him.

11    Q    And what worker was that?  Did you know a name?

12    A    Uh, last name Duque [sic].

13    Q    First name of Jorge?

14    A    Yes.

11:39:02  15    Q    And when you say --

16         THE COURT:  What was his last name?

17         THE WITNESS:  Duque.

18         THE COURT:  L-U-Q-U-E?

19         THE WITNESS:  D-U-Q-U-E, I believe.

11:39:11  20    BY MS. VAN MARTER:  (Continuing)

21    Q    De Luque?

22    A    De Luque.

23    Q    And when you say "disbursements" and things like that, for

24    the record, what are you talking about?

11:39:18  25    A    Wire transfers.

1   Q    And so when you receive a request, so -- in other words,

2   the organization has a specific amount of money that they need

3   to drop to you.

4        Is that correct?

11:39:26   5   A    Yes, is -- they referred to as a contract.  Normally I

6   would be dealing with brokers in Columbia, and they would offer

7   us contracts for -- for drug proceeds that are in various

8   locations.  We would arrange for the pickup of those -- those

9   drug proceeds, and then once the -- they were in our possession,

11:39:44   10   in our undercover accounts, we would receive instructions from

11   the brokers or from the targets or the subjects of the

12   investigation to forward that money to other accounts that

13   facilitated the movement of --

14        THE COURT:  When you initiated contact, tell me, what

11:39:59   15   was your front?  What was your cover?  How did you present

16   yourself?  As a person that did or had connections or --

17        THE WITNESS:  Mostly as a facilitator.  Uh, by that I

18   mean someone who's had business ties or had accounts which can

19   receive the money, put it into the system, and then move it

11:40:18   20   according to the request of the subject that I was dealing with.

21        THE COURT:  And what were you getting for a fee?

22        THE WITNESS:  We would would charge a fee, depending on

23   the location.  Uh, that fee, under the Attorney General's exempt

24   program could be used to further the case.

11:40:35   25        THE COURT:  Sure.

1    BY MS. VAN MARTER:    (Continuing)

2    Q    And so -- and we are going to get into some of these

3    details, but those fees, would those fees change depending on

4    where the money was picked up?

11:40:44  5    A    They would change depending on where the location that we

6    were asked to pick up the money, and sometimes depending on our

7    negotiations with the -- with the person that was making the

8    request.

9    Q    So, in general, if you received a contract to pick up money

11:40:57  10    in Canada, what type of fee would you negotiate and/or charge

11    the organization?

12    A    In that time period we're charging around 6 percent.

13    Q    If the money were to be picked up in the United States,

14    what fee would you charge the organization?

11:41:08  15    A    In that time period we were charging 4 percent.

16    Q    Okay.  So in this particular instance, there was a contract

17    that occurred up in Toronto.  You received the monies or the

18    money drop in Toronto; is that correct?

19    A    Yes, ma'am.

11:41:20  20    Q    And then you received the disbursement requests; is that

21    correct?

22    A    Yes, ma'am.

23    Q    And there was some issue with one of the disbursements, and

24    you received contact by Mr. De Luque?

11:41:29  25    A    Yes.

1    Q    And he was out of Vancouver?

2    A    Yes.

3    Q    And what happened next?

4    A    Uh, after that contact, uh, I -- I told Mr. De Luque that

11:41:41   5    if his -- because he was telling me his boss was reporting that

6    to him.  I told him if he had his boss call me, I'll try to

7    straighten it out.  And that's how I came into contact with

8    Mr. Ivan Hernandez.

9    Q    How did you communicate then with Ivan?

11:41:58  10    A    We would communicate, uh, through BBM, WhatsApp, and

11    sometimes phone calls, as well as voice, uh, calls using the

12    WhatsApp program.

13    Q    And --

14         THE COURT:  Excuse me.  What is a BBM?

11:42:14  15         THE WITNESS:  Blackberry Messenger.

16    BY MS. VAN MARTER:   (Continuing)

17    Q    And when Ivan contacted you, did he explain to you what his

18    role was with respect to that money disbursement?

19    A    He told me he was the owner of the money, and the -- the

11:42:26  20    money hadn't been paid to him --

21    Q    And do you recall --

22    A    -- and he was trying to find out what happened.

23    Q    I apologize.

24         Do you recall approximately how much that money drop was

11:42:34  25    originally, in Toronto?

1    A    I think it was around 260 to 300,000; something in that

2    range.

3    Q    And after that first contact, then, with Ivan, did you

4    remain in communication with him?

11:42:47  5    A    Yes.

6    Q    Did he reach back out to you for the purpose of additional

7    contracts?

8    A    Yes, he did.

9    Q    And what was the nature of those conversations?

11:42:55  10   A    Uh, he would ask me to, uh -- uh, pick up money in

11   different parts, both in -- in Vancouver, Toronto, in other

12   parts of the United States.  And at one time he even asked me

13   about picking up money in Australia and in Japan.

14   Q    And who did Ivan think you were, by name?

11:43:13  15   A    He thought I was El Negro; that was the moniker that I was

16   going by.  And he was assuming that I was someone that he knew

17   or he wanted to work with.

18        THE COURT:  So when I see references in transcripts of

19   "Negro," was that you?

11:43:27  20        THE WITNESS:  That was -- that was my moniker.

21        THE COURT:  That was your moniker.  Okay.  Thank you.

22   BY MS. VAN MARTER:  (Continuing)

23   Q    And based upon your communications, then, with Ivan, what

24   was the business arrangements that you came to him regarding the

11:43:38  25   money contracts?

1    A    Um, the same arrangements with regards that I could do

2    these -- these pickups for a percentage of -- that would range

3    depending on the location, as -- as previously testified.  And

4    also, uh, that I needed him to provide accounts; that I could

11:43:55    5    not do the full payout, being paying him in Mexico where he --

6    he wanted the money to go to.

7    Q    And during these conversations, what did you understand the

8    source of funds to be?

9    A    Uh, narcotic trafficking.

11:44:07    10          THE COURT:  What was your understanding based on?

11          THE WITNESS:  Uh, we ended up negotiating for heroin,

12    uh, purchases and ...

13    BY MS. VAN MARTER:  (Continuing)

14    Q    Were there -- during your communications -- and there were

11:44:20    15    a number of communications between yourself and Ivan; is that

16    correct?

17    A    Yes.

18    Q    Because they began in approximately April of 2014; is that

19    correct?

11:44:28    20    A    That's correct, ma'am.

21    Q    And they continued with him directly up until the time of

22    his death?

23    A    Yes, ma'am.

24    Q    And during these communications, was there a time or often

11:44:37    25    a time to renegotiate or to discuss drug transactions with you?

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    18
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    A    Yes.

2    Q    And what was the nature of that kind of ongoing

3    conversation with Ivan?

4    A    It began with regards to meals or having clients for the

11:44:52    5    drugs in the locations that I worked, and it ended up with, uh,

6    negotiating for the delivery of a sample of heroin in Vancouver.

7    This was being done with the -- under the authority and

8    cooperation of the RCMP.  So that's how we got into the actual

9    drug trafficking transactions.

11:45:10    10    Q    Okay.  And I know we're going to get into that in detail.

11    I want to ask a couple other foundation questions.

12         There was a lot of discussion throughout the investigation

13    about the use of a code system or a piece of currency to ensure

14    that the drug -- or that the cash drop would occur

11:45:27    15    appropriately.

16    A    Yes, ma'am.

17    Q    And could you please explain to the Court what that was.

18    A    We would use what they would refer to as a token or that's

19    a number to exchange.  What it basically was was either a

11:45:38    20    photograph of a dollar bill, which the person that was going to

21    receive the money would provide to the person holding the money

22    to show that he is the correct person to receive those drug

23    proceeds.  That dollar would then transfer to the person that

24    delivers the money, and it would serve as his receipt to the

11:45:57    25    person he's responsible to, to show that he provided the money

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    to the correct person.

2    Q    So in your money drops, specifically first with Ivan, how

3    did they work, then, between you and Ivan and the exchange of --

4    confirmation of the token?

11:46:12  5    A    Uh, whenever he would request me to do a money pickup, I

6    would provide him a contact number.  That would be a contact

7    number to an undercover officer in the location that, uh, the

8    drop was going to be made, and also I would provide him a

9    photograph of a dollar bill or a Canadian $5 bill, whichever --

11:46:31 10    wherever it was being done.  And then that -- then Mr. Ivan

11    would then forward that information to the person holding the

12    money to make contact and then eventually do the transfer.

13    Q    And did this same process later apply when you were doing

14    money drops with Jese Casillas?

11:46:51 15    A    Yes, ma'am.

16    Q    Did you come -- during this time period you said that you

17    involved the RCMP.

18         Is that correct?

19    A    Yes, ma'am.  We were working with the RCMP in Canada and

11:47:00 20    with Mexican authorities on -- on the southern end of the

21    investigation.

22    Q    And you also mentioned that Ivan wanted to do drops in

23    other countries; is that correct?

24    A    Yes, ma'am.

11:47:10 25    Q    And what other countries?

1    A    Australia and Japan.

2    Q    And did you also work with law enforcement in those areas

3    as well?

4    A    In Australia we did a successful pickup; in Japan there

11:47:20  5    were issues so we did not complete that pickup.

6    Q    And during this time period, did you come to learn of an

7    open or active investigation here in the Eastern District of

8    Washington?

9    A    Yes, ma'am.

11:47:29  10    Q    And do you recall how it is that you learned of that

11    investigation?

12    A    I believe it was through deconflicting of numbers and

13    information that we had gathered in the case.

14    Q    During these conversations, then, with Ivan, these ongoing

11:47:42  15    conversations, did he discuss with you having other means of

16    laundering money for his organization as well?

17    A    Yes.  He had told me that -- at one time we entered into

18    discussions with regards to he thought that my fee was too high,

19    and, uh, and in those discussions he told me that he would also

11:47:57  20    use Chinese nationals to move his money, and they were charging

21    much less amounts in order to pay out in Mexico.

22         Um, so at that point we agreed that, you know, if that's

23    cheaper for him, it's good for you, but I'm here available to

24    service anything else you need with regards to local -- local,

11:48:17  25    uh, laundering activities, which he agreed to.

1      THE COURT:  He ceased or he continued?

2      THE WITNESS:  He continued.  But the volume of the

3   amount of money he was giving me was much lower than before

4   because he was saying that he could get that done for cheaper.

11:48:32   5      THE COURT:  Okay.  What kind of money are we talking

6   about that you and he were -- what numbers are we talking about?

7      THE WITNESS:  Originally we were doing anywhere from

8   300,000 and around that.  He spoke of larger amounts, but

9   when -- when he -- we went into this -- basically I became his

11:48:51  10   private banker, that he would give me smaller amounts, and then

11   he would have me distribute those amounts to people and

12   locations throughout the United States, which it was my

13   understanding were people that were associated with him.

14      THE COURT:  So these aren't tens of thousands of dollars

11:49:09  15   or were they -- did they appear to be individual -- individual

16   amounts?

17      THE WITNESS:  The pickups normally were between 70 to

18   100,000, and they were being disbursed to private individuals

19   and also transportation companies, some of which we later found

11:49:25  20   out were involved in transporting of drugs also.

21      THE COURT:  Thank you.

22   BY MS. VAN MARTER:  (Continuing)

23   Q    And during this time when you were disbursing or receiving

24   instructions on where to disburse some of these smaller amounts,

11:49:37  25   what did you understand those payments were going towards?

1    A    Again, my understanding is it was going to payment of

2    people that were associated with him.  The transportation

3    companies were easy to understand, their associations, since

4    they were transport companies.  In one occasion we located one

11:49:50  5    of the transport companies that we sent money to, we actually --

6    seizures were made from that transportation company with drugs

7    in -- in the trucks.

8    Q    And are you familiar, at least, with the term of

9    "overhead," given in the business that you assist with, money

11:50:06  10    laundering for drug trafficking organizations?

11    A    Yes, ma'am.

12    Q    And what types of overhead do they have?

13    A    Again, workers, people who do -- or act in different

14    capacities within the organization.  And it was my understanding

11:50:18  15    that that's what I was doing; I was paying people that were

16    associated to his organization.

17    Q    And did that also draw you to the Eastern District of

18    Washington in terms of some of the disbursements being directed

19    by Ivan?

11:50:29  20    A    Yes, ma'am.

21    Q    Were there several disbursements here in the Eastern

22    District of Washington to individuals as well as businesses?

23    A    Yes, ma'am.

24    Q    And did you later learn that Ivan had lived here in the

11:50:38  25    Eastern District for a period of time?

1    A    Yes, ma'am.

2    Q    Have you had the opportunity to review what has been marked

3    as Government's Attachment A and previously provided to the

4    Court and counsel, which is a summary timeline of the events

11:50:55  5    relating to this investigation?

6    A    Yes, I reviewed that with you yesterday.

7    Q    And do those events also include these wire -- or these

8    cash pickups that you were a party to with Ivan and then later

9    Mr. Casillas?

11:51:06  10    A    Yes, ma'am.

11    Q    And do those accurately summarize the number of cash money

12    pickups that you orchestrated with Ivan and Mr. Casillas?

13    A    Yes, ma'am.

14    Q    As well as the quantity or the number of -- the amount of

11:51:17  15    cash?  Excuse me.

16    A    Yes, ma'am.

17        MS. VAN MARTER:  Your Honor, I would move to admit

18    Attachment A, which I don't believe counsel has an objection to,

19    for the Court's reference in summary of the time period of the

11:51:26  20    investigation and events.

21        MR. VIETH:  That's correct, Judge.  No objection.

22        THE COURT:  Okay.  Admitted.

23        (Government Exhibit No. 1 (also referred to as Attachment

24    A) admitted into evidence.)

25

1    BY MS. VAN MARTER:   (Continuing)

2    Q     Okay.  Showing for you on screen is part of that timeline

3    that we've just admitted, Government's Attachment A.  I want to

4    just refer to, first, these first windows beginning in October

5    of 2014, and there's boxes there referencing Jorge De Vincente

6    Luque and two cash money drops in October of 2014.

7          Are you seeing that?

8    A     Yes, ma'am.

9    Q     Okay.  And are those reflective of the two -- first two

10   cash money drops that occurred in the Vancouver area at the

11   direction of Ivan?

12   A     Yes, ma'am.

13   Q     And is that the same individual that you previously

14   testified to that had first reached out to you before you first

15   began communication with Ivan?

16   A     Yes, ma'am.

17   Q     Okay.

18         THE COURT:  At any time that counsel asks you, you

19   can -- you can mark on the screen with your finger.

20         THE WITNESS:  Yes, ma'am -- sorry, Your Honor.

21   BY MS. VAN MARTER:   (Continuing)

22   Q     And I've just scrolled over to the right.  There are two

23   additional boxes:  November 20th of 2014, a cash money pickup in

24   the amount of 55,376.

25         Do you see that?

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    25
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    A    November 20th, yes.

2    Q    Okay.  And then another one, December 2nd of 2014 in the

3    amount of 76,042?

4    A    Yes, ma'am.

11:53:17  5    Q    Is this the time period that you were referring to that the

6    amounts lessened, based upon the fee?

7    A    Yes, ma'am.

8    Q    Okay.  I want to ask you some specific questions about this

9    April 2015 and April 22nd, 2015, cash money drops referenced.

11:53:43  10    Do you see those on the screen?

11    A    Yes, ma'am.

12    Q    And what was the amount for the April 15th, 2015, cash

13    money drop?

14    A    Uh, 100,140 Canadian.

11:53:55  15    THE COURT:  Hang on a second.  I'm trying to follow you.

16    You're on which date?  Just point to the screen.

17    MS. VAN MARTER:  The green arrow should be at the two

18    boxes, Your Honor.

19    THE COURT:  Not on my screen.

11:54:10  20    Where is it relative to the April 30th, 2015, box?

21    MS. VAN MARTER:  Just to the left.  There's an

22    April 15th and then --

23    THE COURT:  That's fine.  I'm there now.

24    BY MS. VAN MARTER:  (Continuing)

11:54:22  25    Q    And how much was, then, the April 22nd, 2015, cash money

1    drop?

2    A    Uh, $163,608.

3    Q    Okay.

4         THE COURT:  When we're using these numbers, does it

11:54:38   5    matter whether we're talking Canadian or U.S.?

6         MS. VAN MARTER:  I believe he specified earlier that it

7    was Canadian currency.

8    BY MS. VAN MARTER:   (Continuing)

9    Q    Were those both in Canadian currency?

11:54:48  10    A    I believe, ma'am, that the amount that you have on the

11    second one is in U.S. currency, because we did not receive cents

12    in the -- in the drops.

13    Q    Okay.  And have you -- just by way of example for the

14    Court, have you had the chance to review your BBM and WhatsApp

11:55:08  15    communication with Ivan regarding those two money drops?

16    A    Uh, yes, ma'am.

17    Q    And during these communications, then, with Ivan, would you

18    also work out the exchange rate?

19    A    The exchange rate was already set.  Uh, basically the

11:55:27  20    agreement was that, uh, we would charge 6 percent, and that

21    the -- the rate of exchange will be determined at the time that

22    the -- the money was deposited, and it would be the actual

23    exchange rate, the official exchange rate of the day.

24    Q    Okay.  I'm going to show you what has been provided as part

11:55:48  25    of Attachment D, which is a WhatsApp communication from this

1    transaction, which was labeled as Transaction No. 56.

2         Do you recognize what is showing on the screen regarding

3    Transaction No. 56 with respect to communication between

4    yourself and Ivan?

11:56:17  5    A    Yes.  It's a portion of the communication that, uh, I -- I

6    made a screen recording of.  Uh, on the top left-hand corner I

7    would -- I would label, uh, the name and the last numbers of the

8    number associated with this WhatsApp account.  And this one says

9    Ivan 41315, and then what you would see, Your Honor, is the

11:56:42  10   actual conversation as it came into my -- to the WhatsApp, and

11   it was recorded on my phone.

12   Q    Okay.  And specific as to that April 22nd transaction, is

13   there an accounting as noted -- my cursor is going around it --

14   from the April -- noted and dated on April 23rd of a conversion

11:57:06  15   that you began to do with Ivan as to the amount of money that

16   would be dropped and how it would be exchanged?

17   A    Yes, ma'am.

18        THE WITNESS:  This would be, Your Honor, like an

19   approximation, because, again, the only way we would know

11:57:18  20   exactly what the actual transaction -- transaction would --

21   would -- exchange would be would be after the deposit and it's

22   applied for the day.

23        But in these negotiations, what I would do is I would

24   screen-shot.  This is an app, E-X --

11:57:35  25        THE COURT:  It's converted into various currencies?

1    THE WITNESS:  Correct.  So he could see if what we

2 received was 240 -- 200,040 Canadian dollars, uh, what the --

3 the approximate conversion would be, so he would have an idea.

4 BY MS. VAN MARTER:   (Continuing)

11:57:52  5 Q    And so as it's reflected in the April 22nd, then, as you

6 testified, that 163,608, that was actually the converted

7 American, or U.S. currency amount?

8 A    That's correct, ma'am.

9 Q    And the actual amount that was supposed to be, then,

11:58:06 10 provided in Canada was 200,040, correct?

11 A    Correct.

12 Q    And just by way of example, again, to show the Court what

13 these WhatsApp communications were like, I will -- so this was

14 continuing to scroll and capture the conversation between you

11:58:22 15 and Ivan regarding those money drops; is that correct?

16 A    Yes.

17 Q    And later on, as the conversation continued, then, did he

18 provide you disbursement instructions?

19 A    Yes.  So as you can see, these are some of the disbursement

11:58:32 20 instructions that he would provide.  He would either provide

21 them in written form with the WhatsApp application or would take

22 pictures of documents showing the instructions for the wires.

23 Q    And during your time with Ivan, did you have a number of

24 accounts that you would deposit, then, down in Mexico, to

11:58:54 25 include also accounts here in the United States?

1   A    Yes.  He provided me several accounts of businesses and

2   individuals, uh, to send money to in Mexico.

3   Q    And then would you provide him proof, once the disbursement

4   was made?

5   A    Yes, I would -- I would do screen-shots of, uh, the wire

6   transfer confirmation information, and I would send it to him

7   either through BlackBerry Messenger or through WhatsApp.

8   Q    And what's being shown now on the screen as part of this

9   continuous conversation with Ivan are additional disbursement

10  instructions from Ivan; is that correct?

11  A    That's correct.  As you see, information for the account,

12  and then the amount of money that he would want me to send to

13  that -- to that account.

14  Q    And there is a Jese D. Casillas, Wells Fargo account, in

15  the amount of 8 mill.

16       What is that reference?

17  A    That would be $8,000 that was sent to Jese D. Casillas at

18  that account number in Wells Fargo.

19       THE COURT:  What's the date?

20       THE WITNESS:  The date, um, if -- April 24th -- as you

21  see it in the top in light blue, April 24th, 2015.

22       THE COURT:  I have it now.  Thank you.

23       THE WITNESS:  That would show when the conversation was

24  taking place, Your Honor, not exactly when that $8,000 left.

25       THE COURT:  Okay.

1   BY MS. VAN MARTER:   (Continuing)

2   Q    And how soon after receiving the disbursement instructions

3   would you then disburse the funds?

4   A    Uh, it would depend.  You know, if I got the -- the

5   instructions before the weekend, it might not be until the

6   following Monday, but it depends on when I got the instructions.

7   Q    And from an investigative perspective, what is the overall

8   goal in continuing to receive these contracts and disburse funds

9   to various accounts in the United States and elsewhere?

10  A    It's for them to follow the expanse of the whole

11  organization, both from the people who are shipping the drugs

12  and receiving the money to the people who are receiving the

13  drugs and distributing the drugs and the generation of the money

14  and any and all facilitators in the -- in the game or in the

15  organization.

16  Q    And, again, this is during the time period where your

17  relationship with Ivan had evolved to where you were

18  predominately paying overhead and transportation-type costs; is

19  that correct?

20  A    Yes, ma'am.

21       THE COURT:  Would this be a good point to stop, or not?

22  Do you want to complete something or ...

23       MS. VAN MARTER:  We can, Your Honor.  That would be

24  fine.

25       THE COURT:  What would you like to do for lunch, in

1    terms of time?

2           MS. VAN MARTER:  If the Court is amenable, 1 o'clock?

3           THE COURT:  One o'clock is fine.  Okay, folks.

4           Thanks.  You may step down.

12:01:16   5       THE WITNESS:  Yes, Your Honor.

6           THE COURT:  We'll be back later.  We'll take a luncheon

7    recess until 1 o'clock.  Please be back at that time, and thank

8    you.

9           THE COURTROOM DEPUTY:  Please rise.

12:01:32  10       Court is in recess.

11       (Recess taken: 12:01 p.m. to 1:20 p.m.)

12           THE COURTROOM DEPUTY:  Please rise.

13       (Call to Order of the Court.)

14           THE COURT:  Good afternoon.  Please be seated.

01:20:31  15       Let's resume.

16           MS. VAN MARTER:  Thank you.

17

18              CONTINUED DIRECT EXAMINATION OF JAIME CEPERO

19    BY MS. VAN MARTER:

01:20:37  20  Q    We left off with a deposit that was shown from a BBM

21    conversation between you and Ivan directed to Jese Casillas.

22       Do you recall that?

23  A    Yes, ma'am.

24           THE COURT:  That was dated April 24th, 2015?

01:20:52  25       MS. VAN MARTER:  That's correct.

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    32
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1          THE COURT:  Involving an $8,000 transfer to the

2    defendant?

3          MS. VAN MARTER:  Correct.

4          THE COURT:  Thank you.

01:20:58  5          So, for your purposes -- excuse me one second -- are you

6    asserting this demonstrates his participation in the DTO as of

7    that time?

8          MS. VAN MARTER:  Your Honor, I am, yes, using that to

9    demonstrate the timeline that we presented in our brief

01:21:11 10    regarding our first identification of Mr. Casillas beginning in

11    April of that year regarding two stash vehicles that then

12    coincides with when he received that first --

13          THE COURT:  Okay.  Yeah.  All right.  I read that.

14    Thank you.

01:21:25 15          But there's a lot of material to amass, and you're more

16    familiar with it than I am, so if it's important to either of

17    you, then tell me why it's important, and I'll listen.

18          Okay?

19          Thank you.

01:21:36 20          MS. VAN MARTER:  Thank you, Your Honor.

21    BY MS. VAN MARTER:   (Continuing)

22    Q    Okay.  So I've got Government's Attachment A back up on the

23    screen.  We just went over the April 15th, April 22nd cash money

24    drops in 2015.

01:21:52 25          And I want to ask you some specific questions about August

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    of that year, but in between them there were a couple more cash

2    money drops that occurred; is that correct?

3    A    Yes.

4         THE COURT:  Excuse me one second.  When you say

01:22:04  5  "Attachment A," is this an exhibit now in my case or is it just

6    in the pleadings, or both?

7         MS. VAN MARTER:  It has been admitted for the Court's

8    consideration.

9         THE COURT:  As Exhibit 1?

01:22:15  10      MS. VAN MARTER:  Yes, we'll call it Exhibit 1.

11        THE COURT:  Okay.  Good.  Thank you.

12   BY MS. VAN MARTER:  (Continuing)

13   Q    So I was showing on the screen on June 2nd, 2015, an amount

14   of $23,720.

01:22:26  15      Do you recall being involved in that cash money drop?

16   A    Yes, ma'am.

17   Q    Again on June 18th in the amount of 22,741 --

18   A    Yes, ma'am.

19   Q    -- is that correct?

01:22:36  20      And then there's some reference to an Australian drop.

21        Is that what you previously referred to regarding a

22   successful money drop that occurred at the direction of Ivan in

23   Australia?

24   A    Yes, ma'am.

01:22:48  25  Q    And are you also familiar if he made reference to sending

1    an individual to Australia to assist in future cash money drops

2    in Australia?

3    A    Yes, ma'am.

4    Q    And do you recall who that was?

01:22:58    5    A    Not the -- the name was a female that was supposed to be a

6    representative for him in Australia.

7    Q    And since that time have you later learned that that was

8    the spouse of a defendant previously sentenced before this

9    Court, a Rulas Hernandez?

01:23:14    10    A    I can't recall if I knew at the time that that was somebody

11    else's spouse.

12    Q    I want to direct your attention to --

13         THE COURT:  Excuse me just one second.  Would you

14    establish the -- I can see Exhibit 1 and Attachment A and is --

01:23:33    15    is this witness familiar with the compilation of that, the data

16    that was the foundation for this timeline?

17         MS. VAN MARTER:  Your Honor, I believe we previously

18    laid foundation that he reviewed it with me yesterday in regard

19    to the cash money drop data.

01:23:46    20         THE COURT:  Thanks.  Appreciate it.

21    BY MS. VAN MARTER:   (Continuing)

22    Q    Okay.  My little icon is -- there we go.  Okay.

23         So I'd like to draw your attention, then, to August 23rd.

24    I'm going to circle these boxes right here (indicating).

01:24:04    25    August 23rd, 2015, which references to another cash pickup or

1    cash money drop in Vancouver.

2         Do you see what I am referring to?

3    A    Yes, ma'am.

4    Q    And were you familiar with that cash money drop as arranged

01:24:15    5    by Ivan in the amount of $74,029?

6    A    That's correct, ma'am.

7    Q    And in that particular cash money drop, was there also

8    discussion and/or negotiation with respect to narcotics?

9    A    Yes.  There had been an agreement that they would provide a

01:24:30    10    sample of heroin to the RCMP UC at the time of the drop.

11    Q    And when you say "a sample," did you understand what that

12    meant?

13    A    It would have been a small amount just to test out the --

14    the product that he was, uh -- uh, purporting to -- to have

01:24:45    15    available, uh, for us.

16    Q    And when you say "he," are you referring to Ivan?

17    A    Yes.

18    Q    And during those negotiations, what type of quantities were

19    you ultimately discussing with Ivan in regard to heroin?

01:24:55    20    A    Well, we were discussing multiple quantities of kilograms

21    of heroin.

22    Q    And was that sample supposed to be delivered on or around

23    the same time as that August 23rd cash money drop?

24    A    Yes, ma'am.

01:25:08    25    Q    What happened?

1    A    Uh, the subject that was meeting with the RCMP undercover

2    stated that they didn't break it up, so it was either take a

3    whole one or not.  And after more discussions with Mr. Calvillo,

4    we agreed to take a full kilogram of heroin as a sample.

01:25:27    5    Q    And were you required to pay for that full kilogram?

6    A    Yes.

7    Q    And did you, in fact, pay for it?

8    A    Yes.  Well, we used RCMP-appropriated funds to pay for

9    that.

01:25:37    10    Q    And how much money was transferred to Ivan in payment for

11    that kilo of heroin?

12    A    The agreement was, I believe, 71,000 Canadian.  Upon the

13    conversion, it ended up being about 55,000 and some change.

14    Q    And that original negotiation price of approximately

01:25:55    15    $70,000 per kilogram, did that price stay consistent in future

16    conversations with the defendant, Mr. Casillas?

17    A    Yes.

18    Q    Was there ongoing negotiation or attempts to try and lower

19    that price?

01:26:10    20    A    Yes.

21    Q    And is that referenced -- is that referenced in this box

22    right up here (indicating)?

23    A    Yes, that's, uh -- indicates the delivery of the kilogram

24    of heroin in Vancouver.

01:26:30    25    Q    After the cash money drop was successful on August 23rd and

1    the delivery of the kilogram of heroin, did you then have a

2    conversation with Ivan not only regarding the payment for that

3    kilogram but also the disbursement of the $74,000 in funds?

4    A    Yes, ma'am.

01:26:51    5    Q    I'm going to show you a part of Government's Exhibit D, and

6    this is a screen-shot from the BBM conversation that was

7    attached in Government's Exhibit D regarding the conversation as

8    to this cash money drop.

9        Do you recognize that screen-shot?

01:27:16    10    A    This one is a screen-shot of a confirmation of a wire

11    transfer of $4,000.

12    Q    I'm sorry.  Let me get the right one here.

13        There we go.

14        And this screen-shot, do you recognize that?

01:27:30    15    A    Uh, that screen-shot is, uh, some of the -- one of the

16    accounts that was provided by Mr. Calvillo to send the money for

17    the payment of that kilogram.

18    Q    Okay.  And same with this (indicating)?

19    A    Yes, that's a second one that he provided, uh, for that

01:27:47    20    payment.

21    Q    And this one as well (indicating)?

22    A    And that's -- that's the third one he provided.

23    Q    And when he provided these, did you have an issue reading

24    them?

01:27:55    25    A    Yes, uh, because it was -- one of them was very blurry, so

1    I asked him if he could send me the information via e-mail so

2    that way we wouldn't have any errors in the transfers.

3    Q    And did he tell you who would be making that e-mail to you?

4    A    Uh, no.  He just said that he would send me an e-mail.

01:28:11  5    Q    And did you receive e-mails regarding the same information?

6    A    Yes, ma'am.

7    Q    I'm now showing you what has also been marked as -- part of

8    Government's Attachment D.

9         Do you recognize that?

01:28:29  10    A    Yes, ma'am.  That's a -- a PDF, uh, document -- document

11    that shows an incoming e-mail to my undercover account from a

12    Jese Casillas which had three screen-shot PNG attachments to it.

13    Q    I'm going to scroll down to Page 2 of that.

14         Do you recognize that?

01:28:50  15    A    Yes, that's one of the attachments in that e-mail.  That

16    would be the second attachment.  And the third attachments were

17    are all, uh, account information that were being provided to

18    disburse the money for the payment of the heroin.

19    Q    And was this, in essence, the same information that Ivan

01:29:13  20    attempted to send to you in the BBM that you could not read --

21    A    Yes, ma'am.

22    Q    -- that was previously shown as screen-shots to the Court?

23    A    Yes, ma'am.

24    Q    And after that period of time, did you continue to receive

01:29:28  25    e-mail communication from Jese Casillas?

1    A    Yes.

2    Q    And, again, this was in August -- end of August 2015?

3          THE COURT:  Excuse me a second.  There was an incoming

4    e-mail from Casillas?

01:29:44    5          THE WITNESS:  His name appeared on -- on the e-mail.

6          THE COURT:  As a sender?

7          THE WITNESS:  As a sender.  For some reason the -- the

8    e-mail program would -- it created that name as Jese Casillas.

9    I don't recall the exact e-mail address name.

01:30:00    10         THE COURT:  So tell me -- and that was confirmation of

11   what?  A receipt?

12         THE WITNESS:  No, those were when I asked Mr. Calvillo

13   to send me the -- the instructions for the disbursement for the

14   money via e-mail so I wouldn't make a mistake because I could

01:30:15    15   not read --

16         THE COURT:  They were sent by Casillas.

17         THE WITNESS:  Yes.  Well, they were sent by that e-mail

18   address.

19         THE COURT:  That e-mail address that bore his name.

01:30:23    20         THE WITNESS:  That's correct, sir.

21         THE COURT:  Thank you.

22         And the date was sometime in August of 2015?

23         THE WITNESS:  August 26th, 2015.

24         THE COURT:  Thank you.

01:30:31    25         MS. VAN MARTER:  And, Your Honor, I will mark this as

1   Government's Exhibit No. 2 entitled "Jese's e-mails" that was

2   previously included as Attachment D.

3          THE COURT:  That's Exhibit 2, and that's the

4   screen-shots that we're talking about?

01:30:43  5          MS. VAN MARTER:  The actual preserved e-mail attachments

6   from the Jese Casillas.

7          THE COURT:  On the 26th.

8          MS. VAN MARTER:  On the 26th.

9          THE COURT:  Okay.

01:30:53  10         MR. VIETH:  No objection, Judge.

11         THE COURT:  Admitted.

12      (Government Exhibit No. 2 (also referred to as Attachment

13   D) admitted into evidence.)

14         THE COURT:  You may proceed.

01:30:59  15         MS. VAN MARTER:  Thank you.

16   BY MS. VAN MARTER:   (Continuing)

17   Q    So you indicated that you had begun to receive e-mail

18   communications at that point in time from that same e-mail; is

19   that correct?

01:31:06  20   A    Yes, ma'am.

21   Q    Did there come a time when you began to discuss with Ivan

22   meeting with him in person?

23   A    Yes, ma'am, immediately after -- after the payment of the

24   heroin.

01:31:16  25   Q    And what was the purpose of meeting in person?

1    A    Well, we wanted to negotiate for larger amounts, and

2    ultimately we wanted to draw him out to meet with us personally.

3    Q    And where did you understand Ivan was located during your

4    communication?

01:31:29    5    A    In Mexico.

6    Q    And would he agree to leave Mexico to meet you?

7    A    He would agree in Mexico, but we couldn't get authorization

8    to meet him in Mexico.

9    Q    So he would agree for you to come to him, but he would not

01:31:44    10    leave Mexico to meet you; is that correct?

11    A    That's correct, ma'am.

12    Q    Did he ever agree at some point to send somebody to meet

13    with you in his place?

14    A    Yes.

01:32:03    15    Q    I am showing you a transcript of a conversation that was

16    also included in Government's Attachment E.  I would like to

17    mark it as Exhibit No. 3.

18        And have you had the opportunity to review the transcripts

19    of your BBM conversations that would be utilized for Court here

01:32:22    20    today?

21    A    Yes.

22    Q    And have you been able to review them for accuracy as being

23    a party to the conversation?

24    A    As to a part of the translation that is presented in the

01:32:33    25    document.

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    42
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    Q    I am going to scroll it down.

2         So this is from a October 9th, 2015, conversation between

3    yourself and Ivan Calvillo; is that correct?

4    A    Yes, ma'am.

01:32:43  5         THE COURT:  You say "conversation."  You mean telephone

6    conversation?

7         MS. VAN MARTER:  A BBM conversation, a BlackBerry

8    Messenger conversation.

9         THE COURT:  All right.  A Messenger conversation.  Thank

01:32:53  10   you.

11   BY MS. VAN MARTER:   (Continuing)

12   Q    And is this preserved similar to what we've previously

13   shown the Court on how you captured those conversations on your

14   phone?

01:33:01  15   A    Yes, ma'am.

16   Q    And "IHC," as represented in this transcript, that's Ivan

17   Hernandez Calvillo; is that correct?

18   A    That's correct.

19   Q    Okay.  I'm going to take you down to the Page 3.

01:33:12  20        During these conversations, was there a discussion as to

21   where this in-person meet was going to take place?

22   A    We agreed on, uh -- in -- we agreed on Seattle, but we had

23   gone back and forth with regards to Pasco, Yakima, and other

24   locations.

01:33:29  25   Q    And as represented on this portion of the transcript from

1    Mr. Calvillo, did he actually suggest Pasco or Yakima?

2    A    Yes, he did.

3    Q    Going down to the next page.

4         Okay.  Starting at 4:42 p.m. there is a reference by you

01:33:53  5    regarding this meet and a response by Mr. Calvillo on 4:45 p.m.

6         Could you please read that response from Mr. Calvillo.

7    A    (Reading):  Okay.  The one you will send the e-mail to is

8    the one you're going to meet.  His name is Saul.  He's my

9    cousin.

01:34:12  10   Q    And who did you understand Saul to be?

11   A    At that point, the only reference I had was the e-mail, and

12   the only name on the e-mail was Jese Casillas.

13   Q    Did you later learn who Saul was?

14   A    Yes.

01:34:25  15   Q    And who was Saul?

16   A    That was Mr. Casillas from our meeting.

17   Q    Is he in the courtroom today?

18   A    Yes, ma'am.

19   Q    Could you please identify where he's seated and what he's

01:34:33  20   wearing?

21   A    He's the gentleman wearing the dark, uh, colored jumpsuit

22   next to counsel at the counsel table.

23        THE COURT:  For the record, he's identified the

24   defendant.

25

1    BY MS. VAN MARTER:   (Continuing)

2    Q    And the reference to the e-mail by Mr. Calvillo, is that

3    the previous e-mail that you had testified to that you received

4    after that August 2015 money drop?

01:34:56    5    A    Yes, ma'am.  That's the only e-mail I had -- had contact

6    with up to that point.

7    Q    And after that point in time, then, did you make or discuss

8    with Mr. Calvillo that you would then be making arrangements

9    directly with Saul, who was later identified as Mr. Casillas?

01:35:18    10    A    Uh, yes, that I would be meeting with him, and we'll have

11    the discussions.  I asked him if he would be able to answer any

12    questions of the client, the client being the RCMP UC who is

13    going to be posing as the purchaser of the heroin, and he told

14    me that he would, and we ended up meeting with him.

01:35:34    15    Q    Okay.  And so did you have some communication, then, with

16    Mr. Casillas in order to arrange for the meeting?

17    A    Yes.  We then engaged in communication over WhatsApp to

18    firm up the time, the date, and the location.

19    Q    And did that meeting then occur on November 7th of 2015?

01:35:51    20    A    Yes, ma'am.

21    Q    And where did it occur?

22    A    At the Westin Hotel in Seattle.

23    Q    And, again, who was supposed to be present at this meeting?

24    A    Uh, myself and, uh, two RCMP undercovers, and Saul, or

01:36:07    25    Mr. Casillas.

1  Q    And who, again, were the RCMP undercovers supposed to be

2  portraying?

3  A    They were portraying the purchasers of the heroin, or the

4  people interested in making the purchases of the heroin.

01:36:21    5  Q    And where were they supposedly from?

6  A    Vancouver.

7  Q    And what was your role in that meeting?

8  A    I was facilitating the meeting.  I was -- what I told him

9  is these are the people that I worked for -- not worked for,

01:36:32   10  that I worked money laundering contracts with, and they had

11  trust in me, and I was bringing them to the table, basically; I

12  was introducing them to Mr. Calvillo's organization.

13  Q    And during the course of this meeting, were you wearing a

14  recording device?

01:36:46   15  A    Yes.

16  Q    And was there also a recording device outfitted in the

17  hotel room where the -- part of the meeting took place?

18  A    Yes, ma'am.

19  Q    Okay.  So I'm going to show you what's been attached as the

01:36:57   20  video in Government's Exhibit -- or Attachment E.

21       MS. VAN MARTER:  We'll call it Exhibit No. 5, Your

22  Honor.  I'm not going to play the whole video.  I'm just going

23  to play portions of it.  And then I'll have some questions about

24  what occurred.

01:37:14   25       THE COURT:  Meeting on November 7th, 2015, at the

1    Westin.

2            MS. VAN MARTER:  Correct.

3            THE COURT:  Thank you.

4    BY MS. VAN MARTER:  (Continuing)

01:37:21   5    Q    So a portion of this video, was there a part of the

6    recording where you were traveling from the hotel room all the

7    way downstairs to the lobby?

8    A    Yes, ma'am.

9    Q    And who were you meeting in the lobby?

01:37:31  10    A    Mr. Casillas.

11    Q    Did he advise you if he was bringing somebody else to the

12    meeting?

13    A    I believe he did tell me at that point that he had his

14    girlfriend with him.

01:37:39  15    Q    And is this the beginning portion of some the screen-shots

16    that we previously went over regarding that meeting?

17    A    What's on the screen, we're already at the coffee shop area

18    of the, uh -- of the restaurant, of the hotel.

19            MS. VAN MARTER:  Your Honor, move to admit just portions

01:37:57  20    of the video for foundation.

21            THE COURT:  You've already seen this, Counsel?

22            MR. VIETH:  (Nodded.)

23            MS. VAN MARTER:  Okay.

24            (Government Exhibit No. 5 (also referred to as Attachment

01:38:05  25    E) admitted into evidence.)

1          (Whereupon a video clip was played.)

2     BY MS. VAN MARTER:   (Continuing)

3     Q     Okay.  And obviously who is that on the screen?

4     A     Mr. Casillas.

01:38:34   5     Q     And where was his girlfriend seated?

6     A     Uh, to his right.

7     Q     So just off screen?

8     A     I'm sorry, it would be to his left; to my right.

9     Q     Okay.  And this first portion of the meeting took place in

01:38:44   10    the coffee shop area of the hotel; is that correct?

11    A     That's correct.

12    Q     And did you intend to have a conversation with him prior to

13    meeting the, quote, unquote, bosses, or the RCMP undercovers?

14    A     Yes.

01:38:57   15    Q     And why did you want to have a first or initial

16    conversation with Mr. Casillas?

17    A     Because this is the first time we are meeting, and, uh, I

18    had told, uh, Mr. Calvillo and I -- and I told him also that I

19    had told my -- the people that he was going to meet that we had

01:39:12   20    been working together, so we wanted to make sure that we knew

21    who each other was.

22    Q     And did you also want to ensure that Mr. Casillas had the

23    authority to engage in the conversation?

24    A     Yes.  I just asked him if he was clear to, uh, to discuss

01:39:29   25    what we were coming to discuss, because these people are

1    important clients.

2    Q    And during this first part of the meet that occurred in the

3    lobby, did Mr. Casillas make any phone calls?

4    A    Yes, he took a phone call and made a phone call, and then

01:39:41  5    he walked away.  I couldn't hear what he was discussing.

6    Q    And do you know who he spoke to?

7    A    No.

8    Q    And when he returned from that phone call, did you then

9    have this conversation about his authority to negotiate what was

01:39:52 10    going to happen during the meeting?

11    A    Correct.

12    Q    Okay.

13         THE COURT:  Were you recording through some sort of a

14    buttonhole camera or something?

01:40:05 15         THE WITNESS:  Yes, sir.

16    BY MS. VAN MARTER:  (Continuing)

17    Q    Have you had the opportunity to review the transcript of

18    that meeting in its entirety?

19    A    As it's written in this report.

01:40:21 20         MS. VAN MARTER:  I am showing that transcript that the

21    Government would move to admit as Exhibit No. 6 for the Court's

22    consideration regarding the November 7th, 2015, meet.

23         MR. VIETH:  No objection.

24         THE COURT:  Admitted.

01:40:30 25         (Government Exhibit No. 6 admitted into evidence.)

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                              49
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    BY MS. VAN MARTER:   (Continuing)

2    Q    Go down to Page 3.

3         MS. VAN MARTER:  Excuse my scrolling, Your Honor.

4    BY MS. VAN MARTER:   (Continuing)

01:40:42  5    Q    There's a portion of the transcript being shown to you

6    where it -- kind of halfway through this large paragraph it

7    says, "I wanted to talk to you for a bit beforehand."

8         Is that that reference you were talking to about making

9    sure that he could negotiate?

01:40:58  10   A    Yes.

11   Q    Okay.  And what was Mr. Casillas' response?

12   A    Uh, my understanding is that he -- he was authorized.

13   Q    Okay.  And there's some references here.  I think his first

14   response to you is do you already know that he wants to work.

01:41:15  15        What did that mean to you?

16   A    That we wanted to get these transactions going.

17   Q    And this was specific to heroin?

18   A    Yes, ma'am.

19   Q    And how -- was there a particular word that was utilized

01:41:25  20   during the course of the investigation for heroin?

21   A    Yes, the -- the term that, uh, Mr. Casillas liked to use

22   was *pantalones*, or pant, for heroin.

23   Q    Okay.  I'm going to go down to the next page here.

24        And "JC" in the transcript, is that Jese Casillas?

01:41:48  25   A    Yes.

1    Q    There's a statement there where he references -- let me

2    just -- right here (indicating).

3         Would you please read that into the record?

4    A    Um-hmm.   (Reading):  Look, I came to see who I can work

01:42:00   5    with and how often and how much they need.  About that, I send

6    the info, and they tell me how -- how much we'll price it at.

7    Q    And is this in reference to what?

8    A    To what the meeting was going to be about, discussing how

9    much we -- we were looking for, how much we wanted to pay, how

01:42:18  10    we wanted to work -- do the transactions for the heroin.

11    Q    And was there a concern regarding differences of rates in

12    terms of where the product, the heroin was received?

13    A    Well, it -- it was discussed with regards to where we took

14    possession of -- of the heroin.  If it was in the U.S. side,

01:42:38  15    there was a cost; if it was in the Canadian side, there was a

16    higher cost because of the issue of transportation and crossing

17    the border.

18    Q    And what did Mr. Casillas indicate to you in regard to

19    transportation of the product?

01:42:50  20    A    Uh, that they had means to do transport into -- into

21    Vancouver.  Uh, but a lot of times he kept saying -- referring

22    that he -- he needed to check with Mr. Calvillo, you know, for

23    setting the prices and -- and the locations.

24    Q    Okay.  And how long did you speak to Mr. Casillas, just the

01:43:08  25    two of you, down in the coffee shop?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1   A    Several -- ten minutes or so.  Not long.

2   Q    Okay.  And did he indicate that he could then carry on the

3   conversation upstairs with the bosses?

4   A    He never indicated to me that he could not.  He -- he

01:43:20   5   was -- he was willing to -- to represent his boss.

6   Q    Okay.  And at some point, then, did you take the

7   conversation upstairs?

8   A    Yes.  Upon the arrival of the two, uh, undercovers from --

9   from the RCMP, which was already staged, we took the

01:43:34   10   conversation to the room.

11   Q    And have you had the opportunity to view some screen-shots

12   from the inside video camera of the hotel room meet?

13   A    Yes, ma'am.

14        MS. VAN MARTER:  I'll mark this as Government's Exhibit

01:43:57   15   No. 7.

16        (Government Exhibit No. 7 marked as an exhibit.)

17   BY MS. VAN MARTER:  (Continuing)

18   Q    Do you recognize this?

19   A    Yes, that's a screen-shot from the inside of the hotel room

01:44:01   20   where the meeting took place.  The gentleman to the left on --

21   on the forward is one of the RCMP UCs shaking Mr. Casillas'

22   hand.

23   Q    And referred to then as Government's Exhibit No. 8, is this

24   another screen-shot of that inside hotel room meet?

01:44:21   25        (Government Exhibit No. 8 marked as an exhibit.)

USA v. Carillo Casillas/4:15-CR-6049-EFS                52
Sentencing Hearing – Day 1/December 11, 2018
Cepero/D/Van Marter

1   A    Yes, ma'am.  Again, to the left of the photo you see the

2   two undercovers from the RCMP, myself on the right, and

3   Mr. Casillas, his back is to the photo.

4   BY MS. VAN MARTER:   (Continuing)

01:44:32  5   Q    And during the course of this meeting, did you have to

6   provide any translations?

7   A    Yes, uh, because they were having problems communicating

8   between the two, so I acted as a translator between the UCs and

9   Mr. Casillas.

01:44:46  10   Q    And approximately how long did this portion of the meeting

11   take place?

12   A    We were in there for a good while; I think about an hour.

13   Q    And during this meeting did Mr. Casillas make any phone

14   calls or reference his phone?

01:44:56  15   A    Yes, he -- he kept texting on his phone.  A lot of the

16   answers that he would give, he would text, and then he would

17   give me the answer and -- and, uh, I would transfer the answer

18   to the two undercovers.

19   Q    And I know that the transcript is now a part of the record.

01:45:12  20   However, could you just summarize what occurred inside of the

21   hotel room in terms of the meeting.

22   A    Basically we were negotiating the volumes of what we were

23   looking to purchase, or what the UCs from Canada were purporting

24   to want to purchase; the price and the importance of the quality

01:45:30  25   of the heroin that was going to be purchased.

1    Mr. Casillas always defaulted to Mr. Hernandez with regards

2  to setting the prices, uh, and -- but he also made assurances

3  that the quality would be of high standard, and that we would be

4  able to receive whatever we -- whatever order we -- we would

01:45:52  5  place.

6  Q    And what type of quantities were discussed?

7  A    We were discussing up to 50 to 100 kilograms.

8  Q    Of heroin per shipment?

9  A    Not per shipment.  We were saying that, you know, that that

01:46:05  10  was the -- the amounts that we could move.

11  Q    And did Mr. Casillas indicate there would be any difficulty

12  in providing the 50 to 100 kilos?

13  A    No, not that there was any difficulty, but he also always

14  defaulted to Mr. Hernandez Calvillo in order to -- of what could

01:46:23  15  actually be delivered, what the prices would actually be.

16  Q    And did they agree to alter the price in any way based on

17  the quantity?

18  A    After a long discussion back and forth with regards to the

19  amounts, where it could be taken place, the price was arrived to

01:46:36  20  about 70,000 per kilogram.

21  Q    And that was --

22  A    To start.  To start.

23  Q    And was that consistent with the previously delivered

24  sample --

01:46:45  25  A    Yes, ma'am.

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                                     54
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    Q    -- arranged by Mr. Casillas?

2    A    Yes.

3         THE COURT:  You keep saying -- you repeated

4    "Mr. Hernandez."

5         Who was that and --

6         THE WITNESS:  Hernandez Calvillo.  It was Hernandez

7    Calvillo.

8         THE COURT:  -- where was --

9         Is this Ivan or is this --

10        THE WITNESS:  Ivan.

11        THE COURT:  Okay.  Thank you.  Because I want to make

12   sure the transcript reflects that we're talking about the same

13   person.

14        THE WITNESS:  If you'd like, Your Honor, I will keep

15   referring to him as Ivan.

16        THE COURT:  I think it's easier if you do.

17        THE WITNESS:  Okay.

18   BY MS. VAN MARTER:  (Continuing)

19   Q    So just for matter of the record, whenever you referred to

20   Mr. Hernandez, you were referring to Ivan; is that correct?

21   A    That's correct, ma'am.

22        THE COURT:  And by "Ivan," you mean Ivan Calvillo every

23   time you say Ivan?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Thank you.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1          MS. VAN MARTER:  Thank you.

2     BY MS. VAN MARTER:   (Continuing)

3     Q    So how did this meeting end?

4     A    We agreed on the price and then that we would talk again

01:47:26   5     with regards to when we were going to start.

6     Q    Okay.  All right.  So after this face-to-face meeting, did

7     you continue to engage in conversation with both Ivan and

8     Mr. Casillas regarding continued money drops?

9     A    Yes, ma'am.

01:47:59  10     Q    And did there come a time that you learned that Ivan was no

11     longer around?

12     A    Yes.

13     Q    And when did you learn that?

14     A    Uh, in December when he was murdered.

01:48:10  15     Q    And how did you learn that Ivan was murdered?

16     A    Uh, Mr. Casillas told me.

17     Q    And how did he communicate with you?

18     A    Through WhatsApp.

19     Q    And what did he advise you?

01:48:19  20     A    Uh, he told me that Cholo had been killed.  Uh, he was very

21     broken up about it, um, and that, uh, you know, he wanted to see

22     how things were going to fall out after that.

23     Q    Were you also receiving any communications or contacts from

24     anybody else in Ivan's organization at that time?

01:48:36  25     A    Yes.  After his murder, I started receiving, uh,

1    communications on his old phone, contacting my old, uh,

2    BlackBerry Messenger that I used to use with him.

3             THE COURT:  So somebody that you didn't know was using

4    his phone.

01:48:51  5             THE WITNESS:  Yes.

6             THE COURT:  And you knew he was dead.

7             THE WITNESS:  He was -- yeah, I knew he was dead, so

8    somebody had his phone and was --

9             THE COURT:  So somebody else was using his phone.

01:48:59 10             THE WITNESS:  Yes.

11             THE COURT:  Thank you.

12    BY MS. VAN MARTER:   (Continuing)

13    Q    And did you respond to those requests for communication?

14    A    Yes.  Yes, I engaged him.

01:49:04 15    Q    And did you also contact Mr. Casillas regarding being

16    contacted by one of Ivan's phones?

17    A    Yes, because, uh, the person on the phone wanted to get in

18    contact with Mr. Casillas.  He didn't refer to him as

19    Mr. Casillas, but he would -- they were trying to locate some

01:49:21 20    money that was still outstanding from the very last, uh, money

21    pickup that we had received and an accounting of where all the

22    money went.

23             So I told him that I didn't know who he was; I'm not at

24    liberty to tell him about it, or tell him about Mr. Casillas.

01:49:37 25    So after I finished that conversation, I contacted Mr. Casillas,

1    and I told him that there were -- they were looking to talk to

2    him.

3    Q    And how did Mr. Casillas respond?

4    A    Um, at that time, you know, he was still trying to figure

01:49:49    5    out what -- what was happening.  Uh, he said that, uh, some --

6    some people down in Mexico were trying to claim ownership to --

7    to the money that was outstanding; uh, that there was a lot of

8    turmoil over his death; uh, everybody was trying to collect on

9    money that supposedly he owed; and also that people that he had

01:50:08    10    delivered drugs to were also reneging on paying or saying they

11    had paid.

12        So there was a lot of confusion and a lot of, uh, contact

13    going back and forth over those issues.

14    Q    So did he feel that people were taking advantage of Ivan's

01:50:23    15    death and --

16    A    Yes.

17    Q    -- not paying debts?

18    A    Yes.  And he also changed his number.  Uh, he changed his

19    WhatsApp number, I think, once.

01:50:31    20        THE COURT:  Who is "he"?

21        THE WITNESS:  Mr. Casillas.

22    BY MS. VAN MARTER:  (Continuing)

23    Q    Was there ultimately a resolution about who you were

24    supposed to communicate with after some of the chaos settled

01:50:41    25    down?

1    A    Well, once the chaos settled down, I began to receive the

2    instructions from Mr. Casillas for the money that was remaining

3    and then from that point forward.

4    Q    And did he indicate to you that he would now be the point

01:50:52  5    of contact for you?

6    A    Uh, not in those -- in those words.  I mean, basically he

7    provided the -- the account information with regards to the

8    money that was still outstanding.  That went to as he requested,

9    and then later on we began to get into contact with regards to

01:51:10  10    doing other things with what he was referring to as a new boss

11    that he was working with.

12    Q    And did he ever refer to this new boss by name?

13    A    Uh, at one point he referred to him as *compadre*, and

14    that -- supposedly that was the person that was trying to

01:51:25  15    contact me on the BBM.

16    Q    At this point in the investigation, what was your focus,

17    then, now that Ivan was no longer in the picture?

18    A    Well, uh, it kind of threw us for a loop because we had

19    worked so hard to try and get into -- directly with Ivan.  The

01:51:44  20    only thing we had left is to try and communicate with this new

21    *compadre* and try to establish a relationship with him, you know,

22    to find out who he was and continue to tie it to the

23    organization.

24    Q    And --

01:51:58  25        THE COURT:  Does *compadre* translate to "buddy" or "pal"

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                                  59
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    or --

2          THE WITNESS:  It's -- yes, sort of like that, Your

3    Honor.

4    BY MS. VAN MARTER:   (Continuing)

01:52:06  5    Q    And your only communication or avenue to *compadre* at that

6    time was Mr. Casillas?

7    A    Yes.

8    Q    Were you able, then, to set up a second face-to-face

9    meeting with Mr. Casillas?

01:52:19  10   A    Yes.

11   Q    And who requested that meeting?

12   A    I believe he did.

13   Q    And why -- why did he request the meeting?

14   A    Because he wanted to, uh -- for me to explain to him in

01:52:31  15   detail with regards to how the money movements worked and the

16   charges and stuff like that.

17   Q    And why did he need you to explain that to him?

18   A    Because we ended up, uh -- uh, doing pickups on behalf of

19   *compadre's* organization.  Um, we had done some of them prior to

01:52:47  20   this, while we were working with, uh, Mr. -- Ivan.  Uh, he had

21   told me that he had friends, and he was doing some of the

22   pickups on behalf of his friends.  And Mr. Casillas had told me

23   that this is the *compadre* that we had been working with before,

24   and he wanted me to explain to him exactly how things worked.

01:53:07  25   Q    And based upon your communications with Mr. Casillas, did

1    it become clear to you that Ivan had not shared those details --

2    A    Yes.

3    Q    -- with Mr. Casillas?

4    A    Yes, he actually -- I mean, he himself told me that Ivan

01:53:21  5    would keep him in the dark; that basically he would -- and

6    during that conversation in, uh -- in January, he -- he told me

7    that at the time of the first meeting, when we met with the RCMP

8    undercovers, he was upset because Ivan just told him to go meet

9    us and find out what is it that we wanted and did not give him

01:53:40  10    details, and that's why he couldn't answer some of the questions

11    that were being posed to him during the meeting.

12    Q    And on the January meet, then, he wanted those details?

13    A    Yes.  Well, he wanted to understand how I worked.  He

14    wanted to understand what the charges would be.  He wanted to

01:53:55  15    understand where I could work, where I could receive money, and

16    how I could move the money, uh, so that he could relay that to

17    his new boss.

18    Q    Okay.  And where did this meeting take place on

19    January 29th?

01:54:07  20    A    It took place in Seattle, uh, at the Metropolitan, uh,

21    restaurant.

22    Q    And who was supposed to be present?

23    A    Uh, myself and Mr. Casillas.

24    Q    And did other individuals arrive with Mr. Casillas?

01:54:18  25    A    Yes, one of, uh, Ivan's ex-wives, uh, arrived.

1    Q    And have you had the opportunity to review screen-shots

2    from surveillance as to that meeting?

3    A    Yes, ma'am.

4    Q    Do you recognize what's on the screen, the photograph from

01:54:36    5    Government's Attachment F?  We'll make this Government's Exhibit

6    No. 8.

7    A    Yes, those -- that is Mr. Casillas, uh, the young lady that

8    attended the meeting also, and her son.

9    Q    And is that the woman you referred to as one of Ivan's

01:54:50    10    wives?

11    A    Yes, ex-wife, I believe.

12    Q    And have you also had the opportunity to review the

13    transcript from that meeting with Mr. Casillas, Ms. Mendoza, and

14    obviously the child that was present?

01:55:02    15    A    Yes, as it was represented in the document.

16         THE COURTROOM DEPUTY:  Ms. Van Marter, you had already

17    used No. 8.  So can that be No. 9?

18         MS. VAN MARTER:  Oh, No. 9, please.  Thank you.

19         (Government Exhibit No. 9 marked as an exhibit.)

01:55:27    20    BY MS. VAN MARTER:   (Continuing)

21    Q    I am showing you what -- that specific transcript, we'll

22    mark it as Government's Exhibit 10, the transcript from the

23    January 29th, 2016, meeting that you previously reviewed for

24    purposes of this hearing today.

01:55:40    25    A    Yes, ma'am.

1          THE COURT:  This is audio only or audio/video?

2          MS. VAN MARTER:  This is just the transcript, Your

3    Honor.

4          THE COURT:  Is it a transcript of an audiotape?  Is that

01:55:50   5    the idea?

6          MS. VAN MARTER:  No, it's a transcript -- yes, a

7    transcript of the audio/videotape from that day.

8          (Government Exhibit No. 10 marked as an exhibit.)

9    BY MS. VAN MARTER:  (Continuing)

01:55:55   10   Q    Were you wearing the same type of body wire recording

11   device during this meeting?

12   A    Yes, ma'am.

13         THE COURT:  Pocket camera or just recording device,

14   audio recording?

01:56:06   15        THE WITNESS:  Uh, audio -- camera -- video/audio

16   recording.

17         THE COURT:  Okay.  Video/audio.  Okay.

18   BY MS. VAN MARTER:  (Continuing)

19   Q    I'll scroll down to -- we're going to highlight a couple of

01:56:16   20   pages.  But during this conversation, you already testified that

21   Mr. Casillas had made reference to the fact that Ivan had kept

22   him out of certain details.

23         If you could provide a summary to the Court as to the

24   nature of the conversation that occurred with Mr. Casillas

01:56:29   25   during this meet.

1    THE WITNESS:  Um, basically, Your Honor, we discussed,

2    uh, how I managed the money laundering end of the operations,

3    uh, how much I charged, what cities and what countries I could

4    work in.  Um, we discussed past pickups that I had done for, uh,

01:56:47    5    Ivan and in the locations where I had done them.  Uh, we

6    discussed, uh, the need -- that I would have the need to have

7    him provide, or his boss provide accounts for me to -- to send

8    the money to, upon their orders.  Um, we discussed the timing,

9    how long it would take to -- from receiving the money to sending

01:57:08   10    the money out, how would we work the -- the conversion rates;

11    um, all the different little aspects that -- that I previously

12    discussed with Ivan.

13          We also discussed, um -- uh, reviving the deal with what

14    we referred to as *viejito*, which was the two undercovers from --

01:57:29   15    from Canada.  Um, he told me that his new boss operated much

16    stronger than Ivan, and that he -- he could provide the heroin

17    that they were looking for.  Um, we had some discussions with

18    regards to the prices.  Um, and we also discussed, um -- uh,

19    other drugs with regards to meth and also OxyContin pills I

01:57:58   20    believe we discussed.

21    Q    And during the entirety of this meeting that occurred on

22    January 29th, did Mr. Casillas make any phone calls?

23    A    No, he did not.

24    Q    Did he have to -- did he receive any information on his

01:58:10   25    phone during the negotiations with you?

1    A    No, he did not.

2    Q    So he freely had this conversation and negotiation with you

3    without making contact or reference to the boss?

4    A    No.  Although when -- with regards to the -- to settling

01:58:27  5    down on actual amounts and actual, uh, prices, he said that he

6    would obviously have to check with -- with his boss as to -- to

7    confirm what prices, uh, would be charged, but that he did say

8    that the prices would vary depending on where the drugs would be

9    received; will it be in the U.S. or in Canada.

01:58:50  10   Q    And, again, why would those prices vary depending where you

11   receive the drugs?

12   A    Again, it's transportation costs as well as crossing the

13   border into another country.

14   Q    So is it more expensive to receive it in Canada?

01:59:02  15   A    Yes, it would be.

16   Q    In order to cover transportation costs.

17   A    Yes.  Although with the exchange rate, sometimes it ended

18   up being almost the same.

19   Q    And during this conversation, what quantities was

01:59:14  20   Mr. Casillas discussing with you?

21   A    Well, what I was reminding him is, as we discussed with the

22   *viejito,* which would be the two, uh, undercovers from -- from

23   Canada who he had met, that I wanted him to understand that

24   we're not talking 5, 10, or 15; we're talking 50 to

01:59:32  25   100 kilograms.

1    Q    And what was his response?

2    A    He said that his new boss could handle that.

3    Q    And pricing?

4    A    Pricing?

01:59:40    5    Q    What kind of pricing did he discuss?

6    A    Again, the pricing, uh, we -- the discussions were that the

7    price would be a little higher than -- than what he paid, but

8    what he was saying was that the new product would be a much

9    better quality and that his understanding was that if he -- the

01:59:59    10    *viejito*, meaning the Vancouver purchasers, liked what they

11    received the last time, they would really love what they had to

12    offer this time because it's better quality.

13    Q    Did he also make reference to outstanding debts or losses

14    in Canada?

02:00:15    15    A    Yes, he had discussed that, uh -- uh, talked about because

16    of Ivan's murder, there were people in Canada that were refusing

17    to pay or claiming that they had paid.  So that was one of the

18    issues that he was dealing with, and, uh, one of -- I believe he

19    was saying that, uh, there was one person who owed about

02:00:38    20    $300,000 that they had said was seized by the police, but they

21    had not provided any documentation about the seizure.  So he was

22    investigating that, or having people that were already up there

23    on behalf of his boss investigating what happened to that money.

24    Q    And based upon your information regarding this

02:00:56    25    investigation and its coordination with the RCMP, were you aware

1    if the RCMP had made any substantial seizures, monetary seizures

2    with respect to this case?

3    A    Yes, ma'am.

4         THE COURT:  50 to 100 kilograms, was that of a specific

5    drug or just a variety of drugs?

6         THE WITNESS:  Of heroin, Your Honor.

7         THE COURT:  Of heroin.  Okay.  Thank you.

8    BY MS. VAN MARTER:  (Continuing)

9    Q    And specific to the methamphetamine, was there a

10   conversation regarding quantity?

11   A    Uh, with regards to methamphetamine, it was, uh -- there

12   was talk with regards to having some shipped to the East Coast,

13   and, uh, the quantities, I can't remember if we got into it, but

14   I was telling him that if I had a sample, I could show to

15   people, and then we could put, uh, together a -- a shipment

16   request of, I think, maybe 10 to 20 kilograms.

17   Q    And was that the beginning conversation that ultimately led

18   to the delivery of a sample of methamphetamine by Mr. Casillas?

19   A    Yes.

20   Q    And that methamphetamine was intended for who?

21   A    Uh, for me in -- in Boston.

22   Q    And during the time of this meeting, when was it that you

23   learned that the female present was one of Ivan's wives?

24   A    During the conversation with her.

25   Q    And did you have an understanding as to why she was there?

1    A    No, I don't believe so, not -- not at that point if I

2    really knew why she was there --

3    Q    Did you later --

4    A    -- other than to accompany him.

02:02:24    5    Q    I apologize.

6    A    Other than accompanying him.

7    Q    Did you later come to learn why she might have been present

8    during that meeting?

9    A    I can't recall.

02:02:33    10    Q    So how did you leave the meeting with Mr. Casillas, then,

11    on January 29th?

12    A    We just agreed to remain in touch and work on details

13    regarding what we had discussed there in regards to me providing

14    him the service of money laundering activity and also

02:02:48    15    re-establishing the deal that we had discussed with the two

16    Vancouver undercovers.

17    Q    And I neglected to ask, did you try and negotiate another

18    meeting or some type of contact with his boss?

19    A    In -- in -- yes.  During the whole conversation I told him

02:03:04    20    that I was willing to present myself and meet with his boss

21    and -- and explain situations on his behalf and in regards to

22    the behalf to whatever was owed from pickups that I was part of.

23    So I always offered myself to be able to interject on his behalf

24    to his boss.

02:03:22    25    Q    And what was Mr. Casillas' response?

1    A    Uh, he never allowed me to do that.

2    Q    Did he tell you why?

3    A    No.

4    Q    At any point in time did he make reference about being

02:03:32  5    concerned about being cut out if you were to meet the boss?

6    A    Only one -- in one, uh, reference in -- I just couldn't

7    remember which conversation, in which I kept pressing that, you

8    know, I was willing to meet his boss and -- and to see with

9    regards to all of the aspects of what we were doing, and he had

02:03:49  10   made references "where would I be if you start working with

11   him?"

12   Q    And so did Mr. Casillas ever give you access to his boss?

13   A    No.

14   Q    From that point forward, then, did you -- did Mr. Casillas

02:04:05  15   arrange the money drops --

16   A    Yes.

17   Q    -- with you?

18   A    (Nodded.)

19   Q    Okay.  So there is a reference on the screen beginning, I

02:04:25  20   believe, February 24th of 2016.

21            THE COURT:  Which exhibit?

22            MS. VAN MARTER:  This is Exhibit 1.

23            THE COURT:  Thank you.

24   BY MS. VAN MARTER:  (Continuing)

02:04:38  25   Q    I believe these references right here (indicating).

1          Do those reference the first money drops directed by

2      Mr. Casillas without the presence of Ivan?

3      A    Yes, ma'am.

4      Q    And so February 24th, 2016, 120,580 in Kansas City?

02:04:57    5      A    Yes, ma'am.

6      Q    On March 1st, 2016, was money then directed to be delivered

7      to an individual in Los Angeles?

8      A    Yes, ma'am.

9      Q    From the Kansas City pickup?

02:05:10   10      A    That's correct.

11      Q    And then a money drop on March 1st, 2016, approximately

12      46,950 in Canadian currency and $7,000 in U.S. currency?

13      A    Yes, ma'am.

14      Q    Prior to Mr. Casillas getting involved, when you were

02:05:41   15      dealing directly with Ivan, were most of those money drops, did

16      most of those occur up in Canada?

17      A    We had done most -- most of the pickups in Canada, yes.

18      Q    And obviously the one in Australia we referenced.

19      A    Correct.

02:05:53   20      Q    When Mr. Casillas became involved, was it more frequent

21      there were money drops that occurred in the United States as

22      well?

23      A    Yes, ma'am.

24      Q    There is -- referring to this section here (indicating), is

02:06:09   25      there also another money drop April 13th, 2016, that involved a

1  transfer of funds to an individual in the Los Angeles area?

2  A    Yes.  That was from a pickup in New York.

3  Q    And specific to that particular transfer of funds, who

4  directed that the funds were then to be taken to an individual

02:06:28  5  in Los Angeles?

6  A    Uh, Mr. Casillas.

7  Q    And what occurred with that particular transfer of funds to

8  the individual in Los Angeles?

9  A    We staged a wall-off seizure of the money once it was

02:06:39  10  delivered.

11  Q    And what do you mean by that?

12  A    Uh, once the money was delivered a, uh, cruiser or a

13  uniform patrol cruiser stopped the subject that received the

14  money and made a seizure of the -- of the money that he was

02:06:51  15  delivered.

16  Q    And during -- after this seizure of funds, were you in

17  communication with Mr. Casillas?

18  A    Yes.

19  Q    And what happened?

02:07:03  20  A    Uh, he was very upset because, uh, of the seizure, and that

21  he needed to provide documentation to his boss so that they

22  wouldn't think that he was stealing the money.  And, also, that

23  they believed that the person that I was using to deliver the

24  money may -- may have caused the -- the seizure.

02:07:23  25  Q    And who did he want to provide proof regarding the seizure?

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                              71
*Sentencing Hearing – Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1   A    Me and -- and the person that actually delivered the money.

2   Q    And during these conversations, did he indicate that he was

3   accountable?

4   A    Yes, that, uh, he was being held accountable for that money

02:07:41   5   loss because the money got -- got seized from his -- his -- his

6   person, the person that he, uh, elected to receive that money.

7   He even said that if that money had been transferred to the next

8   spot, then he wouldn't have been liable for it.

9   Q    But because it was directly seized from his person, he was

02:07:59   10   liable?

11   A    That's correct.

12   Q    And did you understand when -- what did that mean to you,

13   when he said his person?

14   A    I'm sorry?

02:08:08   15   Q    What did that mean to you when he referred to it as his

16   person?

17   A    Uh, Mr. Rosales, an individual that -- that he provided

18   contact to me as the person who was going to receive the money.

19   Q    Okay.  And were you able to provide proof to Mr. Casillas

02:08:23   20   regarding that seizure?

21        THE WITNESS:  What I did is, Your Honor, we provided a

22   police report detailing the stop and the seizure.  It was not a

23   detailed report of the whole investigation but only as it

24   applied to the officer stopping the car and seizing the money.

02:08:38   25        THE COURT:  Did he ask you how you got that?

1      THE WITNESS:  Uh, he -- I told him that I had contacts

2  with an attorney that could try to go and get the information

3  from the police department.

4      THE COURT:  And how much was involved?

02:08:48  5      THE WITNESS:  246,000 or so.

6      THE COURT:  Okay.  And did they let the carrier go?

7      THE WITNESS:  Yes.  He was identified, fully identified

8  and then allowed to -- to leave.

9      THE COURT:  Okay.

02:09:10  10      MS. VAN MARTER:  And that is, Your Honor, for reference

11  of the record, that is co-defendant in this matter who has

12  already been sentenced, received the money pickup.

13      THE COURT:  Okay.

14      MS. VAN MARTER:  That is referenced right here

02:09:27  15  (indicating).  That's co-defendant Julio Cesar Rosales.

16      Sorry.  I'm trying to pull up the receipt.

17      Mark this -- what number did I leave off with, 11?

18  THE COURTROOM DEPUTY:  Yes.

19      MS. VAN MARTER:  -- as Government's Exhibit No. 12.

02:10:01  20      THE COURTROOM DEPUTY:  I'm sorry.  You're on No. 11.

21      MS. VAN MARTER:  I'm on No. 11.  Exhibit 11.  Excuse me.

22      (Government Exhibit No. 11 marked as an exhibit.)

23  BY MS. VAN MARTER:  (Continuing)

24  Q    And do you recognize this?

02:10:07  25  A    Yes.  This is the Southgate Police Department report,

1    incident report that we provided as proof of the seizure.

2    Q     To Mr. Casillas?

3    A     Yes, ma'am.

4    Q     And Page 2 of Government's Exhibit No. 11?

02:10:25   5    A     It's a receipt of cash, uh, from -- that was seized, that

6    was provided to Mr. Rosales.

7    Q     And in your training and experience in working with these

8    organizations, when there is a large cash seizure such as this,

9    do they often seek or request some type of proof that it was

02:10:45   10   taken by law enforcement?

11   A     Yes, they do.

12   Q     Okay.  I'm going to direct your attention, then, to

13   another, or a third or final face-to-face meet that you had with

14   Mr. Casillas around May 17th, 2018.

02:11:07   15         Do you recall that?

16   A     Yes, ma'am.

17   Q     And where did that occur?

18   A     In -- in the Seattle area, greater Seattle area.  Uh, the

19   Breeze, uh -- South Breeze restaurant, I believe.

02:11:17   20   Q     Okay.  And what was the purpose of this meeting?

21   A     Uh, we had agreed, through other conversations, that I was

22   going to get the -- the Canadian clients to come down again so

23   we could sit down and renegotiate the purchase of the heroin,

24   and also I was going to receive the, uh -- the meth sample that

02:11:37   25   he would bring personally to that meeting.

1    Q    And who did attend that meeting?

2    A    Uh, myself, uh, and one of the, uh, two RCMP undercovers

3    that was in the original meeting, and Mr. Casillas.

4    Q    And what happened during that meeting?

02:11:52  5    A    Again we had discussions with regards to -- to, uh, the

6    heroin, uh, shipments that they were looking to purchase.  Uh,

7    we had discussions as to the prices.  We had discussions as to

8    the location that the heroin would be received, and upon

9    agreement, uh, we decided to start, uh, I believe with about

02:12:14  10   ten, and that they would be received in the, uh, Seattle side or

11   the U.S. side of the border in Seattle.

12   Q    And when you said the negotiations were for about ten, ten

13   what?

14   A    Ten kilograms of heroin.

02:12:29  15   Q    And during this meeting, did you again have a recording

16   device that recorded the entirety of the meeting?

17   A    Yes, ma'am.

18   Q    And have you had the opportunity to review the transcript

19   of -- of that meeting as captured on the recording device?

02:12:42  20   A    Yes.  As -- as presented in that report, yes.

21   Q    And during the course of that -- well, where did the

22   majority of that meeting take place?

23   A    It took place in -- inside of the restaurant and in the

24   parking lot, or the majority took place inside the restaurant.

02:12:56  25   Q    And what occurred outside in the parking lot?

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    75
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/D/Van Marter*

1    A    Uh, I met with him prior to coming inside, and we took

2    possession of the kilogram of, uh, meth.  We had another

3    undercover, uh, outside that was playing as -- as an associate

4    of mine, and he took possession of the meth and drove it outside

02:13:14    5    of the area.  Then we continued our meeting inside.

6    Q    And did Mr. Casillas bring the quantity of methamphetamine

7    himself?

8    A    Uh, he came with a couple of individuals.  I think he was

9    in a separate car.  I'm not sure because I wasn't outside.  Uh,

02:13:29    10    but the meth was in another vehicle with two other occupants.

11    Q    And did you know who those other occupants were?

12    A    I -- I just can't remember at this time.  I think they were

13    identified.

14    Q    And based on your training and experience with individuals

02:13:42    15    who are engaged in this level of trafficking, do they often

16    transport their own product?

17    A    Some do, some don't.  I mean, it -- in all honesty, it

18    depends on -- on what they -- they feel they're willing to do.

19    Q    And why wouldn't they transport their own product?

02:14:00    20    A    If -- if they choose to have, uh, other people to do it,

21    it's for, you know, protection, to -- to remove themselves from

22    any potential seizure.

23    Q    So after you obtained the kilogram sample of

24    methamphetamine, did the meeting move inside the restaurant?

02:14:15    25    A    Yes, ma'am.

1    Q    And how long did that meeting take place?

2    A    It took about another 30, 40 minutes or so.

3    Q    And during this meeting, did Mr. Casillas make any phone

4    calls?

02:14:26    5    A    Not in my presence.

6    Q    Did he refer to his phone in any way, like he did the very

7    first meeting when Mr. -- when Ivan was alive?

8    A    No, he did not.

9    Q    And was he able to freely negotiate with you the continued

02:14:39   10    transaction with a Canadian boss?

11    A    Yes, ma'am.

12    Q    And was there a discussion or agreement as to price?

13    A    Uh, the -- I think the prices that was agreed to would be

14    in dollars upon delivery in, uh -- in Seattle, and I think it

02:14:56   15    was from 60,000 or something like that.

16    Q    Per kilogram of heroin?

17    A    Per kilogram of heroin, yes.

18    Q    And was there ever a discussion regarding price as to the

19    methamphetamine?

02:15:08   20    A    Uh, well, I had to pay for the -- the kilogram that I

21    received, and I think it was around 9,000, close to $9,000.

22    Q    In U.S. currency?

23    A    In U.S. currency.

24    Q    And, again, he had indicated an initial quantity of how

02:15:25   25    much would be delivered?

1   A    Uh, ten kilograms, I believe.

2   Q    Okay.  And then after that, was there a discussion about

3   how the quantity would change?

4   A    Um, I think it was when the delivery was going to take

02:15:36   5   place, that they said there was 12, if we would take all 12; and

6   we accepted all 12.

7   Q    And was there any discussion in a price reduction if there

8   was an increase in quantity, as the relationship continued?

9   A    We -- I'm sure we had those discussions.  I can't remember

02:15:53  10   if there was anything said.

11   Q    And how were you to pay for the sample of methamphetamine?

12   A    I told him to provide me an account, and I would send him

13   the accounts [sic].

14   Q    And did Mr. Casillas provide you those accounts?

02:16:07  15   A    Yes.

16   Q    And what happened after that last face-to-face meeting?

17   A    Um, again, after the agreements, he went his way, we went

18   ours, and, uh, we remained in contact.

19   Q    And were there additional money drops that occurred?

02:16:25  20   A    I believe -- I believe so.

21   Q    Okay.  I'm going to show you again Government's Exhibit

22   No. 1.

23        Starting here, moving this way (indicating), did

24   Mr. Casillas then direct money to be delivered again in

02:16:45  25   Los Angeles on June 3rd, 2016?

1    A    Yes.

2    Q    I'm sorry.  I apologize.  I missed the May.  After --

3    excuse me -- the May 26th money drop that occurred in Vancouver?

4    A    Correct.

02:17:01   5    Q    For approximately 225,070?

6    A    That's correct.

7    Q    And then there was another cash pickup June 28th, 2016; is

8    that correct?

9    A    Yes, ma'am.

02:17:13  10    Q    Amount of 143,175?

11    A    Yes, ma'am.

12    Q    Okay.  And again on July 13th, 2016, in the amount of

13    69,412?

14    A    Yes, ma'am.

02:17:26  15    Q    And is this all in Canadian currency?

16    A    Correct.

17    Q    And, again, Mr. Casillas on July 25th, 2016, requested sums

18    of cash to be delivered in Los Angeles?

19    A    Yes, ma'am.

02:17:42  20    Q    And were those the money drops that occurred between the

21    last face-to-face meeting and then what ultimately was a

22    transaction involving those 12 kilograms that you previously

23    referenced --

24    A    Yes, ma'am.

02:17:54  25    Q    -- in August of 2016?

1   A    (Nodded.)

2   Q    What was your role in that last negotiation of those --

3   that quantity of -- of heroin?

4   A    Again, I was acting as someone that -- that was

02:18:06   5   introducing, uh, the clients from -- from Vancouver, and that I

6   would be handling the -- the payment for the drugs through my

7   money laundering activities.

8   Q    And you would be paying who?  Did you know?

9   A    I would be paying, uh, whoever Mr. Casillas told me to send

02:18:25   10  the money to, which I believe would have been through his new

11  boss.

12  Q    And the negotiations, you said, changed -- or changed from

13  10 kilograms to 12 kilograms?

14  A    Yes, they -- they said that they had 12; if we could take

02:18:41   15  all 12.

16  Q    And during these conversations, was it always of heroin?

17  A    Yes.

18  Q    Had you ever heard a negotiation or discussion of fentanyl?

19  A    We never called it fentanyl.  We never used that word.

02:18:54   20  Only used it as heroin.

21  Q    And at this point, in 2016, was fentanyl a relatively new

22  substance in terms of the narcotics trade?

23  A    Yes.

24  Q    So at the time of the negotiations, did you have any idea

02:19:08   25  that fentanyl might be involved?

1    A    No.

2    Q    And does that change the manner of operations with law

3    enforcement?

4    A    It would based on, uh, just safety issues.

02:19:18    5    Q    And during your communications with Mr. Casillas, did you

6    ever speak to anybody else in the organization regarding this

7    transaction other than Mr. Casillas?

8    A    No.  I offered several times to try and to see, both on the

9    issue with the seizure, on the issue with the negotiations, and

02:19:35    10    I was never allowed to speak to anyone else but him.

11    Q    And did you then communicate with law enforcement here in

12    this district, as well as Seattle, regarding that ultimate

13    delivery?

14    A    Yes, both, uh, with -- with the people in this district,

02:19:50    15    Seattle, and also with the RCMP because they were taking a part

16    in it.

17    Q    And did Mr. Casillas indicate to you, in terms of

18    transportation of that quantity, how he was going to get it to

19    Seattle?

02:20:00    20    A    Um, we didn't discuss that personally.  Uh, the only, uh,

21    discussion we had was when he was -- when they were en route up

22    there, he wanted to make sure that, uh, that people were ready,

23    because they didn't want to sit around waiting with that,

24    wherever he had it.  He wasn't telling me where he had it but

02:20:19    25    that he was en route.

1    Q    And were you aware at that point in time that law

2    enforcement here in this district had eyes on his personal

3    residence and other associates?

4    A    Yes, ma'am.

02:20:28  5    Q    And then obviously communicated that to the task force here

6    in the Eastern District?

7    A    Yes, ma'am.

8         THE COURT:  So you're talking about there were eyes on

9    Mr. Casillas' residence here in the Tri-Cities?

02:20:40  10        THE WITNESS:  Yes, there was -- they were --

11        THE COURT:  They were doing surveillance.

12        THE WITNESS:  They were doing surveillance here, yes, on

13    that whole episode.

14    BY MS. VAN MARTER:  (Continuing)

02:20:47  15    Q    And so, therefore, your communications in terms of the

16    product being on its way was communicated to the people

17    conducting surveillance of Mr. Casillas.

18    A    Yes, ma'am.

19    Q    And were you then made aware if the transaction was

02:20:59  20    completed in Seattle?

21    A    Yes, ma'am.

22    Q    Were you in Boston during that time?

23    A    Yes, ma'am.

24    Q    And then were you aware that after that, or shortly

02:21:06  25    thereafter, Mr. Casillas was arrested?

1    A    Yes, ma'am.

2    Q    And obviously your communications ended at that point in

3    time.

4    A    That's correct.

02:21:13    5         MS. VAN MARTER:  Your Honor, may I have a moment?

6         THE COURT:  Yes, you may.

7         (Counsel conferring.)

8         THE COURT:  Let's take a stretch at this time.

9         Have you finished with this witness on direct?

02:21:36    10         MS. VAN MARTER:  Your Honor, I'm finished with this

11    witness.

12         THE COURT:  Let's all stand up and take a stretch now.

13         THE COURTROOM DEPUTY:  Ms. Van Marter, you have not

14    moved to admit all of the exhibits.

02:21:48    15         Did you intend to do that?

16         (Counsel and courtroom deputy conferring.)

17         MS. VAN MARTER:  Your Honor, the United States would

18    just formally -- I know Exhibits 1 through 4, I think, were

19    already admitted, but we would move to admit all exhibits,

02:21:56    20    Nos. 1 through 11 for the record.

21         MR. VIETH:  No objection, Judge.

22         THE COURT:  All admitted.

23         THE COURTROOM DEPUTY:  Exhibit No. 4, that number was

24    skipped.  I thought maybe you were going to come back to it.

02:22:06    25         MS. VAN MARTER:  Oh, no.  Then just 1 through 3 and then

1    5 through 11.

2         THE COURTROOM DEPUTY:  Just for the record.

3         MS. VAN MARTER:  Thank you.

4         (Government Exhibit Nos. 1-3, 5-11 admitted into evidence.)

02:22:18   5         THE COURT:  Are you ready?

6         MR. VIETH:  Yes, Judge.  Are we going to take a break

7    or are we going to --

8         THE COURT:  We are taking a break, unless somebody needs

9    more of a break, and I will take one.

02:22:26  10         MR. VIETH:  No, Judge, I'm ready.

11         THE COURT:  Okay.  Let's do it.

12         (Counsel conferring.)

13

14                    CROSS-EXAMINATION

02:22:42  15   BY MR. VIETH:

16   Q    Good afternoon, sir.

17   A    Good afternoon, Counsel.

18   Q    Mr. "Cap-PAIR-o"?

19   A    "Sip-PAIR-o".

02:22:53  20   Q    Cepero.  Okay.

21   A    That works.

22   Q    Mr. Cepero, you've got 38 years of law enforcement

23   experience, right?

24   A    You're making me older than I am; 35 going on 36.

02:23:02  25   Q    35.  All right.

1    A    Yes.

2    Q    And 18 of those you've been helping out the DEA on money

3    laundering cases?

4    A    Yes, sir.

02:23:12  5    Q    How many money laundering investigations, at least over the

6    last 18 years, have you been involved with?

7    A    Oh.  Uh, since I started in the FIT group I have, oh, my

8    goodness, at least 20 different operations.  But involved in --

9    uh, I've been in charge of several operations.  I've been part

02:23:41  10   of a number of other operations, either as an undercover or

11   assisting in some other capacity, both in state and out of

12   state.

13   Q    So 20, I guess, with significant involvement.

14        Is that fair?

02:23:56  15   A    Yes.  And "significant involvement" would mean where I have

16   to personally go and -- and be part of an undercover operation.

17   Q    Okay.  Would you consider this one significant or part of

18   the 20 that you've had significant ties to?

19   A    No, this -- this one would have been one of the ones that I

02:24:13  20   had -- that I was not only undercover but also one of the

21   primary investigating officers.

22   Q    And how many of those over the last 18 years have you been

23   involved with?

24   A    Uh, three.  But these -- these are long-term

02:24:26  25   investigations, Counsel, so what -- once you start them, they go

1    on for years, and in between those -- those investigations,

2    additional investigations pop up.  What I mean is like if we do

3    a pickup and we identify a target, that target could be worked

4    as a separate investigation under the original, uh, money

02:24:45    5    laundering investigation.

6    Q    In regard to this investigation, your involvement started,

7    was it April of 2014?

8    A    With regards to this section of that investigation, yes.

9    Q    Okay.  And then it ended when everyone was arrested

02:25:05    10    approximately in August of 2016.

11    A    Yes, sir.  That section of that investigation, yes.

12    Q    So your involvement with this section of the investigation

13    was about two years and four months; is that fair?

14    A    Yes.

02:25:27    15    Q    And in those two years and four months, you originally

16    identified Ivan as the -- as the boss; is that correct?

17    A    Yes, sir.

18    Q    And that lasted up until his passing, his death?

19    A    That's correct.

02:25:53    20    Q    And then a new boss appeared, and that was *compadre*, or

21    pal?

22    A    *Compadre*, yes.

23    Q    And he was the boss down in Mexico that, he did not want to

24    come up and meet with you?

02:26:08    25    A    They both -- no, they -- the one that didn't want to come

1    up and meet with was Ivan.  We tried to -- to get to meet with

2    *compadre* but that never took place.  I never even got a chance

3    to converse with him to try to convince him for a meet.

4    Q    Okay.  But you did receive some messages from him, right,

02:26:25  5    on your phone?

6    A    Yes.  Originally after Ivan's death, yes.

7    Q    Okay.  And did you respond to those messages?

8    A    Oh, yes.

9    Q    Okay.  Did he respond back?

02:26:32  10   A    Yes.

11   Q    Did he respond back with, "No, I don't want to come up and

12   visit you"?

13   A    No, at one point the messages just stopped.  He just

14   stopped responding.

02:26:42  15   Q    By my count, I see approximately 15 financial transactions

16   that you were either involved with or were significant enough

17   that they were noted in your reports.

18        Is that close to being accurate?

19   A    It should be accurate.  We -- we note -- every financial

02:27:11  20   transaction generates a -- a report and a disbursement report,

21   and it's all detailed, uh, to the last penny.

22   Q    Okay.  And I see of those approximately -- I don't want to

23   pin you down, it may have been 16, it may have been 14, but

24   approximately 15 transactions, by my math, that equaled about

02:27:32  25   $1.6 million.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Is that close?

2  A    I would have to take your math into -- accept your math.

3  Q    Okay.  And of those 15 transactions, I see eight of them

4  occurred before April 15th --

02:27:51   5  A    Again, I don't have the --

6  Q    -- 2015.

7  A    -- the Excel sheets, so I'll accept what you're saying.

8  Q    Was it on April 15th, 2015, that you first became aware of

9  my client's involvement with this organization?

02:28:07  10  A    April 15th, 2015?

11  Q    Yes.

12  A    The first time that his name, uh, came up would be during

13  the -- when I received the e-mail.  If that's what we're

14  referring to, yes.

02:28:21  15  Q    Okay.  So before April 15th, 2015, my client wasn't

16  involved in any of those other financial transactions dealing

17  with Ivan, yourself, or the Canadian authorities?

18  A    The only time the name came up, it was when Ivan had

19  provided me his account.  Uh, I don't know if that was prior --

02:28:45  20  I believe it was prior to when -- when I received the e-mail.

21  Q    Okay.

22  A    So that would be the first time his name appeared.  But up

23  to that point I was always dealing with Ivan.  I was not

24  speaking to anybody else.

02:28:56  25  Q    Okay.  And of those 15 transactions, how many of those

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    transactions do you know or did you note that Jese received any

2    money?

3    A     I wouldn't know, other than the -- the only way I could

4    tell is if I sent the money direct to an account under his name.

02:29:23    5    Outside from that, once I sent the wires out, I had no longer

6    control of what -- what happened with the money.

7    Q     So if -- do you recall on April 15th, 2015, if there was --

8    I guess it was April 27th, I'm sorry, 2015, if you sent down

9    $8,000 to Jese?

02:29:47    10    A     Yeah.  Yeah, that is the one I was referring to.

11    Q     Okay.

12    A     Whether that was -- I just couldn't remember if it was

13    prior to the 15th or after the 15th.

14    Q     Okay.  And that $8,000 came from a total transaction amount

02:29:58    15    of $163,608?

16    A     That's correct, sir.

17    Q     And then also, later on, it looks like November of 2015 --

18    this was the Kansas City transaction -- it looks like there was

19    a wire of $5,000 to Jese.

02:30:19    20    A     I believe so.  If -- I have to take your word, Counselor,

21    because I don't have anything in front of me, but I'll accept

22    your -- your statement.

23    Q     And then on December of 2015 there was, it looks like, two

24    different wires to Jese, one for 5,000 and one for 1,689, which

02:30:42    25    would total 6,689; that would be the third wire or the third, I

1    guess, cumulative wire to Jese.

2          Is that your recollection?

3    A    I'll accept that.  Yes, sir.

4    Q    Okay.  And by my math, that would total that my client

02:31:03    5    received from all of these financial transactions $19,689.

6    A    That he received direct to his account, yes.

7    Q    Okay.  And that was out of a total of 1.6 million.

8    A    Again, I'm -- I'm accepting your math because I don't have

9    any of that in front of me.

02:31:23    10    Q    And you previously testified that your -- your take as

11    being a -- now, are you a facilitator or a distributor or a

12    manager?  What -- what would you place yourself in?

13    A    My role would be more of a facilitator.

14    Q    A facilitator.

02:31:45    15    A    Yes.  Money laundering facilitator.

16    Q    Okay.  Facilitating the laundering of money.

17    A    Correct.

18    Q    Okay.  And so your cut for being a facilitator of

19    laundering money was 6 percent?

02:32:00    20    A    Depending on where it was picked up.  If it was in Canada,

21    it was 6 percent.  If it was in the U.S., 4 percent.  When it

22    was in Australia, it may have been higher.

23    Q    Okay.  So at -- well, at 6 percent, did you total -- or was

24    your cut approximately 96,000 Canadian dollars?

02:32:31    25    A    For the expanse of all those operations?  I'll accept your

1    math.  It could be 96,000.

2    Q    And Jese's cut, if it was 19,689, would be 1.56 percent of

3    the 1.6 million.

4    A    The amount that was sent to him directly -- okay? --

02:33:09    5    accepting your math, if that is correct, I'll accept that, yes,

6    1.6 percent.

7    Q    Do you have any other evidence that he received any other

8    compensation?

9    A    That's why I say "accepting your math," what was sent

02:33:23    10    directly to him.

11    Q    Do you have any other evidence that he received any

12    additional monies?

13    A    No, I couldn't tell you that.  No.

14    Q    Okay.  So what the evidence -- or what you know is what was

02:33:36    15    wired directly to him?

16    A    That is correct.

17    Q    And that's a little below $20,000.

18    A    By your math, yes.

19    Q    Now, in your training and experience over the last 35

02:33:55    20    years, 18 with the DEA, do bosses of drug trafficking

21    organizations typically receive only 1 or 2 percent of the total

22    proceeds from drug transactions?

23    A    I never said he was a boss.

24    Q    Okay.  What would you describe Jese?

02:34:22    25    A    I think he was just facilitating, just like I was.  He had

1    a role within his organization, and he was in control of

2    communicating with me and also communicating with other people

3    doing other things on behalf of his organization.

4    Q    And -- and he was a facilitator -- would you agree that he

02:34:41  5    was kind of a middleman?

6    A    You could call him a middleman, yeah.

7    Q    With both Ivan and then later *compadre*?

8    A    Yes.  But he was a middleman in control of other people

9    also, because he was controlling people that were also handling

02:34:57  10   the transportation of the dope and receiving the money that I

11   would transfer.  He was ultimately responsible for that.  As

12   indicated, when the money was seized in LA, he told me, "I'm

13   being held responsible for that money."

14   Q    Do you know if he ever got any percentage or any cut of

02:35:17  15   that -- of that transaction, of any -- did he receive any --

16   A    I couldn't tell you.

17   Q    Okay.  Do you have any evidence that he made any type of

18   money at all from that transaction?

19   A    I could not tell you.

02:35:32  20   Q    Because there's no evidence to support that he did receive

21   any?

22   A    It -- because I don't know.

23   Q    Okay.

24   A    Because I don't know.

02:35:49  25   Q    Now, you also told us that Jese was kept in the dark by his

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    boss --

2    A    Yes.

3    Q    -- is that accurate?

4    A    Yes.

02:35:57    5    Q    And can you tell Your Honor what you believe that to mean?

6    A    Yes.  He complained on the second meeting that when he went

7    to the first meeting, uh, he was not given any information to

8    actually, uh, be able to answer some of the things that, uh,

9    were going to be posed to him.  So that was one of his

02:36:19    10    complaints that he did to me on his second meeting.

11    Q    And in your training and experience, being kept in the dark

12    is a way for bosses making sure that the lower levels don't take

13    over.

14        Would that be accurate?

02:36:34    15    A    Oh, yes.  It's definitely -- this is not a fair world.

16    It's a backstabbing world.  And they -- the one thing that they

17    always want to do is maintain the contact with the person that's

18    important to the organization, because the minute you lose that

19    contact, the minute you lose that -- that kind of control, then

02:36:51    20    you're left out, and now the other people are working and you're

21    not gaining anything.  So it's something that happens at every

22    level of an organization, especially when it involves

23    international and domestic movements of drugs and monies back

24    and forth.

02:37:05    25    Q    Do you recall when you were meeting with Jese, this is the

1    last one in West Seattle, at the end of your conversation with

2    him, did he go outside and have a phone call?  Do you remember

3    that, at the end of the transcript?

4    A    No, he left -- he left, uh, which was kind of odd, he left

02:37:30    5    in the middle of the negotiations, left the, uh -- the bar, and

6    later I found out from surveillance that they drove to

7    McDonald's to get something at McDonald's.  When he came back, I

8    even asked him, you know, what happened.  He said, "No, I

9    just -- you know, wanted to go to McDonald's."  And I said, "Why

02:37:48    10    don't you bring them in.  We could -- we're in a restaurant."

11        So that was the only time that he was outside of my view

12    and outside of my area after we started the meeting.  Whether he

13    made a phone call down there, I don't know.

14    Q    Did you set a price at this meeting?

02:38:01    15    A    We set a price, uh, for, uh -- for -- for receiving it on

16    the U.S. side.

17    Q    Of methamphetamine or for the heroin?

18    A    No, the methamphetamine we -- we discussed.  That was --

19    that was separate from the meeting with the -- with the, uh --

02:38:17    20    the Canadian.  Uh, a price was -- a round-about price was set

21    for -- to start with the first ten at that meeting.

22        THE COURT:  That's heroin.

23        THE WITNESS:  Heroin, yes, sir.

24    BY MR. VIETH:  (Continuing)

02:38:29    25    Q    And what was that price for the heroin?

1   A    I think on the U.S. side it would have been about 55 to 60,

2   and on the Canadian side it would have been over 70.

3   Q    And was there a price set for the fentanyl?

4   A    No, we didn't -- we never called it fentanyl.  We were

02:38:44   5   discussing it as heroin.

6   Q    So the price for the fentanyl, although the fentanyl, it

7   never came up, everybody just kept using --

8   A    Heroin.

9   Q    -- *pantalones* or --

02:38:58   10   A    *Pantalones*, yes.

11   Q    Okay.  I think you also testified that when negotiating

12   prices, Jese would often say he'd have to send the info and then

13   "they tell me how much."

14        Who is "they"?

02:39:32   15   A    It would be his bosses.

16   Q    Okay.  And none of the bosses were ever arrested; is that

17   correct?

18   A    Not under this case.

19        MR. VIETH:  Thank you, sir.

02:39:45   20

21                    REDIRECT EXAMINATION

22   BY MS. VAN MARTER:

23   Q    So I want to ask you a couple of questions.

24        So in the subsequent meeting in January after Ivan's

02:39:57   25   death --

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                     95
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/ReD/Van Marter*

1    A    Yes.

2    Q    -- is that when Mr. Casillas complained that Ivan had not

3    given him details?

4    A    Yes.

02:40:03    5    Q    And during that January 29th meeting, then, did

6    Mr. Casillas indicated he wanted the details now?

7    A    Yes.  Well, part of it -- not only with regards to the

8    details and the negotiations but also as to where he was doing

9    business.  Ivan was very close to the vest as to where other

02:40:21    10    places that I was doing pickups for him at.  So I explained all

11    of that to him.

12    Q    And that was at Mr. Casillas' request for this information;

13    is that correct?

14    A    Yes.

02:40:31    15    Q    And during that meeting did he give any indication -- and I

16    know you previously testified to this -- as to the difference in

17    quality of the product now versus when it was with Ivan.

18    A    Well, yes, because one of the things -- one of the running

19    parts of the negotiations was the fact that what we were looking

02:40:51    20    for was not volume but quality, and obviously if it's good

21    quality, then we can do high volume.  He was assuring us that if

22    we liked the heroin that we had received prior, that was sent to

23    Ivan, that the new stuff we were going to be getting would blow

24    our minds; that it would be really good; that we would accept

02:41:10    25    it, and we would accept the price, the higher price.

*USA v. Carillo Casillas/4:15-CR-6049-EFS*
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/ReD/Van Marter*                                    96

1    Q    And did he also indicate to you that there was a
2    relationship between *compadre* and Ivan previously?
3    A    Um, the discussion with regards to their -- their
4    relationship was that *compadre* was one of Ivan's partners or old
02:41:25  5    partners, and that, in fact, some of the things they had done on
6    behalf of Ivan, uh, were on behalf of *compadre*.  And that
7    reminded me that when I was having discussions with Ivan, he
8    always referred to other friends that he had that needed to use
9    my service.
02:41:40  10    Q    And so now Mr. Casillas was indicating that he was the one
11    in direct communication with *compadre*.
12    A    Well, he -- by nature of telling me where the pickups were
13    and where the money was going to go, yes.
14    Q    And based upon your training and experience in regard to
02:41:55  15    how these organizations work, is it common that there are
16    individuals who do control matters in Mexico?
17    A    Yes.
18    Q    And then do they -- is it common for them to have cells or
19    locations throughout the United States for the purpose of
02:42:09  20    carrying out business?
21    A    Yes.
22    Q    And how does that work?
23    A    Well, you will have someone who is established within an
24    area that they are going to operate, whether it be living there
02:42:19  25    or working there or -- or have some relationship to the local

1   area and have the -- the control of the routes of where the --

2   the dope is going into and where it's going to be distributed.

3        Their -- their, uh, role could be limited to just

4   transportation or could be expanded to distribution or it could

02:42:38  5   be expanded to money laundering.  That's up to the individual

6   and his relationship with, uh, with the supplier in Mexico.

7   Q    And then when Mr. Vieth was asking you questions, you had

8   used the term "facilitator" as it related to Mr. Casillas and

9   yourself.

02:42:56  10  A    (Nodded.)

11  Q    Does that mean that they are a low-level member of the

12  organization?

13  A    Well, it -- it's -- to put them in a location within the

14  organization, it depends on what they're controlling.  Um,

02:43:12  15  controlling the money is the most important thing.  The whole

16  idea of drug dealing is profit, is to move money.  So if I am

17  controlling the movement and receiving and securing of the

18  money, I'm important to their organization.  If I'm involved in

19  the transportation and the securing of the product to arrive

02:43:30  20  where it's distributed, I'm an important -- that's -- that's a

21  level of importance within the organization.

22       So depending on what exactly your duties are for the

23  organization and the location that you're working, that

24  determines your importance within the organization.

02:43:46  25  Q    And in this case, Mr. Casillas was obviously in control of

1    movement of money; is that correct?

2    A    It was apparent, based on his requesting -- you know,

3    giving me the information as to where the money was going and

4    also dictating who was going to receive actual physical cash in

02:44:01    5    LA, that he had some control over the money.

6    Q    And this also included international control of money.

7    A    Well, he was providing the contacts of the people in a

8    foreign country that was holding the money, and passing

9    information along to identify the person to whom they were

02:44:17    10    supposed to turn over the money, so he did have some control

11    over that.

12    Q    And also in control of disbursement of funds.

13    A    With regards to providing me the accounts where the money

14    was supposed to be sent to, uh, yes, he had that control.

02:44:30    15    Q    And did he also have, then, obviously participation as well

16    as negotiation of product?

17    A    Yes, he took part in negotiations for -- for the delivery

18    of those 10 kilograms of heroin.

19    Q    And transportation of the product.

02:44:45    20    A    We discussed transportation of product with regard to

21    this -- this, uh, transaction, and also he had mentioned others

22    that had occurred prior to.

23    Q    And as well as individuals who would not only receive

24    monies for him in other locations in the country but also engage

02:45:06    25    in transportation.

1    A    Uh, I lost your last part.

2    Q    He also had individuals who would receive money for him at

3    his direction at various parts of the country, for instance,

4    Los Angeles.

02:45:16    5    A    Yes.

6    Q    And he also had individuals who transported narcotics for

7    him even down to the sample that you received in May.

8    A    Yes.

9    Q    You had also indicated that you had tried several times to

02:45:36    10    be able to speak directly with *compadre*; is that correct?

11    A    Yes, I wanted to.  I knew that, um, Mr. Casillas was not

12    the owner of any of this -- this dope.  I knew that people that

13    were supplying him, uh, were connected with laboratories, that

14    they were actually producing this.  So it was very important to

02:45:57    15    me to try to -- to reach out to them in any way I could.

16        So at every step in the negotiations, I always try to offer

17    myself to contact these people in order to unburden him but

18    really to try to engage with them, you know, to further the

19    investigation in Mexico.

02:46:15    20    Q    And did Mr. Casillas ever allow you access to *compadre*?

21    A    No, I was never able to -- to get him to do that.

22    Q    There were a lot of questions in regard to the money wired

23    directly to Mr. Casillas in some kind of argument that that was

24    then a representation of his -- his overall proceeds that he

02:46:38    25    would have received as being a part of this organization.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    During the time that Mr. Casillas got involved or that you

2    knew him to be involved in April of 2014, during that time, was

3    that the time period when your relationship with Ivan had

4    changed in regard to the cash money drops?

02:46:58    5    A    Um, well, when he was giving me the -- the contacts for the

6    drops, Ivan was not on the scene; he was gone; he was dead.

7    Q    No, I mean, prior -- in April of 2014 you had previously

8    testified that your relationship with Ivan changed, where he was

9    no longer giving you larger contracts but smaller contracts to

02:47:19    10    cover overhead.

11    A    Correct.

12    Q    And that was based upon his disagreement with you regarding

13    the percentages you were charging.

14    A    The prices, yes.

02:47:26    15    Q    So during the time of April 2014, is it during this time

16    period when Mr. Casillas first became involved that you were

17    then receiving contracts really for payment of overhead on

18    behalf of Ivan?

19    A    Yes.  Yes, and -- but some of them were of a larger nature,

02:47:43    20    so I don't think all of them were just for overhead.  Some of

21    the -- some of the pickups that were over $150,000 were not for

22    overhead, at least my opinion.

23    Q    And some of those wire transfers were directed to Mexico.

24    A    Correct.

02:47:55    25    Q    And some were directed here to this district.

1    A    Yes.

2    Q    And elsewhere.

3    A    Yes.

4    Q    So when asked if this was the money wired directly to

02:48:05  5  Mr. Casillas, if that was a representation of all of the

6    investment or proceeds he received, is that really a fair or

7    accurate statement?

8    A    It's the only thing that I could say because that's what I

9    could say was actually sent to him personally.  I could not tell

02:48:20  10  you what, if any, of all the other money that -- that was

11   received or was under his control was actually received by him.

12   I couldn't tell you that.

13   Q    And could those monies that were wired directly to him

14   easily been used for overhead?

02:48:35  15  A    Yes, they could have.

16   Q    In reference to those transportation costs he discussed.

17        MR. VIETH:  Objection, Your Honor; speculation.

18        THE COURT:  Sustained.

19   BY MS. VAN MARTER:  (Continuing)

02:48:50  20  Q    And for all of the cash money drops that Mr. Casillas then

21   directed himself, do you know if he received any percentage for

22   doing those?

23   A    I do not know.  I know that we had discussed, uh, adding a

24   percentage to -- to my fee, um, that I could wire to him

02:49:12  25  directly if he wanted to, and that I would back him up with his

1    bosses.  Again, it was another attempt of me attempting to

2    contact his bosses direct, uh, with regards to justifying the

3    higher fee.

4    Q    And what -- were you able ever to kick him an extra

5    percentage?

6    A    I don't -- I don't think so.  I think we maintained

7    everything at the same rate.

8    Q    And do you know why that was?

9    A    Uh, to be honest with you, I don't know.  It just -- we

10   maintained it at 4 percent.  I mean, I can only, uh, ask him

11   to -- to do it so much.  I mean, I would follow his instruction

12   with regards to where the money went.

13   Q    And based upon your training and experience with respect to

14   what you know Mr. Casillas engaged in in this investigation, is

15   it your experience that they often do that for free?

16   A    I'm -- well, uh, no, they don't do it for free.  But one of

17   the things that he did say to me after they -- they seized, uh,

18   the $240,000, one of the things he was complaining is this is --

19   "now I'm going to be working for free," uh, because there is --

20   in some options when seizures happen, uh, that the bosses, what

21   they'll do is if they know you don't have the means to -- to

22   repay that, they'll say, "Okay, now you will continue to work

23   for free."

24   Q    Until it's paid off.

25   A    Until it's paid off, yes.

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                          103
*Sentencing Hearing - Day 1/December 11, 2018*
*Cepero/ReX/Vieth*

1          MS. VAN MARTER:  I have no other questions, Your Honor.

2

3                          RECROSS-EXAMINATION

4     BY MR. VIETH:

02:50:36  5     Q    Did you have any indication or any concern for Jese's

6     safety?

7     A    I always have concern for their safety, but in some

8     respects I can only control certain things when you're doing an

9     investigation.  If something comes across, uh, either from

02:50:55 10     Mexico, from Canada, or from any other, uh, source that his life

11     was in danger, we would have tried to intercede.

12          And I'll give you an example.  It happened in this case in

13     which one of the subjects that Ivan was dealing with in Canada,

14     Ivan was making rumblings of having someone hurt him.  And we

02:51:14 15     ended up having the Canadian authorities contact, do a physical

16     meet with that individual, and -- and not alert them as to the

17     investigation but alert them that someone was looking to hurt

18     them.  And that completely voided us being able to follow up on

19     that individual, but we took -- we prefer to do something to

02:51:33 20     make sure he doesn't get hurt as opposed to not doing anything

21     and having something happen.

22     Q    Did you ever receive any information that my client may

23     have been forced into this or had suffered any type of duress in

24     regard to either laundering the cartel's money or dealing the

02:52:02 25     cartel's drugs?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1   A    He never told me directly as to any threats against him or

2   being under any duress.  Uh, when the money was seized, he was

3   definitely under duress with regards to he has to explain how he

4   lost $240,000.  And, uh, we -- that's why we took the pains to

02:52:21   5   provide him the report so that the bosses knew that it was a

6   seizure by law enforcement and that he was not the person that's

7   trying to stealing that money.

8        So that's the only instance throughout my whole contact

9   with him in which, uh, he expressed concern, uh, because his

02:52:39   10   bosses were blaming him for the loss.

11   Q    And you do believe him when he said, "I will work for

12   free."

13   A    Well, I -- I know how these things work, and that money --

14   when -- when you seize money, it's not like, uh, a pass because,

02:52:54   15   you know, you're all set.  I mean, they will try to get the

16   money back.  And even in this case, we had discussions with

17   regards to them having an attorney in the Los Angeles area that

18   was good at -- at getting the money back, and -- and he -- the

19   discussions were for me to provide some kind of cover evidence

02:53:12   20   to justify the legitimacy of that money to present to the court.

21   But all we used was I couldn't do that to the guy that was

22   paying you because his job was complete when he gave the money

23   to the correct person.

24        So I do believe him that, uh, if -- if they held him liable

02:53:31   25   for that 244,000, that anything else he do, they -- they will --

USA v. Carillo Casillas/4:15-CR-6049-EFS                    105
Sentencing Hearing - Day 1/December 11, 2018
Cepero/ReX/Vieth

1    they will try to make that money back, because I know exactly

2    how they work.

3    Q    And "they," that's being the leaders and the bosses down in

4    Mexico or possibly even up here in the Northwest?

02:53:46  5    A    Whoever the owner of the money was.  Losses are not taken

6    lightly, and losses are not -- not forgiven.  Um, this --

7    obviously there's ways to mitigate the loss, and one of the ways

8    to mitigate the loss is to continue to work, and now whatever

9    your gains were, are going to go towards whatever assessment of

02:54:10  10   the loss is put on you by the boss or the owner of that money.

11   Q    Okay.  So just to be clear, Jese didn't own the drugs, he

12   didn't own the money; he's best described as a facilitator.

13   A    Well, he was a manager, yes.  He's a facilitating manager

14   in the U.S., and he was managing the transportation,

02:54:29  15   distribution, and also some of the money laundering activities

16   on behalf of his boss in -- in, uh -- in Mexico, as he did with

17   Ivan.

18          MR. VIETH:  Okay.  Thank you.

19          THE COURT:  Remind me, was there a seizure that Ivan was

02:54:42  20   involved in?  Was he -- was there money seized in Ivan's

21   possession?  Was Ivan let go?

22          THE WITNESS:  There was a -- it wasn't related to this

23   case.  It was prior to this case.  There was a seizure in

24   Los Angeles that -- that we became aware of in which they took

02:54:59  25   $400,000 from -- or something of that effect, and --

1          THE COURT:  Was he present at the time?

2          THE WITNESS:  Yes, he was present at the time and --

3          THE COURT:  And they released him.

4          THE WITNESS:  As far as I know, they did release him,

5   yes.

6          THE COURT:  That's my recollection.

7          THE WITNESS:  Yes.

8          THE COURT:  Do we know the chronology of that seizure

9   and his death?  Because my recollection is there's some -- I've

10  had so many of these cases involving Mr. Ivan Calvillo that -- I

11  thought that he had been ordered back to Mexico and had to stay

12  in Mexico.

13         MS. VAN MARTER:  So if the Court recalls, that was

14  actually during the time of the prior case before this Court,

15  the Title III involving Alberto Hernandez and Rulas Hernandez.

16  So it was back -- it's on the timeline.  I'll pull it up for the

17  Court.

18         THE COURT:  I just wanted to get the details.  As I

19  recalled it, Ivan was involved -- Calvillo was involved and

20  had -- money had been seized from him.  He wasn't prosecuted.

21  He was allowed to go, and I even think there was some -- I can't

22  recall if there was some allegation that -- whether the police

23  let him go on purpose.

24         MS. VAN MARTER:  So it was Pomona County task force.

25  There was a reverse of approximately 40 pounds of cocaine.

1    THE COURT:  Maybe that was it.

2    MS. VAN MARTER:  Mr. Calvillo showed up with Ms. Mendoza

3    and another defendant that has been before this Court to do the

4    exchange.  They completed the exchange.  He provided

02:56:37   5    approximately $400,000 cash.  The task force came in, arrested

6    Mr. Calvillo, and at that time, because of his status in the

7    United States, he was deported prior to any charges being filed.

8    That was during when we were working with law enforcement to --

9    when Mr. Calvillo lived up here in Sunnyside, Washington.  And I

02:56:59   10   believe the seizure was in approximately 2013.  That's what I

11   was just trying to pull up for the Court.

12        And he remained in Mexico after that period of time,

13   and, yes, he did have to pay that back at some point to the

14   organization, but that was prior to Mr. Casillas' involvement in

02:57:16   15   April of 2014.

16        THE COURT:  Thank you.

17        Any other questions for this witness?

18        MS. VAN MARTER:  Not from the United States, Your Honor.

19        THE COURT:  Any other questions?

02:57:26   20   MR. VIETH:  No, Judge.

21        THE COURT:  Thank you for your testimony.  You may step

22   down.

23        THE WITNESS:  Thank you, Your Honor.

24        THE COURT:  Let's take a 15-minute break at this time.

02:57:34   25   Thank you.

1          THE COURTROOM DEPUTY:  Please rise.

2          Court is in recess.

3          (Recess taken: 2:57 p.m. to 3:14 p.m.)

4          THE COURTROOM DEPUTY:  Please rise.

03:14:18    5     (Call to Order of the Court.)

6          THE COURT:  Please be seated.

7          Okay, folks, let's sort out our day.  We've got some

8    issues, and I need to get an estimate of how long it's going to

9    take and how we're going to proceed, because we have other

03:14:30   10   judges I need to accommodate and other hearings.

11          So talk to me.

12          MS. VAN MARTER:  Your Honor, the United States intends

13   to call Scott Barlow with RCMP.  We are going to limit it to a

14   couple issues, not what we were originally going to go over, so

03:14:44   15   we're going to try and shorten that; and then Bill Leahy on a

16   couple of issues.  So we're hoping to make those abbreviated.

17          THE COURT:  It's 3:15.  Give me an estimate.

18          MS. VAN MARTER:  3:45 for both.

19          THE COURT:  For both?

03:14:55   20   Isn't there a 3:30 for Judge Rodgers, magistrate court

21   video?

22          THE COURTROOM DEPUTY:  Yes.  And they expect it to take

23   ten minutes.

24          THE COURT:  What do you want to do?

03:15:05   25   MS. VAN MARTER:  I think I can try and get through one

1    of them by 3:30, and we could probably take a break.

2         THE COURT:  That would be my thought.  I'd like to

3    accommodate Judge Rodgers if we could, and then come back and

4    continue.

03:15:16   5         But let's assume we get everything done by 3:45 -- well,

6    4 o'clock then.

7         Now what?

8         MS. VAN MARTER:  My argument would not be long, Your

9    Honor.  I submitted --

03:15:25  10         THE COURT:  Well, we're not going to rush this.  It's

11    serious business for everybody.  We're talking about years and

12    years in prison.

13         MS. VAN MARTER:  Yes.

14         THE COURT:  So no reason to accelerate that.  And we're

03:15:34  15    not going after 5:00.  So you have your thing, and if you want

16    to come back at another time, that's fine, too.  But I wanted to

17    accommodate your out-of-country witness, so let's get that done

18    now.

19         Mr. Vieth?

03:15:44  20         MR. VIETH:  There was just one point of clarification,

21    Your Honor, and I've already discussed it with the Government.

22    Exhibit No. 11 has a statement in there that I would like to

23    pinpoint for the Court.  There was some representations by the

24    last witness that my client ceased to communicate with the

03:16:05  25    bosses down in Mexico.  And there is an indication, it was at

1    the last --

2            THE COURT:  I'm sorry, Counsel, I didn't hear that.

3            MR. VIETH:  It was at the last meeting at the Buena --

4            MS. VAN MARTER:  The May 17th transaction from -- what I

03:16:22  5    indicated to Mr. Vieth is I believe the testimony was -- the

6    question was whether Mr. Casillas, in the presence of the

7    undercover, made phone calls.  There was -- my understanding of

8    the testimony was Mr. Casillas still had to consult bosses for

9    price and specifics.  The question as to whether he made a phone

03:16:40  10   call in his presence, he didn't.

11           Mr. Vieth would like to point out in the transcript that

12   there's a reference that Mr. Casillas needs to go outside to

13   make a phone call.  That's the time period that was referenced

14   when he left to go to McDonald's, and I believe the witness

03:16:52  15   said, "I don't know if he made a phone call during that time

16   period or not."

17           MR. VIETH:  If that's the Court's understanding, Your

18   Honor, I am completely fine with that.

19           THE COURT:  That's my understanding.

03:17:00  20           MR. VIETH:  Okay.  Thank you, Judge.

21           THE COURT:  Call your witness.

22           MS. VAN MARTER:  Thank you, Your Honor.  The United

23   States calls Scott Barlow.

24           THE COURT:  Cora, let Judge Rodgers' people know we'll

03:17:11  25   do it at 3:30-ish.

1          Come forward, please, to your right and to my left.

2          (Witness approached.)

3          THE COURT:  Good afternoon.

4

03:17:25   5                    SCOTT BARLOW,

6      called as a witness on behalf of the Plaintiff, having first

7          sworn or affirmed, testified under oath as follows:

8          THE WITNESS:  I do.

9          THE COURT:  Please be seated.

03:17:32  10          When you're comfortable, tell us your first and your

11     last name, and then spell both of them for the record.

12          THE WITNESS:  First name is Scott, last name is Barlow;

13     S-C-O-T-T, B-A-R-L-O-W.

14          THE COURT:  Thank you.  Good afternoon.

03:17:46  15          You may proceed.

16          MS. VAN MARTER:  Thank you.

17                    DIRECT EXAMINATION

18     BY MS. VAN MARTER:

19     Q    Good afternoon.

03:17:49  20          How are you employed?

21     A    I'm employed by the RCMP, Royal Canadian Mounted Police.

22     Q    And how long have you been with the RCMP?

23     A    I've been a member of the RCMP since 2000; approximately 18

24     years.

03:18:00  25     Q    And just for the record, do we -- you have permission to

1    sit during the testimony.

2         THE WITNESS:  Thank you very much, Your Honor.

3    BY MS. VAN MARTER:   (Continuing)

4    Q    Do you usually stand during testimony?

03:18:09    5    A    Yes.  In Canada, we normally stand during testimony.

6    Q    All right.  What is your current assignment?

7    A    I'm currently assigned as a sergeant team leader to the

8    Federal Serious and Organized Crime section.

9    Q    Is that referred to as FSOC?

03:18:21    10    A    Yes.

11    Q    And what are your duties and responsibilities with FSOC?

12    A    Our mandate is to investigate transnational organized crime

13    with respect to drug smuggling and money laundering.

14    Q    And did you become involved in an investigation that

03:18:34    15    related to a DEA Boston case?

16    A    Yes.

17    Q    And do you recall when you became involved?

18    A    I became involved in roughly September of 2014, Your Honor.

19    Q    And what -- what was your role in that investigation?

03:18:47    20    A    I was assigned as the primary investigator, which would

21    control the speed, flow, and direction of the file occurring in

22    Canada.

23    Q    And was there a particular target that was identified in

24    the Vancouver area that you were in charge of following up

03:19:00    25    investigation?

1    A    Yes.  The target was, Jorge Esau De Vicente Luque.

2    Q    And is that an individual who has been indicted in this

3    particular case?

4    A    Yes.

03:19:10    5    Q    Yet remains a fugitive?

6    A    Yes.

7    Q    And during your initial assignment, then, did you follow up

8    in regard to surveillance and other investigative techniques

9    with regard to Jorge Luque?

03:19:21    10    A    Yes.  We conducted surveillance on him; we placed trackers

11    on his vehicles; we did telephone dial-recorders, which would

12    monitor all of his telephone calls in and out.

13    Q    And during the course of the investigation, were you aware

14    if he personally participated in aspects of the investigation to

03:19:35    15    include money drops?

16    A    Yes.

17        THE COURT:  Sorry.  Hold on.

18        MR. VIETH:  Mr. Barlow, could you speak up a little bit?

19    The interpreter is having a little bit of difficulty.

03:19:44    20        THE WITNESS:  Yes, I will, sir.

21        THE COURT:  Pull that microphone a little closer.

22    BY MS. VAN MARTER:  (Continuing)

23    Q    I'm sorry.  I'll repeat the question.

24        Did you identify Mr. Jorge Luque as being involved in the

03:19:52    25    investigation, specifically also involved in money drops?

1    A    Yes, he showed up on several occasions to deliver money to

2    our undercover operators.

3    Q    And what was RCMP's role in the investigation with DEA in

4    Boston, predominately?

03:20:05    5    A    Our role?

6    Q    Yes.

7    A    Our role was to support their investigation, but also to

8    look at opportunities in Canada to have disruption and

9    enforcement with respect to seizing drugs or money or cash.

03:20:15    10    Q    And that also included providing undercover operatives who

11    played the role of the Canadian bosses?

12    A    Yes, we inserted several undercover operators to support

13    DEA's operation.

14    Q    And back to Mr. Jorge Luque, you had indicated he

03:20:31    15    participated in several cash money drops; is that correct?

16    A    Yes, that is correct, ma'am.

17    Q    And did he participate early on in the investigation and

18    then --

19         THE COURT:  Counsel, can you just go a little bit

03:20:37    20    slower?

21         MS. VAN MARTER:  Yes, Your Honor.  Sorry, Your Honor.

22         THE COURT:  Thank you.

23    BY MS. VAN MARTER:  (Continuing)

24    Q    During the early part of the investigation, was he

03:20:44    25    identified, then, as participating in those cash money drops?

1    A    Yes.  He showed up at the first part of the cash money

2    drops, and then there was a little bit of a lull in his

3    appearance, and then he showed up towards the end of the

4    investigation, which I believe is --

03:20:55  5        THE COURT:  Who are we speaking of here?

6    BY MS. VAN MARTER:  (Continuing)

7    Q    Jorge Luque?  Is that correct?

8    A    Jorge Luque, yes.

9        THE COURT:  Thank you.

03:21:00  10   BY MS. VAN MARTER:  (Continuing)

11   Q    And during the initial part, that was when Mr. Ivan

12   Calvillo was involved; is that correct?

13   A    Yes, that is correct.

14       THE COURT:  How do we know that?  How do I know that?

03:21:08  15   How does he know that?

16   BY MS. VAN MARTER:  (Continuing)

17   Q    You first became involved in the fall of 2014; is that

18   correct?

19   A    Yes.

03:21:13  20   Q    And when you first became involved, did you have

21   conversations and debriefings with DEA Boston?

22   A    Yes.  We entered into a joint investigation with the Drug

23   Enforcement Agency to support the money pickups occurring in

24   Vancouver and to investigate the criminal organization in

03:21:28  25   Canada.

1    Q    And based upon that involvement, did you become familiar,

2    then, with who the Undercover Operative Jaime Cepero was in

3    communication with?

4    A    Yes.  We had routine communications with Mr. Cepero's team

03:21:41    5    and updates on the file as it progressed in the United States

6    and in Mexico.

7    Q    And so in that early part of your involvement in the fall

8    of 2014, who did you understand Undercover Cepero was in

9    communication with?

03:21:52    10    A    We were advised that he was communicating with

11    Mr. Calvillo, Ivan Calvillo.

12    Q    And it was that time that you first identified Mr. Luque

13    participating in the money drops?

14    A    Yes.

03:22:02    15    Q    And you indicated that there was a lull in time where you

16    didn't see him.

17    A    Yes, there was a lull in time where there were several

18    money pickups where Luque was not the person delivering the cash

19    at hand.

03:22:13    20    Q    And can you recall some of the people that delivered on

21    his -- during -- excuse me, some other individuals who

22    provided -- who participated in the cash money drops?

23    A    Yes, we had several.  We had an Armando Betancort, we had

24    had a Rolando Guajardo (phonetic spelling), we had an Oscar

03:22:28    25    Mendoza, we had a Anna Rogalski, and I believe --

1    Q    A Benjamin Goldring?

2    A    And, sorry, and a Benjamin Goldring.

3    Q    So there are other individuals that were involved in these

4    cash money drops in addition to those that were presented in

03:22:43  5    indictment here in the United States?

6    A    Yes.

7    Q    You had mentioned an Anna Rogalski; is that correct?

8    A    Yes.  Anna Rogalski was identified as she delivered, uh, I

9    believe, approximately $100,000 on April 15th, 2015.

03:23:00  10    Q    And did she also then --

11         THE COURT:  In Vancouver British, Columbia?

12         THE WITNESS:  In Surrey, British Columbia, a small

13    suburb of Vancouver, yes.

14    BY MS. VAN MARTER:    (Continuing)

03:23:11  15    Q    And did she also deliver within a week after that, on

16    April 22nd?

17    A    Yes, approximately seven days later I believe she delivered

18    163,000.

19    Q    And was this the time period that Ivan was in communication

03:23:24  20    with the undercover?

21    A    Yes, I believe so.

22    Q    And based upon those cash deliveries, did you do follow-up

23    investigation regarding Ms. Rogalski?

24    A    Yes.  So we conducted surveillance on Anna Rogalski, just

03:23:36  25    to find out who her associates were, who she was working for,

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    because we believed she was just a runner, delivering the cash.

2    And during surveillance, we found that she met up with an

3    individual called Oscar Mendoza, which we had previous history

4    of.  He's actually -- he was currently under indictment at the

03:23:50    5    time that we found him and located him on surveillance.  He has

6    since been indicted to the United States for drug trafficking

7    offenses and drug smuggling offenses.

8         And during that time on surveillance, she met with him on

9    several occasions, and they went to various places together and

03:24:05    10    purchased a vacuum sealer and a money counter.

11    Q    And where was Mr. Mendoza brought to the United States to

12    face his charges?

13    A    I believe in the Western District of Washington;

14    Bellingham, I believe, was the DEA office.

03:24:19    15         THE COURT:  So is he under indictment in the Western

16    District?

17         THE WITNESS:  Yes, and he has since been extradited to

18    the United States, Your Honor.

19         THE COURT:  Okay.  Thank you.

03:24:26    20    BY MS. VAN MARTER:  (Continuing)

21    Q    And did you also understand or come to learn that

22    Mr. Mendoza had ties to this side of Washington state as well?

23    A    Yes.

24    Q    After you observed Ms. Rogalski purchase the money counter

03:24:44    25    and such, did you participate in or obtain a search warrant for

1    her residence in Canada?

2    A    Yes.  There was another pending money contract that

3    Mr. Cepero had received, and we believed it was from the same

4    organization.  Roughly, they were organizing $300,000 that

03:24:59  5    needed to be repatriated back to other parts of the United

6    States and Mexico.

7        So at that point in time we made an investigative decision

8    to execute a search warrant on her residence, and during the

9    search warrant we located the vacuum sealer, the money counter,

03:25:10  10    and $300,000 in Canadian currency vacuum-sealed and ready for

11    delivery.

12            THE COURT:  How do you spell her last name?

13            THE WITNESS:  Rogalski?  It's R-O-G-A-L-S-K-I.

14            THE COURT:  Thank you.

03:25:22  15    BY MS. VAN MARTER:  (Continuing)

16    Q    And is that also an individual who has been presented in

17    indictment in this jurisdiction --

18    A    Yes.

19    Q    -- based upon her role?

03:25:29  20    A    Yes, she has.

21    Q    And did you have an opportunity to speak to her during the

22    execution of that search warrant?

23    A    Yes.  Following the execution of the search warrant, I

24    personally did a warrant statement of her at the scene.

03:25:40  25    Q    And did she provide you any information as to how she got

1   involved?

2   A    Limited information; just the fact that she was recruited,

3   Your Honor, basically at a salsa dance club by an individual by

4   the name of Hugo.

03:25:54   5   Q    And was she supposed to receive any payment for her

6   participation?

7   A    Yeah, she received, um, a minimal -- a few thousand

8   dollars, I believe, I recall.

9        THE COURT:  Did you say she's under indictment in this

03:26:10   10   district?

11        MS. VAN MARTER:  Yes, Your Honor.

12        THE COURT:  In front of me?

13        MS. VAN MARTER:  Yes.  She's not appeared before you

14   yet.

03:26:14   15   BY MS. VAN MARTER:   (Continuing)

16   Q    Does she remain a fugitive?

17   A    She remains a fugitive in Canada.

18   Q    And, let's see, did Mr. Luque reappear during the course of

19   the investigation himself?

03:26:35   20   A    Yes.  Towards the end, I believe the summer of 2016, maybe

21   June and July, he showed up and delivered, I believe, on three

22   separate occasions bulk cash for transferring to the United

23   States.

24   Q    And based upon your involvement in the investigation at

03:26:50   25   that time, did you know who the undercover was in communication

1   with at that time?

2   A    Who, sorry, Mr. Cepero was in communication with?

3   Q    Yes.

4   A    Yes.

03:27:01  5   Q    And who was that?

6   A    And we knew it was Jese Casillas.

7   Q    Aside from the $300,000 seizure, did your unit also

8   participate in or were a part of a seizure that occurred in

9   August up in Grand Forks?

03:27:26  10  A    Yes, we were.

11  Q    And that -- was that a part of your independent

12  investigation or follow up?

13  A    Yes.  As a result of the money contract received by

14  Mr. Cepero during our undercover operation, the undercover

03:27:37  15  operator observed a hidden compartment in the vehicle that

16  arrived to deliver the cash.  As a result, we conducted

17  surveillance, and within a few days that vehicle drove to a

18  remote area on the border of Washington state and Canada, which

19  is approximately about five or six hours away from Vancouver,

03:27:52  20  and in the middle of the evening, several occupants crossed the

21  border illegally and entered into that vehicle.  And an arrest

22  was made and several items, I believe 17 kilos of

23  methamphetamine, 4 kilos of cocaine, just under a kilogram of

24  heroin, and two stolen handguns, were located.

03:28:09  25  Q    Other than the search warrant, then, at Ms. Rogalski's and

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                    122
*Excerpt of Sentencing Hearing/December 11, 2018*
*Barlow/X/Vieth*

1    the seizure at Grand Forks, BC, did you have any other large

2    cash seizures or bulk drug seizures related to this

3    investigation?

4    A    Not during that time we didn't.

03:28:25    5    Q    So earlier when Officer Cepero was testifying regarding a

6    $300,000 loss or seizure that occurred in Canada, what did you

7    understand that to be a reference to?

8    A    We believe it was the money that we seized during the

9    search warrant from Anna Rogalski.

03:28:43    10        MS. VAN MARTER:  Your Honor, if I could have a moment?

11        THE COURT:  Yes.

12        (Counsel conferring.)

13        MS. VAN MARTER:  That was a long way to come, but thank

14    you very much.  I have no other questions of this witness.

03:29:07    15        THE COURT:  Mr. Vieth?

16

17                        CROSS-EXAMINATION

18    BY MR. VIETH:

19    Q    Good afternoon, sir.

03:29:13    20    A    Good afternoon.

21        THE COURTROOM DEPUTY:  Judge, it's 3:30.  Did you want

22    to break now or --

23        MR. VIETH:  I'll be brief, Judge.  I've only got two

24    questions.

03:29:22    25        THE COURT:  Go ahead.

1    BY MR. VIETH:   (Continuing)

2    Q    Who is Luque?

3    A    Jorge Esau De Vicente Luque was identified as the person

4    who Mr. Cepero was originally in contact with who was

03:29:33  5    negotiating the money contracts in Canada.

6    Q    Is he best described as the leader/organizer, I guess, in

7    Canada, the leader of the group up there?

8    A    Yes.

9    Q    Do you know if there are any telephone records, any other

03:29:50  10    documentation, text messages, e-mails, anything that links my

11    client to Luque?

12    A    Not that I know of.

13         MR. VIETH:   That's all we have, Judge.

14         MS. VAN MARTER:   Just one clarifying question?

03:30:05  15                    REDIRECT EXAMINATION

16    BY MS. VAN MARTER:

17    Q    So Luque was utilized for cash money drops at the direction

18    of Ivan; is that correct?

19    A    Yes.

03:30:15  20    Q    And also at the direction of Jese Casillas?

21    A    Yes, I believe so.

22    Q    And do you know if you have all of the phone numbers and

23    BBM PINs and WhatsApp communications or contacts for Luque?

24    A    No, we don't have all the communications for Luque.

03:30:29  25    Q    And do you know if you have any or all of the

1    communications for Mr. Casillas?

2    A      No, we don't.

3           MS. VAN MARTER:  No other questions, Your Honor.

4           MR. VIETH:  Nothing further.  Thank you, Judge.

03:30:38  5           THE COURT:  Well, thank you for being here.

6           THE WITNESS:  Thank you very much, Your Honor.

7           THE COURT:  Okay, folks, 15 minutes.  See you in 15.

8           THE COURTROOM DEPUTY:  Please rise.

9      (Recess taken: 3:30 p.m. to 3:58 p.m.)

03:30:54  10          THE COURTROOM DEPUTY:  Please rise.

11     (Call to Order of the Court.)

12          THE COURT:  Good afternoon.  Let's resume.

13     You folks ready over there?

14     All right.  Mr. Leahy.

03:58:18  15     (Witness approached.)

16          THE COURT:  Welcome back.

17

18                       WILLIAM LEAHY,

19   called as a witness on behalf of the Plaintiff, having first

03:58:27  20       sworn or affirmed, testified under oath as follows:

21          THE WITNESS:  I do.

22          THE COURT:  Please be seated.

23     When you're ready, tell us your first and last name, and

24   spell them both for the record.  Thank you.

03:58:36  25          THE WITNESS:  William Leahy, W-I-L-L-I-A-M, Leahy,

1    L-E-A-H-Y.

2              THE COURT:  Good afternoon.

3              You may proceed.

4

03:58:41   5                    DIRECT EXAMINATION

6    BY MS. VAN MARTER:

7    Q    Good afternoon.

8         Have you previously testified before this Court in this

9    case regarding your role in the investigation?

03:58:50  10    A    Yes.

11    Q    And were you formerly employed by the FBI?

12    A    Yes.

13    Q    Are you now retired?

14    A    Yes.

03:58:55  15    Q    And how long were you with the FBI?

16    A    Uh, 26 years.

17    Q    And were you assigned specifically to a task force?

18    A    Uh, yes.

19    Q    And how long did you work with the task force while with

03:59:07  20    the FBI?

21    A    Um, approximately ten years off and on because I was a

22    supervisor for some of that time.

23    Q    And you previously testified as to your training and

24    experience in the investigation of large-scale drug trafficking

03:59:21  25    organizations here in this district?

1   A     Yes.

2   Q     Did you become involved in an investigation regarding Ivan

3   Calvillo?

4   A     Yes.

03:59:27   5   Q     And when did you first become involved in that

6   investigation?

7   A     You could probably say back as far as 2010.

8   Q     And are you familiar, then, with how that investigation has

9   continued on up until the present day, specifically to include

03:59:46   10   Mr. Jese Casillas?

11   A     Yes.

12   Q     And have you been a party to that investigation during that

13   entirety up until the time of your retirement --

14   A     Yes.

03:59:53   15   Q     -- and after?

16   A     Yes.

17   Q     I'm going to ask you just a couple of questions.

18        Were you familiar with the arrest and seizure involving

19   Ivan Calvillo down in California during the course of the

04:00:05   20   investigation?

21   A     Yes.

22   Q     And could you just briefly tell the Court what occurred.

23   A     Um, my recollection is that, uh, he was arrested down there

24   with a couple of other individuals by Pomona, I think it was

04:00:20   25   city police department, if I recall correctly.  Um, and it was a

1    reverse where they, uh, obtained approximately $400,000 cash

2    from Calvillo.  Essentially task forces down in California take

3    the money.

4         We got wind of it, um, and Ms. Van Marter and Darren Pitt

04:00:44    5    with his began to draft an affidavit for his arrest, uh, up here

6    in the Eastern District of Washington.  We were told by his down

7    there that they would hold him until that was done.

8         Somehow administratively his let him go before the

9    paperwork could be, uh, put on him, essentially.

04:01:08    10   Q    And was that based upon the ongoing investigation into Ivan

11   Calvillo out of this district at that time?

12   A    Yes, it was.

13   Q    And --

14        THE COURT:  This was the Pomona Police Department?

04:01:18    15        THE WITNESS:  Yes.

16   BY MS. VAN MARTER:  (Continuing)

17   Q    Was that associated with a task force as well down in that

18   area of California?

19   A    It was a task force, and I can't recall if it was the

04:01:26    20   Pomona PD task force, if it was -- it was either a county or a

21   local task force, and that's why I'm not sure if it -- if it was

22   Pomona city or county.

23   Q    And at that time were -- was the FBI in the process of

24   trying to go up on a Title III on Ivan Calvillo's phone?

04:01:44    25   A    We were.

1   Q    So once we received word in this district, was there then

2   efforts to get Mr. Calvillo into custody?

3   A    Yes.

4   Q    And then he was deported instead?

04:01:55   5   A    Correct.

6   Q    And based upon your communications, then, with some of

7   those task forces down there, is deconfliction difficult in

8   terms of their state-level investigations comparative to what is

9   going on in a federal investigation?

04:02:10   10   A    At times, yes.

11   Q    And based on your understanding, did they not have access

12   to or properly deconflict their target at that time?

13          THE COURT:  A what?

14          MS. VAN MARTER:  Deconfliction.

04:02:21   15   BY MS. VAN MARTER:  (Continuing)

16   Q    What is deconfliction?

17   A    So deconfliction is knowing that, for example, that we are

18   working Mr. Calvillo as a target here in the Eastern District of

19   Washington.  And there was not a deconfliction done.

04:02:37   20          THE COURT:  So this is an effort to cooperate so you

21   deconflict?

22          THE WITNESS:  It's an effort to cooperate so that we all

23   work together.

24          THE COURT:  Okay.  Thank you.

04:02:45   25   BY MS. VAN MARTER:  (Continuing)

1    Q    And after that point in time, then, did we lose the ability

2    to obtain a Title III on Mr. Calvillo?

3    A    Yes.  He was deported to Mexico and -- and at that point

4    knew we were investigating him and chose not to come back to the

04:03:00    5    United States.

6    Q    And after that did he remain, then, in Mexico until the

7    time of his death, as best we can tell?

8    A    As best as we know.

9    Q    And did the investigation, however, continue into his --

04:03:11   10    other individuals that may have been operating on behalf of the

11    organization here in the district?

12    A    Yeah.  Essentially what our focus was is once -- once he

13    was deported, we were trying to ascertain who took -- was going

14    to take over for him here in this area.

04:03:27   15    Q    And based on your training and experience and knowledge of

16    this investigation as it operates here in this district with

17    this organization, typically what is put in place in terms of

18    who is in charge and what they're in charge of?

19    A    There's typically one person put in charge of the

04:03:44   20    organization here, um, in -- in the Eastern District of

21    Washington and, uh, into other states and obviously up into

22    Canada.  Um, that person would be in charge of the distribution,

23    um, obtaining the drugs from Mexico, and also the money part of

24    the transactions.

04:04:04   25    Q    And are there other people who play roles in the

1    organization, for instance, in the California area?

2    A    Yeah.  Um, for example, I think that Mr. Cepero testified

3    that money was wired to California.  Um, obviously the -- the

4    narcotics has to come from Mexico into the United States and

04:04:25   5    this --

6            MR. VIETH:  Your Honor, I'm going to object on

7    speculation.  I think he can testify to what he knows, but what,

8    you know, the witness has already testified to, I already heard

9    that part.

04:04:34   10           THE COURT:  No, I'm going to permit this.

11           I had -- I want to make a record that we've had a

12   hearing qualifying him as an expert in this case.  It's of

13   record.  So there was a challenge to his expertise.  I had a

14   hearing.  He testified.  Defense counsel were there.  And so, of

04:04:51   15   record, I found that he was qualified to give opinions about

16   DTOs and money laundering.  And I believe that, Mr. Vieth,

17   you'll find that as an order in the file to that effect.

18           MR. VIETH:  I believe I was present, Judge, so I will

19   retract my objection.

04:05:07   20           THE COURT:  I'm glad that you remember you were present.

21   Thank you.  And I accept your withdrawal.

22           Okay, Mr. Leahy.

23   A    So, for example, uh, drugs would come across from Mexico

24   into California with this organization, and then from California

04:05:21   25   be shipped up here.  And we know that from people that we have

1    arrested, cooperators, um, et cetera.

2    BY MS. VAN MARTER:   (Continuing)

3    Q    And even during the course of the early part of this

4    investigation, was there a defendant arrested out of the

5    California area by the name of Rulas Hernandez?

6    A    Yes.

7    Q    And was that a second part of this investigation that also

8    involved an Alberto Hernandez?

9    A    Yes, it was -- yes.

10   Q    And --

11        THE COURT:  Just for the record, you're offering his

12   testimony as an expert as well as his percipient witness

13   testimony to the extent that -- you need to clarify when it's

14   percipient and when it's expert.  Okay?

15        MS. VAN MARTER:  Yes, Your Honor.

16        THE COURT:  So far I understand it's DTO expertise.

17        MS. VAN MARTER:  I am asking specifically about this

18   investigation now, about this drug trafficking organization and

19   his knowledge.

20        THE COURT:  That's percipient.

21        MS. VAN MARTER:  Yes.

22   BY MS. VAN MARTER:   (Continuing)

23   Q    So in that particular investigation, did you also identify

24   a woman by the name of Rosa?

25   A    Yes.

1   Q    And who was Rosa?

2   A    She was the wife of the individual that you just mentioned.

3   Q    Rulas Hernandez?

4   A    Yes.

04:06:22  5   Q    And what was Rulas Hernandez's role in the organization at

6   that time?

7   A    Well, um, it's debatable, but our understanding is that he

8   was in charge of, uh, bringing narcotics from Mexico up to

9   California.  And then his brother was put in charge up here in

04:06:43  10  Tri-Cities, and, uh, he was, uh, the -- the drugs would be sent

11  from Rulas up here to Beto.

12  Q    And would then Beto be in charge of disbursing them --

13  A    Yes.

14  Q    -- into Canada and elsewhere?

04:06:57  15  A    Yes.  And Ivan Calvillo at the time was in charge of the

16  two -- two brothers.

17  Q    And when this was happening, that was when Ivan was in

18  Mexico.

19       Is that correct?

04:07:05  20  A    Yes.  That's true.

21  Q    So when you were -- previously testified that somebody is

22  usually put in charge in this district, was that Rulas Hernandez

23  in California and Beto Hernandez here in the Eastern District of

24  Washington?

04:07:17  25  A    That's correct.

1    THE COURT:  So it's Ruelas, R-U-E-L-A-S, [sic]

2    Hernandez?

3    MS. VAN MARTER:  Yes.

4    BY MS. VAN MARTER:  (Continuing)

04:07:24  5    Q    And did Rosa come up again during the course of this

6    investigation when the money laundering part of it started

7    through Officer Cepero?

8    A    She did.

9    Q    How so?

04:07:35  10   A    She was sent by Mr. Calvillo to Australia to coordinate,

11   um, the distribution of narcotics in Australia.

12        THE COURT:  And what is her actual name?  You say

13   "Rosa," and I wanted to make sure I knew --

14        MS. VAN MARTER:  Rosa Hernandez, Rulas Hernandez's wife.

04:07:51  15        THE COURT:  Okay.

16        THE WITNESS:  Yeah.  I'm not sure if it's Hernandez.

17   I -- I've been retired for a year.  Sorry, Judge.

18   BY MS. VAN MARTER:  (Continuing)

19   Q    And eventually were Beto and Rulas also arrested?

04:08:05  20   A    Yes.

21   Q    And in your --

22        THE COURT:  And Beto is who?

23        MS. HOLLAND:  Beto Hernandez Ramirez.

24        THE COURT:  Okay.  Thank you.

04:08:14  25   BY MS. VAN MARTER:  (Continuing)

1    Q    After their arrest, were there other individuals, then, put

2    into charge up here in the Eastern District of Washington

3    regarding operations?

4    A    Yes.

04:08:22    5    Q    And did you know one of those to be somebody referred to as

6    AR-15?

7    A    Yes.

8    Q    And that's Juan Pablo Gonzalez Mendoza?

9    A    Yes.

04:08:32    10    Q    And after -- and was he ultimately arrested?

11    A    Yes, he was.

12    Q    And at some point in time did you come to understand if

13    Mr. Casillas played a role with respect to this district?

14    A    Yes.

04:08:43    15    Q    And what role was that?

16    A    Our understanding was, is that he took over for this -- for

17    this organization, um, this territory.

18    Q    And when taking over for this territory, you had mentioned

19    transportation also up into Canada.  I believe you previously

04:09:00    20    testified about a trail system.

21        Are you familiar with that?

22    A    Yes.

23    Q    And was there a trail system specifically utilized by this

24    organization that originated out of this district?

04:09:10    25    A    Yes.

1    Q    And what was that?

2    A    Um, there was basically a trail system where, uh, they

3    would drive up to Oroville, and then at nighttime cross over the

4    border into Canada with backpacks, um, typically containing

04:09:24    5    narcotics to take up to Canada.  And sometimes they would bring

6    back cash into the United States.

7    Q    And based upon this investigation, did you understand those

8    that were in charge in this district would also be responsible

9    for the movement of those narcotics into Canada and cash drug

04:09:44    10    proceeds back down?

11    A    Yes.

12    Q    I'm going to direct your attention to Government's Exhibit

13    No. 1; specifically, the April of 2015 time period.

14         Were you still a part of this investigation at that time?

04:10:02    15    A    Yes, I was.

16    Q    And did you have a confidential human source that had been

17    tied into this organization for a number of years?

18    A    Yes.

19    Q    And did that confidential human source first come to you

04:10:12    20    and identify Mr. Casillas?

21    A    Yes, he did.

22    Q    And how so?

23    A    Uh, he indicated that, um, he had been requested to, uh,

24    give a load car by Mr. Calvillo to Mr. Casillas.

04:10:30    25    Q    And was that the Mini Cooper?

1  A    Yes.

2  Q    Was there a second load car that Mr. Casillas also

3  requested?

4  A    Yes.  It was a Sebring, and I can't recall which -- there

04:10:40  5  were two Sebrings, so I'm not going to remember which one.

6  Q    Did this organization utilize multiple load vehicles?

7  A    Yes.

8  Q    And what was the purpose of Mr. Casillas wanting access to

9  these two load vehicles?

04:10:53  10  A    Uh, to transport narcotics.

11  Q    And this is separate and apart from what you later learned

12  to be his involvement with the money laundering aspect of this

13  investigation and Officer Cepero?

14      Well, let me rephrase the question.

04:11:10  15      These are additional activities from the money laundering

16  part of the investigation with Officer Cepero?

17  A    They're different than the wire transfer part of the

18  investigation because there was money, um, being physically

19  distributed using vehicles, et cetera.

04:11:28  20  Q    And I just scrolled up.  There's a box there that

21  references surveillance of the Mini Cooper.

22      Did your task force surveil and confirm the defendant, as

23  well as his wife, in possession of the Mini Cooper, the load

24  vehicle?

04:11:44  25  A    Yes.

1    Q    And who is Daisy Camacho?

2    A    The defendant's significant other.

3    Q    And did he also have other significant others identified

4    during the course of the investigation?

04:11:55    5    A    There was a girlfriend; Brittany Zaragoza, I believe.

6    Q    And during this time period, was there identification of

7    potential drivers for Mr. Casillas?

8    A    Yes.

9    Q    And who was the potential driver that was identified?

04:12:19    10   A    Um, there were multiple drivers.  Um, one was Juan -- Jose

11   Adrian Mendoza.  Um, he was surveillanced [sic] going up to --

12   to the Canadian border, I think, multiple times by us.

13   Q    And, again, is this consistent with the previous area that

14   had been identified as the trail system utilized by the

04:12:44    15   organization?

16   A    Yes, it was.

17        THE COURT:  Who is his wife or significant other, the

18   defendant's?

19   BY MS. VAN MARTER:  (Continuing)

04:12:50    20   Q    Who is Mr. Casillas' wife or --

21   A    Daisy.

22        THE COURT:  Daisy what?

23        THE WITNESS:  Uh, Camacho, I believe.

24        THE COURT:  Camacho?

04:13:00    25   BY MS. VAN MARTER:  (Continuing)

USA v. Carillo Casillas/4:15-CR-6049-EFS-2                    138
Excerpt of Sentencing Hearing/December 11, 2018
Leahy/D/Van Marter

1    Q    Camacho?

2    A    I believe so.

3            THE COURT:  Okay.  Thank you.

4    BY MS. VAN MARTER:   (Continuing)

04:13:02  5    Q    And I think if we look right here, she's identified

6    (indicating).

7            Is that --

8    A    Yeah, it's Daisy Biviano Camacho Duarte.

9            THE COURT:  There you go.  Thank you.  Camacho Duarte.

04:13:15 10   Thank you.

11   BY MS. VAN MARTER:   (Continuing)

12   Q    And so while the money laundering aspect of the

13   investigation was ongoing, you were also tracking and

14   surveilling load vehicles and identification of Jose Adrian

04:13:29 15   Mendoza; is that correct?

16   A    Yes.

17   Q    Did there come a time during this investigation that you

18   identified a residence associated with Mr. Casillas?

19   A    Yes.

04:13:42 20   Q    And do you recall what residence that was?

21   A    It was in Kennewick, I believe, right off of Kennewick

22   Avenue by the golf course there.  I can't remember -- I can't

23   recall the address at this time.

24   Q    Does 8 North Palouse sound about right?

04:13:54 25   A    That's it.

1  Q    And based upon the investigation, did you ultimately put up

2  a pole camera outside that residence?

3  A    Yes, we did.

4  Q    And do you recall approximately when that pole camera was

04:14:06  5  placed?

6  A    I believe it was very close to -- well, no.  It would have

7  been in the spring after the death of Calvillo, so it would have

8  been in the spring of 2016.

9  Q    Mr. Calvillo was killed in December 2015?

04:14:22  10  A    Yes.

11  Q    Okay.  And you began the pole camera outside the residence,

12  and what was the purpose of that?

13  A    Uh, surveillance to figure out who was coming and going

14  from the residence, uh, to determine, uh, load cars, uh, load

04:14:38  15  drivers; uh, those types of things.

16  Q    Were you also able to ever identify any distributors?

17  A    Uh, yes.

18  Q    And were you able to identify load cars coming to the

19  residence?

04:14:50  20  A    Yes.

21  Q    And some of these distributors, were you able to effectuate

22  traffic stops and seize quantities of narcotics?

23  A    Yes.

24  Q    And what type of narcotic?

04:15:00  25  A    Um, my recollection, it was meth -- all methamphetamine.

1    Q    And in this particular organization, did they typically

2    transport certain narcotics up into Canada and leave certain

3    narcotics here in the United States?

4    A    Yes.

04:15:13    5    Q    And what was that and why?

6    A    Uh, methamphetamine was, uh, the, uh -- what do I want to

7    say?  The -- there was a need for it in, uh, in the Dakotas, so

8    that's why most of the methamphetamine, they could get a better

9    price for it there.  The cocaine, the best price they could get

04:15:37    10    for it was in Canada, so the cocaine would go to Canada.  And

11    the meth would go out towards, uh, South Dakota, North Dakota,

12    and Minneapolis, Chicago.

13    Q    And was there also a time that heroin came into the picture

14    during the course of the investigation?

04:15:52    15    A    Uh, yes.

16    Q    And was -- was heroin more expensive up in Canada than here

17    in the United States?

18    A    Yes.

19    Q    I'm going to ask you, at some point in time you became

04:16:04    20    aware of the money laundering investigation as well as the RCMP

21    involvement; is that correct?

22    A    Yes.

23    Q    And were you receiving information then from Officer Cepero

24    regarding money wire transfers that may have been occurring in

04:16:16    25    this district?

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                                    141
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/D/Van Marter*

1    A    Yes.  We were trying to coordinate those to see whether the

2    wire transfers coordinated with movement of load vehicles.

3    Q    And during the course of that part of the investigation,

4    did you identify if Mr. Casillas received money wire transfers?

04:16:33   5    A    Yes.

6    Q    Did you also identify if any of his family members received

7    money wire transfers?

8    A    Yes, they did.

9        THE COURT:  When you say "wire transfers," are you

04:16:52   10    talking about the drug trafficking organization's money

11    laundering?

12        THE WITNESS:  No.  So Mr. Cepero would get directions

13    from Casillas after doing a money exchange, and then he would be

14    asked to wire --

04:17:10   15        THE COURT:  Right.

16        THE WITNESS:  -- funds, and those funds would go to

17    people that he may not have known who they were but we did.

18        THE COURT:  But these were proceeds from drug

19    transactions.

04:17:21   20        THE WITNESS:  Yes.

21        THE COURT:  Okay.

22    BY MS. VAN MARTER:  (Continuing)

23    Q    I have now showed you Government's Exhibit No. 1.  I've

24    scrolled to the December 2015 time frame, December all the way,

04:17:34   25    actually, through March.

1    So we see here some more representation of cash money wire

2    transfers; is that correct?

3    A    Yes.

4    Q    And, again, these are from the cash drops that occurred at

04:17:49   5    the direction of Mr. Calvillo, Ivan, and then Mr. Casillas

6    during the course of the investigation; is that correct?

7    A    Yes.

8    Q    There's one here (indicating).  And who is that?

9    A    That is, uh, Mr. Casillas' significant other.

04:18:06   10   Q    And did you determine where she was living during the

11   course of the investigation?

12   A    Uh, she was living with -- with him for -- for most of the

13   investigation.  I think he -- he actually moved out for a very

14   short time.

04:18:20   15   Q    Okay.  Then again -- and what was the amount of this

16   February 26th, 2016, cash wire transfer?

17   A    $5,000.

18   Q    Oh, I'm sorry.  This one first (indicating).

19   A    $2,411.

04:18:34   20   Q    And then there was another one referenced over here

21   (indicating), and how much was that?

22   A    $5,000 on, it looks like, November -- I can't see it.  The

23   blue line is through it.  March of 2016.

24   Q    And then another one here (indicating).

04:18:51   25   A    Again, March of 2016, $5,000.

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                    143
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/D/Van Marter*

1    Q    And did you also know Julio Cesar Rosales?

2    A    Yes.

3    Q    And who did you understand Mr. Rosales to be?

4    A    I believe he was a cousin who lived down in Los Angeles.

04:19:06    5    Q    And did you know who a Cindy Alvarado was?

6    A    Uh, a girlfriend of Rosales', I believe.  That's a stretch

7    for my memory.

8    Q    As well as Mr. Gudino Chavez and Claudio Franco.  Were

9    those also associates down in Los Angeles area?

04:19:27    10    A    They were associates, yes.

11         THE COURT:  Associates of whom?

12         THE WITNESS:  Of Julio Cesar Rosales and, I believe, of

13    Mr. Casillas.

14    BY MS. VAN MARTER:   (Continuing)

04:19:42    15    Q    Okay.  I'm going to take you over here to -- here we are

16    again, the individuals (indicating).

17         And Brittany Zaragoza, who did you understand Ms. Zaragoza

18    to be?

19    A    Girlfriend of Mr. Casillas.

04:19:58    20    Q    And, again, the same individuals you previously testified,

21    additional cash money wire transfers to Julio Cesar Rosales and

22    Salvador Gudino Chavez?

23    A    Yeah.

24    Q    And did you become familiar with who a Luis DeDios Valdez

04:20:17    25    or a Rosa Duarte DeDios were?

1    A    Yes.

2    Q    And who were they?

3    A    The father and mother of Daisy Camacho.

4    Q    And did you also become familiar with La Hacienda Mexican

04:20:36   5    restaurant?

6    A    Yes.

7    Q    And what was that?

8    A    It was a restaurant, I believe, in Hermiston that the

9    DeDioses were running with, um, another person.  I can't

04:20:48   10   remember the name, but it may be this Martha Echeverria, but I

11   can't recall.

12   Q    And after Mr. Casillas' arrest, did individuals with your

13   task force go and interview Ms. Camacho's parents regarding some

14   of these cash wire transfers?

04:21:07   15   A    Yes.

16   Q    And what was the purpose of that interview?

17   A    Uh, to find out what they were for and, uh, basically -- my

18   recollection, again, a little fuzzy, but is that they admitted

19   to receiving the funds, but felt that the funds were from his

04:21:29   20   employment, Mr. --

21   Q    And what employment did they think he had?

22   A    He was employed, um, with a lawn service company, I

23   believe, in the Tri-Cities.

24   Q    So they believed that the total of $18,000 in this May,

04:21:47   25   June time period came from Mr. Casillas' landscaping business?

1    A    I think it was 15,000.  I think there was one transaction

2    that didn't go through, if I remember correctly.  But, yes, to

3    answer your question.

4    Q    Okay.  And I've scrolled over on Government's Exhibit No. 1

04:22:10    5    to this area here (indicating).

6         There are a number of additional cash wire transfers

7    represented there; is that correct?

8    A    Yes.

9    Q    And you were previously here for the testimony regarding

04:22:25    10    additional cash money drops that were occurring during this time

11    period at the direction of Mr. Casillas?

12    A    Yes.

13    Q    And, again, there are some cash wire transfers to the

14    restaurant and the parents of Daisy Camacho?

04:22:39    15    A    Yes.

16    Q    Based on your training and experience -- and this is

17    generalized testimony -- in investigating drug trafficking

18    organizations, is it common for individuals involved to try and

19    disburse their funds through legal methodologies or legal

04:22:53    20    businesses?

21    A    Yes.

22    Q    And why is that?

23    A    It's a way to, uh, cover up the money, to launder the

24    money, essentially.

04:23:02    25    Q    And is it also your training and experience that

1    individuals who may receive some of these deposits may not

2    understand necessarily the exact origin of the funds?

3    A    Yes.

4    Q    So would a restaurant pose an ability to hide funds --

04:23:17    5    A    Yes.

6    Q    -- drug proceeds, I should say?

7    A    Yes, especially if it's a cash business.

8    Q    And, for the record, these deposits are June 3rd to

9    Brittany Zaragoza, $3,000; July 1st, 2016, in the amount of

04:23:32    10    $4,162 to the restaurant; July 5th, 2016, in the amount of $3500

11    to Rosa DeDios; July 1st, 2016, in the amount of $3500 to Luis

12    DeDios; and, again, $4700 on July 20th to Rosa DeDios; and

13    another, looks like, $265 to the restaurant on July 5th, and

14    another 3,000 on August 15th, 2016.

04:24:01    15    Is that correct?

16    A    Yes.

17    Q    And back to this specific organization, based on your

18    experience in investigating this organization, are individuals

19    who are part of it always paid in cash?

04:24:14    20    A    No.  Um, cash is very troublesome.  Um, as Mr. Cepero, I

21    believe, explained earlier today, uh, it's very difficult to,

22    uh, launder the cash, and it costs money to do that.  So a lot

23    of times, um, the individuals in Mexico will -- they like to pay

24    in -- in product instead of cash.

04:24:41    25    Q    And why is that?

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*          147
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/D/Van Marter*

1    A    Just like I said, it's difficult to launder the money, and

2    it's a lot easier to pay in product.

3    Q    And when you say "pay in product," what do you mean?

4    A    Uh, in narcotics.

04:24:53    5    Q    And so typically how would that work?

6    A    So if -- if -- for example, if -- if somebody is receiving

7    10 kilos here in the Tri-Cities, they would receive 12 instead,

8    and the two extra kilos would be theirs to sell for their own

9    profit.

04:25:13    10    Q    In this particular case, were you present during kind of

11    the last operation involving Mr. Casillas, specifically the

12    12-kilo transaction of what ended up being fentanyl?

13    A    Yes.

14    Q    And did you have individuals in place surveying his

04:25:29    15    residence prior to the transaction?

16    A    We had a surveillance camera, and I had somebody monitoring

17    the camera that morning.

18    Q    And did you see what you believed to be the product arrive

19    to Mr. Casillas' residence?

04:25:40    20    A    Yes.

21    Q    And do you know if Mr. Casillas was able to take a

22    percentage of or any product from that delivery?

23    A    I do not, no.

24    Q    And then that delivery was ultimately followed to the

04:25:55    25    Seattle area; is that correct?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    A    Yes.

2    Q    I wanted to show you just a couple -- there's previously

3    been testimony that that product ended up being fentanyl.

4         Are you aware of that?

04:26:12   5    A    Yes.

6    Q    And at the time did law enforcement know that that was

7    going to be fentanyl?

8    A    No.

9    Q    Was -- were you familiar with fentanyl at that time?

04:26:23   10   A    I was familiar with it, but, uh, not like I am now.

11        THE COURT:  Is this where people think they're buying

12   heroin but it's fentanyl or a mixture of fentanyl and heroin?

13        THE WITNESS:  Yes.  So a lot of times it will be a

14   mixture.  Sometimes it will be straight fentanyl.  And

04:26:54   15   that's where --

16        THE COURT:  That's much more powerful.

17        THE WITNESS:  Yeah.  And that's where you saw a lot of

18   the overdoses.  A lot of that was going on, I want to say,

19   approximately two years ago now.  There was -- it became a major

04:27:07   20   problem.

21   BY MS. VAN MARTER:   (Continuing)

22   Q    I am showing you what I would like to mark as Government's

23   Exhibit Nos. 12 and 13; specifically, images from that seizure

24   of the fentanyl.

04:27:18   25        At the -- first, do you recognize this first photo?

1   A    Yes, I do, but I can't recall if it's because I actually

2   saw it or because it was sent to me via photo through e-mail,

3   and I think it was through e-mail.

4   Q    And this was -- was this from Seattle DEA when they seized

04:27:38   5   the product?

6   A    Yeah.

7   Q    And is this a capture of what the outside packaging looked

8   like --

9   A    Yes.

04:27:42  10   Q    -- on the fentanyl?

11       And is it common for individuals or for drug trafficking

12   organizations such as this to mark their product?

13   A    Lots of times the laboratories will mark their product.

14   Q    So there's a marking on the outside.

04:27:58  15       And did you receive contact from the Seattle agents when

16   they opened the product and realized that this was not heroin?

17   A    Yes.

18   Q    And how did they describe that?

19   A    Uh, they -- they thought that it possibly was fentanyl, um,

04:28:14  20   and they sent it to the lab to be tested.

21   Q    Immediately closed it up and sent it off?

22   A    That's correct.

23   Q    And Government's Exhibit No. 13, there's some stamping on

24   the inside of the product?

04:28:25  25   A    Yes.

1    Q    And do you recall if that was a devil-type stamping?

2    A    I don't recall.

3    Q    And, again, marking of the particular product from the

4    organization?

5    A    Yes.

6         MS. VAN MARTER:  If I could have a moment, Your Honor.

7         (Counsel conferring.)

8         MS. VAN MARTER:  I don't have any other questions, Your

9    Honor.

10        THE COURT:  Mr. Vieth?

11        Thank you.

12

13                      CROSS-EXAMINATION

14   BY MR. VIETH:

15   Q    As an expert in drug trafficking organizations, would you

16   agree that there is a hierarchy within the organization?

17   A    Yes.

18   Q    That there's bosses and leaders, there's managers, and then

19   ultimately you've got, you know, I guess the street folks that

20   are selling whatever it is that they're distributing?

21   A    I wouldn't say it's that clear-cut.

22   Q    How would you describe it, then, for the drug trafficking

23   organization that we're dealing with?

24   A    I think that what you have is you have bosses in areas that

25   are working for the organization.  That's how I would describe

1    it.  And then from there you have people that are carrying out

2    functions for those bosses.

3    Q    Were you here when Agent Cepero was testifying?

4    A    Yes.

04:30:00  5    Q    Were you here when Agent Cepero described my client as a

6    middleman?

7    A    Yes.

8    Q    And that the bosses were in Mexico?

9    A    Yes.

04:30:14  10    Q    Would you agree with the agent?

11    A    I would say that -- that the most powerful people would be

12    in Mexico, yes.

13    Q    And it's my understanding that you had a supervisory role

14    in this investigation.

04:30:26  15         Is that correct?

16    A    No, I was a supervisor of the office in Richland.

17    Q    Okay.  What was your involvement in this particular case?

18    A    Uh, at times I was the agent that was in charge of the

19    investigation.  Um, at other times I was the task force

04:30:45  20    coordinator.  Um, at -- at other times, uh, other investigators

21    had parts of the investigation.

22    Q    Was Agent Cepero the lead investigator on it?

23    A    He -- he was the lead investigator on the financial side of

24    it from -- from Boston.

04:31:05  25    Q    And so, again, I guess when he testified that my client was

1    a middleman and he took orders from the bosses, is -- is that

2    accurate?

3    A    He -- he took orders from people in Mexico, no doubt about

4    it.  But was he the boss here for a while?  In my opinion as an

04:31:31  5    expert, yes, he was.

6    Q    And when he was having to check in with his bosses about

7    price --

8    A    Um-hmm.

9    Q    -- it's in your opinion that he's still a boss, even though

04:31:46  10   he can't make that decision without another boss telling him yes

11   or no?

12   A    Yes.

13   Q    Can you explain that?

14   A    So he's in charge of this territory.

04:32:03  15   Q    But he can't make a decision as to price.

16   A    No, because he's new.  He's got to prove himself.

17   Q    So wouldn't that lessen his role to a middleman?

18   A    He's -- he's -- he's still got the same role.  He just

19   doesn't have the power because he hasn't -- he's not Ivan

04:32:21  20   Calvillo.  He has not built up his stature here.

21   Q    So he --

22   A    And -- and you have to realize that there were several

23   people that had been put into this position that had been

24   arrested rather quickly.

04:32:34  25   Q    As middlemen --

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*          153
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/X/Vieth*

1    A    No, as bosses.

2    Q    -- or the bosses?

3    A    As bosses.

4    Q    So it's my understanding that the bosses are in Mexico.

04:32:43    5    It's my understanding that the drugs are coming up from Mexico.

6    And then it's my understanding that the money is owned by those

7    bosses in Mexico.

8         Is that accurate?

9    A    The money is -- yeah, you could --

04:32:57    10    Q    I'm using the agent's words.

11    A    Whether you want to say it's owned by the cartel, who in

12    the cartel, what -- what you want to call them, does the cartel

13    own the dope at the end of the day, does the cartel own the

14    money at the end of the day?  Yes, they do.

04:33:13    15    Q    And that's exactly what the agent testified to.  And I'm

16    asking you, as an expert, was he accurate in saying that, that

17    it's not owned by my client, it's owned by the bosses?

18    A    It's owned by the cartel.

19    Q    He described -- he said "bosses."

04:33:25    20    A    I will say "cartel."

21    Q    Okay.  When -- it's my understanding that surveillance on

22    my client's residence was extensive.

23         Is that accurate?

24    A    Yeah.

04:33:47    25    Q    And there was a pole camera up.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                  154
*Excerpt of Sentencing Hearing/December 11, 2018*
*Leahy/X/Vieth*

1    A    Yes, there was.

2    Q    And that camera shot constant video of my client's

3    residence.

4    A    Yes.

04:33:55  5    Q    Was there ever a hiccup in there?  Was there ever a cutoff?

6    Do you know?

7    A    I would have to talk to the agent that was actually the one

8    monitoring it to -- I -- I -- with technology, I would say yes.

9    Q    And so from the spring of 2015 to August of '16, is it your

04:34:16  10    understanding that there was constant surveillance, including a

11    pole camera, on my client's residence?

12    A    I can't be certain of the dates at this point, um, but

13    if -- if that's what documents say, then I would say yes.

14    Q    A little over a year.  Can we agree there?

04:34:34  15    A    I think that's approximately correct.

16    Q    And how many times, in your recollection, were there any

17    reported instances of drug activity at my client's house?

18    A    There was a lot of suspicious activity --

19    Q    I'm not talking about suspicion.  I'm talking about

04:34:57  20    knowing, confirming that there was either drugs in the house or

21    that there was money associated with drug --

22    A    So I -- I believe there were four stops done, based upon

23    what you're asking.

24    Q    So four times -- am I accurate:  Four times over the

04:35:17  25    year-plus that there was constant surveillance is when you can

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    pinpoint that there was either drugs or drug money in my

2    client's house?

3    A    Yes, because we actually -- we -- we did warrants and got

4    drugs --

04:35:33  5    Q    Okay.

6    A    -- on four occasions.

7    Q    Four times over a year.

8    A    Approximately, based on my recollection at this time.

9    Q    And did you -- is it your training and experience that when

04:35:50  10    those video cameras are up, that those are thoroughly reviewed

11    by FBI agents or DEA agents to make sure that if there's any

12    suspicion or anything else, that they can confirm the accuracy

13    of what they're suspicious of?

14    A    So it -- it depends.  If -- if we are coordinating with

04:36:17  15    somebody like Mr. Cepero and we know some things are happening,

16    the guys are going to monitor the cameras more closely.

17         But to say that I have somebody monitoring those cameras

18    24/7, no, that does not happen.  Um, there are weeks where we

19    get busy on other -- other investigations.

04:36:38  20         Do the guys try to go back and review them?  Yes.  But if

21    we go back and review them, at that point it's -- it's outdated,

22    and there's nothing we can do with that information because the

23    load is already gone or the activity has already happened.

24    Q    Well, I think we can all agree that, you know, nobody is

04:36:54  25    perfect, and some things are missed.  But for the most part, you

1    do your best and you try to catch every possible hint of

2    evidence that may end up supporting a search warrant or whatever

3    it is that you want to accomplish; is that right?

4    A    We try, with the limited resources we have, which means

5    that, you know, there are days where -- lots of days where it's

6    not reviewed until a week or two later.

7    Q    In regard to the money that was taken or being wired to my

8    client, to his friends and family, and to his wife, my total is

9    approximately $20,000 to my client.

10        Is that --

11   A    Based on your figures, I can't dispute it.

12   Q    Okay.  It's a little under that.  It's 19,000 and change,

13   but ...

14        And then I have approximately 35,000 additional going to

15   friends and family.

16        Does that sound --

17   A    I -- based on your calculations.

18   Q    Okay.  And then another 10,000 to his wife?  I think you

19   testified to two $5,000 transactions?

20   A    I believe that's --

21   Q    Or was it 15?  Fifteen.  Sorry.

22   A    Okay.

23   Q    So I have approximately $70,000 coming to my client, my

24   client's friends, his wife.

25   A    (Nodded.)

1   Q     Would you agree with me that that is actually less than

2   what the DEA was able to take from their 6 percent percentage?

3   A     I believe, based on your earlier calculations that I heard

4   in this courtroom, that is less.

04:38:51   5   Q     So that would have -- it's less than 6 percent from the 1.6

6   that was totaled.

7   A     That's correct, based on your calculations.

8   Q     And in your training and experience, when divvying up the

9   proceeds from the sale of narcotics, do bosses usually take the

04:39:14  10   majority of the proceeds?

11  A     Yes.

12        MR. VIETH:  No more questions.  Thank you.

13        THE COURT:  Any cross --

14        MS. VAN MARTER:  No, Your Honor.

04:39:32  15        THE COURT:  -- or redirect?

16        MR. VIETH:  No, Judge.  Thank you.

17        THE COURT:  Thank you.

18        Tell me, do you have any -- remind me, is this the

19  witness that was going to demonstrate or testify to the amount

04:39:42  20  of drugs transported from this district into Canada, 20 to

21  40 kilos?  Or has that already been done by the first witness or

22  second -- first witness?

23        MS. VAN MARTER:  Your Honor, I believe that that was

24  already a part of the record over time from previous testimony

04:39:58  25  of this witness and other witnesses, so I didn't -- I wasn't --

1    THE COURT:  When you say "other witnesses," you mean

2    when?

3         MR. VIETH:  During the suppression hearing process and

4    some of the documents that were admitted as exhibits during that

04:40:11  5    time period.

6         THE COURT:  Okay.  And the seizure that occurred in

7    British Columbia that was talked about, I'm trying to recall how

8    much -- I probably have his testimony here.

9         MS. VAN MARTER:  Your Honor, I believe it's in --

04:40:30  10    THE COURT:  They seized -- they searched the car, and

11    they found quite a bit in the car, backpacks, et cetera.

12         THE WITNESS:  I believe it's one kilo of heroin, ten of

13    coke.

14         MS. VAN MARTER:  Your Honor, I'll pull it up on

04:40:43  15    Government's Exhibit No. 1.  There's actually a number of

16    seizures that are noted on Government's Exhibit No. 1.

17         THE COURT:  That's in the timeline?

18         MS. VAN MARTER:  Yes, Your Honor.

19         THE COURT:  Okay.  So that would demonstrate the facts

04:40:53  20    supporting your position that this was the amount of drugs?

21         MS. VAN MARTER:  Yes, Your Honor.  In fact, there is --

22    so that -- showing right now, August 27th, 18 kilos of meth,

23    4 kilos of cocaine, and a smaller amount of heroin, handguns,

24    and cash.

04:41:08  25    THE COURT:  Where is that, please?

1          MS. VAN MARTER:  (Indicating.)

2          THE COURT:  Okay.  Thank you.

3          MS. VAN MARTER:  But that also is a matter of record in

4     the suppression hearing and all of the documents that were

04:41:19  5     provided during the Mr. Zambrano --

6          THE COURT:  Okay.  Thank you.

7          MS. VAN MARTER:  And Mr. -- or, I'm sorry, and RCMP

8     Barlow also testified to the quantity.  And then there's some

9     previous references to seizures, Your Honor, from backpackers in

04:41:37  10     the timeline.

11          THE COURT:  Okay.  Thank you.

12          MS. VAN MARTER:  Yes, Your Honor.

13          THE COURT:  I have no other questions.  Thank you.

14          You may step down.

04:42:06  15          MS. VAN MARTER:  I do not have any other witnesses, Your

16     Honor.

17          THE COURT:  Do you have witnesses?

18          MR. VIETH:  No, Your Honor.  My client does wish to make

19     a statement, though.

04:42:13  20          THE COURT:  Well, I'm sure he does, but we have a lot of

21     talk about.  We've got objections, discussions about your

22     objections to the PSIR.

23          And how would you like to proceed?  Because we're not

24     going to have enough time to get all of this done.  And I say

04:42:26  25     that -- I mean, I'm happy to spend a half an hour, but that's --

1    that's all I'm going to spend.

2            So the question is how do you want to handle this?

3    You've got people from Spokane and Idaho; you do, Mr. Vieth, you

4    and your colleagues.

04:42:41    5            So how do you want to handle this?

6            MR. VIETH:  Judge, I think we're going to have to

7    continue it, unfortunately.  And --

8            THE COURT:  Well, when would you like to conclude?

9            MR. VIETH:  I think we conclude now, and then we save

04:42:54   10    our argument for what was contained in the PSR for that time.  I

11    don't think we can get all that in in --

12            THE COURT:  I don't think we can either.  I think it's

13    going to take us an hour minimally.

14            MR. VIETH:  At least.

04:43:07   15            THE COURT:  So how do you want to handle this?  I think

16    we continue it, but the question is to when.

17            MS. VAN MARTER:  Your Honor, I am here tomorrow.

18            MR. VIETH:  I can be, Judge.

19            THE COURT:  I think what I'm doing is trying to organize

04:43:22   20    my day so that I have -- are you here on my afternoon docket?

21            MS. VAN MARTER:  And I'm also here in the morning, Your

22    Honor.

23            THE COURT:  Okay.  Well, I think I have an afternoon

24    docket, and the problem is that I have colleagues in Yakima who

04:43:36   25    have matters in the morning, and our interpreter is scheduled to

*USA v. Carillo Casillas/4:15-CR-6049-EFS-2*                                    161
*Excerpt of Sentencing Hearing/December 11, 2018*
*Colloquy*

1    be there for them, and I haven't checked with them to see if

2    they can move their hearings an hour or two to get ours in first

3    so that our out-of-town people can get home.  And I'll make an

4    inquiry, but -- I know Judge Bastian has a docket tomorrow, and

04:44:00   5    so my interpreter, the court interpreter is scheduled to be

6    there, and I don't know what -- about our second interpreter

7    either, whether she's available tomorrow.

8            MR. VIETH:  And, Judge, I do have a meeting at the U.S.

9    Attorney's Office in the District of Idaho at 8:30 in the

04:44:16   10   morning.  I anticipate that taking an hour, so I can be here at

11   12:30 or 1:00 tomorrow.

12           THE COURT:  That's good with me.

13           Ms. Vargas?

14           THE COURTROOM DEPUTY:  We could do 12:45 -- I'm sorry,

04:44:34   15   2:45.

16           THE COURT:  2:45?

17           THE COURTROOM DEPUTY:  Yes.

18           THE COURT:  Well, then my Yakima colleagues, their

19   docket should be completed by then, right?

04:44:41   20           THE COURTROOM DEPUTY:  Yes, and Ms. Hickey can be here

21   in the afternoon at that time.

22           THE COURT:  Okay.  Well, then I think we'll do it at

23   2:45.

24           MS. VAN MARTER:  That's fine for the United States, Your

04:44:49   25   Honor.

1        THE COURT:  Is that okay?

2        MS. VAN MARTER:  Yes, Your Honor.

3        THE COURT:  So you can have a good night tomorrow and

4   then enjoy the ride back tomorrow.

04:44:55  5        MR. VIETH:  And my wife is on call, Judge.  It's

6   awesome.

7        THE COURT:  Okay.  Well, always a pleasure to meet with

8   you folks, and we'll have that pleasure again tomorrow afternoon

9   at 2:45.

04:45:06  10       Can you be here as well?

11       THE INTERPRETER:  I cannot, Your Honor.  I am scheduled

12  in Portland.

13       THE COURT:  Okay.  Well, I don't know how we want to

14  handle that, but we'll do the best we can.  We may have to go

04:45:17  15  with one interpreter for that hour or hour and a half.  So ...

16       THE COURTROOM DEPUTY:  I already cleared that with

17  Ms. Hickey.  She just will need a break.

18       THE COURT:  Sure.  We'll take a break.

19       Anything else that we need to do for the good of the

04:45:31  20  order before we take a recess?

21       MS. VAN MARTER:  No, Your Honor.  I just want to -- I

22  think, for the record, all of the Government's exhibits have

23  been admitted.  If not, we would so move to admit any ones for

24  the record that were not.

04:45:45  25       THE COURT:  They would be what numbers, what?  One

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    through ...

2           MS. VAN MARTER:  1, 2, and 3 -- there was no

3    Exhibit 4 -- 5 through 13.

4           THE COURT:  Mr. Vieth?

04:45:55  5           MR. VIETH:  No objection to those, Judge.

6           THE COURT:  Admitted.

7       (Government Exhibit No. 12 admitted into evidence.)

8       (Government Exhibit No. 13 admitted into evidence.)

9           THE COURT:  No more testimony, so we'll hear from you,

04:45:59  10   then we'll hear from -- Ms. Coronado, are you on this file.

11           THE PROBATION OFFICER:  I am, Your Honor.

12           THE COURT:  We'll hear from her as well.  I believe that

13   completes matters for today.  I appreciate all of your

14   cooperation.  Thank you for being here, and we'll resume

04:46:11  15   tomorrow at 2:45.

16           All right, folks, have a good night.

17           THE COURTROOM DEPUTY:  Please rise.

18           THE COURT:  You may go about your business.

19       (Hearing adjourned at 4:46 p.m.)

20

21

22

23

24

25

164

C E R T I F I C A T E

1

2

3    I, KIMBERLY J. ALLEN, do hereby certify:

4        That I am an Official Court Reporter for the United

5    States District Court for the Eastern District of Washington in

6    Richland, Washington;

7        That the foregoing proceedings were taken on the date

8    and at the time and place as shown on the first page hereto; and

9        That the foregoing proceedings are a full, true and

10   accurate transcription of the requested proceedings, duly

11   transcribed by me or under my direction.

12       I do further certify that I am not a relative of,

13   employee of, or counsel for any of said parties, or otherwise

14   interested in the event of said proceedings.

15       DATED this 29th day of January, 2019.

16

17

18

19   _____

20   Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
     Washington CCR No. 2758
21   Official Court Reporter
     Richland, Washington
22

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER