165

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No. 4:15-CR-6049-EFS
3                                )
                    Plaintiff,   ) December 12, 2018
4                                )
v.                               ) Richland, Washington
5                                ) Sentencing Hearing
JESE DAVID CARILLO CASILLAS,     ) Day 2
6                                )
                    Defendant.   ) Pages 165 to 221
7    _____)

8

              BEFORE THE HONORABLE EDWARD F. SHEA
9          SENIOR UNITED STATES DISTRICT COURT JUDGE

10

                      APPEARANCES:
11

For the Plaintiff:           Stephanie A. Van Marter
12                           Stephanie.Van Marter@usdoj.gov
                             US Attorney's Office-SPO
13                           920 W Riverside, Suite 300
                             P.O. Box 1494
14                           Spokane, WA 99210
                             509-353-2767
15

For the Defendant Carillo    Nicolas V. Vieth
16  Casillas:                Nick@viethlaw.com
                             Vieth Law Offices
17                           505 West Riverside
                             Suite 200
18                           Spokane, WA 99201
                             208-664-9448
19


20


21  Official Court Reporter:     Kimberly J. Allen, CCR #2758
                             United States District Courthouse
22                           P.O. Box 685
                             Richland, Washington 99352
23                           (509) 943-8175

24  Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.
25

              KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
                   OFFICIAL COURT REPORTER

1                          <u>**INDEX**</u>

2  <u>**Proceedings:**</u>                                        <u>**Page**</u>

3          TESTIMONY OF OFFICER SANJUANITA            184
         CORONADO
4          EXAMINATION BY MS. VAN MARTER             186
         EXAMINATION BY MR. VIETH                  190
5


6                      <u>**WITNESS INDEX**</u>

7  <u>**Plaintiff Witness:**</u>                                 <u>**Page**</u>

8

9     None

10                              *****

11  <u>**Defense Witnesses:**</u>                                <u>**Page**</u>

12

13     None

14

15

16                    <u>**EXHIBITS ADMITTED**</u>

17  **Plaintiff**
   <u>**Number**</u>        <u>**Description**</u>                     <u>**Page**</u>
18

19                   None

20
   **Defense**
21  <u>**Number**</u>        <u>**Description**</u>                     <u>**Page**</u>

22                   None

23

24

25

167

1                            **GENERAL INDEX**

2
                                                              **Page**
3
    Reporter's Certificate............................221
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    (December 12, 2018; 2:56 p.m.)

3         THE COURTROOM DEPUTY:  Matter before the Court is United

4    States of America v. Jese David Carillo Casillas, Cause

02:56:21  5    No. 4:15-CR-6049-EFS, Defendant No. 2.  Time set for

6    continuation of sentencing hearing.

7         Counsel, please state your presence for the record.

8         MS. VAN MARTER:  Stephanie Van Marter on behalf of the

9    United States, present with Joe Brazeau.

02:56:36  10         MR. VIETH:  Good afternoon, Judge.  Nick Vieth for

11    Mr. Casillas.

12         THE COURT:  Counsel, good afternoon.

13         Mr. Casillas, good afternoon.

14         We're ready to begin.  I think we've concluded the

02:56:47  15    testimonial portion of this matter.

16         Is that correct?

17         MS. VAN MARTER:  Yes, Your Honor.

18         THE COURT:  So are we ready for the objections?  I think

19    there are a number of objections we need to take up.

02:56:55  20         Why don't you share the podium, and let's go over those

21    together.

22         The issue before us is Page 6, Paragraph 32, and you say

23    that's based on -- the defendant objects that it's based on

24    informant reporting rather than recoveries actually by law

02:57:24  25    enforcement related to Mr. Casillas Carrillo.

1          Let's see.  And it's clear that the amount of drugs that

2     were trafficked across the -- across into Canada involved

3     cocaine, heroin, and meth, 20 to 40 kilograms.  This was

4     attributable to the DTO and not necessarily specifically to the

02:57:56   5     defendant, but he pled guilty to a conspiracy, and a conspiracy

6     involves the activities of the drug trafficking organization

7     from the time he joined it in 2015 and thereafter.

8          And the Court's satisfied that the record, after the

9     testimony that I heard yesterday and a review of the timelines,

02:58:16  10     which the Court finds were proven by a preponderance of the

11     evidence, generate a solid basis for that statement in the PSIR,

12     and the objection is overruled.

13          Page 6, Paragraph 34, the objection is to, quote,

14     "high-ranking organizer for the DTO," end of quote.  He asserts

02:58:40  15     that he only received a small amount of money from the DTO, and

16     the narcotics sales totaled over 1.6 million.  And Mr. Vieth

17     made some points about that yesterday, but as the testimony

18     developed, it was clear there was about 80,000 that was a

19     benefit to he or to his relatives or friend, as I recall the

02:59:01  20     testimony that you actually elicited, based on the timelines and

21     the amounts of money that were laundered and sent to people at

22     his direction.

23          It is, in the Court's mind -- so that's what I'm

24     beginning with.  And I've listened carefully to the testimony of

02:59:19  25     all of the witnesses, and if you want to make more argument on

 1   that, Mr. Vieth, this is your opportunity to do so.

 2        MR. VIETH:  If Your Honor is to consider -- because my

 3   numbers were about $20,000 that my client actually received from

 4   the wires -- the additional 60 to 65,000 that was sent to his

 5   wife, his family and friends, then, yes, Your Honor, you would

 6   be correct, 80 to $85,000 I think is a good -- good number.  But

 7   you juxtapose that against even what the DEA received on their

 8   6 percent cut --

 9        THE COURT:  So your argument is the amount of money

10   received would mark him as something less than a

11   leader/organizer?  Is that the inference you're trying to draw?

12        MR. VIETH:  Not only that, Your Honor, but I think you

13   can see from the testimony both by the DEA agent and then

14   ultimately by the FBI expert that my client had that middle

15   management position, and that's evidenced by the fact that,

16   especially what the DEA agent testified to was in regard to this

17   was not his dope, this was not his money; that was the boss'

18   down in Mexico.  That he was a middleman, was the -- was the

19   testimony.

20        And so that's where -- at least in my mind, in looking

21   at the guideline, and the guideline's definition of that

22   manager, supervisor, middle management role, not being the

23   leader, not being the organizer, but having to pick up the phone

24   and confirming with his bosses, especially as to price.  I

25   think -- there is no way that I'm going to argue or suggest to

1   this Court that he does not have a role in this DTO that does

2   not justify some sort of enhancement.  The enhancement, though,

3   I believe is more in order with a two-level enhancement, not the

4   full four for being the leader.

5         THE COURT:  Do you want to say anything?

6         MS. VAN MARTER:  Yes, Your Honor.

7         THE COURT:  Go ahead.

8         MS. VAN MARTER:  So I think there are a couple issues

9   being raised here that are somewhat problematic and disingenuous

10  of the entire picture before the Court.  You can't just look at

11  each money wire transfer and say, oh, that's the extent of the

12  financial benefit that this particular defendant received.

13  That's a complete misrepresentation of the total picture.

14        As was testified to, this organization, just like any

15  other multimillion dollar company, has many and varying

16  different ways to which they would launder their funds.  The

17  witness here, the undercover was just one of those that they

18  utilized to launder their funds.  And ultimately this person was

19  reduced down to being really a private banker to help cover, in

20  some part, not always, but in some part just overhead costs.

21        And I think in the whole picture, as was described in

22  definition by each of the witnesses, there is a difference

23  between "a boss" and "the boss."  And in this particular

24  scenario, when you're talking about, really, a multimillion

25  dollar company, they have different strategic areas that they

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                                    172
*Sentencing Hearing - Day 2/December 12, 2018*
*Objections to PSIR*

1   need to control in order to guarantee their profit and success.

2          One of those strategic areas was here in the Eastern

3   District of Washington, in part because of its close proximity

4   to Canada, which is a huge market for their product, but also

03:02:38   5   because it had access to great transportation lines.  That's why

6   Ivan started here to begin with.

7          So I think the testimony isn't that he's -- he's a

8   facilitator or midlevel manager.  The testimony is that he was

9   in charge of this region, and this region had a very important

03:02:55   10  part to play for that overall company, controlled ultimately by

11  a boss down in Mexico.

12         But this defendant certainly played a crucial role and

13  had access to the movement of all of those funds, had access to

14  the movement of the narcotics.  And as the testimony bore out,

03:03:11   15  it's not just payment by way of overhead and money wire

16  transfers, but he's receiving payment in product, and that's

17  also visualized by the fact that when he lost almost $300,000,

18  he had to make that money back, which assumes that he has access

19  to that type of net profit in order to pay back those people for

03:03:32   20  the loss that he made.

21         So it's not just a small percentage of what he was

22  actually wired or what he wired to his family or what he wired

23  to a legitimate business to help hide funds, but there's a total

24  picture of other benefits that he was receiving because he was

03:03:48   25  in charge of this entire region.

1          THE COURT:  Anything else, Mr. Vieth?

2          MR. VIETH:  Just quickly, especially on that assumption

3     that my client had access to pay back immediately the monies

4     that he was indebted for, that he lost.  I think we can look at

03:04:04    5     what happened to Ivan as an example of how these assumptions are

6     wrong.  Ivan had the responsibility for the money that he lost

7     as well.  Ivan's dead.  And so just to, quote, unquote, make

8     that assumption I think is incorrect, Judge.

9          I think that especially the testimony from the DEA

03:04:25   10     agent, the one that was closest to my client, the undercover,

11     the one that worked with my client, and when he describes my

12     client as a middleman, I think does justify a two-level but not

13     the four.

14          THE COURT:  Well, to me, it's just a difference between

03:04:45   15     having a corporate headquarters in Detroit, Michigan, and having

16     a dealership in the state of Washington in Tri-Cities.  To me,

17     it's no question that the -- the DTO is headquartered in Mexico,

18     but there's no question that Mr. Casillas was, in fact, in

19     charge of this region subsequent to the death of Ivan Calvillo.

03:05:11   20     And so he ran people; his interactions with the undercover

21     witness, the undercover -- the confidential human source who was

22     planted in Canada and testified, Mr. Cepero?

23          MS. VAN MARTER:  Cepero.

24          THE COURT:  Cepero.

03:05:29   25          -- Mr. Cepero from the team in Boston, who became the

1   confidential human source involved with money laundering and

2   other matters, the interaction there -- and I've read the

3   telephone conversations with them -- there was no question that

4   when they -- and I read the conversations where he was referring

03:05:48   5   to Mr. Negro, and I've read all of those, and it's clear to me

6   that he was in charge of making all the usual decisions that are

7   critical to the success of a drug organization.

8          And that plus the other features that have been

9   testified to, such as the obvious benefits that he clearly

03:06:08   10   received, and his ability to dictate where they would go, all of

11   that, and his behavior and what he said to -- about his ability

12   to produce and deliver, et cetera, all of that is indicative of

13   a person who was running this store in Eastern Washington, if

14   you will, or this dealership.

03:06:30   15          And so I'm persuaded that the objections to No. 7, for

16   example, on the question of whether he should receive an

17   enhancement for leader are justified on this basis, and I'm

18   going to overrule your objections to that.

19          That was No. 7, a four-level aggravating role increase

03:06:54   20   for being leader/organizer.  He was definitely that here in

21   Eastern Washington in connection with the transport of -- or

22   back and forth of drugs and money to British Columbia, as the

23   timeline sets out and as the testimony from Mr. -- sorry,

24   Cepero?

03:07:12   25          MS. VAN MARTER:  Cepero.

1        THE COURT:  Cepero?

2        -- Mr. Cepero was -- also supported that notion as well.

3    So as to 7, he gets the four-level increase, and I overrule that

4    objection.

03:07:24    5        And I think that informs other things.  Let's see.

6    We've already dealt with No. 2 where you say -- high-ranking is

7    your objection.  I overrule it.  He is clearly a

8    leader/organizer in this jurisdiction.

9        As to No. 3, we've already resolved that, that he's only

03:07:47   10    responsible for the acts after 2015, so I think that's

11    essentially moot, since the Government's not asserting it.  But

12    the offense level, the Base Offense Level 38 is after that,

13    after he became the man in this -- running the dealership here,

14    so to speak.

03:08:09   15        As to 4, where it was indication of prints on a shopping

16    bag used by another, that's been resolved and I think is now

17    moot.

18        No. 5, you believe it should be 36 as a Base Offense

19    Level of the defendant, having to do with the amounts of drugs

03:08:29   20    and the type of drugs, but it's clear that he was representing

21    his -- to the undercover agent the use of backpackers and how

22    much they were carrying into Canada, and the general load was 20

23    to 40 kilograms of various drugs.  And the drug seizures

24    occurred while he was working directly with Ivan Calvillo, and

03:08:53   25    he confirmed that was the amount.  Also, the orchestration of

1    850,000 in drug cash proceeds to be laundered was equivalent of

2    55 kilograms of meth, 36 kilograms of cocaine, or 15 kilograms

3    of heroin, and he was certainly more involved in the delivery of

4    at least 10 kilograms of heroin.

03:09:17    5          So the Court makes factual findings in that regard by a

6    preponderance of the evidence, that he was so involved and those

7    amounts were as indicated.

8          So as I looked at the guideline 2D1.1(c)(1), if it's an

9    equivalency of 90 kilograms of marijuana, the Base Offense Level

03:09:49   10    is 38, and there's no question in my mind that, given the amount

11    of drugs that I have found that he was responsible for, there's

12    an equivalency at least of 90 kilograms of marijuana, and the

13    Base Offense Level of 38 is justified, and I so find.

14          As to No. 6, here we're dealing with the residence, and

03:10:10   15    the question is what's the standard that I need to apply in

16    determining that fact.  And so, on the one hand, it's clear from

17    the evidence that he used it as his -- customarily as his home,

18    with his wife and child.  It's also clear that from time to time

19    he conducted drug transactions at that residence.  So the

03:10:31   20    question is what's the standard that has to be applied.

21          When you look further, it's a question of -- there are

22    several factors that are -- that are set out in 2D1.1 Committee

23    Note 17:  Whether the defendant had a possessory interest in the

24    premises; the extent to which the defendant controlled access to

03:10:51   25    or activities at the premises; is it -- was it a primary or

1    principal use of the premises, or was it incidental and

2    collateral?  Those are the questions I have to ask under the

3    guidelines.

4              He moved into the home in 2014 with his wife and

03:11:09    5    children, and the question is what was going on from that time

6    forward.

7              Now, there's absolutely no question that there were,

8    from time to time, some transactions, but they are by virtue of

9    a period of time from when he moved in to when he was arrested.

03:11:29    10   The question -- that's about two years, I think.  '16 that he

11   was arrested?

12             MS. VAN MARTER:  August of 2016, Your Honor.

13             THE COURT:  So I'm guessing about two years.  The

14   question is:  Is that, in fact, a primary use for the premises?

03:11:43    15   And so I'll hear you out on that.  I think that's the standard.

16   So you need to tell me if I'm wrong, and if that's the standard,

17   what your position is.

18             MR. VIETH:  It is, Your Honor.  And it's our argument

19   that it is a collateral use.  I think there was -- I know there

03:11:58    20   was evidence elicited from the FBI agent that there was

21   surveillance conducted of my client's residence; that there was

22   a pole camera up for, I believe it was a little over a year, a

23   year and two months, if I recall; and that there was four

24   occasions where suspicion of drug activity was confirmed.

03:12:22    25             So there was also some evidence that was presented that

1    some of the vehicles used for trafficking were parked there.

2    And that I believe at the search, Your Honor, there was some

3    money found; I believe there was also some cocaine found, but I

4    think that was attributable to another co-defendant.  And that's

03:12:52   5    about all I can point to, Your Honor.

6         So, again, I would point the Court to the fact that it

7    was his primary residence, that his wife and kids lived there,

8    that it was collateral; that these four other transactions

9    occurred under the watchful eye of the FBI cameras.

03:13:14   10        MS. VAN MARTER:  Your Honor, based upon the evidence,

11    it's clear that Mr. Casillas re-inserted himself into this

12    organization at least beginning of April of 2014 when he reached

13    out to the CHS to obtain the two separate load vehicles.  As is

14    noted in Government's Exhibit 1, from that point forward, he was

03:13:31   15    heavily involved in this organization, whether it was directly

16    working for Calvillo or taking over for the region.  He had no

17    other business but this.

18        I think the other important point is everybody else who

19    lived in that residence is also implicated either by conviction

03:13:47   20    and/or by evidence --

21        THE COURT:  Give me an example.

22        MS. VAN MARTER:  -- into the illegal activity.

23        Co-defendant Figueroa lived at the residence.  He was

24    utilized to make the 12-kilo delivery of heroin.  This Court has

03:14:00   25    already sentenced Mr. Figueroa.  He was the first to be

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                           179
*Sentencing Hearing - Day 2/December 12, 2018*
*Objections to PSIR*

1   sentenced in this case.

2          THE COURT:  How much time did he get?

3          MS. VAN MARTER:  He got the mandatory minimum of ten

4   years.

03:14:06   5   THE COURT:  Okay.  And what was his relationship to the

6   people who resided there?

7          MS. VAN MARTER:  He's Daisy Camacho's uncle --

8          THE COURT:  Uncle.

9          MS. VAN MARTER:  -- which is Mr. Casillas' --

03:14:14   10   THE COURT:  Camacho is the wife or significant other?

11          MS. VAN MARTER:  Correct.  And as the evidence also bore

12   out, Mr. Figueroa, throughout the time period under

13   surveillance, was also utilized -- utilized several of the

14   vehicles, one of which was also a Jeep that had a secret

03:14:29   15   compartment.  That is the Jeep that a different co-defendant,

16   Mr. Hurtado, was caught in with 2 pounds of methamphetamine.

17   That same Jeep was utilized by Mr. Figueroa registered to

18   Ms. Camacho, along with some of the other vehicles.

19   Ms. Camacho was seen with Mr. Casillas driving in the Mini

03:14:47   20   Cooper that also had a secret compartment.  He also took

21   possession of the Sebring and --

22          THE COURT:  There's no question that they were all

23   involved.  The question is whether this was a premises whose

24   principal maintenance was for drug trafficking.

03:14:58   25   MS. VAN MARTER:  Your Honor, during this time period,

1    these vehicles and all of these individuals were frequenting and

2    utilizing the residence.  Mr. Hurtado was caught leaving the

3    residence.  Mr. Juvenal Landa was caught leaving the residence.

4    Mr. Figueroa, during the time that he was meeting with other

03:15:15  5    individuals in the conspiracy, was living at the residence.

6              THE COURT:  I think the defendant is requesting a pen or

7    a pencil.  That's why I stopped you.

8              MS. VAN MARTER:  Thank you.

9              THE COURT:  Go ahead.

03:15:34  10             MS. VAN MARTER:  So it's not just four isolated

11   incidents.  It's that this house and this residence and all of

12   its occupants from the beginning of the defendant's involvement,

13   which maintained consistent throughout the investigation --

14             THE COURT:  Well, I think I'm perplexed about it, or at

03:15:50  15   least conflicted about it, because on the one hand you have

16   stash houses, where people store drugs, and that's their

17   principal -- they can -- they can use a front and -- as we've

18   found in other cases that you've been involved in and have been

19   before me.  There was a stash house in Hermiston, as I recall;

03:16:04  20   someone lived there, said they weren't involved in the drugs,

21   but, nevertheless, they were aware the drugs were stashed.  So

22   was that the principal use of the residence?  The person lives

23   there, but -- and so you've got people living here.  Admittedly,

24   all of the people living there are -- except the children, of

03:16:22  25   course -- I think there were children, weren't there?

1          MS. VAN MARTER:  Yes, Your Honor.

2          THE COURT:  Okay.

3          -- were involved in some fashion or another in

4     facilitating the whole operation.  And so if you say, "Well,

03:16:33   5     there had to be someplace where they did business," that would

6     mean that virtually in every case where I see people storing

7     drugs or having drugs or you find drugs or firearms, that that's

8     the primary residence or that's the primary purpose of the

9     residence.

03:16:50  10          And, you know, that's not so.  I mean, we've been in so

11     many cases that I've heard you argue and that I'm familiar with

12     the fact patterns, and it's not uncommon that they keep drugs in

13     a safe in there; they had money in a duct or in the washing

14     machine, and a gun in the closet.  And we've seen so many

03:17:06  15     variations of that.  And those -- there's never an issue about

16     whether that's the primary purpose of that residence.

17          So it's that historical knowledge of so many cases where

18     there's storage and yet not primary use that's been argued, and

19     I haven't seen a case where this fact pattern fits that.  So, in

03:17:28  20     that sense, I'm going to grant the objection and find that it's

21     not the principal -- I'm going to grant the objection there for

22     those reasons.  I don't find any cases that are clear to me that

23     this would be an appropriate case to declare it a primary --

24     that was the primary use of the residence.  So I grant that

03:17:49  25     objection, and I remove the two-level increase from the

 1     calculation of the guidelines.

 2            Currently, we're at 38 plus 4 for leader/organizer;

 3     that's 42.

 4            MS. VAN MARTER:  And I believe there's two levels for a

03:18:05    5     firearm.

 6            THE COURT:  Two for the firearm, so that's 44.  Okay.

 7            And I believe that takes us to the Objection 8 and what

 8     the correct calculation is.  And I think -- did I say 44?  We're

 9     at 44?

03:18:21    10            MS. VAN MARTER:  I believe 44, and then with three for

11     acceptance, I believe, brings it to a 41.

12            THE COURT:  Sure.  So the same objections apply, I

13     think, to 8 and 9.

14            10 is overruled as moot.  I think there's a correction

03:18:35    15     as to marriage date.

16            No. 11, again, it's a guideline difference.  Here again,

17     I think the Total Offense Level would be 41 after timely

18     acceptance of responsibility.  So it's a 41 that we're dealing

19     with.

03:18:52    20            No. 12 has to do with factors that warrant departure,

21     but we're really not at departure yet, I don't think.  We're at

22     41.  And so I can hear arguments about that.

23            And then No. 13, there's another disagreement about the

24     calculation of the guideline range.  And so for me he's at 41/I,

03:19:20    25     and I think that's where we are.

1    So I have a calculation of the guidelines as 38 plus 2,

2    for possession of the firearm; plus 4, leader/organizer; minus 3

3    takes us to 41.

4    He is a Criminal History Category I because he has no

5    countable criminal history points.

6    Let's see.  It looks like it's ten years to life under

7    the statute.  Let's see.  It's lifetime under the guidelines for

8    Count 1, and 240 months maximum on Count 2; a $10 million

9    fine -- up to $10 million on Count 1, up to 500,000 on Count 2;

10   supervised release, five to life on Count 1 -- excuse me, five

11   years under the guidelines on Count 1, and on Count 2 -- would

12   that be three years, one to three years?

13   MS. VAN MARTER:  One to three years, Your Honor.

14   THE COURT:  Okay.  A $100 mandatory payment; denial of

15   benefits under 18 United States -- excuse me, 21, United States

16   Code, Section 862, and I'm likely to deny other benefits under

17   862; and then also ineligibility under 862(a).

18   So he is at I think -- I need to refigure this to make

19   sure I have the correct amount.

20   MR. VIETH:  Your Honor, my book has, at least the range,

21   324 to 405.

22   THE COURT:  324 to 405.  Okay.  Thank you.

23   I'm sure it's in my sentencing memoranda that staff

24   prepared, but I'm not looking at that right now.  Hang on a

25   second.

1    Okay.  At least that's where I am at the present time.

2   I think that resolves all of the objections of the PSIR.

3   Otherwise, with those corrections, I accept the PSIR.

4    Let's hear from Ms. Coronado, and then we'll come back

03:21:32  5   to you folks in just a bit.

6    Ms. Coronado.

7    (Witness approached.)

8

9                    SANJUANITA CORONADO,

03:21:36  10   called as a witness, having first sworn or affirmed, testified

11                    under oath as follows:

12    THE WITNESS:  I do, yes.

13    THE COURT:  Please be seated.

14    When you're comfortable, tell us your first and last

03:22:05  15   name, and spell them both for the record.

16    THE WITNESS:  SanJuanita Coronado; S-A-N-J-U-A-N-I-T-A

17   C-O-R-O-N-A-D-O.

18    THE COURT:  And you're employed at Probation here in

19   Richland.

03:22:18  20    THE WITNESS:  Yes.

21    THE COURT:  In the course of your duties, did you

22   prepare the presentence report in this case?

23    THE WITNESS:  I did.

24    THE COURT:  Using the statutory criteria, and with a

03:22:27  25   mind towards the goals and purposes of the statutory criteria,

1   including the sentencing guidelines, what is your

2   recommendation, and what are the reasons for it?

3           THE WITNESS:  All right.  My recommendation, Your Honor,

4   is a total of 180 months for both Counts 1 and 2.

03:22:44   5           THE COURT:  So 15 years.

6           THE WITNESS:  Fifteen years, yes, with five years of

7   supervised release for Count 1 and three years for Count 2.

8           And my reasoning for that is I have been working on the

9   presentence reports for this case and for all of the different

03:23:03   10   co-defendants, and as previously discussed for Mr. Casillas, he

11   did appear to be a leader/organizer for the DTO in this area.

12   His co-defendants that were -- have been sentenced already, as

13   mentioned before, Francisco Figueroa got 120 months; Juvenal

14   Landa Solano also received 120 months; Julio Rosales Salcedo

03:23:36   15   received 87 months; and a related case of Rodolfo Hurtado Garcia

16   received 90 months.  They all were working with Mr. Casillas and

17   received instructions from him.

18           And so to avoid any unwarranted sentencing disparities,

19   I believe that, because of his role in the DTO, um, and his

03:24:00   20   involvement with the money laundering as well, he deserved a

21   higher sentence than 15 --

22           THE COURT:  So 50 percent higher than the next lower

23   defendant.  They were getting 10 years each.  He's getting 15,

24   is your recommendation.

03:24:19   25           THE WITNESS:  That's correct.  Yes.  And that's also

1    based on he has no prior criminal history.  And at the time my

2    guideline range was life, because it was 43, and I thought that

3    was an extreme.  And even now with the current guidelines

4    calculated at 324 to 405 months, I believe that was -- was a

03:24:42   5    little too high.

6              THE COURT:  Okay.  Questions?

7

8                            EXAMINATION

9    BY MS. VAN MARTER:

03:24:52  10    Q    Good afternoon.

11    A    Good afternoon.

12    Q    Did you have the opportunity to sit through testimony

13    yesterday?

14    A    I did.

03:24:57  15    Q    Have you also had the opportunity to review any of the

16    sentencing materials that were supplemented and presented by the

17    United States?

18    A    I did.  I was not able to look at the CDs, though.

19    Q    And did that at all impact or change your opinion as to

03:25:12  20    what an appropriate sentence may be?

21    A    It did made me think about whether or not he should receive

22    an increase from the 180.  However, I didn't receive a lot of

23    that information until yesterday.

24         I do still think that a 15-year sentence for Mr. Casillas

03:25:35  25    is pretty significant and would provide a just punishment for

1    him.

2           THE COURT:  Pull that microphone a little closer so I

3    can hear you in the overheads.  Thank you.

4           THE WITNESS:  Oh.

03:25:45    5    BY MS. VAN MARTER:  (Continuing)

6    Q    And from the materials that you heard yesterday, what

7    specific information caused you to question your 180-month

8    recommendation?

9    A    More so the -- the -- his involvement in the DTO, that he

03:26:02   10    was -- I knew he was involved since at least 2015.  I didn't

11    have a lot of the available discovery that implicated him in

12    2014 except for some of the confidential informants referring to

13    him being involved.  So having a longer period of time involved

14    in the DTO affected my -- made me think that maybe he -- because

03:26:32   15    I took that into consideration.  If he became at least the

16    leader after Mr. Calvillo died, so from two thousand -- I'm

17    forgetting my dates -- 2014 to 2016 until his arrest, so a

18    couple of years where he was in a position of -- as a leader as

19    opposed to one of the other transporters.

03:26:52   20    Q    And, in fairness, there was a lot of information to review

21    in this case.

22           Is that right?

23    A    There -- there was.

24    Q    Okay.  Had you -- was this the first case that you were

03:27:02   25    familiar with that there was actually this quantity seizure of

1    fentanyl in this district?

2    A    Yes, this amount.  Um-hmm.

3    Q    In this amount?

4    A    Um-hmm.

03:27:12    5    Q    And there are a number of other defendants that are yet to

6    be sentenced; is that correct?

7    A    Yes.

8    Q    Would you agree that none of those defendants who are yet

9    to be sentenced played the same role as Mr. Casillas?

03:27:28    10    A    Yes.  I haven't really looked into the discovery for the

11    ones that have not been sentenced and are pending trial and

12    that, so I don't know how much involvement, other than seeing

13    their names in the discovery --

14    Q    Well, and that's fair.  At least you would agree that

03:27:44    15    Mr. Casillas, by your own statement, was the head of operations

16    here --

17    A    Yes.

18    Q    -- so the leader/organizer amongst the indictment.

19    A    Yes.

03:27:53    20    Q    So would it be fair to say that even for those who are yet

21    to be sentenced, Mr. Casillas' sentence should likely be higher

22    than others?

23         MR. VIETH:  Your Honor, I think that's been answered by

24    the witness here, that she has yet to review and receive the

03:28:11    25    information on the other co-defendants.  So especially in

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    189
*Sentencing Hearing - Day 2/December 12, 2018*
*Testimony by Officer Coronado*

1    consideration to possibly their criminal history and where they

2    stand, I don't know if that's fair to the witness right now.

3            THE COURT:  I will let the witness testify and take it

4    all into consideration.

03:28:28    5            Go ahead.

6            Thank you, Mr. Vieth.

7    A    Yeah, I -- like I said, I haven't reviewed the ones that

8    have not been -- have not pled guilty, reviewed all of their

9    discovery to see how much -- what they were involved in.  A lot

03:28:45    10   of the discovery I received, as the other co-defendants pled

11   guilty, a lot of it was blocked out because many of the cases

12   were still sealed and that.  So I -- there is some information

13   that I don't have, and so I don't know how much the other

14   co-defendants were involved, if any of them were potential

03:29:06    15   leaders as well.

16   BY MS. VAN MARTER:   (Continuing)

17   Q    In some respects, that was a little bit of a hindrance for

18   you even in coming up with a complete report as to Mr. Casillas?

19   A    Yes.  Um-hmm.

03:29:16    20   Q    And some of that additional material you heard yesterday.

21   A    Yes.  Um-hmm.

22           MS. VAN MARTER:  I don't have any other --

23           THE COURT:  Just for the record, there are no 851s filed

24   against any of the people in this case, are there?

03:29:26    25           MS. VAN MARTER:  No.

1    THE COURT:  That's what I thought.  Thank you.

2    MS. VAN MARTER:  I have no other questions, Your Honor.

3    THE COURT:  Mr. Vieth, do you have anything for the

4    probation officer?

03:29:33  5

6                        EXAMINATION

7    BY MR. VIETH:

8    Q    Ms. Coronado, is it your opinion that a 15-year sentence is

9    truly sufficient but not greater than necessary to meet all the

03:29:53  10   criteria under 3553(a)?

11   A    For Mr. Casillas, yes.

12   Q    And I know that you have noted that you've reviewed all the

13   materials, and then I also know that you've put into your

14   presentence report the cost of incarceration.

03:30:14  15        Did the factor or the fact that my client will be deported

16   upon serving any incarceration play in any part to that 15-year

17   recommendation?

18   A    Not really, no.

19   Q    Okay.  Because in some of my pleadings, I've made the Court

03:30:32  20   aware and I've argued that the cost of incarceration, at least

21   the current cost, I believe, is a little over $40,000 a year

22   that the taxpayers have to pay to have my client in prison.

23        Is that -- I think that you noted that.

24   A    I'm trying to find it here.

03:31:00  25        Okay, here it is.  Yes, it's -- annually at this time it's

1    36,300.

2    Q    Okay.  And I just wanted to ask if that had any -- any play

3    at all in the recommendation, the additional tax burden or the

4    cost associated with putting my client in jail for 20 years or

03:31:25  5    30 years opposed to 15, just from a cost standpoint, when we

6    know that he's going to be deported?

7    A    No, I didn't take the cost of the -- of his incarceration

8    into consideration for his sentence.

9    Q    Okay.

03:31:44  10         MR. VIETH:  That's all I had, Judge.  Thank you.

11         THE COURT:  Thank you.

12         What was the arrest date for Mr. Carillo Casillas in

13   this case?

14         THE WITNESS:  It was --

03:31:53  15         THE COURT:  Or Casillas Carillo.

16         THE WITNESS:  August 16th of 2016.

17         THE COURT:  Eight what?

18         THE WITNESS:  Oh, '16.  Of '16.

19         THE COURT:  8-16 of '16.

03:32:03  20         THE WITNESS:  Yes.

21         THE COURT:  So he's served approximately 27 months at

22   this point, two years plus the time, another three months --

23         THE WITNESS:  Um-hmm.

24         THE COURT:  -- into the fourth month.  Okay.

03:32:42  25   Twenty-eight months.

1           Okay.  I have no other questions.  Thank you.  You may

2    step down.

3           Okay, folks, let's take -- how long, ten minutes? --

4    okay, let's take ten minutes.

03:33:07  5          THE COURTROOM DEPUTY:  Please rise.

6        Court is in recess.

7        (Recess taken: 3:33 p.m. to 3:54 p.m.)

8           THE COURTROOM DEPUTY:  Please rise.

9        (Call to Order of the Court.)

03:54:15 10          THE COURT:  Please be seated.

11           Okay.  Let's resume.  And I believe we're -- do you want

12   to speak to the sentencing issue at this time?

13           MS. VAN MARTER:  I can, Your Honor.

14           THE COURT:  If you'd like go ahead.  I believe there's

03:54:35 15   nothing else to do but to hear from the two of you.

16           MR. VIETH:  And my client.

17           THE COURT:  And the allocutions.  Okay.

18           MS. VAN MARTER:  Your Honor, I always find it

19   interesting; it appears, at least in Mr. Vieth's questioning

03:55:00 20   when he left off with the probation officer, that, you know, he

21   will be highlighting the fact, as did Mr. Casillas, that he's

22   going to be deported at the conclusion of any sentence imposed

23   in this case, and it seemed to be reflective of that this is

24   some kind of additional punishment to the defendant that should

03:55:17 25   weigh on this Court in determining what an appropriate sentence

1    should be.

2            I kind of take a look at it in a different way.  I look

3    at the fact that the defendant came here unlawfully from a

4    location where this organization originated, and since he's been

03:55:32  5    here in the Eastern District, which is since 2007, and since

6    approximately 2014 -- he came here, I believe, when he was 23,

7    in the Eastern District -- and in 2014 is when he was first

8    identified as re-initiating in this organization.  And I say

9    re-initiating because the evidence is that he had previously

03:55:54  10   known -- had been known to work for Mr. Calvillo, and that he

11   was again, based on the confidential human source's information,

12   that he was again returning to work for Mr. Calvillo in the

13   organization when he requested the load cars when he was first

14   identified by law enforcement.

03:56:10  15           THE COURT:  And that's '15.

16           MS. VAN MARTER:  2014.  April of 2014.

17           THE COURT:  '14.

18           MS. VAN MARTER:  And I think that that's important when

19   we talk about the scope of this organization and the history and

03:56:20  20   characteristics of this defendant.  This, by far, is probably

21   the most extensive investigation at a high level of a drug

22   trafficking organization that I have been a part of in this

23   district and that many of these agencies have been a party to.

24   This organization, at a very high level, was responsible for

03:56:44  25   countless, countless amounts of narcotics; on average, 50 to

1    100 kilograms of product a month coming in through this district

2    for almost a decade.

3          And they used this district because of its strategic

4    advantage, as we talked about with this Court before.  They used

03:57:06    5    this district because of its proximity to Canada, because of its

6    access to transportation routes.

7          And it was Ivan Calvillo who started that here in the

8    district as being kind of that strategic point, and we

9    identified him back in 2010.  And since that time, there has

03:57:22   10    been a successive replacement of those leaders in this district

11    after him leading all the way until Mr. Casillas.

12          And this organization continues to root and work through

13    that same strategic point in this district.  Without people like

14    Mr. Calvillo and without people like Mr. Casillas, this district

03:57:43   15    wouldn't be on the map to the degree that it is in the drug

16    trafficking world.  That is a substantial quantity.

17          And I think the sophisticated nature of this

18    organization is even more played out by the fact that a group in

19    Boston, a financial -- a very sophisticated financial

03:57:58   20    investigation group was brought to the attention of Ivan

21    Calvillo for purposes of money laundering.  And when that

22    relationship began, they began to discuss the extent of this

23    organization, not only in the laundering of their drug cash

24    proceeds, but also in the trafficking of narcotics.  And why

03:58:16   25    those strategic locations throughout the United States, as well

1    as Canada, were so important to its success, to include

2    Australia, China, there were drops in Kansas City, New York,

3    Los Angeles, it -- it exhibits to this Court the substantial

4    nature of what this organization was, which completely belies

5    the defendant's characteristics of his involvement.

6         I've had the opportunity to review extensively his

7    letter, the agents have reviewed his letter, and it is

8    completely and wholly inconsistent with the evidence.  It is

9    inconsistent with his own words.  It is inconsistent with his

10   own actions.  I do not disagree that this organization is

11   dangerous.  But the business the defendant chose to be a part of

12   is very dangerous.  That's how they operate.

13        But by the defendant's own words, he wanted the

14   information.  He wanted in.  He did not want to give the

15   undercover access to his direct boss because that would cut him

16   out.  He wanted the leadership role that he took in this

17   district.  And he did so successfully for the two years leading

18   up until the time of his arrest.

19        And so all of the information that he relies upon in his

20   letter oftentimes is a convenience to the defendant because we

21   do not have the ability to bring all these witnesses from Mexico

22   that he claims were continuing to threaten him; we do not have

23   the opportunity to bring all these individuals to try and claim

24   that he was under some kind of duress.  All we have the

25   opportunity to do is to listen to his own words from all of the

1    recordings that we have and all of the conversations that we

2    have.  And nowhere in those recordings does it indicate the

3    things that he has indicated to this Court in his letter.  It's

4    quite the opposite.

04:00:02    5        Again, he's the one that chose to take over in this

6    district, and he did so willingly, knowing of all of the

7    benefits that were involved.

8        So this is one of those cases that we understand his

9    history and characteristics and that he has no criminal history;

04:00:18    10   he's never been arrested for anything substantial.  But

11   individuals in his role aren't typically, because the

12   organization needs them to be successful.  They need them not to

13   draw attention to law enforcement.  They need to not have them

14   getting DUIs or simple possessions.  They need them to be able

04:00:37    15   to maintain the operation so that the whole organization can be

16   successful.  And in this particular case, the defendant did so,

17   as I indicated, successfully for a period of time.

18       It's not just the money laundering aspect, as this Court

19   heard from all the testimony; it was also the transportation

04:00:52    20   control, his recruitment of individuals to work for him.  We saw

21   that with Adrian Mendoza, a new driver, a 21-year-old individual

22   from this community.  We saw that in the individuals in

23   Los Angeles referred to as his cousins, that accepted money on

24   his behalf and at his direction.  We saw that in his

04:01:15    25   conversations with the confidential human source and the

1    transportation of narcotics up into the Canadian border, which

2    was why this organization was so successful here in routing and

3    controlling that trail system that the defendant later took over

4    for Mr. Calvillo upon his death.

5            So all of the extent of the organization, and all of the

6    fingers that they controlled throughout this district, has to be

7    taken into consideration in terms of what an appropriate

8    sentence would be.

9            And I think, most importantly, when I -- in looking to

10    the other co-defendants involved in this case and the

11    recommendation of Probation, which, respectfully, I do not

12    believe adequately takes into consideration all of those

13    factors, a sentence of 180 months is simply not appropriate,

14    especially in comparison to other defendants that already have

15    been sentenced and other defendants that are yet to be

16    sentenced.  It is a six-level departure, downward departure from

17    the applicable guideline range.  And there is simply, at least

18    from my perspective, no justifiable basis for a six-level

19    departure for this defendant, whom this Court has already found

20    to be the leader/organizer in this district.

21            And I look to some of the defendants, co-defendants that

22    have been sentenced that worked for the defendant:

23    Mr. Figueroa, his uncle through Daisy Camacho, the one who did

24    errands and deliveries at the request of the defendant, he was

25    sentenced to ten years; Juvenal Landa, who was a distributor for

1    the defendant, he got caught with 2 pounds of methamphetamine,

2    and he was sentenced to ten years.

3              There are yet other defendants that are yet to be

4    sentenced:  Miguel Reyes Garcia, who was caught with the

04:02:56  5    backpackers going up into Canada, backpacking the 18 kilos of

6    meth and the cocaine and the heroin, he is yet to be sentenced.

7    And we also have another individual that went by the name of

8    Burro, who was one of Ivan's right-hand men before Ivan left

9    this district to return to Mexico.  He too had a high-level

04:03:19  10   knowledge of the organization.  He took over for a period of

11   time for Ivan.  After him and during that time was AR15.  After

12   him and during that time there was Beto and Rulas, and that

13   person has yet to be sentenced, but they are facing ten-year

14   mandatory minimums before this Court.  And Burro does have a

04:03:39  15   prior conviction, although there is no 851 filed.

16             So in looking at those sentences, a sentence of 15 years

17   for this defendant just does not seem fair or appropriate,

18   considering his role in this offense.

19             I would argue to the Court that those other

04:03:54  20   co-defendants that have yet to be sentenced are looking at a 12-

21   to 15-year sentence, and certainly a 15-year recommendation from

22   the United States.

23             This defendant having a sentence anywhere near that does

24   not seem appropriate.

04:04:08  25             The Court has to take into consideration the impact this

1   organization has had on the community.  This was the first

2   substantial seizure of fentanyl in this district; 10 kilos of

3   fentanyl, what we now know to be the cause of the 70 percent

4   increase of overdose deaths in the state of Washington.  This

04:04:34   5   organization and this defendant introduced it into this

6   district.

7       And I think what's very telling from the evidence is

8   this defendant repeatedly promised the undercover that this

9   product was going to be better than the last; he would be so

04:04:48   10   much more pleased with he and *compadre's* product.  And, quite

11   frankly, that makes sense if their new product was to introduce

12   fentanyl into the district rather than just heroin.  And to me,

13   Your Honor, that is an aggravating factor that should be

14   attributable to this defendant, given the dangerousness of that

04:05:11   15   particular drug.

16       And in this case, law enforcement had no idea that they

17   were even handling fentanyl.  And I know this Court is aware

18   that the reason fentanyl is so dangerous is that it can be

19   transmitted through the skin, and if any quantity is put into

04:05:28   20   the air and breathed, it poses a direct danger to anyone who

21   comes into contact with it.

22       So I think some of those factors are very interesting.

23   And I know the Court had commented it read some of the

24   transcripts, and I would rely on those transcripts to show the

04:05:43   25   true Jese Casillas and his intent with this organization in this

1   district.

2         Based upon all of those factors, the United States has

3   recommended a sentence of 35 years.  I will tell the Court that

4   that is a consistent recommendation with other defendants who

04:05:56   5   have been at this level of an organization.  I would direct the

6   Court to Aren Lee Perryman, which was a case before Judge Rice.

7   It was a conspiracy involving heroin, methamphetamine,

8   originating out of a halfway point in Arizona.  There were

9   multiple seizures in that case, over 20 pounds.  Mr. Perryman

04:06:18   10   tried to arrange to get rid of witnesses, tried to arrange to

11   get rid of the case agent in that particular case, and the

12   recommendation from the United States was 35 years, based upon

13   the totality of his involvement.

14         I would tell the Court that Mr. Perryman was not a boss.

04:06:34   15   He was working for the folks in Arizona.  He didn't control any

16   distribution routes.  He was a distributor in the Eastern

17   District of Washington.  However, based upon the scope of that

18   criminal conduct, that was the recommendation, and I believe he

19   was sentenced to 30 years by Judge Rice.

04:06:51   20         I can tell the Court in another case that actually

21   Mr. Vieth was a part of, we had a pill conspiracy that

22   originated out of Los Angeles, and in that particular case,

23   post-trial the Court found the leader/organizer Arvin Carman.

24   We recommended a sentence of 60 years, and Judge Nielsen imposed

04:07:13   25   a sentence of 50 years, and that was a continuing criminal

1    enterprise, which I would argue to the Court the facts in this

2    case certainly support that this organization could have

3    received a CCE qualification as well.

4         So a recommendation of 35 years for Mr. Casillas, who

04:07:27  5    stepped in for Mr. Calvillo, is a consistent recommendation for

6    somebody at this level of this high-ranking drug trafficking

7    organization operating and centering out of this district for

8    over a decade.

9         THE COURT:  Thank you.

04:07:40  10        Okay, Mr. Vieth and Mr. Casillas Carrillo.

11        MR. VIETH:  Your Honor, first off, in regard to a case

12   that the Government just mentioned, the Perryman matter, I

13   believe our case is fairly distinguishable to that one,

14   especially in regard to Mr. Perryman indicating he wanted to

04:08:13  15   kill witnesses and kill the case agent.  I don't think we're

16   even close to that.  So ...

17        In regard to the presentence report, Ms. Coronado's

18   recommendation of 15 years, I do believe that's appropriate, but

19   I'm going to ask this Court to take it one step further, and

04:08:34  20   that step is -- and my briefing outlines it.  My -- and the

21   reason why I mentioned the deportation is that my client

22   understands that once he is deported, whether it's 120 months --

23   the mandatory minimum -- or the 15 years, he cannot return; but,

24   most importantly, I noted that because of the cost of the --

04:09:01  25   cost of the incarceration at $36,300, I believe it is.  So at

1   ten years, we're looking at $360,000 and a little bit more.  For

2   an additional five years, which the recommendation by

3   presentence would be, that's an additional $200,000 of the

4   taxpayers' that we have to burden.  And I believe that's

04:09:23  5   unnecessary, due to my client being deported, and I think we can

6   alleviate that cost.  That's the reason why I mentioned the

7   deportation, Your Honor, just to dovetail that with my briefing,

8   not any other reason.

9           In regard to duress and what the Government maintains is

04:09:45  10   a falsehood, even a DEA agent yesterday indicated that my client

11   was quite concerned, especially after the loss of that money

12   down in the Los Angeles area.  Why was he concerned?  Well,

13   because we have the individual that he replaced, Ivan, had a

14   similar situation; Ivan was deported; Ivan was killed.  This is

04:10:10  15   very concerning not only to my client, of course, but also to my

16   client's family, who resides and continues to reside, at least

17   his mom and dad and some of his siblings, down in the -- down in

18   Mexico.

19           In speaking with my client's brother just before this

04:10:28  20   hearing -- Guillermo, right?

21           THE DEFENDANT:   (Nodded.)

22           MR. VIETH:  -- Guillermo, who has been sitting back

23   here, he told me and showed me some pictures, along with -- the

24   interpreter was there, too, to help me figure out what happened,

04:10:44  25   that the family has actually already not only received a threat,

1    but their house has been shot up by gunmen.

2          And to -- for the Government to just say and suggest,

3    especially in light of what happened to Ivan, is -- is

4    inappropriate.

04:11:08    5          With regard to sentencing disparity, and I'm looking at

6    Page -- Pages 4 and 5 of the presentence report, the Government

7    is quick to note that there were some defendants that have

8    already been sentenced and some of those defendants have been

9    sentenced to the recommendation request that I'm making, the

04:11:28    10    120 months.  But there are other defendants, and this Court is

11    in a much better position to figure out whether or not they are

12    similarly situated, but some of these individuals received no

13    jail.  There's some pretrial diversion.  There's a

14    two-and-a-half-year sentence for Ms. Vasquez.  Julio Rosales,

04:11:55    15    six years; Mr. Goldring, two years; Veronica Cortez, she

16    received six months of home confinement.

17          So my position is in regard to sentencing disparity, I

18    believe that United States Probation's recommendation is clearly

19    in line with the goals of the 3553(a), including making sure

04:12:22    20    that this Court doesn't sentence my client outside of -- of that

21    area.

22          And furthermore, Your Honor, my client, again, he's a

23    fairly young man; a ten-year sentence is going to be very

24    significant.  He dearly misses his family, his kids.  And

04:12:49    25    it's -- it's really unfortunate.  And I've told him that once he

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                          204
*Sentencing Hearing – Day 2/December 12, 2018*
*Colloquy re: Sentencing*

1    is incarcerated, he has to take advantage of all the programming

2    that BOP is going to offer, whether that's a welding course,

3    engineering course, electronics course.  I told him take a

4    quilting course; whatever.  Keep himself busy.  But more

04:13:12   5    importantly, when he is deported and sent back to Mexico, he can

6    hit the ground running and get a good, gainful job to help

7    support his family.

8              And he's told me that he's going to take that benefit,

9    and he's going to do everything that he can while he's

04:13:28   10   incarcerated.

11             Lastly, Your Honor, my client does request that you make

12   a recommendation for a facility outside of Lompoc.  It's

13   called -- what's the prison?

14             THE DEFENDANT:  Taft.

04:13:46   15   THE COURT:  Taft?

16             MR. VIETH:  Taft.

17             THE DEFENDANT (through the interpreter):  Taft, or

18   something like that.

19             MR. VIETH:  It didn't ring a bell to me, Judge, but ...

04:13:53   20   THE COURT:  Taft?

21             THE DEFENDANT (through the interpreter):  It's close to

22   Lompoc.

23             MS. VAN MARTER:  It's in California, outside of

24   Bakersfield, Your Honor.

04:14:01   25   MR. VIETH:  And then there was also one request by my

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                                          205
*Sentencing Hearing - Day 2/December 12, 2018*
*Colloquy re: Sentencing*

1    client's wife:  That the Court order one contact visit to be

2    supervised by the marshal service and the jailers here at Benton

3    County.  My client's oldest son is having some very significant

4    separation issues.  Granted, that's going to be impossible to

04:14:30    5    cure, knowing that he's going to be incarcerated for a long

6    time.  But, nevertheless, the family has requested that I make

7    the request to you for one contact visit so he can say good-bye

8    to his family.

9            THE COURT:  Thank you.

04:14:43    10           Okay.  Mr. Casillas Carrillo, this is your opportunity

11   to make such remarks as you want me to think about before

12   sentence is imposed.  You have the right to speak, but you're

13   not required to.  And I have read the letter that you submitted,

14   and I sent copies to the U.S. Attorney's Office and to your

04:15:02    15   attorney.

16           THE DEFENDANT (through the interpreter):  Yes.  Good

17   afternoon, Your Honor.

18           As my letter says, my letter states --

19           THE COURT:  Why don't you move the microphone closer to

04:15:28    20   you so I can hear the English translation.

21           THE DEFENDANT (through the interpreter):  My letter

22   states what the situation was and how I became involved in

23   Mr. Calvillo's organization.  I started out -- I do accept this,

24   that I started out messaging Negro so that we could do these

04:15:48    25   money transactions.

1     Regarding the situation with Calvillo's death, the

2     person who was acting like *compadre*, he was the middleman, and

3     he was responsible for getting the other people after me,

4     because they wanted me to start selling -- being involved with

04:16:28  5     the money transaction.

6          The DEA people said that *compadre* was like the boss, but

7     he was just taking advantage of the situation so he could get

8     the people in the state of Washington after me.  And they were

9     able to find me and talk to me.  And *compadre* was amongst the

04:17:09 10     first people who started threatening me, telling me that I had

11     to talk to Calvillo's real bosses, and that I had to help him

12     get part of that money back.

13          I told *compadre* that I didn't know them, but he insisted

14     that I had to talk to them.  So I had to -- I had to take it, I

04:17:43 15     had to accept that because I was afraid, and there were no other

16     options.  I was fearful that they would do something to me or to

17     my family or that something would happen.

18          The first transactions, that was just money.  One of

19     those transactions was where we lost 244,000.  That's when the

04:18:11 20     new bosses came after me saying, "Well, what happened?  You have

21     to pay for this now."

22          So that's when Negro said he was going to help me and

23     help me get the pressure off and maybe talk to the bosses.  And

24     he says that I didn't want to because I was afraid that I was

04:18:37 25     going to get cut out of the whole deal.  And I did talk to the

1    boss, and he said, "I want Negro to come to Mexico."

2           And Negro didn't want to go to Mexico because Negro knew

3    that if you go to Mexico, yes, those people are going to meet

4    with you, but it's going to be under their terms.  I think maybe

04:19:17    5    Negro got scared, and he didn't want to go, and he also didn't

6    want to send anybody.

7           But -- but it wasn't me saying, "I don't want you to get

8    to know them or meet them."  It would have been better for me

9    because it would have taken off that responsibility from me.

04:19:43   10           And when he didn't agree, the boss from Mexico, he did

11   not want to talk to him over the phone.  These are people who

12   have been in the business for a while, and they tried to be very

13   careful.  That's why they get people like me, people who don't

14   really know and they're not open to this, and they just send you

04:20:14   15   here:  Go here, go there.

16           And that's how I came into the organization, because I

17   was listening to Negro, what he was telling me to do, and also

18   because I was listening to the boss from Mexico; I was doing

19   what he was telling me to do.

04:20:36   20           Honestly, I don't see myself as a leader or the boss or

21   organizer in the state of Washington.  I did two deliveries.  I

22   delivered product, drugs, twice to El Negro, but that was after

23   the money was seized, because I felt more pressure because now I

24   also had to help them get the money back that was seized on top

04:21:17   25   of the situation with the drugs.

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                      208
*Sentencing Hearing - Day 2/December 12, 2018*
*Colloquy re: Sentencing*

1        If they had found me first, when I didn't owe them any

2    money, imagine now that I had lost $244,000 now?  Well, I had to

3    work to help them get the money back.  But my intention was

4    never to be the boss or feel like I had people that I could

04:21:48   5    order around.

6        I've always worked.  The time that I was here, ten

7    years, always worked.  I did landscaping; I, you know, cut

8    grass.  Even when it's 100 degrees outside, I'll do it.

9        Being the boss and making thousands of dollars, what

04:22:23  10    would have been the need for me to be out there working when

11    it's that hot, at that temperature?

12        I do accept that I participated in this, but I didn't

13    have a choice, Your Honor.  There was some money laundering

14    transactions.  Two -- drugs were sold twice, and that was

04:22:55  15    organized through me.  They followed me for a long time.  They

16    didn't catch me selling drugs again.  They thought that I was

17    doing it, but they have no proof or solid proof of that.

18        If I was a leader in Washington, how is it possible that

19    I'm only doing these transactions every eight months, every

04:23:27  20    six months?  That's a long time.  If I took Calvillo's position,

21    then I would have had a lot of clients, and I would have been

22    moving drugs every single day, and I wouldn't have had a regular

23    job that would take up a lot of my time to be -- I wouldn't have

24    had the time to do my drug dealing, supposedly.

04:24:01  25        Sometimes I start thinking:  Calvillo was deported to

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                    209
*Sentencing Hearing - Day 2/December 12, 2018*
*Colloquy re: Sentencing*

1    Mexico, and I wonder how much money he made with Negro, because

2    he could have been sentenced during that time.  When -- when

3    they did the seizure and they did the possession and they did

4    the money that he paid, the -- that was a really important point

04:24:50   5    where they could have had him.  And how could you just have

6    somebody and not get them and just let them go?

7         So when they let him go, they gave him time to get

8    himself together back in Mexico and continue to send this

9    product.  This could have been over much sooner.  I would have

04:25:16   10   been happy.  I would have been free.

11        Right now, I'm in jail.  But this was not something that

12   I decided.  I didn't come in and say, "Here.  Here I am.  I'm

13   going to be the new boss."

14        Honestly, I apologize to the community, to the state, to

04:25:44   15   the country, to you as the judge because I am wasting your time.

16   I want to apologize to my wife, my children because I won't be

17   in their lives for a long time.  And like my attorney said, when

18   I go to prison, I will ask and inquire about all the programs

19   they have available so that I can take advantage of these

04:26:24   20   programs, and when I'm released I can have access to a good job

21   and -- and an honest job.

22        That is all, Your Honor.

23        THE COURT:  Hmm.  Okay.  Well, it's a difficult position

24   you find yourself in, Mr. Casillas Carillo; regrettably, one

04:26:44   25   that you put yourself in.  And the Court has carefully

1    considered the sentencing guidelines and the -- I want to make

2    sure that, for the purposes of the record, it looks to me, and I

3    think we've done a calculation, basically, on Count 1, and

4    that's resulted in the guideline calculations we have.  And

04:27:09    5    it's -- essentially, Count 2 seems to be part of that.

6         I'm looking at the offense level computation, Page 20,

7    Paragraph 106 and the grouping in Paragraph 108, which groups

8    Counts 1 and 2 for the purposes of calculating the guidelines,

9    and comes up with a Base Offense Level of 38, and that's how I

04:27:38    10    understand it occurred.

11         Then we made the adjustments that we've made and ended

12    up after at the Final Offense Level at 41.  And he's a 41/I with

13    the range of imprisonment that we've already recited into the

14    record -- let me just get to that -- 324 months to 405 months.

04:28:21    15         The range of imprisonment the Court finds is not

16    reasonable in this case, given the statutory considerations the

17    Court has to make.  There is -- it's undisputed in the

18    Court's -- well, it's disputed, but the Court has found, on the

19    basis of the evidence in the exhibits submitted and the sworn

04:28:43    20    testimony, that you were, indeed, were a leader/organizer in

21    this area.  And I've read the transcripts of your conversations

22    with Negro, Mr. Cepero, and in my mind, it's very clear that you

23    had a major role in the distribution of drugs through a DTO in

24    huge quantities here and transported into Canada and places east

04:29:11    25    of this area.

1    The carnage, the social and human costs of what your

2    distribution did to human beings and their families, their wives

3    and their children, the addictions, the horrors that they've

4    endured and what has happened to the communities affected by the

04:29:38    5    distribution of those drugs cannot be overstated.  It is a

6    plague upon the law-abiding people in this state, as well as in

7    Canada and the places where your people and your couriers

8    distributed drugs.  You destroyed countless lives.  And that's

9    why, in a case like this, the sentences are so severe, because

04:30:02    10    of the enormous damage that your behavior, your conduct, and the

11    conduct of the people that you controlled and directed has

12    caused other human beings whose families sit in courtrooms like

13    this listening to their family members who are facing

14    consequences because of the addiction that you supplied.

04:30:22    15    Certainly, you worked for bosses in Mexico.  And if we

16    could bring those bosses from Mexico to justice in the United

17    States, the law enforcement agencies would do everything they

18    could to do that.  It's not frequent that I have the leader or

19    organizer in my court.  On a regular basis I have people who

04:30:42    20    transport minor amounts, people who take loads, who transport

21    money, people without records, mothers of children, people that

22    are hard -- on hard times and who are recruited as part of

23    organizations like this one to bring drugs from Mexico to this

24    area.

25    And there's no question that the U.S. Attorney is

04:31:04

1  correct that the amount of drugs brought to the Tri-Cities by

2  this drug trafficking organization, which you were a director of

3  here in the state of Washington on this side of the mountains

4  for sure, was tons.  And so the damage is astronomical.

04:31:28  5         That is all attributable to you and the people with whom

6  you worked, and you're before the Court because you were a

7  central figure in the money laundering of huge amounts of money

8  and the distribution of huge amounts of drugs that have caused

9  enormous damage to the people of the United States.

04:31:52  10        You are now 33 years old?

11        THE DEFENDANT (through the interpreter):  Yes.

12        MR. VIETH:  '85, I believe, was his birth --

13        THE COURT: 35?

14        MR. VIETH:  33, I believe, Judge --

04:32:03  15        THE COURT:  33.  He was a 1985 date of birth.

16        MR. VIETH:  That's correct, Judge.

17        THE COURT:  So 33 years old.  You were born in Mexico

18  and are here illegally.

19        The sentences are quite high under the guidelines, I've

04:32:17  20  already recited that, and up to 240 months, I think, for Count 2

21  as a maximum, at least five years supervised release, and then

22  three years on Count 2.  You lack the resources to pay a fine,

23  so the fine is inapplicable here.  You're not eligible for

24  probation or for community service.

04:32:45  25        Others like Figueroa and Landa received ten years in

1    prison for pleading guilty to the same count you pled guilty to,

2    Count 1.  The guideline range I've already recited, and I find

3    the guideline range as to Count 1 is unreasonably high and will

4    depart downward.

04:33:06   5          Your involvement in this case is clear, and you were, as

6    I said, the head of the organization in the state of Washington,

7    with distribution into Canada, and money laundering as well, and

8    you're responsible for all of that.  You -- you have no criminal

9    history, and you do have a family.  The question is what will be

04:33:32  10    a sentence that will provide just punishment and -- and be

11    proportionate and not disproportionate to sentences that others

12    have received in this case.

13          Certainly you'll be deported upon completion of whatever

14    sentence I impose.  And I take into consideration, as I say, the

04:33:56  15    human carnage that follows from distribution of drugs of this

16    quantity and the monies that were used to -- in fact, reinvested

17    certainly into the drug transactions and distributed out to

18    others to continue the organization's activity.

19          The U.S. Attorney mentions 10 kilograms of fentanyl, and

04:34:17  20    the enormous danger that that poses to people.  Yes, it is true

21    that there are overdoses because addicts don't appreciate the

22    strength of fentanyl and think it's heroin.

23          I think it's right that Cepero wanted to talk directly

24    to your bosses, but you did not allow that to happen.  And, yes,

04:34:38  25    I believe that he -- they wanted him in Mexico, and he wasn't

1    going to go there, of course, as we know.

2           The question is, with credit for time served, and I

3    think we calculated that as something like 28 months or

4    something of that nature, whatever the exact count is, you'll

04:34:56  5    get credit for time served, and the question is what's a

6    sentence that is sufficient but not greater than necessary to

7    carry out the goals and purposes of the Sentencing Act.

8           At 33 years old, the amount of time that you're going to

9    spend in prison will constitute a significant portion of your

04:35:12  10   adult life from age 18 to the time you get out of prison, and

11   will be an unfortunate tragedy for your children, who will be

12   deprived of your presence and will have to be dealt with by

13   their mother and comforted by their mother.

14          I'm going to deny you federal benefits for any grants,

04:35:36  15   contracts, loans, licenses, or the like.  You're already

16   ineligible for other food stamp program benefits under the two

17   statutes that are cited in the plea agreement:  21, United

18   States Code, Section 862; and then 21, United States Code,

19   Section 862(a).

04:35:54  20          All things considered, I've looked at this very

21   carefully, and I think 38 years itself is unreasonable and will

22   not impose 38 years.  I also find that 15 years, despite my

23   respect for Ms. Coronado and her work, is, in my mind, markedly

24   insufficient to adequately provide a just punishment for the

04:36:17  25   crime that you have plead guilty to.  And so the Court is going

1   to impose 25 years with credit for time served; no fine because

2   you lack the resources to pay it; supervised release of five

3   years on Count 1, three years on Count 2; a $100 mandatory

4   payment as to each of those two counts.  I've already talked

04:36:40   5   about the ineligibility of those matters for those benefits

6   under 21, United States Code, Section 862 and 862(a).

7          So in order to achieve justice, the Court has departed

8   slightly.  That means that you will serve probably, with good

9   time, about 20 more years in prison, approximately, so you'll

04:37:05  10   have served about 23 years altogether.  Credit for good time

11   will be two or three years.

12          So that's your future.  Mr. Casillas Carrillo, I want

13   you to understand, as difficult as it is to accept that

14   sentence, I've looked very carefully at the amount of time that

04:37:27  15   the Government proposed.  I looked very carefully at 30 and 35

16   years as well.  And the Court considered your age and the amount

17   of time that you will spend in prison as part of your adult

18   life, and I believe that this sentence carries out the goals and

19   purposes of the Sentencing Act and is just, given all of the

04:37:47  20   statutory factors that the Court's required to consider.

21          I will recommend placement at Taft.

22          One can't tell what will transpire in the years ahead

23   for you, and there is -- given the length of time that you'll

24   spend in prison, we can't foresee what your health issues may

04:38:14  25   be.  There are some folks who write letters recommending that

*USA v. Carillo Casillas/4:15-CR-6049-EFS*                              216
*Sentencing Hearing - Day 2/December 12, 2018*
*Colloquy re: Sentencing*

1    the BOP consider, pursuant to its policies, compassionate

2    release if a person is terminally ill.  I certainly don't wish

3    that for you, but you'll be in prison for 20 years, and at 33,

4    who knows what your health issues will be.

04:38:38    5         And if counsel wants me to write such a letter, I will.

6    That's up to you.

7         So the question becomes -- I believe that completes the

8    articulation.  You have a right of appeal.  You must exercise

9    that right of appeal within 14 days from tomorrow, when I will

04:38:55   10    sign your judgment of conviction and sentence.  If you cannot

11    afford a lawyer, one will be appointed to assist you with the

12    appeal.

13         And I believe that completes matters, doesn't it?

14         MR. VIETH:  Yes, Your Honor.

04:39:07   15         MS. VAN MARTER:  Yes, Your Honor.

16         THE COURT:  Ms. Coronado?

17         THE PROBATION OFFICER:  Special conditions, Your Honor?

18         THE COURT:  Count 2 is concurrent, and it is -- let me

19    just check that.

04:39:20   20         MS. VAN MARTER:  Your Honor, I believe Ms. Coronado also

21    asked about special conditions.

22         THE COURT:  One second.

23         So 180 months -- well, 180 months on Count 2 concurrent.

24    Is that correct?  190 months on Count 2 concurrent.  Thank you.

04:39:40   25         Special conditions:  That you never return to the United

1   States without the express permission of the United States

2   Attorney General or his designee.  And if you do return to the

3   United States, if you are somehow legally able to return to the

4   United States, which is, in this Court's mind, absolutely not

04:40:02   5   going to happen, you must report within 72 hours.  When I say

6   that, it's clear that you can never return to the United States

7   legally at this time in our country's history.

8          You must not communicate or associate or interact with

9   any other witness or co-defendants in this case without first

04:40:24   10   obtaining the permission of the probation officer; this is a

11   term of supervised release.  You must submit your person,

12   office, residence, vehicle, and belongings to a search conducted

13   by a probation officer at a sensible time and manner, based upon

14   reasonable suspicion of contraband, or evidence of violation of

04:40:42   15   a condition of supervision.  Failure to submit to search may be

16   grounds for revocation, and you'll warn people you live with of

17   that condition.

18          Your perspective on this, Mr. Casillas Carrillo, is not

19   one that I accept.  It's a terrible mistake that you've made,

04:41:01   20   and you will pay a heavy price, as will your family, and that is

21   regrettable.  I hope the time passes quickly and that you, as

22   Mr. Vieth says, you take advantage of the programs that are in

23   prison.

24          As to a contact visit, what's the position of the

04:41:17   25   marshals?

1       (The Court and marshals conferring.)

2           THE COURT:  How old is this child?

3           MR. VIETH:  He's got two, Your Honor; one is 3 and one

4  is 8, I believe.  Is that --

04:41:37  5           MINOR SON:  7.

6           MR. VIETH:  He's 7, Your Honor.

7           THE COURT:  Is that his child?

8           MR. VIETH:  Yes.

9           THE COURT:  Very difficult to have your child present in

04:41:43  10  the courtroom, I'm sure, when you're being sentenced for the

11  crimes that you've committed against other people and other

12  families that have children such as your son.  And the question

13  becomes:  How are we going to handle this?

14          If you think -- and what kind of a visit are you looking

04:41:58  15  for?  What's it called?

16          MR. VIETH:  A contact visit, Your Honor, with his

17  family.  There's definitely no concern or objection about having

18  the marshals there.  I can be there, if the Court orders.  My

19  investigator will --

04:42:10  20          THE COURT:  It's not going to be a private visit.

21  Because the children are certain ages, I'm going to permit a

22  contact visit under the scrutiny of the marshals, under such

23  terms and conditions as they require, and pursuant to the

24  conditions of the jail, whatever those conditions are.  Nobody

04:42:26  25  will go into that room without going through a metal detector,

1    at the very least, and they will be not entitled to bring

2    anything into the room with them, I'm sure.

3            Isn't that correct?

4            U.S. MARSHAL:  Yes, Judge.

04:42:38    5            THE COURT:  Nothing in there but them.  And so you're

6    talking about a very short visit.

7            MR. VIETH:  That's fine, Your Honor.  He just wants to

8    give everybody a hug and say good-bye.

9            THE COURT:  Then that is the -- if he really wants to do

04:42:50   10    that, that's the extent of it.  There will be no more than that.

11            This is very difficult, Mr. Carillo Casillas.  I

12    consider you're a human being, empathetic to your terrible

13    situation, but I've always considered all of the conditions that

14    I have to consider that puts you in prison for this time, and

04:43:10   15    I'm convinced it's a just punishment.

16            Is there anything else before we conclude?

17            MR. VIETH:  No, Judge.

18            MS. VAN MARTER:  No, Your Honor.  Thank you.

19            THE COURT:  He pled guilty to two counts, and you

04:43:19   20    dismissed the others?

21            MS. VAN MARTER:  There was no plea agreement.  We did

22    file a motion to dismiss --

23            THE COURT:  My recollection is we did that because we

24    dealt with the trial issues, and we resolved all of those at

04:43:31   25    that time.

1          MS. VAN MARTER:  Correct.

2          THE COURT:  All right.  Thank you.

3          Court is adjourned.  You may go about your business.

4          MR. VIETH:  Thank you, Judge.

04:43:38  5       (Hearing concluded at 4:43 p.m.)

221

1                    C E R T I F I C A T E

2

3        I, KIMBERLY J. ALLEN, do hereby certify:

4            That I am an Official Court Reporter for the United

5    States District Court for the Eastern District of Washington in

6    Richland, Washington;

7            That the foregoing proceedings were taken on the date

8    and at the time and place as shown on the first page hereto; and

9            That the foregoing proceedings are a full, true and

10   accurate transcription of the requested proceedings, duly

11   transcribed by me or under my direction.

12           I do further certify that I am not a relative of,

13   employee of, or counsel for any of said parties, or otherwise

14   interested in the event of said proceedings.

15           DATED this 29th day of January, 2019.

16

17

18

19   _____

20   Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
     Washington CCR No. 2758
21   Official Court Reporter
     Richland, Washington
22

23

24

25