1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No.
3                                ) 4:15-CR-6049-EFS-21
                    Plaintiff,   )
4                                ) March 26, 2019
v.                               ) Richland, Washington
5                                )
MIGUEL REYES GARCIA (21),        ) Sentencing Hearing
6                                )
                    Defendant.   ) Pages 1 to 42
7    _____

8

9           BEFORE THE HONORABLE EDWARD F. SHEA
          SENIOR UNITED STATES DISTRICT COURT JUDGE

10

11                     APPEARANCES:

12   For the Plaintiff:          Stephanie A. Van Marter
                                 Stephanie.Van Marter@usdoj.gov
13                               Caitlin Baunsgard
                                 US Attorney's Office-SPO
14                               920 W Riverside, Suite 300
                                 P.O. Box 1494
15                               Spokane, WA 99210
                                 509-353-2767

16   For the Defendant:          Kenneth D. Therrien
                                 Kentherrien@msn.com
17                               Kenneth Therrien Law Office
                                 413 North Second Street
18                               Yakima, WA 98901
                                 509-457-5991

19

20   Court-Certified Interpreter:  Carolina Hickey

21   Official Court Reporter:    Kimberly J. Allen, CCR #2758
                                 United States District Courthouse
22                               P.O. Box 685
                                 Richland, Washington 99352
23                               (509) 943-8175

24   Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
25

2

## INDEX

**Proceedings:**                                                           **Page**

      SANJUANITA CORONADO – QUESTIONS BY THE          17
      COURT
      EXAMINATION BY MS. VAN MARTER                    21
      EXAMINATION BY MR. THERRIEN                      23

## WITNESS INDEX

**Plaintiff Witness:**                                                     **Page**


  None


&ast;&ast;&ast;&ast;&ast;


**Defense Witnesses:**                                                     **Page**


  None

## EXHIBITS ADMITTED

**Plaintiff**
**Number**         **Description**                                        **Page**
     None


**Defense**
**Number**         **Description**                                        **Page**
     None

1

## GENERAL INDEX

2

**Page**

3

Reporter's Certificate.............................42

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (March 26, 2019; 2:17 p.m.)

2         THE COURTROOM DEPUTY:  Please rise.

3       (Call to Order of the Court.)

4         THE COURT:  Good afternoon.  Please be seated.

02:17:35    5         THE COURTROOM DEPUTY:  Matter before the Court is *United*

6    *States of America v. Miguel Reyes Garcia*, Cause

7    No. 4:15-CR-6049-EFS, Defendant No. 21.  Time set for sentencing

8    hearing.  Defendant is being assisted by a federally certified

9    interpreter, Carolina Hickey.

02:17:57   10         Counsel, please state your presence for the Court and

11   record.

12         MS. VAN MARTER:  Stephanie Van Marter and Caitlin

13   Baunsgard on behalf of the United States.  Good afternoon.

14         THE COURT:  Good afternoon.

02:18:05   15         MR. THERRIEN:  Good afternoon, Your Honor.  Ken Therrien

16   for Miguel Reyes Garcia.

17         THE COURT:  Good afternoon.

18         Mr. Reyes Garcia, good afternoon.

19         Ms. Van Marter.

02:18:13   20         MS. VAN MARTER:  Your Honor, the United States has had

21   the opportunity to review the presentence investigation report,

22   as well as the defendant's objections and sentencing memorandum

23   at ECF 1169.  The United States has filed its sentencing

24   memorandum at 1176.  This was a case where there was no plea

02:18:39   25   agreement.  The defendant pled the morning of scheduled trial.

1      However, there does not appear to be a dispute as to the

2   Base Offense Level of 38 and minus only two points for the

3   limited acceptance of responsibility, resulting in an Adjusted

4   Offense Level of a 36 with an applicable guideline range of 188

02:19:05   5   to 235 months.

6      THE COURT:  So 15, a little over 15 years to almost 20

7   years.

8      MS. VAN MARTER:  Correct.

9      THE COURT:  Okay.

02:19:17   10      MS. VAN MARTER:  The United States in this case, Your

11   Honor, is recommending --

12      THE COURT:  Excuse me.  When I say that, that is the

13   advisory guideline sentence.

14      MS. VAN MARTER:  That is the advisory guideline

02:19:25   15   sentence, Your Honor.

16      THE COURT:  Which is not binding on the Court.

17      And the statutory maximum is what?

18      MS. VAN MARTER:  Life.

19      THE COURT:  Life in prison.

02:19:31   20      MS. VAN MARTER:  With a mandatory minimum of ten years.

21      THE COURT:  Okay.

22      MS. VAN MARTER:  Your Honor, the United States has, in

23   its sentencing memorandum, recommended a sentence of 15 years,

24   which, in this particular case, would be the second highest

02:19:48   25   sentence recommended and/or potentially imposed by this Court to

1    related co-defendants in this overall drug trafficking

2    organization.

3         THE COURT:  Who was the -- what was the higher -- what's

4    the highest I've given at this point?

02:20:02  5         MS. VAN MARTER:  It has been Jese Casillas, who has

6    certainly been deemed as the most culpable amongst of the

7    defendants before this Court, and the Court imposed a sentence

8    of 25 years for Mr. Casillas.  Mr. Casillas also pled without a

9    plea agreement from the United States; however, he did plead

02:20:20  10   earlier than this particular defendant.

11        This particular defendant, along with one other

12   co-defendant, pled the morning of scheduled trial.  If the Court

13   recalls, that would have -- I believe it was October 10th.  We

14   were all trial-ready set, and a jury had been brought to the

02:20:36  15   building, and we were advised that morning.

16        THE COURT:  Mr. Farias, represented by Mr. Schweda, was

17   the other.

18        MS. VAN MARTER:  That's correct, Your Honor.

19        THE COURT:  Yeah.

02:20:45  20        MS. VAN MARTER:  That was the second time that this

21   defendant had come before this Court with an attempt to accept

22   responsibility.  The first time was a rather lengthy plea

23   colloquy that did not end up in a resolution before this Court.

24        THE COURT:  It did not because he wouldn't admit his

02:21:00  25   culpability.

1      MS. VAN MARTER:  That is correct.  That is correct, Your

2   Honor.

3      So in looking at the totality of the factual

4   circumstances before the Court, and I know the Court recalls the

02:21:08  5   facts well, there were a number of hearings, factual hearings

6   pertaining to the events associated with this particular

7   defendant, of those facts that are significant, aside from the

8   quantity of narcotics that were involved by this organization

9   and backpacking across into Canada these quantities -- and as

02:21:25  10   the Court also knows, the RCMP also was a partner in this

11   investigation with the FBI task force here in the Tri-Cities --

12   that this particular defendant was identified as an individual

13   who was tasked to go along on this trip in order to try and

14   determine what had happened to previous drug debt funds.

02:21:46  15      To the United States, that is a significant factor

16   because it does go to the defendant's scope of knowledge and

17   participation in this overall endeavor.  In fact, of the

18   backpackers who were present and caught on that particular trip,

19   I would hold this defendant as the most culpable amongst the

02:22:03  20   others who were present.  The others played a role consistent

21   with those being recruited to do these backpacking trips.  They

22   were paid a nominal fee.  They were given less information;

23   certainly their scope and knowledge of the overall organization

24   was not significant or sophisticated.  They were often recruited

02:22:23  25   straight from field jobs or field work in order to do the

1    backpacking.

2         This particular defendant was tasked to -- to tag along

3    in order to try and find out what was going on with some debt

4    that had been previously owed.  It is also consistent with his

02:22:36    5    role that his fingerprints were located on some of the narcotics

6    packages that were found in the hotel room after they had been

7    unloaded.

8         THE COURT:  Yeah, I think it's important to remind me --

9    I remember the event well because it's been the subject of other

02:22:53    10    sentences, and that is, the Canadian stop and arrest and the

11    hotel itself and what was found in the hotel and who was there.

12    And there were Canadian fingerprint testing of packages;

13    18 kilograms of methamphetamine, which is a substantial amount

14    of methamphetamine, and his fingerprints were on the packages.

02:23:19    15    That is, Defendant Reyes Garcia.

16         MS. VAN MARTER:  Correct.

17         THE COURT:  And so there's physical evidence of him in

18    the hotel room and of this material being seized both in the car

19    and in the hotel room; is that right?

02:23:36    20         MS. VAN MARTER:  That is correct.

21         THE COURT:  Okay.  So let me see here for a second.

22         MS. VAN MARTER:  The bulk of the narcotics were found, I

23    believe, in the vehicle.  If the Court recalls from the

24    suppression hearing, after the backpackers got into Canada, they

02:23:48    25    were picked up, and there was a period of time where they went

1     to a hotel, and there was actually surveillance at the hotel.

2              THE COURT:  That's right.

3              MS. VAN MARTER:  This defendant was located still inside

4     of the hotel room, while several of the other defendants were

02:24:00    5     located during the course of a traffic stop.

6              THE COURT:  Right.  But the reasonable inference on the

7     evidence is that they were all picked up having crossed the

8     Canadian border from the United States with a huge -- well, a

9     significant amount of drugs, including methamphetamine, cocaine,

02:24:18   10     and heroin.  And 18 kilograms is a significant quantity of

11     methamphetamine --

12              MS. VAN MARTER:  That is correct, Your Honor.

13              THE COURT:  -- on which his fingerprints were found on

14     packages.

02:24:28   15              MS. VAN MARTER:  And there were also additional

16     witnesses who identified the defendant as traveling with them

17     for the purposes I've already indicated: to try and track down

18     what had happened to some previous -- a previous shipment or a

19     debt that had been accumulated.  And so he was tasked, for lack

02:24:45   20     of a better word, to baby-sit this load.

21              THE COURT:  In addition to that stop in British

22     Columbia, are there other confidential sources or undercover

23     agents whose evidence in the file indicates his -- his

24     involvement with other distribution activities?

02:25:03   25              MS. VAN MARTER:  That is correct, Your Honor.  As we

1    indicated in our memorandum, there are two additional

2    cooperating individuals who knew the defendant back in 2015 and

3    '16 who was engaged in negotiations about having what is

4    referred to in -- in the drug trafficking, I don't know, world

02:25:23    5    as "a line."  So they identify themselves as having a line; that

6    is, a line of transportation that they can get the product from

7    Mexico through the United States and, in this case, up and into

8    Canada.

9            That was one of the things that Mr. Calvillo, as well as

02:25:39    10    others whom the defendant was associated when Mr. Calvillo first

11    developed the line into Canada, one of the things that elevated

12    them in status, is that they had a new line, an ability to

13    transport large quantities into Canada for sale.  And several

14    organizations would then want to take part in adding their

02:25:56    15    shipments in with others in order to take advantage of the

16    method of transportation into Canada.

17            This particular defendant was identified as engaging in

18    those types of conversations, as well as his participation in

19    the sale of kilogram quantities of cocaine and methamphetamine.

02:26:15    20            THE COURT:  So he was apprehended where and when here in

21    the United States?  Do you recall?  Because the reason I make

22    that point is, was he prosecuted in British Columbia?

23            MS. VAN MARTER:  He was not.  They were all deported.

24            THE COURT:  To the country -- their country of birth.

02:26:35    25            MS. VAN MARTER:  Correct.

1          THE COURT:  In his case it is?

2          MS. VAN MARTER:  Mexico.

3          THE COURT:  And we know that he has a criminal record

4    established for a conviction in Arizona --

02:26:46  5          MS. VAN MARTER:  Correct.

6          THE COURT:  -- in February of 2016 for illegal entry.

7          MS. VAN MARTER:  Correct.

8          THE COURT:  And then after that, was he found in the

9    United States?

02:26:56  10         MS. VAN MARTER:  He was arrested here pursuant to this

11   indictment that came down.  And I believe -- there's also

12   indication that after the Canadian incident, he remained in

13   Canada -- or, excuse me, in Mexico for a period of time before

14   he unlawfully returned.  I believe that was addressed at the

02:27:21  15   time of his original detention hearing by his then girlfriend on

16   him coming back into the United States.  And as we indicated,

17   based on our information, he continued to remain involved with

18   the drug trafficking organization; certainly, at a minimum, of

19   negotiating and/or being present and sent by the bosses to --

02:27:37  20         THE COURT:  He wasn't arrested until '17; is that

21   correct?

22         MS. VAN MARTER:  Correct.

23         THE COURT:  So the British Columbia event is in '15.

24   He's deported to Mexico by the Canadian authorities, back in the

02:27:49  25   United States '16 --

1          MS. VAN MARTER:  Correct.

2          THE COURT:  -- picks up a conviction in Arizona --

3          MS. VAN MARTER:   (Nodded.)

4          THE COURT:  -- and then is arrested here in the United

02:27:58  5  States in January of '17 --

6          MS. VAN MARTER:  Correct.

7          THE COURT:  -- and charged with the -- as part of the

8     conspiracy number one in the case filed in 2015.

9          MS. VAN MARTER:  Correct.

02:28:09 10  THE COURT:  Was that a sealed indictment for a while --

11          MS. VAN MARTER:  The initial --

12          THE COURT:  -- while people were picked up?

13          MS. VAN MARTER:  The initial indictment only had a

14     handful of those that were charged.  There were superseding

02:28:21 15  indictments that included additional defendants, in part because

16     of -- that money laundering investigation was still ongoing, so

17     we did not have a sealed indictment.  We just chose to supercede

18     with the additional co-conspirators, once that money laundering

19     investigation was wrapped up.

02:28:36 20          THE COURT:  And was that sealed as well?

21          MS. VAN MARTER:  It was sealed until they were arrested,

22     and then their name was unsealed.  There are other co-defendants

23     who were not.

24          THE COURT:  Well, that seal was filed December 6th of

02:28:48 25  '16.

1    MS. VAN MARTER:  Correct.

2    THE COURT:  And then he was arrested a month later,

3    January 15th of 2017.

4    MS. VAN MARTER:  Correct.

02:28:55  5    THE COURT:  I just needed to get the chronology for all

6    of us, see how it all flowed.

7    Okay.  Thank you.

8    MS. VAN MARTER:  And so, Your Honor, in comparison to

9    the levels of the other co-defendants that have been sentenced

02:29:06  10    thus far, certainly this particular defendant bears a higher

11    level of culpability than many that have been before the Court.

12    I would say his role is that of more than just a distributor.

13    As indicated by the evidence, he was also placed in a position

14    of trust to watch over, most certainly, this particular large

02:29:22  15    load of narcotics.

16    The Court is correct; the average load into Canada from

17    the organization was anywhere from 20 to 40 pounds, and in this

18    particular case, more.  And they needed multiple backpackers.

19    Obviously it was a long journey; it's difficult to backpack that

02:29:37  20    type of weight, but that was a consistent quantity.

21    I think that the United States' recommendation of 15

22    years is more than appropriate, also taking into consideration

23    his late plea, the difficulties in accepting responsibility.  I

24    know the Court is aware of the letter that he previously

02:29:53  25    provided to the Court and the Court in turn provided to the

1    parties.  It was somewhat difficult -- I would characterize it a

2    little bit as a -- whether it's a misunderstanding of the law

3    initially and later gamesmanship by the defendant, certainly the

4    overall totality of the factual circumstances support a sentence

02:30:12   5    of 15 years.

6         THE COURT:  Give me a moment.

7       (Pause in proceedings.)

8         THE COURT:  So in terms of Francisco Figueroa and

9    Juvenal Landa, how do you compare their involvement to this

02:30:55   10   gentleman?  And they both got 120 months, or 10 years.

11        MS. VAN MARTER:  Francisco Figueroa, if the Court

12   recalls, was the uncle of Jese Casillas.  He entered into this

13   conspiracy later, as soon as Mr. Casillas' status arose, or at

14   least rose after Mr. Calvillo's death.

02:31:13   15        Mr. Figueroa, for lack of a better term, was an errand

16   boy to Mr. Casillas.  He would make deliveries, he would collect

17   money, but I would argue that his scope of knowledge as to the

18   higher-ups and the operations of the organization were not the

19   same as this defendant.  He was also the very first person to

02:31:31   20   come in and accept responsibility early on in the case to plead

21   to the mandatory minimum offense.  I do not believe -- I believe

22   he had a prior cocaine arrest in Spokane County for simple

23   possession.  Other than that, had limited criminal history.

24        So based upon length of time involved, which is nowhere

02:31:52   25   near what this defendant's involvement was, and scope of

1    knowledge, I would -- I would differentiate him in that way.

2         Juvenal Landa was a younger individual who was closer to

3    Mr. Casillas' age and was just a distributor.  He would receive

4    pound quantities.  He was caught with 2 pounds at one point; had

02:32:10   5    his own customers, and would sell quantities of methamphetamine

6    here in the Tri-Cities area.  Again, his scope of knowledge as a

7    distributor, not somebody responsible for shipments and/or

8    understanding the overall scope.  The line in this particular

9    case up into Canada was not a role that Mr. Landa had.

02:32:27  10    Mr. Landa was given opportunity -- he did not have criminal

11    history, but chose to not evade [sic] himself of any

12    opportunities to alleviate that sentence, and also accepted

13    responsibility early on.

14         THE COURT:  What about Garibay?

02:32:43  15         MS. VAN MARTER:  Garibay, as the Court is aware --

16         THE COURT:  Alfredo Magana Garibay.

17         MS. VAN MARTER:  Yes.

18         THE COURT:  I have many cases, so you'll have to refresh

19    me.

02:32:53  20         MS. VAN MARTER:  Mr. Garibay was an individual who was

21    identified as taking loads on the -- within Washington state

22    from the east side to the west side; you know, 3 to 5 pounds at

23    a time, a distributor in that regard, and then was asked to put

24    a stash house in his name.  And that stash house was then

02:33:09  25    occupied by an individual who was another co-defendant, Veronica

1  Cortez, who was supposed to make the house look as if it were a

2  normal residence, not for the purpose of receiving backpackers.

3        Mr. Garibay has -- his brother, which came up during the

4  course of his sentencing, had remained in Mexico and was a close

02:33:28  5  associate of Mr. Calvillo initially.  But Mr. Garibay up here in

6  the Eastern District of Washington, again, didn't have the same

7  scope of knowledge.  His involvement also terminated with

8  respect to additional activities once Mr. Calvillo was killed,

9  which was in December of 2015.

02:33:55  10        THE COURT:  What was it about his letter that you think

11  made it clear that he was guilty of Count 1?

12        MS. VAN MARTER:  Your Honor, I think if -- and I don't

13  have the translated copy in front of me.  My recollection is

14  that he does, in the letter, admit to certainly the backpacking

02:34:12  15  trip.  I think that was a basis that the Court inquired of him

16  at the time of his change of plea, or at least the Court

17  utilized that, in combination with the trial memorandum, to

18  establish the factual basis for his acceptance -- or your

19  acceptance of his guilty plea.

02:34:26  20        I don't recall all the specifics, because, again, I

21  don't have the translated copy in front of me, but I believe, in

22  sum, he did admit to his knowledge on that trip.  And I believe

23  he also admitted to being sent there to find out what had gone

24  on with the debt.

02:34:55  25        THE COURT:  So he's 39 years old, here illegally, having

 1    been previously deported, and that's part of his profile.

 2          Okay.  Thank you.

 3          MS. VAN MARTER:  Thank you, Your Honor.

 4          THE COURT:  Okay.  Ms. Coronado?

02:35:14  5       (Witness approached.)

 6

 7                    SANJUANITA CORONADO,

 8        having first sworn or affirmed, testified under oath as

 9                          follows:

02:35:25 10          THE WITNESS:  Yes, I do.

11          THE COURT:  Please be seated.  And when you're

12    comfortable, tell us your first and last name, and spell them

13    both for the record.

14          THE WITNESS:  SanJuanita Coronado; S-A-N-J-U-A-N-I-T-A

02:35:42 15    C-O-R-O-N-A-D-O.

16          THE COURT:  Okay.  Ms. Coronado, you're employed at the

17    probation office here in Richland.

18          THE WITNESS:  I am.

19          THE COURT:  In the course of your duties there, did you

02:35:51 20    prepare the presentence report in the case of *United States v.*

21    *Miguel Reyes Garcia*?

22          THE WITNESS:  I did.

23          THE COURT:  Would you tell us what your recommendations

24    are, and making reference to the statutory criteria, the reasons

02:36:04 25    for that recommendation.

1      THE WITNESS:  Okay.  My recommendation, Your Honor,

2  after taking into consideration all the 3553(a) factors and the

3  defendant's personal history and his involvement with this drug

4  trafficking organization, I'm recommending a term of 180 months

02:36:24   5  followed by five years of supervised release.  This is a little

6  bit of a variance below the applicable guideline range of

7  188 months to --

8      THE COURT:  Well, that's the bottom of the guideline

9  range.  It's 188 to 235?

02:36:38  10      THE WITNESS:  Yes.  Um-hmm.

11      THE COURT:  So that's just over 15 years to just under

12  20.

13      THE WITNESS:  Um-hmm.  Yes.

14      THE COURT:  And your recommendation is 15 years exactly.

02:36:46  15      THE WITNESS:  Yes.  Yeah.

16      THE COURT:  Okay.

17      THE WITNESS:  And I took into consideration, as the

18  Government also mentioned, the defendant's involvement with the

19  DTO.  In comparison to some of the other defendants, from the

02:37:00  20  information obtained from confidential sources and cooperating

21  defendants and that, it appears he was involved at least from

22  2013 to 2017.  So he had some significant ties with the DTO.  He

23  was also connected with other distributors, such as his brother,

24  Baltazar Reyes Garcia, who was also convicted in the Western

02:37:26  25  District of Washington.  He received a sentence of 216 months.

1    The incident in Canada, I took that into

2  consideration --

3    THE COURT:  I'm sorry.  Did you say his brother received

4  a 216-month sentence?

02:37:37   5    THE WITNESS:  Yes.  Um-hmm.

6    I also took into consideration his involvement in the

7  trip to Canada, in which that large quantity of drugs of

8  methamphetamine and -- it was heroin and cocaine were located,

9  along with the guns, and he was sent there to check for any

02:38:03  10  remaining -- either getting money that was missing or drugs that

11  were not sold.  So that reflects that he was well established

12  with the DTO and had that responsibility to track down that

13  money or the drugs that were missing.

14    THE COURT:  Explain that.

02:38:23  15    THE WITNESS:  He -- there was apparently some drugs that

16  were in Canada that either were not sold or were sold, and some

17  of the money was not returned back to the organization.  So from

18  the information in discovery, he was sent with the backpackers,

19  as the Government said, kind of to babysit; to check that the

02:38:45  20  drugs were delivered, and, if possible, obtain the money that

21  was missing for the prior drugs, and make sure that things got

22  transferred accordingly and returned -- and the money returned.

23    THE COURT:  What do you draw from that, based on your

24  experience in reviewing many of these kinds of cases involving

02:39:04  25  drug distribution and importation, what do you -- what do you

1    draw from that, the fact that he was given that responsibility?

2         THE WITNESS:  Normally, from what I've seen in the

3    different cases with drug distribution conspiracies, is that

4    that type of responsibility is usually placed on people that are

02:39:27   5    more involved, more trusted with the organization.  Usually

6    lesser involved defendants, such as the backpackers or even the

7    ones who transport the drugs from, say, California up to

8    Washington or Arizona up to Washington, they have less knowledge

9    of the scope of the organization, how it works.  And so when

02:39:50  10    someone is tasked with the responsibility of checking -- keeping

11    an eye on the money and the drugs and making sure the

12    organization gets what they're supposed to get --

13         THE COURT:  And you've been doing federal work now for

14    how many years?

02:40:06  15         THE WITNESS:  Federal?  Just a little over ten years.

16         THE COURT:  And in the course of your duties, have you

17    seen -- would you give us a rough estimate of how many drug

18    cases like this you've -- that is, drug conspiracy cases you've

19    seen over the years?

02:40:24  20         THE WITNESS:  Many.  I couldn't give you a number.

21    There's quite a few conspiracy cases.

22         THE COURT:  Would it be dozens or hundreds or --

23         THE WITNESS:  Dozens for sure.

24         THE COURT:  Ten years; it wouldn't take much to get into

02:40:36  25    the hundreds, would it?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  And so that's the basis, plus the

3     record itself, for your belief that he had a higher level of

4     culpability and -- as a member of the DTO?

02:40:51   5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  Thank you.

7          What else?  No, there would be other things.

8          Is that it?  Do you believe -- addressing the statutory

9     factors, for example, disparate sentences, comparing it to the

02:41:06  10     others, as the Government has done, is there any -- is it

11     disparate to the others?

12          THE WITNESS:  No, I did take that into account, and as

13     mentioned by the Government, the other co-defendants that were

14     mentioned, like Mr. Figueroa and Juvenal Landa Solano,

02:41:27  15     Mr. Garibay, both got -- all three got 120 months.  And then

16     Mr. Casillas received a 25-year sentence.  I do think he's more

17     culpable than like Mr. Figueroa and Mr. Landa Solano but not --

18          THE COURT:  Who received ten-year sentences.

19          THE WITNESS:  Yes.

02:41:46  20          THE COURT:  Okay.  Ms. Van Marter, questions, if any?

21

22                              EXAMINATION

23     BY MS. VAN MARTER:

24     Q    Do you recall in some of the discovery materials if that --

02:41:55  25     if his brother Balta Reyes was mentioned?

1  A    He was, yes.

2  Q    And do you know if in that case, do you know if that case

3  went to trial or if that was a post-plea sentence?

4  A    That I did not check into.  I just obtained the sentencing

02:42:10  5  information.

6  Q    And based on your experience in some of these conspiracy

7  cases, have you found it to be common that there are familial

8  relationships in individuals involved in drug trafficking?

9  A    Yes.

02:42:22  10  Q    And did you take into consideration, then, the ties with

11  this defendant and his brother and the west side's investigation

12  into drug trafficking as well?

13  A    Yes.

14      MS. VAN MARTER:  I don't have any other questions, Your

02:42:38  15  Honor.

16      THE COURT:  When you say you took it into consideration,

17  that's because there were -- there's some records and

18  confidential sources that indicated there was a relationship

19  between the two?

02:42:51  20      THE WITNESS:  Yes.

21      THE COURT:  Okay.  So it wasn't something you pulled out

22  of the air, but it was based on confidential informants and

23  statements they gave about the relationship between the two

24  brothers.

02:43:02  25      THE WITNESS:  Yes.

1    THE COURT:  Okay.  And that was a factor.  Okay.

2    Mr. Therrien.

3

4                     EXAMINATION

02:43:09    5  BY MR. THERRIEN:

6  Q    A question regarding the relationship with Baltazar, his

7  brother.  I'm sorry.  I know I read in -- in this -- in your

8  final pretrial sentencing report that there was a controlled

9  informant, in fact, who'd said they didn't -- Baltazar and

02:43:35   10  Mr. Reyes didn't do business anymore because there was a falling

11  out between them.

12    Do you recall that?

13  A    In the report?  I mean, in the --

14  Q    Yes, in the report.

02:43:55   15  A    I --

16  Q    I'm trying to look for it.

17    THE COURT:  I'm sorry, what are you looking for?

18    MR. THERRIEN:  I was reviewing the report before we had

19  this hearing, and I do remember reading that there was a

02:44:08   20  controlled informant or source of information that proffered --

21  it's my understanding that Baltazar Reyes Garcia and Miguel had

22  a falling out, and they don't -- they didn't do -- they don't do

23  business anymore; they weren't doing business anymore.  So --

24    THE COURT:  Well, there are several inferences from

02:44:33   25  that.  One, if there was a falling out, there had to be a

1    relationship.

2          MR. THERRIEN:  Well, they're brothers.  That's a

3    relationship.

4          THE COURT:  Sure.  If that's your point, then by all

02:44:43   5    means make it.

6          MR. THERRIEN:  Well --

7          THE WITNESS:  I did find that in the report here, so if

8    I could answer?

9          In 2013 the confidential source advised --

02:44:48  10    BY MR. THERRIEN:  (Continuing)

11    Q    What paragraph is that?

12    A    Oh, sorry.  I lost my place.

13          Page 7, Paragraph 35.  The one confidential source at that

14    time mentioned Mr. Reyes Garcia's brother and the planning on

02:45:05  15    moving back to Washington, and they had sold a ranch in Franklin

16    County, so they were -- and then they were -- the paragraphs

17    previous to that mentioned their connection, including obtaining

18    cocaine and that type of thing.

19          But then in Paragraph 68, Page 13, that's where you

02:45:27  20    mentioned -- it is mentioned that Miguel and Baltazar had a

21    fight and were not doing business together.  But that was

22    January of 2016, and that would be about -- if they discontinued

23    at that time, he was still involved with him at least between

24    2013 and 2016.

02:45:49  25    Q    Right.  I mean, it was reported -- it looks like it was

1    reported in January of 2016, but it could have -- could have

2    happened earlier than that.

3    A      True.

4           MR. THERRIEN:  I have no additional questions than that.

02:46:03    5           THE COURT:  Thank you.

6           I have no further questions.  Thank you for your report.

7    You may step down.

8           Okay.  Mr. Therrien, I believe this is your opportunity

9    to address the Court.

02:46:18   10           MR. THERRIEN:  Yes, Your Honor.

11           THE COURT:  And I believe you have some objections to

12    the statements in the PSIR about your client's involvement, and

13    you recognize that it doesn't affect the ten-year mandatory

14    minimum.

02:46:35   15           MR. THERRIEN:  Right.

16           THE COURT:  Okay.  But he disputes the statements

17    attributed to others regarding his extensive involvement; is

18    that correct?

19           MR. THERRIEN:  Yes, Your Honor.

02:46:48   20           THE COURT:  Okay.

21           MR. THERRIEN:  It's -- it's our -- it's his position

22    that these guys are not very good informants because they

23    don't -- they don't have their facts right.  So that's basically

24    all I could mention about that.

02:47:05   25           THE COURT:  Okay.  The Court's going to overrule those

1    objections.  It doesn't affect sentencing in the sense that he

2    has a ten-year mandatory minimum.

3            MR. THERRIEN:  Right.

4            THE COURT:  On the other hand, this is taken from the

02:47:17  5    records, and it's consistent with the review conducted by the

6    probation officer and the AUSA on the file, and those statements

7    will remain in the record, and they will be there for

8    consideration, though he disputes them.

9            MR. THERRIEN:  I understand, Your Honor.

02:47:37  10            Judge, I think the three motions I have for downward

11    variances, I think the one where, to afford adequate deterrence

12    to criminal conduct, and I cite those cases in there, I just

13    previously had a sentencing in front of the Court, and I used

14    that argument in that case, and the Court indicated that --

02:48:01  15            THE COURT:  Okay.  Why don't you go over them one by one

16    for me.

17            MR. THERRIEN:  All right.  Okay.  Let me -- do you want

18    me to do them chronologically first?

19            THE COURT:  As you wish.

02:48:10  20            MR. THERRIEN:  Okay.  I'd like to go to the afford

21    adequate deterrence to criminal conduct.

22            Mr. Reyes Garcia had the deportation in Arizona, the

23    illegal re-entry.  He didn't do a lot of time on that.

24            THE COURT:  Well, this is in your -- your materials

02:48:33  25    filed --

 1          MR. THERRIEN:  Right.

 2          THE COURT:  -- ECF 1169, right?

 3          MR. THERRIEN:  Yes.  I'm sorry, Judge.

 4          THE COURT:  Okay.  So what pages on that should we look

 5  at?  I guess it's Page --

 6          MR. THERRIEN:  Page 4 of 6.

 7          THE COURT:  -- 4?

 8          Right.  Okay.  Thank you.

 9          And this is where you argue that a lesser sentence is

10  appropriate in this case.

11          MR. THERRIEN:  Right.  Right.  And I don't have anything

12  to add to that.  I made this argument before, just recently

13  before the Court, and the Court sort of indicated to me, or

14  pointed out to me that these decisions were by the same judge

15  out of the Eastern District of Washington.  I think I probably

16  made that argument last week, so -- but I still think it applies

17  towards --

18          THE COURT:  Eastern District of Wisconsin?

19          MR. THERRIEN:  Wisconsin.  I'm sorry, did I say

20  "Washington"?  I'm sorry, Judge.

21          THE COURT:  Okay.  And then what about the -- and then

22  the vocational/educational opportunities you've talked about as

23  a noncitizen inmate --

24          MR. THERRIEN:  Correct.

25          THE COURT:  -- and the scarcity of those, if not the

1    absolute --

2         MR. THERRIEN:  Right.

3         THE COURT:  -- deprivation -- or the absence of those.

4    And then unwarranted sentencing disparities.  And so if you want

02:49:44  5    to make more of a record on that, that means how does he compare

6    to the others whom I've sentenced.  And we've gone over that,

7    both with Ms. Coronado and Ms. Van Marter, about the other

8    sentences at 120 months, and then Casillas Carillo at 25 years.

9    And so I'm happy to hear you out on what else you think is a

02:50:08 10    disparity.

11         MR. THERRIEN:  Well, other than, I think, Mr. Reyes

12    Garcia's involvement in this case, from his -- his point of

13    view, has been exaggerated by the controlled informants.

14         If the Court recalls, in one of the pretrial conferences

02:50:35 15    we had, we filed a bill of particulars and -- specifically to

16    ask the Government what role did Mr. Reyes Garcia play in the

17    Calvillo drug -- or now the Casillas drug trafficking

18    organization, and it was one as a transporter.  And -- and we

19    took that as meaning that he used -- he used that line up in

02:51:05 20    from -- through Washington to Canada to transport drugs and

21    certainly for -- they're saying for the Calvillo or Casillas

22    drug trafficking organization.

23         It's always been his position that it was for somebody

24    else.  I don't know how much difference that makes in terms of

02:51:32 25    the -- the amount of drugs involved in that, that are attributed

1   to him, but that's -- that's something we would like to point

2   out.  I don't think he's any more -- you know, other than the

3   controlled informants or cooperating defendants are saying

4   how -- how involved he was, I don't think there's anything other

02:51:56   5   than the historical statements that they make about him to

6   indicate that he was.

7       I mean, he was -- he was arrested in Canada and

8   released, and I think they all were released because they --

9   they didn't want them to interfere with the ongoing drug

02:52:18   10   conspiracy or drug investigation in that case.  That's why they

11   were released out of Canada.  To prosecute it there would have

12   basically shut down the operation that they were -- that the

13   Government was involved with, or a substantial part of that.  So

14   I think that was part of why they were released.

02:52:40   15       But I really don't have anything other than that in

16   terms of the disparity argument.

17       THE COURT:  Okay.

18       MR. THERRIEN:  Promote respect for the law, I already

19   covered that.

02:52:56   20       Regarding his children, the -- he has -- his family is

21   here.  It's reported -- or his family history is reported in the

22   PSIR.

23       THE COURT:  I'm looking at it right now.

24       MR. THERRIEN:  But I had my investigator contact Ms. Ana

02:53:20   25   Valencia, and she's here with their children; she's in the back

1    here with his family.

2              THE COURT:  Okay.

3              MR. THERRIEN:  And I'd like to read the report, and I

4    just found -- I didn't provide a copy of it, but you can -- you

02:53:33   5    can review that.  It's just a --

6              THE COURT:  You talked to counsel but not for the

7    record.  If you need to talk to her --

8          (Counsel conferring.)

9              MR. THERRIEN:  All right.  Okay.

02:53:56  10              And I'd just like to read it into the record, Your

11   Honor.

12              THE COURT:  Any objections?

13              MS. VAN MARTER:  No, Your Honor.

14              THE COURT:  Go ahead.

02:54:02  15              MR. THERRIEN:  This is a report by Abel Campos from

16   Premier Investigations, LLC.  He contacted Ana Valencia.  They

17   have three children together.  They have Ariana Valencia, date

18   of birth -- well, she's 11 years old.  They have --

19              THE COURT:  She's one of two twins, isn't she?

02:54:25  20              MR. THERRIEN:  Yes.

21              THE COURT:  Ariana and Iani.

22              MR. THERRIEN:  Iani and --

23              THE COURT:  Age 11, and then Daniel age 9.

24              MR. THERRIEN:  Right.

02:54:34  25              And he says (reading):  On March 1st, 2019, I made

1    contact with Ana Valencia in reference to Miguel Reyes Garcia.

2    Ana said the following:  That she and Miguel Reyes were together

3    for about 2005 to 2011 where they lived in Pasco --

4            THE COURT:  Take your time.  It's one thing to read it.

02:54:48  5    It's another thing for the court reporter to take it down.

6            MR. THERRIEN:  All right.  I'll slow down, Judge.

7    Sorry.

8            (Reading);  Ana said they have three kids together named

9    Ariana, Iani, and Daniel.  Ana said Miguel Reyes Garcia is a

02:55:04  10    loving partner and a loving father.  She said he still calls the

11    children to speak with them, when he has money to make phone

12    calls.  Ana said Mr. Garcia has always been involved in the

13    children's lives.  She said all three children play soccer, and

14    Mr. Garcia would take the kids to the park to practice with

02:55:26  15    them.  She said Mr. Garcia would attend all the games, would

16    also try to help them with their homework.  Ana said Mr. Garcia

17    worked out in the fields and -- and has always been a good

18    worker.  She said he would send his parents in Mexico money

19    from -- from what he made to help them out.  Ana said they never

02:55:47  20    had problems in their relationship, and it ended in good terms.

21    She said Mr. Garcia was still involved with his children and

22    would pick them up and take them for the weekends and spend time

23    with them by taking them to the park or to feed the farm

24    animals.  And he's indicated Ana Valencia had nothing but

02:56:08  25    positive things to say about Mr. Garcia.

1          THE COURT:  So he has six children or seven children?

2    Seven children.  Seven children by -- four with Ms. Lopez and

3    three with Ms. Valencia, as I read it.

4          MR. THERRIEN:  Yes.

02:56:39  5          THE COURT:  And those ages are 16, 14, 11, 9, 9, and 8.

6          MR. THERRIEN:  Yes, Judge.

7          THE COURT:  Okay.  So 16, 14, 9, and 8 are the ages of

8    the children with Ms. Lopez, and 11 and 9 are the ages of the

9    children with Ms. Valencia, including the twins; is that

02:57:02 10   correct?

11         MR. THERRIEN:  That's correct, Your Honor.

12         THE COURT:  Okay.

13         MR. THERRIEN:  Judge, we're here to ask for -- for

14   Mr. Reyes Garcia a sentence of ten years.  We think that would

02:57:20 15   be a sufficient but not greater than necessary sentence under

16   the guidelines, considering his involvement in the case.  And we

17   would probably be asking for whatever sentence he receives, he

18   would be allowed to do that in Sheridan, Oregon.

19         THE COURT:  Okay.  A request for Sheridan, I grant that,

02:57:41 20   or at least I will make a recommendation to the BOP, which has

21   the authority to decide it.

22         And I'm assuming, since you haven't indicated it, that

23   no one wishes to speak.

24         MR. THERRIEN:  Does anybody --

02:57:52 25      (Counsel conferring.)

1          MR. THERRIEN:  No.  I talked to them beforehand.

2          THE COURT:  Okay.

3          MR. THERRIEN:  That's all I have, Judge.

4          THE COURT:  Okay.  If you'll come to the podium, please.

02:58:17  5          Mr. Reyes Garcia, this is your opportunity to speak

6    directly to the Court.  You have the right to speak, but you're

7    not required to speak.  If you wish to make some statements that

8    you want me to consider before I actually impose sentence, this

9    would be the time to do so.

02:58:49  10         THE DEFENDANT (through the interpreter):  What I wanted

11   to say is if all those people who are accusing me, if they saw

12   the discovery that they have against me.  And they're making me

13   out to be like I'm this big drug dealer, drug trafficker when I

14   am not.  If they're going to accuse me, and I'm going to get all

02:59:22  15   of these years in jail, then show me the evidence.

16         They said I trafficked with Calvillo, Casillas, or

17   whatever.  I don't even know Casillas.  They said I also worked

18   with Ivan, when I never actually worked with Ivan.  Those

19   informants who they're saying that they know me, I don't know

02:59:59  20   who they are.  I've never seen them because we've never seen

21   each other.  We don't know each other.

22         I -- I did go to Canada.  It was the first time I went

23   there, and I was not in charge of anything.  I didn't even know

24   the way that we were supposed to take, and I had to pay

03:00:28  25   attention when we were in the vehicle.  And if you listen to

1    what was happening in the car, one of the backpackers asked me,

2    help us out so we could do it quickly, and that's all I did.

3          What I'm asking is for more investigation into this.

4    They're saying that I've been selling drugs since 2013.  I want

5    you to look into where was I in 2013.

6          Respectfully, towards the FBI, if I did this, where is

7    my wealth?  Where is all of the money that I made doing this?

8          I made a mistake, yes.  I did it; I went to Canada.  If

9    they say that I was a drug trafficker for all these years, then

10   show me the proof.

11         That's all I have to say.

12         THE COURT:  Well, a difficult case for you and your

13   family, Mr. Reyes Garcia, your children, and the people with

14   whom you've had children, the two women.  Always a very

15   difficult time for the families when they sit in a courtroom and

16   listen to the fact that somebody they love has been part of an

17   organization that has distributed a large amount of drugs, and

18   the distribution of which has ruined the lives of other families

19   and other daughters and spouses or significant others who are

20   deprived of their relationships because of the addiction, and

21   then oftentimes addiction that led to drug crimes to cover the

22   cost of their addiction.

23         Here, you're a Base Offense Level 38, minus two for

24   acceptance of responsibility, which applies, despite the fact

25   that you didn't plead until the day of trial, and that gives you

1    an offense level of 36, with a Criminal History Category of I,

2    because in 2016 in February you illegally entered the United

3    States and were given 30 days in prison in Arizona at age 36.

4           The maximum penalties are a statutory ten years to life.

03:03:17    5    Under the advisory guidelines, as a category of Total Offense

6    Level 36, Criminal History Category I, the range of imprisonment

7    is just a little more than 15 years, 188 months, up to just a

8    little less than 20 years, 235 months.  You're not eligible for

9    probation.  The guideline fine range is $40,000 to $10 million.

03:03:44   10    The guideline supervision range is five years to life.  There is

11    a special penalty assessment of $100.  Because of the kind of

12    crime you committed under -- that you pled guilty to, you're no

13    longer eligible for Part A, Title IV Social Security benefits,

14    Temporary Assistance For Needy Families, or food stamp program

03:04:09   15    benefits under the Food Stamp Act.

16           Under the 21, United States Code, Section 862, the Court

17    denies you eligibility for any other federal benefits such as

18    federal contracts, grants, loans, professional, or commercial

19    licenses under that 21, United States Code, Section 862(b), and

03:04:36   20    there is -- and the Court will continue with this.

21           This is a very comprehensive case.  For a long period of

22    time you were a participant in a drug trafficking organization

23    in Eastern Washington, substantially involved in the

24    transportation -- you were involved in, even if you personally

03:04:58   25    didn't carry them, in the transportation of large quantities of

1    drugs over the Canadian border.

2          You have a limited criminal history.  Seven children by

3    two women; you are a citizen of Mexico; your children are

4    citizens of the United States.

03:05:16   5          Your range for imprisonment is a minimum of ten years up

6    to life imprisonment for Count 1.  You must be supervised for at

7    least five years.  You're not eligible for probation.  And

8    it's -- the Court finds that you lack the resources to pay a

9    fine.

03:05:36   10          And I find your question of where's all the money if I

11    was drug dealing is a question that I ask in every drug dealing

12    case when I have people just like yourselves who are given

13    appointment of CJA attorneys for free who have been dealing in

14    pound quantities of a number of different drugs over a number of

03:05:58   15    different months or years, and always claim to have no resources

16    of any kind or nature.  And so I share your concerns of where's

17    the money.

18          The answer is they don't have to prove that you actually

19    have money.  They don't have to prove that you actually have it

03:06:16   20    and found the place where you may have hidden it or a bank where

21    you put it under another name.  That's not something that the

22    Government has to prove.  It's sufficient that they prove the

23    quantities.

24          And here there were significant quantities of drugs as

03:06:30   25    part of this conspiracy.  And the conspiracy involved 500 grams

1    or more of a mixture or substance containing a detectable amount

2    of methamphetamine, 5 kilograms or more of cocaine, a kilogram

3    or more of heroin, and 400 grams or more of fentanyl.  All of

4    those drugs are addictive and cause untold economic and social

03:07:00   5    harm to people living in the United States.

6          The question is whether or not I should depart from the

7    guideline range of 188 to 235 months; and if so, why.

8          This was a serious case, involving widespread

9    distribution of drugs, that harmed countless people by virtue of

03:07:30   10    their addictions, and has social and economic costs to the

11    people in the United States that are enormous.  That is, it's

12    damaged a lot of people and a lot of families.

13          The sentence I impose must promote respect for the law

14    and adequately deter you from other criminal activities and

03:07:53   15    protect the public.

16          These are strict cases, and Congress has seen fit -- the

17    United States Congress has seen fit to tell the world that the

18    damage to the people of the United States from this kind of drug

19    trafficking organization is so great that a severe penalty is

03:08:14   20    necessary.  So the Court here is looking at the question of how

21    many months is sufficient.

22          I do this by also looking at the sentences given to

23    others who have been part of the conspiracy, and I note that at

24    least two have received 120 months -- that's ten years -- that

03:08:35   25    are significantly less involved than you are.

1    Here, the Court has listened to you carefully on a

2    number of occasions, and believes that your approach to this

3    case is still a bit puzzling to this Court, since your

4    fingerprints were on it, on the drugs in large quantities; you

03:08:55  5    were there as a person of some responsibility to check on money

6    that was owed to the drug trafficking organization.

7    And the probation officer and U.S. Attorney are quite

8    right: that is never given to a lowly member of the

9    organization; only given to people that are trusted by the drug

03:09:15  10    trafficking organization.  And as a result, the Court believes

11    that the sentencing recommendations of 180 months by the

12    Government and the Probation office -- and having considered the

13    statutory factors, including the sentencing guidelines, the

14    Court will grant a variance from the low end of the guidelines

03:09:33  15    of 188 months down to 180 months, and imposes a sentence of

16    180 months of imprisonment; five years supervised release on

17    standard as well as special conditions; no fine because you lack

18    the resources to pay it; and a $100 special penalty assessment.

19    The special conditions are you are prohibited from

03:09:59  20    returning to the United States without the advance legal

21    permission from the United States Attorney General, or his

22    designee.  Should you re-enter the United States, you're

23    required to report to the Probation Office within 72 hours of

24    re-entry.  You must not communicate, associate, or otherwise

03:10:16  25    interact with any witnesses or co-defendants in this case

1    without first obtaining the permission of the probation officer.

2    Three, you'll submit your person, office, residence, car, and

3    belongings to a search conducted by a probation officer at a

4    sensible time and manner, based upon reasonable suspicion of

03:10:36   5    contraband, or evidence of a violation of supervised release,

6    and failure to do so may be grounds for revocation.  You'll warn

7    people you live with of this condition.

8         You must abstain from the use of illegal controlled

9    substances, submitting to testing, including urinalysis and

03:10:54   10    sweat patch testing, as directed by your supervising officer up

11    to but no more than six times per month to confirm your

12    continued abstinence from illegal substances.

13         The Court will recommend Sheridan, Oregon.

14         Give me a moment.

03:11:12   15    (Pause in proceedings.)

16         THE COURT:  Did you say Sheridan, Mr. Therrien?

17         MR. THERRIEN:  I did.  I just want to make sure that's

18    the closest to his family.

19         Can you ask him?

03:11:27   20    (Interpreter and defendant conferring.)

21         MR. THERRIEN:  Yes, the request is for Sheridan.

22         THE COURT:  The Court recommends Sheridan, Oregon.

23         Mr. Reyes Garcia, you have a right to appeal your

24    judgment of conviction and sentence, as does every defendant who

03:11:47   25    has, in your circumstances, pled without a plea agreement.  If

1    you cannot afford an attorney, one will be appointed at no

2    expense to yourself to assist you with that appeal.

3           You must file that appeal within 14 days from today --

4    well, it won't be today.  It will probably be tomorrow -- well,

03:12:10  5  14 days from the time that I sign the judgment of conviction and

6    sentence.  That might take a day or two, maybe a little bit

7    more.  And you must file it within that period of time by filing

8    a simple notice of appeal.  Mr. Therrien will explain that to

9    you.

03:12:27  10        Mr. Therrien, if he decides to appeal, will you seek to

11   withdraw or to seek appointment?

12          MR. THERRIEN:  I will seek to withdraw.

13          THE COURT:  Okay.  Well, file your motion to withdraw,

14   and I will grant that.

03:12:39  15        MR. THERRIEN:  Okay.

16          THE COURT:  That means that if someone is going to

17   represent you on appeal, Mr. Reyes Garcia, it will be a

18   different lawyer.  Mr. Therrien declines to represent you on

19   appeal, and others -- and other lawyers oftentimes take appeals,

03:12:57  20   appeals to the Ninth Circuit.

21          And so is there anything further that I need to discuss

22   before we conclude?

23          MS. VAN MARTER:  Not from --

24          THE COURT:  Any other motions of some sort?  Any other

03:13:06  25   counts, or was he only on Count 1?

1    MS. VAN MARTER:  He was only on that count, Your Honor.

2    THE COURT:  On Count 1.

3    MR. THERRIEN:  Nothing else.

4    THE COURT:  I believe that completes matters for today.

03:13:14   5    Mr. Reyes Garcia, it's a difficult time for you and your

6    children and the people who care greatly about you, and I hope

7    in the future that you'll be again part of their lives, after

8    you've served your sentence.

9    With that, the Court is adjourned.  You may go about

03:13:27   10   your business.

11   (Hearing concluded at 3:13 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

1                    C E R T I F I C A T E

2

3      I, KIMBERLY J. ALLEN, do hereby certify:

4            That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7            That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9            That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12           I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15           DATED this 29th day of April, 2019.

16

17

18

19  _____

20  Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
    Washington CCR No. 2758
21  Official Court Reporter
    Richland, Washington
22

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER