1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
 2
   UNITED STATES OF AMERICA,      ) Case No. 4:15-CR6049-EFS-16
 3                                )
                    Plaintiff,    ) September 9, 2019
 4                                )
   v.                             ) Richland, Washington
 5                                )
   EDGAR OMAR HERRERA FARIAS,     ) Motion Hearing
 6                                )
                    Defendant.    ) Pages 1 to 163
 7   _____)

 8
                  BEFORE THE HONORABLE EDWARD F. SHEA
 9           SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                            APPEARANCES:
11
   For the Plaintiff:          Stephanie A. Van Marter
12                             Stephanie.Van Marter@usdoj.gov
                               US Attorney's Office-SPO
13                             920 W Riverside, Suite 300
                               P.O. Box 1494
14                             Spokane, WA 99210
                               509-353-2767
15
   For the Defendant:          Shea C. Meehan
16                             Smeehan@walkerheye.com
                               Walker Heye Meehan & Eisinger
17                             PLLC
                               1333 Columbia Park Trail
18                             Suite 220
                               Richland, WA 99352
19                             509-735-444

20 Federal Court-certified
   Interpreter:                Claudia A'Zar
21
   Official Court Reporter:    Kimberly J. Allen, CCR #2758
22                             United States District Courthouse
                               P.O. Box 685
23                             Richland, Washington 99352
                               (509) 943-8175
24
   Proceedings reported by mechanical stenography; transcript
25 produced by computer-aided transcription.
</pre>

2

**INDEX**

**Proceedings:**                                              **Page**

      OPENING STATEMENT MR. MEEHAN              10
      OPENING STATEMENT MS. VAN MARTER          14


**WITNESS INDEX**

**Plaintiff Witness:**                                        **Page**


  None


*****


**Defense Witnesses:**                                        **Page**


**EDGAR OMAR HERRERA FARIAS,**
      Direct Examination By Mr. Meehan          110
      Cross-Examination By Ms. Van Marter       125
      Redirect Examination By Mr. Meehan        157

**PETER SCHWEDA**
      Direct Examination By Mr. Meehan          20
      Cross-Examination By Ms. Van Marter       38
      Redirect Examination By Mr. Meehan        73
      Recross-Examination By Ms. Van Marter     79

**LARRY VALADEZ**
      Direct Examination By Mr. Meehan          81
      Cross-Examination By Ms. Van Marter       85
      Redirect Examination By Mr. Meehan        97
      Questions By the Court                    98
      Further Recross-Examination By Ms. Van    103
      Marter
      Further Redirect Examination By Mr. Meehan 107

3

1

2

### EXHIBITS ADMITTED

3

| Plaintiff Number | Description | Page |
|---|---|---|
| 3 | Defendant's Objections to the Presentence Investigation Report, ECF 1143 | 38 |
| 1 | Proposed Plea Agreement filed as an exhibit to ECF No. 1293 | 50 |
| 2 | Transcript of Final Conference/Change of Plea Hearing held on 10/10/2018 and filed as an exhibit to ECF No. 1293 | 72 |

| Defense Number | Description | Page |
|---|---|---|
| 100 | Sentencing Memorandum of Edgar Omar Herrera Farias and Motion for Downward Departure and/or Variance filed by Mr. Schweda under ECF 1148 | 73 |

### GENERAL INDEX

Page

Reporter's Certificate.............................163

1    (September 9, 2019; 10:17 a.m.)

2            THE COURTROOM DEPUTY:  Please rise.

3        (Call to Order of the Court.)

4            THE COURT:  Good morning to you all.  Please be seated.

10:17:59    5        MS. VAN MARTER:  Good morning.

6            THE COURTROOM DEPUTY:  Matter before the Court is *United*

7    *States of America v. Edgar Omar Herrera Farias*, Cause

8    No. 4:15-CR-6049-EFS, Defendant No. 16.  Time set for motion

9    hearing.

10:18:15    10        Counsel, please state your presence for the record.

11            MS. VAN MARTER:  Stephanie Van Marter on behalf of the

12    United States, with Task Force Officer Brazeau.  Good morning.

13            THE COURT:  Good morning.

14            MR. MEEHAN:  And Shea Meehan here on behalf of Edgar

10:18:26    15    Omar Herrera Farias, Your Honor.

16            THE COURT:  Good morning.

17        A couple things at the outset:  Exclusion of witnesses

18    will be in effect, so neither of the Government's witnesses will

19    be permitted into the courtroom until they're called for

10:18:38    20    trial -- for hearing.

21        The other is a matter that I simply thought about this

22    morning.  I wasn't sure what it should -- what the RPCs say, but

23    I'm assuming that you do not intend to be a witness, Ms. Van

24    Marter.

10:18:56    25            MS. VAN MARTER:  No, Your Honor.

1        THE COURT:  Okay.  But there may -- you know, there may

2   well have been conversations on October 10th, the day of trial,

3   with counsel about changing plea and under what circumstances,

4   et cetera.  And I don't know -- I'm assuming that in the file

10:19:20  5   itself there would be -- any letters or e-mails would be in the

6   file between your office and -- and Mr. Schweda's office during

7   the course of his representation, and I don't know what your

8   standard procedures are when dealing with defense counsel,

9   whether you put everything in writing or whether you don't,

10:19:40  10  and -- I have no idea.

11        So I just wanted to alert us all to the fact that I

12  wasn't sure about whether you'd be a witness in this matter, so

13  I wanted to at least get a sense of what you thought so we'd

14  know at the outset.

10:19:57  15       MS. VAN MARTER:  And, Your Honor, the morning of the

16  plea, the agreements -- the extent of any agreement made by the

17  United States is on the record in part of the transcript.  There

18  were communications between myself and Mr. Schweda, obviously,

19  during the course of his representation, but nothing substantive

10:20:17  20  in an e-mail other than sending of the plea agreement that's

21  been attached as an exhibit or an attachment in the file here.

22        We did meet in person and discussed things in person,

23  and those things we did discuss during the course of preparation

24  of Mr. Schweda's testimony.

10:20:34  25       THE COURT:  Mr. Schweda, the exclusion of witnesses is

1    in effect.

2          MR. SCHWEDA:  Sure.

3        (Mr. Schweda left the courtroom.)

4          THE COURT:  Give me one second.

5          Did you say you had attached the proposed plea

6    agreement?

7          MS. VAN MARTER:  I did, Your Honor, in United States'

8    ECF 1293.

9          THE COURT:  Okay.  Let me just make sure I have that --

10   yeah, I have it right in front of me.  1293?

11         MS. VAN MARTER:  It was ECF -- it was Attachment A to

12   ECF 1293.

13         THE COURT:  Okay.  All right.  So I need that.  I don't

14   think I have that.  I have 1293, but I don't have the

15   attachments.

16         Attachment C?

17         MS. VAN MARTER:  Attachment A.

18         THE COURT:  A.  Okay.

19         Would you please print that for me?  Thank you.

20         Okay.  I'll take a look at that.

21         All right.  Well, let's see.  All right.  I just wanted

22   to make sure that we'd made a record so we all know where we're

23   going with this.

24         Mr. Meehan, have you had the file itself from

25   Mr. Schweda?

1      MR. MEEHAN:  Yes, Your Honor, I have what I believe

2  constitutes Mr. Schweda's file.

3      THE COURT:  Okay.  So we're good there then.  All right.

4  And that would involve all of his investigative notes from his

10:21:55  5  investigator and any memos of their conferences, something of

6  that nature?

7      MR. MEEHAN:  Well, it involves some fairly limited

8  notes, but, yes, I do have Mr. Schweda's notes.

9      THE COURT:  Okay.  And Bea Rump is not going to be a

10:22:09  10  witness that either of you are going to call; is that correct?

11      MS. VAN MARTER:  That is correct, Your Honor.

12      MR. MEEHAN:  That's correct, Your Honor.

13      THE COURT:  Okay.

14      MR. MEEHAN:  I --

10:22:18  15      THE COURT:  We'll see.  All right.

16      So that said, how do you want to proceed this morning?

17  It's your motion, Mr. Meehan.

18      MR. MEEHAN:  Well, Your Honor, we would like to call,

19  actually, Mr. Schweda.  I realize in the last status report we

10:22:31  20  filed I indicated that we'd be calling Mr. Herrera Farias first,

21  but I've spoken with the Government, and we'd like to get

22  Mr. Schweda on --

23      THE COURT:  Okay.  Fair enough.  Let's see.

24      Well, Ms. Vargas, do you want to --

10:22:50  25      THE COURTROOM DEPUTY:  Ran out of paper.

1           THE COURT:  Okay.  Fair enough.

2           MR. MEEHAN:  Your Honor, I'm assuming that anything that

3    has been filed through ECF we can reference and that the Court

4    will have that available, to the extent necessary?

10:23:03  5           THE COURT:  I have a number of printings, various ECFs,

6    but my staff attorney will be able to print those.

7           MR. MEEHAN:  And also, Your Honor, in case Mr. Schweda

8    needs to refer to his sentencing memorandum, I had brought

9    copies of that for him.

10:23:19  10          THE COURT:  Okay.

11          MR. MEEHAN:  Does the Court want to, in the event we

12   need to refer directly to that, does the Court want that

13   marked --

14          THE COURT:  Yes.

10:23:26  15          MR. MEEHAN:  -- as an exhibit?

16          THE COURT:  Yeah.  Do you have some things you'd like to

17   mark now before we start?

18          MR. MEEHAN:  Your Honor, that is the only item that I

19   believe is necessary to mark.

10:23:35  20          THE COURT:  Okay.  Well, let's give Ms. Vargas a moment,

21   and then we'll have you come up, and she'll mark that for us.

22   Okay?

23          MR. MEEHAN:  Okay.

24          THE COURT:  Are you ready, Ms. Vargas?

10:23:52  25          THE COURTROOM DEPUTY:  Yes.  I was going to give him

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                    9
*Motion Hearing/September 9, 2019*

1    some of the exhibit stickers.

2             THE COURT:  Sure.

3             If you want to come forward with that exhibit, and

4    Ms. Vargas will mark it for us.

10:24:00  5             You have a copy of this, of course, Ms. Van Marter?

6             MS. VAN MARTER:  Yes, Your Honor, I do.

7             MR. MEEHAN:  And I have a copy for the Court.

8             THE COURT:  Okay.  Thank you.

9             THE COURTROOM DEPUTY:  We will start -- Ms. Van Marter,

10:24:12 10    you have exhibits as well?

11             MS. VAN MARTER:  I do.  They were attached --

12             THE COURTROOM DEPUTY:  Okay.

13             MS. VAN MARTER:  -- to our --

14             THE COURTROOM DEPUTY:  I'm just going to start

10:24:21 15    defendants at 100.  Is that --

16             MS. VAN MARTER:  That's fine.

17             THE COURTROOM DEPUTY:  Is that ...

18             MR. MEEHAN:  Yes.  Might I ask -- Ms. Van Marter, they

19    were attached to?

10:24:29 20             MS. VAN MARTER:  ECF 1293.

21             MR. MEEHAN:  Yes.

22             MS. VAN MARTER:  Yes.  Attachments A and B.

23             (The courtroom deputy and counsel conferring.)

24             (The Court and courtroom deputy conferring.)

10:25:06 25             MR. MEEHAN:  Your Honor, would -- would the Court like

 1    brief openings, or would the Court like to proceed and have

 2    argument only at the end?

 3           THE COURT:  I'm at your disposal, Counsel.  Whatever you

 4    wish is fine with me.

 5           Would you like openings?

 6           MR. MEEHAN:  A brief opening I think would be

 7    appropriate, Your Honor.

 8           THE COURT:  Okay.  Fine.  Let's get started.  It's your

 9    motion, so you're up first.

10           And, Ms. Vargas, after the openings would you locate

11    Mr. Schweda and tell him he's wanted as a witness?

12           THE COURTROOM DEPUTY:  Okay.

13

14                         OPENING STATEMENT

15           MR. MEEHAN:  Good morning, Your Honor.

16           THE COURT:  Good morning.

17           MR. MEEHAN:  May it please the Court.  Shea Meehan here

18    on behalf of Mr. Herrera Farias.  And we're here on Mr. Herrera

19    Farias' motion to withdraw his guilty plea.

20           I understand that the Court has reviewed the materials,

21    but I'd like to lay a little roadmap, I think, for how I expect

22    things will likely come out today, as we prepare to put on

23    evidence.

24           As the Court is aware, it is the defendant's burden on

25    this motion to show that he should be able to withdraw his

10:25:18

10:25:27

10:25:36

10:25:49

10:26:07

1   guilty plea, and the standard is fair and just grounds, and it

2   is a generous standard that must be applied liberally.

3          With that said, Mr. Herrera Farias understands he cannot

4   withdraw his guilty plea on a lark.

10:26:25   5          In this case, though, where counsel's advice is at

6   issue, a defendant may meet the fair and just standard by a

7   showing that his counsel's gross mischaracterization plausibly

8   could have motivated his decision to plead guilty.

9          THE COURT:  And where do you get that standard?

10:26:42  10          MR. MEEHAN:  That is from the *Davis* case, Your Honor,

11   *United States v. Davis,* 428 F.3d 802 at 808.

12          THE COURT:  Okay.  Give me a second, please.

13        (Pause in proceedings.)

14          THE COURTROOM DEPUTY:  Did you say you needed a copy of

10:27:29  15   Government's Attachment A as well?

16          MR. MEEHAN:  No, I have a copy.  Thank you.

17          THE COURT:  Okay.  So in the -- that's a quotation from

18   the *Garcia* case, because it talks about -- it says, quote,

19   "Because the defendant does not have to prove that his plea was

10:27:46  20   invalid in order to justify withdrawal, a defense counsel's

21   erroneous advice may warrant withdrawing a plea even if the

22   defendant does not prove that he would not have pleaded guilty

23   but for the erroneous advice, end of quote.

24          The opinion cites *Garcia* on a basis of newly discovered

10:28:16  25   evidence, but it goes on to analyze *Garcia*, and it talks about

1    the effect of the new evidence and goes on to say, quote, "It is

2    sufficient that this evidence was relevant evidence in Garcia's

3    favor that could have a [sic] least plausibly motivated a

4    reasonable person in Garcia's position not to have pled guilty,

10:28:46    5    had he known about the evidence prior to pleading.

6            Is that the standard you're referring to?

7            MR. MEEHAN:  No, Your Honor.  I believe that there is

8    actually a quote on 808 that -- that has the language, quote,

9    " ... showing that his counsel's gross mischaracterization

10:29:04    10    plausibly could have motivated his decision to plead guilty ..."

11    I do not have the case in front of me, Your Honor, and --

12            THE COURT:  I do.  Hang on a second.

13            MR. MEEHAN:  Okay.

14            THE COURT:  Okay.  Let me just grab the pagination.  As

10:29:20    15    always, trying to find the pages in the course of the opinion --

16    here I am.  Right there.  I have it.  Thank you.

17            I'm looking at 808.  Okay.  So that's the sentence after

18    the quotation I just read.  And the sentence after the quotation

19    on Page 808 is, "Thus, a defendant may demonstrate a fair and

10:29:41    20    just reason for plea withdrawal by showing that his counsel's

21    gross mischaracterization plausibly could have motivated his

22    decision to plead guilty.  Nothing in Rule 11(d)(2)(B) requires

23    a defendant to show more in order to satisfy the fair and just

24    reason.

10:30:03    25            That's what you're referring to?

1        MR. MEEHAN:  Yes, Your Honor.

2        THE COURT:  Okay.

3        MR. MEEHAN:  That's what I'm citing.  That's the

4    standard, I believe, that's applicable.

10:30:08    5        And the import to that standard is it is not incumbent

6    on Mr. Herrera Farias to show that but for the erroneous advice,

7    he would not have pleaded guilty.  Instead, the burden is simply

8    to show that the advice from Mr. Schweda, which I believe the

9    Court will find to be a gross mischaracterization or otherwise

10:30:32   10    erroneous, plausibly could have motivated Mr. Herrera Farias'

11    decision to plead guilty.  We do not need to meet a but-for

12    causality.  Instead, this plausible motivation is the standard

13    under the circumstances.

14        We believe that the testimony today will show that there

10:30:53   15    was a theory with regard to various different types of

16    conspiracies that Mr. Schweda put forward and advised

17    Mr. Herrera Farias of; and that that theory was that, in fact,

18    what Mr. Herrera Farias had committed and was pleading guilty to

19    was a conspiracy under section 18 U.S.C. 371, when, in fact,

10:31:22   20    what Mr. Herrera Farias had been indicted with and what the

21    Court addressed during his guilty plea hearing was 21 U.S.C. 846

22    and the conspiracy contained therein.

23        We believe that Mr. Herrera Farias had a right to rely

24    on the advice that he was receiving from counsel, and in this

10:31:43   25    case it was, unfortunately, erroneous.

1    But it is that issue which is then borne out by the

2  sentencing memorandum filed by Mr. Schweda that will make clear

3  for the Court that there was a gross mischaracterization here.

4  And, again, it is borne out by the sentencing memorandum filed

10:32:04  5  with the Court.  There was a gross mischaracterization, and it

6  certainly did motivate Mr. Herrera Farias to enter his plea,

7  believing that he could receive substantially less than the

8  10-year mandatory minimum required by 21 U.S.C. 846.

9    So, Your Honor, we'll ask at the end of the hearing that

10:32:29  10  you allow Mr. Herrera Farias to withdraw his guilty plea due to

11  this erroneous advice received.  We think that the testimony

12  that you'll hear today, in combination with the sentencing

13  memorandum filed, show unequivocally that Mr. Herrera Farias

14  should be allowed to withdraw that plea and proceed to a trial,

10:32:49  15  Your Honor.

16    THE COURT:  Thank you.

17    Ms. Van Marter.

18

19              OPENING STATEMENT

10:32:58  20    MS. VAN MARTER:  Thank you, Your Honor.

21    With all due respect, I disagree with the standard that

22  was recited by counsel.  As the Court pointed out, the *Davis*

23  case truly dealt with newly discovered evidence in the context

24  of the allowance of a withdrawal of plea.

10:33:14  25    The cases cited by the United States, specifically

1    *Briggs*, which was a 2010 decision after *Davis*, as well as the

2    *Williams* case, which is a 2018 case, talks about the

3    circumstance we're faced with here, and that is the allegation

4    that he was promised a lower sentence than he is now facing, at

10:33:37    5    least that's the allegation and the tenor of his motion; that --

6         THE COURT:  Okay.  I've been reading a couple of

7    different cases, and so I want to make sure I'm with you.  Hang

8    on one second.

9         So you're at 1293.  And let me just get to yours.

10:34:12    10         So I'm in your argument, authorities section.  Which

11    section are you talking about?

12         MS. VAN MARTER:  Section B.  It's on Page 12.

13         THE COURT:  Yes, I have B.

14         MS. VAN MARTER:  And specifically the *Briggs* case where

10:34:28    15    the Ninth Circuit --

16         THE COURT:  *Briggs*.  Okay, *Briggs*.

17         MS. VAN MARTER:  -- in 2010 previously expressed

18    skepticism at the proposition that a defendant may change his

19    plea solely because he underestimated the severity of sentence.

10:34:41    20    And in that particular circumstance, the Ninth Circuit noted:

21    While we have on occasion allowed a defendant to change his plea

22    for such a reason, we have done so only in exceptional

23    circumstances.

24         So this is not a context of newly discovered evidence.

10:34:56    25    There is no allegation of newly discovered evidence or new

1    information which would have had a relevant impact on the

2    defendant's decision the morning of trial to plead guilty.  Here

3    the allegation is that the defendant somehow believed he was

4    promised or would be exposed to a lighter sentence.

5            THE COURT:  Excuse me one second.  I want to make sure

6    that when I'm looking at 1293 and reading your *Briggs* analysis,

7    that I find the language that you referred to about exceptional.

8            MS. VAN MARTER:  It's in the block quote, Your Honor, at

9    the bottom of Page 12 right after the parenthetical when it

10    cites to the *Shaw* case.

11            THE COURT:  Sure.  There you go.

12            Yeah, and, notably, the quote that you had said nothing

13    about newly discovered evidence.  And that's the problem with

14    Ninth Circuit cases, as we all know.  In the context of one

15    case, they announce a very broad standard, and like what lawyers

16    do, once they have a broad standard and they haven't limited it,

17    then lawyers appropriately apply it to every possible scenario,

18    and that's -- so your block quote, I understand in context

19    that's what they said about newly discovered evidence because I

20    read it into the record.  But, on the other hand, there's

21    nothing in your block quote that restricts it to newly

22    discovered evidence.  So even in the *Briggs* case, they didn't

23    add that.

24            Okay.

25            MS. VAN MARTER:  But I -- at least our argument is, Your

1   Honor, with *Briggs*, as well as *Williams*, when we're in the

2   context of looking at that fair and just reason --

3         THE COURT:  Yes.

4         MS. VAN MARTER:  -- and that fair and just reason being

10:36:38  5   submitted by the defendant is "I didn't get the sentence I

6   thought I was," that is -- in the United States' argument from

7   these two cases, that's a bit -- that's a much more difficult

8   hurdle to overcome on the part of the defendant.

9         THE COURT:  Well, I agree if you say that the problem is

10:36:54 10   the defendant's perception of what he would get.  But I think,

11   as I understand what Mr. Meehan is focusing on, it's that there

12   was a gross mischaracterization of the potential for a 5-year

13   sentence, and I believe that's -- that's somewhat different.  So

14   on the one hand, it is true that if the defendant said, "Well,

10:37:19 15   yeah, but I didn't think I'd get it," okay, we all understand

16   that's just -- that's not a fair and just reason.

17         On the other hand, as we've gone through this, I'm

18   trying to remember which case -- we actually called defense

19   counsel to the stand, Mr. Egan.

10:37:41 20         Were you counsel on that case?

21         MS. VAN MARTER:  I believe I was, Your Honor.

22         THE COURT:  And it was a motion to withdraw a plea, and

23   Mr. Egan testified, and I remember that case.  That's right.

24   Okay.  And there there was a guideline question.

10:37:52 25         MS. VAN MARTER:  Correct.

1      THE COURT:  Were the guidelines correctly analyzed, were

2  they -- had they been appropriately determined so that the

3  defendant could make a reasoned and understanding plea based on

4  what the guideline said.

10:38:06   5      So -- as a matter of fact, because of that case, I'm

6  careful to say "whatever your lawyers told you about guidelines

7  isn't binding.  It's what I say, and I have to do it,"

8  et cetera.  So -- but no matter what I do and you all do,

9  nevertheless we have hearings.

10:38:21  10      So, that said, I understand your point.  Thank you for

11  that.

12      Anything else?

13      MS. VAN MARTER:  And, Your Honor, I just -- I think that

14  once the Court hears testimony from counsel in this matter, that

10:38:31  15  it was made very clear to the defendant what he was facing, what

16  his maximum penalties are, and a discussion of potential

17  theories of argument was in no way a promise and expressly told

18  to the defendant, "This is a theory.  I don't think we're going

19  to win, but it's a theory we can try," because in this

10:38:49  20  particular case, I think the evidence will be very clear the

21  defendant was very adamant to try and get a sentence under 10

22  years, and that was not something on the table or something that

23  was possible, as explained to him.  So --

24      THE COURT:  Give me one second.

10:39:03  25      MS. VAN MARTER:  Yes, Your Honor.

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                    19
*Motion Hearing/September 9, 2019*
*Opening Statement by Ms. Van Marter*

1          THE COURT:  Give me one second.

2          (Pause in proceedings.)

3          THE COURT:  Okay.  I'm good.

4          Anything else?

10:39:46   5          MS. VAN MARTER:  No, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          MS. VAN MARTER:  Thank you.

8          MR. MEEHAN:  Your Honor, we'd like to call Mr. Peter

9   Schweda.

10:39:55  10          THE COURT:  Okay.  Would you call Mr. Schweda for us?

11   Thank you.

12          (Witness approached.)

13          THE COURT:  Good morning.  If you'd come up to my left,

14   please.  There's a path that you can follow, Mr. Schweda, to the

10:40:29  15   witness chair.

16

17                          PETER SCHWEDA,

18    called as a witness on behalf of the Defendant, having first

19       sworn or affirmed, testified under oath as follows:

10:40:40  20          THE WITNESS:  I do.

21          THE COURT:  Good morning.  Please be seated.

22          THE WITNESS:  Thank you.

23          THE COURT:  There's water there, if you'd like to pour

24   yourself a glass before we begin.

10:40:50  25          THE WITNESS:  Thank you.

1          THE COURT:  When you're comfortable, tell us your first

2     and last name, and spell them both for the record.

3          THE WITNESS:  It's Peter, P-E-T-E-R, Schweda,

4     S-C-H-W-E-D-A.

10:41:09    5          THE COURT:  Good morning, Mr. Schweda.

6          Mr. Meehan, you may proceed.

7          MR. MEEHAN:  Thank you.

8          THE COURT:  For the record, the attorney-client

9     privilege has been waived pursuant to the filings of the

10:41:22   10     parties, and the filings of the defendant in particular, to the

11     extent that we will take evidence on the issue of what informed

12     his plea, and I think generally that's it.  And so with regard

13     to that, if there are any objections to the scope of the

14     testimony by either party, let me know and just make them of

10:41:45   15     record so I can rule on them.  Otherwise, I think we're prepared

16     to go.

17          Go ahead, Mr. Meehan.

18

19                         DIRECT EXAMINATION

10:41:50   20     BY MR. MEEHAN:

21     Q    Mr. Schweda, you were the former attorney for Mr. Edgar

22     Omar Herrera Farias; is that correct?

23     A    Correct.

24     Q    And you were the attorney for Mr. Farias in the case we're

10:42:05   25     here on today, correct?

1    A    Correct.

2    Q    When did you start representing Mr. Herrera Farias?

3    A    Um, can I refer to my billing records?  That's -- uh -- to

4    refresh my recollection?

10:42:20    5         THE COURT:  Go ahead.

6         I believe it was August of 2017.

7         THE WITNESS:  Correct.  Yeah, the first entry I have is

8    on August 22nd of 2017, so it would have been on that day or

9    shortly before that.

10:42:54   10    BY MR. MEEHAN:   (Continuing)

11    Q    Okay.  And you were not Mr. Herrera Farias' first attorney

12    in the case, correct?

13    A    Correct.

14    Q    Who was his prior counsel?

10:43:04   15    A    Uh, Sam Swanberg.

16    Q    And had Mr. Swanberg, to your understanding, been his

17    counsel since the time of his indictment and arrest?

18    A    I believe so.

19    Q    Okay.  And when you took over representation of Mr. Herrera

10:43:17   20    Farias in August of 2017, was it your understanding that he had

21    been advised of the mandatory minimum pertaining to a 21 U.S.C.

22    846 conspiracy charge?

23    A    So Mr. Swanberg had advised him.

24         Is that your question?

10:43:38   25    Q    I'm asking you if you're aware of that, if he had been

1    advised.

2    A    I'm not aware of that, no.

3    Q    Okay.  Are you aware of whether he'd been advised of the

4    maximum penalties?

10:43:47   5    A    By Mr. Swanberg?

6    Q    Correct.

7    A    No, I'm not.

8    Q    When you undertook representation, do you contend that you

9    informed Mr. Herrera Farias of the mandatory minimum that he

10:43:59  10    faced under the second superseding indictment Count 1?

11    A    Yes.

12    Q    And what did you advise him that was?

13    A    Well, there was a 10-year minimum mandatory sentence.

14    Q    And did you also advise him of the maximum penalties?

10:44:19  15    A    I believe I did.

16    Q    And do you contend that you did that on more than one

17    occasion?

18    A    Yes.

19    Q    Okay.  How many times did you meet with Mr. Herrera Farias

10:44:31  20    between the time you undertook representation in August of 2017

21    and the morning that was set for trial in October of 2018?

22    A    Um, how many times did I meet with him?

23    Q    Correct.

24    A    That's the question?

10:44:50  25        So I met with him on August 29th of 2017.  I met with him

1    on -- on November 16th of 2017.  I met with him on November 28th

2    of 2017.  I met with him on December 19th of 2019 [sic], and

3    that was -- that was for a hearing, and so it would have been a

4    very limited contact with him on that date.

10:45:25    5         THE COURT:  Excuse me, Counsel.  You were doing

6    something chronologically by referring to your vouchers.

7         THE WITNESS:  I'm referring to my billing records, yes,

8    Your Honor.

9         THE COURT:  So is that different from your vouchers?

10:45:38    10         THE WITNESS:  No, it's the -- these are rough notes that

11    would have gone into the vouchers.

12         THE COURT:  Okay.  So the way I heard it, you went from

13    November 28th of 2017 to December 19th of 2019.

14         Was that --

10:45:55    15         THE WITNESS:  Oh, I misspoke then.  I'm sorry.  These

16    are all -- all of these had been 2017.

17         THE COURT:  All right.  So December 19th of 2017.  Okay.

18         THE WITNESS:  Correct.

19         THE COURT:  Give me a moment, please.

10:46:15    20       (Pause in proceedings.)

21         THE COURT:  Go ahead.

22         THE WITNESS:  The next time I met with him was on

23    January 18th of 2018; and then on February 22nd of 2018; then on

24    March 6th of 2018, and that was for a hearing as well, and that

10:47:20    25    would have been a very limited meeting with him.

1          Then on April 26th of 2018, May 29th of 2018,

2   August 31st of 2018, September 10th of 2018, September 18th of

3   2018.

4          THE COURT:  Excuse me a second, Counsel.  Let me just --

10:48:06   5   which was the date -- the last date was September 18th?

6          THE WITNESS:  Correct.  That was a pretrial conference

7   hearing, and so I would have had very limited contact with him,

8   but I did meet with him and talk to him.

9          THE COURT:  Okay.  So September 10th; then

10:48:23   10  September 18th.

11          Okay, then what?

12          THE WITNESS:  And then October 1st of 2018 and

13  October 10th of 2018.  And then I also met with him -- and

14  October 10th of 2018 is when he changed his plea, and then I met

10:48:53   15  with him a couple of times after that as well.

16          THE COURT:  So through the date of plea, you met with

17  him on October 1st and then again on October 10th --

18          THE WITNESS:  Correct.

19          THE COURT:  -- as to the month of October.

10:49:09   20          THE WITNESS:  Correct.

21          THE COURT:  Okay.  Okay.

22          THE WITNESS:  And I might have met with him one other

23  occasion that the time for the travel was billed to a different

24  voucher, but I'm not seeing that right --

10:49:33   25          THE COURT:  I don't have -- I have your vouchers and --

1          THE WITNESS:  Okay.

2          THE COURT:  -- I'm looking at them so I could follow

3     chronologically what your notes said.

4          Go ahead.

10:49:42  5  BY MR. MEEHAN:  (Continuing)

6     Q    And do you recall at how many of those meetings that you

7     discussed sentencing ranges with Mr. Herrera Farias?

8     A    Um, I can't give you an exact number, um, but many of them.

9     Q    Okay.  So it would be fair to say that you discussed

10:50:00  10  sentencing ranges with Mr. Herrera Farias numerous times through

11    the course of your representation?

12    A    Correct.

13    Q    You had a theory, it's my understanding, that Mr. Herrera

14    Farias had committed a conspiracy that you have referenced as a

10:50:22  15  371 conspiracy.

16         Is that correct?

17    A    Correct.

18    Q    Okay.  When did that theory first arise in your thinking

19    and representation of Mr. Herrera Farias?

10:50:36  20  A    Um, it would have been later on in the, uh, representation.

21    Um, I can't give you an exact date.

22    Q    Okay.  Was it sometime -- my understanding is that there

23    was a plea agreement at one point offered by the Government.

24         Is that correct?

10:50:55  25  A    Correct.

1  Q    Okay.  Did your theory with regard to a Section 371

2  conspiracy arise after you had discussed that plea agreement

3  with Mr. Herrera Farias?

4  A    I'm not sure.

10:51:07  5  Q    Okay.  And please explain to me your theory with regard to

6  a 371 conspiracy.

7  A    The 371 requires that a defendant commit an offense against

8  the United States.  And in the Count 1 of this indictment, it

9  uses those exact terms.  And so, um -- and I've cited this in, I

10:51:43  10  believe, the sentencing memorandum.  The -- our -- my theory was

11  that he was charged with a conspiracy to commit a conspiracy.

12  And, um, I cited some case -- a case in my submittals to the

13  Court that basically said that's possible.

14  Q    And please explain how you believed Mr. Herrera Farias had

10:52:14  15  possibly engaged in a conspiracy to commit a conspiracy.

16  A    Well, he made an agreement to make an agreement.  So that's

17  how the indictment alleges.  So the indictment alleges, um, a

18  conspiracy to commit an offense against the United States which

19  is a conspiracy under the Controlled Substance Act.

10:52:40  20  Q    Okay.  Are you aware of whether Mr. Herrera Farias was ever

21  indicted under 18 U.S.C. Section 371?

22  A    Well, I guess it depends on how you -- I submit that the

23  indictment charges a conspiracy under Section 371 because of the

24  way -- because it uses one of the, um, essential elements of a

10:53:08  25  371 conspiracy: an offense against the United States.

1    Q    But you're not aware of any specific document relating to

2    the conduct Mr. Herrera Farias is alleged to have committed that

3    references, aside from the sentencing memorandum that you filed,

4    that references a conspiracy under 18 U.S.C. Section 371?

10:53:32  5    A    Section 371 is not cited, correct.

6    Q    Okay.  And do you recall there being any discussion of

7    Section 18 -- or, excuse me, 18 U.S.C. Section 371 during the

8    change of plea hearing on the morning that had been set for

9    trial?

10:53:54  10    A    Um, he was -- the discussion was to --

11         THE COURT:  Excuse me.  Excuse me one second.

12    BY MR. MEEHAN:   (Continuing)

13    Q    I'm simply asking do you recall anything during the court

14    hearing, not --

10:54:06  15    A    Oh.  The court hearing, no, I don't recall any.

16    Q    Okay.  What was appealing about the theory that Mr. Herrera

17    Farias had committed a Section 371 conspiracy instead of a

18    conspiracy under 21 U.S.C. Section 846?

19    A    Say -- I don't think I understand your question.  I'm

10:54:33  20    sorry.

21    Q    Well, Mr. Herrera Farias was indicted for conspiracy under

22    21 U.S.C. Section 846; is that correct?

23    A    That's cited in his indictment, yes.

24    Q    Okay.  And you had a theory under which he would have

10:54:49  25    committed a conspiracy under 18 U.S.C. Section 371, correct?

1   A    That's what, in effect, is charged in Count 1 of the

2   indictment.

3           THE COURT:  Excuse me one second.  Excuse me.

4           Counsel, for the record, you keep using the word

10:55:06   5   "indictment."

6           MR. MEEHAN:  I'm --

7           THE COURT:  Are you intending to use indictment, first

8   superseding, or second superseding?

9           MR. MEEHAN:  I'm sorry, Your Honor.  Second superseding

10:55:18  10   indictment has --

11          THE COURT:  So all of your questions intended that?

12          MR. MEEHAN:  Yes.

13          THE COURT:  Did you understand that?

14          THE WITNESS:  Yes, the final indictment.  Yes.

10:55:23  15          MR. MEEHAN:  Yes, Your Honor.  Thank you.

16          THE COURT:  Okay.  That's the record.  Thank you.

17  BY MR. MEEHAN:  (Continuing)

18  Q    What was the benefit to Mr. Herrera Farias of suggesting

19  that he had committed a conspiracy under 18 U.S.C. Section 371?

10:55:34  20  A    Well, it would alleviate his sentencing exposure.  The

21  maximum sentence under Section 371 is not more than 5 years in

22  prison.  So if the -- if the Court were to agree with me, it

23  would seriously limit the sentence that would be available.

24  Q    It would limit that sentence to something less than 5

10:56:00  25  years?

1   A    Five years or less, yes.

2   Q    Okay.  Did you share with Mr. Herrera Farias your theory

3   about a conspiracy under 18 U.S.C. Section 371?

4   A    Yes.

10:56:17   5   Q    When did you first share that idea with him?

6   A    I don't recall, but we talked about it on several

7   occasions, um, in reference to what he should do as far as

8   whether to go to trial or try to, um, make some kind of a plea

9   agreement.

10:56:35   10   Q    Okay.  And in advising Mr. Herrera Farias, did you consider

11   the 10-year mandatory minimum under 21 U.S.C. 846 to be binding

12   in terms of the absolute minimum sentence he would receive?

13   A    Correct.  I mean, the -- the whole idea of a 371 argument

14   is novel, and I told him that, but I also was very clear that he

10:57:09   15   should expect to receive a sentence of not less than 10 years in

16   prison, and that his sentencing exposure was significantly

17   higher, based upon the Government's theory of his culpability in

18   the case.

19   Q    Okay.  But you explained to him that it was possible that

10:57:28   20   he could get a sentence of less than 5 years --

21         THE COURT:  Five years or less.

22   BY MR. MEEHAN:  (Continuing)

23   Q    -- excuse me, five years or less, in the event your theory

24   was accepted by the Court?

10:57:40   25   A    Correct.

1    Q    Did you have any case law specifically supporting your

2    theory that Mr. Herrera Farias could be sentenced for conspiracy

3    under 18 U.S.C. Section 371 when the second superseding

4    indictment referenced 21 U.S.C. 846?

10:57:58    5    A    Just what I cited in my submittals.

6    Q    So if there is nothing cited in your submittals supporting

7    that position, then it doesn't exist?

8    A    Well, there is citations in my submittals.  I -- I know

9    that.

10:58:20    10    Q    Okay.  Do you recall specifically what case would -- would

11    support the fact -- the theory that Mr. Herrera Farias could be

12    sentenced for a conspiracy under 18 U.S.C. Section 371 when the

13    second superseding indictment, in fact, referenced 21 U.S.C.

14    846?

10:58:39    15    A    I -- I -- whatever I submitted.  I don't recall the names

16    of the cases.

17         MR. MEEHAN:  Okay.  May the witness be provided with

18    Exhibit -- is it 100, Madam Clerk?

19         THE COURTROOM DEPUTY:  Yes.

10:58:56    20         MR. MEEHAN:  -- with Exhibit 100?

21         THE COURT:  And Exhibit 100, for the record, is?

22         MR. MEEHAN:  Is the sentencing memorandum of Edgar Omar

23    Herrera Farias and motion for downward departure and/or

24    variance.

10:59:07    25         THE COURT:  Okay.  You've seen Exhibit -- are you

1   familiar with that exhibit?

2          THE WITNESS:  Yes, I prepared it.

3          THE COURT:  Go ahead.

4   BY MR. MEEHAN:  (Continuing)

10:59:16  5   Q     Okay.  So I was wondering if you could point out for me,

6   Mr. Schweda, the citation to law in the Ninth Circuit that would

7   indicate that Mr. Herrera Farias could be sentenced for a

8   conspiracy under 18 U.S.C. Section 371 when, in fact, the second

9   superseding indictment referenced a conspiracy under 21 U.S.C.

10:59:43  10  Section 846.

11  A     Okay.  So it's not in the sentencing memorandum.  It must

12  be in the objections to the presentence report.

13  Q     So in terms of the sentencing argument, though, you didn't

14  think that it was important to cite that authority for the

11:00:02  15  Court?

16  A     Well, it was already in the -- it was in the objections to

17  the --

18         THE COURT:  Excuse me, Counsel.  Let's all get on the

19  same page.

11:00:11  20         Look at Page 2 of the sentencing memorandum.  That's

21  ECF 1148 and Exhibit 100 to this, and go to Lines 3 through 6.

22         MR. MEEHAN:  Yes, Your Honor.

23  BY MR. MEEHAN:  (Continuing)

24  Q     Do you recall specifically what that authority was?

11:00:35  25  A     Again, I don't remember the names of the cases.  I do -- I

1    do recall that I cited two different cases.

2    Q    Are you aware of this ever having been argued successfully,

3    where a defendant was sentenced under 18 U.S.C. Section 371 when

4    they had, in fact, been indicted under 21 U.S.C. 846?

11:00:57    5    A    No, but it -- the issue is pending in at least one other

6    case in the Ninth Circuit.

7    Q    As a defense attorney, do you truly consider the mandatory

8    minimums that your client is charged with to be the actual

9    minimum sentence that they might receive?

11:01:19    10    A    Well, unless they are safety valve eligible, uh, yes,

11    and --

12    Q    I thought during our conversation the other day that you

13    indicated that you don't, in fact, consider that, the mandatory

14    minimum of the indicted charge, to be the minimum because the

11:01:38    15    Government can always go back and amend the indictment to have a

16    different charge.

17        Isn't that correct?

18    A    Oh, yes.  I mean, um, certainly, um, they could charge, uh,

19    by superseding indictment, uh -- um, a drug conspiracy without,

11:01:58    20    um, the drug amount to get to any kind of a minimum mandatory

21    sentence.

22    Q    Okay.  And, in fact, you tried to negotiate for a sentence

23    of less than 10 years for Mr. Herrera Farias; is that correct?

24    A    Correct.

11:02:13    25    Q    You asked for a sentence of 7 years?

1   A    Um, when we -- my recollection is that in January of 2018

2   when I met with him to go over the proposed plea agreement that

3   I received from the Government, um, that he said he would do 7

4   years, and that he wanted me to attempt to get an agreement on

11:02:38   5   that basis.

6   Q    All right.  And did you seek to get that agreement?

7   A    Yes.

8   Q    Okay.  Did you ever tell him that that type of an agreement

9   or sentence would be impossible because there was a mandatory

11:02:53   10   minimum?

11   A    Well, it would take the Government to file a, um,

12   superseding information with an appropriate charge that would

13   get it below that.

14   Q    Okay.  But you did indicate to Mr. Herrera Farias that it

11:03:07   15   would be -- that there was at least a possibility that he could

16   reach a plea agreement of less than 10 years.

17   A    Sure.  But that would be up to, um, the Government agreeing

18   to it.

19   Q    Understood.

11:03:21   20       But you suggested to him that it was plausible that he

21   could get an agreement that would have him serve less than 10

22   years.

23   A    So I would -- I think you used "plausible."  I said I would

24   have told him it was possible.

11:03:36   25   Q    Okay.  So when you did discuss the theory that this was a

1    conspiracy under 18 U.S.C. Section 371, how many times did you

2    discuss that with Mr. Herrera Farias?

3    A    I told -- I -- I don't recall.  I'm just not sure.

4    Q    Do you recall discussing that with him on the morning of

11:04:03   5    trial?

6    A    I -- I did.

7    Q    Tell me about the discussions on the morning of trial with

8    regard to 18 U.S.C. Section 371 and what the potential was.

9    A    Um, I told him the potential was not great, uh, that it was

11:04:21  10    a novel argument, but that he, uh -- since he was pleading

11    without a plea agreement, that he would still be able to appeal

12    the issue, and so at least it was an argument that could be

13    made, um, on an appeal.

14    Q    Okay.  You indicated to him, though, that although it was

11:04:42  15    novel, if accepted by the Court, he could serve something less

16    than 5 years potentially; is that correct?

17    A    Correct.

18    Q    Okay.  So on the morning that Mr. Herrera Farias changed

19    his plea to guilty, it would be feasible that he thought, in

11:05:06  20    spite of the mandatory minimum and everything else, that there

21    was a potential that he would receive a sentence of less than 5

22    years?

23    A    Well, I'm not going to agree that there was -- I said that

24    or represented that there was a potential.  I told him that

11:05:21  25    he -- we had this argument that we could make.  Um, he

1    understood -- going up to court, we discussed it -- that the

2    minimum mandatory would be 10 years, and that, um, there was

3    nothing the judge could even do about getting it less than 10

4    years, based upon his guilty plea.

11:05:46  5    Q    But you also told him -- I want to make sure I understand.

6    You also told him, though, that you had a theory that, without

7    regard to the mandatory minimum, if your theory was successful,

8    he could serve 5 years or less?

9    A    Correct.

11:06:01  10    Q    Okay.  And so would it have been plausible that Mr. Herrera

11    Farias went into the sentencing hearing -- excuse me.

12         Would it be plausible that Mr. Herrera Farias went into the

13    change of plea hearing believing that he could, in fact, if your

14    argument was successful, have a sentence of 5 years or less?

11:06:24  15    A    Correct.

16    Q    Okay.  And it was plausible that he believed that in spite

17    of the fact that he had otherwise been advised that there was a

18    10-year mandatory minimum under 21 U.S.C. 846, correct?

19    A    Correct.

11:06:47  20    Q    And you, in fact, then filed the sentencing memorandum,

21    ECF 1148, and asked the Court to interpret Mr. Herrera Farias'

22    plea as a conspiracy under Section -- under 18 U.S.C. Section

23    371; is that right?

24    A    Correct.

11:07:12  25    Q    Okay.  And that's consistent with your having told

1    Mr. Herrera Farias that there was, in fact, a chance that he

2    would receive a sentence of 5 years or less under 18 U.S.C.

3    Section 371, correct?

4    A    Correct.

11:07:31    5    Q    Okay.

6         MR. MEEHAN:  I have nothing further of the witness at

7    this time, Your Honor.

8         THE COURT:  Thank you.

9         Ms. Van Marter.

11:07:57    10         MS. VAN MARTER:  Your Honor, I would like to just clear

11    up one area, since it was referenced earlier.  ECF 1143, if we

12    could also make that Government's exhibit, is defendant

13    Mr. Herrera Farias' objections to the presentence investigation

14    report filed by Mr. Schweda.

11:08:14    15         THE COURT:  What about it?

16         MS. VAN MARTER:  May I -- just because I think

17    Mr. Schweda referenced to citing to the case law in that

18    objection [sic] as well, and I wanted to submit those for the

19    record.

11:08:24    20         THE COURT:  Are you talking about exceptions to, what,

21    preliminary jury instructions?

22         MS. VAN MARTER:  No.  These were his objections to the

23    presentence investigation report.

24         THE COURT:  Okay.

11:08:32    25         MS. VAN MARTER:  I believe Mr. Schweda was questioned as

1    to whether he had --

2        THE COURT:  Sure.

3        MS. VAN MARTER:  -- any authority --

4        THE COURT:  That's 1143.

11:08:40  5        MS. VAN MARTER:  And he referenced this document.

6        THE COURT:  Sure.

7        MS. VAN MARTER:  So I'd like to submit that.

8        May I approach?

9        THE COURT:  You may.

11:08:45  10        When you say "submit it," what is the technical posture

11    that this is in?

12        MS. VAN MARTER:  I would like this to be an exhibit,

13    Your Honor.  Would move to admit this as an exhibit as well.

14        MR. MEEHAN:  Your Honor, I would appreciate a copy of

11:08:56  15    the document.

16        THE COURT:  It's all on ECF, so we can get you a copy.

17        THE COURTROOM DEPUTY:  I'll print it for you right now.

18        THE COURT:  All right.  It's 1143.

19        THE COURTROOM DEPUTY:  Which exhibit number do you want

11:09:09  20    to refer to this?

21        MS. VAN MARTER:  Let's make this Government's Exhibit 3,

22    because 1 and 2 are already in.  Thank you.

23        THE COURT:  Exhibit 3?

24        MS. VAN MARTER:  Exhibit 3, Government's Exhibit 3.

11:09:19  25        THE COURT:  So ECF 1143 will be Exhibit 3, USAO

1    Exhibit 3.  Okay.

2         (Government Exhibit No. 3 admitted into evidence.)

3

4                        CROSS-EXAMINATION

11:09:25  5   BY MS. VAN MARTER:

6    Q    And, Mr. Schweda, before we get into the other questions,

7    is the case law that you previously referenced as having cited,

8    is that located in Government's Exhibit No. 3?

9    A    Um, just one of the cases is.  There is another case that I

11:09:40  10  cited; it was actually a case out of this district.

11             THE COURT:  It's on Page 2, Lines 3 through 13.

12   BY MS. VAN MARTER:  (Continuing)

13   Q    And is that a reference to that case that you just

14   indicated, Mr. Schweda?

11:09:55  15  A    Uh, no.  No.  The reference in that section is to *United*

16   *States v. Arlt*, which was not en banc, Ninth Circuit case, that

17   states that the Ninth Circuit concluded that Congress intended

18   the crimes charged in Count 1 under 18 U.S.C. Section 846 and

19   Count 2, 18 U.S.C. Section 371 to be separate offenses.

11:10:26  20  Q    And you also indicated that there's another case that you

21   know of out this district.

22   A    Yeah, and I -- I believe I cited it somewhere in one of

23   the submittals, and it's a case that dealt with World War II,

24   um, rationing, and they held that you could have a conspiracy to

11:10:55  25  commit a conspiracy.

1    Q    And this particular theory, was this a theory that had been

2    discussed amongst the defense bar as a possible theory to pursue

3    in drug conspiracy cases?

4    A    Um, some -- some of the people that I'm associated with

11:11:10    5    in the defense bar --

6          THE COURT:  Well, excuse me.  Hold on.  Hold on here

7    now.

8          Do we get to ask him a question about what he and other

9    people who are not witnesses talked about?

11:11:17    10          MS. VAN MARTER:  No, I'm not asking him -- I'm asking if

11    this is something that has been discussed, not what was

12    discussed, in his presence in terms of a theory being pursued by

13    the defense bar.

14          THE COURT:  Well, he can say he's heard of the theory,

11:11:27    15    and that may have prompted him, but that's all, unless there's

16    something more that's an exception to hearsay.

17          MS. VAN MARTER:  Well, Your Honor --

18          THE COURT:  And I think hearsay probably applies in this

19    setting.  I think the rules against hearsay may apply in a

11:11:40    20    motion like this.

21          MS. VAN MARTER:  I don't believe they do, but I

22    understand the Court's position.  I think when we're talking

23    about a standard of gross mischaracterization --

24          THE COURT:  Well, what's to prevent counsel from saying,

11:11:53    25    sure, everybody in Spokane that I talked to thinks that when you

1    cite 846, it implicates 371, and put that in your pocket, and

2    keep it there until you get your plea, and then argue it at that

3    time?

4           MS. VAN MARTER:  I don't -- I'm not asking for any

11:12:09  5    specific statements, but I do think it's fair and appropriate to

6    ask this witness, this attorney as to whether he is aware --

7    whether this particular theory he has received some training or

8    instruction on, if it's -- so that when we talk about gross --

9    gross misrepresentations to his client, that this is something

11:12:28 10    that is being addressed in the field of defense work.

11           THE COURT:  Okay.  You can ask him a general question

12    about that.

13    BY MS. VAN MARTER:  (Continuing)

14    Q    Is this theory being addressed in terms of general defense

11:12:39 15    work as to drug conspiracy cases?

16           THE COURT:  Do you mean right now or do you mean back

17    then?

18    BY MS. VAN MARTER:  (Continuing)

19    Q    During the time that you were having discussions with

11:12:47 20    Mr. Farias.

21    A    Correct.  Yes.

22    Q    It was a theory that was being discussed?

23    A    Correct.

24    Q    I'm going to back up quite a bit, Mr. Schweda.

11:12:57 25           How long have you been an attorney?

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                              41
*Motion Hearing/September 9, 2019*
*Schweda/X/Van Marter*

1    A    Uh, since 1977.

2    Q    And how long have you been doing federal defense work?

3    A    Uh, since 1981.

4    Q    And have you served on any committees or boards in regard

11:13:10   5    to federal defense work?

6    A    Um, I have.  I've been -- I was the panel representative

7    for the district for 12 years.  Um, I served on an ad hoc Ninth

8    Circuit oversight committee, um, for five years maybe, and I,

9    um, was a member -- I represented the Ninth Circuit to the

11:13:37   10   Defender Services Advisory Group, or DSAG, for 9 years.

11   Q    And what did that involve?

12   A    Um, DSAG is, um -- uh, meets at the Defender Services

13   Office at least twice a year, and is made up of equal number of

14   defenders and panel representatives.  And, uh, we, um, provide

11:14:03   15   advice to the Defender Services Committee, which is a judicial

16   committee that has oversight over the Criminal Justice Act.

17   Q    And what types of -- just in general, what was the purpose

18   of the advice?

19   A    Um, to, um -- uh, ask for policy changes or new policies.

11:14:25   20   Q    Did it also include reviewing new potential legal arguments

21   in federal defense work?

22   A    Um, not really.

23   Q    And during your time working with federal defendants, do

24   you know approximately how many defendants you have represented

11:14:41   25   in federal court?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    A    How many what?

2    Q    Defendants you've represented.

3    A    I just -- I wouldn't want to hazard a guess.

4    Q    Quite a few?

11:14:48    5    A    Yes.

6    Q    And during that time, did you kind of establish your own

7    methodology or procedure in reviewing potential sentences with

8    federal defendants?

9    A    Yes.

11:15:02    10    Q    And what is that?

11    A    Well, I -- I, uh, certainly always advise them of a minimum

12    mandatory sentence and a maximum sentence, and, uh, I do rough

13    calculations as to what the sentencing guideline range would be.

14    Um, that part can be kind of tricky, because a lot of times

11:15:28    15    we're really arguing it right up until the judge makes a

16    decision as to what would be applicable.

17    Q    And during your time, at least since 1981, have you ever

18    had a practice of promising any particular sentences to your

19    federal defendants?

11:15:45    20    A    No.

21    Q    And why not?

22    A    Because I -- I can't promise.  Um, I've told people that if

23    anybody does promise there -- you shouldn't listen to that

24    person because they don't know what they're talking about.

11:15:58    25    Q    And in your occasion as a federal defense attorney, have

1    you had the opportunity to try and argue new theories of

2    defense?

3    A    Yes.

4    Q    On more than one occasion?

11:16:08    5    A    Yes.

6    Q    And when you are in that posture of finding a new theory or

7    argument that you would like to raise, how do you describe that

8    to your client?

9    A    Um, just that this is a new theory and, uh, usually I tell

11:16:23   10    them I don't expect any success at the district court level;

11    that it would take an appeal to win it.

12    Q    Let's go back to specifically your representation of

13    Mr. Farias.  And I know you went through all of those dates.

14    And I actually asked you to bring your -- your notes with you to

11:16:43   15    court today.

16         Is that correct?

17    A    Correct.

18    Q    And do those notes also contain references to

19    communications that are not covered by the current waiver?

11:16:51   20    A    Yes.

21         MS. VAN MARTER:  Okay.  So, Your Honor, for purposes of

22    this hearing, I'm not sure how the Court wants to address this,

23    but I do -- I would like there to be a record, whether we can go

24    through and redact, but specifically turning those notes into

11:17:06   25    some form of an exhibit that references the dates and times that

1    he met with Mr. Farias, and then specifically not redacting the

2    ones that refer to plea negotiation or discussion of change of

3    plea.

4         THE COURT:  Has he brought a redacted --

11:17:22    5         MS. VAN MARTER:  He brought -- they've not been redacted

6    yet, and obviously we would not take possession of them at this

7    time because there's information within them.  But I can,

8    given the Court's direction --

9         THE COURT:  Have you seen them?

11:17:31    10        MS. VAN MARTER:  No, because they're not redacted, so

11    it's not appropriate --

12        THE COURT:  Have you seen them?

13        MR. MEEHAN:  Your Honor, I believe Mr. Schweda has

14    provided me with these notes.

11:17:39    15        THE COURT:  Okay.  Is that correct?

16        THE WITNESS:  I don't recall if I sent them or not.  I

17    sent him all the records that I had, and I believe I sent them

18    to Mr. --

19        THE COURT:  Do you happen to have notes?

11:17:50    20        MR. MEEHAN:  Your Honor, I did receive notes from

21    Mr. Schweda, among other things.  We have addressed it.  I don't

22    happen to have those notes with me.  I did not intend to use

23    them here today.

24        THE COURT:  Well, because they -- because -- you don't

11:18:05    25    get to read them, but he does.

1      MS. VAN MARTER:  Correct.

2      THE COURT:  Then you'd have to see the notes to decide

3  whether or not he wanted to redact them or whether he wanted to

4  include them, he and his client.

11:18:14  5      MR. MEEHAN:  Your Honor, we're --

6      THE COURT:  Excuse me.  I was referring to you,

7  Mr. Meehan.

8      MR. MEEHAN:  We would object to having the notes as an

9  exhibit at this time.  If there was an issue with that, we

11:18:26  10  believe it should have been addressed prior to the hearing

11  today.

12      THE COURT:  Well, they're not going to be admitted at

13  this time because they haven't been redacted.  So ...

14      MS. VAN MARTER:  And, Your Honor, I'm going to ask him

11:18:36  15  specific questions to refer to them, and then perhaps afterwards

16  if we still need to address that --

17      THE COURT:  Do what you have to do, Counsel.

18      MS. VAN MARTER:  Thank you.

19  BY MS. VAN MARTER:  (Continuing)

11:18:42  20  Q   So during the times -- you were asked about all of times

21  you have met with Mr. Farias up until the time of his entry of

22  plea.

23      Could we go through those dates, and could you indicate how

24  long you met with Mr. Farias on those occasions?

11:18:58  25  A   Sure.  Um --

1          THE COURT:  Excuse me, Counsel.  I just want to -- these

2     are going to be from the date of your original service; is that

3     correct?

4          MS. VAN MARTER:  Yes, Your Honor.

11:19:09    5          THE COURT:  Okay.  Give me a second.

6          Okay.  Go ahead.

7          THE WITNESS:  So on August 29th of 2017 I met with

8     Mr. Farias for eight-tenths of an hour, and that was also a date

9     that we had a, um, court hearing.

11:19:42   10          On November 16th of 2017 I met with Mr. Farias for, um,

11     5.5 hours -- or, excuse me, 2.5 hours to review discovery.

12          And then on November 28th of 2017 I met with Mr. Farias

13     for 4 hours to review discovery.

14          On December 19th of 2017 I traveled to Richland for a

11:20:29   15     hearing and, um, just had contacts with Mr. Farias in court but

16     had, uh, some limited discussion with him.

17          Um --

18          THE COURT:  So when you say you came to a hearing on the

19     19th of December 2017, you did not actually meet with your

11:20:49   20     client except in the courtroom; is that correct?

21          THE WITNESS:  Correct.  And there would have been just

22     some limited discussion in the courtroom.

23          THE COURT:  So you met with him in the courtroom as --

24     during the hearing?

11:20:59   25          THE WITNESS:  Correct.

1          THE COURT:  Okay.  Thank you.

2          THE WITNESS:  On January 18th of 2018, um, I met with

3    Mr. Farias at the Benton County Jail.  Um, we discussed

4    strategy, discovery, and plea negotiations.  And this would have

11:21:18  5   been the date that I would have gone over, um, the plea

6    agreement that you sent me with him.

7    BY MS. VAN MARTER:  (Continuing)

8    Q    And how long was that meeting?  Do you recall?

9    A    5.3 hours.

11:21:30  10  Q    And before -- I want to stay on that date for a moment.

11         Do you recall when you received the proposed plea

12   agreement, Mr. Schweda?

13   A    Well, it was before then.  Uh, I believe you indicated it

14   was in December, and I think that's probably correct.

11:21:44  15  Q    Of 2017?

16   A    Correct.

17   Q    And on that occasion, January 18th, 2018, do you recall

18   reviewing that plea agreement with Mr. Farias?

19   A    Yes.

11:21:54  20  Q    And who else was present?

21   A    Uh, Larry Valadez.

22   Q    And what was Mr. Valadez's purpose of being present?

23   A    He was, um, the investigator that, um, we used on this

24   case, um, but he was also, um -- he -- he's fluent in Spanish,

11:22:12  25  so he acted as -- as the interpreter as well.  Um, it was -- I

1    thought there was an economy to have him as the interpreter,

2    since we didn't need to bring in a third person to act as the

3    interpreter.

4    Q    And during that meeting, was there any indication that

11:22:31  5    Mr. Farias was having any difficulty understanding Mr. Valadez?

6    A    No.

7         THE COURT:  And for the record, Mr. Valadez is simply an

8    investigator who's fluent in Spanish, asserted by the defendant,

9    but not a certified court interpreter; is that correct?

11:22:47  10        THE WITNESS:  Correct.  As far as I'm aware, yes.

11    BY MS. VAN MARTER:    (Continuing)

12    Q    Do you know if he's state-certified?

13    A    I don't know.

14    Q    Okay.  And during that meeting when you reviewed the plea

11:22:58  15    agreement, did you have any understanding if Mr. Farias was

16    understanding at least the communications between Mr. Valadez

17    and yourself?

18    A    Yes.  He was asked by Mr. Valadez on more than one occasion

19    whether he understood Mr. Valadez, and, um, the discussion that

11:23:17  20    we had on that date, um, was appropriate with, uh, Mr. Farias --

21    that he understood what was going on and what, uh -- what was

22    being translated by Mr. Valadez.

23         THE COURT:  We're talking about an event that occurred

24    in January -- January 18th of 2018?

11:23:38  25        THE WITNESS:  Correct.

1           THE COURT:  Okay.

2    BY MS. VAN MARTER:  (Continuing)

3    Q    Do you recall if Mr. Farias had -- had any questions of you

4    during the course of reviewing that plea agreement?

11:23:49  5    A    Yes.

6    Q    And what kind of questions do you recall?

7    A    I don't remember any specific questions, but, um, we -- we

8    discussed it, and he had questions.

9           MS. VAN MARTER:  Your Honor, I have Government's Exhibit

11:24:02 10    No. 1.

11           May I approach?

12           THE COURT:  I'm sorry?

13           MS. VAN MARTER:  I have Government's Exhibit No. 1 to --

14    ECF 1293.

11:24:10 15           THE COURT:  Okay.

16           MS. VAN MARTER:  May I approach?

17           THE COURT:  Yes.

18    BY MS. VAN MARTER:  (Continuing)

19    Q    And, Mr. Schweda, do you recognize that?

11:24:24 20    A    Um -- (Reviewing document.)

21           Yes, this looks like the plea agreement that you sent me.

22    Q    And is that the plea agreement that you reviewed with

23    Mr. Farias with Mr. Valadez's --

24    A    Yes.

11:24:50 25    Q    -- assistance?

1    A    Yes.

2    Q    On January 18th?

3    A    Yes.

4         MS. VAN MARTER:  United States would move to admit

11:24:56    5    Government's Exhibit No. 1.

6         MR. MEEHAN:  No objection, Your Honor.

7         THE COURT:  Admitted.

8         (Government Exhibit No. 1 admitted into evidence.)

9    BY MS. VAN MARTER:  (Continuing)

11:25:01    10    Q    When you went over this plea agreement, did you have

11    Mr. Valadez review with Mr. Farias the -- the minimum and

12    mandatory potential sentence?

13    A    Um, well, I discussed it with him, and Mr. Valadez, uh, in

14    turn, interpreted it.

11:25:20    15    Q    Did you also review with him the application of the

16    guidelines --

17    A    Yes.

18    Q    -- in this particular case?

19         And what did you explain to Mr. Farias regarding the

11:25:32    20    guidelines?

21    A    Um, that the -- the 10-year minimum mandatory sentence was

22    nondiscretionary, but that the guidelines are only

23    recommendations that the judge doesn't necessarily have to

24    follow.  Um, I discussed with him the, um -- the offense level

11:25:54    25    that you came up with, a 38 for -- which is the top of the range

1    for a drug offense.  You were seeking a two-level upward

2    adjustment for the possession of a firearm.  And, um, I would

3    have also discussed with him, um, the potential of, uh,

4    receiving an upward enhancement for being a leader or an

11:26:20    5    organizer or manager.

6    Q    And so did you discuss with him, then, his sentencing

7    exposure even as articulated in the plea agreement?

8    A    Correct.

9    Q    And was that range higher --

11:26:33    10    A    Yes.

11    Q    -- than the sentence --

12    A    Significantly higher.

13    Q    Than the mandatory minimum sentence?

14    A    Yes.

11:26:40    15    Q    Did you, at that point in time, also go over his criminal

16    history and any prior drug convictions he may have?

17    A    Correct.

18    Q    And for what purpose?

19    A    Well, because it has -- his criminal history would have an

11:26:55    20    effect on his sentence.

21    Q    And did you also go over the potential of a prior drug

22    conviction?

23    A    Yes.

24    Q    And what was -- what did you go over with him in that

11:27:04    25    regard?

1    A    Well, that, um, the, um -- he had a prior drug conviction

2    from 2012, um, that was in Yakima County.  Um, it was the

3    Government's theory, and it's stated -- I believe stated in the

4    plea agreement, that that would have been an act in furtherance

11:27:25    5    of the -- of the conspiracy.  Um, I told him that the, um --

6    even though it was part and parcel of the conspiracy, that the

7    Government could file an 851 information which would have

8    doubled the minimum mandatory sentence to 20 years.

9    Q    And did you also discuss with him any options he may have

11:27:57    10    at that time to get below a mandatory minimum sentence?

11    A    Um, well, I just told him that if we -- it would take your

12    agreement to get there.

13    Q    And, in other words, an amended charge of some kind.

14    A    Correct.

11:28:14    15    Q    Did you at that point in time discuss with him any of the

16    other options for getting out from under a mandatory minimum

17    that exist within the law or the guidelines?

18    A    Well, he wasn't safety valve, uh, eligible, so I don't

19    think we would have discussed it, or if we -- I don't recall

11:28:31    20    discussing it.  If it would have come up, it would have just

21    been in passing because he wasn't eligible for it; and, um, we

22    would have discussed the possibility of cooperating.

23    Q    And did he reject that offer or opportunity?

24    A    He didn't want to cooperate.

11:28:50    25    Q    Okay.  And at the conclusion of reviewing the plea

1    agreement, what was Mr. Farias' response or receptiveness to the

2    proposed plea agreement?

3    A    He said that he was willing to do 7 years.

4    Q    And during the time that you spoke with Mr. Farias, was

11:29:04  5    there -- did he express on more than one occasion a desire for a

6    particular sentence?

7    A    Yes.  Um, there was -- I believe at one point he wanted

8    5 years, but, uh, generally the discussion was that he would

9    do 7 years.

11:29:23  10    Q    And did that -- so was there repeated discussion that he

11    simply did not want to face the mandatory minimum that applied

12    in this case?

13    A    Um, there was repeated discussion that he was willing to do

14    7 years.

11:29:41  15    Q    And did you agree to -- or did you make that counteroffer

16    to the United States?

17    A    Yes.

18    Q    And was the counteroffer accepted?

19    A    No.

11:29:52  20    Q    So from that point forward, were you then, for lack of a

21    better term, in a trial posture for Mr. Farias?

22    A    Correct.

23    Q    You had mentioned several additional meetings.  I think the

24    next one was February 22nd of 2018.

11:30:09  25         Is that correct?

1    A    Yes.

2    Q    And how long was that meeting?

3    A    Um, I met with him for, uh, 3.6 hours.

4    Q    And if you could then go through the remaining dates and

11:30:23  5    indicate how long you spent with Mr. Farias.

6    A    Okay.  On March 6th of 2018, um, that would have been for a

7    hearing, so that would have been in court.

8         Um, on April 26th of 2018, um, I met with him and

9    Mr. Valadez for 3.2 hours.

11:30:50  10        On May 29th, that was for a court hearing, and so that

11    would have just been for a limited time in the courtroom.

12        On -- and here's the reference -- so on July 19th I had to

13    go to Benton County, um, to meet with another client, so I met

14    with Mr. Farias for 1.3 hours on that case, and the travel was

11:31:16  15    charged to a different voucher.  And I recall that Mr. Valadez

16    acted as the interpreter, but I used my cell phone, um, and we

17    made sure that, um, Mr. Farias understood Mr. Valadez.

18        On August 31st of 2018 I met with Mr. Farias and

19    Mr. Valadez at the Benton County Jail for 2.7 hours.

11:31:53  20        THE COURT:  I'm sorry, what date was that?

21        THE WITNESS:  That was August 31st of 2018.

22        THE COURT:  August 31st of 2018?

23        THE WITNESS:  Correct.

24        THE COURT:  So you were at Benton County Jail

11:32:17  25    August 31st, 2018?

1          THE WITNESS:  Uh, yes.

2          THE COURT:  Okay.  With Valadez?

3          THE WITNESS:  Pardon?

4          THE COURT:  With Mr. Valadez?

11:32:29   5          THE WITNESS:  With Mr. Valadez, yes.

6          THE COURT:  Okay.  And how long was the meeting?  I

7   apologize.  What was it?  2.7 hours.  Okay.

8          THE WITNESS:  2.7 hours, yes.

9          THE COURT:  Thank you.

11:32:49  10          THE WITNESS:  On September 10th of 2018 I met with

11  Mr. Farias and Mr. Valadez, and we, uh, reviewed the cooperating

12  defendant disclosures for 2.6 hours.

13          On 2018, um, I traveled to Richland for a hearing, and I

14  also met with Mr. Farias for 1.1 hours, and I don't have a note

11:33:32  15  as to who served as the interpreter on that occasion.

16          THE COURT:  Well, what was the date of that?

17          THE WITNESS:  That was, um, September 18th of 2018.

18          THE COURT:  And how long did you spend with him?

19          THE WITNESS:  Uh, 1.1 hours.

11:33:54  20  BY MS. VAN MARTER:  (Continuing)

21  Q    And you said that you did not have a note as to the

22  interpreter, but did you have somebody with you?

23  A    Yes.  I -- I have never met, uh, with Mr. Farias without an

24  interpreter, um, being available to interpret.

11:34:10  25          THE COURT:  You don't have any notes as to who that

1    interpreter was?

2            THE WITNESS:  No.  I just neglected to put it down.

3            On October 1st of, um, 2018 I met with Mr. Farias at the

4    Benton County Jail for 3.2 hours, and, again, I don't have -- I

11:34:31  5    didn't note who the interpreter was on that occasion.

6    BY MS. VAN MARTER:   (Continuing)

7    Q    And then on October 10th, 2018, how long did you meet with

8    Mr. Farias?

9    A    Um, on October 10th, um, I have "various meetings with

11:34:50  10   client" for 2.5 hours, so that was before, during, and after

11   court.

12   Q    And who did you utilize on that occasion, if your notes

13   say, as an interpreter?

14   A    Um, when I first, um, met with Mr. Farias before the

11:35:07  15   hearing, um, I had Mr. Valadez on the telephone, and, um, after

16   that it was the Court's interpreter that was present that day.

17   Q    And on those occasions that you just recounted, how many

18   times, do you recall, did you discuss the possibility of a plea

19   resolution with Mr. Farias?

11:35:36  20   A    I -- well, there would have been -- I would say most of

21   them.  Um, I can't say that it was all, but most of them.

22   Q    And what did you discuss with him regarding a potential

23   plea?

24   A    Well, uh, just whether he would consider entering a plea,

11:35:54  25   um, and that would be in conjunction with talking about the, um,

1    merits of the Government's case against him.

2    Q    And did that include the risks or the sentencing exposure,

3    should he decide to go to trial, versus a plea resolution?

4    A    Certainly.  That was the whole point of bringing up --

11:36:14    5    bringing it up all of the time.

6    Q    And what was your point to Mr. Farias?

7    A    Um, that he was facing great sentencing exposure, and that,

8    um, the only way to get around that would be to work something

9    out with the Government.

11:36:29    10    Q    And during these times, is this when, or a time period when

11    you began to discuss this potential theory that you were going

12    to raise regarding conspiracy?

13    A    Correct.

14    Q    And you previously testified that you discussed that with

11:36:45    15    him on a number of occasions.

16        Is that correct?

17    A    I believe so, yeah.

18    Q    When you discussed this theory, could you please explain to

19    the Court how you raised it with Mr. Farias.

11:36:57    20    A    Well, I told him that, uh -- about this theory, um, and

21    that it would be a possible way to get a lower sentence, um, but

22    there's no case law directly on point, um, and, um, it's a novel

23    theory.

24    Q    And did you explain that to him?

11:37:23    25    A    Yes.

1    Q    Did you explain to him the likelihood of success in this

2    theory?

3    A    I'm not sure if I -- I wouldn't have, uh, led him to

4    believe that this is going to happen, um, just that it's a

11:37:43    5    possibility.

6    Q    And without getting into any specifics, was it common

7    during this time period of meeting with him that you would have

8    discussed all kinds of theories in terms of your overall

9    defense?

11:37:55    10    A    Correct.

11    Q    So was that one of many?

12    A    Yes.

13    Q    And during these times --

14         THE COURT:  Excuse me.  Did you say that was one of many

11:38:08    15    theories of defense?

16         MS. VAN MARTER:  Yes.

17         THE COURT:  Okay.

18    BY MS. VAN MARTER:  (Continuing)

19    Q    And, in fact, you had filed a number of motions on behalf

11:38:16    20    of Mr. Farias as to some of the other theories; is that correct?

21    A    Yes.

22    Q    During this time when you were discussing with him a

23    possible plea resolution, did you continue to discuss with him

24    the impact of the mandatory minimum sentence?

11:38:31    25    A    Yes.

1    Q    Did you discuss with him the likelihood of receiving a

2    sentence higher than the mandatory minimum?

3    A    Yes.

4    Q    On more than one occasion?

11:38:40    5    A    Yes.

6    Q    Did you ever promise to him in any way a sentence below the

7    mandatory minimum?

8    A    No.

9    Q    So when you talk about potential, how did you explain that

11:38:52    10    potential to him regarding this specific conspiracy theory?

11    A    Well, I told him that, uh, he should expect something over

12    the minimum mandatory sentence, based upon, um, the evidence

13    that was, um, accumulated by the Government against him and what

14    the Government's theory of the case was.

11:39:14    15    Q    And did you explain to him who would be the ultimate person

16    to decide his sentence, regardless of what your arguments would

17    be?

18    A    Yes.

19    Q    And who was that?

11:39:22    20    A    The judge.

21    Q    I want to ask you some questions specifically about

22    October 10th, the day that Mr. Farias entered his plea of

23    guilty.

24        Could you explain to the Court when -- or at what point the

11:39:40    25    possibility of pleading guilty came up?

                                 USA v. Herrera Farias/4:15-CR-6049-EFS-16                 60
                                       Motion Hearing/September 9, 2019
                                            Schweda/X/Van Marter

1    A    Um, well, it came up when I got there.  So it -- uh, in

2    fact, the -- all of the discussion with Mr. Farias until I came

3    up to the courtroom was, uh, regarding whether he should plead

4    guilty or not.

11:40:03  5    Q    And what was the nature of that -- that conversation?

6    A    Um, he was indecisive.  Um, and I literally, uh, was

7    becoming late for court, and I'm walking out the door, uh,

8    with -- holding my cell phone with Mr. Valadez on the phone, and

9    I told him, "I got to get upstairs.  I'm going to be late," and

11:40:28  10   then that's when he decided he wanted to plead guilty.

11   Q    And prior to that decision, what did you explain to him

12   regarding his sentencing exposure that morning?

13   A    Well, all of the -- all of the things -- I told him that,

14   um, you had offered, um -- uh, a plea to the conspiracy; um,

11:40:52  15   that you wouldn't file an 851; um, that you would agree to two

16   levels off for acceptance of responsibility, not three; and that

17   you would not seek a leader/organizer/manager enhancement.

18   Q    And did you explain to Mr. Farias what that meant in terms

19   of his potential sentencing?

11:41:14  20   A    Yes.

21   Q    Did you go over his potential sentencing guideline

22   calculation again with him?

23   A    I -- I don't have any specific recollection, but I would

24   have.

11:41:26  25   Q    Did you go over with him again the application of the

1   mandatory minimum?

2   A    Yes.

3   Q    Did you explain to him what you believed his potential

4   sentence might be, even if he chose to plead guilty?

11:41:37  5   A    Yes.

6   Q    And what did you tell him?

7   A    I don't remember the range, uh, but it was something

8   consistent with what the presentence report came back with.

9   Q    So well over the 10-year mandatory minimum?

11:41:48  10   A    Yes.

11   Q    Did you explain to him any benefit he would receive if he

12   decided to change his plea that morning?

13   A    Well, he -- he could argue his, uh -- what he believed his

14   sentencing exposure was versus what the Government's belief of

11:42:07  15   his sentencing exposure as far as the amount of involvement that

16   he had, uh, in the case.  Um --

17   Q    Did he have a factual dispute with --

18   A    Yes.

19   Q    -- regard to his involvement --

11:42:24  20   A    Yes.

21   Q    -- versus the Government's theory?

22        So did you explain to him that he could preserve those

23   factual arguments if he pled that morning?

24   A    Yes.

11:42:32  25   Q    And there was no plea agreement, correct?

1   A    Correct.

2   Q    Except for some of those agreements that you outlined that

3  the Government orally indicated that it would do.

4   A    Correct.

11:42:41  5   Q    Did you explain to him that he would also preserve rights

6  of appeal?

7   A    Yes.

8   Q    And why did you go through that with him?

9   A    Well, it -- because he would preserve his right to appeal.

11:42:55  10  And, uh, you know, I expected the sentence to be harsh, um, and

11  so all of his rights would be preserved as far as appealing any

12  sentence.

13   Q    And did you explain to him that you expected his sentence

14  to be harsh?

11:43:14  15   A    Yes.

16   Q    And you said that Mr. Valadez was on the telephone?

17   A    Correct.

18   Q    And was interpreting via the telephone?

19   A    Yes.

11:43:26  20   Q    Was there any indication that Mr. Farias was having any

21  difficulty understanding Mr. Valadez?

22   A    No.

23   Q    Did Mr. Farias have questions like he had before that

24  morning?

11:43:36  25   A    Um, I -- he did, but I don't recall any specific questions.

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*     63
*Motion Hearing/September 9, 2019*
*Schweda/X/Van Marter*

1    Q    But enough so that he was engaging in a back-and-forth

2    conversation?

3    A    Yes.

4    Q    And you said towards the end, on your way up to court,

11:43:50  5    Mr. Farias then indicated he wished to change his plea?

6    A    Correct.

7    Q    Okay.  Did the conversation end at that point, or was there

8    a later conversation with Mr. Farias about the potential plea?

9    A    Uh, there was.  So when I came up to court, um, I advised,

11:44:08  10    uh, the two other attorneys that were proceeding to trial that

11    day of what Mr. Farias intended to do.  Uh, Mr. Therrien, um,

12    wanted to talk to his client.  And -- and actually what happened

13    was we had a meeting with, uh, Mr. Therrien, Mr. Therrien's

14    client -- Mr. Reyes-Garcia -- and Mr. Farias, and myself, and as

11:44:36  15    well as the Court's interpreter, um, in the marshal's holding

16    cell in the basement of this building.

17    Q    And I don't want to get into any conversations that involve

18    another client or another counsel, but, in general, was the

19    topic of pleading guilty discussed?

11:44:53  20    A    Yes.

21        THE COURT:  Excuse me a second, Counsel.  What was your

22    point about you didn't want to get into conversations?

23        MS. VAN MARTER:  There was a joint meeting that occurred

24    between Mr. Schweda, Mr. Therrien, and their two clients

11:45:07  25    together.  I just wanted the record to be clear I didn't want

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    him to answer any questions that would have exposed Mr. Therrien

2    or his client's conversation.

3         THE COURT:  Well, what's the point of raising it then?

4         MS. VAN MARTER:  Just to, for the record, to indicate

11:45:21  5    that there was a continued discussion about --

6         THE COURT:  Well, no, Counsel.  If you want to establish

7    there was a joint meeting, that's one thing.  If it was, "What

8    did you discuss?" well, you could say that there's a joint

9    meeting, and therefore there's some -- I seem to recall vaguely

11:45:41  10    that there's an attorney-client privilege that protects in a

11    joint meeting to develop strategies, almost a work product sort

12    of thing.  But it depends on what you're introducing this for as

13    to whether counsel's going to be able to talk about it.

14         So what's the point?

11:45:56  15         MS. VAN MARTER:  My next question was just to say that

16    Mr. -- to ask if Mr. Farias affirmed his intent to plead guilty

17    during that meeting.

18         THE COURT:  Well, that may be, but it makes witnesses of

19    the other person and Mr. Therrien.  So, go ahead.

11:46:12  20         MS. VAN MARTER:  Well, we can move on, Your Honor.

21    BY MS. VAN MARTER:   (Continuing)

22    Q    After that meeting that occurred, the joint meeting that

23    occurred, did Mr. Farias then continue with his desire to enter

24    a plea of guilty?

11:46:24  25    A    Yes.

1  Q    Were there any other conversations that you had with your

2  client other than those that occurred with the Court regarding

3  his plea of guilty, after that joint meeting?

4  A    Yes.  During the, um, change of plea portion for

11:46:43  5  Mr. Farias, he had some questions, so, um, we were -- went away

6  from the podium and -- and discussed the questions he had.

7  Q    And what were the nature of his questions?

8  A    Um, the only thing that I recall was the nature and extent

9  of what Mr. Farias was, um, going to admit to as far as his

11:47:14  10  involvement in the crime.

11  Q    So did that have to do with his factual disagreements with

12  the Government's evidence?

13  A    Yes.

14  Q    Did he have any or express to you any concern regarding the

11:47:29  15  application of the mandatory minimum during that conversation?

16  A    No.

17  Q    Did he express any confusion or concern regarding the

18  maximum potential penalties as -- as described by the Court?

19  A    No.

11:47:42  20  Q    So that conversation that you had away from the podium was

21  only specific, as you recall, to just some factual issues he was

22  struggling with in terms of his admission of guilty?

23  A    Yes.

24  Q    And you had indicated that you had met with Mr. Farias a

11:48:07  25  number of times after the entry of plea of guilty.

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                          66
*Motion Hearing/September 9, 2019*
*Schweda/X/Van Marter*

1      Is that correct?

2   A    Yes.

3          THE COURT:  Excuse me.  Who was translating during this

4   conference in court?

11:48:17  5          THE WITNESS:  One of the courtroom interpreters.  There

6   were two.

7          THE COURT:  One of the certified interpreters?

8          THE WITNESS:  Yes.

9          THE COURT:  Thank you.

11:48:27  10  BY MS. VAN MARTER:  (Continuing)

11  Q    Did you have any other interpreters that met with you and

12  Mr. Farias while you represented him?

13  A    Uh, Bea Rump did.

14  Q    Do you recall how many occasions Bea Rump was present?

11:48:39  15  A    I think a couple.  And I think there might have been one

16  occasion when, um, a lady -- the lady from Yakima, I can't think

17  of her name right now, but she's a certified interpreter.

18  Q    And do you recall if either of them were also present

19  during times that you discussed potential resolution or his

11:48:58  20  sentencing exposure?

21  A    Um, I can't say for certain.

22  Q    And during these meetings, did you discuss -- these

23  meetings after his entry of plea, did you continue to discuss

24  with him the conspiracy theory that you were going to argue on

11:49:18  25  his behalf for sentencing?

1    A    Yes.

2         THE COURT:  What meetings are you referring to?

3         MS. VAN MARTER:  I -- the meetings that occurred after

4    the entry of plea on October 10th.

11:49:29    5         THE COURT:  Okay.

6    BY MS. VAN MARTER:  (Continuing)

7    Q    And do you recall what dates you met with him after, just

8    for the record, after October 10th?

9         THE COURT:  This is after October 10th?

11:49:53    10         MS. VAN MARTER:  Yes, Your Honor.

11    A    Um, on December 12th of 2018, um, I attended Mr. Farias'

12    presentence investigation report interview, and that was at the

13    Benton County Jail.  And I believe the Court's interpreter from

14    Yakima, uh, was there on that occasion.

11:50:36    15         THE COURT:  And that was .70?

16         THE WITNESS:  Yes, .7 hours.

17         THE COURT:  Hmm.

18    BY MS. VAN MARTER:  (Continuing)

19    Q    Next date?

11:50:45    20         THE COURT:  Well, wait a minute now.  Which date was

21    that?

22         THE WITNESS:  That was on December 19th of 2018.  It was

23    for the presentence investigation report interview with the

24    probation officer.

11:50:54    25         THE COURT:  Well, you said December 12th you met with

1    the client, right?  You met with the client on December 12th; is

2    that correct?

3            THE WITNESS:  Excuse me.  I misspoke.  It's

4    December 19th.

11:51:08  5            THE COURT:  Actually, Counsel, why don't you go back

6    over your notes.

7            Did you meet with your client before the PSIR interview

8    about the PSIR interview?

9            THE WITNESS:  Uh, I may have -- yes, that's what I --

11:51:21 10    and I see there that I have a wrong date on, uh -- the first

11    portion of that would have been December 19.  So it would have

12    been a total of 1.9 hours, um, .7 with just my client and the

13    Court's interpreter, and then 1.2 for the PSIR interview.

14            And that December 12th date is wrong, at least on my

11:51:57 15    notes it's incorrect.

16            THE COURT:  You mean the date's wrong?

17            THE WITNESS:  Yes.  It should be -- it should be

18    December 19th for --

19            THE COURT:  Because your voucher shows December 12th.

11:52:10 20            THE WITNESS:  Yeah, that's -- that's a -- incorrect.

21            THE COURT:  Okay.

22    BY MS. VAN MARTER:  (Continuing)

23    Q    And what was the next date?

24    A    Um, the next time was on March 4th of 2019.  Um --

11:52:30 25    Q    Do you also have a February 16th?

1   A   Oh, excuse me.  Let me see.  Maybe I did miss one here.

2       That's correct.  So on February 16th, um, I met with

3   Mr. Farias regarding the, uh, presentence investigation report

4   that had been issued, not filed yet, um, and Bea Rump was there,

11:52:54  5   and we met for 4.3 hours.

6   Q   And the next date?

7   A   And then the next time was on March 4th of 2019, um, and I

8   met with Mr. Farias to go over the -- to prepare for sentencing,

9   go over the Government's sentencing memorandum, and also the

11:53:23  10   PSIR addendum that had been issued by the probation officer, for

11   2.5 hours.

12       Um, and then on April 10th, um, I -- that was the date set

13   for sentencing, and I met with, uh, Mr. Valadez and Mr. Farias

14   for an hour prior to sentence -- prior to the beginning of the

11:53:51  15   sentencing hearing.

16   Q   And during these subsequent meetings you just recounted,

17   you indicated that you again reviewed with him this theory or

18   argument you were going to raise in regard to conspiracy law; is

19   that correct?

11:54:04  20   A   Correct.

21   Q   Did you give him the same or similar explanation as you had

22   prior to his change of plea?

23   A   Yes.

24   Q   Did you also discuss with him other theories that you would

11:54:15  25   raise in terms of sentencing arguments on his behalf?

1    A    Yes.

2    Q    And did you again indicate to him, or at least was the

3    presentence investigation report, as you indicated, consistent

4    with what you thought his sentencing exposure would be?

11:54:37    5    A    Yes.

6    Q    And did you explain that to him?

7    A    Yes.

8    Q    So during all of the times that you've met with him and

9    discussing the various theories that you did, to include the

11:54:49    10    conspiracy law theory, did you ever indicate to him any definite

11    outcome?

12    A    No.

13    Q    Was it always explained on both the pros -- the pros and

14    cons of each theory you discussed?

11:55:05    15    A    Yes.

16    Q    But maintaining his -- discussion of what his ultimate

17    sentencing exposure would be?

18    A    Say that again.

19    Q    But continuing to discuss his ultimate sentencing exposure?

11:55:17    20    A    Yes.

21    Q    Which is well over 10 years.

22    A    Yes.

23         MS. VAN MARTER:  I don't have any other questions, Your

24    Honor.

11:55:22    25         THE COURT:  We'll take our recess at this time.  We'll

 1    be back at -- let me ask the interpreter what's convenient for

 2    her.

 3            What time would you like to reconvene?

 4            THE INTERPRETER:  Half an hour, Your Honor, the

11:55:38  5    interpreter would be fine.

 6            THE COURT:  I'm thinking we're going to take at least an

 7    hour for lunch.

 8            THE INTERPRETER:  Then that's fine, Your Honor.

 9            THE COURT:  Okay.  So 1:15.  1:15.  Thank you, folks.

11:55:47 10    We're in recess until then.  You may go about your business.

11            (Recess taken: 11:55 a.m. to 1:19 p.m.)

12            THE COURTROOM DEPUTY:  Please rise.

13        (Call to Order of the Court.)

14            THE COURT:  Good afternoon.  Please be seated.

01:20:23 15        Is Mr. Schweda still on the stand?

16            MR. MEEHAN:  Yes, Your Honor.

17            THE COURT:  Is he?

18        Okay.  Mr. Schweda.

19        (Witness approached.)

01:20:38 20        MS. VAN MARTER:  And, Your Honor, I just wanted to

21    ensure -- Mr. Meehan had a question as to whether Government's

22    Exhibits 1 and 3 were formally admitted.  I believe they had

23    been, but I just wanted for the record to make sure.

24            THE COURT:  Sure.  Remind me what they are.

01:21:02 25            MS. VAN MARTER:  Government's Exhibit No. 1 is the plea

1    agreement.

2            THE COURT:  Okay.

3            MS. VAN MARTER:  And No. 3 was the ECF objections to the

4    presentence investigation by defense citing to his -- that

01:21:14  5    conspiracy theory.

6            THE COURT:  Sure.

7            Ms. Vargas; is that correct?

8            THE COURTROOM DEPUTY:  Yes.

9            THE COURT:  Okay.  Thank you.

01:21:18  10            MS. VAN MARTER:  And I didn't have any other questions

11    for Mr. Schweda.

12            THE COURT:  Okay.  Mr. Meehan, anything else?

13            MR. MEEHAN:  Your Honor, we would also ask to make sure

14    that the Court is either admitting Exhibit 2 or will consider

01:21:33  15    that transcript which is part of the record in this matter.

16            MS. VAN MARTER:  I have no objection.  We submitted it

17    as Government's Exhibit 2 with our memorandum.

18            THE COURT:  It's admitted.

19            Do we have a copy of it, Ms. Vargas?

01:21:46  20            THE COURTROOM DEPUTY:  No, but I can print it from ECF.

21            THE COURT:  So we'll print it from ECF and make it

22    Exhibit 2.

23        (Government Exhibit No. 2 admitted into evidence.)

24            MR. MEEHAN:  Thank you, Your Honor.

01:21:53  25            THE COURT:  Okay.  Sure.

1          MR. MEEHAN:  And similarly want to make sure that

2     Defendant's 100 is admitted.

3          MS. VAN MARTER:  No objection.

4          THE COURT:  I thought I -- I admitted that.  Yeah, 100,

01:22:05    5     yes.  Right.  Thanks.

6          (Defense Exhibit No. 100 admitted into evidence.)

7          MR. MEEHAN:  Thank you, Your Honor.

8          THE COURT:  Yeah.

9

01:22:09   10                    REDIRECT EXAMINATION

11     BY MR. MEEHAN:

12     Q    Mr. Schweda, I think earlier you testified that you had --

13     that you recall discussing the Section 371 conspiracy concept

14     with Mr. Herrera Farias on multiple occasions.

01:22:25   15          Is that correct?

16     A    Correct.

17     Q    And you did discuss that with him on the morning that was

18     set for trial prior to Mr. Herrera Farias changing his plea?

19     A    Correct.

01:22:38   20     Q    Do you know the other meetings -- can you identify of the

21     meetings that you have listed which other meetings specifically

22     you discussed that theory at?

23     A    No, but they would have been the ones close -- uh, leading

24     up to trial.

01:22:53   25     Q    Okay.  And you don't specifically recall telling

1    Mr. Herrera Farias that he couldn't get the sentence under 18

2    U.S.C. Section 371 at the trial court level; is that correct?

3    A    Correct.  I didn't believe he could.

4    Q    But you also didn't specifically tell him that the 5 years

01:23:22   5    or less would only be available on appeal, did you?

6    A    No.

7    Q    So it was fair for him to have the belief that there was a

8    possibility that the Court would impose a sentence of 5 years or

9    less when it sentenced him?

01:23:38  10    A    Yes.

11    Q    Looking at Exhibit 3 and Objection 15, it's on Page 9 of

12    the objections to the presentence investigation report, do you

13    see, you actually asked the presentence investigator to change

14    the maximum term of imprisonment listed in the presentence

01:24:14  15    report to not more than 5 years, correct?

16    A    Correct.

17    Q    And earlier I had asked you about authority for the

18    proposition that a defendant charged under 21 U.S.C. 846 could

19    be sentenced under 18 U.S.C. Section 371.

01:24:42  20         Do you recall that?

21    A    Yes.

22    Q    Okay.  And I'm looking at Exhibit 8 and -- excuse me,

23    Objection No. 8, which is referenced in your sentencing -- in

24    the sentencing memorandum, and I just want to be clear:  I don't

01:24:57  25    see any authority in Objection No. 8 that would allow a

1    defendant to be sentenced under 18 U.S.C. Section 371 when they

2    were charged under 21 U.S.C. Section 946.

3         Is that correct?

4    A    I don't think I'm understanding your question.

01:25:17    5    Q    Okay.  Well, when we were looking at Defendant's

6    Exhibit 100 --

7         THE COURT:  When you say "Exhibit 100," then tell us

8    what it is.

9         MR. MEEHAN:  Exhibit 100, the sentencing memorandum.

01:25:32    10        THE COURT:  Okay.  Of the defendant.

11        MR. MEEHAN:  Yes.  Excuse me.

12   BY MR. MEEHAN:   (Continuing)

13   Q    The sentencing memorandum for Edgar Omar Herrera Farias and

14   motion for downward departure and/or variance is Exhibit 100.

01:25:48    15   And where you said that Mr. Herrera Farias should receive a

16   three-level downward adjustment under the U.S. Sentencing

17   Guidelines because this is a conspiracy under 18 U.S.C. Section

18   371, do you see that on Page 2?

19   A    Of the memorandum?

01:26:04    20   Q    Yes.  Lines 3 through 5.

21   A    Correct.

22   Q    Okay.  And I asked you whether you were aware of any

23   authority for the proposition that a defendant who is indicted

24   under 21 U.S.C. Section 846 could be sentenced under the

01:26:25    25   provisions referencing 18 U.S.C. Section 371, and you said that

1    the authority was in the objections to the presentence

2    investigation report, correct?

3    A    Uh, a case citation, yes.

4    Q    Okay.  Well, and then this refers to Objections 1 and 8.

01:26:45    5    And I just want to be clear:  With regard to the proposition

6    that a defendant could be sentenced under 18 U.S.C. Section 371

7    when indicted under 21 U.S.C. 846, I don't see any authority in

8    Objection No. 8 supporting that proposition.

9         Is that correct?

01:27:09    10    A    Well, if -- if memory serves me correctly, 2X1.1 is the

11    conspiracy guideline that provides for a reduction on a

12    noncompleted conspiracy, so that's what that citation was to.

13    Q    Okay.  But the citation does not stand for the proposition

14    that one can be sentenced under the provisions relating to 18

01:27:37    15    U.S.C. Section 371 when they've been indicted under 21 U.S.C.

16    Section 846.

17    A    Well, I guess I don't agree with the -- your proposition

18    that he was indicted under -- only under 21 U.S.C. 846.  The use

19    of the phrase "offense against the United States" is an element

01:28:00    20    of a 371 conspiracy, and that's why -- that's my theory on why

21    he was charged with a 371 conspiracy.

22    Q    Okay.  And you testified, when the Government was

23    questioning you, there is no case law directly on point.

24         Do you recall that?

01:28:22    25    A    Correct.

1    Q    Please explain that for me further.

2    A    That there's no case law on my -- my theory of -- that a

3    371 conspiracy was charged?

4    Q    Correct.

01:28:35   5    A    Um, the closest we have is that *U.S. v. Arlt* case, and I

6    don't think that squarely says it.  It implies it.

7    Q    In fact, looking at -- looking at Objection 1 on Page 2 of

8    Exhibit 3, the defendant, Edgar Omar Herrera Farias', objections

9    to presentence investigation report, and looking at Lines 9

01:29:05   10    through 13, isn't it true that the case that you cited, *United*

11    *States v. Arlt*, actually stands for the proposition that double

12    jeopardy does not prevent a defendant from being indicted with

13    and convicted of both a conspiracy under 21 U.S.C. 846 and, as a

14    separate count, 18 U.S.C. Section 371?

01:29:33   15    A    That's my recollection of the direct holding in that case.

16    Q    Okay.  So at least in terms of the direct holding, it

17    doesn't provide authority that a case that would otherwise --

18    where the -- so *Arlt* does not provide authority for the

19    proposition that in a case where everything points to a

01:29:56   20    conspiracy charged under 21 U.S.C. Section 846, that that can

21    then be construed as a conspiracy under 18 U.S.C. Section 371,

22    correct?

23    A    No.  Um, I beg to differ.  The -- *Arlt* says that 846

24    conspiracy is different; they're -- they're two separate

01:30:23   25    offenses from 371.  And the conspiracy count in this case

1  charged, um -- uh, Mr. Herrera Farias with a -- having committed

2  an offense against the United States, which is an element of a

3  371 conspiracy; therefore, my theory was that that's what the

4  indictment charged --

01:30:47  5  Q    Okay.

6  A    -- a 371 conspiracy to commit an 846 conspiracy.

7  Q    Okay.  But you're not aware of any case law directly on

8  point to support your theory of how this was actually a

9  Section 371 conspiracy.

01:31:12  10  A    Well, *Arlt* stands for the proposition that a 371 conspiracy

11  is separate from an 846 conspiracy.

12  Q    Correct.  So that you -- so that double jeopardy does not

13  prevent the charging of both against a defendant in the same

14  case, correct?

01:31:29  15  A    Correct.

16  Q    Okay.

17       MR. MEEHAN:  I have nothing further.

18       THE COURT:  Did I understand you to say that your

19  research was that there was no case on the subject of this novel

01:31:49  20  theory?

21       THE WITNESS:  Correct, not -- not a direct -- there's no

22  authority one way or the other directly on point.

23       THE COURT:  Okay.

24       MR. MEEHAN:  Thank you, Your Honor.

01:32:05  25       THE COURT:  Ms. Van Marter, anything else?

1                    RECROSS-EXAMINATION

2    BY MS. VAN MARTER:

3    Q    How did you come up with this defense theory regarding --

4         THE COURT:  Are we going back to this "my colleagues and

5    I got together and discussed this"?

6         MS. VAN MARTER:  I haven't asked him this question.  I

7    was going to ask him how he came up with this -- this defense

8    theory.

9         THE COURT:  My recollection is we went over this because

10   he was going to say, well, the defense bar was talking about

11   this theory of 371.

12        MS. VAN MARTER:  I believe that was in response to my

13   direct question as to whether this theory had been discussed

14   amongst the defense bar.

15        THE COURT:  Right.

16        MS. VAN MARTER:  Which was a different question than --

17        THE COURT:  Is this a different question?  Okay.

18        MS. VAN MARTER:  -- than --

19        THE COURT:  Maybe I'm missing the nuance.  Go ahead.

20        MS. VAN MARTER:  And maybe I'm missing -- maybe I'm

21   missing where it's going to end up, but I just ...

22        THE COURT:  Go ahead.

23   BY MS. VAN MARTER:   (Continuing)

24   Q    How did you come up with this defense theory regarding

25   conspiracy?

1    A    By talking to other --

2         MR. MEEHAN:  Objection; hearsay.

3         THE COURT:  Well, he's just not going to tell us what

4    they said, but -- it's, I think, just what I said, that he was

01:33:03  5    talking to other guys over coffee, and they thought maybe this

6    would fly.

7         MS. VAN MARTER:  I have no other questions.

8         THE COURT:  So on that point, I guess then, there's no

9    case that says one way or the other whether this theory is

01:33:16  10    correct.

11         THE WITNESS:  Correct.  It would be a matter of first

12    impression.

13         THE COURT:  Okay.

14         MS. VAN MARTER:  I have no other questions, Your Honor.

01:33:28  15         THE COURT:  May this witness be excused, or is he

16    subject to re-call?  I think probably we ought to have him

17    subject to re-call.

18         Step out, Mr. Schweda.  You never know what's going to

19    happen in a courtroom.

01:33:41  20         THE WITNESS:  Okay.

21         THE COURT:  So you remain in the courthouse, subject to

22    re-call, Mr. Schweda.  Thank you.  I appreciate it.  Yeah.

23    Thank you.

24         MR. MEEHAN:  Your Honor, we would next call Mr. Valadez.

01:33:52  25         THE COURT:  Okay.  Mr. Valadez.

1      (Witness approached.)

2          THE COURT:  Yeah, come forward.  Sorry.  I was busy

3  doing some research.

4

01:34:34  5                      LARRY VALADEZ,

6    called as a witness on behalf of the Defendant, having first

7        sworn or affirmed, testified under oath as follows:

8          THE WITNESS:  I do.

9          THE COURT:  Good afternoon.  Please be seated,

01:34:42 10  Mr. Valadez, and when you're comfortable, tell us your first and

11  last name, and speaking into the microphone, spell them for the

12  record.  Thank you.

13          THE WITNESS:  Larry Valadez; V-A-L-A-D-E-Z.

14          THE COURT:  Good afternoon.

01:34:54 15      You may proceed, Mr. Meehan.

16

17                    DIRECT EXAMINATION

18  BY MR. MEEHAN:

19  Q    Good afternoon, Mr. Valadez.

01:34:59 20  A    Good afternoon.

21  Q    My understanding is that you are an investigator.

22      Is that correct?

23  A    Yes.

24  Q    And you have worked with Mr. Peter Schweda in regard to

01:35:11 25  Edgar Omar Herrera Farias?

1    A    Yes.

2    Q    And how many times did you translate -- or excuse me.

3         You interpret; is that correct?

4    A    That is correct.

01:35:23    5    Q    And are you a certified interpreter?

6    A    I am certified by the State of Washington.

7    Q    Okay.  And how many times did you interpret for -- or

8    between Mr. Schweda and Mr. Herrera Farias?

9    A    I don't have the exact number, but I would estimate four,

01:35:44    10   maybe five.

11   Q    Okay.  And --

12        THE COURT:  Give me a second, Counsel.

13        MR. MEEHAN:   Pardon?

14        THE COURT:  Give me one moment.

01:35:53    15       (Pause in proceedings.)

16        THE COURT:  Okay.  Go ahead.

17   BY MR. MEEHAN:   (Continuing)

18   Q    And, Mr. Valadez, you interpreted for Mr. Schweda regarding

19   his conversations with Mr. Herrera Farias on October 10th of

01:36:44    20   2018; is that correct?

21   A    I don't have that date in front of me, but that's quite

22   possible.

23   Q    You interpreted conversations between Mr. Schweda and

24   Mr. Herrera Farias on the morning Mr. Herrera Farias was

01:36:58    25   scheduled to go to trial?

1    A    Yes, I did.

2    Q    And you did that telephonically?

3    A    Yes.

4    Q    And you received a call from Mr. Schweda?

01:37:05  5    A    Yes.

6    Q    Okay.  And how many times did you interpret for Mr. Schweda

7    and Mr. Herrera Farias that day?

8    A    It was just that one telephone conversation.

9    Q    Okay.  And are you aware, was that one telephone

01:37:25  10   conversation before the court hearing began that day?

11   A    Yes, it was.

12   Q    Okay.  And you don't recall any discussion while you were

13   interpreting --

14        MS. VAN MARTER:  Your Honor, I'm going to object to

01:37:39  15   leading questions at this point.

16        THE COURT:  Leading.

17        MR. MEEHAN:  Okay.

18   BY MR. MEEHAN:  (Continuing)

19   Q    Do you recall any conversation that you interpreted on the

01:37:51  20   morning that Mr. Herrera Farias was set to go to trial regarding

21   different conspiracies?

22   A    I recall the, uh -- the gist of the conversation for which

23   I was interpreting was just to see whether he would be pleading

24   guilty on that date or if he would prefer to go to trial.

01:38:12  25   Q    You don't -- do you recall any discussion that morning of

1    there being different types of conspiracies?

2    A    I honestly do not remember that being discussed.  I

3    don't -- at least I don't recall it, no.

4    Q    Okay.  So there may have been that discussion or may not;

01:38:29  5    you're just not certain of it?

6    A    That's correct.

7    Q    Okay.  And oftentimes when you're interpreting, are there

8    parts of the substance of the conversations that you don't

9    remember?

01:38:42  10    A    By "don't remember," are you saying -- are you saying that

11    perhaps I'm in a different, uh, interpreter mode?  Is that what

12    you're implying?  I'm sorry, sir.

13    Q    Well, I think when we talked earlier, you talked about the

14    fact that sometimes when you're interpreting that you're focused

01:39:02  15    so much on the interpretation that you're not really picking up

16    the substance of the conversation in a way that you're going to

17    have recall for it at a later date.

18    A    That is correct, sir.

19    Q    Okay.  And do you ever recall interpreting a conversation

01:39:17  20    between Mr. Schweda and Mr. Herrera Farias that there were

21    different types of conspiracies for which Mr. Herrera Farias

22    could be sentenced?

23    A    I don't recall that ever being a part of the conversation,

24    sir.

01:39:28  25    Q    Okay.  So if it was discussed when you were present, you

1    don't remember it; is that right?

2    A    That is correct.

3    Q    And, otherwise, it may not have been discussed in your

4    presence?

01:39:39    5    A    That is correct.

6    Q    Okay.

7         MR. MEEHAN:  Thank you, Your Honor.  I have nothing

8    further for the witness at this time.

9         THE COURT:  Thank you.

01:39:49    10        Okay.  Ms. Van Marter.

11

12                   CROSS-EXAMINATION

13    BY MS. VAN MARTER:

14    Q    Good afternoon.

01:39:57    15    A    Good afternoon.

16    Q    I'm going to ask you just some background questions.

17         Prior to your role as an investigator or an interpreter,

18    what was your employment?

19    A    Um, I had different employments right after I retired, but

01:40:12    20    my main employment prior to retirement was as a federal --

21    federal probation officer for this district.

22    Q    And how long were you a federal probation officer?

23    A    From 1984 until 2004.

24    Q    And you -- are you a native Spanish-speaker?

01:40:29    25    A    Yes, I am.

1    Q    So obviously fluent in Spanish.

2    A    Yes.

3    Q    And you said that you're state-certified?

4    A    Yes.

01:40:36  5    Q    And what was the process that you had to go through to

6    obtain state certification?

7    A    The certification was a written test, a multiple choice;

8    also an oral test that was recorded and then graded by people

9    that were issuing the certification.

01:40:52  10   Q    And are you currently -- do you have an active state

11   certification?

12   A    Yes.

13   Q    Do you have to renew that every year?

14   A    No, there is no renewal process, but, uh -- once it's

01:41:03  15   granted, the State does not require further training.

16   Q    Have you ever gone through a federal certification process?

17   A    I did a federal certification process in about 1987 or

18   1988.

19   Q    Were you --

01:41:20  20   A    I did not pass on that one, no.

21   Q    Have you ever tried to retake it since then?

22   A    No, ma'am.

23   Q    Okay.  And how long have you been interpreting in this

24   capacity since your retirement from Probation?

01:41:31  25   A    For probably right at 10 years.

1    Q    And obviously you had indicated that you had worked with

2    Mr. Schweda in the past as an interpreter.

3         Is that correct?

4    A    Um, I don't recall that I've ever worked with Mr. Schweda

01:41:48    5    with any other federal cases or state cases.  Just this one.

6    Q    Just for Mr. Farias?

7    A    Yes.  With Mr. Schweda, yes.

8    Q    Okay.  And you had indicated that you believe that you have

9    met with Mr. Schweda and Mr. Farias four to five times, to the

01:42:03    10    best of your memory.

11    A    Yes.

12    Q    When you submit any bills for services, do you submit that,

13    then, through Mr. Schweda?

14    A    I do.

01:42:11    15    Q    So does he maintain all of the records?

16    A    He does.

17    Q    And do you have any reason to question records that he

18    might have submitted on your behalf?

19    A    Um, no.  The checks have always been in the correct amount.

01:42:22    20    Q    Okay.  Do you remember the first time, approximately, that

21    you met with Mr. Farias and Mr. Schweda?

22    A    I believe it was right near the end of 2017.

23    Q    And did you ever have occasion to review with Mr. Farias a

24    plea agreement?

01:42:43    25    A    Yes, I did.

1    Q    And do you recall when that was?

2    A    I do not, no.

3    Q    Okay.  And did you have a written plea agreement that you

4    reviewed with him?

01:42:51    5    A    Yes, I did.

6    Q    And did you transcribe that or interpret it verbatim?

7    A    I, uh -- parts of the plea agreement were read to him

8    verbatim, uh, translated.  Other parts we skipped, uh, with

9    Mr. Farias' permission, and that was the legalese, primarily on

01:43:13    10    the first page of the plea agreement, so that was not

11    necessarily, uh, translated for him, uh, verbatim.

12    Q    And was that also in consultation with Mr. Schweda in terms

13    of the specific provisions he wanted read?

14    A    Yes.

01:43:27    15    Q    And when you say with Mr. Farias' permission, how did you

16    check with Mr. Farias in terms of what you were going to review

17    with him?

18    A    Uh, Mr. Farias and I discussed in Spanish what the basis

19    was for the plea agreement, uh, what it normally contained, and

01:43:47    20    I asked if he wished me to read all of the first page and

21    translate it for him, or if he wanted me just to skip to the

22    main part of the plea agreement, which he agreed to, and we did.

23    Q    Okay.  During the time that you met with him

24    specifically --

01:44:02    25            THE COURT:  Excuse me, Counsel.

1    You're talking about a plea agreement, right, not an

2    indictment?

3         THE WITNESS:  A plea agreement, sir.

4         THE COURT:  Okay.

01:44:10    5    BY MS. VAN MARTER:  (Continuing)

6    Q    Let me make sure that we understand.  When you say on the

7    first page of the plea agreement and legalese, what are you

8    referring to?

9    A    Uh, normally the plea agreement just lays out the basis for

01:44:20    10    the, uh -- for the plea agreement as the parties involved and --

11    and so forth.  So in order to save time, because we were

12    traveling down to Benton County to conduct this, um, interview,

13    we tried to save as much time as we could to save the government

14    some expense.

01:44:38    15    Q    Okay.  So during this time that you spoke with Mr. Farias

16    and reviewed the plea agreement, did you have any indication

17    that he was having trouble understanding your interpretation?

18    A    No, ma'am.

19    Q    At any point in time in your conversations with Mr. Farias

01:44:54    20    did he indicate to you he did not understand your

21    interpretation?

22    A    Every now and then he indicated that he did not understand

23    legal terms.  Then we would slow down, and I would explain the

24    legal terms to him, and we would proceed.

01:45:09    25    Q    And in your experience in interpretation, is that type of a

1    question normal in terms of a defendant's understanding of a

2    legal term?

3    A    Yes, it is.

4    Q    When you reviewed the plea agreement, you said you did read

01:45:25  5    verbatim several sections of it; is that correct?

6    A    Yes, ma'am.

7    Q    Did that include the penalties, the maximum potential

8    penalties?

9    A    Yes.

01:45:33  10    Q    Did you read those verbatim to Mr. Farias?

11    A    Yes.

12    Q    And do you recall if this case involved a mandatory minimum

13    sentence?

14    A    I really cannot recall the terms of the plea agreement

01:45:47  15    anymore.

16    Q    Okay.  But you recall specifically reviewing with him the

17    penalties?

18    A    Yes, I did.

19    Q    Did you also review with him the factual section that was

01:45:55  20    proposed by the United States?

21    A    Yes, I did.

22    Q    Was that a section that you recall reading verbatim?

23    A    Yes.

24    Q    Did you also review with him the application of the

01:46:05  25    sentencing guidelines that were in the plea agreement?

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                91
*Motion Hearing/September 9, 2019*
*Valadez/X/Van Marter*

1    A    Yes.

2    Q    Do you recall, was there a discussion about his sentencing

3    exposure, while you talked to him with Mr. Schweda?

4    A    There was a discussion between Mr. Schweda and him.  I was

01:46:20  5    there to, uh, translate the plea agreement.

6    Q    Thank you.

7        And do you recall interpreting that discussion in terms of

8    Mr. Schweda advising him of those maximum penalties and his

9    sentencing exposure?

01:46:37  10    A    Yes.

11    Q    Do you recall going over any enhancements that may apply

12    that day?

13    A    I believe there was an enhancement, but I cannot

14    specifically refer to what it actually was.

01:46:49  15    Q    And did Mr. Schweda request to review that, through your

16    interpretation?

17    A    Yes, we reviewed pretty much the plea agreement in its

18    entirety.

19    Q    And do you recall if there was any discussion about

01:47:07  20    Mr. Farias accepting or rejecting the plea agreement?

21    A    There was a discussion between Mr. Schweda and Mr. Farias

22    about, uh -- about what he should do or what he wished to do

23    regarding the plea agreement.

24    Q    And what was that?

01:47:20  25    A    His initial, uh, statement at that point was he would

1    prefer to go to trial.

2    Q    And do you recall if there was any conversation about the

3    amount of years involved?

4    A    I believe Mr. Schweda indicated that, uh, he was looking at

01:47:36    5    a significant sentence -- I don't recall how many years -- and

6    that, uh, it would be hard to argue for a lesser sentence based

7    on other circumstances.  And, uh, Mr. Farias was requesting

8    Mr. Schweda to approach the Court or the U.S. Attorney's Office

9    to see about a lower sentence, asking basically, "Please try to

01:48:01    10    get me a lower sentence."

11    Q    And you recall specifically Mr. Schweda advising Mr. Farias

12    that he had a rather high sentencing exposure?

13    A    Yes.

14    Q    And ultimately, do you recall, was the plea agreement at

01:48:19    15    that time rejected?

16    A    Yes, it was.

17    Q    And during the other meetings that you were present, do you

18    recall if there was further discussion about Mr. Farias entering

19    into a plea agreement or plea resolution?

01:48:41    20    A    Any other conversations, of which there were few, perhaps

21    only two, I'm guessing, the, uh -- Mr. Schweda kept letting him

22    know of what his range could be but also assuring him that

23    there's no guarantee that those -- that any range could be, uh,

24    agreed upon between Mr. Schweda and Mr. Farias because the

01:49:03    25    ultimate decision would have to go to the Court.  And I recall

1  Mr. Schweda specifically stating that, that the Court had final

2  discretion.

3  Q    And do you recall if Mr. Schweda reviewed with him during

4  those times again his high sentencing exposure?

01:49:19  5  A    I believe he did, yes.

6  Q    And during the times that you interpreted for Mr. Schweda,

7  do you recall if he would often discuss with him the

8  possibilities of what sentences he could have?

9  A    Yes, he did.

01:49:35  10  Q    And during that time did he ever make any guarantees to

11  Mr. Farias about what would happen?

12  A    No, Mr. Schweda never made -- never made any guarantees.

13  Q    Do you recall during this time if Mr. Schweda discussed

14  with him multiple -- without getting into specifics, multiple

01:49:52  15  defense theories and sentencing theories?

16  A    I honestly cannot recall any specific defense theories, no.

17  Q    But you do recall Mr. Schweda discussing with him both the

18  pros and cons as to sentencing?

19  A    Yes, he did that.

01:50:10  20  Q    And specifics about the risks of going to trial?

21  A    Yes.

22  Q    And what did Mr. Schweda explain to Mr. Farias about his

23  risks of going to trial?

24  A    Mr. Schweda stated that, uh, many of the co-defendants had

01:50:25  25  already pled guilty, and that there would be a good chance that

1    those co-defendants would -- would testify against him, which

2    would -- which would look unfavorable to him as a defendant.

3    Q    And at any point in time do you recall there ever being a

4    statement to Mr. Farias that he would receive a sentence lower

01:50:51  5    than 5 years?

6    A    No, there was -- that I recall, there was never any promise

7    of that, no.

8    Q    And you indicated that you provided interpretation via the

9    telephone on the day he entered his plea of guilty.

01:51:08  10   A    I did.

11   Q    And please tell the Court approximately how long you were

12   assisting Mr. Schweda that morning, if you recall.

13   A    I did make a note that the telephone conversation between

14   Mr. Schweda and Mr. Farias and myself was .6 hours.

01:51:24  15   Q    And what, if anything, do you recall specific to the topic

16   of changing his guilty plea?

17   A    The, uh -- the main, uh, focus on -- from Mr. Schweda was

18   he needed to know right then and there if he wished to plead

19   guilty or if he wished to proceed to trial.  And, uh, because as

01:51:46  20   I understand it, the -- the trial was set to begin.  And it was

21   a conversation that went back and forth between Mr. Schweda and

22   Mr. Farias, Mr. Farias stating, "No, if I can't get a guarantee

23   of a low sentence, I want to go to trial."  And this kind of

24   went back and forth, because Mr. Schweda said that he could not

01:52:10  25   guarantee a low sentence.  And it wasn't until the very -- the

1    last minute of that conversation that Mr. -- uh, when they --

2    excuse me.  It was during the last minute of that conversation

3    when the marshals came and said, "We have to take Mr. Farias to

4    court," and at that point he said, "Okay, I will plead guilty."

01:52:29    5    Q    Did Mr. Schweda indicate if he was prepared to proceed to

6    trial?

7    A    He told him that it was his choice, and that if he wished,

8    he would proceed to trial.

9    Q    And you said that the back and forth was that Mr. Farias

01:52:46    10    wanted a guarantee of a lower sentence --

11    A    Yes.

12    Q    -- is that correct?

13    A    Yes.

14    Q    And what was Mr. Schweda's response?

01:52:52    15    A    That he could not guarantee a lower sentence.

16    Q    Do you recall if he discussed with him again his high

17    sentencing exposure even if he pled guilty that morning?

18    A    I believe it did, yes.  I can't say for sure, but I'm

19    pretty sure that it did.  I would have to say "yes."

01:53:11    20    Q    And do you recall if Mr. Schweda explained that risk, given

21    that he was pleading without a plea agreement?

22    A    Yes, that was mentioned.

23    Q    And do you recall if Mr. Farias kept questioning

24    Mr. Schweda as to why he couldn't get him lower time?

01:53:39    25    A    Yes, that was repeated or asked by him on several occasions

1  during that conversation.

2  Q    And did Mr. Schweda explain to him?

3  A    Yes, he did.

4  Q    And do you recall the specifics of that explanation as to

01:53:51  5  why he couldn't get him lower time?

6  A    Mr. Schweda kept telling Mr. Farias that he had no control

7  over what the Court finally did, and if he pled guilty or if he

8  went to trial, that at this point of the -- at this stage of

9  the -- of the proceedings, that everything rested with the

01:54:12  10  judge.

11  Q    And do you know if he again went over his minimum or

12  maximum penalties during that conversation?

13  A    I believe he did.

14  Q    And at the end, it was Mr. Farias who indicated that he --

01:54:25  15  no, he now wished to plead guilty?

16  A    Yes, he did at the very end of that conversation.

17  Q    And did you have any other continued interpretation after

18  that point in time?

19  A    Um, I do recall that I did come to the court here for the,

01:54:38  20  uh -- on the date of sentencing.  Although I did not have any --

21  I did not appear in court as a witness, I did, uh, interpret for

22  Mr. Schweda, uh, when he spoke with Mr. Farias in the, uh,

23  marshal's holding cell, and I forgot to mention that this

24  morning when we spoke.

01:54:57  25  Q    And during that last conversation, do you recall if

1    Mr. Schweda ever made Mr. Farias any promises as to sentencing

2    then?

3    A    No, ma'am.  Mr. Schweda never made any promises to

4    Mr. Farias.

01:55:10    5    Q    Did Mr. Schweda again explain to him what all of his

6    potential sentencing exposure was?

7    A    Yes.

8         MS. VAN MARTER:  Your Honor, I don't have any other

9    questions.  Thank you.

01:55:21    10         THE COURT:  Redirect?

11

12                    REDIRECT EXAMINATION

13    BY MR. MEEHAN:

14    Q    Mr. Valadez, the Government just asked you a question, in

01:55:35    15    the course of its questions, of whether you had ever heard

16    Mr. Schweda discuss the possibility of a sentence of 5 years or

17    less.

18         Do you recall that question?

19    A    I do.

01:55:47    20    Q    Okay.  And you answered that there was no promise of a

21    sentence less than 5 years.

22         Is that --

23    A    That is correct.

24    Q    Okay.  Was there ever discussion of a sentence of 5 years

01:56:02    25    or less -- without regard to the fact of whether a promise was

1  made, do you recall there being discussion of a sentence of 5

2  years or less?

3  A    There was a discussion on more than one occasion, yes, but

4  it was a discussion and not a promise, yes, sir.

01:56:15  5  Q    Okay.  So just so we're absolutely clear, Mr. Schweda

6  discussed with Mr. Herrera Farias that there were possible

7  avenues for a sentence of 5 years or less?

8  A    No, there was, uh -- he never said there were avenues for

9  that, but it was discussed.

01:56:35  10       MR. MEEHAN:  Okay.  Thank you very much.

11       Nothing further, Your Honor.

12       MS. VAN MARTER:  I have nothing further, Your Honor.

13

14                   QUESTIONS BY THE COURT

01:56:40  15       THE COURT:  Well, tell me what you mean, "there were

16  avenues."  What does that mean?

17       THE WITNESS:  Mr. Schweda and Mr. Farias discussed the

18  option -- or the possibility of a 5-year sentence, but that was

19  at Mr. -- a subject that was brought up by Mr. Farias;

01:56:57  20  therefore, they discussed it, but Mr. Schweda never did make any

21  promises to say yes, that's a possibility.  But there was a

22  discussion of the 5-year.

23       THE COURT:  And it came up from the defendant?

24       THE WITNESS:  Yes.

01:57:10  25       THE COURT:  And so the defendant was -- give me a sense

1    of what happened.  Just tell me what happened.

2         THE WITNESS:  Okay.  So the -- these conversations took

3    place in the interview room at the Benton County Jail and, uh,

4    at a table.  And during this open conversation between

01:57:25   5    Mr. Farias and Mr. Schweda, uh, on more than one occasion,

6    Mr. Farias would say, "Well, I want to have a sentence of 5

7    years or less."

8         And Mr. Schweda would say, "Well, that's really not a

9    possibility, based on what the Government says that you did."

01:57:43  10   And so the discussion was there, but there was never any, um --

11   never any guarantee by Mr. Schweda that the 5-year sentence

12   would be an appropriate sentence by the Government.

13        THE COURT:  Okay.  So the morning of trial, you're on

14   the phone in Spokane somewhere.

01:58:01  15        THE WITNESS:  Yes, sir.

16        THE COURT:  And what did you understand your job to be

17   that day?

18        THE WITNESS:  I was the interpreter that day, Your

19   Honor.

01:58:08  20        THE COURT:  Okay.  So an interpreter is different from a

21   translator; isn't that true?

22        THE WITNESS:  A translator take documents and translates

23   them word for word.

24        THE COURT:  And what does an interpreter do?

01:58:19  25        THE WITNESS:  An interpreter takes a statement that is

1    given orally and -- and interprets it to the defendant or

2    another person, and it may not be exactly word for word, but

3    the -- but the feeling of the sentence is there.

4              THE COURT:  Okay.  So that's what you were doing.

5              THE WITNESS:  Yes, ma'am -- yes, sir.

6              THE COURT:  So on the morning of trial when you get the

7    call -- did Mr. Schweda call you and say, "Hey, I need your

8    help," or was this something you'd already planned to do?

9              THE WITNESS:  Mr. Schweda had called me, and I don't

10   recall the date of the -- of what that date -- the day of the

11   week that that conversation took place, but he had called me a

12   few days prior to that and said, "I am going down to, uh, the

13   Tri-Cities to, uh -- to have Mr. Farias either enter a guilty

14   plea or go to trial.  Will you be available to interpret if I

15   can arrange to get him on the line, on a cell phone so that you

16   can interpret?"

17             And I said, yes, I'd be available.

18             THE COURT:  Okay.  What was the -- what was the -- when

19   you think back to it, can you actually remember the call?

20             THE WITNESS:  Yes.

21             THE COURT:  You can?

22             THE WITNESS:  I can.

23             THE COURT:  So tell me, what was -- what was the

24   defendant's problem?  What was -- what was your sense of what

25   was going on here?

1          THE WITNESS:  The defendant's problem, in my opinion,

2     was --

3          THE COURT:  Based on what you heard.

4          THE WITNESS:  -- from what I heard, was that he wanted

01:59:32   5     to be guaranteed a lighter sentence than -- than what the --

6     what the guidelines would suggest or the guidelines or the

7     Court -- or the U.S. Attorney would suggest that he receive.  He

8     wanted a lesser sentence, and something in the range of 5 years

9     or so.

01:59:52  10          THE COURT:  So he was asking for 5 years.

11          THE WITNESS:  Yes.

12          THE COURT:  And your memory is that Mr. Schweda's

13     position was what?

14          THE WITNESS:  Mr. Schweda's position was that he could

02:00:04  15     not guarantee a lower sentence.  And I believe there was also a

16     figure of 7 years thrown out between the two of them on

17     occasion, but, uh, Mr. Farias was really pushing for a 5-year

18     sentence.  And it wasn't until over a half hour into the

19     conversation that, uh, he finally agreed to plead guilty.

02:00:25  20          THE COURT:  Why?  I mean, you were part of the

21     conversation.

22          THE WITNESS:  I'm part of the conversation, but, uh, I

23     couldn't say that, Your Honor, because, you know, I couldn't --

24     a lot of times you'll go on facial, uh, expressions and such,

02:00:37  25     which wasn't available to me.  But all of a sudden, when the

1    marshals came to remove him from the holding cell and to bring

2    him to court, at that point he quickly said, "Okay, I'll plead

3    guilty."

4         THE COURT:  Is counsel aware of other contacts that

02:01:06  5    Mr. Valadez had with the defendant's family?

6         MS. VAN MARTER:  No.

7         MR. MEEHAN:  Not entirely, Your Honor.

8         THE COURT:  Well, you did have contacts with the

9    defendant's family?

02:01:18  10        THE WITNESS:  I did, Your Honor.

11        THE COURT:  Okay.  So -- and what was your job with

12   regard to the defendant's family?

13        THE WITNESS:  I was working as an investigator and an

14   interpreter on this case, Your Honor.  And, uh, in contacting

02:01:30  15   his family, I was going at Mr. Schweda's request to interview

16   them by telephone and in an attempt to contact his aunt in

17   person.  I can't -- I think it's his aunt, Maria Farias.

18        THE COURT:  How about Berta Alvarez?

19        THE WITNESS:  Yes, Berta Alvarez.  I did not meet her in

02:01:52  20   person.  I talked to her by phone, and I did not meet her in

21   person until the day of sentencing out in the hallway.

22        THE COURT:  Okay.  Are counsel aware that prior to the

23   sentencing this witness talked to the family of the defendant

24   about the sentencing?

02:02:22  25        MS. VAN MARTER:  (Shook head.)

1          MR. MEEHAN:  No, Your Honor --

2          MS. VAN MARTER:  No, Your Honor.

3          MR. MEEHAN:  -- I was not specifically aware of that.

4          THE COURT:  You did, didn't you?  Or did you?

02:02:31   5          THE WITNESS:  I, uh -- if I did, Your Honor, it would

6  have been to Berta Alvarez, his aunt, who lives in Wapato, um,

7  on the day of sentencing out in the hallway.

8          THE COURT:  Let me put it this way --

9          Have a seat.

02:02:49   10         -- on the day of sentencing, did you expect the

11  sentencing to go ahead?

12         THE WITNESS:  I did.

13         THE COURT:  Okay.  All right.  Now I may have one other

14  question; let me check.

02:03:24   15         No.  Thank you, Mr. Valadez.

16         Any follow-up questions?

17         MS. VAN MARTER:  Yes.

18         THE COURT:  Go ahead.

19

02:03:34   20                 FURTHER RECROSS-EXAMINATION

21  BY MS. VAN MARTER:

22  Q    Had -- first, as a matter of record, had you talked to or

23  interviewed any family members prior to Mr. Farias' entry of a

24  guilty plea?

02:03:45   25  A    Yes, I talked to --

1          MR. MEEHAN:  Objection, Your Honor.  I'm going to object

2     that this gets into potentially attorney-client privileged

3     communication.

4          THE COURT:  I'll let her say that he talked to him, the

02:03:59    5     answer is he talked to them, but that's all.

6          MR. MEEHAN:  Okay.

7          MS. VAN MARTER:  And the only follow-up question I --

8     because now I have a concern, just in terms of the record --

9     BY MS. VAN MARTER:  (Continuing)

02:04:09   10   Q    Did any conversations with the family members prior to

11    entry of plea, did that have anything to do with your

12    discussions with him the morning he decided to plead guilty?

13   A    No, it did not.

14   Q    Okay.  And you had indicated that you had come to

02:04:25   15    sentencing potentially for the purpose of testifying; is that

16    correct?

17   A    Yes.

18   Q    Was that specific to a sentencing issue?

19   A    No, it was in -- in, uh -- in essence because of my role as

02:04:38   20    an investigator for Mr. Schweda.

21   Q    Okay.  As to sentencing issues or as to another issue?

22   A    As I understood it -- Mr. Schweda didn't tell me exactly

23    what I would be testifying about, but as I understood it, it was

24    more to what I had done in my investigation, if I -- if I had

02:04:56   25    been called.

1    Q    Okay.

2         THE COURT:  That had to do with the records from Mexico?

3         THE WITNESS:  Yes, sir.

4         MS. VAN MARTER:  Okay.  That was what was my --

02:05:04    5    BY MS. VAN MARTER:  (Continuing)

6    Q    Okay.  But nothing to do with your interpretation or

7    anything relevant to the change of plea?

8    A    As far as I know, no.

9    Q    Okay.  And when -- during your time interpreting with

02:05:16    10   Mr. Farias, as the Court inquired, on more than one occasion was

11   Mr. Farias focused on trying to get a sentence below 10 years?

12   A    Yes, he was.

13   Q    So in terms of his questioning to Mr. Schweda, was that

14   from Mr. Farias to Mr. Schweda asking how he could get him to

02:05:36    15   those numbers?

16   A    Yes, it was.

17   Q    And did Mr. Schweda try and address with him all

18   possibilities in those conversations, given what his client was

19   asking for?

02:05:46    20   A    There were many possibilities discussed.  I can't say all,

21   but there were many.

22   Q    But is it your memory that Mr. Schweda also was very clear

23   with him as to the high potential sentence he would likely face?

24   A    Yes, that was -- that was part of it, yes.

02:06:00    25        MS. VAN MARTER:  Thank you.  I have no other questions,

1    Your Honor.

2           THE COURT:  Excuse me.  What were the possibilities?

3           THE WITNESS:  The possibilities of, Your Honor?

4           THE COURT:  You said you were discussing possibilities

02:06:14  5    for a lower sentence.

6           THE WITNESS:  Oh.  The possibilities of the overall

7    sentence of what he might get.  But Mr. Schweda always

8    maintained the position that he could not give him any

9    guarantees, that the Court would make the decision.

02:06:24  10          THE COURT:  You keep saying "no guarantees," but did

11   they discuss possible sentences that were less?  And if so, what

12   were those discussions?

13          THE WITNESS:  The focus of the -- of Mr. Farias'

14   questioning was, "How can I get a sentence of 5 years?" and then

02:06:39  15   later on 7 years.  Mr. Schweda kept saying, "There's no

16   guarantee that you can get these sentences."

17          THE COURT:  Well, that's not answering my question.  You

18   keep saying he didn't guarantee him something, but that's not

19   what the witness said -- I mean what the defendant said.  What

02:06:53  20   you attributed to the defendant was, "How can I get less than 7

21   years or less or 5 years or less?"

22          So what did Mr. Schweda answer to that question?

23          THE WITNESS:  Mr. Schweda answered, "You can't -- I

24   can't guarantee it" --

02:07:09  25          THE COURT:  Guarantee what?

1    THE WITNESS:  I'm just interpreting or telling you what

2    I said as an interpreter and that was it; that he could not

3    guarantee it.

4    THE COURT:  Guarantee what?

02:07:17    5    THE WITNESS:  He could not guarantee a sentence of 5 or

6    7 years.

7    THE COURT:  Do you hear the question?  When the

8    defendant says, "How can I," he's asking for a way forward.

9    Did Mr. Schweda give him a way forward?

02:07:31    10    THE WITNESS:  He did not.

11    THE COURT:  Go ahead.

12

13                FURTHER REDIRECT EXAMINATION

14    BY MR. MEEHAN:

02:07:35    15    Q    Mr. Valadez, are you aware of what Mr. Herrera Farias was

16    indicted with in the second superseding indictment?

17    A    The second superseding indictment, I do believe I have a

18    copy of that in my notes, but I don't recall offhand what that

19    second superseding indictment involved.

02:08:01    20    Q    You don't -- you don't recall that it indicted him pursuant

21    to 21 U.S.C. Section 846?

22    A    I believe you are correct.

23    Q    Okay.  And did you hear Mr. Schweda discuss the sentencing

24    ranges under 21 U.S.C. 846 with Mr. Herrera Farias?

02:08:23    25    A    Yes, that was, uh, one of our initial interviews.  Yes.

1    Q    And were you party to conversations in which Mr. Schweda

2    indicated -- to one or more conversations in which Mr. Schweda

3    indicated to Mr. Herrera Farias that he had, in fact, been

4    charged with a conspiracy under 18 U.S.C. Section 371?

02:08:47  5    A    Which is?  371, I'm not familiar with that.

6    Q    Oh, okay.  I'm just asking, did you ever hear Mr. Schweda

7    reference Mr. Herrera Farias being indicted under 18 U.S.C.

8    Section 371?

9    A    If that was the, uh -- if that was the number in the

02:09:07  10    superseding indictment, I'm sure he did, because I was

11    interpreting for him.

12    Q    I will represent --

13         MR. MEEHAN:  Your Honor, may we admit or may we have

14    marked and move for admission the second superseding indictment?

02:09:19  15         THE COURT:  This is the subject of the kind of thing

16    where lawyers would agree, won't they?

17         MS. VAN MARTER:  I have no objection, Your Honor.

18         THE COURT:  Okay.

19         MR. MEEHAN:  Your Honor, I --

02:09:28  20         THE COURT:  Won't you agree that there was no reference,

21    explicit reference to Section --

22         MR. MEEHAN:  18 U.S.C. 371?

23         MS. VAN MARTER:  We would agree.

24         THE COURT:  In the indictment?

02:09:38  25         MS. VAN MARTER:  We would agree.

1    THE COURT:  Okay.  Do you understand?  The second

2  superseding indictment did not have --

3    THE WITNESS:  Okay.

4    THE COURT:  -- a reference to 18, United States Code,

02:09:46   5  Section 371.

6    THE WITNESS:  Okay.

7    THE COURT:  All right.

8  BY MR. MEEHAN:   (Continuing)

9  Q    So my question for you is, it's been agreed that the second

02:09:53   10  superseding indictment made no reference to 18 U.S.C. Section

11  371.

12    Did you interpret conversations between Mr. Schweda and

13  Mr. Herrera Farias where Mr. Schweda indicated that, in fact,

14  Mr. Herrera Farias had been indicted under 18 U.S.C. Section

02:10:11   15  371?

16  A    I don't recall if I did or did not.

17  Q    Do you recall conversations where Mr. Schweda discussed

18  with Mr. Herrera Farias that if the Court construed the

19  indictment to be under 18 U.S.C. Section 371, that he would

02:10:30   20  serve a sentence not more than 5 years?

21  A    I don't recall that, no.

22  Q    Okay.  So if those conversations occurred, either you don't

23  recall them or they occurred outside of your presence?

24  A    They may have.

02:10:48   25    MR. MEEHAN:  Okay.  Nothing further, Your Honor.

1          MS. VAN MARTER:  I have no other questions, Your Honor.

2          THE COURT:  Okay.  So you're subject to re-call.  You

3     remain in the courthouse, and you're not to discuss your

4     testimony.

02:10:59  5          Go ahead.

6          You may step down.  Thank you, Mr. Valadez.

7          What's next?

8          MR. MEEHAN:  Your Honor, I would call Edgar Omar Herrera

9     Farias.

02:11:09 10          THE COURT:  Okay.  Come forward, please.

11          (Witness approached.)

12

13                    EDGAR OMAR HERRERA FARIAS,

14      called as a witness on behalf of the Defendant, having first

02:11:11 15         sworn or affirmed, testified under oath as follows:

16          THE WITNESS (through the interpreter):  Yes.

17          THE COURT:  Please be seated.

18          And you may proceed.

19

20          (**ALL ANSWERS ARE THROUGH THE INTERPRETER UNLESS OTHERWISE

21     INDICATED**)

22

23                         DIRECT EXAMINATION

24     BY MR. MEEHAN:

02:11:43 25     Q    Mr. Herrera Farias, are you here today asking the Court to

1    allow you to withdraw your guilty plea?

2    A    Yes.

3    Q    Okay.  And I'd like to -- first of all, Mr. Schweda was

4    your attorney for -- in excess of a year.

02:12:07   5         Is that correct?

6    A    Yes.

7    Q    And he came to meet with you many times; is that correct?

8    A    Yes.

9    Q    Prior to Mr. Schweda, Mr. Swanberg had been your attorney.

02:12:22  10        Is that correct?

11   A    Yes.

12   Q    Okay.  And before the morning that was set for trial in

13   this matter, you -- am I correct that you had been advised of

14   the potential --

02:12:37  15        MS. VAN MARTER:  Objection; leading.

16        THE COURT:  Leading.  Rephrase.

17   BY MR. MEEHAN:  (Continuing)

18   Q    Okay.  Had you been advised of the fact that there was a

19   mandatory minimum sentence -- excuse me, let me ask the whole

02:12:51  20   question again.

21        Prior to the morning set for trial, had you been advised

22   that the conspiracy you had been alleged to participate in had a

23   mandatory minimum sentence of 10 years?

24   A    Yes.

02:13:08  25   Q    Had you been advised regarding the maximum potential

1    sentence under the conspiracy that you had been alleged to

2    participate in?

3    A    Uh, could you please repeat the question?

4    Q    Prior to the morning that was set for trial, October 10th,

02:13:37    5    2018, had you been advised of the maximum penalty that you could

6    face for the allegations against you in the second superseding

7    indictment?

8    A    Yes.

9    Q    On the morning set for trial, did you meet with

02:14:02    10    Mr. Schweda?

11    A    Yes.

12    Q    And did you meet with Mr. Schweda only once or did you meet

13    with Mr. Schweda multiple times before entering a guilty plea?

14          THE COURT:  Excuse me, Counsel.  Are you restricting it

02:14:18    15    to day of trial, or not?

16          MR. MEEHAN:  I am restricting it to the day that was set

17    for trial, yes.

18          THE COURT:  Okay.

19    A    Just once before the trial started.

02:14:30    20    BY MR. MEEHAN:  (Continuing)

21    Q    Okay.  Did you then, after the court hearing had started,

22    take a break and talk to Mr. Schweda again?

23    A    Yes.

24    Q    So before entering your plea of guilty, you had -- had had

02:14:50    25    two opportunities that morning to talk to Mr. Schweda?

1    A    Yes.

2    Q    And the first one of those times Mr. Valadez was the

3    interpreter?

4    A    Yes.

02:15:07    5    Q    And the second time was Mr. Valadez the interpreter?

6    A    No.

7    Q    Okay.  Now, you've heard us talk about different

8    conspiracies under 18 U.S.C. Section 371 and 21 U.S.C. Section

9    846 today; is that right?

02:15:34    10    A    Yes, today.

11    Q    Did Mr. Schweda ever talk to you about the different types

12    of conspiracy under 18 U.S.C. 371 and 21 U.S.C. 846?

13    A    Not -- not in those terms.

14    Q    Did Mr. Schweda talk to you about the fact that there were

02:16:03    15    different types of conspiracies?

16    A    Yes.

17    Q    Okay.  And depending on the type of conspiracy, was there a

18    difference in regard to the likely sentence that you would

19    receive?

02:16:18    20    A    Yes.

21    Q    Okay.  And when was the first time Mr. Schweda discussed

22    with you the idea that there were different types of

23    conspiracies for which you might be sentenced?

24    A    The day of the trial, when the trial was starting.

02:16:41    25         MR. MEEHAN:  Your Honor, may I get my water?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1          THE COURT:  Yes.

2          And, Mr. Farias, there is water there, if you need

3     water.

4          THE WITNESS (through the interpreter):  Thank you.

02:16:52    5     BY MR. MEEHAN:   (Continuing)

6     Q    And how -- tell me about how the conversation with

7     Mr. Schweda went the morning it was set for trial.

8     A    He talked to me about the different types of conspiracies,

9     uh --

02:17:27    10    Q    How did he describe one type of conspiracy?

11    A    One of them was one against the U.S. Government where the

12    mandatory minimum was 10 years.

13    Q    And what was the other type of conspiracy discussed?

14    A    The one about drugs that had, uh, a maximum minimum -- no,

02:18:07    15    the minimum mandatory was 5 years or less.

16    Q    Okay.  So under the conspiracy that he talked -- that

17    you've identified -- talked about that you've identified being

18    about drugs, he said that the sentence would be 5 years or less?

19    A    That's right.

02:18:26    20    Q    Okay.  And what did he tell you about what you were

21    pleading -- would be pleading guilty to if, in fact, you decided

22    to plead guilty?

23    A    I -- I pled to a possession charge.

24    Q    Okay.  So -- so that was your understanding, is that you

02:18:57    25    were pleading guilty to possession?

1    A    Yes.  In fact, I mean, every time that I spoke with him,

2    these interviews, everything was based on that.

3    Q    And did Mr. Schweda talk to you about the fact that you had

4    been charged with a conspiracy -- with the conspiracy that had a

5    10-year mandatory minimum?

6    A    Yes.

7         THE COURT:  Excuse me.  Counsel, I think it would be

8    helpful for the record and for what we're doing to -- to be more

9    specific about what the conspiracy was so that we're not

10   confusing terms between 371 and 846.  So rather than have the

11   record confusing about what is truly meant by "conspiracy," make

12   a distinction between the two in your own way so that we have a

13   definitive record on that, would you?

14        MR. MEEHAN:  Yes, Your Honor.

15   BY MR. MEEHAN:   (Continuing)

16   Q    So to be clear, I will refer to the one type of conspiracy

17   that has a 10-year mandatory minimum as an 846 conspiracy, and

18   I'll refer to the conspiracy that has a penalty of 5 years or

19   less as a 371 conspiracy.

20        Okay?

21   A    I think so.

22        THE COURT:  Counsel, you really need to help him

23   understand what an 846 conspiracy is.  It was a conspiracy to

24   what?

25

1    BY MR. MEEHAN:   (Continuing)

2    Q    What do you understand -- do you understand that the second

3    superseding indictment indicted you with a conspiracy to

4    distribute drugs under 21 U.S.C. Section 846?

02:21:01   5    A    Yes, I understand that I've been charged of that.

6    Q    Okay.  And do you understand that that conspiracy under 21

7    U.S.C. Section 846 has a mandatory minimum penalty of 10 years?

8    A    Yes.

9    Q    And Mr. Schweda had discussed that with you, correct?

02:21:32   10    A    Yes.

11    Q    Mr. Schweda also discussed this other conspiracy that had a

12    lesser penalty under 18 U.S.C. Section 371; is that correct?

13    A    Yes.

14    Q    And do you understand why Mr. -- excuse me.

02:21:54   15         What is your understanding of why Mr. Schweda was talking

16    to you about these different types of conspiracies, one of them

17    under 18 U.S.C. Section 371, the other under 21 U.S.C.

18    Section 846?

19    A    Because if I pled guilty, supposedly he had these legal

02:22:35   20    documents that he could use so I could get 5 years, if I were to

21    plead guilty the day of the trial.

22    Q    Okay.  What -- what do you recall Mr. Schweda telling you

23    would happen if you didn't plead guilty on the day of trial?

24    A    Well, I would have to go to trial.

02:23:01   25    Q    Okay.  And what -- what range of sentences did he say you

1    could expect if you were found guilty at trial?

2    A    If I lost, it would be 40, 41 to life.

3    Q    Did Mr. Schweda explain to you how he was going to -- or

4    anything more about the paperwork he was going to file with the

02:23:41   5    Court to get you sentenced under the 18 U.S.C. Section 371

6    conspiracy that only had a penalty of 5 years or less?

7    A    Well, he only said to me that there were two types of

8    conspiracies, and they had different codes of law, and that I

9    should be in the one that has a maximum of 5 years.

02:24:25   10   Q    Did he tell you that it was guaranteed that you would be

11   sentenced under the conspiracy 18 U.S.C. Section 371 that only

12   has a penalty of 5 years or less?

13   A    Well, he made me understand that that was the case because

14   there were laws that were based on that.

02:24:59   15   Q    So did he tell you that the Court should sentence you under

16   the 18 U.S.C. Section 371 conspiracy that only had a penalty of

17   5 years or less?

18   A    At that moment, yes.

19   Q    Okay.  When you made the decision to plead guilty, was that

02:25:28   20   influenced by Mr. Schweda's statements to you that you --

21          MS. VAN MARTER:  Objection; leading.

22          THE COURT:  Overruled.

23          Go ahead.

24   BY MR. MEEHAN:  (Continuing)

02:25:39   25   Q    -- that you were eligible for sentencing under 18 U.S.C.

1    Section 371?

2    A    Yes.

3    Q    Okay.  On the morning of trial, at any time before you

4    actually entered your plea of guilty, did Mr. Schweda tell you

02:26:00  5    that the only way that you would be sentenced to 5 years or less

6    under 18 U.S.C. Section 371 was on appeal?

7    A    No.

8    Q    Did he ever tell you that the Court was almost certain to

9    sentence you under 21 U.S.C. Section 846 that had a 10-year

02:26:30  10    mandatory minimum?

11    A    Could you repeat the question, please?

12    Q    Did Mr. Schweda ever tell you that it was a virtual

13    certainty that the Court would sentence you under the 21 U.S.C.

14    Section 846 conspiracy to distribute drugs that had a 10-year

02:26:53  15    mandatory minimum?

16    A    I didn't understand the last part.  I'm sorry.

17        THE COURT:  You're going to have to rephrase that

18    question so he understands it.  So ...

19    BY MR. MEEHAN:  (Continuing)

02:27:19  20    Q    Did Mr. Schweda tell you that the idea that you could be

21    sentenced to 5 years or less under 18 U.S.C. Section 371 was an

22    exceptionally novel and untested idea?

23    A    No.  Not at that moment.

24    Q    Did -- prior to your pleading guilty, did Mr. Schweda tell

02:27:54  25    you that there was virtually no chance that you would get a

1    sentence less than the 10 years required by 21 U.S.C. Section

2    846?

3    A    Could you repeat the question again, please?

4    Q    At any -- on the morning of trial and before you pleaded

02:28:21  5    guilty, did Mr. Schweda tell you that it was a virtual certainty

6    that you would receive a sentence of 10 years or more, as

7    required by the conspiracy under 21 U.S.C. Section 846?

8    A    If I lost the trial, yes.

9    Q    If you lost at trial, yes.

02:28:48  10    What about in the event that you pleaded guilty?

11    A    That based on the documents that he had, I could get 5

12    years or less.

13    Q    Okay.  When you went into the plea hearing and were -- were

14    in the discussions with the Court about entering a guilty plea,

02:29:25  15    did you believe that the Court could sentence you to 5 years or

16    less, based on your guilty plea?

17    A    Yes.

18    Q    At some point did you find out from Mr. Schweda that you

19    were very unlikely to get sentenced to 5 years or less under 18

02:30:00  20    U.S.C. Section 371?

21    A    Yes.

22    Q    When did he inform you of that?

23    A    After the PSR.

24    Q    Okay.  So was it in your conversation with him where you

02:30:21  25    were discussing the findings of the presentence investigation

1    report?

2    A    After we had the PSR interview, I had another visit from

3    Mr. Schweda, and that's when he told me.

4    Q    But that was after you had pleaded guilty?

02:31:02    5    A    That's right.

6    Q    Prior to the morning set for trial, had you had any

7    discussion with Mr. Schweda about the possibility of being

8    sentenced under 18 U.S.C. Section 371 to 5 years or less?

9    A    Before that morning of the trial, no.

02:31:30   10    Q    Okay.  Had you asked Mr. Schweda if there was a possibility

11    of a 5-year sentence prior to that?

12    A    No.

13    Q    Had you discussed sentences with Mr. Schweda of less than

14    10 years?

02:31:55   15    A    I never suggested that to him.

16    Q    Did Mr. Schweda, in fact, suggest a 7-year sentence to you?

17    A    Um, he told me that he had requested like a deal to the

18    prosecutor, something like that.

19    Q    Okay.  Was it your understanding that it would be possible

02:32:31   20    for you to get -- excuse me.

21         Prior to the morning of trial, was it your understanding

22    that it would be possible for you to get a sentence of less than

23    10 years?

24    A    If I pled guilty, no.

02:32:52   25    Q    Okay.  So the information that you were given on the

1    morning of trial about the conspiracy under 18 U.S.C. Section

2    371 that would result in a 5-year sentence or less was new to

3    you that morning?

4    A    That's right.

02:33:12    5    Q    Were you relying on Mr. Schweda, in his capacity as your

6    attorney, as you made decisions about whether to plead guilty?

7    A    Could you repeat the question?

8    Q    Did you rely on Mr. Schweda's advice from your

9    conversations on the morning that was set for trial in making

02:33:36    10    your decision to plead guilty?

11    A    Yes.

12    Q    If you had known that there was no way that you would

13    receive a sentence of less than 10 years, that that was

14    impossible, would you have pleaded guilty?

02:33:58    15    A    No.

16    Q    Did Mr. Schweda tell you that you would be guaranteed a

17    sentence of 5 years or less?

18          MS. VAN MARTER:  Your Honor, all of these questions are

19    leading.  I don't know -- I mean, he hasn't asked one open-ended

02:34:17    20    question of the defendant.

21          THE COURT:  I'll permit the question.

22    A    No.

23    BY MR. MEEHAN:  (Continuing)

24    Q    Do you recall Judge Shea advising you during the change of

02:34:37    25    plea hearing on the morning it had been set for trial of the

1    mandatory minimum sentence of the crime you had been indicted

2    with under 21 U.S.C. Section 846?

3    A    Yes.

4    Q    Why did you proceed to plead guilty, in light of the fact

02:35:06    5    that the judge had told you that there was a 10-year mandatory

6    minimum?

7    A    Based on the recommendation of Mr. Schweda.

8    Q    Was it -- what was your understanding about how

9    Mr. Schweda's paperwork or the documents that he would file with

02:35:30    10    the Court could change the potential minimum sentence -- or

11    excuse me, the required minimum sentence?

12    A    Because I -- because he told me that if I pled guilty,

13    based on those legal documents that he had, that that should be

14    the sentence that I should receive.

02:36:11    15    Q    That what should be the sentence that you received?

16    A    Five or less, 5 years or less.

17    Q    So when you heard the Court advise you of the 10-year

18    mandatory minimum, is it fair to say that you relied on

19    Mr. Schweda's advice in continuing to plead guilty?

02:36:55    20    A    That's right.

21    Q    When did you question the wisdom of your guilty plea?

22    A    Question what?  I'm sorry.

23    Q    When did you --

24         THE COURT:  Rephrase the question, please.

02:37:24    25         MR. MEEHAN:  Yes.

1    BY MR. MEEHAN:   (Continuing)

2    Q    When did you -- when did you start having questions about

3    the fact you had entered a plea of guilty?

4    A    Um, almost immediately.

02:37:40  5    Q    Okay.   Why was that?

6    A    Based on what the judge said, that the minimum sentence

7    would be 10 years.

8    Q    So after the plea hearing you began questioning whether

9    Mr. Schweda could get you the relief he said he could, in light

02:38:12  10    of what the judge had said?

11    A    That's right.

12    Q    When was it that you fully realized that you were not

13    likely to get the 5 years or less that Mr. Schweda had discussed

14    with you on the morning set for trial when you entered your

02:38:34  15    guilty plea?

16    A    After the PSR.

17    Q    Is that when you realized that it was highly unlikely that

18    you would get the 5 years or less Mr. Schweda had promised?

19    A    That's right.

02:38:59  20    Q    What about the presentence investigation report caused you

21    to reach that conclusion?

22    A    Uh, they were recommending between 200-and-some months to

23    300-and-some months.

24    Q    And what did that indicate to you?

02:39:33  25    A    That I was not going to get a sentence of 5 years or less.

1    Q    When did you begin questioning whether Mr. Schweda had

2    given you good advice about the potential for a sentence of 5

3    years or less?

4    A    Well, I questioned him about it.

02:40:04  5    Q    But when did you start having questions about whether that

6    was good advice?

7    A    Um, a few days after I pled guilty.

8    Q    Were those concerns then confirmed when you received the

9    presentence investigation report?

02:40:40  10    A    That's right.

11          MR. MEEHAN:  I have nothing further at this time, Your

12    Honor.

13          THE COURT:  Thank you.

14          Let's see.  Give me a second.

02:41:14  15          How is the interpreter doing?  Do you need a break?

16          THE INTERPRETER:  The interpreter is fine, Your Honor.

17    Thank you.

18          THE COURT:  Are you, or do you want a break?

19          THE INTERPRETER:  No, if we do more simultaneous, the

02:41:29  20    interpreter would need a break, but right now I'm fine.

21          THE COURT:  Well, let's see.  We've been going for an

22    hour and 15 minutes, and there is going to be a lengthy

23    cross-examination.  So why don't we take a break at this time.

24    Let's take 15 minutes.

02:41:40  25          Okay?

1              THE INTERPRETER:  Thank you, Your Honor.

2              THE COURTROOM DEPUTY:  Please rise.

3        Court is in recess.

4        (Recess taken: 2:41 p.m. to 3:00 p.m.)

02:41:54    5              THE COURTROOM DEPUTY:  Please rise.

6        (Call to Order of the Court.)

7              THE COURT:  Please be seated.  Let's resume.  Please be

8    seated.

9              Okay.  So let's see.  Let me get started here.

03:02:03   10              Okay, Ms. Van Marter.

11

12                         CROSS-EXAMINATION

13   BY MS. VAN MARTER:

14   Q     Good afternoon, Mr. Farias.

03:02:11   15   A     Good afternoon.

16   Q     You are 32 years old?

17   A     Yes.

18   Q     And you first came to the United States when you were 19?

19   A     Yes.

03:02:25   20   Q     And while -- during your time here in the United States,

21   you've had occasion to be in courtrooms before, correct?

22   A     Um, well, like one -- like some times, like maybe two or

23   three times, I think.

24   Q     And you've been in front of a judge before?

03:02:52   25   A     Yes.

1    Q    And you've pled guilty to crimes before; is that correct?

2    A    Yes.

3    Q    And you had the services of interpreters during those times

4    as well?

03:03:06    5    A    Yes.

6    Q    And you've also had occasion to be in front of immigration

7    court; is that correct?

8    A    That's right.

9    Q    You've talked to an administrator or administrative judge;

03:03:22    10    is that correct?

11    A    I don't understand the term.

12    Q    You had occasion to speak to somebody who discussed with

13    you matters of your deportation, correct?

14    A    Yes.

03:03:34    15    Q    And you also had the assistance of interpreters during

16    those times?

17    A    Yes.

18    Q    So how many times in total have you been in front of a

19    judge?

03:03:58    20    A    Um, three or four times.

21    Q    And how many times have you been in front of an immigration

22    court?

23    A    Just once.

24    Q    Okay.  And you understood you could ask questions during

03:04:10    25    those times, correct?

1    A    No.

2    Q    If you didn't understand, you couldn't ask a question?

3    A    Oh, no.  You mean like asking for an explanation or to

4    repeat the question?

03:04:37    5    Q    Yes.

6    A    Yes.

7    Q    And did you have a lawyer that helped you during those

8    times before?

9    A    When I was in front of the immigration court, no, I didn't

03:04:52    10    have one.

11    Q    When you were in front of criminal court, you had a lawyer?

12    A    Yes.

13    Q    On more than one occasion.

14    A    That's right.

03:05:08    15    Q    And in this particular case, you were arrested

16    December 2016.

17         Would you agree?

18    A    I was arrested in December but not in -- yes, 2016.

19    Q    And you appeared before a judge at the time of your arrest,

03:05:39    20    correct?

21         THE COURT:  Not at the time of his arrest, but --

22    BY MS. VAN MARTER:  (Continuing)

23    Q    I apologize.

24    A    No.

03:05:46    25    Q    You were brought to this courtroom and faced a judge just

1    after your arrest, correct?

2    A    Yes, the following day.

3    Q    And there was an attorney here to help you?

4    A    I was -- I had an attorney appointed to me.

03:06:08    5    Q    And the Court explained to you the maximum penalties that

6    you were facing, correct?

7    A    Uh, that day, the maximum penalty was not explained to me.

8    Q    You at least recall being advised that you were facing a

9    10-year mandatory minimum, correct?

03:06:32    10    A    Yes.

11    Q    And the Court explained to you the charges against you, the

12    second superseding indictment, correct?

13    A    Yes.

14    Q    And that you were charged with conspiracy to distribute

03:06:46    15    drugs, correct?

16    A    That's right.

17    Q    And there was more than one drug noted, correct?

18    A    Yes.

19    Q    But you only had knowledge and involvement in

03:07:00    20    methamphetamine, correct?

21    A    I don't understand your question.

22    Q    You were charged as being involved in a conspiracy that

23    involved methamphetamine, cocaine, and fentanyl and heroin,

24    correct?

03:07:26    25    A    Yes.  Yes, I was charged with that.

1    Q    And when you pled guilty to this Court, you told this judge

2    you only had knowledge about methamphetamine; is that correct?

3    A    That's right.

4    Q    And that is the drug that you admitted to being involved

03:07:44    5    with, correct?

6    A    Possession.

7    Q    Okay.  We'll get to that in just a minute.

8         But you recall being advised of those penalties shortly

9    after your arrest, correct?

03:07:56    10    A    Yes.

11    Q    And you had one attorney that ended up leaving, and you

12    ended up being represented by Mr. Schweda.

13         Do you recall all that?

14    A    Yes.

03:08:15    15    Q    And Mr. Schweda began to represent you in August of 2017,

16    correct?

17    A    Yes, that's right.

18    Q    And how many times did you meet with Mr. Schweda in person?

19    A    I don't remember how many times.

03:08:38    20    Q    More than once?

21    A    Yes.

22    Q    More than five times?

23    A    Maybe.

24    Q    And when you met with him, did you sometimes meet with him

03:08:50    25    for a long period of time?

1    A    Uh, maybe three hours; two, three hours, three hours and a

2    half.

3    Q    It varied; fair to say?

4    A    Yes.

03:09:16  5    Q    And during that time, did you have occasion to review a

6    plea agreement with him?

7    A    Yes.

8    Q    And who was there when the plea agreement was reviewed with

9    you?

03:09:35  10    A    Mr. Schweda and Mr. Valadez.

11    Q    And did they bring a copy of the plea agreement, the paper?

12    A    Yes.

13    Q    And did Mr. Valadez read what the paper said to you?

14    A    Paragraphs.

03:09:56  15    Q    And what did Mr. Valadez explain to you about that?

16    A    That -- he explained to me the reasons why -- I mean, the

17    reasons or the causes of why I should plead guilty to

18    conspiracy.

19    Q    Did Mr. Schweda explain those things to you with

03:10:29  20    Mr. Valadez's help?

21    A    The reasons, yes.

22    Q    And did you -- did they explain to you in that plea

23    agreement that it was a 10-year mandatory minimum offense?

24    A    Yes.

03:10:49  25    Q    And did Mr. Valadez read to you those penalties from the

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                    131
*Motion Hearing/September 9, 2019*
*Herrera Farias/X/Van Marter*

1    plea agreement?

2    A    No, not all of them.  Not the entire agreement.  Just a few

3    paragraphs.

4    Q    But did he read to you the penalties as one of those

03:11:16  5    paragraphs?

6    A    Yes.  If I accepted it, yes.

7    Q    I'm sorry.  I didn't understand that.

8    A    If I accepted the deal.

9    Q    Did he read to you the penalties in the plea agreement?

03:11:38  10         MR. MEEHAN:  Objection, Your Honor.

11         THE COURT:  I'm sorry?

12         MR. MEEHAN:  Asked and answered, Your Honor.

13         THE COURT:  No.  Overruled.

14    A    No.

03:11:47  15    BY MS. VAN MARTER:  (Continuing)

16    Q    He did not -- it's your testimony that Mr. Valadez did not

17    read to you the penalties in the plea agreement?

18    A    I'm sorry.  If I accepted the guilty plea, the punishment

19    would be 10 years.

03:12:14  20    Q    The mandatory minimum, you recall that?

21    A    No.  No.  I was told that if I accepted, I would get 10

22    years.

23    Q    What paragraphs did he read to you?  Do you recall?

24    A    I don't remember.

03:12:41  25    Q    Do you recall them explaining to you the relevance of

1    having a firearm?

2    A      No.

3    Q      Did they discuss with you the facts that were written in

4    the plea agreement?

03:13:09    5    A      Yes, a little bit.  We talked about that a little bit.

6    Q      And that was to represent the evidence the United States

7    had against you, correct?

8    A      Could you repeat that question, please?

9    Q      Did Mr. Schweda discuss with you the evidence the United

03:13:40   10    States had against you?

11    A      Not at that moment.  The only thing is what -- whatever the

12    deal showed.

13    Q      The deal had 10-plus pages that talked about --

14    A      But I repeat:  Not everything was read to me, just certain

03:14:14   15    paragraphs.

16    Q      The plea agreement had specific evidence the United States

17    had against you.

18           Was that reviewed with you?

19    A      Honestly, I don't remember.

03:14:35   20    Q      What did you understand the plea agreement to mean?

21    A      Basically, uh, if I accepted it, I would receive a 10-year

22    sentence.  That was my understanding.

23    Q      And did you want that plea agreement?

24    A      No.

03:15:11   25    Q      Why not?

1    A    I never asked for a guilty plea.

2    Q    Did you ask Mr. Schweda to get a sentence under that 10

3    years?

4    A    No.

03:15:32    5    Q    You never asked Mr. Schweda?

6    A    No.

7    Q    What did you tell him after they reviewed the plea

8    agreement?

9    A    Why was he bringing me a guilty plea if I had not asked for

03:15:53    10    one.

11    Q    Did you indicate at that point that you wanted to go to

12    trial?

13    A    After we read it, yes.

14    Q    And so from that point forward, did you meet with

03:16:08    15    Mr. Schweda and Mr. Valadez to prepare for trial?

16    A    That's right.

17    Q    Did you, during that time, review and discuss what things

18    you could do in your trial?

19    A    Yes.

03:16:31    20    Q    What defenses you could raise?

21    A    Yes.

22    Q    Did Mr. Schweda discuss with you different options and

23    different defenses?

24    A    We spoke about motions.  I don't know if you're talking

03:16:52    25    about that.

1   Q    And that's fair.  Motions.

2        Motions that represented things you talked about, right?

3   A    Okay.

4   Q    And he filed those motions on your behalf, correct?

03:17:09   5   A    That's right.

6   Q    Motions to try and take away some of the evidence, right?

7   A    That's right.

8   Q    And you sat through all of those hearings, correct?

9   A    Yes.

03:17:23  10   Q    Some of them were very long?

11   A    That's right.

12   Q    People testified, like you are today.

13   A    That's right.  That's right.

14   Q    And there was testimony about the search warrant at your

03:17:36  15   house in 2012, correct?

16   A    Yes.

17   Q    There was testimony about drugs?

18   A    That's right.

19   Q    Lots of drugs seized, correct?

03:17:52  20   A    Yes, there was testimony like that.

21   Q    And do you remember what quantities of drugs, how much?

22        THE COURT:  Excuse me.  Are you asking him what was

23   testified -- if he recalls --

24        MS. VAN MARTER:  If he recalls.

03:18:07  25        THE COURT:  -- what the testimony was?

1          MS. VAN MARTER:  Yes.

2          THE COURT:  Okay.  Do you understand she's asking you

3     what the testimony at those hearings was.  *Comprendo*?  Do you

4     understand?

03:18:27   5          THE WITNESS (through the interpreter):  In fact, I was

6     going to ask about that, if it was about that.  Do you want to

7     know if I remember, or do you want me to explain to you what I

8     remember of what they said?

9     BY MS. VAN MARTER:  (Continuing)

03:18:41  10    Q    Do you remember what they said in testimony about the

11    drugs?

12    A    Not everything.

13    Q    Okay.  And how many more times did you meet with

14    Mr. Schweda?

03:18:59  15          THE COURT:  After what?

16    BY MS. VAN MARTER:  (Continuing)

17    Q    After you reviewed the plea agreement with him.

18    A    No, I wouldn't know how many times.

19    Q    Again, more than five?

03:19:25  20    A    Um, I don't think so, but maybe.  Close to that.

21    Q    And during these times, did you also review the discovery

22    with Mr. Schweda?

23    A    Like -- discovery like evidence that I had or evidence that

24    the Government had against me?

03:19:47  25    Q    Evidence the Government had against you.

1    A    Yes.

2    Q    And you also obviously reviewed evidence that you wanted to

3    present, correct?

4    A    That's right.

03:20:02  5    Q    And you knew during this time that some of your

6    co-defendants had been entering guilty pleas, correct?

7    A    Yes, I knew that.

8    Q    And you knew some of them were even going to testify at

9    your trial, correct?

03:20:24  10   A    The attorney told me that, yes.

11   Q    And did Mr. Schweda review with you what they potentially

12   were going to say?

13   A    Uh, some parts.

14   Q    And during this time did Mr. Schweda discuss with you again

03:20:43  15   whether you should enter a guilty plea?

16   A    No, not during that time.

17   Q    So between the time when he reviewed the plea agreement

18   with you and all those meetings and hearings until the time you

19   actually entered your guilty plea, he never again discussed with

03:21:09  20   you resolving your case?

21   A    I don't understand your question.

22   Q    After you reviewed the plea agreement -- do you recall

23   that?

24   A    Yes.

03:21:29  25   Q    -- how many times did you discuss entering a guilty plea?

1    A    Never again, because I made it clear that I wanted to go to

2    trial.

3    Q    Did Mr. Schweda discuss with you after the time he reviewed

4    the plea agreement the types of penalties you would face if you

03:22:06    5    went to trial?

6    A    Yes.

7    Q    And what were those?

8    A    If I lost the trial, the maximum would be 20 years.

9    Q    The maximum would be 20 years?

03:22:21    10    A    That's what he said at that time.

11    Q    Did you not previously testify that he indicated to you it

12    would be 41 years to life?

13    A    No.

14    Q    You did not testify to that just earlier?

03:22:40    15         THE COURT:  Excuse me a second.  Make sure that you

16    understand what you're asking -- he understands what you're

17    asking him.

18    BY MS. VAN MARTER:   (Continuing)

19    Q    Did you earlier testify, when questioned by your attorney,

03:22:54    20    that you were told if you lost a trial you could be sentenced to

21    41 years to life?

22    A    That's what he told me the day of the trial, in the

23    morning, before trial began.

24    Q    And it's your testimony that before that he only told you

03:23:19    25    you would face a maximum of 20 years?

1    A    That's right.

2    Q    Even though the plea agreement you reviewed and your

3    arraignment in front of Judge Dimke advised you the maximum

4    penalty was life?  Do you recall that?

03:23:43    5    A    I honestly don't remember.

6    Q    Do you recall Mr. Schweda talking to you about your prior

7    drug conviction?

8    A    Yes.

9    Q    What did he tell you?

03:23:59    10         MR. MEEHAN:  Objection.  Your Honor, I believe that this

11    goes beyond the scope of the waiver.  Unless the question is

12    narrowed or limited, it goes beyond his purpose of pleading

13    guilty in just a general question of --

14         THE COURT:  Yeah, the general nature of it is such that

03:24:18    15    it might open something, so why don't you get more specific.

16         MS. VAN MARTER:  I'll rephrase.

17         THE COURT:  Thank you, Counsel.

18    BY MS. VAN MARTER:  (Continuing)

19    Q    What did Mr. Schweda discuss with you about your prior drug

03:24:27    20    conviction and an impact on your potential sentence?

21    A    That they could use it against me in trial.

22    Q    Did he also explain to you it could be used to enhance your

23    sentence?

24    A    No.

03:24:53    25    Q    Do you recall being advised at your arraignment in front of

1    Judge Dimke the penalties if an enhancement were filed about

2    your prior drug conviction?

3    A    I honestly don't remember.

4    Q    After you reviewed the written plea agreement with

03:25:16    5    Mr. Schweda, how many times did he discuss with you or give you

6    advice that you should consider changing your plea?

7    A    I think I already answered that question to you.  I mean,

8    you're asking me that after reviewing the guilty plea with him,

9    how many times we talked about the fact that I should plead

03:26:03   10    guilty.

11    Q    Yes.

12    A    And I told you that never again because I made it very

13    clear that I wanted to go to trial.

14    Q    And he explained to you the risks that you would face if

03:26:21   15    you were convicted at trial, correct?

16    A    Twenty years.

17    Q    And he explained to you the risks of going to trial all the

18    way up to the morning of, correct?

19    A    Could you repeat that question, please?

03:26:43   20    Q    I'll rephrase.

21         Every time he met with you in trial preparation do you

22    recall him discussing with you your potential sentencing risks?

23    A    We never talked about it every time.  It was just that

24    time.

03:27:09   25    Q    You never talked again about your sentencing exposure

1    during those meetings?

2    A    No, because it was clear that if I went to trial and I were

3    to lose at trial, the maximum I would get would be 20 years.

4    Q    The morning of your guilty plea, when you were speaking

03:27:41  5    with Mr. Valadez and Mr. Schweda, what did Mr. Schweda tell you

6    about entering a plea of guilty that morning?

7    A    What did Mr. Schweda say to me?

8    Q    Yes.

9    A    That if I were to lose at trial, I would get 40, 41, or

03:28:07  10    life.

11    Q    Did you ask him why that number was different than the 20

12    years before?

13    A    Yes.

14    Q    What did he say?

03:28:19  15    A    That the rules had changed.

16    Q    What rules?

17    A    I didn't ask that.

18    Q    The rules had changed how?

19    A    Um, I didn't ask that.  The only thing is that he -- he

03:28:57  20    said is that if I were to plead guilty, it would be according to

21    two types of conspiracy, and if I were to plead guilty, I could

22    face 5 years and a half or less.

23    Q    And it's your testimony that that was the first time he

24    ever discussed these two conspiracies with you?

03:29:16  25         THE INTERPRETER:  The interpreter forgot one part of the

USA v. Herrera Farias/4:15-CR-6049-EFS-16                  141
Motion Hearing/September 9, 2019
Herrera Farias/X/Van Marter

1    sentence.

2            MS. VAN MARTER:  Do you want me to repeat?

3            THE INTERPRETER:  No.  The previous response.

4        (Interpreter and witness conferring.)

03:29:25  5        THE INTERPRETER:  The complete answer was:  There were

6    two types of conspiracies, and if I were to plead guilty, it

7    would be 5 years and a half or less, according to the legal

8    documents that he had.

9    BY MS. VAN MARTER:  (Continuing)

03:29:38  10   Q    And it's your testimony that that was the first time you

11   discussed these two conspiracies with Mr. Schweda?

12   A    That's right.

13   Q    So when Mr. Schweda testified that you discussed it on

14   multiple occasions, you disagree?

03:30:01  15   A    No.

16   Q    And on the morning that he discussed the potential plea --

17           THE COURT:  That answer is unclear to me.  I'm not going

18   to -- that answer, it was "no."  So "no" could mean a couple of

19   different things.  If you want to leave it for argument, go

03:30:22  20   ahead.

21           MS. VAN MARTER:  I don't.

22           Now I'm just trying to remember what the question was.

23           THE COURT:  So on the morning of trial he -- excuse me.

24           (Reading realtime transcript feed):  And it's your

03:30:34  25   testimony that this was the first time you discussed the two

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    conspiracies with Mr. Schweda?

2         Yes.

3         So when Mr. Schweda testified that you had discussed it

4    on multiple occasions, you disagree?

03:30:48  5         No.

6         So ...

7         MS. VAN MARTER:  Thank you.

8         THE COURT:  That's not clear to me.

9         MS. VAN MARTER:  No.

03:30:55  10   BY MS. VAN MARTER:  (Continuing)

11   Q    Did you discuss with Mr. Schweda the multiple conspiracies

12   on more than one occasion?

13   A    Uh, are you asking before the trial?

14   Q    Yes.

03:31:19  15   A    No.

16   Q    So it's your testimony you never discussed that argument

17   before the day of your guilty plea?

18   A    That's what I just said.

19   Q    Mr. Schweda testified he discussed it with you on multiple

03:31:37  20   occasions.

21   A    I don't agree with his testimony.

22   Q    So he is not telling the truth?

23   A    Basically.

24   Q    And Mr. -- so the -- later that morning when you were

03:32:00  25   discussing your plea with Mr. Schweda, did Mr. Schweda indicate

1    to you he was ready for trial?

2    A    He told me that he was ready to go to trial.  That's right.

3    Q    And did he offer to proceed to trial?

4        THE COURT:  Excuse me.  I'm going to ask you to rephrase

03:32:40    5    that and don't use the word "offer."

6    BY MS. VAN MARTER:  (Continuing)

7    Q    Did he tell you he was ready to go upstairs and start

8    trial?

9    A    Yes.

03:32:52    10    Q    Did he tell you it was your choice if you wished to enter a

11    guilty plea?

12    A    Yes, he told me that it was my choice, but he also offered

13    me -- he spoke about offering me about and then he talked to me

14    about the two types of conspiracies.

03:33:21    15    Q    Did he tell you that you would still be facing the

16    mandatory minimum 10 years?

17    A    Not at that moment.

18    Q    Did he tell you at any moment that you were facing the

19    10-year mandatory minimum that day?

03:33:43    20    A    No.  I was -- I mean, if you're asking -- if you're asking

21    this, I was kind of like aware of it, but he didn't say anything

22    about it at that moment.

23    Q    How were you -- what were you aware of?

24    A    Well, that the minimum -- the mandatory minimum for the

03:34:25    25    conspiracy charge was 10 years, but he didn't say it or repeat

1    it at that point at all.

2    Q    So you knew before you entered your plea that the

3    conspiracy was still a 10-year mandatory minimum?

4    A    Yes, but he explained to me that there were two types of

03:34:57  5    conspiracies, and based on the papers that he had, I should

6    receive at the most 5 years.

7    Q    Did he explain to you that your guideline range was going

8    to be much higher than the 10 years?

9    A    Not at that moment, no.

03:35:19  10    Q    You keep saying "at that moment," so I want to make sure.

11    At any time the day you entered your plea, did he explain to you

12    that your guideline range would be higher than 10 years?

13    A    No, he didn't explain that to me.

14    Q    At any point in time when you met with Mr. Schweda, from

03:35:44  15    the beginning of his representation until the morning of your

16    plea, did he bring to you a guideline book, a big red book?

17    A    No.

18    Q    The morning you entered your guilty plea, did he explain to

19    you the risk of going to trial rather than accepting

03:36:13  20    responsibility?

21    A    Could you repeat the question, please?

22    Q    I'll repeat.

23    Did he explain to you that there would be a benefit if you

24    entered a plea of guilty that morning, on your guideline range?

03:36:31  25    A    Yes.

1  Q    What did he explain to you?

2  A    That I could get 5 years or less, based on the legal papers

3  that he had.

4  Q    And you do know that Mr. Schweda testified that he never

03:36:58  5  discussed with you or promised you those 5 years the morning you

6  pled guilty.

7       It's your testimony he's wrong?

8  A    Yes.

9       MR. MEEHAN:  Objection, Your Honor; misstates the

03:37:15  10  record.

11       THE COURT:  Overruled.  The answer stands.  The answer

12  was "yes."

13  BY MS. VAN MARTER:  (Continuing)

14  Q    And Mr. Valadez testified that Mr. Schweda explained to you

03:37:24  15  the high sentencing range you would face if you pled guilty that

16  morning.

17       And you disagree with that?

18  A    I disagree with that.

19       THE COURT:  Counsel, earlier you elicited testimony that

03:37:42  20  on the morning he was told it was 41 to life.

21       MS. VAN MARTER:  Correct.

22       THE COURT:  Okay.  So are you distinguishing between

23  statutory enhancements and guideline ranges?

24       MS. VAN MARTER:  Your Honor, I -- he had said that that

03:37:57  25  was some -- that is some of the advice they had given.  But when

1    I was asking him questions about whether he went over with him

2    that guideline range on a second time, he said no.  So he's

3    contradicting himself.

4         THE COURT:  Okay.  That's up to you.  But I have 41 to

03:38:10    5    life that they told him.  So ...

6    BY MS. VAN MARTER:   (Continuing)

7    Q    But you earlier testified that Mr. Schweda told you your

8    sentencing range could be 41 years to life if you lost at trial.

9    A    Could you -- could you repeat the question again?

03:38:35   10    Q    Mr. Schweda the morning you pled guilty explained to you

11    that your likely sentence, if you lost at trial, would be very

12    high, correct?

13    A    Yes.

14    Q    Forty-one years to life?

03:38:54   15    A    That's right.

16    Q    He explained if you pled guilty, your sentencing range

17    would still be very high, correct?

18    A    No.

19    Q    And that is what you disagree with in Mr. Schweda's

03:39:09   20    testimony, correct?

21    A    That's right.

22    Q    And you disagree that Mr. -- with Mr. Valadez on that same

23    point, correct?

24    A    That's right.

03:39:25   25    Q    When you went in to face the judge to enter your plea of

1   guilty, do you recall that?

2   A    Yes.

3   Q    Do you recall being placed under oath?

4   A    That's right.

03:39:38   5   Q    Swearing to tell the truth?

6   A    Yes.

7   Q    And you started with the Court and then asked to take a

8   break to speak to your lawyer.

9        Do you recall that?

03:39:55   10   A    That's right.

11   Q    And before you took the break, Judge Shea read to you the

12   charge you were pleading guilty to.

13        Do you recall that?

14   A    Yes.

03:40:10   15   Q    And he told you you would be pleading guilty or had

16   requested to plead guilty to conspiracy to distribute

17   methamphetamine, cocaine, heroin, and fentanyl.

18        Correct?

19   A    Yes.

03:40:28   20   Q    And you asked for a moment to speak to your lawyer.

21   A    That's right.

22   Q    And why did you want the moment to speak to your lawyer?

23   A    Because I was not sure if I should plead guilty.

24   Q    Did you understand the charge as the Court read it to you?

03:40:57   25   A    That's the reason why I was hesitant about pleading guilty.

1    Q    So you took a moment to ask questions, correct?

2    A    Exactly.

3    Q    And you asked questions about the conspiracy to distribute

4    drugs charge, correct?  Did you ask Mr. Schweda about the charge

03:41:18    5    you were pleading guilty to?

6    A    Yes, I asked because I -- I had questions, and, in fact, I

7    asked him several questions.

8    Q    And what kind of questions did you ask him?

9    A    About -- about, well, I wanted to ask him to make sure that

03:42:18    10    if I pled guilty, uh, even though they had said that the

11    mandatory minimum was 10, if I were to plead guilty, if I could

12    still get the 5 years or less, based on the documents and the

13    laws that he talked about.

14    Q    And Mr. Schweda explained to you he could make the

03:42:34    15    argument, correct?

16    A    That's right.

17    Q    And he explained to you he would try and make the argument

18    to the Court, correct?

19    A    Uh, yes, I think so, although I don't understand all the

03:42:57    20    terms you use.  I mean, there are a lot of terms that I don't

21    understand.

22    Q    He explained to you that he would raise that argument to

23    the Court but the judge would decide, correct?

24    A    Well, he didn't explain that reason to me at that moment.

03:43:35    25    He basically made me believe that I was going to be able to get

1    5 years, 5 years or less.

2    Q    He -- he had explained to you that the judge was going to

3    decide your sentence, correct?

4    A    Not at that moment.

03:43:52    5    Q    The judge explained to you that the judge would be the one

6    to decide your sentence, correct?

7    A    Let's see.  I don't know if I'm explaining myself.  I do

8    know that the judge is the one who will sentence me.

9    Q    And you know that the judge has discretion, then, to listen

03:44:26    10    to both parties and decide what's the best sentence, right?

11    A    I imagine that that's the way it should be done, yeah.

12    Q    That your attorney doesn't decide your sentence, correct?

13    A    I understand that.

14    Q    And you've been sentenced before a judge before, correct?

03:44:55    15    A    Yes.

16    Q    And you knew that the judge decided your sentence then,

17    correct?

18    A    That's right.

19    Q    So you had a moment to speak to your attorney and ask

03:45:06    20    questions, correct?

21    A    Yes.

22    Q    And then you asked --

23    A    Yes.

24    Q    You asked to finish your plea and enter your guilty plea,

03:45:18    25    correct?

1    A    Yes.

2    Q    And when you came back before the Court, the judge advised

3    you again the charge, correct?

4    A    Yes.

03:45:37    5    Q    And that was conspiracy to distribute methamphetamine,

6    cocaine, heroin, and fentanyl, correct?

7    A    Yes.

8    Q    And the judge explained to you it was a mandatory minimum

9    10-year offense up to life, correct?

03:45:57    10    A    Yes.

11    Q    And you said you understood that.

12    A    Yes.

13    Q    And you said that you had met with your attorney on several

14    occasions prior to that, correct?

03:46:08    15    A    Yes.

16    Q    And that you were satisfied with his advice, correct?

17    A    Until that moment.

18    Q    In court the morning of your change of plea?

19    A    Yes.

03:46:26    20    Q    Did you ask the Court about this other conspiracy?

21    A    No.

22    Q    And the judge advised you that those were the maximum

23    penalties, correct?

24    A    Yes.

03:46:46    25    Q    And that you still had the 10-year mandatory minimum,

1    correct?

2    A    That's right.

3    Q    And the judge reviewed with you your rights to go to trial

4    that day, correct?

03:46:59    5    A    That's right.

6    Q    That there was a jury waiting in the other room, correct?

7    A    That's right.

8    Q    And that you did not have to plead guilty, correct?

9    A    That's right.

03:47:11    10    Q    And if you chose to plead guilty, you would be waiving

11    those rights, correct?

12    A    That's right.

13    Q    And you knew that the Government had their witnesses

14    prepared for trial, correct?

03:47:25    15    A    Yes.

16    Q    To include co-defendants, correct?

17    A    Yes.

18    Q    And you knew that your attorney was prepared to go forward

19    to trial, correct?

03:47:43    20    A    That's what we -- that's what he told me, but I don't

21    believe so.

22    Q    He had met with you on several occasions to prepare for

23    trial, correct?

24    A    That's right.

03:47:54    25    Q    He collected evidence that you would like to admit on -- on

1    your behalf, correct?

2    A    Yes.

3    Q    He talked to witnesses, correct?

4    A    That's right.

03:48:06    5    Q    He had an investigator?

6    A    Yes.

7    Q    And Mr. Valadez did things to assist in preparing for

8    trial, correct?

9    A    I believe so.

03:48:24    10    Q    And you told the Court you understood but wanted to proceed

11    with a guilty plea, correct?

12    A    Yes.

13    Q    And you wanted to admit to being involved in a conspiracy

14    to distribute methamphetamine specifically, correct?

03:48:49    15    A    What is your question entails [sic]?  I'm sorry.

16    Q    You wanted to admit to the methamphetamine, but you wanted

17    to argue your knowledge as to the other drugs, correct?

18    A    I don't really understand.

19    Q    When you were talking to the judge about why you were

03:49:15    20    guilty of conspiracy, do you recall that?

21    A    Yes.

22    Q    You didn't agree with all of the Government's evidence,

23    correct?

24    A    That's right.

03:49:30    25    Q    You wanted to just admit certain facts, correct?

1    A    Yes.

2    Q    Specifically involving methamphetamine, correct?

3    A    Yes, and that's why -- that's why I spoke with my attorney

4    again.

03:49:55    5    Q    Because you had questions about that?

6    A    Exactly.

7    Q    And you asked your attorney those questions?

8    A    Yes.

9    Q    And then you asked to proceed with your guilty plea,

03:50:06    10    correct?

11    A    Yes.

12    Q    And your attorney, on your behalf, explained what you would

13    admit to and what you disagreed with, correct?

14    A    Yes.

03:50:22    15    Q    Which ultimately led to you admitting to being a member of

16    this conspiracy?

17    A    That's right.

18    Q    Along with Ivan Calvillo, correct?

19    A    Yes.

03:50:35    20    Q    And the Court read to you the charge again in total.

21         Do you recall that?

22    A    Yes.

23    Q    And asked what your plea was?

24    A    Yes.

03:50:48    25    Q    And what did you say?

*USA v. Herrera Farias/4:15-CR-6049-EFS-16*                    154
*Motion Hearing/September 9, 2019*
*Herrera Farias/X/Van Marter*

1    A    "Guilty."

2    Q    And you also agreed that your involvement in this

3    conspiracy involved more than 500 grams of methamphetamine,

4    correct?

03:51:23  5    A    Well, when I pled guilty, I believe -- I believe so.

6    Q    And, in fact, the Court told you your offense level was

7    unknown but would likely be a 38, correct?

8    A    Yes, that's correct.

9    Q    And you understood that to be a very high offense level,

03:51:50  10    correct?

11    A    Yes.

12    Q    And at no point in time did you ask the Court about a

13    5-year conspiracy, correct?

14    A    No, not really.

03:52:05  15    Q    And the Court gave you several options to speak to your

16    attorney if you needed it, correct?

17    A    Yes.

18    Q    And if you had any questions or concerns, correct?

19    A    Yes.

03:52:21  20    MS. VAN MARTER:  Your Honor, if I could just have a

21    moment?

22    THE COURT:  Sorry?

23    MS. VAN MARTER:  Just one moment?

24    THE COURT:  Sure.

03:52:27  25    (Counsel conferring.)

1      MS. VAN MARTER:  I don't have any other questions, Your

2  Honor.

3      THE COURT:  When you inquire, one of you needs to ask

4  about these, quote, documents, end of quote.

03:52:48  5      MS. VAN MARTER:  I can ask that, Your Honor.

6      THE COURT:  Go ahead.

7  BY MS. VAN MARTER:  (Continuing)

8  Q     You've referred several times to documents that Mr. Schweda

9  talked about for these other conspiracies.

03:53:04  10  A     That's right.

11  Q     What are you referring to?

12  A     Well, he told me that there were two types of conspiracies,

13  and that I should not be receiving the mandatory minimum of 10

14  years, that I should receive the 5 -- 5 years or less as a

03:53:55  15  minimum because there were different codes in the law.

16  Q     So when you say "documents," are you referring to the

17  different codes in the law?

18  A     Well, I'm talking about the fact that he had everything

19  prepared.  I think that he had already prepared everything, and

03:54:26  20  he had already printed some documents about that.

21  Q     So when you say he prepared documents, was it a motion?

22  A     I believe so.

23  Q     So the documents you're referring to was a motion that had

24  his argument contained in it?

03:54:50  25  A     Yes.

1   Q    So he showed you what he intended to file to the Court?

2   A    Yes.

3   Q    And those were the same types of arguments he raised for

4   you at sentencing?

03:55:16  5   A    Well, when you talk about documents, I never saw them

6   physically, but that's what he told me.

7   Q    Okay.  So the documents were a motion he prepared to file

8   for you?

9   A    That's right.

03:55:29  10   Q    About this argument on conspiracies.

11   A    That's right.

12   Q    And he had previously done the same thing when he talked

13   about other motions he was going to file for you, correct?  He

14   discussed with you those documents?

03:55:49  15   A    Yes.

16        MS. VAN MARTER:  Does that answer the Court's question?

17        THE COURT:  Thank you.

18        Redirect.

19        By the way, do we anticipate re-calling either of you

03:56:05  20   the witnesses outside?

21        MS. VAN MARTER:  No, Your Honor.

22        THE COURT:  Perhaps we should release them so they can

23   get started back to Spokane.

24        Excuse me.  Would you do that?  Let Mr. Schweda and

03:56:18  25   Mr. Valadez know that they're released, and that they are free

1    to leave.

2              COURT SECURITY OFFICER:  Okay, Your Honor.

3              THE COURT:  Is that okay with you?

4              MR. MEEHAN:  Yes, Your Honor.

03:56:27  5              MS. VAN MARTER:  Yes, Your Honor.

6              THE COURT:  Okay.  Thank you.

7

8                     REDIRECT EXAMINATION

9    BY MR. MEEHAN:

03:56:32  10   Q    Mr. Herrera Farias, you're not an attorney, correct?

11   A    No.

12   Q    Do you know the technical differences between a motion and

13   a legal memorandum?

14   A    Honestly, I don't.

03:56:48  15   Q    So when you talk about documents that Mr. Schweda had

16   prepared and referred to them as a motion, do you mean just

17   documents he was going to file with the Court?

18   A    I think that he would have to file them in court to make

19   sure that the 5 years or less could be valid.

03:57:28  20   Q    Okay.  Are you aware of whether Mr. Schweda could have been

21   referring to the sentencing memorandum he intended to file?

22   A    Uh, no, no -- well, as I said, I'm not an attorney, and I

23   don't know anything about legal terminology.

24             THE COURT:  Counsel, for your benefit, my concern was I

03:57:55  25   didn't -- I wanted to make sure that we weren't dealing with

1    those documents, Ms. Van Marter, that were produced late in the

2    case.  And the question was what were you going to do with them

3    at trial, and then there was discussion about how to use them at

4    sentencing, and I wasn't sure how they fit into any of this.

5    But those were the documents that he produced from Mexico, and I

6    had no clue how -- I don't believe they impact this case and

7    this posture or this issue, but I wanted to understand what

8    "documents" meant to this defendant.  That's all.  Okay?  I'm

9    done.

10        MR. MEEHAN:  Your Honor, my understanding is that "the

11   documents" mean that some form of documents that Mr. Schweda was

12   to prepare and file with the Court.

13        THE COURT:  May well be.  The word "documents" is

14   amorphous.  It has no boundaries.  It could mean anything.

15   BY MR. MEEHAN:  (Continuing)

16   Q    When you've been talking about documents that Mr. Schweda

17   discussed with you in regard to the conspiracy under 18 U.S.C.

18   371 in which you would receive 5 years or less, are you using

19   the term "documents" just generically as documents he would

20   prepare and file with the Court?

21   A    I am using the word "document" to refer to the motion -- I

22   mean to the types of conspiracy.

23        MR. MEEHAN:  Nothing further at this time, Your Honor.

24        THE COURT:  Anything else?

25        MS. VAN MARTER:  No, Your Honor.

1    THE COURT:  Please step down.

2    THE WITNESS (through the interpreter):  Thank you.

3    THE COURT:  Counsel, I want to make sure that you have

4  an opportunity to argue your case.

03:59:51   5    I do want to point out to you the case of *United States*

6  *v. Frost.*  I believe it's unpublished, but it's a district court

7  case out of Montana in 2005, 2005 WL 8153884 by Judge Cebull,

8  C-E-B-U-L-L, district court.  Page 3 of that headnote -- well, I

9  guess it must be Page 4, but it's Paragraph 5, motion to dismiss

04:00:45  10  indictments deals with 18, United States Code, Section 371 and

11  21, United States Code, Section 846 where he says, quote,

12  "However, the defendant's arguments concerning 18, United States

13  Code, Section 371 are irrelevant because she's not charged with

14  violating 18, United States Code, Section 371 but with 21,

04:01:08  15  United States Code, Section 846, which is cited in both the

16  caption and in the body of Count 1," and then he -- end of

17  quote.  He then cites 21, United States Code, Section 846 and

18  the other sections and that relates to it.  But the essence of

19  it is he distinguished between the two, and you need to take a

04:01:37  20  look at that.

21    My preference here is that you provide me with written

22  arguments.

23    What would you think a date and -- a length and a date

24  should be?  Because there's been a lot of testimony, and I don't

04:01:52  25  want to put you in a spot with having to review all your notes

1    and then making an argument.

2              So how much time do you think you'll need to review your

3    notes and prepare a memorandum, and how long would you like it

4    to be?  I'm thinking at least a couple of weeks, but you tell

04:02:10   5    me.

6              MR. MEEHAN:  Your Honor, due to scheduling issues

7    upcoming, we would ask for four weeks and ten pages.

8              THE COURT:  Thirty days is okay with me.

9              MS. VAN MARTER:  It's fine with the United States, Your

04:02:28   10    Honor.

11              THE COURT:  Thirty days?  Yeah, and it will be a joint

12    submission.  You don't have to file it -- typically if I give

13    you 30 days, it will be filed in 30 days, but feel free to file

14    it before that date, if you wish to do it.  It would be a rarity

04:02:41   15    to have that happen, but you have 30 days to file it, if you

16    wish.  It's not a matter of filing and responding and replying.

17    It's a matter of simply filing.  So there will be no response or

18    replies.  Each party gets to make their final argument, and I'll

19    read them, of course, and go from there.

04:02:58   20              I encourage you to comment on that case I cited you and

21    any other cases you could find.  We could find no others.  There

22    was some reference to some case in the Ninth Circuit that was

23    raising this theory.

24              So why don't you folks -- is there anything else for the

04:03:18   25    good of the order before we complete this matter?

1          MS. VAN MARTER:  Not from the United States, Your Honor.

2          THE COURT:  Okay.  Mr. Herrera Farias, I'm going to give

3    each party an opportunity to write out the reasons that they

4    think I should decide in favor of the Government or for you.  So

04:03:35  5    your attorney will tell me in writing what he thinks I should do

6    and why, and the Government will tell me what it thinks I should

7    do and why.

8          Do you understand?

9          THE DEFENDANT (through the interpreter):  Yes.

04:03:47  10          THE COURT:  And because there's been so much testimony

11   and a couple of exhibits and a case I've cited, I want to give

12   the parties time to consider everything and then carefully argue

13   their positions, so that's why I'm giving them 30 days.  There

14   will not be another hearing to do that.  You'll simply submit

04:04:09  15   the documents to me, and then I will make a decision, probably

16   within 30 days from that, but it may be less.

17          So anything else?

18          MS. VAN MARTER:  No, Your Honor.

19          THE COURT:  Length?  Length of memorandum?

04:04:25  20          MS. VAN MARTER:  You know the Court knows that I tend to

21   be wordy, so I will defer to how long the Court wants the length

22   to be.

23          THE COURT:  Not anywhere close to others I've seen on

24   the other side of the aisle.  But I'm thinking 20 pages should

04:04:40  25   be more than adequate.

1    MS. VAN MARTER:  That should be more than adequate.

2    THE COURT:  Don't you think?

3    MR. MEEHAN:  Yes, Your Honor.

4    THE COURT:  Okay.  Fair enough.

04:04:53    5    All right, folks.  Thank you very much.  Court is

6  adjourned.  You may go about your business.

7    (Hearing concluded at 4:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                    C E R T I F I C A T E

2

3      I, KIMBERLY J. ALLEN, do hereby certify:

4           That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7           That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9           That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12          I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15          DATED this 13th day of September, 2019.

16

17

18

19  _____

20  Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
    Washington CCR No. 2758
21  Official Court Reporter
    Richland, Washington
22

23

24

25
</pre>